UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, MELISSA MAYS, AMERICAN
CIVIL LIBERTIES UNION OF MICHIGAN,
and NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

               Plaintiffs,

v.

                                      Case Number 16-10277
                                      Honorable David M. Lawson

NICK A. KHOURI, FREDERICK HEADEN,
MICHAEL A. TOWNSEND, DAVID
MCGHEE, MICHAEL A. FINNEY,
BEVERLY WALKER-GRIFFEA, NATASHA
HENDERSON, and CITY OF FLINT,

               Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

     Three organizations advocating on behalf of the citizens of Flint, Michigan, and a Flint

resident, have turned to the federal courts for relief from the hardship visited on the population

caused by the mishandling of the City's water treatment and distribution system.  The targets of their

lawsuit are the Michigan treasurer and members of the Flint Receivership Transition Advisory Board

(RTAB) (the State defendants), and the City of Flint and its city administrator (the Flint defendants).

Both defendants have filed motions to dismiss, arguing, among other things, that the federal district

court should not, or cannot, get involved, and the plaintiffs should be content with the remedial

course charted by the Environmental Protection Agency.  The Court disagrees.  For reasons

explained below, the Court believes that it should not defer to the EPA's "primary jurisdiction" to

address the plaintiffs' complaints, the lawsuit is not a disguised appeal of the EPA's January 2016

order, the relief the plaintiffs seek is, in the main, prospective and the Eleventh Amendment does

not bar this lawsuit against the State defendants, the individual members of the RTAB are proper defendants under the Safe Drinking Water Act (SDWA) because they exert control over the financial decisions affecting the operation of the Flint water system, and the complaint states viable claims for relief.  The motions to dismiss will be denied.

I.

According to the allegations in the complaint, the water in Flint, Michigan is not safe to drink and has not been safe to drink since April 2014.  The plaintiffs allege that in November 2011, in response to Flint's budget deficit and mounting debt, Governor Rick Snyder declared a financial emergency in the city and appointed an emergency manager to take over and run the city's operations.  In order to save the city money, the plaintiffs contend, the emergency manager switched the city's drinking water source from Lake Huron to the Flint River, a water source known to be contaminated by nearby industries.  The city and state officials allegedly failed to follow the federal requirements for treating and testing drinking water for lead under the SDWA.  The plaintiffs maintain that the caustic Flint River water corroded the city's aging metal pipes and destroyed the protective coating that had formed over many years, causing lead to leach into the drinking water. The plaintiffs maintain that even though the defendants have stopped using the Flint River as the city's drinking water source in October 2015, the city's water remains unsafe to drink, wash with, and bathe in. The plaintiffs assert that the residents of Flint have been exposed and are still being exposed to high levels of lead in their water, and in the past two years, the percentage of Flint children with elevated levels of lead in their blood has doubled and nearly tripled in some areas.

The complaint sets forth the plaintiffs' view of the political history that emerged as a result of Flint's financial travails.  In November 2011, the City of Flint was put into a state-controlled

receivership.  Local government officials were stripped of authority in favor of state-appointed personnel.  Between November 2011 and April 2015, Flint had four successive emergency managers, who were vested with broad powers to address the city's financial emergency, including authority over the city budget.  In early 2015, the emergency manager gave defendant Natasha Henderson full authority to direct and supervise the day-to-day operations of the city, including authority to direct the head of the Department of Public Works and manage the operations of the water system.  Flint's Utilities Department is responsible for the supply and maintenance of water services, which reports to the Department of Works.  The plaintiffs maintain that defendant Henderson has directed the operation of the water system, managed the purchase of water meters, plumbing supplies, and chemicals to treat Flint River water at the treatment plant.  She also allegedly decided that Flint could enter into a contract with the consultants to provide design, procurement, and construction services to the Flint water treatment plant.

On April 28, 2015, Governor Snyder removed the emergency manager and replaced him with an appointed Receivership Transition Advisory Board to continue to manage the city's affairs along with the city officials for the duration of the receivership.  The plaintiffs contend that since its inception, the RTAB has made a number of decisions directing the operation of the Flint water system.  In August 2015, the RTAB allegedly decided that Flint could enter into a multi-year environmental monitoring services contract with a testing laboratory and decided to allow Flint to purchase chemicals to be used to treat water at the water treatment plant.  It further decided whether Flint could purchase water distribution pipe repair parts for use in maintaining the water system.

-3-

The plaintiffs allege that the RTAB is the primary, but not exclusive, state entity that managed Flint's operations during the receivership.  They also allege that the State Treasurer, defendant Nick A. Khouri, manages aspects of the city's operations.  For example, the Mayor and the City Council cannot amend the budget that was adopted by the emergency manager without approval of both the RTAB and the State Treasurer.  The plaintiffs further maintain that the State Treasurer exerts control over the Flint water system by having the final authority to decide whether the water system can make large operational changes that involve budget amendments.  In early 2014, the State Treasurer decided whether Flint could expend more than $3 million to upgrade its water treatment plant to allow Flint to use the Flint River as its primary drinking water source.  And, the plaintiffs allege, the State Treasurer exercised final decision-making power over the water system's choices about where to get its drinking water.  The plaintiffs allege that the Mayor and the City Council were stripped of all authority except as specifically authorized in writing by the emergency manager prior to the elimination of the position last spring.

The plaintiffs allege that in March 2013, Flint's City Council voted to join the Karegnondi Water Authority (KWA), a newly formed water supply system that would have a new operational pipeline available in June 2016.  The City Council's vote to join the KWA could only be authorized by the emergency manager and State Treasurer.  The plaintiffs allege that the State Treasurer rejected Detroit's final offer to continue to receive water from Detroit while the KWA pipeline was completed.

The problem, the plaintiffs contend, was that the City of Flint had not treated its own water on a regular basis for nearly fifty years.  And it had never undertaken the analysis required by the SDWA to identify and understand how a water system optimizes corrosion control treatment for

-4-

drinking water.  The plaintiffs allege that in 2011, outside consultants for the city analyzed whether the Flint River could be used as the city's permanent primary source of drinking water.  The consultants allegedly concluded that it would require about $50 million in upgrades to the equipment and systems to assure reliable and safe drinking water to customers.   Nonetheless, the plaintiffs allege, the water system was not upgraded with all of the recommended improvements in advance of distributing the Flint River water to customers' homes in 2014.  And the water was distributed without any treatment to reduce its corrosivity and to minimize the leaching of lead from the pipes and solder into the drinking water.

The plaintiffs allege that Flint residents began raising concerns about the safety of their drinking water nearly two years ago.  However, government officials dismissed their concerns and insisted that the water was safe to drink.  The state officials allegedly disregarded researchers' findings that the water contained dangerously high levels of lead.  The plaintiffs allege that the damage done to the city pipes from the Flint River water means that lead will continue to contaminate Flint's drinking water unabated.  The ongoing contamination, the plaintiffs allege, poses an ongoing health risk to city residents and in particular young children, who are the most vulnerable to the effects of lead.

On October 1, 2015, the plaintiffs petitioned the United States Environmental Protection Agency (EPA) to issue an emergency order in response to Flint's water crisis as authorized by the SDWA.  On January 21, 2016, the EPA issued an Emergency Administrative Order (EPA Order) directing Flint and the State of Michigan to take certain steps to begin to address the crisis, including providing certain information to the public on a website and to the EPA, planning for optimization of water treatment to control corrosion, and retaining personnel qualified to ensure compliance with

the SDWA's requirements.  The purpose of the EPA Order was to "make sure" that the defendants take "actions to protect public health . . . immediately."

The plaintiffs filed the present action on January 27, 2016 alleging violations of certain federal regulations enacted under the Safe Drinking Water Act, 42 U.S.C. §§ 300f, *et seq*.  They bring four separate claims: (1) Violations of the SDWA's requirement to operate and maintain optimal corrosion control treatment, 40 C.F.R. §§ 141.81 .82; (2) violations of the SDWA's requirements for monitoring tap water for lead, 40 C.F.R. § 141.86; (3) violations of the SDWA's reporting requirements, 40 C.F.R. § 141.90; and (4) violations of the SDWA's notification requirements, 40 C.F.R. § 141.85.  The plaintiffs are seeking a judgment declaring that all of the defendants are in violation of their obligations under the SDWA and its implementing regulations. They also ask to enjoin the defendants from ongoing and future violations of the SDWA and its implementing regulations, ordering the defendants to take all such actions to remedy the violations of the SDWA, and ordering a complete replacement of all lead service lines in the water system at no cost to customers of the water system.  The plaintiffs also ask for preliminary injunctive relief to address the immediate concerns of Flint residents' need to access safe water for drinking and household needs.

Upon filing, the case was assigned to another judge in this district, who disqualified himself at the defendants' request on April 26, 2016.  The defendants responded to the complaint with motions to dismiss under Federal Rule of Civil Procedure 12(b)(1) & (6).  This Court heard oral arguments on those motions on May 13, 2016.

II.

A.

The Flint defendants argue in their motion to dismiss that this Court lacks subject matter jurisdiction because the plaintiffs in reality are seeking review of a final order issued by the EPA, which must be taken to a circuit court, not a district court.  They invoke Federal Rule of Civil Procedure 12(b)(1), which "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014).  This challenge amounts to a "factual attack" on the Court's jurisdiction, because a determination requires consideration of evidence not included in the complaint. *Ibid.*  That evidence here consists of the EPA's emergency administrative order dated January 21, 2016.  "In the case of a factual attack, a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case." *Id.* at 759-60.  The "[p]laintiff bears the burden of establishing that subject matter jurisdiction exists." *Id.* at 760 (citing *DLX, Inc. v. Commonwealth of Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004)).

On January 21, 2016, the EPA's Office of Enforcement and Compliance Assurance issued an emergency administrative order, in which it found that the "Respondents"      the City of Flint, the Michigan Department of Environmental Quality, and the State of Michigan      had operated the Flint Water System in such a way as to introduce contaminants into the system that "present[ed] an imminent and substantial endangerment to the health of persons" who had a right to assume that the water was safe for human consumption.  EPA Emergency Admin. Order ¶¶ 45, 33 (Jan. 21, 2016).  The EPA then ordered the Respondents to engage in certain reporting and information disclosure

-7-

requirements, respond to the Flint Task Force recommendations, and comply with various water treatment obligations. The EPA also directed the Respondents to submit a plan to address corrosion control and water quality parameters, and it prohibited the transition to a new water source unless certain conditions had been fulfilled. The parties bound by the EPA's order are the "Respondents and their officers, employees, agents, successors and assigns." *Id.* ¶ 65. The order was "a final agency action by EPA." *Id.* ¶ 74.

The Flint defendants argue that the plaintiffs' complaint is an implicit request for judicial review of the EPA Order, and therefore this Court lacks subject matter jurisdiction, because under the SDWA a petition for judicial review of a final action by the Administrator of the EPA can only be reviewed by the circuit court in which the petitioner resides. They reason that granting *any* of the relief requested by the plaintiffs would necessarily differ from that of the EPA and would be substituting the Court's judgment for that of the EPA in several areas. For one, they say that the EPA did not find that the defendants violated the various provisions of the Lead and Copper Rule, 40 C.F.R. § 141.80, *et seq.*, as the plaintiffs contend. They also point out that the plaintiffs seek relief that exceeds the scope of that ordered by the EPA. And the Flint defendants observe that the injunctive relief that the plaintiffs seek     including replacement of all of the lead pipe service lines (privately owned lines included), and equitable relief to mitigate the health and medical risks from the defendants' violations     goes beyond what the EPA determined was necessary to protect the health of Flint residents. The Flint defendants argue that granting these requests amounts to judicial review of the EPA Order.

Congress has allocated the responsibility for reviewing EPA actions under the SDWA among the various circuit and district courts. A final EPA action under that Act "may be filed in the circuit

in which the petitioner resides or transacts business which is directly affected by the action." 42 U.S.C. § 300j-7(a)(2). That statute, however, does not directly answer the question of this Court's subject matter jurisdiction.

Subject matter jurisdiction refers to "the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (emphasis in original). Federal courts have "the authority to decide cases that the Constitution and Congress have empowered them to resolve." *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 474 (6th Cir. 2008). Congress has empowered district courts to hear civil actions against a city or state government by citizens brought under the SDWA, subject to two conditions. 42 U.S.C. § 300j-8(a). First, the plaintiffs may not file a suit 60 days before giving notice of the violation to the Administrator of the EPA, the alleged violator, and the state in which the violation is occurring. 42 U.S.C. § 300j-8(b)(1). Second, a civil action may not commence "if the Administrator, the Attorney General, or the State has commenced and is diligently prosecuting a civil action *in a court of the United States* to require compliance with such requirement." 42 U.S.C. § 300j-8(b)(2) (emphasis added).

The plaintiffs filed the present action more than 60 days after giving notice of the alleged violations to the relevant parties and no civil actions have commenced by the Administrator of the EPA, the Attorney General, or the State of Michigan against the Flint defendants. The plaintiffs say that *Jones v. City of Lakeland, Tennessee*, 224 F.3d 518 (6th Cir. 2000) (en banc), supports their position. In that case, the court held that a provision of the Clean Water Act, which prevented a private action when the EPA or a state agency was "diligently prosecuting" an enforcement action, did not bar the plaintiffs' lawsuit against a local city for polluting a creek. The state agency had issued a number of compliance orders. But the court held that the preclusion language barred a

citizen-suit only if the agency was "diligently prosecuting an enforcement action *in a court of the United States or of a State*." *Id.* at 522 (emphasis added). Because the state administrative agency was prosecuting the action on its own authority and not in a federal or state court, the citizen suit was allowed to proceed.

The Flint defendants acknowledge that the SDWA, 42 U.S.C. § 300j-8(a)(1), authorizes citizen-suits. Nonetheless, they insist that citizen-suits are prohibited by 42 U.S.C. § 300j-8(e) when the suit amounts to judicial review. In fact, that statute explicitly prohibits judicial review of agency actions "except as provided in section 300j-7 of this title." 42 U.S.C. § 300j-8(e). They argue that *Jones* is distinguishable because the Clean Water Act does not contain a blanket prohibition on using citizen suits to judicially review EPA orders like the SDWA's section 300j-8(e).

That distinction is not persuasive. Although the Clean Water Act does not contain an express provision for judicial review of EPA compliance orders, compliance orders issued by the EPA are reviewable in district courts under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq*. *Sackett v. E.P.A.*, 132 S. Ct. 1367, 1374 (2012) (The Administrative Procedure Act "creates a presumption favoring judicial review of administrative action."); *Nat'l Mining Ass'n v. Sec'y of Labor*, 763 F.3d 627, 632 (6th Cir. 2014) ("[T]he normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals.") (internal marks and citations omitted). Therefore, the same prohibition would seem to apply under the Clean Water Act, and the lack of an express provision in the act is not informative here. *Jones* supports the plaintiffs' position. However, as the Flint defendants note, it does not fully address their argument that the Court lacks subject matter jurisdiction because this case is an impermissible judicial review of the EPA Order under 42 U.S.C. § 300j-8(e).

-10-

The defendants point out that the Sixth Circuit recently provided guidance when an action constitutes judicial review in *Mokdad v. Lynch*, 804 F.3d 807, 813 (6th Cir. 2015), a case that does not support their position. However, the defendants do not examine *Mokdad*; rather, they rely on its reference to *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958), which the court of appeals characterized as "[t]he leading Supreme Court case discussing the scope of exclusive-jurisdiction provisions." *Mokdad*, 804 F.3d at 813. In *City of Tacoma*, the city intended to construct a power project on a river where the State of Washington owned a fish hatchery. The power project could not be built without condemnation of the state's hatchery, because the proposed dams would flood the hatchery. Tacoma sought and received a license to proceed with their power project by the Federal Power Commission, under the Federal Power Act, over the vigorous objections of the state. The Ninth Circuit affirmed the issuance of the license and the state appealed to the Supreme Court. While that appeal was pending, Tacoma proceeded with its plans for the power project and filed an action in state court that would declare valid an issuance of bonds to finance the project. The state opposed the action raising the same issues it had in the previous licensing proceedings. The state court case was appealed to the state supreme court twice and ultimately resulted in an injunction preventing Tacoma from proceeding with the project. But the Supreme Court reversed the state supreme court, holding that the exclusive review provision of the Federal Power Act "necessarily precluded *de novo* litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review." 357 U.S. at 336.

*City of Tacoma* is distinguishable on a number of bases. For one, the plaintiffs are not a party to an action between the EPA and the City of Flint. Nor are the plaintiffs identified as "Respondents" in the EPA's emergency order. Moreover, the plaintiffs are not subject to the EPA

-11-

Order and are not asking for relief from the EPA Order.  The plaintiffs are not seeking to enjoin the EPA Order either explicitly or implicitly.  *See F.C.C. v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984) (holding that a party "may not evade [statutory exclusive-jurisdiction] provisions by requesting the District Court to enjoin action that is the outcome of the agency's order).  Rather they are asserting their own rights under the SDWA.  As the *Mokdad* court observed, "[l]ater decisions of the Supreme Court have reiterated that exclusive-jurisdiction provisions bar litigants from 'requesting the District Court to enjoin action that is the outcome of the agency's order,' but not claims that are 'wholly collateral to a statute's review provisions.'"  *Mokdad*, 804 F.3d at 813 (quoting *ITT World Commc'ns,* 466 U.S. at 468, and *Thunder Basin Coal Co. V. Reich,* 510 U.S. 200, 212 (1994)).

The Sixth Circuit used the concept of "inescapable intertwinement" as an aid in determining whether a lawsuit was barred by an exclusive jurisdiction provision in a statute governing appeals of administrative agency orders.  Citing precedent from other circuits, the court stated that "'[a] claim is inescapably intertwined [with an agency order] if it alleges that the plaintiff was injured by such an order and that the court of appeals has authority to hear the claim on direct review of the agency order.'" *Ibid.* (quoting *Merritt v. Shuttle, Inc.*, 245 F.3d 182, 187 (2d Cir. 2001)) (alteration in original).  Here, the plaintiffs do not allege that their injury stems from the EPA's emergency order.  In fact, the plaintiffs likely would endorse many of its findings.  And even if the relief requested by the plaintiffs may overlap or even be inconsistent with the EPA Order, the SDWA provides for intervention by the EPA in a citizen-suit or by a citizen in a suit brought by the EPA. 42 U.S.C.A. § 300j-8(b)(1)(B), (c).

The plaintiffs' present suit does not amount to an appeal of a final determination by the EPA. The relief they seek may parallel the EPA's directives to the Flint and Michigan respondents, and may augment those orders. And their action is wholly collateral to the SDWA's review provisions. The Court has subject matter jurisdiction over this suit under 42 U.S.C. § 300j-8(a), unaffected by section 300j-7 or section 300j-8(e).

B.

The state defendants make a related argument: that the Court should abstain from adjudicating the complaint and defer to the EPA under the doctrine of primary jurisdiction. Under that doctrine, a court may stay or dismiss a proceeding if it finds that the matter lay within the primary jurisdiction of an administrative agency to allow the parties the reasonable opportunity to seek an administrative ruling. *United States v. Haun*, 124 F.3d 745, 749 (6th Cir. 1997); *see Alltel Tennessee, Inc. v. Tennessee Pub. Serv. Comm'n*, 913 F.2d 305, 307 (6th Cir. 1990). "The doctrine of primary jurisdiction arises when a claim is properly cognizable in court but contains some issue within the special competence of an administrative agency." *Id.* at 749 50. The state defendants argue that this case involves complex factual and scientific questions that are outside the Court's conventional experience, and the Court may be called upon to determine the most appropriate manner in which to abate any violations of the SDWA requiring the resolution of complicated environmental, biological, logistical, municipal, financial, and practical issues of great significance and impact. They also note that EPA proceedings have begun and the agency has issued a compliance order. And the state defendants argue that primary jurisdiction is often invoked when a plaintiff is seeking injunctive relief, because there is the greatest likelihood that a court's order will interfere with an administrative agency's proceedings.

-13-

An analysis of abstention requests must begin with the observation that district courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). The primary jurisdiction doctrine is recognized as a means "to obtain the benefit of the expertise and experience of the administrative agencies and the desirable uniformity which occurs when a specialized agency decides certain administrative questions." *Alltel Tennessee*,, 913 F.2d at 309 (citing *In re Long Distance Telecommunications Litigation*, 831 F.2d 627, 630 (6th Cir. 1987). But the court should "defer[] to an administrative agency only when the reasons for the existence of the doctrine are present." *Ibid*. (citing *United States v. Western Pacific*, 352 U.S. 59, 64 (1956)). The Supreme Court has observed that "[n]o fixed formula exists for applying the doctrine of primary jurisdiction." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)).

The state defendants argue that this case involves complex factual and scientific questions that are outside the Court's conventional experience, but that does not appear to be the case. The plaintiffs are seeking a declaratory judgment that the defendants violated the SDWA. That determination does not require reviewing environmental impact reports or considering the content of lead in the drinking water. It merely requires determining whether the defendants complied with the statute, which is well within the Court's expertise. Furthermore, the injunctive relief in this case focuses on obtaining clean drinking water for the residents of Flint. Whether such relief requires the defendants to supply water filters to every Flint resident or replace all of the lead service lines, the expertise required is no more than inquiring into whether the lead levels in the water are above or below the prescribed amount, and what remedial measures may suffice to cause compliance. It may be that the lead service lines can be made safe again through proper water treatment and all that

-14-

is needed is temporary injunctive relief to allow time for that to occur.  "A federal court may not abdicate its adjudicative duty simply because an action sounds an administrative tone." *Haun*, 124 F.3d at 752.

The state defendants rely on *Harding-Wright v. District of Columbia Water and Sewer Authority*, 04-00558 (D.C. 2004).  That case is similar in many ways to this one.  In *Harding-Wright*, the District of Columbia Water and Sewer Authority (WASA) made a change in its water treatment that resulted in increased levels of lead in the drinking water.  *Harding-Wright*, Ex. 1 at p. 5.  To help alleviate the harm, WASA and the EPA worked on a series of interim measures to ensure the safety of drinking water, such as making an interim water supply available and making certified water filters available to the 23,000 homes that had been affected by the high levels of lead in the drinking water.  *Id.* at 10.  The *Harding-Wright* court granted in part the defendant's motion to dismiss because it found that fashioning an interim remediation plan independent of what the EPA already required was better left to the expertise of the EPA.  *Id.* at 20.  Furthermore, the plaintiffs were asking the court to order the defendants to distribute water filters to a greater number of residents than had already been required under a consent administrative order, and would therefore result in inconsistent judgments.  *Id.* at 22.

*Harding-Wright* is informative; however, the EPA had already entered an Administrative Order for Compliance on Consent that mandated replacement of some of the lead service lines and the provision of water filters to 23,000 affected homes.  The court deferred to the EPA under the primary jurisdiction doctrine in a case where the EPA had taken more substantial steps than have been taken thus far in Flint.  It appears that much more remains to be done here, and the plaintiffs are entitled to seek other avenues of relief.

-15-

The state defendants also argue that EPA proceedings have begun and they have issued a compliance order, which would weigh in favor of staying the current proceeding. The plaintiffs respond that there is no decision pending with the EPA that would be relevant to this case. The plaintiffs have the better argument. In *Haun*, the Sixth Circuit explained that one of the reasons to stay a proceeding under the primary jurisdiction doctrine is to allow the parties the opportunity to seek an administrative ruling. *Haun*, 124 F.3d at 749. The EPA issued its compliance order on January 21, 2016. The SDWA allows for      and even contemplates      concurrent actions. 42 U.S.C.A. § 300j-8(b)(1)(B), (c). As the plaintiffs point out, there are no questions before the EPA that must be answered before the plaintiffs' claims can be adjudicated by this Court.

Finally, the state defendants argue that primary jurisdiction is often invoked when a plaintiff is seeking injunctive relief, because there is the greatest likelihood that a court's order will interfere with an administrative agency's proceedings. *See B.H. v. Gold Fields Mining Corp.*, 506 F. Supp. 2d 792, 798 (N.D. Okla. 2007). In *B.H.* the EPA ordered remediation of a 40-square-mile area where lead contamination had been found. The plaintiffs were seeking injunctive relief that the court found would likely conflict with the EPA's remediation plan. The *B.H.* court stayed the action pending the resolution of the EPA's remediation plan under the primary jurisdiction doctrine because the cleanup of environmental hazards fell squarely within the EPA's expertise, and injunctive relief would have interfered with the remediation effort. But here, the plaintiffs are not seeking relief that would likely interfere with the EPA's compliance order. Instead, the relief the plaintiffs are seeking would be consistent with the order. The danger of creating inconsistent obligations for the defendants is relatively low in this case, because the EPA and the plaintiffs are seeking the same result: safe drinking water for the residents of Flint.

-16-

This does not appear to be a case that will require intricate fact finding or the need for special administrative expertise.  Nor does there appear to be an administrative program that may be upset by the Court's decisions.  The plaintiffs are seeking to enforce their rights under the SDWA.  The relief sought is both similar and different than what has been ordered in the EPA Order, but not conflicting.  The state defendants have not shown how such relief would be inconsistent with the EPA Order or would interfere with it in any way.  Because federal judges "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given," *United States v. Haun*, 124 F.3d 745, 752 (6th Cir. 1997) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)), abstaining under the primary jurisdiction doctrine would be imprudent here.

<div align="center">III.</div>

The Flint defendants contend that the complaint fails to state a viable claim, because the plaintiffs ask for retrospective relief, which is unavailable under the SDWA.  The state defendants make a similar argument, contending that because the plaintiffs are seeking retrospective relief, their claims are barred by the Eleventh Amendment.  The state defendants also contend that the complaint fails to state a claim for which relief can be granted against the individual members of the Flint Receivership Transition Advisory Board in their official capacities, because the Board is a non-juridical entity.  And they also contend that the claims against the board members and the state treasurer must fail because none of those individuals has the requisite control over the Flint water system.

These arguments are based on Federal Rule of Civil Procedure 12(b)(6).  "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are taken as true." *Rippy ex rel. Rippy v.*

<div align="center">-17-</div>

*Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)).   Under Rule 12(b)(6), the Court views the complaint in the light most favorable to the plaintiff, the allegations of fact are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff.  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  To survive a motion to dismiss under that rule, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678] (2009)."  *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Under the new regime ushered in by *Twombly* and *Iqbal*, pleaded facts must be accepted by the court, but conclusions may not be accepted unless they are plausibly supported by the pleaded facts.  "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but they are insufficient to state a claim for relief and must be disregarded.  *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555).  However, as long as a court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabian*, 628 F.3d at 281 (quoting *Iqbal*, 556 U.S. at 678).

-18-

A.

All the defendants characterize the relief sought by the plaintiffs as "retrospective." They insist that the replacement of lead service lines and mitigation of health and medical risks are measures to address past violations, and therefore the relief requested is retrospective. The plaintiffs recognize that retrospective relief is not available under the SDWA. But they characterize the relief they seek as prospective rather than retrospective. They argue that replacement of lead service lines and mitigating the health and medical risks amount to prospective relief because those measures address the ongoing violations by the defendants. And they contend that 42 U.S.C. § 300j-8(a) specifically authorizes district courts to enforce the SDWA's various monitoring, reporting, public information, and treatment provisions.

"The purpose of the [Safe Drinking Water Act] is to assure that water supply systems serving the public meet minimum national standards for protection of public health." H.R. Rep. No. 93-1185, at 6454 (1974). The SDWA allows a citizen-suit against any person "alleged to be *in violation of* any requirement prescribed" by the Act. 42 U.S.C. § 300j-8(a)(1). The Sixth Circuit has not interpreted this provision, but the Supreme Court interpreted the same "in violation of" language in the Clean Water Act as requiring a citizen-plaintiff to "allege a state of either continuous or intermittent violation      that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987) (noting parallel language in Clean Air Act, 42 U.S.C. § 7604; Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6972 (1982 ed. and Supp. III); Toxic Substances Control Act, 15 U.S.C. § 2619 (1982 ed. and Supp. IV)); *see United States v. Stauffer Chem. Co.*, 684 F.2d 1174,

1188 (6th Cir. 1982) (finding that where possible, similar statutory language should be given similar construction). The plaintiffs have done so here.

Congress has empowered "[t]he United States district courts . . . to enforce in an action brought under this subsection any requirement prescribed by or under" the SDWA. 42 U.S.C. § 300j(a). Although the Sixth Circuit has not interpreted the scope of this provision, other circuits however have interpreted analogous language in the Clean Water Act to mean that "[t]he authority to 'enforce' an existing requirement is more than the authority to declare that the requirement exists and repeat that it must be followed." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1000 (9th Cir. 2000). Rather, as "long as the district court's equitable measures are reasonably calculated to 'remedy an established wrong,' they are not an abuse of discretion." *Ibid.* (quoting *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994)).

The defendants do not fairly characterize the harm alleged by the plaintiffs. It is not, as the defendants would read it, the damage to the lead service pipes. Instead, the harm is the continued leaching of lead into the drinking water. To remedy that harm, replacement of all lead service pipes may be required. Indeed, the regulations contemplate such relief. The SDWA requires "water systems" to comply with regulations designed to control lead contamination in drinking water, known collectively as the Lead and Copper Rule. 40 C.F.R. §§ 141.80 .91. The Lead and Copper Rule mandates that "[s]ystems that fail to meet the lead action level in tap samples taken pursuant to § 141.86(d)(2), after installing corrosion control and/or source water treatment (whichever sampling occurs later), shall replace lead service lines in accordance with the requirements of this section." 40 C.F.R. § 141.84(a). Whether those remedial measures will be required in this case remains to be seen.

-20-

In all events, the plaintiffs are seeking relief consistent with the regulations. The plaintiffs allege that the corrosive water from the Flint River water destroyed the protective coating in the water system that was built up over a period of years. They also allege that corrosive water can damage water pipes irreversibly, necessitating replacement. They have stated a claim under 40 C.F.R. § 141.84(a). They also seek the mitigation of health and medical risks resulting from the alleged ongoing violations of the SDWA. Such relief also may be called for because, as the plaintiffs allege, the lead is continuing to leach into the drinking water supply. The relief the plaintiffs can fairly be characterized as prospective, and authorized by the SDWA.

## B.

This holding also impacts the state defendants' argument that the claims against them in their individual official capacities are barred by the Eleventh Amendment.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any foreign State." U.S. Const. Amend. XI. In general, the Eleventh Amendment immunizes state officials from suit in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984). However, state sovereign immunity as recognized by the Eleventh Amendment does not extend to suits against state officials seeking to enjoin violations of federal law. *Ex parte Young,* 209 U.S. 123, 159-160 (1908). A plaintiff can "avoid[] this sovereign immunity bar by suing for injunctive or declaratory relief, rather than monetary relief." *Johnson v. Unknown Dellatifa,* 357 F.3d 539, 545 n.1 (6th Cir. 2004) (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n.10 (1989)). To determine whether a claim for such relief avoids sovereign immunity, "a court need only conduct 'a straightforward

inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Dubuc v. Michigan Bd. of Law Examiners,* 342 F.3d 610, 616 (6th Cir. 2003) (quoting *Verizon Maryland, Inc. v. Public Service Comm'n of Maryland,* 535 U.S. 635, 645 (2002)).

As noted above, the remedies sought by the plaintiffs plainly are forward-looking. They do not seek an award of damages or other forms of compensation to redress past injuries. Instead, they seek to compel state officials to comply with federal law, a form of relief authorized under the Eleventh Amendment. *Ex parte Young,* 209 U.S. at 159-160.

## C.

The individual members of the RTAB also argue that they can not be sued in their official capacities, because an official capacity suit is tantamount to a suit against the entity itself, and the RTAB is immune from suit because it is a non-juridical entity. They contend that the legislation creating the RTAB supports the conclusion that the entity was not intended to be amenable to suit, and the entity has no legal means of raising funds for payment of a judgment.

That argument "ha[s] been consistently rejected by the courts." *Telespectrum, Inc. v. Pub. Serv. Comm'n of Kentucky*, 227 F.3d 414, 422 (6th Cir. 2000); *see, e.g.*, *Michigan Bell Tel. Co. v. Climax Tel. Co.*, 202 F.3d 862, 868 (6th Cir. 2000) (allowing an action against the individual members of the Michigan Public Service Commission under *Ex parte Young*). Moreover, the state court cases cited in support of their argument concern money damages, which is what prompted the Michigan Supreme Court to say that "[i]t cannot be true that such an agency can be officially liable to suits for liabilities, where it has no legal means of raising funds for payment." *O'Leary v. Bd. of Fire & Water Comm'rs of Marquette*, 79 Mich. 281, 286, 44 N.W. 608, 610 (1890). Here, the

-22-

plaintiffs are seeking declaratory and injunctive relief against individual state officials, consistent with *Ex Parte Young*.

### D.

The state defendants also argue that they are immune from suit from the requirements of the SDWA because they are not responsible as a "supplier of water," since they do not "own[] or operate[] a public water system." *See* 42 U.S.C. § 300f(5). They maintain that as the State Treasurer and as individual members of the Flint Receivership Transition Advisory Board, they lack the requisite control over the Flint water system to ensure compliance with the SDWA or its regulations. They argue that they merely have financial monitoring responsibility over the city, not any level of operational control. The plaintiffs disagree and allege that the state defendants have taken actions that should result in a finding that they are "operators" of the Flint water system within the meaning of the SDWA.

The term "operator" is not defined in the SDWA. 42 U.S.C. 300f(4)(A). However, the term is found in other environmental statutes, such as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). Under CERCLA, "operator" is defined as "any person owning or operating" a facility. 42 U.S.C. § 9601(20)(A)(ii). The Supreme Court gave the term in CERCLA its "ordinary meaning" as "someone who directs the workings of, manages, or conducts the affairs of a facility." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998). The Court recognized that "operate" means "more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 71.

The plaintiffs allege that the state defendants all had significant operational control over the Flint water system, including the decision to use the water from the Flint River and authorize expenditures to upgrade the water system in preparation for using Flint River water. The plaintiffs allege that the RTAB worked with the city officials to manage the city, that the city administrator had direct control over the water supply, and the State Treasurer made decisions that directly impacted the Flint water system.

The state defendants argue that they did not have the authority to exert operational control over the Flint water system. The significance of that reality, they say, lies in the fact that none of the state defendants have the authority to implement the relief the plaintiffs are requesting. However, the plaintiffs have alleged that the RTAB must authorize all contracts or purchases over $75,000, and the State Treasurer has the final decision-making authority over where Flint gets its drinking water and must approve any amendments to the budget. It is difficult to imagine how the plaintiffs could obtain the relief they request without the participation and cooperation     coerced or otherwise     of the state defendants.

Courts have found that the financial authority and level involvement as alleged by the plaintiffs here to be relevant under CERCLA on the question of operator liability. *See K.C.1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1020 (8th Cir. 2007) ( finding relevant that defendant's approval was necessary for any decisions involving large expenditures); *see also Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 531 (S.D. Tex. 2015) (finding relevant that the government, among other things, approved any expenditure exceeding $1,000); *Clean Harbors, Inc. v. CBS Corp.*, 875 F. Supp. 2d 1311, 1327-28 (D. Kan. 2012) (finding relevant the requirement that a defendant approve significant operational expenses). Commenting on these cases, the state

-24-

defendants concede that financial control was a relevant consideration, but they argue that it was not determinative in those cases. The state defendants are correct. Those cases found operator liability based on more than simply financial control. However, those cases were adjudicated at the summary judgment stage. Here, the plaintiffs' allegations are sufficient to state a claim that the state defendants have exerted a level of control to bring them within the scope of the SDWA's requirements.

<div align="center">IV.</div>

The Court has jurisdiction over the plaintiffs' claims under the Safe Drinking Water Act. Those claims are not barred by the Eleventh Amendment. And the complaint states claims against all the defendants for which relief can be granted.

Accordingly, it is **ORDERED** that the defendants' motions to dismiss [dkt. #22, 23] are **DENIED**.

It is further **ORDERED** that counsel for the parties shall appear before the Court for a status conference on **August 3, 2016 at 3:00 p.m.** to discuss adjudication of the plaintiffs' motion for preliminary injunction and further case management.

<div style="text-align:right">
s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge
</div>

Dated:  July 7, 2016

<div style="border:1px solid black; padding:8px; max-width:60%; margin:auto;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 7, 2016.

<div style="text-align:right">
s/Holly Monda<br>
HOLLY MONDA
</div>

</div>