UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, MELISSA MAYS, AMERICAN
CIVIL LIBERTIES UNION OF MICHIGAN,
and NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

               Plaintiffs,

                                      Case Number 16-10277
v.                                    Honorable David M. Lawson

NICK A. KHOURI, FREDERICK HEADEN,
MICHAEL A. TOWNSEND, DAVID
MCGHEE, MICHAEL A. FINNEY,
BEVERLY WALKER-GRIFFEA, NATASHA
HENDERSON, and CITY OF FLINT,

               Defendants.

_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The plaintiffs in this lawsuit seek remedial action — both immediate and long-term — to address lead contamination found in Flint's public water system. Presently before the Court is the plaintiffs' motion for preliminary injunction through which they ask the Court to order the defendants to provide two forms of immediate relief: First, the plaintiffs want the defendants to submit to the Court for review and approval a plan to provide every household served by the Flint water system with reliable access to safe drinking water, which would include door-to-door delivery, if needed. Second, the plaintiffs want the defendants to ensure that Flint residents have easy access to adequate information about lead contamination in their drinking water, the safe and unsafe uses of unfiltered tap water, and contact information residents can use if they need additional water delivered or filter installation or maintenance. At the evidentiary hearing held on September 14,

2016, the defendants produced testimony on the condition of the water delivered to homes in Flint through the water delivery system, the cost of providing door-to-door delivery of bottled water, and steps taken by City and State officials to remediate the contaminated system. The plaintiffs offered anecdotal evidence of the hardships endured by Flint residents caused by the contamination, the unreliability of the 211 telephone call-in service for water deliveries, and the defendants' inability consistently to deliver safe drinking water to the tap in the homes of Flint residents.

The criteria for obtaining a preliminary injunction are well known and undisputed by the parties. The relevant factors are whether (1) the moving party has demonstrated a substantial likelihood of success on the merits; (2) the moving party will suffer irreparable injury without the injunction; (3) the preliminary injunction will cause substantial harm to others; and (4) the public interest will be served if the injunction issues. *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012) (citing *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)). Although these factors are to be balanced, the failure to show a likelihood of success on the merits is generally fatal. *Ibid.*; *see also Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). The plaintiff has the burden of proof, and that burden is the same irrespective of whether the relief sought is mandatory or prohibitive. *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.,* 163 F.3d 341, 348 (6th Cir.1998). Rule 65 of the Federal Rules of Civil Procedure authorizes the issuance of preliminary injunctions and temporary restraining orders when appropriate. It is appropriate here.

### I. Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, the plaintiffs must show that they can prove violations of certain federal regulations enacted under the Safe Drinking Water Act, 42 U.S.C.

-2-

§§ 300f, *et seq*., and that the defendants — the Michigan treasurer and members of the Flint Receivership Transition Advisory Board (RTAB) (the State defendants), and the City of Flint and its city administrator (the Flint defendants) — are responsible for curing those violations and providing safe drinking water to the City's water customers, the residents of the City of Flint.  But at this stage of the proceeding, the plaintiffs need not prove their case "in full."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  They need only show "more than a mere possibility of success."  *NE. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)).  As the Sixth Circuit has explained, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).  The plaintiffs have easily satisfied this standard.

This case involves the contamination of Flint's drinking water with minerals that are harmful to health.  The plaintiffs contend that the contamination comes from the way the defendants have operated Flint's public water system.

To begin, according to the Safe Drinking Water Act (SDWA), a "'public water delivery system' means a system for the provision to the public of water for human consumption through pipes or other constructed conveyances."  42 U.S.C. § 300f(4)(A).  Under the SDWA, the Environmental Protection Agency (EPA) has enacted regulations with which operators of public water delivery systems must comply.  The plaintiffs allege that the defendants have violated (1) the SDWA's requirement to operate and maintain optimal corrosion control treatment, 40 C.F.R. §§

141.81–.82; (2) the SDWA's requirements for monitoring tap water for lead, 40 C.F.R. § 141.86; (3) the SDWA's reporting requirements, 40 C.F.R. § 141.90; and (4) the SDWA's notification requirements, 40 C.F.R. § 141.85. They contend that both the Flint and State defendants are responsible for remediating those violations and curing the harm caused. The SDWA allows a citizen-suit against any person "alleged to be in violation of any requirement prescribed" by the Act. 42 U.S.C. § 300j-8(a)(1).

### A. SDWA Regulations

The City of Flint has operated a public water system for over a century. *See* "Flint's Water Crisis Should Raise Alarms for America's Aging Cities," *Fortune* (found at http://fortune.com/2016/01/25/flint-water-crisis-america-aging-cities-lead-pipes/) (last visited Nov. 10, 2016) (noting that "[t]he city of Flint was incorporated in 1855, just as water mains were becoming increasingly common in American cities"); *How the Flint River Got So Toxic*, The Verge (found at (http://www.theverge.com/2016/2/26/11117022/flint-michigan-water-crisis-lead-pollution-history) (last visited Nov. 10, 2016) (stating that "[b]etween 1900 and 1930, Flint had its first boom, reaching a population of 150,000. The city had been drawing its drinking and industrial water from the Flint River since 1893. . ."). Since 1965, the City of Detroit provided treated or "finished" water to Flint. The finished water included chemicals, such as orthophosphate, to maintain corrosion control and mitigate the leaching of lead into the water system from lead water pipes. After a series of decisions discussed more fully below, Flint switched its water source from the Detroit system to the Flint River in April 2014. That change triggered requirements established by the SDWA regulations relating to treatment and monitoring drinking water in Flint's delivery system.

-4-

## 1. Corrosion Control

The SDWA, 42 U.S.C. § 300f, *et seq.*, requires the EPA "to establish maximum contaminant level goals (MCLGs) and national primary drinking water regulations (NPDWRs) for contaminants that, in the judgment of the Administrator, may have any adverse effect on the health of persons and that are known or anticipated to occur in public water systems." Maximum Contaminant Level Goals and National Primary Drinking Water Regulations for Lead and Copper, 56 Fed. Reg. 26460-01 (June 7, 1991). In 1991, the EPA promulgated the Lead and Copper Rule with the goal of "provid[ing] maximum human health protection by reducing the lead and copper levels at consumers' taps to as close to the MCLG as is feasible." *Ibid.* MCLGs are non-enforceable health goals, whereas maximum containment levels (MCLs) are enforceable and should be set as close to the relevant MCLG as possible. *Ibid.* The EPA's MCLG for lead is zero. *Ibid.* The current MCL for lead is 15 parts per billion (ppb), at the 90th percentile of samples collected in accordance with 40 C.F.R. § 141.86. 40 C.F.R. § 141.80(c)(1).

The EPA has determined that lead can enter drinking water systems from two sources: (1) from "raw water supplies, i.e., source water or distributed water, and (2) corrosion of plumbing materials in the water distribution system (corrosion by-products). Most lead contamination is from corrosion by-products." 56 Fed. Reg. 26460-01. "The amount of lead in drinking water attributable to corrosion by-products depends on a number of factors, including the amount and age of lead and copper bearing materials susceptible to corrosion, how long the water is in contact with the lead containing surfaces, and how corrosive the water in the system is toward these materials." *Ibid.* "The amount of lead in drinking water depends heavily on the corrosivity of the water." *Ibid.*

All water systems are required to "install and operate optimal corrosion control treatment." 40 C.F.R. § 141.80(d)(1). "Optimal corrosion control treatment . . . means the corrosion control treatment that minimizes the lead and copper concentrations at users' taps while insuring that the treatment does not cause the water system to violate any national primary drinking water regulations." 40 C.F.R. § 141.2. "All systems optimizing corrosion control shall continue to operate and maintain optimal corrosion control treatment, including maintaining water quality parameters at or above minimum values or within ranges designated by the State." 40 C.F.R. § 141.82(g).

In the 1990s, after a multi-year lead and copper corrosion control optimization study that included Flint, the Detroit water system administrators concluded that adding orthophosphate to drinking water was the optimal treatment alternative for full-scale lead corrosion control in its water system. According to Daniel Giammar, Ph.D, an environmental engineer with an expertise in water chemistry and its effect on drinking water distribution systems, adding orthophosphate to drinking water can promote the formation of a lead-phosphate "scale" on the surface of lead pipes. Giammar Decl. ¶ 19. In order to maintain optimal levels of corrosion control once a stable protective scale has formed inside of lead pipes, water systems must maintain the stability of the scale by continuing to add orthophosphate to the water. *Id.* ¶ 21.

All parties acknowledge that Flint's water system includes lead pipes. In Mr. Giammar's opinion, the constant flow of orthophosphate-treated water from Detroit created a chemically and physically stable lead-phosphate scale on the interior surface of Flint's lead pipes. *Id.* ¶ 24. He represents that a review of the Flint water system's tap monitoring system shows more than a decade of lead concentrations ranging from 4 ppb to less than 2 ppb. *Id.* ¶ 25. But the Flint water administrator failed to add orthophosphate to the Flint River water used after April 2014. That

failure, according to Mr. Giammar, caused significant damage to the lead-phosphate scale that built up over many years. *Id.* ¶¶ 28-29. This conclusion is supported by the water samples collected from July 2014 to December 2014, and January 2015 to June 2015, where the lead levels increased to 6 ppb and 11 ppb respectively. *Id.* ¶ 34. An additional set of water samples collected during August 2015 saw an increase of lead levels to more than 25 ppb. *Id.* ¶ 34.

From subsequent water monitoring data collected by the EPA and the Michigan Department of Environmental Quality (MDEQ), Mr. Giammar calculated lead levels ranging between 8 to 11 ppb, and between 0.9% and 1.6% of homes had lead levels above 100 ppb. *Id.* ¶ 43. He noted, however, that those samples may be biased low because the samples may not have been collected from homes with lead service lines, as is required by the SDWA. *Id.* ¶ 46; *see* 40 C.F.R. § 141.86(a)(8). A new protective scale can take up to twelve months to form, but Mr. Giammar's conclusion is that the subsequent data do not show a downward trend in the 90th percentile lead levels as would be expected if the protective scale were reforming. ¶¶ 36-44.

Mr. Giammar also reviewed publically available tap water monitoring data at sites that the MDEQ has designated as "sentinel sites." *Id.* ¶ 48. Sentinel sites are homes in Flint that the MDEQ plans to sample repeatedly over time to determine the effectiveness of Flint's water system corrosion control. Those samples showed a lead level of 14 ppb, and 2.1% of the samples showed lead concentration levels of over 100 ppb. *Id.* ¶ 49. It was too early to make any conclusions from the sentinel site data at the time the preliminary injunction motion was filed, because the samples were only collected during the course of a single month. *Id.* ¶ 49. And Bryce Feighner, Chief of the Office of Drinking Water at the MDEQ, testified at the hearing that during the first six-month testing period, the initial lead levels were at 40 ppb, but reduced to 16 ppb by the last round of monitoring.

Mr. Feighner agrees that the action level of 15 ppb was exceeded during that first six-month monitoring period. Most telling, however, was Mr. Feighner's testimony that the unfiltered tap water in Flint is not safe for the residents to drink at this time.

It appears beyond dispute that the City of Flint failed to meet its responsibilities under the corrosion control regulations of the Lead and Copper Rule.

### 2.  Monitoring

The change in Flint's water source from the Detroit water system to the Flint River in April 2014 triggered the requirement for Flint to renew its testing protocols, as prescribed by the MDEQ rules. *See* Mich. Admin. R. §§ 325.10101-.12820. The plaintiffs also argue that the defendants did not comply with the Lead and Copper Rule's monitoring requirements, and that the defendants continue to ignore the monitoring requirements. Again, the defendants do not contest this argument.

The Lead and Copper Rule requires water systems personnel to conduct periodic tap water sampling for lead. 40 C.F.R. § 141.86(d). Beginning in 1992, Flint was required to complete a materials evaluation of its distribution system "in order to identify a pool of targeted sampling sites, . . . which [wa]s sufficiently large to ensure that the water system can collect the number of lead and copper tap samples required" by the rule. 40 C.F.R. § 141.86(a)(1). Flint was required to use the information collected under 40 C.F.R. § 141.42(d) (special monitoring for corrosivity characteristics) when conducting a materials evaluation. 40 C.F.R. § 141.86(a)(2).

The regulations require that once the sampling site pool is established, "[a] water system shall collect each first draw tap sample from the same sampling site from which it collected a previous sample." 40 C.F.R. § 141.86(b)(4). "If, for any reason, the water system cannot gain entry to a sampling site in order to collect a follow-up tap sample, the system may collect the follow-up

-8-

tap sample from another sampling site in its sampling pool as long as the new site meets the same targeting criteria, and is within reasonable proximity of the original site." *Ibid.* A first-draw sample is one liter of cold water that has stood motionless in the system for at least six hours taken from either the kitchen or bathroom sink tap.  40 C.F.R. § 141.86(b)(2).

Personnel operating large water systems, such as Flint's, must draw samples from 60 to 100 single family structures designated as "tier 1 sampling sites," that contain copper pipes with lead solder installed after 1982, or lead pipes, or are served by a lead service line.  40 C.F.R. § 141.86(a)(3) & (c).  Because Flint's water system contains lead service lines, 50 percent of the samples collected during each monitoring period must be from sites that include copper pipes with lead solder or lead pipes, and 50 percent from sites that are served by lead service lines.  40 C.F.R. § 141.86(a)(8).  First-draw samples from residences may be collected by the water system, or by residents after being instructed on the methods for collection.  40 C.F.R. § 141.86(b)(2).  First-draw samples from the service lines are conducted in much the same way, except that the samples must be taken directly from the service line or after flushing the water in a residence long enough to access the water that was in the lead service line (either by calculating the water volume or waiting for a significant change in temperature of the water).  40 C.F.R. § 141.86(b)(3).

The regulations require Flint to sample its water system every six months until the water system achieves lead levels at or below 15 ppb for two consecutive six-month monitoring periods, at which point it is allowed to reduce its sampling sites and test only once per year.  40 C.F.R. § 141.86(d)(4) & (c).  Any system that demonstrates a tap water lead level at or below 5 ppb, and copper levels at or below 6.5 ppb, may further reduce the frequency of sampling to once every three calendar years.  40 C.F.R. § 141.86(d)(4)(v).

-9-

After Flint switched to the Flint River as a water source, the MDEQ required the collection of tap water samples for two six-month monitoring periods.  Mich. Admin. R. § 325.10710(a)(3).  However, Flint did not comply with all the Lead and Copper Rule monitoring requirements.  It appears that there had been 324 monitoring sites used by the Flint water system for compliance from 1992 to 2015.  Rather than taking samples from the targeted sampling sites, Flint reached out to the general public, its own employees, and even entertained posting requests for testing sites on Twitter.  Indeed, the Flint Utilities Manager said in an interview that the water system "throw[s] bottles out everywhere" to collect the required number of samples.  Pl.'s Mot., Ex. 60 at 5.  It appears that only 14 of the 100 homes used in the previous six-month period were used for the 2015 period, which is a clear violation of the Lead and Copper Rule.  *See* Pl.'s Mot., Ex. 61, Pls.' App'x pp. 366-68.

Additionally, five days before the end of the 2015 monitoring period, the MDEQ informed Flint that it needed 61 more water samples, and that based on the first 39 samples, the water system measured over the 15-ppb action level.  During this period, it appears that the Flint population was under 100,000 (99,763), and therefore only required 60 tap samples.  Mich. Admin. R. §§ 325.10710a(3).  Nonetheless, the tap samples provided from June 25, 2015 to June 30, 2015 were not from the pre-established sampling pool, and all of the samples had lead levels below 15 ppb.

On November 9, 2015, the MDEQ sent a letter to the Flint Water System seeking additional information about its compliance with the Lead and Copper Rule.  The letter stated that all of the Lead and Copper reports submitted to the MDEQ certified that all of the tap samples were collected from tier 1 sites.  However, the MDEQ stated that it could not confirm that the 324 historically used tier 1 sites indeed were qualifying sites.  For example, it could only confirm that 6 of the sites contained lead service lines, and 26 of the sites used service lines that were not lead.  Indeed, the

-10-

MDEQ stated that there are more than 10,000 homes and businesses in Flint with service lines of unknown composition.

It appears that Flint is continuing to violate the monitoring requirements. The Flint water system was required to continue water sampling for the monitoring period of January 1, 2016 to June 30, 2016. According to the plaintiffs, based on the available data, the sentinel site monitoring does not consist entirely of homes that meet the Lead and Copper Rule requirements, in part, because it relies on citizen volunteers to provide water samples. Furthermore, the EPA noted that Flint has not "demonstrated that it has an adequate number of qualified personnel to perform the duties and obligations required to ensure the City's public water system complies with the [SDWA] and the [NPDWRs], including the [Lead and Copper Rule]." Pl.'s Mot., Ex. 70, Pls.' App'x p. 416.

The defendants have not offered contrary evidence. It appears, therefore, that there is no dispute that monitoring requirements were not followed and continue to be disregarded.

### 3. Defendants' Response

The parties have not discussed the claimed violations of the SDWA's reporting or notification requirements in this injunction proceeding, and the Court need not address them. The Flint defendants argue, however, that the plaintiffs cannot carry their burden of demonstrating a likelihood of success on the merits because the relief they seek is moot in light of the pending, now implemented, water delivery plan. The Flint defendants argue that they should be given the benefit of the doubt that the plan will be in place and run effectively. That argument talks past the claimed corrosion control and monitoring requirements, however. It more appropriately is considered as a response to the contention that irreparable harm cannot be shown, and the Court will discuss it when assessing that factor.

-11-

B.  Defendants' Responsibility

There is no question that the Flint defendants bear some responsibility for addressing the contamination problem.  The State defendants argue that the relief sought is overbroad, and that an injunction should not issue because the State defendants are not "operators" within the meaning of the SDWA.  That argument is not persuasive.  Because of the State defendants' initial and continuing involvement in decisions that affect water delivery, they also are properly subject to this injunction.

It is undisputed that over the last several years, Flint has experienced economic challenges, and in 2011 the City was placed in receivership.  That year, Michigan Governor Rick Snyder appointed Michael Brown as the emergency manager to run the City of Flint under the Local Government and School District Fiscal Accounting Act, Public Act 4 of 2011 (Public Act 4) (later rejected by Proposition 12-1, effective August 8, 2012).  The emergency manager "act[ed] for and in the place and stead of the governing body and the office of chief administrative officer of the local government."  Public Act 4, § 15(4).  The emergency manager displaced Flint's locally elected government while the receivership was in effect.  Public Act 4, § 15(4) ("Upon the declaration of receivership and during the pendency of receivership, the governing body and the chief administrative officer of the local government may not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager and are subject to any conditions required by the emergency manager.").  Instead, the State, through its emergency manager, was responsible to "assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare."  *Ibid.*

-12-

Michael Brown was succeeded by three more emergency managers — Edward Kurtz, Darnell Early, and Gerald Ambrose — although they were appointed under subsequent versions of Public Act 4. As a group, the emergency managers took major steps toward rectifying Flint's financial emergency. Those steps included the purchase of water from the Karegondi Water Authority instead of the Detroit Water and Sewerage Department. On March 25, 2013, Flint's City Council, while under receivership, voted to join the Karegnondi Water Authority (KWA), a consortium of cities and counties in southeastern Michigan that was created to build a water pipeline that will provide water from Lake Huron to Flint and the surrounding areas. The shift away from Detroit water was a purported cost-saving decision that was projected to have substantial savings over the next 25 years. The decision required the approval of then emergency manager Gerald Ambrose. On April 17, 2013, Flint gave notice to Detroit that it would be terminating its contract and no longer purchasing water from Detroit beginning on April 17, 2014. The termination of the contract, however, occurred before the KWA pipeline was in place. Although Detroit offered to continue to provide water to Flint at a discounted rate while the KWA finished its pipeline, Flint declined the offer. In the interim, the City Council and emergency manager decided to activate Flint's own water treatment plant and use the Flint River as its water source.

When Flint began using the Flint River water in April of 2014, it did not treat the water with orthophosphate to control lead levels in the drinking water, and instead added chemicals, such as ferric chloride, which, studies have shown, exacerbate the problem. In the months following the switch to the Flint River, residents reported that their water was discolored, foul-smelling, and laden with sediment. Subsequent testing showed a substantial increase of lead in the Flint drinking water.

-13-

In April 2015, after being informed that the financial emergency had been addressed, the governor appointed the City of Flint RTAB to succeed the emergency managers under the Local Financial Stability and Choice Act 436 of 2012, 141.1563.  Emergency Manager Gerald Ambrose issued Order No. 20, which effectuated the transfer of governing power to the RTAB.  That order contains at least two provisions that are relevant here: first, it requires that the City's governing authority "[t]ake all steps necessary to successfully establish, develop, and complete the Karegnondi Water Authority (KWA) project"; and second, those city officials "shall not revise any Order that was implemented by the Emergency Manager during his or her term prior to one year after the termination of the receivership."

As the Court held in its opinion denying the motion to dismiss, the state defendants qualify as operators of the Flint water system.  The term "operator" is not defined in the SDWA.  But that term is found in other environmental statutes, such as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA).  Under CERCLA, "operator" is defined as "any person owning or operating" a facility.  42 U.S.C. § 9601(20)(A)(ii).  The Supreme Court gave the term in CERCLA its "ordinary meaning" as "someone who directs the workings of, manages, or conducts the affairs of a facility."  *United States v. Bestfoods*, 524 U.S. 51, 66 (1998).  The Court recognized that "operate" means "more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities."  *Id.* at 71.

The Court previously found that the allegations in the complaint were sufficient to establish that the state defendants were operators of the Flint water system within the meaning of the SDWA, and the plaintiffs have tendered further evidence to support that finding.  For instance, the state

defendants routinely assessed whether plant operators were qualified, evaluated the water system's water-source options, and gathered information about chemicals and equipment needed for water treatment. Indeed, the Flint Water Advisory Task Force, commissioned by the governor, issued a report stating that

> [t]he role of the emergency manager (EM) under the Emergency Manager law, PA 436, is clear and unambiguous. Though they report directly to the Department of Treasury, EMs have complete authority and control over municipal decisions. In that context, the EMs had the responsibility to ensure that Flint water system operations were adequately resourced and supported by personnel and consultants with adequate training and expertise.
> . . .
> Numerous decisions were made between December 2011 and April 2015 that had some impact on the decision to use the Flint River as the primary source of drinking water for the city of Flint. Various state-appointed EMs served during this timeframe and it was these EMs who made these decisions, **not locally elected officials**. Although it is true that some locally elected officials supported, acknowledged, embraced, and even celebrated some of the decisions, the decisions were not theirs to make. The state-appointed EMs made the decisions.

Pl.'s Mot., Ex. S, Pls.' App'x pp. 669-70; *see also* Pls.' App'x pp. 678-80 (Letter by Gerald Ambrose explaining the state of affairs of the water system as of March 3, 2015, which demonstrates his involvement with Flint's water system).

For the last few years, Treasury officials have participated in near-weekly meetings with Flint officials during which they discussed various aspects of the water system, including water-quality sampling, boil-water notices, environmental compliance, and preparation to switch to a new water source. Moreover, the water system cannot purchase treatment chemicals or implement a project plan for water system improvements absent RTAB's approval.

The state defendants argue that the City of Flint is the sole owner and operator of its water system. However, for all practical purposes, the state defendants have been the municipal government during the receivership that was put into place by Governor Snyder. The emergency

-15-

managers "act[ed] for and in the place and stead of the governing body and the office of chief administrative officer of the local government." Public Act 4, § 15(4). They had "broad powers . . . *to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare*." *Ibid*. (emphasis added). Indeed, "the governing body and the chief administrative officer of the local government [could] not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager and are subject to any conditions required by the emergency manager." *Ibid*. The RTAB is the next representative of the State and is required to follow the emergency managers' established orders. And any decisions to remediate the continuing crisis must be made and approved by that board. There is substantial evidence that the state defendants have significant involvement with compliance going forward; it is their actions that are the focal point in this case.

The plaintiffs have demonstrated a strong likelihood of success on the merits of their claims. Accordingly, this factor weighs heavily in the plaintiffs' favor.

## II. Irreparable Harm

It is beyond dispute that Flint residents, like all other people, need daily access to a source of safe drinking water, and the presence of lead in drinking water can cause serious health problems. Most at risk to lead exposure are infants, young children, and pregnant women. Lead can cause permanent damage to the brain and kidneys and can interfere with the production of oxygen-carrying red blood cells that perfuse other organs. Lead poisoning has been linked with lowered mental functioning in children. And it can affect more severely adults with kidney ailments and high blood pressure. That much is uncontested here.

-16-

The Flint defendants argue, however, that the plaintiffs have not offered evidence that a single Flint water user lacks access to safe drinking water, nor that a single consumer has been forced to consume unsafe water.  They characterize the harm claimed by the plaintiffs in three ways: (1) inconvenient for some; (2) embarrassing for some; and (3) and embarrassing for some because their needs are being met by people or organizations other than the government.

The Flint defendants contend that although some Flint residents suffer varying degrees of inconvenience and embarrassment in obtaining safe drinking water, such inconveniences do not rise to the level of an irreparable harm.  They believe that *Gilley v. United States*, 649 F.2d 449, 455 (6th Cir. 1981), supports their position.  It does not. The *Gilley* court based its decision primarily on *Sampson v. Murray*, 415 U.S. 61 (1974).  In that case, the Supreme Court held that neither financial loss nor damage to reputation constitutes irreparable harm sufficient to support a preliminary injunction in the context of a probationary federal employee seeking to prevent her discharge.  415 U.S. at 91-92.  That holding was extended by the Sixth Circuit in *Gilley*, when the court held that harm to a tenured federal employee's reputation was not sufficiently irreparable to support a preliminary injunction to bar transfer of the employee to another work site.  649 F.2d at 454.  *Gilley* is readily distinguishable from the present case on its facts, and it applies a legal standard that is unique to federal labor disputes.  *See ibid.* (holding that the "standards for judging claims of irreparable harm in federal personnel cases . . . are more stringent than those applicable to other classes of cases." *Ibid.*   It does not provide guidance on the irreparable harm determination in this case.

The state defendants argue that the plaintiffs have not shown irreparable harm because they are not in danger of consuming tainted Flint water, since clean water is available for free to all those

-17-

who need it.  They also contend that the plaintiffs' delay in filing this motion for preliminary injunction nullifies any showing of irreparable harm; and the plaintiffs delayed providing to the State the addresses of particular individuals in need, such as Jacqueline Childress (who testified about her travails at the evidentiary hearing), and therefore caused the delay in getting them the relief they needed.

The state defendants rely mistakenly on *Fund for Animals v. Frizzell,* 530 F.2d 982 (D.C. Cir. 1975), for the proposition that a plaintiff's delay somehow nullifies irreparable harm.  But that case dealt with a request for a preliminary injunction to stop a regulation issued by the Fish and Wildlife Service that permitted hunting the greater snow goose.  *Id*. at 984.  The D.C. Circuit rejected the plaintiffs' argument that irreparable harm could be established by proof that a small loss of a reasonably abundant species would irretrievably damage the species.  *Id*. at 987.  In addition, the panel mentioned in passing that the plaintiffs' delay in seeking injunctive relief "bolstered" the "conclusion that an injunction should not issue."  *Ibid*.

The delay in seeking injunctive relief in this case in no way resembles the circumstances in *Fund for Animals*.  Here, once the state officials acknowledged the lead contamination in Flint's water system, the emergency response to the crisis changed rapidly in the early months as the response teams and volunteers endeavored to meet Flint's drinking water needs.  Once the State's efforts took shape and became more stable, the plaintiffs took the prudent step of requesting limited discovery to ensure the relief they sought was still needed.  When it was clear to them that the efforts were insufficient, they proceeded with their motion.  Arguing that irreparable harm is "nullified" by the plaintiffs' own delay is unfounded.  Any delay caused by lack of contact information for specific

-18-

persons in need is largely irrelevant to the overall question of irreparable harm caused by the questionable availability of safe drinking water to Flint residents.

It is abundantly clear that the public relies every day on the ready availability of safe drinking water at the tap. The most efficient and cost effective way to deliver safe drinking water to a population is through a public water system. The SDWA was enacted in 1974 "to assure that water supply systems serving the public meet minimum national standards for protection of public health." 1974 U.S.C.C.A.N. 6454, 6454.

A safe water supply has always been critical to civilization. Early villages were purposely located near good water supplies, and ancient trails were often routed past natural springs. In the 1600s and 1700s, water systems were localized and consisted generally of little more than a water supply source. Communities came to rely on central wells or ponds for filling buckets and carrying the water home on a daily basis.

During the 1800s, America fundamentally changed from an agrarian society to an urban industrial society. A "few modern citywide [water] systems began to appear before 1830. By the late nineteenth century, waterworks were generally regarded as a public enterprise, justified as such because of the need to protect the public health and to supply water on a citywide basis." Martin V. Melosi, PhD, *The Sanitary City: Urban Infrastructure in America From Colonial Times to the Present*, 423 (2000). "The new distribution system of pipes and pumps removed from the individual responsibility for filling containers at a public well or local watercourse, and made the waterworks . . . responsible for bringing water directly to each consumer. Implicit in this system was a guarantee that the supply met the prevailing standards of purity." *Id*. at 424.

-19-

In modern society, when we turn on a faucet, we expect safe drinking water to flow out. As the evidence shows, that is no longer the case in Flint. The Flint water crisis has in effect turned back the clock to a time when people traveled to central water sources to fill their buckets and carry the water home.

Although the evidence from the hearing established that Flint's tap water is not safe to drink, the defendants maintain that injunctive relief is not necessary because Flint residents can obtain all the water they need for drinking from bottles available at points of distribution (PODs) throughout the city, and tap water run through a filter contains only small amounts of lead, which measures below the EPA's action level prescribed by the SDWA's regulations. They rely on *Lyda v. City of Detroit* (*In re City of Detroit, Mich.*), No. 13-53846, 2014 WL 6474081 (Bankr. E.D. Mich. Nov. 19, 2014), as authority for the idea that community water distribution efforts negate a finding of irreparable harm. In that case, the plaintiffs sought, among other things, to enjoin the City of Detroit from shutting off their water due to unpaid water bills. *Id*. at *1. The court assessed the preliminary injunction factors, even though it questioned its authority to grant such relief. *Id*. at *13. The court concluded that an injunction would not be warranted because there was very little likelihood of success on the merits, even though there was strong evidence of irreparable harm. *Ibid.* The court gave two reasons for rejecting the defendants argument that the availability of bottled water ameliorated the irreparable harm caused by water shut-offs: first, bottled water was more expensive, and second the court noted "it is challenging to commit the time and energy necessary to purchase and transport sufficient quantities of water." *Id*. at *12. Although the Flint defendants argue that the *Lyda* court denied injunctive relief, in part, because of the patchwork of charity and public funds available to the plaintiffs to assist with obtaining water, the case plainly does not stand for that

-20-

proposition. *See Lyda*, 2014 WL 6474081, at *11 (stating that "there ha[d] been no analysis of whether the available resources w[ould] be sufficient to address [the plaintiffs'] need[s] over the long term"). Moreover, the plaintiffs have offered evidence that rebuts the defendants' assumptions that the distribution of water filters and bottled water addresses the obvious daily need for safe drinking water.

The filtered water solution is a commendable step, but it is uneven at best. MDEQ Chief Bryce Feighner testified that filtered water is safe for everyone to drink, including young children and pregnant women. But he also acknowledged and agreed with a Centers for Disease Control (CDC) study that found that certain Pur and Brita filters make the Flint tap water safe to drink only when the filters are properly installed and maintained.

Christopher Kelenske, a Captain with the Michigan State Police who commands the Emergency Management Homeland Security Division, assumed control of the emergency response in Flint in January 2016, and presently manages the State's response to the Flint water crisis and coordinates the distribution of resources in Flint. He testified that between 30,000 and 34,000 homes rely on the Flint water system. He confirmed that water filters and cartridges are available to Flint residents at several PODs throughout the city. The water filters were confirmed by the National Sanitation Foundation to reduce lead in drinking water. According to Captain Kelenske, as of April 11, 2016, all of the active water customer households had been visited by water response teams. Of those homes, 90% confirmed having water filters. The remaining 10% of homes have been visited, but response teams have been unable to make contact to confirm the residents have the water filters. Additionally, 89.1% of the 5,686 apartments in Flint have been visited and 99.7% of those visited confirmed having water filters. As of April 11, 2016, more than 100,000 certified

water filters, 240,000 water filter cartridges, and 44,000 water testing kits had been distributed.  He also testified that the MDEQ recently began a program called Community Outreach and Resident Education (CORE), which sends out teams to install water filters and educate residents about the water crisis.  In August 2016, CORE personnel began training Flint residents to take over the program.  There are currently two teams in operation and they have visited approximately 1,100 homes and installed approximately 400 water filters.

Nonetheless, distributing water filters alone does not guarantee that they are properly installed and maintained.  For instance, Michael Hood, the executive director of Crossing Water, a non-profit corporation started in January 2016 to respond to the Flint water crisis, testified that his organization delivers bottled water and water filters to Flint residents using rapid response service teams (RRSTs), and also installs water filters and installs new plumbing when necessary to allow for the installation of water filters.  Crossing Water has visited more than 400 homes and interacted with approximately 800 families in Flint.  According to Mr. Hood, the installation process is not as simple as one might imagine.  Damage to the faucet and pipes, which he often finds, prevents proper installation.  Aerators must be removed from the faucet head and cleaned, which can be difficult if the aerator has corroded onto the faucet or the resident does not have the dexterity to remove it. After the aerator is reattached, the appropriate adaptor and washer that comes with the water filter must be attached to the faucet.  However, sometimes the adaptors do not fit a given faucet.  If the filter is attached, a filter cartridge must then be placed inside that water filter and cold water only must be run through the filter to make sure it is working.

Mr. Hood testified that some residents can install the filters easily, but others have difficulty for a variety of reasons: some are illiterate or do not read English and therefore cannot read the

-22-

instructions; others have cognitive issues, are elderly, or lack the tools necessary for the installation; and still others have faucets that simply are not compatible with any of the filters.

Moreover, once a water filter is installed, it is important to maintain it by periodically replacing the cartridge. The filters have lights that indicate when the cartridge is expired or about to expire. But it is also important to run only cold water through the filters, because hot water can compromise the cartridge. Mr. Hood testified that some residents have been given the wrong cartridge replacements, are running hot water through the filters, and in one case a resident was using the filter without a cartridge, rendering it entirely ineffective. Mr. Hood testified that the data that have been collected by Crossing Water indicates that as many as 52% of the homes visited by Crossing Water had some type of problem with the water filters. Although on cross-examination, the city defendants challenged Crossing Water's computation and suggested that the actual number supported by the data was closer to 23%, even that number indicates that the distribution of water filters does not ameliorate the danger of lead contamination to a large swath of Flint water customers.

Cynthia Roper, the director of Michigan Voice, an advocacy group, testified that she has witnessed confusion about maintaining water filters. For example, in July she spoke with a woman who had her 15-year-old son install the water filter, but the resident was not sure it was installed properly. When asked how long it had been since she had replaced the filter, the woman reported five months, which far exceeds its effective life. Ms. Roper also mentioned that the woman ran hot water through the filter, which compromises the filter.

The installation and proper maintenance of water filters that allow delivery of tap water with lead contents below the Lead and Copper Rule's action level might be an acceptable response that

-23-

blunts the plaintiffs' claim of irreparable harm. But the defendants have not offered sufficient evidence that the water filter solution is an effective one, because there is no reliable data establishing that the filters are properly installed and consistently maintained.

That leads to the question whether the defendants' efforts to furnish bottled water adequately alleviates the harm they caused with lead contamination. Certainly, since the Flint water system cannot deliver safe drinking water to the homes of Flint residents through its water main and service line distribution system, then alternate container delivery — bottled water — becomes necessary. The defendants insist that they have satisfied that obligation, and indeed, significant efforts to distribute bottled water have been undertaken.

Captain Kelenske testified in an affidavit that on January 6, 2016, the State Emergency Operations Center (SEOC) was activated and staffed daily from 8:00 a.m. until 5:00 p.m, and later those times were extended to 8:00 p.m. seven days a week. On January 8, 2016, Flint's Mayor dedicated five Flint fire stations as points of distribution. Additionally, nine Flint churches were supplied with bottled water for distribution. The fire stations were staffed by the American Red Cross and remained open from 9:00 a.m. to 9:00 p.m. State agencies also have been working on translating written information to be distributed into multiple languages, including Spanish, Chinese-Mandarin, Arabic, Hmoob-Hmong, and American Sign Language.

Beginning on January 14, 2016, in addition to current water supplies, more than 12,000 cases of water began to arrive daily for distribution. According to the Flint defendants, there is no limit on the amount of water a resident may have, and residents are not required to produce identification to receive Commodities. More points of distribution were set up and service announcements were

-24-

made to inform Flint residents of their locations.  According to Captain Kelenske, as of April 11, 2016, more than 8 million liters of water had been distributed.

The State continues to operate nine PODs, one in each of Flint's nine wards.  The Flint Transit Authority is willing to make adjustments to bus routes to assist with water distribution, and will provide free rides to the points of distribution if needed.  The United Way has provided bus passes for those who cannot afford them.

Kelenske testified that his agency identified individuals in Flint who are homebound and created an Access and Functional Needs list (AFN list).   The initial AFN list was compiled by contacting various agencies that serve, for example, the aging population.  As of date of the hearing, a list of 1250 residents had been compiled; those residents receive weekly deliveries of water.  He contends that the people on the list are visited by rapid response teams approximately every five to seven days.  Flint residents may also call either 211 or (866) 561-2500 if they need assistance installing water filters or require deliveries of water.  The requests made through the call numbers are sent to the emergency operations centers several times a day and delivery routes are scheduled. The delivery teams are comprised of individuals from the American Red Cross and AmeriCorp National Civilian Community Corps.  When the teams make contact with Flint residents, they determine whether the residents need to be added to the AFN List.

Those efforts certainly are commendable.  However, the plaintiffs have offered credible anecdotal evidence that indicates that the distribution network is in flux and not completely effective in providing safe drinking water to several households.

For instance, Loretta Burns, a 69-year-old long-time Flint resident, testified in an affidavit that getting bottled water has become a major challenge.  She is the primary care giver for two of

-25-

her grandsons, and takes care of her husband, who has significant health problems.  Ms. Burns is the only person in her household capable of obtaining cases of bottled water.  She says that shortly after the water crisis was announced, her family received home deliveries of bottled water from volunteers and community organizers.  After a month, however, those deliveries ceased.  Ms. Burns says that it has been difficult to get information, and only learned that she was able to get water from one of the fire stations because she happened to drive by it.  And when she did ask for water from that location, she was limited to two cases, which forced her to stop at various churches advertising bottled water.  Furthermore, Ms. Burns says that the lines at the fire station were long, she had to sign her name, give her address, and show her driver's license to receive the water.  When the fire station stopped providing water, she drove around town looking for a new distribution center and asked neighbors where water could be found.  Because of the size of her family, Ms. Burns has to pick up cases of water about three times a week, and she is never sure where water will be available, or how much she will be allowed to have.  Ms. Burns says that she has filters, but that she has received conflicting information about who should use the filters and how often the filters need to be changed.

Jacqueline Childress, a 60-year-old retired General Motors inspector, testified at the hearing that she has been a resident of Flint for most of her life.  She rents a house in Flint and lives with her 40-year-old son who has a mental disability.  Ms. Childress relies on her pension and Social Security benefits to support herself.  She does not drink the tap water in her home.  Neither she nor her son own a vehicle; she must rely on others to drive her to pick up water from the various PODs.  Sometimes her other son gives her a ride, but other times she pays anywhere from $10 to $20 for a ride to pick up the bottled water she uses for drinking.  When the water crisis first began, Ms.

Childress says that she often received deliveries of bottled water. However, the water deliveries have slowed down and now are not frequent. She has called 211 several times, but has yet to receive a bottled water delivery as a result of calling 211. Ms. Childress testified that she has plates and screws in her legs, which makes it more difficult to carry cases of bottled water. She acknowledged that there are sites where water can be obtained, but without a car she cannot retrieve the drinking water. She knows buses are available, but she is only able to carry one case of bottled water at a time, which may only last her family half a day. She said that she has run out of bottled water a number of times. Ms. Childress testified that she has a water filter, but when it was installed the faucet broke. She said that she was unaware that the plumbers union had been replacing faucets at no cost. Without a working faucet, she cannot use a water filter. She said that for many people on her block it is a big struggle to get the bottled water they need.

Jerry Gains is a 67-year-old veteran who lives with his wife and daughter; all suffer from serious medical conditions. Before the fire station near him stopped providing water, he was making three trips a week to retrieve cases of water. When he would go to the station, he could only get two one-gallon jugs or two cases of water per visit, which was simply not enough to meet his household's needs. He was forced to drive around the city searching for water to supplement the water he received from the fire station. Recently, after several changes in distribution centers, he has been able to get as much water as he asks for. Mr. Gains notes, however, because he is unable to walk up his front steps with a case of water, he has to toss the cases to the top of the stairs so his daughter can pick them up. He has to take breaks when unloading the water because he gets short of breath. He only recently heard about the 211 number from a neighbor.

A filter was delivered to Mr. Gain's home early in 2016, but it did not have installation instructions. He installed it and assumed it could remain in place until the indicator light turned red. However, after four months the indicator light did not change, and a canvasser subsequently told him that he should be changing the filter at least once a month. Therefore, he and his family do not trust the filtered tap water.

Community organizers contend that the experiences of Ms. Burns, Ms. Childress, and Mr. Gains are not unique. Mary Brady-Enerson testified in an affidavit that she has canvassed Flint since January 31, 2016 and has encountered residents without access to safe drinking water, faucets that cannot use filters, and those who are confused on how to properly install and monitor filters they have. She also contends that the new distribution centers do not open until noon and close most days by 6 p.m.

Darnell Ishmel, who runs FlintH2o, a community-led digital platform that seeks to coordinate water and resource access for Flint, has also witnessed Flint residents struggling to access water. He witnessed one man struggling to carry two cases of water on his back to his multi-generational family, as he does several times a week. He recalls one instance when a semitrailer truck from Maryland arrived during a snowstorm blared its horns and called out "Water!" to the Flint residents. Despite being within a few blocks of one of the fire stations, residents from the surrounding area came out in the snow to receive water from the truck.

Despite the substantial efforts of Captain Kelenske and others, it is clear that some residents, who are actively seeking safe drinking water, are encountering great difficulty in accessing safe drinking water by retrieving bottled water from the PODs.

The Sixth Circuit has held that, "'despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required a showing of irreparable harm before an interlocutory injunction may be issued.'" *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 957 (6th Cir. 2013) (internal marks omitted) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 103 (6th Cir. 1982)). Plaintiffs seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (citing cases). "'A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury.'" *Ibid.* (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948.1, p. 139 (2d ed. 1995)).

The plaintiffs have satisfied this factor, even in the face of the defendants' evidence of the availability of bottled water and filters. The fact that such items are *available* does not mean that they are reliably accessible or effective in furnishing safe drinking water to every household. Bottled water is heavy, and not all of Flint's residents are capable of transporting the cases of water effectively. Indeed, the endeavor of hunting for water has become a dominant activity in some Flint residents' daily lives. The initial surge of volunteer support last winter aided greatly in the distribution efforts, but as that effort wanes, for any number of reasons, access to water becomes more difficult. Furthermore, leaving water filters at residents' doorsteps — even if the instructions are provided in multiple languages — does not ensure proper installation and maintenance. The likelihood that some of the filters are installed improperly and Flint residents are continuing to consume lead is quite high under the circumstances.

Additionally, the plaintiffs have shown that the AFN list is inadequate and there are no clear criteria for getting onto or being removed from the list. The plaintiffs argue persuasively that in light of the varied challenges facing Flint residents, the AFN list only addresses a small part of the access problem. The plaintiffs also point out that the 211 help line is not always effective. As Ms. Childress testified, the 211 staff "are very nice when you call them, but they just don't come." Some residents have stopped calling, and some, because illiteracy is common and internet access limited, still do not know that 211 is available to take delivery requests.

The plaintiffs have made a significant showing that at least some residents have struggled to obtain the water they need to sustain themselves. And their evidence raises serious questions as to the efficacy of the emergency response. Flint has been struggling to access safe drinking water for the better part of a year. With the colder months approaching, it is reasonable to conclude that the difficulties will worsen. This factor weighs in favor of the plaintiffs.

### III. Harm to Others

The Flint defendants maintain that injunctive relief in the form requested by the plaintiffs — particularly door-to-door water delivery to every home in the city — will cause them great financial harm, and it is speculative that the relief will be of any benefit. David Sabuda, Flint's Interim Chief Financial Officer, testified that although Flint has a water fund that accounts for the water revenues and the water expenses for the city, it has a projected negative cash flow of approximately $18.9 million between June of 2016 and June of 2017. He also testified that although Flint is anticipating spending $12.9 million on water in the current fiscal year, those funds can be used only to purchase water, and the funds cannot be used to fund a door-to-door water delivery system for bottled water. Sabuda said that if Flint were required to pay for a door-to-door bottled

water delivery service, it would be $9 million a month, and such an expense would be devastating to the City of Flint.

Similarly, Captain Kelenske testified that his staff projected the cost of providing door-to-door delivery service of five cases of bottled water each week for every home in Flint to be approximately $9.4 million a month, which is $6 million more than his operation is spending now. At 10 cases a week, the estimated cost would be $11.4 million a month. Captain Kelenske expects it would take 70 teams to accomplish such deliveries and his recommendation would be to activate the National Guard, although he offered no supporting information for either the amount of expense or the need for the National Guard call-up.

Added expenses of that magnitude, if shouldered solely by the City of Flint, indeed would be daunting. But, as noted above, the city still is under the governmental control of the State of Michigan through the governance of the RTAB. The plaintiffs have furnished evidence that of the $212 million appropriated by the State to respond to the Flint water crisis, about $100 million remains unspent, and only about five percent of the total has been used to purchase bottled water and filters.

The defendants argue that the large cost of the proposed injunctive relief is not worth the benefit, relying on *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013). In that case, environmental groups sued to enjoin the construction of the Gulf Coast Pipeline and sought a preliminary injunction until their case could be litigated fully. The court found that because the enormous cost of delaying the project ("hundreds of thousands of dollars each day," *id.* at 890) could not be justified by a "minimal impact on the environment," *ibid.*, the plaintiffs failed to show that the balance of the equities favored them. That case is not persuasive. The harm in this case is not

-31-

environmental; it concerns public health and safety.  The "minimal" harm posed by the pipeline construction in *Bostick* pales to the dangers posed by lead in Flint's drinking water and the daily struggles Flint residents have endured to obtain safe drinking water for the past year.

Moreover, in the Sixth Circuit, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended' in compliance with an injunction 'are not enough'" to show a substantial harm. *United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir. 2004) (quoting *Baker v. Adams County/Ohio Valley School Board*, 310 F.3d 927, 930 (6th Cir. 2002)).  And, as the plaintiffs point out, the harm to be remediated by the injunction is largely of the defendants' making. *See Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002) (holding that where state defendants proceeded with the construction of a highway project without complying with various environmental statutes and "'jumped the gun' on the environmental issues by entering into contractual obligations that anticipated a pro forma result," injunctive relief was proper in part because "the state defendants are largely responsible for their own harm," and the environmental harms from proceeding without proper compliance with the statutes outweighed the costs to the defendants).

Finally, the financial harm to the defendants can be mitigated by scaling back the scope of injunctive relief sought in a way that ensures the benefit of safe drinking water in each household. As noted above, water filters can provide homes with safe drinking water that complies with the Lead and Copper Rule regulations *if* those filters are installed and maintained properly.  The defendants need not deliver water to homes that have properly installed and maintained faucet water filters, as long as the defendants can monitor and verify the effectiveness of the filters.

It is clear that the interim relief the plaintiffs seek would provide a concrete benefit for many Flint residents.  Flint's monetary concerns, although valid, are not enough to tip the scale in their

-32-

favor in light of the physical harm Flint residents have been exposed to during this water crisis. Moreover, the Flint defendants would not be required to shoulder the full cost if the plaintiffs' requested relief is granted. This factor also favors the plaintiffs.

### IV. The Public Interest

There can be no dispute that "the public interest at stake here, the quality of public drinking water and the health and safety of the consumers, is fundamental." *United States v. Alisal Water Corp.*, 431 F.3d 643, 656 (9th Cir. 2005). Where the public interest is involved, "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946). "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Ibid.* The SDWA gives the district court authority to enter "such judgment as protection of public health may require." 42 U.S.C. § 300g–3(b).

The Flint defendants argue that granting this preliminary injunction would force the City to reallocate both personnel and money away from its most critical priority: restoring its water system. They argue that such relief would contravene the public interest because it would prolong the water crisis in Flint. The plaintiffs argue that the relief they seek is the type of relief contemplated for those that seek exemptions from the Lead and Copper Rule. 40 C.F.R. § 142.62(f)-(h). The plaintiffs have the better argument.

There is no evidence that an injunction will necessarily halt or delay restoration of Flint's water system. And even if it did delay the process, it is in the public interest to address the immediate health and safety needs of residents before addressing the long-term needs. Here, the

-33-

plaintiffs seek a stop-gap measure that provides ready access to safe drinking water. It is in the best interest of everyone to move people out of harms way before addressing the source of the harm.

The Flint defendants also argue that *Rizzo v. Goode*, 423 U.S. 362 (1976), counsels courts to be reluctant to enjoin governmental bodies. But in that case — which addressed the district court's insertion of "itself by injunctive decree into the internal disciplinary affairs of [a] state agency," *id*. at 380 — the Supreme Court merely reiterated the "settled rule that in federal equity cases the nature of the violation determines the scope of the remedy." *Id*. at 378 (internal quotation marks omitted).

Here, the Court is not being asked to meddle with an agency's internal operations. The plaintiffs are seeking temporary relief to provide Flint residents basic life necessities while the water crisis is resolved. Furthermore, even with the proposed injunctive relief, the defendants still enjoy wide latitude to address Flint's water needs. How the water crisis is resolved ultimately will be left to the City of Flint and the State of Michigan. Nonetheless, there is an immediate danger to Flint residents, and the nature of the defendants' violations reasonably justify the relief ordered herein. There is already a water distribution mechanism in place, so the relief the plaintiffs seek in light of what is already being provided may be a far less drastic than the defendants believe. The public interest factor favors the plaintiffs.

## V.  Remedy

This lawsuit was prompted by the lead contamination of the Flint water delivery system. The interim relief is intended to provide a rough substitute for the essential service that municipal water systems must furnish: delivery of safe drinking water at the point of use. The Court is convinced that this service can be achieved by means of the current water main and service line infrastructure,

-34-

augmented by effective faucet filters that are installed and maintained properly.  If the defendants cannot establish that a household is so equipped, then they must deliver the water by other means. They also must provide information to residents about the current state of the water distributed through the system, proper use and maintenance of filters, and points of distribution of bottled water.

Accordingly, it is **ORDERED** that the plaintiffs' motion for a preliminary injunction [dkt. #27] is **GRANTED**.

It is further **ORDERED** that the defendants, their agents and employees, and those in active concert and participation with them **MUST** provide door-to-door bottled water delivery in the manner outlined below to every non-exempt household served by the Flint Water System.

It is further **ORDERED** that an exempt household shall consist of any of the following:

A.    Any household in which the residents affirmatively opt out of door-to-door water delivery;

B.    Any household in which the residents refuse to permit the installation and maintenance of a qualifying faucet water filter at public expense;

C.    Any household in which the defendants verify that a qualifying faucet water filter is installed and properly maintained.

D.    Any household that is not occupied by residents.

A qualifying water filter (1) is a point-of-use faucet filter certified by the National Sanitation Foundation to remove lead up to 150 ppb and compatible with the household's plumbing in the kitchen and all other locations where a filter is installed; (2) has had the faucet filter properly installed and verified as properly functioning; and (3) is periodically inspected by a qualified person to verify that cartridges are replaced consistent with the manufacture's service life recommendations and that the water filters otherwise are maintained properly.  The defendants must inspect each filter to ensure the filter and cartridge have been maintained properly and are functioning.  Inspections

-35-

must occur at least monthly for the first three months, and at least every other month thereafter. The defendants must provide instructions to one or more adult residents regarding the use and maintenance (including the frequency for changing cartridges) of any filter used by or installed at that household.

It is further **ORDERED** that the door-to-door bottled delivery program for non-exempt household must conform to the following criteria:

A.     The defendants must confirm the number of residents in each household and provide each household with four cases of bottled water per week per resident; each case must contain at least the equivalent of twenty-four 0.5 liter bottles of water;

B.     The defendants may leave bottled water deliveries at each household in the program in an appropriate and conspicuous location if residents are not home at the time of delivery;

C.     The defendants must notify in writing residents of households that opt out of water delivery that they may opt back in to receive weekly bottled water deliveries at any time by calling 211, or another telephone number provided by the defendants.

D.     The defendants must ensure that the water distribution sites operated by the State of Michigan, or equivalent distribution sites, remain in operation as necessary to provide bottled water to those residents who opt out of the bottled water delivery program.

It is further **ORDERED** that the defendants must provide Flint residents with clear and current information about lead contamination in the drinking water that states that: (1) unfiltered tap water from the Flint Water System is currently unsafe for drinking, cooking, brushing teeth, or preparing baby formula because it may contain high levels of lead; (b) lead exposure can cause serious and permanent health harms, especially when consumed by pregnant women, infants, children less than six years old, and adults with high blood pressure or kidney ailments; and (c) faucet filters are effective at removing lead only when properly installed and adequately maintained. The notices must also list the locations, hours, and resources available at state-run water distribution sites, and provide a phone number, email address, and website that Flint residents can use to notify

-36-

the defendants if they lack access to sufficient safe water and to arrange for a prompt bottled water delivery or faucet filter replacement, installation, or maintenance. The initial notices must be delivered promptly, and thereafter whenever there is a material change in the information furnished. The notices must be delivered in a manner reasonably calculated to ensure actual notification to each household.

It is further **ORDERED** that notices and instructions required by this order must be presented in multiple languages, including English, Spanish, Chinese, Arabic, and Hmong.

It is further **ORDERED** that the defendant will file a status report with the Court **on or before December 16, 2016** documenting compliance with each of the provisions of this order.

It is further **ORDERED** that this order shall be effective immediately and continue until further order of the Court.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  November 10, 2016

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 10, 2016.

s/Susan Pinkowski
SUSAN PINKOWSKI