UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, MELISSA MAYS, AMERICAN
CIVIL LIBERTIES UNION OF MICHIGAN,
and NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

          Plaintiffs,

v.

          Case Number 16-10277
          Honorable David M. Lawson

NICK A. KHOURI, FREDERICK HEADEN,
MICHAEL A. TOWNSEND, DAVID
MCGHEE, MICHAEL A. FINNEY,
BEVERLY WALKER-GRIFFEA, NATASHA
HENDERSON, and CITY OF FLINT,

          Defendants.

_____/

**OPINION AND ORDER DENYING MOTION TO STAY PRELIMINARY INJUNCTION**

On November 10, 2016, the Court ordered that the defendants — operators of the Flint water system — provide the residents of Flint with safe drinking water at the point of use. That ruling was based on testimony furnished by the State defendants that unfiltered tap water delivered to Flint users does not comply with the Lead and Copper Rule and is unsafe to drink. The primary method of water delivery outlined in this Court's order was through the Flint Water System's existing transmission infrastructure with the added protection of properly installed and maintained water filters. The State's witnesses assured the Court that tap water run through a properly installed and maintained water filter is safe to drink. For those households that do not have a properly installed and maintained water filter, the Court ordered the defendants to deliver bottled water.

The Michigan Attorney General has filed a motion on behalf of the State defendants asking that this Court's order for safe drinking water be stayed. He says that the current method of

"delivery," whereby Flint residents must find a way to retrieve their own drinking water, and can use water filters that may or may not be installed and maintained correctly, is good enough. He bases his arguments on the premise that all of the factors relevant to a stay pending appeal favor the Court staying the preliminary injunction. He is incorrect. The State defendants' arguments consist of a rehash of contentions advanced and rejected by the Court earlier in this case, a mischaracterization of the nature of the relief ordered, and factual assertions that are unfaithful to the record. The motion to stay the preliminary injunction will be denied.

I.

Based on the evidence presented by the parties — including the State defendants' witnesses — the Court was convinced that the most effective means to ensure compliance with the Safe Drinking Water Act's (SDWA) Lead and Copper Rule for the benefit of Flint residents was the proper installation and maintenance of faucet water filters for all water system users. That conclusion was supported by the testimony of two of the State defendants' witnesses: MDEQ Chief Bryce Feighner and Michigan State Police Captain Christopher Kelenske. For those households for which the defendants could not demonstrate compliance, the Court ordered that bottled water be delivered.

In their stay motion, the State defendants cite the cost of monthly delivery of bottled water to 100% of the Flint households as the basis for their conclusion that the Court's remedial order is unreasonable and overbroad. That peculiar argument is based on a demonstrably false premise. Moreover, when considering the nature of the remedy ordered to address the continuing violation of the SWDA's regulations, and the consequences of noncompliance, a balance of the applicable factors does not favor a stay of the preliminary injunction.

The traditional factors balanced with each other when deciding whether to stay a court's order pending appeal are: "'(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.'" *Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 661 (6th Cir. 2016) (quoting *Serv. Emp. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 343 (6th Cir. 2012) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). The factors are "'interrelated considerations,'" *Husted*, 698 F.3d at 343 (quoting *Griepentrog*, 945 F.2d at 153), meaning that a strong showing of irreparable injury, for example, might make up for a modest showing of likely success, *Griepentrog*, 945 F.2d at 153-54 (observing that "more of one excuses less of the other" (citations omitted)). However, a defendant seeking to stay a district court's judgment "is still required to show, at a minimum, 'serious questions going to the merits.'" *Ibid.* (quoting *In re DeLorean*, 755 F.2d 1223, 1229 (6th Cir. 1985).

A.

The State defendants argue that they are likely to be successful on their appeal for at least four reasons. They say, *first*, that the Treasurer and members of the RTAB are not "operators" of the Flint water system; *second*, the Eleventh Amendment prohibits the remedial relief the plaintiffs seek because the plaintiffs failed to demonstrate an ongoing violation of the Safe Drinking Water Act (SWDA); *third*, the injunction is overbroad and unsupported by reliable evidence; and *fourth*, the Court failed to comply with the security requirement of Federal Rule of Civil Procedure 65(c). The Court will address each in turn.

The argument that the State defendants — the state treasurer and members of the Flint Receivership Transition Advisory Board (RTAB) — are not operators of the Flint water system has been discussed and rejected in the Court's opinion denying the motion to dismiss, *Concerned Pastors for Soc. Action v. Khouri*, No. 16-10277, 2016 WL 3626819, at *11 (E.D. Mich. July 7, 2016), and the order for the preliminary injunction, *Concerned Pastors*, 2016 WL 6647348, at *6-8 (E.D. Mich. Nov. 10, 2016). The State defendants rely on *Phillips v. Snyder*, 836 F.3d 707, 715-16 (6th Cir. 2016), for the proposition that emergency managers appointed by the governor are local actors. The case contains no such holding, although it does confirm that "states may allocate the powers of subsidiary bodies among elected and non-elected leaders and policymakers." *Id.* at 715 (citing *Sailors v. Board of Education*, 387 U.S. 105 (1967)). And it is true that the mere act by a state governor of appointing a public official — even when that official displaces a locally elected official — does not make the governor responsible for everything that the appointee does. But as discussed in detail in the previous opinions, Michigan law subjects emergency financial managers to oversight by the governor and the state treasurer, and curtails the power of local government officials during the state receivership. Mich. Com. Laws §§ 141.1549(2), (3)(d), (3)(e), (8); *Phillips*, 836 F.3d at 712.

Moreover, Flint is still in state receivership and the emergency manager orders are still in effect and cannot be modified by the City. One such order requires the City to take all steps necessary to complete the KWA project. The RTAB must make and approve any decisions to remediate the continuing crisis in Flint, and substantial evidence shows that the State defendants have significant involvement with compliance going forward. Because the State defendants effectively "manage[] . . . the affairs of [the Flint water] facility," *United States v. Bestfoods*, 524

U.S. 51, 66 (1998), they are responsible as operators because they "exercise . . . direction over the facility's activities," *id.* at 71.

The State defendants' argument that the Eleventh Amendment prohibits the Court's injunction is premised on their belief that there are no ongoing violations of the SDWA. The evidence establishes otherwise. Monitoring violations are continuing and are likely to recur. Neither the sentinel site program nor residential monitoring that relies on volunteers who do not have homes from the pre-selected high-risk pool comply with the Lead and Copper Rule (LCR). Mr. Feighner testified that the sentinel and extended sentinel sites do not all meet the LCR's high-risk criteria. Moreover, as the plaintiffs point out, Flint's Water Treatment Plant Supervisor JoLisa McDay admitted at deposition in July 2016 that the water system did not have the proper monitoring program in place. Nor is it likely that the monitoring will be complied with in the near future because there are not an adequate number of qualified personnel to ensure compliance. Although Mr. Feighner testified about the current monitoring efforts, he did not rebut evidence of inadequate staffing and long-standing violations of the LCR monitoring requirements.

The State defendants make the point that the Court erred by stating that the 15 ppb "action level" for lead content was a "maximum contaminant level" (MCL). They are correct that this statement was erroneous. The EPA's MCL *goal* for lead is zero. The EPA decided not to establish an MCL for lead, and instead adopted a treatment technique approach, which set an "action level" of 15 ppb that triggered a number of compliance measures such as corrosion control, source water treatment, lead service line replacement, and public education. Maximum Contaminant Level Goals and National Primary Drinking Water Regulations for Lead and Copper, 56 FR 26460-01 at 26477. Nonetheless, the plaintiffs are correct that the Court did not rely on the misstatement of an MCL to

conclude that the Flint water system did not have optimal corrosion control treatment. The Court summarized the relevant regulations and credited information that showed lead levels in the water both above and below 15 ppb. The Court finally concluded that it is not in dispute that the action level was exceeded, and Mr. Feighner conceded that unfiltered tap water in Flint is not safe to drink at this time. The SDWA violations continue, and the injunction is designed as a remedial measure to order compliance going forward.

The State defendants' argument that the injunction is overbroad and lacks evidentiary support is based on the mistaken notion that the primary remedial action contemplated is the door-to-door delivery of bottled water to all residents in Flint. The main thrust of the ordered relief is the proper installation and maintenance of tap water filters. For those homes that have properly installed and maintained water filters in place — which is the vast majority of residences, if the State defendants' witnesses are to be believed — bottled water delivery is not necessary and was not ordered. But there are two problems with the State defendants' position. First, handing out a water filter does not ensure that it is effective in reducing lead content of drinking water to an acceptable level. There must be a protocol in place to see that the filters are installed and maintained properly. Otherwise, the presence of a filter alone may cause the more insidious problem of false security in the suitability of the tap water for drinking. Second, for many without a proper filter in place, the difficulty of obtaining drinking water is significant, as the testimony demonstrated. The evidence of a systemwide problem supports the need for systemic relief for Flint residents. The SDWA empowers citizens to act as "private attorneys general" to "seek relief . . . on behalf of society as a whole," further suggesting the propriety of a systemwide remedy. *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004) (discussing Clean Air Act citizen suits); 42 U.S.C. § 300j-8(a)(1).

The injunction is tailored to the specific systemic harms found and is appropriate in scope. A stay pending appeal would perpetuate the very irreparable harm the preliminary injunction is designed to address.

Finally, the defendants are correct that the Court did not address whether a security bond was required under Federal Rule of Civil Procedure 65(c). "[T]he rule in [the Sixth] [C]ircuit has long been that the district court possesses discretion over *whether* to require the posting of security." *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (quoting *Moltan Co. v. Eagle–Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978)) (emphasis in original). "A court errs when it "'fail[s] to . . . expressly consider[ ] the question of requiring a bond' *when the issue has been raised*." *Ibid*. (quoting *Roth*, 583 F.2d at 539) (emphasis added). The defendants never broached the issue, and they have not asked for reconsideration on that point. No error occurred, and the Court has significant discretion to waive the bond requirement in light of the public interest. *See Moltan Co. v. Eagle-Picher Indus., Inc*., 55 F.3d 1171, 1175-76 (6th Cir. 1995).

The State defendant have not demonstrated that they are likely to prevail on the merits of the appeal on any of these points, and therefore this factor does not favor a stay of the injunction.

B.

It is unlikely that the State defendants will be irreparably harmed absent a stay. The defendants acknowledge an obligation to furnish safe drinking water to Flint residents — an obligation which has eluded them following the calamity brought about by the state-appointed emergency managers' decisions when operating the Flint water system. The Court's injunction is

designed reasonably to ensure that the measures taken will be effective to satisfy the demands of the SDWA and its regulations in the short term.

Notwithstanding the response to the crisis by the State defendants, Flint residents continue to suffer irreparable harm from a lack of reliable access to safe drinking water. This is more than a mere inconvenience; hunting for water has become a dominant activity in some residents' lives, causing anxiety, stress, and financial hardship. As noted above, those who rely on filters that may not be properly installed or maintained are at risk of exposure to lead. As noted by the record, there are systemic barriers to water access that the injunction is tailored to address. Compliance with the order does not require bottled water delivery in perpetuity, or to every household. The defendants may discontinue delivery if they ensure that a home has a properly installed and maintained water filter, or residents opt out of the delivery service.

C.

The State defendants contend that the public interest favors a stay because of the financial commitment necessary to comply with the Court's injunction, among other reasons discussed below. They say that if the appropriated funds for Flint relief, which include other services, are redirected solely to comply with the Court's order to deliver four cases of bottled water per week to every Flint resident, some of the broader relief efforts will be left without funding. That argument is based, in turn, on the defendants' continued but disingenuous assertion that the cost of door-to-door water delivery carries a monthly cost of $10.5 million. The State defendants' forceful but aimless language on this point is undermined by the evidence they themselves have offered to the Court, both at the evidentiary hearing and in support of this stay motion.

The $10.5 million figure is a chimera. According to Captain Kelenske, it is based on the idea that between 30,000 and 34,000 homes rely on the Flint water system, and five cases of water would be delivered to each one of them every week. But Captain Kelenske also testified that under his watch, every Flint home has been visited and his operation has verified that 96% of the homes have water filters. The remaining 1,000 to 1,500 homes that are on the water system but have not been verified as having a water filter may be because some of those homes are unoccupied. Captain Kelenske did not say that all of the households with water filters have them properly installed and maintained. But according to the State defendants' witness, George Krisztian, the cost of verifying that faucet water filters are installed and maintained properly is $955,971. Moreover, how compliance with the injunction might affect other state-funded projects in Flint is in the State defendants' hands. Because State defendants substantially can control the costs of compliance, and can fund those costs from the state treasury, the order does not necessarily require displacing any existing or planned projects.

The defendants also insist that delivering massive amounts of bottled water to each Flint resident will slow the recovery of Flint's water system by significantly decreasing the amount of water moving through the Flint water system delivery lines. There is no factual support for that assertion, and it defies common sense. Even where no effective filter is in place, faucet uses that bottled water delivery may displace constitute only a small fraction of household water use. According to the EPA, an average family of four uses 400 gallons of water per day, or 2800 gallons per week. Approximately 70% of that water usage is used indoors. The indoor water usage is 26.7% toilet, 21.7% clothes washing, 16.8% shower, 15.7% faucet, 13.7% leaks, and 5.3% other.

Faucet usage includes washing hands and dishes, as well as drinking water and water for cooking. https://www3.epa.gov/watersense/pubs/indoor.html (last visited December 2, 2016).

The State defendants argue that the Court's order is contrary to the public interest because water needs to move through the water pipes in order to reform the scale that prevents lead from leaching into the water. The argument goes that any water delivered to Flint residents would offset the amount of water that moves through the water system therefore slowing the reformation of the orthophosphate scale. This argument is specious, because the amount of water displaced by bottled water use is negligible.

Moreover, Flint residents are already offsetting the amount of water moving through the water system by consuming large amounts of bottled water. And, as noted above in several places, the Court's order does not call for bottled water delivery to every house. It calls for water filters to be installed and properly maintained, which in turn would increase rather than decrease the amount of water moving through the water system. Finally, even if the State decided to ignore the water filters and instead deliver bottled water to every house in Flint, the amount of water offset would be very small — about 1.7% of usage for a family of four. And in any case, the defendants can address this issue by installing and maintaining filters, which should result in no water use reduction.

The State defendants also argue that complying with the Court's order could add an additional 4.7 million plastic bottles to Flint's recycling system each week. That argument assumes, however, that (1) door-to-door bottled delivery would be provided to every Flint residence — a premise that is simply false; and (2) delivery of bottled water would have an effect on the amount of bottled water usage, compared to the present system of requiring residents to fetch the cases of bottled water from distribution points. There is no evidence on this second point. If recycling empty

-10-

water bottles is a municipal problem, it is one that already exists, because Flint residents know that it is not safe to drink unfiltered tap water. The purported recycling problem was caused by the damage wrought on the Flint water system infrastructure through the ill-advised decisions of appointed receivership officials. The Court's injunction would have no effect on that score, and the argument impacts the public interest factor not at all.

Next, the State defendants argue that the scope of the Court's door-to-door delivery has no known precedent. Perhaps, but there also is no precedent for the systemic infrastructure damage to a water delivery system caused by a public official's decision to switch to a water source that is corrosive and the failure to "install and operate optimal corrosion control treatment." 40 C.F.R. § 141.80(d)(1); *see also* 40 C.F.R. § 141.2 ("Optimal corrosion control treatment . . . means the corrosion control treatment that minimizes the lead and copper concentrations at users' taps while insuring that the treatment does not cause the water system to violate any national primary drinking water regulations."); 40 C.F.R. § 141.82(g) ("All systems optimizing corrosion control shall continue to operate and maintain optimal corrosion control treatment, including maintaining water quality parameters at or above minimum values or within ranges designated by the State." The relief ordered is consistent with the EPA's requirements in the LCR. The order builds on the existing water distribution mechanisms to provide a rough substitute for the essential service that municipal water systems must furnish, and mirrors what the EPA already requires of water systems that seek exemptions from the LCR. *See* 40 C.F.R. § 142.62(f)-(h).

D.

The Lead and Copper Rule is intended to "provide maximum human health protection by reducing the lead and copper levels at consumers' taps to as close to the MCLG as is feasible."

Maximum Contaminant Level Goals and National Primary Drinking Water Regulations for Lead and Copper, 56 Fed. Reg. 26460-01 (June 7, 1991). Because, according to the State defendants' witnesses, unfiltered tap water delivered to water customers of the Flint water system is not safe to drink, the public interest is not served by staying the injunction designed to ensure that each water user has an operational tap water filter, or that there is a suitable alternative for the delivery of safe drinking water at the point of use.

II.

The factors set out in *Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 661 (6th Cir. 2016), do not favor staying the Court's preliminary injunction.

Accordingly, it is **ORDERED** that the motion to stay the injunction pending appeal [dkt. #97] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: December 2, 2016

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 2, 2016.

s/Susan Pinkowski
SUSAN PINKOWSKI