UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, MELISSA MAYS, AMERICAN
CIVIL LIBERTIES UNION OF MICHIGAN,
and NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

      Plaintiffs,

v.

NICK A. KHOURI, FREDERICK HEADEN,
MICHAEL A. TOWNSEND, JOEL
FERGUSON, MICHAEL A. FINNEY,
SYLVESTER JONES, and CITY OF FLINT,

      Defendants.

Case Number 16-10277
Honorable David M. Lawson

_____/

## ORDER GRANTING PLAINTIFFS' FOURTH MOTION
## TO ENFORCE SETTLEMENT AGREEMENT

The main concerns that the plaintiffs outlined in their fourth motion to enforce the terms of the Settlement Agreement that the parties entered into on March 28, 2017, are that the City of Flint refuses to conduct excavations and service line replacements in two neighborhoods within the City; the City has not complied with the monitoring requirements of the Lead and Copper Rule by identifying 60 water sample sites that the City confirmed meet the Rule's high-risk criteria; the City has fallen far short of its obligation to report on time information about its service line replacement activities, including its in-person outreach to residents; and the City has not conducted mail and in-person outreach to residents to obtain their permission to conduct excavations and replacements in the manner contemplated by the Settlement Agreement. The Court held a hearing via videoconference technology on the motion on October 6, 2020. It appears that the plaintiffs' concerns are well-founded. The Court will grant relief to the plaintiffs.

### A. Service Line Excavations and Replacements

The Settlement Agreement initially required the City of Flint to complete service line excavations for at least 18,000 eligible homes in Flint and replace those lines composed of lead or galvanized steel. Settlement Agmt., ¶9, ECF No. 147-1, PageID.7365. The Settlement Agreement defined an "eligible home" as one that either currently has an active water service account with the City of Flint or had an active water service account as of March 28, 2017 (regardless of any subsequent water shutoff). The Agreement was later modified to require that the City replace the service lines of all the estimated 28,400 eligible residences in the City. It also requires the State of Michigan to provide up to $97 million to fund this work.

In March 2019, the parties agreed to modify the Agreement further to use predictive modeling to identify homes that likely had lead or galvanized steel service lines. That format generated a list of about 4,000 homes that were bumped to the top of the list for service line replacement. The Court's order adopting that stipulation stated further that the "City shall complete excavations and service line replacements . . . for all [prioritized addresses] before it conducts any excavations or service line replacements at any other addresses in Flint" by January 1, 2020. Order Amending Settlement Agmt, ¶3, ECF No. 208, PageID.10347.

The coronavirus pandemic upset the plan, however, and the parties agreed that the City of Flint would complete all required work at the prioritized addresses by October 31, 2020. Order Modifying Settlement Agmt., ¶1, ECF No. 217, PageID.10409. The City had to complete the service line replacement work on all other homes by November 30, 2020. *Ibid.*

The City's pipe replacement work, in its sixth and final phase, has produced excavations at 26,106 residences. Of those, 9,736 service lines were identified as lead or galvanized steel and

replaced. The defendants estimate that by November 30, 2020, the City will have excavated and replaced any identified lead or galvanized steel service line at almost 28,000 residences.

The City has not made any excavations of houses in the University Park and Smith Village neighborhoods, however. The City does not intend to do so (except for six identified addresses), because it believes there is a very low likelihood that any of the homes have offending service lines, because they were built in and after the 1990s. The plaintiffs have refused to agree to exempt those neighborhoods from the settlement, and they now move to enforce the Agreement to compel the excavation work there. The City argues that it should not be compelled to conduct service line excavations for all 180 residences in the University Park and Smith Village neighborhoods because the efforts would be futile as its records indicate that those residences were built recently and do not have lead or galvanized service lines. It also argues that any obligation to do so results from a mutual mistake of fact; it contends that neither party had sufficient information to identify the composition of the service lines in the neighborhoods when they entered into the Agreement.

The parties are well aware that a settlement agreement is "a type of contract and is governed 'by reference to state substantive law governing contracts generally.'" *Cogent Sols. Grp., LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013) (citations omitted). The same is true of consent decrees and judgments. *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 811 (6th Cir. 2007) (quoting *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 372 (6th Cir.1998)). The Settlement Agreement here operates as a consent decree. *See Pedreira v. Sunrise Children's Servs. Inc.*, 802 F.3d 865, 871 (6th Cir. 2015).

Michigan law requires courts to enforce unambiguous contracts "as written unless a contractual provision violates law or public policy." *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 491, 703 N.W.2d 23, 43 (2005). A court's authority to alter such settlement terms is "very limited,"

requiring a finding of "fraud or a mutual mistake of fact." *Universal Settlements Int'l, Inc. v. Nat'l Viatical, Inc.*, 568 F. App'x 398, 404 (6th Cir. 2014) (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1280 (6th Cir. 1991)). Courts may modify an agreement only "when the [mutual] mistaken belief relates to a basic assumption of the parties upon which the contract is made, and which materially affects the agreed performances of the parties." *Lenawee Cnty. Bd. of Health v. Messerly*, 417 Mich. 17, 29, 331 N.W.2d 203, 209 (1982).

There was no mutual mistake that would permit the Court to modify the Settlement Agreement terms for excavating the service lines in the two neighborhoods. *See Brown v. Cnty. of Genesee*, 872 F.2d 169, 171, 174 (6th Cir. 1989) (making clear that only a mutual, not a unilateral, mistake may justify modifying a settlement agreement). The plaintiffs were quite aware that the City had *some* records on service line composition when the Settlement Agreement was executed and modified. *See* Compl., ECF No. 1, ¶149, PageID.47 ("On information and belief, the Water System has not consistently used and does not consistently use the records it may have concerning the locations of lead service lines to confirm that its samples are collected from homes with lead service lines."). Because the plaintiffs were aware that the City's records are often unreliable and viewed City's representations with skepticism, the plaintiffs negotiated terms that did not rely solely on those records. *See* Reply, ECF No. 255, PageID.10955. Instead, the parties agreed that physical excavation at all eligible homes was the only permissible method of verifying service line composition. Settlement Agmt., ¶¶8-9, ECF No. 147-1, PageID.7355; Order Modifying Settlement Agmt., ¶1, ECF No. 217, PageID.10409.

Moreover, the documents relied upon by the City of Flint do not prove conclusively that the residences in the University Park and Smith Village neighborhoods have copper service lines. As the parties have explained, a service line has a public side and a private side, demarcated by a

curb box. The plot files offer no information about the composition of the private side of the service lines. They also say nothing about the pipe materials that were actually installed on the public side; rather, they show what the City contractors planned to do. And the spreadsheet that the City sent to the plaintiffs on August 7, 2020 was incomplete; it lacked information verifying the service line material for each home. For about two-thirds of the homes, the spreadsheet showed the material for only half of the service line. For many of these homes, the other half of the service line is either listed as "?" or is left blank.

The spreadsheet also indicates that the service line material for certain homes was "assumed" because there are no written records of service line material. The spreadsheet also states that the City is missing written records of service line material for most homes in the two neighborhoods. Smith Village/Univ. Park Information, ECF No. 218-2, PageID.10514 (noting that the "card value of the line size was not filled out, hardly any of these are"); *see also* Email from Flint Counsel dated Sept. 1, 2020, ECF No. 218-2, PageID.10531-32 ("The information came from water (service line location) cards, as best as I can interpret them. 20 years ago, approximately, the crews who were there at Smith Village did not necessarily have house numbers, in some cases, or even a structure. So the results were haphazard. . . . Their motivation was to get pipe in the ground, not create legal documents. . . . No prior records, of course, for these new line installations existed. . . . The assumption was that every piece of copper line was 1 inch copper everywhere in the system. Our employees installed nothing."). And the predictive model forecasts that 48 out of 180 addresses in the neighborhood have lead or galvanized steel service lines.

The plot files are also missing entire streets where the City seeks to exclude addresses from the program; for those homes, the documents provide no information about the service line material. The declaration from the City's data technician, Alan Roberts, does not fill these gaps.

-5-

Roberts assumes that many disputed homes have copper service lines because they were built after 2000. Roberts Decl., ECF No. 222-4, PageID.10793-94. But that assumption does not establish that the homes do not have lead or galvanized steel service lines. In fact, the City has excavated 100 homes in other areas where records indicate that homes were built in in 2000 or later and found lead service lines at two of them. Supp. Webb Decl., ¶4, ECF No. 225-2, PageID.10968. And not all homes in the Smith Village and University Park neighborhoods are newly built. Flint Data Analysis, ECF No. 222-4, PageID.10797-99. The City previously conducted eight service line excavations at homes in these two neighborhoods, and three needed to have their service lines replaced because they were made of lead or galvanized steel. Webb Decl., ¶24, ECF No. 218-4, PageID.10729.

Furthermore, excavating the service lines in University Park and Smith Village would not place an "unwarranted burden" on residents or compel them to do anything. Residents are free to decline an excavation. But the Agreement clearly confers that choice on the Flint residents themselves, and some residents in these neighborhoods want their service lines excavated. *See, e.g.*, Flint Resident Hubbard Decl., ¶5, ECF No. 225-3, PageID.10971.

One of the main objectives of the Settlement Agreement was to devise, fund, and implement a plan to replace *all* lead and galvanized service lines at Flint residences. Allowing the City to skip a significant swath of homes based on inconclusive data that no offending service lines would be found undermines a core purpose of the Agreement. Information that goes to the likelihood of finding lead or galvanized steel service lines addresses only the question of priority, that is, the urgency of performing the work. It does not excuse the City from completing the work it is obliged to undertake.

The parties did not make a mutual mistake in their Settlement Agreement. They believed that the City lacked comprehensive, reliable records on service line composition, and the filings pretty much confirm that. The plaintiffs' motion to compel performance of this part of the Settlement Agreement will be granted.

### B. Tap-Water (Lead and Copper Rule) Monitoring

The Settlement Agreement requires the City of Flint to comply with the tap-water monitoring requirements in the federal and state Lead and Copper Rules, 40 C.F.R. § 141.86; Mich. Admin. Code R. 325.10710a, which call for water systems of Flint's size to collect at least 60 tap-water samples in every six-month period beginning in January and July every year, 40 C.F.R. § 141.86(c), (d). Settlement Agmt., ¶¶46-49, ECF No. 147-1, PageID.7384-85. The sample sites must include homes with the highest risk of lead levels in the drinking water, referred to as "Tier 1 sites." 40 C.F.R. § 141.86(a)(1); Mich. Admin. Code R. 325.10710a(1)(c)-(d). Those are homes with lead service lines or copper lines joined with lead solder. 40 C.F.R. § 141.86(a)(3). If there are not enough Tier 1 sites in the system, the sampling pool may include "Tier 2 sites," which are multiple-family residences that are either served by a lead service line or contain interior lead pipes. Mich. Admin Code R. 325.10710a(1)(d); 40 C.F.R. § 141.86(a)(4).

The City must report the test results to the Michigan Department of Environment, Great Lakes, and Energy (EGLE) within ten days after the period ends. *See* 40 C.F.R. § 141.90(a)(1). The agency uses the test results to measure the water system's lead content.

The City resumed its testing duties in July 2018. It has not satisfied the testing requirements for the last three testing periods. For the January-to-June 2019 period, the City did not sample from a preestablished pool of high-risk homes. It collected 129 samples, but only 35 came from Tier 1 sites. EGLE issued a violation notice to the City. Based on the set of 35 verified

samples, it calculated the 90th percentile lead level for the City's water as three parts per billion (ppb). The City was able to verify that an additional 26 sites met the Tier 1 criteria, raising the total verified sites to 61 around September 2019. EGLE calculated the 90th percentile lead level at six ppb.

The City collected only 49 samples from verified Tier 1 homes during the next monitoring period (July to December 2019). EGLE issued another violation notice on March 3, 2020. EGLE also told the City to submit an updated version of its sampling plan for the next six-month monitoring period. Recent amendments to the Michigan version of the Lead and Copper Rule separately required water systems to submit a new sampling pool to the State by January 1, 2020, identifying "sufficient sites to ensure the water supply can collect the number of tap samples required" under the Michigan Rule. Mich. Admin. Code R. 325.10710a(1)(a).

The City did not comply until February 2020. Its submission listed only thirteen sites as Tier 1 sites served by lead service lines. It identified 392 sites as Tier 2 sites, but it identified the service line material as "tbd," and the interior plumbing material listings were left blank.

The City of Flint again failed to collect at least 60 samples from Tier 1 sites during the latest monitoring period (January to June 2020). On August 21, 2020, the City verified that 49 of its samples were from Tier 1 or Tier 2 sites. EGLE issued another violation notice to Flint on September 17, 2020. EGLE "highly recommend[ed] the City identify 90 Tier 2 sites and coordinate access to those sites to ensure the City has an adequate number of sampling sites."

The City explains that its difficulties in meeting the Lead and Copper Rule requirements are caused by the voluntary nature of the sampling process (they cannot sample water when residents refuse), and as it replaces lead and galvanized steel pipes in residences, the number of

Tier 1 sites are disappearing. The plaintiffs are not satisfied with that explanation and ask the Court to order remedial measures aimed at ensuring compliance.

The defendants, including the state defendants, argue that the plaintiffs' request for a court order mandating the City to identify 90 Tier 1 sites usurps the authority of the state and federal agencies to enforce the Lead and Copper Rule (LCR). They say that the plaintiffs should back off and leave the testing enforcement responsibilities to state and federal regulators. The plaintiffs are understandably reluctant to accept that direction. The last time the Flint citizens entrusted the quality of their drinking water to city and state government, things did not work out so well.

The plaintiffs do not rely on the Safe Drinking Water Act to support this request for relief (the SDWA does not contemplate judicial intervention, leaving enforcement to state and federal agencies). Instead, they stake their claim on the Settlement Agreement, which requires that the City must monitor tap-water distributed through the Flint Water system as mandated by the LCR. The SDWA does not limit the Court's authority to order compliance, as the Court possesses "broad equitable remedial powers" to enforce the Settlement Agreement which the parties entered. *Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 533 (6th Cir. 2012) (internal quotation marks omitted); *ibid.* ("Where a consent decree is violated, the court should fashion equitable relief that is designed to make the party whole for his or her loss."); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004).

But Flint says that the Settlement Agreement does not allow the parties (or the Court) to tamper with the sampling requirements. To get to that point, it employs a cannon of interpretation, *expressio unius est exlusio alterius*, which means that the express mention of one thing implies exclusion of other similar things. *See First Am. Title Co. v. Devaugh*, 480 F.3d 438, 453 (6th Cir. 2007) (citing *Millsaps v. Thompson,* 259 F.3d 535, 546 (6th Cir. 2001)). It then points to paragraph

47 of the Settlement Agreement, which states that the "Government Parties shall not seek, and the Michigan Department of Environmental Quality shall not permit, reduced monitoring for the Flint Water System under 40 C.F.R § 141.86(d)(4) until one year after Completion of Service Line Replacement." ECF No. 147-1, PageID.7385. That statement, the City argues, implies EGLE's exclusive authority to regulate the selection of sampling sites. It does not. The Settlement Agreement certainly prohibits state regulators from relaxing a specific provision of the Lead and Copper Rule, but it does not cabin the Court's authority to fashion equitable relief to enforce the Settlement Agreement by, say, increasing the number of sampling sites to address prior serial defaults.

The defendants also argue that compelling the City of Flint to submit a 90-site sampling pool of Tier 1 sites would impermissibly exceed the scope of the Settlement Agreement. The Settlement Agreement requires only that the City comply with the LCR, which mandates "the collection of tap water samples from at least the minimum number of sites specified in the first column ('standard monitoring') of the table in 40 C.F.R. § 141.86(c)," which is 60. Settlement Agmt., ¶¶ 48, ECF No. 147-1, PageID.7385. However, the plaintiffs do not seek a substantive modification of the Settlement Agreement (which would require a showing of mutual mistake or fraud). *Universal Settlements*, 568 F. App'x at 404 (*citing Mallory*, 922 F.2d at 1280)). Instead, they seek injunctive relief to cure the City's ongoing violation of the Settlement Agreement's requirement that it provide water samples from at least 60 Tier 1 sites. That request falls squarely within the Court's "broad equitable remedial powers" to enforce the Settlement Agreement, *Shy*, 701 F.3d at 533, which may include the imposition of "additional affirmative conduct" not required by the underlying agreement. *Roman v. Korson*, 307 F. Supp. 2d 908, 919 (W.D. Mich. 2004)

(citing *In re Arthur Teacher's Franchise Litig.*, 689 F.2d 1150, 1158 (3rd Cir.1982); *N.L.R.B. v. J.P. Stevens & Co., Inc.*, 563 F.2d 8, 15 (2d Cir.1977)).

The City plainly is struggling to comply with the LCR's monitoring requirements. The fact that the City is replacing lead service lines, although commendable, does not excuse its noncompliance with the obligation to monitor water quality. The decrease in Tier 1 sites was foreseeable (and expected) in 2017, when the City began replacing service lines under the Agreement. The City could have anticipated that reality and identified Tier 2 sites for its sampling pool, as contemplated by the LCR. 40 C.F.R. § 141.86(a)(4). Nor does the consent feature provide a valid excuse. If participation is low, the City could enhance its outreach and engagement with community leaders or identify and distribute sampling kits to additional potential sites that meet the Rule's criteria.

The State's willingness to work with the City likewise is commendable; the City's history of noncompliance with its sampling obligation shows that more needs to be done to protect the people of Flint and to ensure that the City's water quality is safe. Although EGLE recently increased its attention to this issue, the City's violations are likely to continue, considering that compliance has been elusive following consecutive violation notices. The plaintiff's requested remedy reasonably is tailored to address the City's shortcomings.

### C.  Outreach Efforts and Reporting

The Settlement Agreement (as amended) includes an obligation of the City to report monthly to the plaintiffs the progress of the service line replacements. The reports must include details about the City's efforts to obtain consent from residents to excavate and replace the service lines. The City did not report any information on its outreach activities in December 2019 and throughout 2020 until August 11, 2020. And when the report eventually was submitted, it did not

include the required data. Acknowledging this default, the City represented on September 3, 2020, that it would "make every reasonable effort to comply with its reporting obligations under the settlement agreement as amended, particularly in relation to contact attempts." Flint Email to Plfs.' Counsel dated Sept. 3, 2020, ECF No. 218-2, PageID.10657.

The outreach requirement includes the obligation for the City to "undertake reasonable efforts" to obtain consent from residents to excavate and replace the service lines. That consists of "at least two in-person attempts to contact the resident, with at least one of the two attempts being made during the evening (after 5 p.m.) or on a weekend (Saturday or Sunday)," and where in-person attempts fail, "sending at least one written request . . . by U.S. Mail, to the address of the replacement eligible household." Order Amending Settlement Agmt., ¶15a, ECF No. 174, PageID.8711. The Agreement required the City to complete these outreach efforts by late September 2018. Settlement Agmt., ¶15b, ECF No. 147-1, PageID.7368 (requiring completion of outreach within 18 months of the effective date).

On August 11, 2020, the City provided the plaintiffs with a list of about 800 "non-responsive" homes. However, the City it indicated that it was not requiring its contractors to revisit the homes to try to obtain permission for service line excavations, but permitted them to "do[] so at their discretion." In addition, the data contradicted the City's claims of compliance. For 466 homes, the City either made only one in-person visit or did not visit the home after 5:00 p.m. or on the weekend.

On August 18, 2020, the plaintiffs notified the City of the noncompliance. The parties conferred and reached a preliminary agreement for the City to remedy the outreach violations by September 9, 2020; the City would complete additional in-person visits after 5:00 p.m. or on weekends to homes on the non-responsive list that have not yet received the required visits. The

plaintiffs asked for documentation by September 16, 2020. That documentation was not in the plaintiffs' hands as of September 28, 2020. And recent updates from the City show that it has not completed the required in-person outreach at 86 homes (out of 466) the plaintiffs identified in their motion.

Moreover, according to media reports, the City of Flint has been informing residents that they must choose whether to opt into the service line replacement program by September 18, 2020. The plaintiffs are concerned that residents may be misled into believing that they can no longer sign up for a service line excavation after that date. They want the deadline extended.

The City concedes that it has not conducted the required outreach. It does not oppose the plaintiffs' request to order completion of those contact attempts, but it does oppose extending the opt-in deadline. The City says that is has made reasonable efforts to comply with the Settlement Agreement. It has completed 26,232 excavations, 9,769 of which had lead or steel service lines, and it has reached out to an additional 2,000 residents. It believes that about 674 homes still need one or more contact attempts (done by contractors).

The plaintiffs are not inclined to accept the City's oral representations, and they believe the deadline must be adjusted, even if moving it might stimulate procrastination by residents. That feature of human nature must be balanced against the interests of residents who still have not received the required outreach and who may be confused over time limits.

Considering the City's repeated promises and failures to complete this outreach, it is understandable that the plaintiffs find unsatisfying the City's profession of an intention to comply with its outreach and reporting obligations. *See Chilcutt v. United States,* 4 F.3d 1313, 1321-22 (5th Cir. 1993) (sanctions appropriate after defendant who "strung [plaintiffs] along" with repeated "vain assurances of its alleged intent to comply" with discovery orders). Moreover, the City of

Flint has been informing residents that they must choose whether to opt into the service line replacement program by September 18, 2020. Flint Press Release dated Aug. 13, ECF No. 225-5, PageID.11015. Although some news sources suggest that the City may extend the deadline, the plaintiffs are rightly concerned that many residents who have not received the required outreach may believe mistakenly that they can no longer sign up for a service line excavation.

The objective of all parties to the Settlement Agreement was to rid the city water system of lead and steel service lines as at least one means of improving the quality of the City's drinking water. Enforcing compliance with the outreach and reporting requirements honors that intention. And when enforcing a settlement agreement, as with a contract, the first objective is to "honor the intent of the parties." *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 29 n.28 (1994). Understandably, the City is trying to bring to a close the service line replacement program. But allowing the adjustments the plaintiffs request will not materially upset that objective.

### D. Enforcement Waiting Period

The plaintiffs also seek to waive the requirement in the Settlement Agreement that the parties may not seek enforcement relief from the Court until 14 days after serving notice of a violation on a counterparty. Settlement Agmt. ¶¶ 129-30, ECF No. 147-1, PageID.7424. However, the Court believes that provision still serves a useful purpose, and it will not amend the Settlement Agreement to eliminate it.

* * * * * * * * *

The plaintiffs have demonstrated that they are entitled to the relief they request to enforce the terms of this Settlement Agreement that is so important to the welfare of the City's residents,

and which promotes the interests of the City and the State of Michigan in restoring confidence in the municipal water system.

Accordingly, it is **ORDERED** that the plaintiffs' fourth motion to enforce the Settlement Agreement (ECF No. 218) is **GRANTED IN PART**.

It is further **ORDERED** that the City of Flint must conduct excavations at all homes in the University Park and Smith Village neighborhoods (for which consent has been or can be obtained) by the deadlines set forth in the Agreement, as modified, *see* Order ¶ 1, ECF No. 217, PageID.10409, that is by October 31, 2020 for Prioritized Addresses and November 30, 2020 for all other remaining addresses.

It is further **ORDERED** that **on or before November 9, 2020**, the City must (A) submit to the parties a sampling pool of at least 90 sites that the City has confirmed (by hydro-excavation, visual inspection, or other definitive means) meet the Lead and Copper Rule's Tier 1 (or Tier 2 or Tier 3 as necessary) high-risk criteria; and (B) submit to the parties a detailed written plan explaining the City's processes for identifying and recruiting residents at the identified high-risk sites to participate in tap-water monitoring on an ongoing basis.

It is further **ORDERED** that the City must comply with the outreach disclosure requirements in Paragraph 6 of the Court's March 26, 2019 Order, and Paragraphs 5, 6, and 7 of the Court's August 24, 2020 Order. *See* Order ¶ 6, ECF No. 208, PageID.10348-10349; Order ¶¶ 5-7, ECF No. 217, PageID.10412-10413.

It is further **ORDERED** that **on or before October 20, 2020**, the City must remedy all outreach violations required by the Settlement Agreement, as modified, *see* Order Amending Settlement Agmt. ¶ 15.a, ECF No. 174, PageID.8711; Order ¶ 15, ECF No. 208, PageID.10355; Order ¶ 5, ECF No. 217, PageID.10412, including conducting the required outreach to homes in

the University Park and Smith Village neighborhoods, and completing all additional in-person visits to homes that have not yet received the required visits. The additional visits must occur between 5 p.m. and 8 p.m. or on the weekend. The City must also send letters seeking permission to conduct a service line excavation to all homes that did not previously receive a letter from the City, as required by the Settlement Agreement. The City must document and report these efforts to the plaintiffs on a weekly basis until the work is complete.

It is further **ORDERED** that the September 18, 2020 deadline for residents to opt into the service line replacement program, *see* Order ¶ 4, ECF No. 217, PageID.10411, is extended until the City remedies all outreach violations required by the Settlement Agreement and provides the plaintiffs with documentation demonstrating compliance.

s/David M. Lawson<br>DAVID M. LAWSON<br>United States District Judge

Date:  October 13, 2020