# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, et al.,

        Plaintiffs,

v.

NICK A. KHOURI, et al.,

        Defendants.

_____ /

Case No. 16-10277

Hon. David M. Lawson

## PLAINTIFFS' FIFTH MOTION TO ENFORCE SETTLEMENT AGREEMENT

A central part of the parties' Settlement Agreement (Agreement) resolving this case was the City of Flint's commitment to find and remove Flint's lead service lines expeditiously and on a set timeline. Settlement Agmt. (Agmt.) ¶¶ 8-20, ECF No. 147-1, PageID.7365-71. The City has not upheld its end of that bargain: It has failed to complete all required service line excavations and replacements despite more than two-and-a-half years of extensions beyond its initial January 2020 deadline to complete this work. *See* Order Mod. Settlement Agmt. (2020 Order) ¶ 1, ECF No. 217, PageID.10409; Order Mod. Settlement Agmt. (2022 Order) ¶ 1, ECF No. 237, PageID.11071; Pls.' App'x (PA) 140-42.[1]

---

[1] Plaintiffs have compiled the exhibits attached to the Declaration of Adeline Rolnick (Rolnick Decl.) in a consecutively paginated appendix for the Court's convenience.

The City has also failed to track and report its restoration of lawns, driveways, and sidewalks after completing service line excavations and complete this work by the deadline in the Agreement. PA 142-44.

As a result, as explained in the accompanying brief, Plaintiffs Concerned Pastors for Social Action, Melissa Mays, American Civil Liberties Union of Michigan, and Natural Resources Defense Council respectfully move the Court to order relief necessary to ensure the City complies with its obligations to finish implementing the service line replacement program. The requested relief includes an order that the City, among other things: prepare detailed written plans describing all steps it will take to complete the remaining required service line replacement and restoration work; follow set procedures to retroactively fill gaps in the City's restoration records; comprehensively identify which addresses still need to be restored by May 1, 2023; complete all remaining excavations and replacements by August 1, 2023; and provide specified reporting to allow Plaintiffs to track the City's progress.

Plaintiffs need this relief now to ensure the City completes the necessary planning in enough time for the remaining work to be promptly completed when the construction season begins in spring 2023. Without this planning and a court order requiring the City to finish the pipe replacement program, Plaintiffs fear that work will drag on beyond 2023, especially given the City's slow pace of work in

2

the last two years. *See infra* Brief pp. 8-9. More than five years ago, the City

agreed to replace Flint's lead service lines within three years. Plaintiffs and Flint

residents have waited long enough for the City to finish the job.

On August 19, 2022, Plaintiffs wrote to the City requesting a conference to

discuss whether the City was on track to comply with the Agreement's upcoming

deadline to finish all required excavations and replacements by September 30,

2022. PA 126-31. The parties discussed the status of the City's compliance in

person in Flint on August 30 and by videoconference on September 19. PA 150-

51; 155-58. After the City missed the September 30 deadline, and pursuant to the

dispute resolution provisions of the Agreement, Plaintiffs notified the City on

October 4 of its noncompliance and proposed remedies to resolve the dispute, as

well as a dispute related to the City's restoration obligations. PA 140-45; *see*

Agmt. ¶¶ 125-30, PageID.7423-24. The parties then conferred by videoconference

on October 11 and in person on October 20 to attempt to negotiate remedies for the

City's violations, but were unable to reach agreement. Rolnick Decl. ¶¶ 3-5.

On October 26, 2022, Plaintiffs' counsel communicated with opposing

counsel pursuant to Local Rule 7.1(a) explaining the nature of the relief sought in

the motion and seeking concurrence. Counsel for State Parties stated that State

Parties do not consent to the motion. On October 27, for the first time since

Plaintiffs proposed similar relief in an October 4, 2022 Notice of Violation, PA

140-45, the City's counsel stated that the City would agree "in principle" to the majority of Plaintiffs' requested relief, but only if the parties could come to an agreement on language for proposed modifications to the Agreement and, even then, only upon obtaining approval from City Council at some unknown future date. PA 232.

Plaintiffs remain open to resolving these disputes through negotiation, and will continue the discussions they have diligently pursued with Defendants for more than two months. *See* PA 126-31, 140-45. If the parties are able to fully resolve these disputes and present a stipulated order for the Court's approval, Plaintiffs will promptly withdraw the motion to conserve the Parties' and the Court's resources.

Nonetheless, filing this motion now is necessary to protect Plaintiffs' interest in promptly obtaining relief. The City's agreement in principle to negotiate specific language for stipulated modifications and at some point seek City Council approval for any such modification does not mean the dispute is now resolved: It is not the equivalent of a ready-to-file stipulation modifying the Agreement, much less a court order finding that the City has violated the Agreement and ordering equitable relief needed now to enforce its terms. If the parties cannot agree on specific stipulation language, or if City Council does not approve the agreed language, Plaintiffs would be left with no relief.

Further, the history of this case illustrates that the parties' negotiations may move slowly, or that City Council may fail to promptly approve a proposed stipulation, both of which would undermine Plaintiffs' interest in prompt relief. *See, e.g.*, PA 212 (over two months between Plaintiffs' proposal of stipulation language and City's response); PA 87, 249, 255, 259-60 (showing City Council delays in voting on proposed stipulation across multiple meetings). Additionally, City Council's involvement in the process may result in changes to the substance of the parties' preliminary agreement after a stipulation is submitted to the Council—as has occurred in this case. *See infra* Brief pp. 7-8 (discussing negotiations culminating in modifications to the Agreement in April 2022).

Plaintiffs' previous motion to enforce highlights why proceeding with this motion is necessary to protect Plaintiffs' interests, despite the City's preliminary agreement to most of Plaintiffs' requests. Plaintiffs' Fourth Motion to Enforce included a claim about a problem the City had preliminarily agreed to remedy before the motion was filed: completing the required outreach to Flint residents on a set schedule. Pls.' 4th Mot. to Enforce Settlement Agmt. 15-16, ECF No. 218, PageID.10440-41. Despite the City's argument that relief was unwarranted because it had "agreed" to fix the issue, the City *still* had not remedied its violations, and had missed the deadline it agreed to meet, when the Court granted the motion more than a month later. City's Resp. to Pls.' 4th Mot. to Enforce 13-15, ECF No. 222,

5

PageID.10783-85; Order Granting Pls.' 4th Mot. to Enforce (Order Granting Pls.'

4th Mot.) 12-13, ECF No. 228, PageID.11040-41. This Court explained:

"Considering the City's repeated promises and failures" to comply, "it is

understandable that the plaintiffs find unsatisfying the City's profession of an

intention to comply" alone. Order Granting Pls.' 4th Mot. 13, PageID.11041.

Plaintiffs cannot reasonably expect a different outcome here.

     For these reasons and those set forth in the accompanying Brief, Plaintiffs

respectfully request that the Court grant this motion to enforce the Settlement

Agreement and order the relief described in the Brief, *infra* pp. 21-25.

Dated:     November 1, 2022     Respectfully submitted,

/s/ Adeline Rolnick     /s/ Bonsitu Kitaba (with consent)
Adeline Rolnick     Bonsitu Kitaba (P78822)
Sarah C. Tallman     Daniel S. Korobkin (P72842)
Natural Resources Defense Council     American Civil Liberties Union Fund
1152 15th Street NW, Suite 300     of Michigan
Washington, DC 20005     2966 Woodward Avenue
(202) 513-6240     Detroit, MI 48201
arolnick@nrdc.org     (313) 578-6823
stallman@nrdc.org     bkitaba@aclumich.org
     dkorobkin@aclumich.org

Melanie D. Calero
Natural Resources Defense Council     *Counsel for Plaintiff American Civil*
40 West 20th Street     *Liberties Union of Michigan*
New York, NY 10011
(212) 727-4546
mcalero@nrdc.org

*Counsel for Plaintiffs Concerned*
*Pastors for Social Action, Melissa*

6

*Mays, and Natural Resources Defense
Council, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, et al.,

      Case No. 16-10277

   Plaintiffs,

  v.          Hon. David M. Lawson

NICK A. KHOURI, et al.,

   Defendants.

_____/

## PLAINTIFFS' BRIEF IN SUPPORT OF FIFTH MOTION
## TO ENFORCE SETTLEMENT AGREEMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

CONCISE STATEMENT OF THE ISSUE PRESENTED .................................... iv

CONTROLLING AUTHORITY ............................................................................ v

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .................................................................................. 3

      I.      The Agreement requires the City to implement a lead service line
            replacement program and to track and report its work ......................... 3

      II.     The City has violated its obligations under the Agreement ................. 6

            A.     The City has repeatedly missed deadlines to complete
                  required excavations and replacements ...................................... 6

            B.     The City has neither tracked the addresses where it
                  restored residents' properties nor timely completed all
                  restorations .............................................................................. 9

STANDARD OF REVIEW ................................................................................ 13

ARGUMENT ................................................................................................... 13

      I.      The City is violating the Agreement .................................................. 13

            A.     The City failed to complete all excavations and
                  replacements by September 30, 2022 ...................................... 13

            B.     The City is violating the Agreement's restoration
                   requirements .......................................................................... 16

      II.     Court intervention is necessary to effectuate the Agreement ............ 17

SUMMARY OF RELIEF REQUESTED ............................................................ 21

CONCLUSION ............................................................................................... 25

i

# TABLE OF AUTHORITIES

## Cases

*Chilcutt v. United States*,
  4 F.3d 1313, 1321-22 (5th Cir. 1993) ..........................................................19

*Duane B. v. Chester-Upland Sch. Dist.*,
  No. CIV. A. 90-0326, 1994 WL 724991, (E.D. Pa. Dec. 29, 1994) ...........20

*Elec. Workers Pension Trust Fund of Local Union # 58 v. Gary's Elec. Serv. Co.*,
  340 F.3d 373, 379 (6th Cir. 2003) ................................................................13

*Frew ex rel. Frew v. Hawkins*,
  540 U.S. 431, 440 (2004) ..............................................................................13

*Glover v. Johnson*,
  934 F.2d 703, 708 (6th Cir. 1991) ...........................................................15, 16

*Kelly v. Wengler*,
  979 F. Supp. 2d 1104, 1108-10 (D. Idaho 2013) .........................................16

*Mannick v. Kaiser Found. Health Plan, Inc.*,
  No. C 03-5905 PJH, 2006 WL 3734390, (N.D. Cal. Dec. 18, 2006) ..........19

*Mich. Dep't of Env't Quality v. Flint*,
  282 F. Supp. 3d 1002, 1009-10 (E.D. Mich. 2017)......................................15

*Pedreira v. Sunrise Children's Servs. Inc.*,
  802 F.3d 865, 871 (6th Cir. 2015)................................................................13

*Ricci v. Okin*,
  537 F. Supp. 817, 824 (D. Mass. 1982)........................................................15

*Roman v. Korson,*
  307 F. Supp. 2d 908, 919 (W.D. Mich. 2004)..............................................13

*Screw Mach. Tool Co. v. Slater Tool & Eng'g Corp.*,
  683 F.2d 159, 163 (6th Cir. 1982) ...............................................................20

*Shy v. Navistar Int'l Corp.*,
    701 F.3d 523, 533 (6th Cir. 2012) ...................................................................13

*United States v. United Mine Workers of Am.*,
    330 U.S. 258, 303 (1947) ...........................................................................13

## CONCISE STATEMENT OF THE ISSUE PRESENTED

The Settlement Agreement requires the City of Flint to excavate service lines at all eligible homes and replace those discovered to be lead or galvanized steel; restore properties where it excavates a service line; maintain records of where it has completed restoration; and provide reports documenting the City's compliance with the Agreement. The City has violated and is violating these requirements by (1) failing to complete the remaining required service line excavations and replacements by the Court-ordered deadline of September 30, 2022; (2) failing to track and maintain records of the addresses where it has completed restoration; (3) neglecting to provide Plaintiffs with required monthly reports; and (4) failing to meet the Agreement's deadline to complete the remaining required restoration work. Should the Court order the relief requested by Plaintiffs in this motion, which is designed to ensure the City's prompt compliance with its obligations under the Agreement?

## CONTROLLING AUTHORITY

*Shy v. Navistar Int'l Corp.*, 701 F.3d 523 (6th Cir. 2012)

# INTRODUCTION

More than five years after this Court approved the Settlement Agreement in this case requiring the City of Flint to implement a lead service line replacement program, thousands of Flint residents are still waiting for relief. Although still ongoing, the City's work to finish replacing lead pipes and restore properties where it conducted work has slowed dramatically in the last two years, with no end in sight. Despite agreeing in April 2022 to finish excavations at 1,931 homes by September 30, 2022, the City conducted a mere 72 excavations between April and that deadline. And its work remains far from done: The City must still check the service lines at more than 1,000 homes and repair property damage at thousands more. Moreover, because the City failed to track its work to restore lawns, sidewalks, and driveways, it must now figure out where that work is still needed. The City's failures to complete and track required work violate the Agreement.

First, the City has repeatedly failed to finish excavating and replacing service lines by the deadlines it agreed to meet. The City missed the Agreement's deadlines to complete this required work in January 2020, November 2020, and now September 30, 2022. Indeed, after pausing work for the winter at the end of 2021, the City did not resume service line replacement work in 2022 until two weeks before the September 30 deadline. Its excuses for delay—including the City's contracting process, supply chain issues, and its purported need to collect

1

and analyze data about where it has already completed work—were entirely foreseeable or of the City's own making.

The City's efforts to finish restoring the property at each address where it excavated a service line are similarly floundering. The City is violating the Agreement's requirements to keep records of where it completes restorations, provide monthly reports of its progress, and timely restore the properties at all excavated addresses. As a result of its recordkeeping failures, the City does not know which addresses or precisely how many still require restoration. It is now trying to retroactively fill the gaps in its records by driving to each of more than 6,000 homes to visually determine whether restoration occurred sometime in the past—an inefficient, time-consuming endeavor contributing to further delays. Relief from the Court is needed to ensure the City promptly identifies how much restoration work is left using appropriate standards and finishes all remaining restoration work.

The City's egregious noncompliance compounds the years of injustice Flint residents have endured as a result of the water crisis. Residents of at least a thousand homes are still waiting for the City to conduct the basic required outreach to inform them of their right to participate in the pipe replacement program and/or investigate whether their home is served by a lead or galvanized steel service line and remove it if so. Thousands more are waiting for the City to fill large holes and

2

reseed the grass in their lawns and fix broken sidewalks and driveways. These residents should not have to wait any longer.

Plaintiffs request that the Court order the relief necessary to ensure the City finishes the job it committed to without further delay. This includes requiring the City to prepare plans describing all steps it will take to finish the remaining work, including steps to address foreseeable factors that may affect the City's pace of work. Plaintiffs also request that the Court order the City to report specified information to Plaintiffs about its progress, finish the remaining work on a clear timetable, and fill the gaps in its restoration recordkeeping according to appropriate and consistent standards. After years of delay and mismanagement in violation of the Agreement's clear requirements, the City must be compelled to ensure that every Flint resident obtains the benefits the Agreement guarantees.

## STATEMENT OF FACTS

### I.     The Agreement requires the City to implement a lead service line replacement program and to track and report its work

A key goal of the Settlement Agreement resolving Plaintiffs' Safe Drinking Water Act claims is "to devise, fund, and implement a plan to replace *all* lead and galvanized service lines at Flint residences" to reduce lead contamination in the City's tap water. Order Granting Pls.' 4th Mot. 6, PageID.11034. The initial 2017 Agreement required the City to excavate service lines at 18,000 homes and replace those made of lead and galvanized steel. *See* Agmt. ¶¶ 8-20, ECF No. 147-1,

3

PageID.7365-7371. By 2018, it had become clear that removing all of the City's lead pipes would require more than 18,000 excavations, in part because the City chose to prioritize excavations of thousands of service lines its records indicated were likely made of copper. *See* Pls.' Post-Hr'g Br. Regarding Mot. to Enforce Paras. 29 & 30, at 4, 8-9, ECF No. 203, PageID.10159, 10163-64. Upon agreement of the parties, the Court later modified the Agreement to require excavations at all eligible Flint homes (roughly 31,000).[2] Order Granting Pls.' 4th Mot. 2, PageID.11030; 2022 Order ¶ 1, PageID.11071. The City must complete this work within a set period of time. *See infra* pp. 6-7.

Completing work at each home involves several steps: The City must first conduct outreach to ensure each resident is aware of their opportunity to participate in the program and seek their consent to excavate their service line. *See* Order Am. Settlement Agmt. (2019 Order) ¶¶ 14-15, ECF No. 208, PageID.10354-55. So that the City's contractor can access the property when it conducts the work, the City must schedule the work with the resident to ensure the resident is home. *See* 2020 Order ¶ 6, PageID.10413. The contractor then excavates the service line to determine its material by digging a large hole or trench in the lawn to uncover the

---

[2] In 2022, the parties agreed to a precise list of 31,578 eligible homes. *See* 2022 Order ¶ 1, PageID.11071. The parties are still working to resolve data discrepancies in this list. *See* PA 63, 242-43, 246-47; Declaration of Nicole Vandal (Vandal Decl.) ¶¶ 16-27.

pipe. This process may damage sidewalks, curbs, and driveways. PA 37-38**.** If the service line is made of lead or galvanized steel, the City replaces it with a copper pipe. Agmt. ¶¶ 9-10, PageID.7365.

Finally, the City must restore the property at each address it excavates. 2020 Order ¶ 1, PageID.10409; 2022 Order ¶ 2, PageID.11071. This includes filling the excavation trench, placing debris-free topsoil, fertilizer, and seeding, and repairing any broken asphalt or concrete. *See* PA 46-47, 49-54, 57-8. Before fully restoring the property, the City must allow the ground to settle for at least 90 days after the pipe excavation and replacement. PA 37, 66.

The City must also "maintain records sufficient to comply with" the Agreement's "reporting and disclosure requirements." Agmt. ¶ 36, PageID.7381. Those requirements include providing monthly status reports to Plaintiffs. *E.g.*, 2019 Order ¶ 6, PageID.10348-49. As modified in August 2020, the Agreement requires each monthly report to include "an updated list of all homes where restoration has been completed." 2020 Order ¶ 7.iii, PageID.10413. In addition, the City must respond within 14 days to Plaintiffs' requests for information related to the Agreement's implementation, including records relating to restoration. *See* Agmt. ¶ 118, PageID.7419-20.

**II.     The City has violated its obligations under the Agreement**

**A.     The City has repeatedly missed deadlines to complete required
excavations and replacements**

The City has failed to meet three deadlines—January 2020, November 2020,

and September 2022—to complete all required service line excavations and

replacements. To ensure that a major source of lead contamination in Flint's tap

water was removed as quickly as possible, the initial 2017 Agreement required the

City to finish the required excavations, replacements, and restorations within three

years—by January 1, 2020. Agmt. ¶ 20.c, PageID.7371. The City did not meet this

initial deadline. *See* PA 69.

Over the years, the City and Plaintiffs have agreed to modify both the

deadlines for and the scope of required work to effectuate the Agreement's core

aim to remove all of Flint's lead pipes. In spring 2020, with Plaintiffs' agreement,

the City paused its work due to the coronavirus pandemic. *See* Stip. & Notice, ECF

No. 214, PageID.10391-92. When the City paused work, it had excavated the

service lines at 25,409 homes. PA 69.

The City resumed work in summer 2020, and, based on the parties'

agreement, the Court ordered the City to complete the remaining outreach,

excavations, replacements, and restorations by November 30, 2020. Stip. & Notice

p. 2 & ¶ 1 (2020 Stip.), ECF No. 216, PageID.10399-400; 2020 Order ¶ 1,

PageID.10409. The City missed this deadline, too. PA 77-78.

On April 13, 2022, the Court approved the parties' stipulated revised deadline of September 30, 2022, for the remaining excavation and replacement work (excluding restoration). *See* Stip. & Notice ¶ 1, ECF No. 236, PageID.11061; 2022 Order ¶ 1, PageID.11071; *infra* pp. 9-10 (describing separate restoration deadline). The parties were able to submit their agreed modification to the Court only after sixteen months of negotiation that began in December 2020. *See* PA 73. During that time, to ensure that the revised deadline would be practicable, Plaintiffs provided spreadsheets indicating their understanding—based on the City's reporting—of the remaining required work. *See, e.g.*, PA 72-73. In February 2022, Plaintiffs shared a list of the 1,931 homes where their analysis showed the City had remaining outreach, excavation, and replacement obligations. *See* PA 11, 84-85; Rolnick Decl. ¶¶ 12-21. At this stage, the parties agreed that the City had completed its excavation obligations at the vast majority of eligible homes. Only 1,931 addresses remained out of a universe of 31,578. 2022 Order ¶ 1, PageID.11071.

The City agreed to submit the text of the proposed modifications to City Council for approval in February 2022. PA 87. However, that agreement in principle to the proposed modifications did not end the parties' negotiations. Rather, the City did not agree to file the final stipulation until April 2022—and only then with further revisions. *Id.*, PA 109. This was in part because of delays

obtaining the approval from City Council for both the stipulation and the related renewal of the City's contract with its project management firm, ROWE Professional Services (ROWE). PA 109.

The City did not meet the September 30 deadline. Instead, it completed only 72 new excavations between April and September 2022, far short of the work that remained as of April (1,931 excavations). Vandal Decl. ¶ 13, Rolnick Decl. ¶¶ 12-21.[3] Indeed, the City did not perform any outreach, excavations, replacements, or restorations between the end of 2021 and September 14, 2022—just two weeks before the deadline. PA 153, 160; Vandal Decl. ¶ 12. Instead of acknowledging publicly it had missed the deadline, the City issued a press release trumpeting its "great strides" towards completing the pipe replacement program. PA 121.

Since missing the deadline, the City has continued to slowly make progress on the excavation work, averaging 23 excavations per week since beginning work on September 14, 2022.[4] Vandal Decl. ¶ 14. In total, the City has completed only 1,322 total excavations in the past two years. *Compare* Order Granting Pls. 4th

---

[3] Although the City may have fulfilled its obligations as to some additional addresses by September 30 by completing outreach but not obtaining residents' consent, the City has not submitted compliant reporting necessary to enable Plaintiffs to verify how many. *See* Vandal Decl. ¶ 15; 2019 Order ¶ 6(v)(2), PageID.10349 (requiring the City to report both the date and time of any in-person outreach).

[4] This number is current as of data the City shared on October 26, 2022. *See* Vandal Decl. ¶ 5.

Mot. at 2, PageID.11030 (26,106 excavations as of October 13, 2020), *with* PA 121 (27,428 excavations as of September 29, 2022). This marks a dramatic slowdown compared to the City's pace during earlier years of the program. The City's average weekly excavation rate was 211 addresses in 2018 and 99 in 2019. Vandal Decl. ¶¶ 29-30. Even in 2020, when the City faced pandemic-related challenges, it excavated an average of 35 homes per week. *Id*. ¶ 30.

As of October 26, 2022, the City has remaining outreach, excavation, and or replacement obligations to over 1,000 homes. Vandal Decl. ¶ 27. Over a thousand Flint residents are still waiting for the City to inform them of their opportunity to participate in the program and/or investigate whether their home is served by a lead pipe. *Id*.

**B.     The City has neither tracked the addresses where it restored residents' properties nor timely completed all restorations**

The City's restoration work is a mess. In August 2020, the parties agreed to a new deadline for the City to complete all remaining work, including restoration—November 30, 2022. 2020 Stip. ¶ 1, PageID.10400. The City also agreed to report monthly cumulative lists of homes it had restored, so the parties would have a regularly updated understanding of the City's progress to complete restoration. *Id*. ¶ 7.iii, PageID.10405-06. The Court approved both the modified deadline and reporting requirements. 2020 Order ¶ 1, 7.iii, PageID.10413.

The City has not complied. It did not finish all restoration work by

9

November 30, 2020. PA 77. And it has failed to provide the required regular monthly lists of every home where restoration has been completed, providing a purportedly cumulative list of restored homes only twice. *See* Rolnick Decl. ¶¶ 9, 11. These reporting deficiencies persisted despite repeated reminders from Plaintiffs, including a Notice of Violation on May 4, 2021, describing the City's restoration recordkeeping violations. PA 129-30, 137-38. Plaintiffs have received *no* cumulative completed restoration lists from the City since July 2021. PA 8, 129.

Moreover, the two purportedly cumulative lists the City has provided are not accurate. The City has conceded it lacks comprehensive and accurate records of where it completed restorations and does not know how many addresses still require restoration. PA 143; *see also* PA 137-38. The City's records are so lacking that the City has recently resorted to driving to at least 6,000 previously excavated homes in Flint to visually inspect whether restoration has been completed and fill the gaps in its records. *See* PA 143; Rolnick Decl. ¶ 4. Despite Plaintiffs' inquiries, the City has not shared what criteria, if any, it is using to determine whether to retroactively "deem" an address restored through visual inspection. PA 144, 147. The City is also not notifying residents of its determinations. Rolnick Decl. ¶ 2.

These are far from the City's first recordkeeping lapses. For years, Plaintiffs have documented the City's repeated violations of the Agreement's recordkeeping and reporting requirements. *E.g.*, Pls.' Mot. to Enforce Settlement Agmt. 4-14,

10

ECF No. 155, PageID.7699-709; Pls.' Mot. to Enforce Paras. 38 & 117 of

Settlement Agmt. 14-15, ECF No. 173, PageID.8507-08; Order Granting Pls.' 4th

Mot. 11-14, PageID.11039-42; Order Granting in Part Pls.' 3rd Mot. to Enforce

Settlement Agmt. 2-4, ECF No. 209, PageID.10358-60; PA 262-67. These

violations have frustrated Plaintiffs' efforts to verify the City's compliance with

terms designed to protect public health and reduce lead exposure. Pls.' Mot. to

Enforce Paras. 38 & 117, at 15, PageID.8508.

   In this instance, the consequence of the City's failure to track its work is

further delay in restoring residents' properties. Indeed, it remains unclear when the

City will complete the required restoration work. In the parties' April 2022

stipulation modifying the City's deadlines, the parties agreed to wait to negotiate a

new restoration deadline until after the City executed its last contract for the

remaining work, and to then meet and confer to discuss a reasonable revised

deadline. 2022 Order ¶ 6, PageID.11074-75. If the parties were able to agree on a

deadline within 75 days of when the City executed its final restoration contract,

they agreed to file that proposed deadline with the Court. *Id*. Because the City

executed its last restoration contract on August 16, 2022, the deadline to file an

agreement with the Court was October 31, 2022. *See* PA 28, 39.

   The parties have conferred multiple times since August about this issue. *See*

PA 143, 150, 156-58, 166-67. But because the City does not know the scope of

remaining restoration work, the parties' negotiations have reached an impasse. Plaintiffs have explained that while they "remain willing to agree to a restoration deadline that is reasonable and workable, the deadline must be tailored to a reasonable estimate of the amount of work remaining." PA 143. Given the large number of homes the City is planning to drive to, the City's current staffing, and that the City will be unable to visually verify whether a home's lawn was restored during the winter, the City projects that its "driving inspection" process will not be completed this year. Rolnick Decl. ¶ 4.

*      *      *

On October 4, 2022, Plaintiffs sent the City a Notice of Violation describing the City's noncompliance. *See* PA 140-145. On October 27, the City indicated its preliminary agreement to the majority of the relief Plaintiffs request, contingent both on reaching an agreement as to the text of proposed modifications to the Agreement and on City Council approval. *See supra* Motion pp. 3-4. Based on past experiences with the City, these two contingencies may take months to resolve, so Plaintiffs filed this motion to protect their ability to promptly obtain necessary and time-sensitive remedies for the City's violations. *See supra* Motion pp. 1-6. In the event the parties reach final agreement, including City Council approval, Plaintiffs will promptly notify the Court and will not further pursue the relief covered by such an agreement.

## STANDARD OF REVIEW

The Court has "broad equitable remedial powers" to enforce the Agreement, which operates as a consent decree. *Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 533 (6th Cir. 2012) (internal quotation marks omitted); *see Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004); *Pedreira v. Sunrise Children's Servs. Inc.*, 802 F.3d 865, 871 (6th Cir. 2015). A court's power to issue relief to ensure "compliance with [its] order," *Elec. Workers Pension Trust Fund of Local Union # 58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303 (1947)), includes ordering "additional affirmative conduct … not required by the underlying injunction," *Roman v. Korson*, 307 F. Supp. 2d 908, 919 (W.D. Mich. 2004).

## ARGUMENT

### I.    The City is violating the Agreement

#### A.    The City failed to complete all excavations and replacements by September 30, 2022

The Agreement required the City to complete all remaining excavations and replacements by September 30, 2022. 2022 Order ¶ 1, PageID.11071. The City did not do so. *See supra* pp. 6-9.

Although the City blames several factors for its noncompliance, PA 87-88, the City's excuses only illustrate how the City's lack of planning led to its third violation of a Court-ordered deadline. The City first suggests that its work was

13

slowed this year because it needed to "collect[] data" to identify the scope of

remaining work. PA 87. This is baffling. Since 2017, the Agreement has required

the City to track which addresses it excavated and whether it performed a

replacement. *See* Agmt. ¶ 117.c.i-ii, PageID.7417-18. And in February 2022,

Plaintiffs sent the City a list of the exact addresses where, based on Plaintiffs'

analysis of the City's reporting, additional work was required. *See* PA 11, 84-85,

113. The City's suggestion that it lacked information about the scope of remaining

work when it agreed to the September 2022 deadline is simply not credible. And to

the extent the City's recordkeeping was so dismal that additional data collection

and analysis were needed in 2022, any delay was of the City's own making and

should have been entirely foreseeable years ago.

The need to prepare a request for a proposal for a new construction

contractor, *see* PA 87, was also a foreseeable step, and a relatively minor one. The

City issued a request for proposals for a contractor to conduct pipe replacements in

2019, and as ROWE stated, the new request for proposals to complete the 2022

work would reflect only "minor changes" to the prior request. PA 103.

The City's other excuses for its sluggish pace of work over the past two

years also illustrate the City's lack of planning to meet its commitments. While the

City may have faced recent challenges obtaining certain materials due to "supply

chain" issues, PA 88, ROWE acknowledged that it has known about such

14

challenges for six months—and indeed, they have been in the news for years. PA
147, 171-76. And while City Council may have taken longer than expected to
approve the 2022 Stipulation and the City's updated contract with ROWE, City
Council's delays are a factor with which the City has deep familiarity and for
which it should have planned. *See, e.g.*, *Mich. Dep't of Env't Quality v. Flint*, 282
F. Supp. 3d 1002, 1009-10 (E.D. Mich. 2017) (documenting City Council's
months-long delay in approving a long-term water source). In any event, the City
committed to the September 2022 deadline *after* City Council approved both the
2022 Stipulation and the updated project management contract. *See supra* pp. 7-8.

All of these factors were reasonably foreseeable. *Accord* Order Granting
Pls.' 4th Mot. 11, PageID.11039. Moreover, the City's explanations address only
the past six months of delays: it has provided no explanation for why it has made
so little progress in the two years since it missed the November 2020 deadline. The
City's excuses make clear that it has not taken "all reasonable steps within [its]
power to insure compliance" with this Court's orders. *Ricci v. Okin*, 537 F. Supp.
817, 824 (D. Mass. 1982) (internal quotation marks omitted); *cf. Glover v.
Johnson*, 934 F.2d 703, 708 (6th Cir. 1991) (affirming civil contempt finding when
defendants failed to take "all reasonable steps to comply" with court orders).

**B.      The City is violating the Agreement's restoration requirements**

The City is violating the Agreement's clear requirements to (1) maintain records of every restoration it completes, (2) report monthly cumulative lists of all addresses it has completely restored, and (3) complete restoration at all excavated addresses. *See supra* pp. 9-12.

The City conceded that it has not tracked all addresses at which it previously conducted restoration, and that, as a result, the City does not know which homes still require restoration. PA 143. The City's restoration recordkeeping deficiencies—and its corollary persistent failure to include cumulative restoration data in its monthly reporting—are part of the City's longstanding pattern of systemic documentation failures in violation of the Agreement. *See supra* pp. 10-11. And that the City is just beginning in 2022 to address its failure to track restorations, when it had reason to know about that failure more than two years ago, is clear evidence that the City is not taking all available, reasonable steps to promptly come into compliance. *Cf. Glover*, 934 F.2d at 708; *Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1108-10 (D. Idaho 2013), *aff'd*, 822 F.3d 1085 (9th Cir. 2016) (defendants who failed to "proactively check that they were in compliance" did not take all reasonable steps to comply with settlement).

The City's recordkeeping lapses are contributing to another violation of the Agreement: continuing delays in restoring properties at thousands of homes, nearly

16

two years after the City was required to finish restoration at all addresses it excavated. 2020 Order ¶ 1, PageID.10409-10; PA 77-78; *see also* 2022 Order ¶ 6, PageID.11074-75 (contemplating a future modification of the 2020 deadline). The City cannot complete this work because it lacks an accurate list of which homes need restoration. In December 2020, the City estimated that 1,110 homes remained to be restored. PA 77. Now, the City projects that there are thousands more homes that still require restoration, although it does not know precisely how many or which ones. PA 104; Rolnick Decl. ¶ 4. Each home corresponds to a Flint resident still waiting for the City to repair damage to their property. *See* PA 178-84.

## II.    Court intervention is necessary to effectuate the Agreement

In light of the City's violations of the Agreement, Plaintiffs seek equitable relief to effectuate compliance and ensure the City finishes replacing lead service lines and restoring all addresses without further delay. The parties did not intend the Agreement to last indefinitely. To the contrary, a core objective of the Agreement was to replace every lead service line in Flint within three years, permanently removing the most significant source of lead in drinking water. *See* Order Granting Pls.' 4th Mot. 2, 6, PageID.11030, 11034; PA 200. And as part of that process, the City must restore every home it excavates. Without prompt and complete restoration, residents will be left with yards, sidewalks, and driveways that are eyesores or even safety hazards. *See* PA 178-84. The City must complete

all of this work as soon as possible.

Setting new deadlines will not alone be a sufficient remedy: The City has now missed three deadlines to complete the required work, proving itself a poor judge of how quickly it will conduct outreach, excavations, replacements, and restoration. *See, e.g.*, City's Resp. to Pls.' 4th Mot. to Enforce 3-4, PageID.10773-74 (explaining in September 2020 that the City "intends" to complete all remaining work by the end of 2020). Every deadline the City has missed was one to which it agreed after arms-length negotiations, including discussion of how much work remained.

Indeed, in an effort to conserve this Court's resources and remedy the City's 2020 violations, the parties spent over a year expending significant efforts to identify an excavation deadline that would stick—September 30, 2022. Plaintiffs analyzed the City's reporting to provide the City with their best assessment of the remaining scope of work and encouraged the City to identify achievable deadlines, accounting for potential unforeseen delays. *See, e.g.*, PA 84-85, 204, 207, 211. The City still missed the September 30 deadline by a wide margin. *See supra* pp. 6-9.

Further, a revised restoration deadline will not be sufficient to ensure that the City implements the Agreement's restoration requirements. Any reasonable deadline must be tailored to the amount of work remaining. That deadline cannot be set until the City remedies its recordkeeping lapses by expeditiously identifying

18

which addresses still need to be restored—a process the City has not timely completed on its own, despite Plaintiffs' repeated prodding. PA 129-30, 137-38, 142-44. Moreover, absent relief from the Court, the City will continue to use standardless visual inspections to gauge whether restoration has already been completed at thousands of homes. *See supra* p. 10.

Relief beyond resetting the Agreement's deadlines is therefore warranted at this stage. Plaintiffs cannot reasonably rely on additional "vain assurances of [the City's] alleged intent to comply" with a deadline months in the future. *See Chilcutt v. United States*, 4 F.3d 1313, 1321-22 (5th Cir. 1993) (sanctions appropriate after defendant "strung [plaintiffs] along" with repeated promises to comply with court orders); *Mannick v. Kaiser Found. Health Plan, Inc.*, No. C 03-5905 PJH, 2006 WL 3734390, at *14 (N.D. Cal. Dec. 18, 2006) (civil contempt appropriate where defendants "repeatedly failed to comply with the time line required" under consent decree).

Plaintiffs' proposed relief is designed to ensure the City engages in the reasonable and necessary planning required to meet its commitments—planning it appears to have long neglected. Given the City's repeated and ongoing noncompliance, it is appropriate for the Court to impose "more stringent and complete measures" than the Agreement initially specified to ensure the City promptly remedies the latest violations. *Screw Mach. Tool Co. v. Slater Tool &*

*Eng'g Corp.*, 683 F.2d 159, 163 (6th Cir. 1982). Plaintiffs' proposals will also provide transparency into the City's process and give Plaintiffs and the Flint community much-needed assurance that the City will make all efforts to expeditiously complete the remaining work. Without additional insight into the reasonableness of the City's projections and a "coherent, precise plan" to meet those projections, reliance on the City's promises to finish the remaining work within a set period will be futile. *Cf. Duane B. v. Chester-Upland Sch. Dist.*, No. CIV. A. 90-0326, 1994 WL 724991, at *2, *11 (E.D. Pa. Dec. 29, 1994).

Plaintiffs also request relief to ensure the City fixes its recordkeeping noncompliance using a reasonable and appropriate method. The City plans to drive to thousands of homes and perform standardless visual inspections to determine whether these homes' properties have already been restored. Given the absence of contemporaneous recordkeeping, Plaintiffs agree that something must be done to identify the remaining scope of work. Plaintiffs also agree that if a visual inspection reveals that restoration has already been completed—whether by the City, the resident, or someone else—the City need not complete further work at the address. But to serve as an adequate substitute for contemporaneous recordkeeping, the City's visual inspections must be based on defined and consistent criteria. *See infra* pp. 23-24.

Finishing the remaining excavation and restoration work is no less urgent

20

because the City has fulfilled its obligations as to the majority of the homes in Flint. The City is required to complete work at *every* eligible home in Flint—not 95 percent. Order Granting Pls.' 4th Mot. 2, 6, PageID.11030, 11034. Finishing work at all addresses is necessary to effectuate the Agreement's aim of removing all of Flint's lead and galvanized steel service lines. The City's work this year proves this point: The City has found lead or galvanized steel service lines at roughly 30 percent of the 114 homes it has excavated so far in 2022. Vandal Decl. ¶ 11.

The people of Flint have waited nearly six years for the City to find and remove their hazardous lead pipes—a process the City initially anticipated would take three. *See* Agmt. ¶ 20, PageID.7371. The City cannot leave residents behind. It must finish the job, and quickly. "A defendant who has obtained the benefits of a consent decree—not the least of which is the termination of the litigation—cannot then be permitted to ignore" the decree's requirements. *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985).

## SUMMARY OF RELIEF REQUESTED

To remedy the City's violations of the Agreement, as amended by this Court, Plaintiffs respectfully request that the Court grant their motion to enforce the Agreement and order the City to:

(1)   Complete all service line excavations and replacements (excluding

restoration) as quickly as practicable, and by no later than August 1, 2023.[5]

(2)    As soon as practicable and by no later than May 1, 2023, compile a list of all previously excavated addresses at which restoration is still needed, and within seven days thereafter, propose a revised deadline to complete restoration work. The proposed restoration deadline must be as soon as practicable.

(3)    For all properties at which the City completes a service line excavation or replacement after October 1, 2022, complete restoration within 120 days of when the City excavated that service line or completed that replacement.

(4)    Continue performing excavations, replacements, and restorations in 2022 until cold weather conditions prevent further work, and resume work in 2023 within two weeks of when weather conditions permit.

(5)    Within fourteen days of this Court's order, create detailed plans describing the steps the City will take to complete the remaining excavation, replacement, and restoration work as quickly as practicable. These plans must describe, among other things, how the City will anticipate and plan for the following factors:

   a.  Securing and maintaining an adequate inventory of materials necessary for service line replacements and restoration.

---

[5] This deadline is reasonable in light of the City's past pace of work. Assuming the City must still excavate roughly 1,600 homes, *see* Vandal Decl. ¶ 27, and it pauses work from December through February due to winter weather, the City could meet this deadline by completing 60 excavations per week. The City easily exceeded this rate in the program's early years. *See* Vandal Decl. ¶¶ 29, 30; *supra* p. 9.

b. Maintaining sufficient labor to complete the required work as quickly as practicable.

c. Weather-related work disruptions, including both seasonal work stoppage for the winter and short-term disruptions caused by inclement weather (e.g., storms).

d. Resident cooperation with scheduling excavations and replacements.

e. Completing any remaining excavation and/or restoration along major roads.

f. Completing any remaining excavation and/or restoration at any of the addresses flagged by Michigan's State Historic Preservation Office.

g. For the restoration plan, identifying how many and which previously excavated addresses still require restoration, including a timeline for filling the gaps in the City's restoration records of previously excavated addresses through visual inspections, by no later than May 1, 2023.

h. Meeting the 120-day requirement in item 3 above, including how the City will coordinate between its project management and construction contractors to ensure that the appropriate work orders are timely issued.

(6) Document that it has fulfilled its obligation to complete restoration at an address by either (a) providing a contemporaneous record of completing restoration at that address or (b) confirming by visual inspection, and documenting with photos, that a restoration was completed. Confirming by visual inspection requires verifying that the following criteria were met: (i) no asphalt, concrete, or other debris remains; (ii) the sidewalk, driveway, and/or curb are complete, uniform in grade and alignment, and lacking any gaps or holes; (iii) the greenbelt

23

or lawn is free of holes or trenches and is of a uniform grade, with no visible

depressions; (iv) any visible topsoil on the greenbelt or lawn is free of debris and

the greenbelt or lawn has a consistent and uniform plant cover; (v) the water shut-

off valve is flush with the surface of the greenbelt or lawn and does not pose a

tripping hazard. *See* PA 46-47, 49-54, 57-58. If the City conducts a visual

inspection and determines no further restoration is needed, the City must leave a

door hanger at that address notifying the resident of that determination.

(7)     Provide with each monthly status report an Excel spreadsheet listing

the following in separate tabs: (a) all previously excavated addresses where the

City has a contemporaneous record of completed restoration, including the date of

restoration; (b) all previously excavated addresses where the City's records

indicate restoration is still required, without the need for a visual inspection to

confirm the address's restoration status; and (c) all previously excavated addresses

where the City has no contemporaneous record of completed restoration, noting

which of the following categories each address falls into: (i) City confirmed by

visual inspection that restoration was completed, including the date of the

inspection; (ii) City confirmed by visual inspection that restoration is still needed,

including the date of the inspection; or (iii) determination of whether restoration is

still needed is pending a visual inspection.

(8)     Include in each monthly status report information on the City's

24

current inventory of materials needed for service line replacements.

(9)     Provide Plaintiffs with weekly progress updates including: the

addresses where excavations and replacements were completed the previous week;

the total number of addresses where the City completed outreach in the previous

week; the number of excavations and/or replacements scheduled for the coming

week; and the number of replacements the City can perform based on the current

total number of parts in its materials inventory.[6]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to enforce the Agreement

should be granted.


Dated:        November 1, 2022              Respectfully submitted,

/s/ Adeline Rolnick                         /s/ Bonsitu Kitaba (with consent)
Adeline Rolnick                             Bonsitu Kitaba (P78822)
Sarah C. Tallman                            Daniel S. Korobkin (P72842)
Natural Resources Defense Council           American Civil Liberties Union Fund
1152 15th Street, NW, Suite 300             of Michigan
Washington, DC 20005                        2966 Woodward Avenue
(202) 513-6240                              Detroit, MI 48201
arolnick@nrdc.org                           (313) 578-6823
stallman@nrdc.org                           bkitaba@aclumich.org
                                            dkorobkin@aclumich.org
Melanie D. Calero
Natural Resources Defense Council           *Counsel for Plaintiff American Civil*
40 West 20th Street                         *Liberties Union of Michigan*

---

[6] As part of the parties' negotiations, the City has begun providing some weekly
reporting on its progress and monthly reporting on its materials inventory.

New York, NY 10011
(212) 727-4546
mcalero@nrdc.org

*Counsel for Plaintiffs Concerned*
*Pastors for Social Action, Melissa*
*Mays, and Natural Resources Defense*
*Council, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2022, I electronically filed Plaintiffs'

Fifth Motion to Enforce Settlement Agreement and accompanying Brief and

exhibits with the Clerk of the Court using the ECF system.

/s/ Adeline Rolnick
Adeline Rolnick
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 513-6240
arolnick@nrdc.org