# Exhibit C

Plaintiffs' Appendix

# TABLE OF CONTENTS

| Exhibit | Description | Bates Number |
|---------|-------------|--------------|
| 1 | Email from William Kim, City of Flint, to Sarah Tallman, NRDC, et al. (Jan. 8, 2021) ...................................................... 1 | |
| 2 | Email from William Kim, City of Flint, to Richard Kuhl, Assistant Attorney General, et al. (June 2, 2021).................... 5 | |
| 3 | Email correspondence between William Kim, City of Flint, and Sarah Tallman, NRDC, et al. (July 8-14, 2021) ............... 7 | |
| 4 | Email correspondence between Adeline Rolnick, NRDC, and Richard Kuhl, Assistant Attorney General, et al. (Feb. 22-23, 2022) ................................................... 10 | |
| 5 | Email correspondence between William Kim, City of Flint, and Adeline Rolnick, NRDC, et al. (Sept. 14–Oct. 13, 2021) ........................................... 13 | |
| 6 | Email correspondence between William Kim, City of Flint, and Sarah Tallman, NRDC, et al. (Jan. 4-5, 2022) ................. 17 | |
| 7 | Email correspondence between Adeline Rolnick, NRDC, and William Kim, City of Flint, et al. (Jan. 4-21, 2022).......... 20 | |
| 8 | Excerpts of contract between Lakeshore Global Corporation and the City of Flint (executed Aug. 16, 2022) ... 27 | |
| 9 | Email from Kalaya Thomas, Metro Consulting Associates, to Adeline Rolnick, NRDC, et al. (Oct. 10, 2022)......................................................... 62 | |
| 10 | Email from William Kim, City of Flint, to Sarah Tallman, NRDC, et al. (June 17, 2021)................................................. 65 | |
| 11 | *City of Flint suspends service line replacement work to help prevent spread of coronavirus*, a City of Flint press release (Apr. 2, 2020)...................................................... 69 | |

12      Email correspondence between Adeline Rolnick, NRDC,
        and William Kim, City of Flint, et al.
        (Nov. 5, 2020–Feb. 3, 2021) ..................................................... 72

13      Letter from Sarah Tallman, NRDC, to William Kim,
        City of Flint (Feb. 22, 2022)..................................................... 83

14      Letter from William Kim, City of Flint, to
        Adeline Rolnick, NRDC (Oct. 7, 2022) ................................... 86

15      Contract between ROWE Professional Services and the
        City of Flint (executed Apr. 27, 2022) .................................... 89

16      Email correspondence between Jolie McLaughlin, NRDC,
        and Richard Kuhl, Assistant Attorney General, et al.
        (Feb. 22–Apr. 1, 2022) ............................................................ 108

17      Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
        Assistant Attorney General, et al. (Oct. 26, 2022) .................. 115

18      City of Flint Status Report (Oct. 28, 2022).............................. 117

19      *City of Flint reaches 95%+ completion of lead service line
        replacement project*, a City of Flint press release
        (Sept. 29, 2022) ........................................................................ 120

20      Letter from Robert Bincsik, City of Flint, to Linda Holst,
        EPA, et al., (Mar. 25, 2019) ...................................................... 123

21      Letter from Sarah Tallman, NRDC, to William Kim and
        Clyde Edwards, City of Flint (Aug. 19, 2022)......................... 125

22      Letter from Sarah Tallman, NRDC, to Angela Wheeler,
        City of Flint, et al., (May 4, 2021) ........................................... 132

23      Letter from Adeline Rolnick, NRDC, to William Kim and
        Clyde Edwards, City of Flint (Oct. 4, 2022)............................ 139

24   Email from Adeline Rolnick, NRDC, to William Kim,
City of Flint, et al. (Sept. 21, 2022) .......................................... 146

25   Email correspondence between Adeline Rolnick, NRDC,
and William Kim, City of Flint, et al. (Sept. 19, 2021) ........... 149

26   Letter from Sarah Tallman, NRDC, to William Kim,
City of Flint (Oct. 17, 2022) ...................................................... 163

27   News article by Peter S. Goodman and Keith Bradsher,
*The World Is Still Short of Everything. Get Used to It*,
NY Times (Nov. 14, 2021) ......................................................... 170

28   News article by Ron Hilliard, *Pandemic fallout leads
Flint lawn, sidewalk restoration delays*, NBC 25 News
(May 13, 2021) .......................................................................... 177

29   Peer-reviewed journal article by Darren A. Lytle et al.
*Sequential drinking water sampling as a tool for evaluating
lead in Flint, Michigan*, Water Res., (Mar. 24, 2019) .............. 187

30   Email correspondence between Sarah Tallman, NRDC,
and William Kim, City of Flint, et al. (May 14-17, 2021) ....... 203

31   Email correspondence between Sarah Tallman, NRDC,
and William Kim, City of Flint, et al. (June 22-24, 2021) ....... 206

32   Email correspondence between Adeline Rolnick, NRDC,
and William Kim, City of Flint, et al.
(Sept. 14–Nov. 24, 2021) .......................................................... 210

33   Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
Assistant Attorney General, et al. (Oct. 19, 2022) ................... 223

34   Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
Assistant Attorney General, et al. (Oct. 12, 2022) ................... 225

35   Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
Assistant Attorney General, et al. (Oct. 6, 2022) ..................... 227

36      Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
        Assistant Attorney General, et al. (Sept. 28, 2022).................. 229

37      Email correspondence between William Kim, City of Flint,
        and Adeline Rolnick, NRDC, et al. (Oct. 26-27, 2022)........... 231

38      Email correspondence between Jolie McLaughlin, NRDC,
        and William Kim, City of Flint, et al. (Feb. 4-11, 2022)......... 239

39      Letter from Damon L. Garrett, Metro Consulting Associates,
        to Clyde Edwards, City of Flint (Sept. 14, 2022)..................... 245

40      Email correspondence between William Kim, City of Flint,
        to Richard Kuhl, Assistant Attorney General, et al.
        (Feb. 28, 2022) ........................................................................ 248

41      Excerpt of City of Flint City Council Meeting
        Agenda (Mar. 14, 2022) ........................................................... 251

42      Excerpt of City of Flint City Council Meeting
        Agenda (Mar. 28, 2022) ........................................................... 256

43      Letter from Sarah Tallman, NRDC, to William Kim
        and Clyde Edwards, City of Flint (May 6, 2022).................... 261

44      Email correspondence between Joseph Kuptz, City of Flint,
        and Richard Kuhl, Assistant Attorney General, et al.
        (Oct. 28–Nov. 1, 2022)............................................................ 268

# Exhibit 1

| From: | William Kim |
|---|---|
| To: | Tallman, Sarah; McLaughlin, Jolie; Chaudhary, Dimple; Cirillo, David |
| Cc: | Angela Wheeler; Kuhl, Richard (AG); Bonsitu Kitaba (bkitaba@aclumich.org) |
| Subject: | Inquiry responses and December report data |
| Date: | Friday, January 8, 2021 4:56:56 PM |
| Attachments: | Oct 2016 - Leadline Replacement (PHASE I).xlsx |
| | Nov 2016 - Leadline Replacement (PHASE I).xlsx |
| | May 2017- (PHASE III) Leadline Restoration (Addt'l).xlsx |
| | June 2017- (PHASE III) Leadline Restoration (Addt'l).xlsx |
| | Sept 2016 - Leadline Replacement (PHASE I).xlsx |
| | April 2017- (PHASE 3) Restoration Costs.xlsx |
| | COF Filters Warehoused.xlsx |
| | SLR Restoration Completed 2016-2018.xls |
| | Dec 2016 - (PHASE 3) Leadline Replacement Cost.xlsx |
| | Phase IV Restoration Data.pdf |
| | Phase 5 & Phase 6 Restoration Report.xls |

Sarah,

We are still reviewing your email from yesterday, but the City provides the following information in response to your 12/22 email, as well as our December monthly reporting (which will be sent in a separate email. Your original inquiries are highlighted in yellow.

Thank you.

> (item 1.a) Data defining universe of eligible homes
> It appears that the 2020-12-09 Unexcavated homes.xlsx list excludes unexcavated homes in University Park and Smith Village. Can you confirm that this is the case?

**COF Response:** Per the PMT from Rowe, this is the case.

> (item 2) Restoration data
> The data the City provided concerns only Phases 5 and 6 of the pipe replacement program. Paragraph 7 of the 2020 Stipulation requires the City to provide monthly "an updated list of all homes where restoration has been completed." ECF No. 217, ¶ 7. Please provide a complete list, including addresses where restoration was completed in Phases 1 through 4, with the City's next status report.

**COF Response:** The City's Transportation division provided the following files which reflect, to the best of their knowledge, the entirety of the City's records regarding restoration activities since 2016:

> April 2017- (PHASE 3) Restoration Costs.xlsx
> Dec 2016 - (PHASE 3) Leadline Replacement Cost.xlsx
> June 2017- (PHASE III) Leadline Restoration (Addt'l).xlsx
> May 2017- (PHASE III) Leadline Restoration (Addt'l).xlsx
> Nov 2016 - Leadline Replacement (PHASE I).xlsx
> Oct 2016 - Leadline Replacement (PHASE I).xlsx
> Phase 5 & Phase 6 Restoration Report.xlsx
> Sept 2016 - Leadline Replacement (PHASE I).xlsx
> SLR Restoration Completed 2016-2018.xlsx
> Phase IV restoration data.pdf

> (item 3) Scheduling Attempt Data
> • The file named 2020-12-09 Scheduling Attempts.xlsx has columns

labeled "consent attempts." Please clarify whether this spreadsheet reflects attempts to obtain consent ("consent attempts"), attempts to schedule work after a resident has submitted a consent form ("scheduling attempts"), or a mix of both.

**COF Response:** Per the PMT from Rowe, it is a mix of both.

• We understand that the City's data does not distinguish between consent attempts and scheduling attempts. The 2020 Stipulation requires the City to include in its status reports a list of addresses that have provided the City with consent to conduct an excavation but have not yet responded to the City's attempts to schedule an excavation, as well as reporting on the dates and times of attempts to schedule an excavation at those addresses. ECF No. 217, ¶ 6. The City's failure to maintain this information violates the 2020 Stipulation. Once the parties understand the universe of remaining unexcavated homes, we would like to discuss the City's recordkeeping and how to determine whether the City has complied with its scheduling attempt obligations.

**COF Response:** Response pending finalized list of remaining unexcavated homes.

(item 5) Tap water sampling plan
• Regarding the second bullet under "Establishing a Sampling Pool," how will the City determine which Tier 2 sites have a "high probability" of lead?

**COF Response:** Historic data on time of construction, and nearby service lines to other non residential properties

• Regarding the "Capturing Samples" process, what, if any, efforts will be made to contact residents prior to dropping off a sampling kit to determine whether the resident is interested in participating in the program? What process will the Public Health Office or DPW follow to conduct outreach to these residents prior to dropping off kits?

**COF Response:** For sites that have never participated there is no way to contact them in advance of going and knocking on their door. For returning sites when we have contact information they would be called prior to the start of the sampling period.

• The plan doesn't specify how the Navigators will know when a resident has captured a sample. Do the instructions ask the resident to contact the City after they have captured the sample, to schedule a pick-up?

**COF Response:** Yes. Each kit has a contact number or the Public Health office and directions on who to contact upon completion

• How will the City work to recruit participants at eligible sites to participate in sampling? What specific outreach efforts are being planned, and who will undertake them?

**COF Response:** Right now with a list of one and a half times the amount necessary for sampling recruitment isn't a planned. As this sampling period proved the process for completion is one of management and efficiency. If the universe of available sites drops below the 1.5 threshold prior to the completion of the Service Line Replacement program then appropriate discussions will be held with regulating authorities.

> (item 7) Filter replacement cartridges and test kits
> Please confirm whether the data in the "Water Filter Distribution Report" file includes only those filter cartridges picked up at City Hall, or also at other locations and/or distributed by contractors for post-replacement filter installation. If these cartridges are distributed at other locations, please specify a list of those locations. In addition, if this information is known to the City, please let us know the total remaining available filter replacement cartridges at the Food Bank (or other site where these materials are warehoused).

**COF Response:** The Filter Distribution Report includes water filter/cartridges that were: Picked up at Flint City Hall, delivered by City of Flint Public Health Navigators' (PHN) via porch drop-off, distributed at Resource Fair's by PHN's and delivered by the Food Bank of Eastern Michigan to community organizations, but ordered through the City of Flint. The Filter Distribution Report includes all activities that encompass water filter distribution through the City of Flint's Public Health Office.

Water filters cartridges are also distributed at the following sites: State of Michigan (Union Street, State building downtown- Flint), McKenzie Patrice Croom Water Lab and ROWE Construction. These organization's order water filters through the City of Flint, I arrange to have the filters delivered from the Food Bank of Eastern Michigan to these organizations or the organization will pick the filters up from Flint City Hall. The organization that ordered the filters is responsible for distributing said filters to their demographic of Flint residents' visiting their establishment. This data of water filter cartridge distribution is accumulative and is also included in the Filter Distribution Report.

Please see the attached Excel spreadsheet, COF Filters Warehoused.xlsx, which includes the remaining City of Flint water filter cartridges that are warehoused at the Food Bank of Eastern Michigan:

--

William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079

# Exhibit 2

| | |
|---|---|
| **From:** | William Kim |
| **To:** | Kuhl, Richard (AG) |
| **Cc:** | Tallman, Sarah; McLaughlin, Jolie; Angela Wheeler; Bonsitu Kitaba; Krisztian, George (EGLE); Russell, Erin (EGLE); Rolnick, Addie |
| **Subject:** | Partial Quarterly Report - Concerned Pastors v. Khouri |
| **Date:** | Wednesday, June 2, 2021 5:03:30 PM |
| **Attachments:** | Phase 5 Restoration 4.15.21-5.14.21.pdf |
| | Phase 6 Restoration 4.15.21-5.14.21.pdf |
| | 2021.06.02 CoF Quarterly Status Report.pdf |

My apologies for the incomplete report, but due to the holiday weekend key personnel were unavailable last week and apparently into this week. I will supplement this as soon as I receive completed information from Rowe's data analyst.

--

William Kim, Assistant City Attorney

City of Flint, Department of Law

1101 S. Saginaw St., 3rd Floor

Flint, MI 48502

(810)237-2079

PA-6

# Exhibit 3

| From: | William Kim |
|---|---|
| To: | Tallman, Sarah |
| Cc: | Angela Wheeler; kuhlr@michigan.gov; McLaughlin, Jolie; Rolnick, Addie; Xu, Cat; Bonsitu Kitaba |
| Subject: | Re: Update |
| Date: | Wednesday, July 14, 2021 5:33:03 PM |
| Attachments: | 2021-06-14 Consent Attempts.xlsx |
| | 2021-06-14 Declinations.xlsx |
| | 2021-06-14 Homes with consent received.xlsx |
| | 2021-06-14 Non-responsive.xlsx |
| | 2021-06-14 SL Exploration Status.xlsx |
| | Restoration Addresses as of 6-24-21.xlsx |
| | 2021.07.14 CoF Status Report.pdf |

Apologies for the delay.  This week has been unusually difficult.

On Wed, Jul 14, 2021 at 10:27 AM Tallman, Sarah <stallman@nrdc.org> wrote:

> Bill,
>
> Plaintiffs have not received the City's June 2021 monthly status report. Please provide this outstanding report as soon as possible, and no later than Monday, 7/19. The report should include an updated declination list, non-response list (i.e., "an updated list of all addresses where the City was otherwise unable to obtain permission from the resident and/or property owner to conduct an excavation despite undertaking all required outreach activities as to that address), and an updated list of all homes where restoration was completed. ECF No. 217, ¶ 7. The status report must also include the required elements listed in ECF No. 208, ¶ 6. The City's inconsistent, late, and incomplete reporting is impeding Plaintiffs' ability to track the City's progress in completing its obligations under the Settlement.
>
> Regards,
>
> Sarah
>
> **From:** William Kim <wkim@cityofflint.com>
> **Sent:** Thursday, July 8, 2021 5:17 PM
> **To:** Tallman, Sarah <stallman@nrdc.org>; McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>
> **Cc:** Angela Wheeler <awheeler@cityofflint.com>
> **Subject:** Update
>
> Sarah,

PA-8

I know I owe you responses on a few things, and some outstanding data requests.  I should have the bulk of that in hand by Monday (FYI I'll be off tomorrow).  On your proposed timeline, that's being discussed at levels above me, but we may want to plan on discussing your proposed timeline via a zoom soon.  Unfortunately, next week is the fairness hearing for the Flint Water settlement, and its currently scheduled  to basically be all day M/T/Th.  So if you can look at your calendars for the week afterwards that would probably work best.

Thanks,

B

--

William Kim, Assistant City Attorney

City of Flint, Department of Law

1101 S. Saginaw St., 3rd Floor

Flint, MI 48502

(810)237-2079

--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079

# Exhibit 4

| From: | Rolnick, Addie |
|---|---|
| To: | Kuhl, Richard (AG) |
| Cc: | Tallman, Sarah; Xu, Cat; Bonsitu Kitaba; McLaughlin, Jolie; William Kim (wkim@cityofflint.com); Gambill, Nathan (AG) |
| Subject: | RE: Concerned Pastors - letter re: remaining scope of work & final stipulation |
| Date: | Wednesday, February 23, 2022 4:35:00 PM |
| Attachments: | 2022.2.23 Plaintiffs" list of homes with remaining work.xlsx |

Richard,

That spreadsheet is attached here. Please let us know if you have any questions.

-Addie

**ADELINE ROLNICK**
*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL

1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

---

**From:** Kuhl, Richard (AG) <KuhlR@michigan.gov>
**Sent:** Tuesday, February 22, 2022 3:31 PM
**To:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>; William Kim (wkim@cityofflint.com) <wkim@cityofflint.com>
**Cc:** Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Gambill, Nathan (AG) <GambillN@michigan.gov>
**Subject:** RE: Concerned Pastors - letter re: remaining scope of work & final stipulation

To avoid any confusion, can you point me to a spreadsheet listing the approximately 1931 residences listed in Paragraphs 1-3 of the attached February 22, 2022 letter?

Richard S. Kuhl
Assistant Attorney General
Environment, Natural Resources,
and Agriculture Division

6th Floor, G. Mennen Williams Building
525 West Ottawa Street
P.O. Box 30755
Lansing, MI  48909

Office: (517) 335-0696

PA-11

Mobile: (517)575-9343
Fax: (517) 373-1610
Email: kuhlr@michigan.gov



---

**From:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Sent:** Tuesday, February 22, 2022 2:34 PM
**To:** William Kim (wkim@cityofflint.com) <wkim@cityofflint.com>
**Cc:** Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; Gambill, Nathan (AG) <GambillN@michigan.gov>
**Subject:** Concerned Pastors - letter re: remaining scope of work & final stipulation

> **CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Bill,

As discussed, I'm attaching a letter describing Plaintiffs' understanding of the remaining scope of work (excluding restoration) under the Settlement, with attached replacement eligible homes list in excel format. Please let us know if you have any questions about this letter.

I'm also attaching the final version of the stipulation. We made a couple of changes to paragraphs 3 and 4 since the last version we circulated, to clarify that Paragraph 4(iv) (regarding post-consent scheduling attempts) applies only if no excavation has been conducted, and not when an excavation has already identified a lead/galvanized steel service line that has not yet been replaced. For your reference, I'm attaching a redline so you can more easily see these changes.

Please let us know if there is anything else you need from us in order to put the stipulation before the City Council at tomorrow's meeting.

Thanks,
Jolie

JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

Exhibit 5

| From: | William Kim |
|---|---|
| To: | Rolnick, Addie |
| Cc: | McLaughlin, Jolie; Xu, Cat; Bonsitu Kitaba; kuhlr@michigan.gov; Tallman, Sarah; awheeler@cityofflint.com |
| Subject: | Re: Concerned Pastors - action steps from 9/14/21 call |
| Date: | Wednesday, October 13, 2021 3:05:51 PM |
| Attachments: | 2021-09-14 Declinations.xlsx |
| | 2021-09-14 Homes with consent received.xlsx |
| | 2021-09-14 Fast Start Exploration Status.xlsx |
| | 2021-09-14 Filter Verification.xlsx |
| | 2021-09-14 Completed SLE SLR All Phases.xlsx |
| | 2021-09-14 Non-responsive.xlsx |
| | 2021-09-14 Outstanding work orders.xlsx |

Colleagues,

Please see the following files:

> **2021-09-14 Completed SLE SLR All Phases.xlsx** A list of all addresses where excavations/replacements have occurred since 2016
> - **2021-09-14 Declinations.xlsx** A list of all declinations
> - **2021-09-14 Non-responsive.xlsx** A list of all non-responsive addresses
> - **2021-09-14 Homes with consent received.xlsx** A list of all addresses with consents on file that have not been scheduled
> - **2021-09-14 Outstanding Work Orders.xlsx** A list of the remaining outstanding work orders (including the 682 addresses recently identified by the NRDC)

Let us know when you've had a chance to review and can discuss further.

Also attached are the files 2021-09-14 Fast Start Exploration Status.xlsx and 2021-09-14 Filter Verification.xlsx, which should have been the information reported at the end of last month.

On Tue, Oct 12, 2021 at 2:07 PM William Kim <wkim@cityofflint.com> wrote:
> Addie and company, I'm back from my vacation, and am going through all of the issues that have piled up. I expect I'll respond to you with all of the requested information by tomorrow.
>
> Thanks,
>
> Bill
>
> On Tue, Oct 5, 2021 at 11:04 AM Rolnick, Addie <ARolnick@nrdc.org> wrote:
>
>> Bill,
>>
>> I'm writing to follow up on the below action steps from Plaintiffs' 9/14/21 call with the City. As a reminder, Plaintiffs are waiting for the City to share the (1) 2021 Replacement Eligible Homes List; (2) mailing information concerning the 748 inactive addresses on Plaintiffs' 8/2/21 list; (3) the City's position on the most recent stipulation language; and (4) the amount of state funding remaining for the Settlement. Please provide this information as soon as possible.
>>
>> Regards,
>>
>> Addie

ADELINE ROLNICK

*Attorney\**

NATURAL RESOURCES DEFENSE COUNCIL

1152 15TH STREET NW, SUITE 300

WASHINGTON, DC 20005

T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER

NRDC.ORG

---

**From:** Tallman, Sarah <stallman@nrdc.org>
**Sent:** Tuesday, September 14, 2021 6:52 PM
**To:** William Kim <wkim@cityofflint.com>; 'awheeler@cityofflint.com'
<awheeler@cityofflint.com>
**Cc:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Rolnick, Addie
<ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba
<bkitaba@aclumich.org>; 'kuhlr@michigan.gov' <kuhlr@michigan.gov>
**Subject:** Concerned Pastors - action steps from 9/14/21 call

Bill and Angela,

Thank you for the productive call this morning. As discussed, Plaintiffs would like to keep this process moving as expeditiously as possible to resolve the remaining issues. Here are the next steps the parties agreed to:

1. **Compilation of 2021 Replacement Eligible Homes List.** As soon as possible, the City will provide Plaintiffs with the full list of replacement eligible homes that comprise the "2021 Replacement Eligible Homes List" in the draft Stipulation, including:
   a. All excavated addresses.
   b. All declination addresses.
   c. All non-responsive addresses (i.e., addresses where the resident did not provide consent after the City completed all required consent attempts).
   d. All addresses where the resident consented to excavation, but the City was unable to schedule an excavation after completing the required post-consent scheduling attempts. *See* ECF No. 217 ¶ 6.
   e. All addresses with outstanding work orders. This includes the 672 addresses listed on the spreadsheet shared by Plaintiffs on August 2, 2021, that have current active water accounts and where the City has not completed the required in-person consent attempts. *See* ECF No. 174 ¶ 15.a. The City and Plaintiffs agree that these 672 homes are replacement eligible and must receive the required in-person outreach.
   f. [Placeholder for additional homes pending resolution of the parties' discussions concerning the 748 inactive addresses identified on Plaintiffs' 8/2/2021 spreadsheet (see item 2 below).]
2. **Mailing information concerning 748 Inactive Addresses on Plaintiffs' 8/2/21**

PA-15

**List.** The City will confirm whether mailings were sent to the 748 "inactive" addresses on Plaintiffs' 8/2/21 spreadsheet. If the property owner's address is different from the address on Plaintiffs' spreadsheet (the "service address"), the City will indicate whether the mailing was sent to the service address or the property owner address.

3. **Final Review of Stipulation Language.** The City will review the near-final stipulation Plaintiffs shared via email on August 30, 2021 and confirm whether it agrees to the language in the stipulation, apart from the content of the 2021 Replacement Eligible Homes List and the listed deadlines.

4. **Remaining Available Settlement Funds.** If such information is available, the City will share the amount of state funding remaining for the Settlement.

Regards,

Sarah

SARAH C. TALLMAN (SHE/HER)

*Senior Attorney*

NATURAL RESOURCES

DEFENSE COUNCIL

20 N. WACKER DR., SUITE 1600

CHICAGO, ILLINOIS 60606

T 312.651.7918
stallman@nrdc.org

--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079



--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079

PA-16

# Exhibit 6

| From: | William Kim |
|---|---|
| To: | Tallman, Sarah |
| Cc: | awheeler@cityofflint.com; McLaughlin, Jolie; Rolnick, Addie; Xu, Cat; Bonsitu Kitaba |
| Subject: | Re: Concerned Pastors |
| Date: | Wednesday, January 5, 2022 3:19:54 PM |
| Attachments: | 2021-12-2 Concerned Pastors Stip - redline.docx |
| | 2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List.xlsx |

Sarah,

Here's my notes on your latest proposed stip.  Let me know if you want to discuss.

Also, I've attached my preliminary spreadsheet.  Each tab should be pretty self-explanatory, but let me know if any of my abbreviations aren't apparent.  The first tab ("Consol. Rpl. Elig. Add's") consolidates what should be all of the applicable addresses.  As discussed yesterday, once I have your add'l info on the 11.2 list, I'll be able to incorporate that information as well.

Bill

On Tue, Jan 4, 2022 at 4:27 PM Tallman, Sarah <stallman@nrdc.org> wrote:

> Bill,
>
> Thanks for taking the time to talk today. Thank you for pulling together the lists that will comprise the 2021 Replacement Eligible Homes List and sending them to Plaintiffs in the next day or so. We can pull out the addresses from the 11/10 List that still require work from the City. If we receive the data and redline of the draft stipulation by COB Wednesday, we will aim to turn around the materials you send us by the end of the week.
>
> As discussed, here are Plaintiffs' questions concerning the information on the City's website:
>
> - **Help Line.** The City's GetTheLeadOut page currently directs residents to call 810-410-1133 with questions. I tried calling this number, and got a voice message from Jennifer Allen at ROWE. If ROWE is not currently under contract with the City, who, if anyone, is managing and responding to messages left at this number? In addition, the voice mailbox instructs residents with questions about restoration to call the City Hall Street Maintenance Department at 810-766-7343, ext. 2. Is this the correct number for inquiries about restoration? If so, we request that the City directly post this number on its website.
> - **Email.** The City's GetTheLeadOut page includes a link to a contact email of GetTheLeadOut@cityofflint.com. Please confirm whether this account is being checked on a regular basis by a City staff member, and if so, how frequently the inbox is being checked and messages responded to.
> - **Updating website information.** The City's GetTheLeadOut page is unclear about whether the City is still accepting consent forms. The page says both that the deadline was extended to July 23, 2021, and that "You can still have your service line checked for lead by submitting a consent form." This information is ambiguous as to whether

PA-18

residents may still submit consent forms to join the program. As the City has agreed, there are, at minimum, a specific set of addresses that still need outreach from the City and thus may join the program by submitting their consent forms. Other than those specific addresses, Plaintiffs are unclear as to whether the City is still accepting consent forms. We request that the City update the website to provide up-to-date information to the public.

Regards,

Sarah

SARAH C. TALLMAN (SHE/HER)

*Senior Attorney\**

NATURAL RESOURCES DEFENSE COUNCIL

1152 15TH STREET NW, SUITE 300

WASHINGTON, DC 20005

T 312.651.7918
stallman@nrdc.org

*ADMITTED ONLY IN ILLINOIS; SUPERVISION BY A MEMBER OF THE D.C. BAR

--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079



# Exhibit 7

| From: | Rolnick, Addie |
| --- | --- |
| To: | William Kim; awheeler@cityofflint.com |
| Cc: | McLaughlin, Jolie; Xu, Cat; Tallman, Sarah; Bonsitu Kitaba; "kuhlr@michigan.gov" |
| Subject: | RE: Concerned Pastors |
| Date: | Friday, January 21, 2022 12:40:00 PM |
| Attachments: | 01.21.2022 Replacement Eligible Homes Discrepancies.xlsx |

Bill,

We're looking forward to the City's response about whether the near-final language in the stipulation is acceptable to the City. In the meantime, we're following up to provide more information on the data discrepancies we mentioned in our January 7 email. As we noted, the data discrepancies we've identified do not affect the stipulation that the parties are preparing to file with the court. However, these data issues may affect the specific addresses where work still needs to be completed by the contractors, and so we wanted to flag these issues now before the City resumes work in the spring.

The attached spreadsheet details the following discrepancies between the replacement eligible homes list that the City shared with Plaintiffs on January 5 ("2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List") and the City's reporting data:

1. Tab 3 of the City's "2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List" ("11.24.21 Add's w Csnt") identified 388 homes where the resident provided consent for the City to conduct an excavation, but an excavation has not yet occurred. According to the City's monthly reporting data, 25 of these addresses already received an excavation and/or replacement. These 25 addresses are listed on tab 1 of the attached spreadsheet ("consent – excavation not needed").

2. Tab 4 of the City's "2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List" ("Excav Non-CU Addys") identified 26 homes where an excavation identified a lead or galvanized steel service line but no replacement has yet occurred. Plaintiffs' analysis of the City's data identified 87 additional homes that appear to fall in this category. These are listed on tab 2 of the attached spreadsheet ("Excavated – replacement needed").
   a. 50 of these addresses were listed as "complete" by the City on the "2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List" spreadsheet, but the spreadsheet does not state whether a service line replacement occurred at the address. These addresses are indicated in Column E on tab 2 of the attached spreadsheet ("Included on City's 2022.01.05 "complete" list?").
   b. The remaining 37 addresses were listed on Plaintiffs' spreadsheet titled "2022.01.07 Pls.' List of Homes Missing from Replacement Eligible Homes List." This is indicated in Column F ("Included on Plaintiffs' 2022.01.07 list of homes missing from Replacement Eligible Homes?")
   c. Because these addresses are part of the 2022 Replacement Eligible Homes List, the City must replace the lead/galvanized steel service lines at these additional 87 homes. If the City has already replaced the service lines at any or all of these homes, please provide the required documentation (i.e., date of replacement, which portion of service line was replaced, and material of service line confirmed or discovered).

3. Tab 2 of the City's "2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List" ("11.24.21 Compl Add's") listed as "complete" 8 homes where an excavation occurred, but there was no service line replacement, and all or a portion of the service line is "unknown." Plaintiffs' spreadsheet titled "2022.01.07 Pls.' List of Homes Missing from Replacement Eligible Homes List" included an additional 36 homes that appear to fall into this category. These addresses are listed on tab 3 of the attached spreadsheet ("Excavated – missing composition"). For each of these addresses, please identify the material(s) of the service line

confirmed or discovered as a result of the excavation.

4. Tab 2 of the City's "2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List" ("11.24.21 Compl Add's") listed as "complete" 8 addresses where only one side of the service line is lead or galvanized steel and the City's reporting indicates that the City replaced the copper side of the line, rather than the lead or galvanized steel side. These addresses are listed on tab 4 of the attached spreadsheet ("Excavated – composition mismatch"). Please confirm whether this is a reporting error or whether the lead/galvanized steel portion of these service lines still needs to be replaced.

Additionally, we have not heard back from the City concerning the questions we raised by email on January 4, 2022, concerning the City's website. It is critical that the City's website contains accurate and up-to-date information about how residents can get more information about the service line replacement program. Please provide answers to these questions, which we've re-copied below, no later than January 28.

1. **Help Line.** The City's GetTheLeadOut page currently directs residents to call 810-410-1133 with questions. I tried calling this number, and got a voice message from Jennifer Allen at ROWE. If ROWE is not currently under contract with the City, who, if anyone, is managing and responding to messages left at this number? In addition, the voice mailbox instructs residents with questions about restoration to call the City Hall Street Maintenance Department at 810-766-7343, ext. 2. Is this the correct number for inquiries about restoration? If so, we request that the City directly post this number on its website.

2. **Email.** The City's GetTheLeadOut page includes a link to a contact email of GetTheLeadOut@cityofflint.com. Please confirm whether this account is being checked on a regular basis by a City staff member, and if so, how frequently the inbox is being checked and messages responded to.

3. **Updating website information.** The City's GetTheLeadOut page is unclear about whether the City is still accepting consent forms. The page says both that the deadline was extended to July 23, 2021, and that "You can still have your service line checked for lead by submitting a consent form." This information is ambiguous as to whether residents may still submit consent forms to join the program. As the City has agreed, there are, at minimum, a specific set of addresses that still need outreach from the City and thus may join the program by submitting their consent forms. Other than those specific addresses, Plaintiffs are unclear as to whether the City is still accepting consent forms. We request that the City update the website to provide up-to-date information to the public.

Regards,

Addie

ADELINE ROLNICK
*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL

1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

**From:** Rolnick, Addie
**Sent:** Friday, January 7, 2022 6:27 PM
**To:** William Kim <wkim@cityofflint.com>; awheeler@cityofflint.com
**Cc:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Tallman, Sarah <stallman@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; 'kuhlr@michigan.gov' <kuhlr@michigan.gov>
**Subject:** RE: Concerned Pastors

Bill,

Thank you for providing the spreadsheet containing the City's understanding of the 2022 Replacement Eligible Homes List and your notes on the Stipulation. (We're now calling it the "2022" list as we're now in 2022.)

-
**Stipulation Language**
We cleaned up the document for resolved issues, proposed changes to address your comments, and raised a few questions in comment bubbles. Please let us know whether these revisions are acceptable to the City. We agree it makes sense to discuss the restoration deadline. Sarah and I are available Monday between 10:30am and 12pm on Monday and between 9am and 11:30 am or 12pm-12:30pm on Tuesday. Will any of those work for you?

-
**Addresses that Need to be Added to the 2022 Replacement Eligible Homes List**
Plaintiffs' review indicates that the 2022 Replacement Eligible Homes List should include an additional 1,276 homes that do not appear on the List that the City shared via email on January 5. These 1,276 missing addresses are listed on the attached spreadsheet titled "2022.01.07 Pls.' List of Homes Missing from Replacement Eligible Homes List," and are explained in more detail below.

a. For 1,144 of the addresses, Plaintiffs' analysis of the City's data reflects that the City has already completed its outreach and excavation obligations under the Settlement. These addresses were all previously shared by Plaintiffs in the spreadsheet titled "11.10.21 Pls.' List of Homes Missing from Replacement Eligible Homes List." In Column B of the attached spreadsheet, these addresses are listed as appearing on "Plaintiffs' 11/10 List."

b. For 9 addresses, Plaintiffs' analysis shows that the resident has consented to an excavation but the City has not yet completed an excavation. (This is the information you asked Sarah for when you spoke on the phone earlier this week.) These addresses were highlighted in <mark>yellow</mark> on the attached spreadsheet. These addresses were all either previously shared by Plaintiffs in the spreadsheet titled "11.10.21 Pls.' List of Homes Missing from Replacement Eligible Homes List" or included by the City in the draft Replacement Eligible Homes List shared on October 29, 2021. In Column B of the attached spreadsheet, these addresses are listed as appearing on "Plaintiffs' 11/10 List" or the City's October 29, 2021 "Outstanding Work Orders" list

("2021-09-14 Outstanding work orders.xlsx").

c.  123 addresses that the City included on the draft 2022 Replacement Eligible Homes List shared on October 29, 2021, but which are not listed on tab 1 ("Consol. Rpl. Elig. Add's") of the draft Replacement Eligible Homes List that the City shared on January 5.

   i.  In Column B of the attached spreadsheet, these addresses are listed as appearing on the City's "Outstanding Work Orders" list ("2021-09-14 Outstanding work orders.xlsx"), which was shared with Plaintiffs in October.

   ii.  Although tab 4 ("8.2.21 NRDC Outreach") of the City's spreadsheet titled "2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List" indicates that **28** of these addresses are "not in city," all 28 of these addresses appeared on the City's July 26 active water accounts list, and 27 of these addresses were on the 2019 paragraph 13(b) list agreed to by the parties. These addresses are indicated in column C ("City outreach notes") and D ("Plaintiffs' response") of the attached spreadsheet. It is Plaintiffs' understanding that these addresses are served by the Flint water system and are eligible for participation in the service line replacement program under the Agreement. If this is not the City's understanding, we suggest discussing this issue.

**Please confirm the City's agreement that the 1,276 addresses on the attached spreadsheet titled "2022.01.07 Pls.' List of Homes Missing from Replacement Eligible Homes List" are part of the 2022 Replacement Eligible Homes List. In total, the 2022 Replacement Eligible Homes List includes 32,106 addresses (the 30,830 addresses listed on tab 1 ("Consol. Rpl. Elig. Add's") of the City's spreadsheet titled "2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List" and the 1,276 addresses identified above and in the attached spreadsheet).**

<u>Discrepancies in Certain Subcategories of 2022 Replacement Eligible Homes List</u>

Plaintiffs have preliminarily identified some discrepancies in certain subcategories of the 2022 Replacement Eligible Homes List. For example, there may be some homes that already received an excavation and/or replacement, even though the City's list indicates that no excavation and/or replacement has occurred. Conversely, the City's list shows that the City considers some addresses to be "complete" even though an excavation at those addresses uncovered a lead service line and the City has not yet completed a replacement.  Plaintiffs are still assessing these issues and will provide more information by the end of next week. However, because these data discrepancies do not affect the scope of the 2022 Replacement Eligible Homes List, Plaintiffs do not believe the parties need to come to an agreement on the scope of these two categories before finalizing the Stipulation.

Regards,


Addie


ADELINE ROLNICK
*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Wednesday, January 5, 2022 3:18 PM
**To:** Tallman, Sarah <stallman@nrdc.org>
**Cc:** awheeler@cityofflint.com; McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>
**Subject:** Re: Concerned Pastors

Sarah,

Here's my notes on your latest proposed stip.  Let me know if you want to discuss.

Also, I've attached my preliminary spreadsheet.  Each tab should be pretty self-explanatory, but let me know if any of my abbreviations aren't apparent.  The first tab ("Consol. Rpl. Elig. Add's") consolidates what should be all of the applicable addresses.  As discussed yesterday, once I have your add'l info on the 11.2 list, I'll be able to incorporate that information as well.

Bill

On Tue, Jan 4, 2022 at 4:27 PM Tallman, Sarah <stallman@nrdc.org> wrote:

> Bill,
>
> Thanks for taking the time to talk today. Thank you for pulling together the lists that will comprise the 2021 Replacement Eligible Homes List and sending them to Plaintiffs in the next day or so. We can pull out the addresses from the 11/10 List that still require work from the City. If we receive the data and redline of the draft stipulation by COB Wednesday, we will aim to turn around the materials you send us by the end of the week.
>
> As discussed, here are Plaintiffs' questions concerning the information on the City's website:
>
> - **Help Line.** The City's GetTheLeadOut page currently directs residents to call 810-410-1133 with questions. I tried calling this number, and got a voice message from Jennifer Allen at ROWE. If ROWE is not currently under contract with the City, who, if anyone, is managing and responding to messages left at this number? In addition, the voice mailbox instructs residents with questions about restoration to call the City Hall Street Maintenance Department at 810-766-7343, ext. 2. Is this the correct number for inquiries about restoration? If so, we request that the City directly post this number on its website.
> - **Email.** The City's GetTheLeadOut page includes a link to a contact email of GetTheLeadOut@cityofflint.com. Please confirm whether this account is being checked on a regular basis by a City staff member, and if so, how frequently the inbox is being checked and messages responded to.
> - **Updating website information.** The City's GetTheLeadOut page is unclear about whether the City is still accepting consent forms. The page says both that the deadline was extended

to July 23, 2021, and that "You can still have your service line checked for lead by submitting a consent form." This information is ambiguous as to whether residents may still submit consent forms to join the program. As the City has agreed, there are, at minimum, a specific set of addresses that still need outreach from the City and thus may join the program by submitting their consent forms. Other than those specific addresses, Plaintiffs are unclear as to whether the City is still accepting consent forms. We request that the City update the website to provide up-to-date information to the public.

Regards,
Sarah

SARAH C. TALLMAN (SHE/HER)
*Senior Attorney*\*

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 312.651.7918
stallman@nrdc.org

\*ADMITTED ONLY IN ILLINOIS; SUPERVISION BY A MEMBER OF THE D.C. BAR

--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079



# Exhibit 8

**PHASE VII FAST START SERVICE LINE REPLACEMENT, EXCAVATION
AND RESTORATION (SLE/SLR)**

This agreement (hereinafter "Agreement")  by and between the City of Flint, a Michigan Municipal Corporation, 1101 S. Saginaw Street, Flint, MI  48502, (hereinafter the "City"), and Lakeshore Global Corporation, hereinafter referred to as "Contractor."

**1.     Applicable Law**:      This Agreement and all related disputes shall be governed by and interpreted in accordance with the laws of the State of Michigan.

**2.     Arbitration**:  Contractor agrees that for all claims, disputes, and other matters arising out of or relating to this agreement, Contractor must request the City's consent to arbitrate within 30 days from the date the Contractor knows or should have known the facts giving rise to the claim, dispute or question.

       (a)     Notice of a request for arbitration must be submitted in writing by certified mail or personal service upon the City Attorney.

       (b)     Within 60 days from the date a request for arbitration is received by the City, the City shall inform Contractor whether it agrees to arbitrate.  If the City does not consent, Contractor may proceed with an action in a court of competent jurisdiction within the State of Michigan.  If the City does consent, then within 30 days of the consent each party shall submit to the other the name of one person to serve as an arbitrator.  The two arbitrators together shall then select a third person, the three together shall then serve as a panel in all proceedings.  Any unanimous decision of the three arbitrators shall be a final binding decision.  The City's failure to respond to a timely, conforming request for arbitration is deemed consent to arbitration.

       (c)     The costs of the arbitration shall be split and borne equally between the parties and such costs are not subject to shifting by the arbitrator.

       (d)     Contractor's failure to comply with any portion (including timeliness) of this provision shall be deemed a permanent waiver and forfeiture of the claim, dispute, or question.

       (e)     This provision shall survive the expiration or termination of this Agreement in perpetuity.

**3.     City Income Tax Withholding**:  Contractor and any subcontractor engaged in this contract shall withhold from each payment to his employees the City income tax on all of their compensation subject to City tax, after giving effect to exemptions, as follows:

       (a)     <u>Residents of the City</u>: At a rate equal to 1% of all compensation paid to the employee who is a resident of the City of Flint.

 Phase VII lead line SLR/SLE

    (b)   <u>Non-residents:</u> At a rate equal to ½ % of the compensation paid to the employee for work done or services performed in the City of Flint.

These taxes shall be held in trust and paid over to the City of Flint in accordance with City ordinances and State law.  Any failure to do so shall constitute a material breach of this contract.

**4.**    **Compensation**:  The City shall pay for such services as have been set forth herein within 30 days of submission of completed approved invoices, releases, affidavits, and the like. Notwithstanding, the contract price shall not to exceed <u>$17,871,747.85</u>.  Contractor recognizes that the City does not guarantee it will require any set amount of services.  Contractor's services will be utilized as needed and as determined solely by the City of Flint.  Contractor expressly acknowledges that it, without limitation, has no right to payment of an amount exceeding the amount set forth in this Section.  Contractor agrees that oral agreements by City officials to pay a greater amount are not binding.  Contractor also confirms agreement that any cancellation of funding by State of Michigan based or federally based funding sources for this project would allow an immediate cancellation of this contract.

In addition, for each address, as assigned by the City to Contractor or one of its subcontractors, at which an eligible service line excavation and replacement is deemed complete by September 30, 2022, the City will pay Contractor an incentive payment of $500.00, up to a maximum of $1,800,000.00.  An assigned address will be deemed complete if any of the following conditions are met and properly documented, to the satisfaction of the City:

    (1) completing service line replacement;
    (2) completing service line excavation and determining that service line replacement is unnecessary;
    (3) having the property owner or resident decline excavation and/or replacement;
    (4) being unable to contact the homeowner/resident or schedule an excavation after three documented attempts, at least one of which occurs after 5PM or on a weekend;
    (5) otherwise determining that an assigned address is ineligible for service line excavation and replacement.

To receive this incentive payment, Contractor must submit itemized invoices to the City by October 8, 2022 for any of the above-listed work completed by September 30, 2022.  Any such incentive payments will be in addition to the contract price for work done.

A.    **Contractor will submit itemized invoices by the 8th of each month, reflecting all work completed in the previous week which must include:**

    (i)     The dates of service
    (ii)    The addresses completed
    (iii)   The name of the company providing the service and a general description of the service provided.
    (iv)   The unit rate and the total amount due.
    (v)    All household addresses eligible for the CHIP program must be identified and billed as such.

 Phase VII lead line SLR/SLE

    (vi)    Addresses eligible to be billed under the CHIP program must be listed separately from other addresses; either all together in a distinct section of each invoice with its own subtotal, or on separate invoices.

    (vii)    Any corrections, credits or additional charges must be billed on separate invoices from the standard line replacement charges.

    (viii)    **Invoices must be submitted simultaneously to Accounts Payable located in the City's Finance Department, DPW Accounting Supervisor, and Rowe Professional Services.**

Invoices can be submitted to the City of Flint Finance Department in person at:

1101 S. Saginaw St.
Finance, 2nd Fl, Rm 203
Flint, MI 48502

By way of US Postal Service to:

City of Flint
Accounts Payable
P.O. Box 246
Flint, MI 48501-0246

And/Or by email to:        **accountspayable@cityofflint.com**

Invoices can be submitted to the City of Flint DPW Accounting Supervisor to the attention of Yolanda Gray, DPW Accounting Supervisor at:

ygray@cityofflint.com

And invoices can be submitted to Rowe Professional Services to Jeff Markstrom at:

Jmarkstrom@rowepsc.com

It is solely within the discretion of the City as to whether Contractor has provided a proper invoice. The City may require additional information or waive requirements as it sees fit.

B.      The City shall make payments to the Contractor as specified herein:

    (i)    As of the day agreed to each month during which satisfactory progress has been made toward the final completion of the project, the Contractor shall submit to the City an application for payment based upon the amount and value of the work which has been done under this contract during that month or since the date of the past previous estimate.

        The Contractor shall submit, along with such application for payment, waiver of lien or sworn affidavits or other vouchers showing payments for materials and labor, payments to subcontractors and such other evidence of the Contractor's right to payment application, the city



will pay to the Contractor an amount of such application except that the City may deduct and retain out of any such partial payment, a sum sufficient to meet any undischarged obligations of the Contractor for labor and/or materials incorporated in the work.

     (ii)     Payment and retainage on the pay estimate shall be as follows:

     The Contractor agrees that the partial payment request shall consist of the cost of work certified as completed to the date as estimated in the contract price subject to the decisions of:

     1.     Ten percent (10%) of the sum to be retained until payment of the first fifty percent (50%) of the contract work is in place, and

     2.     The amount of previous payments to the Contractor, and ten percent (10%) of the dollar value of work, which is certified as in place.

     3.     More than fifty percent (50%) in place, if the City in its sole discretion determines that the Contractor is not making satisfactory progress, or that the Contractor is not performing the contract in a satisfactory manner.  The Contractor agrees that the City shall have the option to submit any dispute concerning whether the Contractor is making satisfactory progress or is not performing the contract in a satisfactory manner and is thus entitled to continue withholding ten percent (10%) as retainment to a third party.  The Contractor agrees that for purposes of this section the word "unsatisfactory" shall mean that the Contractor is failing to comply with any section of this contract or with any part of the project schedule submitted by the Contractor which schedule has been approved by the City.

     The City shall deposit any retained funds in an interest bearing account in the City of Flint's name, and the Contractor agrees to pay all expenses regarding the deposit, investment, and administration with the interest bearing account.

     The Contractor agrees that the City shall have sole control over the interest bearing account.  The Contractor agrees that the interest rate paid on a regular passbook savings account at any federally chartered financial institution shall be the proper and reasonable interest, which shall be paid on any retainment of the Contractor.

     4.     At any time after fifty percent (50%) of the written contract is complete, and at the request of the Contractor, the City may reduce the retainage to five percent (5%).

     (iii)     Withholding payments:  The City, before making any payment, will require the Contractor to furnish releases or receipts from any or all persons performing work and supplying material or services to the Contractor, or any subcontractor, if this is deemed necessary to protect its interest.  The City, however, may make payment in part or in full to the Contractor without requiring the furnishing of such releases or receipts and any payments so made shall in no way impair the obligations of any surety or sureties on any bond or bonds furnished under this contract.

 Phase VII lead line SLR/SLE

(iv)    Payments subject to submission of certificates:  Each payment to the Contractor by the City shall be made subject to the following:

1.    Submission by the Contractor of all written certifications required of it and its subcontractors under general conditions, and

2.    No payment made under the contract shall act as a waiver of the right of the owner to require the fulfillment of all of the terms of the contract.  The City reserves the right to issue joint warrants naming the prime and subcontractors when such action is in the interest of the owner.

(v)    Final payments:  After the final inspection by the City of all work under the contract, the Contractor shall prepare its requisition for final payment and submit it to the City's Chief Financial Officer or his or her designee.  The final payment shall consist of the total cost of all work, as adjusted in accordance with approved change orders, less all previous payments to the Contractor and subject to withholding of any amount due the City under "liquidated damages," if applicable less the costs of depositing, investing and administering the retained amount or any other costs associated with the interest bearing account.

(vi)    The Contractor shall not withhold any retainage from payments to suppliers unless there is an executed written agreement to that effect between the Contractor and the supplier. **Final retainage payment to Contractor shall not be made until all related expenses have been reviewed and approved by the State of Michigan.**

(vii)    Progress payment shall be made in the following manner:  A single check each month to Contractor.

**5.    Contract Documents**:  The invitation for bids, instructions to bidders, proposal, affidavit, addenda (if any), statement of bidder's qualifications (when required), general conditions, special conditions, performance bond, labor and material payment bond, insurance certificates, technical specifications, and drawings, together with this agreement, form the contract, and they are as fully a part of the contract as if attached hereto or repeated herein.  If there is a conflict between this Agreement and any of the documents listed above, this Agreement will control.

**6.    Davis Bacon:  Contractor must fully adhere to the Davis-Bacon Act, 40 U S C 276a, *et seq*.**

**7.    Disclaimer of Contractual Relationship With Subcontractors:** Nothing contained in the Contract Documents shall create any contractual relationship between the City and any Subcontractor or Sub-subcontractor.

**8.    Effective Date:** This contract shall be effective upon the date that it is executed by all parties.  This contract shall not extend beyond fiscal year FY24.

**9.    Certification, Licensing, Debarment, Suspension and Other Responsibilities:** Contractor warrants and certifies that Contractor and/or any of its principals are properly

certified and licensed to perform the duties required by this contract in accord with laws, rules, and regulations, and is not presently debarred, suspended, proposed for debarment or declared ineligible for the award of any Federal contracts by any Federal agency. Contractor may not continue to or be compensated for any work performed during any time period where the debarment, suspension or ineligibility described above exists or may arise in the course of Contractor contractual relationship with the City. Failure to comply with this section constitutes a material breach of this Contract. Should it be determined that contractor performed work under this contract while in non-compliance with this provision, Contractor agrees to reimburse the City for any costs that the City must repay to any and all entities.

**10.    Force Majeure:**  Neither party shall be responsible for damages or delays caused by Force Majeure or other events beyond the control of the other party and which could not reasonably have been anticipated or prevented. For purposes of this Agreement, Force Majeure includes, but is not limited to, adverse weather conditions, floods, epidemics, war, riot, strikes, lockouts, and other industrial disturbances; unknown site conditions, accidents, sabotage, fire, and acts of God. Should Force Majeure occur, the parties shall mutually agree on the terms and conditions upon which the services may continue.

**11.    Furnishing of Bonds - Payment/Performance/Materials/Fidelity:**  Contractor shall furnish to the City at his or her own cost, performance and payment bonds which shall become binding upon the awarding of the contract to Contractor.

**12.    Good Standing**: Contractor must remain current and not be in default of any obligations due the City of Flint, including the payment of taxes, fines, penalties, licenses, or other monies due the City of Flint or having any current or pending litigation against the City or be in violation of the Clean Water Act, or any permitting by the City, or Sewer Use Ordinances or any other City Ordinances, or any State or Federal regulatory agency, or be debarred by the City of Flint from consideration for a contract award pursuant to Section 18-21.5 (d) of Article IV of the "Purchasing Ordinance of the City of Flint". Violations of this clause shall constitute a substantial and material breach of this contract. Such breach shall constitute good cause for the termination of this contract should the City of Flint decide to terminate on such basis.

**13.    Indemnification**: To the fullest extent permitted by law, Contractor agrees to defend, pay on behalf of, indemnify, and hold harmless the City of Flint, its elected and appointed officials, employees and volunteers and other working on behalf of the City of Flint, against any and all claims, demands, suits, or losses, including all costs connected therewith, and for any damages which may be asserted, claimed, or recovered against or from the City of Flint, its elected and appointed officials, employees, volunteers or others working on behalf of the City of Flint, by reason of personal injury, including bodily injury or death and/or property damage, including loss of use thereof, which may arise as a result of Contractor's acts, omissions, faults, and negligence, or that of any of his employees, agents, and representatives in connection with the performance of this contract. Should the Contractor fail to indemnify the City in the above-mentioned circumstances, the City may exercise its option to deduct the cost that it incurs from the contract price forthwith or may file an action in a court of competent jurisdiction, the costs of which shall be paid by Contractor. This provision shall survive the termination and/or expiration of this agreement, in perpetuity.

 Phase VII lead line SLR/SLE

**14.    Independent Contractor**:  No provision of this contract shall be construed as creating an employer-employee relationship.  It is hereby expressly understood and agreed that Contractor is an "independent contractor" as that phrase has been defined and interpreted by the courts of the State of Michigan and, as such, Contractor is not entitled to any benefits not otherwise specified herein.

**15.  Insurance/Worker's Compensation:** Contractor shall not commence work under this contract until he has procured and provided evidence of the insurance required under this section. All coverage shall be obtained from insurance companies licensed and authorized to do business in the State of Michigan unless otherwise approved by the City's Chief Financial Officer or his or her designee. All policies shall be reviewed by the City's Chief Financial Officer and his or her designee for completeness and limits of coverage.  All coverage shall be with insurance carriers acceptable to the City of Flint. Contractor shall maintain the following insurance coverage for the duration of the contract.

(a)    Commercial General Liability coverage of not less than one million dollars ($1,000,000) combined single limit with the City of Flint, and including all elected and appointed officials, all employees and volunteers, all boards, commissions and/or authorities and their board members, employees and volunteers, named as "Additional Insureds." This coverage shall be written on an ISO occurrence basis form and shall include: Bodily Injury, Personal Injury, Property Damage, Contractual Liability, Products and Completed Operations, Independent Contractors; Broad Form Commercial General Liability Endorsement, (XCU) Exclusions deleted and a per contract aggregate coverage.  This coverage shall be primary to the Additional Insureds, and not contributing with any other insurance or similar protection available to the Additional Insureds, whether said other available coverage be primary, contributing, or excess.

(b)    Workers Compensation Insurance in accordance with Michigan statutory requirements, including Employers Liability coverage.

(c)    Commercial Automobile Insurance in the amount of not less than $1,000,000 combined single limit per accident with the City of Flint, and including all elected and appointed officials, all employees and volunteers, all boards, commissions and/or authorities and their board members, employees and volunteers, named as "Additional Insureds."  This coverage shall be written on ISO business auto forms covering Automobile Liability, code "any auto."

(d)    Professional Liability - Errors and Omissions.  All projects involving the use of Architects, civil engineers, landscape design specialists, and other professional services must provide the City of Flint with evidence of Professional Liability coverage in an amount not less than one million dollars ($1,000,000).  Evidence of this coverage must be provided for a minimum of three years after project completion.  Any deductibles or self-insured retention must be declared to and approved by the City.  In addition, the total dollar value of all claims paid out on the policy shall be declared.  At the option of the City, either the insurer shall reduce or eliminate such deductibles or self-insured retention with respect to the City, its officials,

Phase VII lead line SLR/SLE

employees, agents and volunteers; or Contractor shall procure a bond guaranteeing payment of losses and related investigation, claim, administration, and defense expenses.

Contractor shall furnish the City with two certificates of insurance for all coverage requested with original endorsements for those policies requiring the Additional Insureds. All certificates of insurance must provide the City of Flint with not less than 30 days advance written notice in the event of cancellation, non-payment of premium, non-renewal, or any material change in policy coverage. In addition, the wording "Endeavor to" and "but failure to mail such notice shall impose no obligation or liability of any kind upon the company, its agents or representatives" must be removed from the standard ACORD cancellation statement. These certificates must identify the City of Flint, Risk Management Division, as the "Certificate Holder." Contractor must provide, upon request, certified copies of all insurance policies. If any of the above polices are due to expire during the term of this contract, Contractor shall deliver renewal certificates and copies of the new policies to the City of Flint at least ten days prior to the expiration date. Contractor shall ensure that all subcontractors utilized obtain and maintain all insurance coverage required by this provision.

**16.     Laws and Ordinances**: Contractor shall obey and abide by all of the laws, rules and regulations of the Federal Government, State of Michigan, Genesee County and the City of Flint, applicable to the performance of this agreement, including, but not limited to, labor laws, and laws regulating or applying to public improvements.

**17.     Modifications:** Any modifications to this contract must be in writing and signed by the parties or the authorized employee, officer, board or council representative of the parties authorized to make such contractual modifications under State law and local ordinances.

**18.     No Third-Party Beneficiary:** No contractor, subcontractor, mechanic, materialman, laborer, vendor, or other person dealing with the principal Contractor shall be, nor shall any of them be deemed to be, third-party beneficiaries of this contract, but each such person shall be deemed to have agreed (a) that they shall look to the principal Contractor as their sole source of recovery if not paid, and (b) except as otherwise agreed to by the principal Contractor and any such person in writing, they may not enter any claim or bring any such action against the City under any circumstances. Except as provided by law, or as otherwise agreed to in writing between the City and such person, each such person shall be deemed to have waived in writing all rights to seek redress from the City under any circumstances whatsoever.

**19.     Non-Assignability:** Contractor shall not assign or transfer any interest in this contract without the prior written consent of the City provided, however, that claims for money due or to become due to Contractor from the City under this contract may be assigned to a bank, trust company, or other financial institution without such approval. Notice of any such assignment or transfer shall be furnished promptly to the City.

**20.     Non-Disclosure/Confidentiality:** Contractor agrees that Contractor will not disclose any such information provided to Contractor in furtherance of this Agreement, or in any other way

PA-35

make such documents public, without the express written approval of the City or the order of a court of competent jurisdiction.

**21.    Non-Discrimination**: The Contractor shall comply with the Elliott Larsen Civil Rights Act, 1976 PA 453, as amended, MCL 37.2101 et seq., the Persons with Disabilities Civil Rights Act, 1976 PA 220, as amended, MCL 37.1101 et seq., and all other federal, state, and local fair employment practices and equal opportunity laws and covenants that it shall not discriminate against any employee or applicant for employment, to be employed in the performance of this Agreement, with respect to his or her hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, because of his or her race, religion, ethnicity, color, national origin, age, sex, sexual orientation, gender identity, height, weight, marital status, familial status, association with the federal government, or physical or mental disability that is unrelated to the individual's ability to perform the duties of a particular job or position or status with respect to public assistance. A breach of this covenant is a material breach of this Agreement.

**22.    Anti-Lobbying**: The Contractor shall not use any of the grant funds awarded in this Agreement for the purpose of lobbying as defined in the State of Michigan's lobbying statute, MCL 4.415(2). "'Lobbying' means communicating directly with an official of the executive branch of state government or an official in the legislative branch of state government for the purpose of influencing legislative or administrative action." The Contractor shall not use any of the grant funds awarded in this Agreement for the purpose of litigation against the State or City. Further, the Contractor agrees to require that language of this assurance be included in the award documents of all subawards.

**23.    Ethics:** Pursuant to the Flint City Charter §1-602 (I) entitled Notice, every public servant, volunteer and city, contractor is to receive training and be provided with a copy of these ethical standards upon passage of this Charter or at the time of appointment and or hire or the commencement of services (See Attached Flint City Charter §1-602 (I)). Therefore, Contractor acknowledges receipt of Flint City Charter §1-602 and agrees that Contractor and its staff shall abide by the terms and participate in any training provided by the City/or update orientation as may be necessary from time to time. Public servants are all persons employed or otherwise engaged by the corporation of the City of Flint to conduct business on its behalf including but not limited to elected officials, appointed employees, members of boards and commissions, classified employees, contractual employees, and volunteers, in accordance with Flint City Charter §1-602.

**24.    COVID-19 Policies and Training:** Contractor acknowledges that the Country is in the middle of a COVID-19 pandemic and agrees that Contractor, its staff and its subcontractors will comply with Federal, State of Michigan Executive Orders, Michigan Department of Health and Human Services Epidemic Orders, Local guidance, CDC, OSHA, MIOSHA and other regulatory guidelines to mitigate risk and exposure to COVID-19.  Contractor also agrees that Contractor, its staff and subcontractors if any, shall abide by City of Flint COVID-19 policies and procedures currently in existence, modified or that may be created, including but not limited daily temperature checks, social distancing, mitigation and disinfected measures and agree to participate in any trainings as required by the City of Flint. Contractor, its staff and its

 Phase VII lead line SLR/SLE

subcontractors agree that failure to comply with this provision shall constitute a substantial and material breach of this contract. Such a breach shall constitute good cause for the termination of this contract should the City of Flint decide to terminate on such basis.

25. **Notices**: Notices to the City of Flint shall be deemed sufficient if in writing and mailed, postage prepaid, addressed to **Michael Brown, DPW Director** and **Inez Brown, City Clerk, City of Flint, 1101 S. Saginaw Street, Flint, Michigan 48502**, or to such other address as may be designated in writing by the City from time to time. Notices to Contractor shall be deemed sufficient if in writing and mailed, postage prepaid, addressed to <u>Lakeshore Global Corporation, 7310 Woodward Ave., Suite 500, Detroit, MI  48202</u>, or to such other address as may be designated in writing by Contractor from time to time.

26. **Records Property of City:** All documents, information, reports and the like prepared or generated by Contractor as a result of this contract shall become the sole property of the City of Flint, and shall be disclosed to the City upon request.

27. **Scope of Services**: Contractor shall provide all of the materials, labor, equipment, supplies, machinery, tools, superintendence, insurance and other accessories and services necessary to complete the project in accordance with Proposal #22000526, #22000527 submitted on <u>June 27, 2022</u>. Contractor shall conduct residential water service line replacements and restorations under the direction of the City's project management team. Contractor may also be directed by a representative of the City to cut and cap the service line of a property deemed as abandoned.

Contractor will perform said service based on the price submitted under "Exhibit A, Article 5" of their proposal. Contractor shall be responsible for any and all damages resulting from the installation of the service line replacement. Contractor shall maintain each address for six months post inspection for settling on soft surfaces and 90 days for temporary restoration and road way repair. Contractor shall perform the work in accordance with the Standard General Conditions and any Special Conditions provided for in this contract and warrants to the City that all materials and equipment furnished under this contract will be new unless otherwise specified, and that all work will be of good quality, free from faults and defects and in conformance with the contract documents. All work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. In addition to any other remedies the City may have, if, within one year of the date of substantial completion of work, or within one year after acceptance by the City, or within such longer period of time as may be prescribed by law, any of the work is found to be defective or not in accord with the contract documents, Contractor shall correct promptly after receipt of a written notice from the City to do so, unless the City has previously given Contractor a written acceptance of such condition.

Contractor will complete all forms that have been provided by the City and provide information as requested by the City that may be germane to this project.

Contractor shall be responsible for the removal and proper disposal of all sidewalk, pavement or other surfacing, curbs, driveways and excavated materials necessary for installation of the complete water service line and/or the permanent restoration of a previously explored/replaced

service line.  If old service line material is removed, Contractor is to take old, removed service line material to the Water Service Center, 3301 E. Court St., Flint, MI 48506.  Contractor will take approximately two (2) feet of removed service line, place duct tape on the material and place the address of which the pipe was removed on duct tape.

**28.**     **Severability**:  In the event that any provision contained herein shall be determined by a court or administrative tribunal to be contrary to a provision of state or federal law or to be unenforceable for any reason, then, to the extent necessary and possible to render the remainder of this Agreement enforceable, such provision may be modified or severed by such court or administrative tribunal so as to, as nearly as possible, carry out the intention of the parties hereto, considering the purpose of the entire Agreement in relation to such provision.  The invalidation of one or more terms of this contract shall not affect the validity of the remaining terms.

**29.**     **Standards of Performance**: Contractor agrees to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices.  The City is relying upon the professional reputation, experience, certification, and ability of Contractor.  Contractor agrees that all of the obligations required by him under this Contract shall be performed by him or by others employed by him and working under his direction and control.  The continued effectiveness of this contract during its term or any renewal term shall be contingent upon Contractor maintaining any certifications in accordance with any applicable legal requirements.

**30.**     **Termination**:  In the event of a failure by either party to perform any material provision of this Contract, the other side shall give written notice of the breach along with 30 days to cure the breach.  If after the 30 day period the breach has not been cured, the non-breaching party may terminate the contract.  Either party may also terminate the contract if required by law to do so.

**31.**     **Time of Performance**: Contractor's services shall commence immediately upon receipt of the notice to proceed and shall be carried out forthwith and without reasonable delay.

**32.**     **Union Compliance:** Contractor agrees to comply with all regulations and requirements of any national or local union(s) that may have jurisdiction over any of the materials, facilities, services, or personnel to be furnished by the City.  However, this provision does not apply if its application would violate Public Act 98 of 2011.

**33.**     **Waiver:** Failure of the City to insist upon strict compliance with any of the terms, covenants, or conditions of this Agreement shall not be deemed a waiver of any term, covenant, or condition.  Any waiver or relinquishment of any right or power hereunder at any one or more times shall not be deemed a waiver or relinquishment of that right or power at any other time.

**34.**     **Whole Agreement**: This Agreement and the documents cited herein embody the entire agreement between the parties.  Any additions, deletions or modifications hereto must be in writing and signed by both parties.  This Agreement may be executed by facsimile and in counterparts, all of which, taken together, shall constitute a single agreement.

<SIGNATURES ON NEXT PAGE>

 Phase VII lead line SLR/SLE

**CONTRACTOR:**                              **WITNESS(ES):**

_Thomas E. Hardin_  8-16-22   _Lauren Rowley_
**Lakeshore Global Corp.**    **Date**
_Thomas E. Hardiman_

**Its** _____


**CITY OF FLINT, a Michigan Municipal Corp.:**

_(signature)_                    8/12/22
**Sheldon A. Neeley, Mayor**      **Date**

_(signature)_                    8/12/22
**Clyde Edwards, City Administrator**   **Date**


**APPROVED AS TO FORM:**

_(signature)_                    8-12-22
**William Kim, City Attorney**    **Date**


12 of 12

PA-39

SECTION 00 73 02

SUPPLEMENTARY CONDITIONS

**Supplementary Conditions**

**These Supplementary Conditions amend or supplement EJCDC® C 700 Standard General Conditions of the Construction Contract, (2018). The General Conditions remain in full force and effect except as amended.**

**The terms used in these Supplementary Conditions have the meanings stated in the General Conditions.  Additional terms used in these Supplementary Conditions have the meanings stated below, which are applicable to both the singular and plural thereof.**

**The address system used in these Supplementary Conditions is the same as the address system used in the General Conditions, with the prefix "SC" added—for example, "Paragraph SC 4.05."**

**ARTICLE 1—DEFINITIONS AND TERMINOLOGY**

No suggested Supplementary Conditions in this Article.

**ARTICLE 2—PRELIMINARY MATTERS**

2.06     *Electronic Transmittals*

SC-2.06     Supplement Paragraph 2.06 of the General Conditions by adding the following paragraph:

D.  *Requests by Contractor for Electronic Documents in Other Formats*

1.  Release of any Electronic Document versions of the Project documents in formats other than those identified in the Electronic Documents Protocol (if any) or elsewhere in the Contract will be at the sole discretion of the Owner.

2.  To extent determined by Owner, in its sole discretion, to be prudent and necessary, release of Electronic Documents versions of Project documents and other Project information requested by Contractor ("Request") in formats other than those identified in the Electronic Documents Protocol (if any) or elsewhere in the Contract will be subject to the provisions of the Owner's response to the Request, and to the following conditions to which Contractor agrees:

a.  The content included in the Electronic Documents created by Engineer and covered by the Request was prepared by Engineer as an internal working document for Engineer's purposes solely, and is being provided to Contractor on an "AS IS" basis without any warranties of any kind, including, but not limited to any implied warranties of fitness for any purpose. As such, Contractor is advised and acknowledges that the content may not be suitable for Contractor's application, or may require substantial modification and independent verification by Contractor. The content may include limited resolution of models, not-to-scale schematic representations and symbols, use of notes to convey design concepts in lieu of accurate graphics, approximations, graphical simplifications, undocumented intermediate revisions, and other devices that may affect subsequent reuse.

SECTION 31 23 33

TRENCHING AND BACKFILL

PART 1 - GENERAL

1.1    DESCRIPTION:

A.    Provide trenching and backfill as indicated and in compliance with Contract Documents.

B.    Section includes:

1.    Trench excavation width and safety.

2.    Backfill materials and placement.

3.    Soil and aggregate materials.

4.    Compaction and testing.

1.2    REFERENCES:

A.    American Association of State and Highway Transportation Officials (AASHTO) Publications:

1.    M147:  Standard Specification for Materials for Aggregate and Soil-Aggregate Subbase, Base, and Surface Courses.

B.    ASTM International (ASTM):

1.    C33:  Specification for Concrete Aggregates.

2.    C150:  Standard Specification for Portland Cement.

3.    C618:  Standard Specification for Coal Fly Ash and Raw or Calcined Natural Pozzolan for Use in Concrete.

4.    D75:  Standard Practice for Sampling Aggregates.

5.    D421:  Practice for Dry Preparation of Soil Samples for Particle Size Analysis and Determination of Soil Constants.

6.    D422:  Test Method for Particle-Size Analysis of Soils.

7.    D698:  Standard Test Methods for Laboratory Compaction Characteristics of Soil Using Standard Effort (12 400 ft-lbf/ft3).

8.     D1557:   Test Method for Laboratory Compaction Characteristics of Soil Using Modified Effort (56,000 ft-lb/ft3).

9.     D2419:   Standard Test Method for Sand Equivalent Value of Soils and Fine Aggregate.

10.     D2434:   Standard Test Method for Permeability of Granular Soils (Constant Head).

11.     D2487:   Standard Practice for Classification of Soils for Engineering Purposes (Unified Soil Classification System).

12.     D2488:   Standard Practice for Description and Identification of Soils (Visual-Manual Procedure).

13.     D2940/D2940M:   Standard Specification for Graded Aggregate Material For Bases or Subbases for Highways or Airports.

14.     D4318:  Test Method for Liquid Limit, Plastic Limit and Plasticity Index of Soils.

15.     D6938: Standard Test Method for In-Place Density and Water Content of Soil and Soil-Aggregate by Nuclear Methods (Shallow Depth).

C.     Occupational Safety and Health Administration (OSHA) Standards and Regulations:

1.     29 CFR 1926, Subpart P:   Safety and Health Regulations for Construction, Excavations.

1.3     CLASSIFICATION OF EXCAVATION:

A.     Excavation is considered incidental to other work for the entire project and is not classified. Excavation is not classified, except where rock excavation is authorized outside specified or indicated limits of excavation.

1.4     DEFINITIONS:

A.     Percent Compaction or Compaction Density: The field dry density of compacted material, expressed as a percentage of the maximum dry density.

B.     Field Dry Density or Field Density: In-place density as determined by ASTM D6938 (Nuclear Method).

C.     Maximum Dry Density: Laboratory density as determined by ASTM D698 (Standard Proctor) or ASTM D1557 (Modified Proctor) and occurring at the optimum moisture content of the soil being tested.

1.5     SUBMITTALS:

A.     Submit the following in accordance with Section 01 33 00.

1. Gradation analysis.

2. Materials Sources: Name of source, location, date of sample, sieve analysis, and laboratory compaction characteristics.

3. Test and Evaluation Reports:

   a. Field density testing reports:  Provide results from field density testing of prepared subgrade and compacted fill.

   b. Grain-size analysis.

   c. Laboratory compaction characteristics of soils.

   d. Water content.

4. Compaction method.

1.6 QUALITY ASSURANCE:

A. Comply with the requirements specified in Section 01 43 00.

B. Sample backfill materials in accordance with ASTM D75.

C. Provide testing in accordance with Part 3 of this section.

   1. Employ an independent testing laboratory accredited by the American Associates of State Highway and Transportation Officials (AASHTO) Accreditation Program.

   2. Minimum of three years experience in sampling, testing and analysis of soil and aggregates, and monitoring field compaction operations. Minimum of three references from previous work.

1.7 DELIVERY STORAGE AND HANDLING:

A. Comply with the requirements specified in Section 01 66 10.


PART 2 - PRODUCTS

2.1 BACKFILL MATERIALS:

A. Suitable Material: Material from on-site excavation or permitted off-site sources that meets all of the specified requirements for its intended use and is not unsuitable. Wet subgrade material which meets other requirements for suitable material is suitable.

B. Unsuitable Material: Material that fails to meet requirements for suitable materials; or contains any of the following:

    1.    Organic clay, organic silt, or peat; as defined in ASTM D2487 and visually determined in ASTM D2488.

    2.    Vegetation, wood, roots, leaves, and organic, degradable material.

    3.    Stones or rock fragments over 6 inches in any dimension.

    4.    Porous biodegradable matter, excavated pavement, construction debris, rubbish, or refuse.

    5.    Ice, snow, frost, or frozen soil particles.

C.    Crushed Stone:  MDOT 23A crushed limestone.

D.    Sand: MDOT Class II granular material free from clay balls, organic matter, and other deleterious substances.

2.2    EQUIPMENT:

A.    Compaction equipment shall be capable of consistently achieving the specified compaction requirements.


PART 3 - EXECUTION

3.1    EXAMINATION:

A.    Verify that excavation safety meeting the requirements of OSHA 29 CFR 1926, Subpart P are in place before commencing with excavation.

B.    Verify that materials submittals have been accepted by Engineer before commencing with work requiring the use of these materials.

C.    Immediately notify the Engineer if unexpected subsurface facilities or suspected hazardous materials are encountered during excavation. Discontinue affected work in area until notified to resume work.

3.2    PREPARATION:

A.    Contact 811, Michigan Miss Dig for utility markouts prior to the start of work.

B.    Cut pavement and concrete with a saw or pneumatic tools to prevent damage to remaining pavement. Dispose of large pieces of demolished pavement before proceeding with excavation.

3.3    PROTECTION OF IN-PLACE CONDITIONS:

A.    Comply with the requirements specified in Section 01 14 14.

PA-44

B.   Support and protect from damage – existing pipes, poles, wires, fences, curbs, property line markers, and other features or structures which must be preserved in place to avoid being temporarily or permanently relocated.

C.   Discontinue digging by machinery when excavation approaches pipes, conduits, or other underground structures. Continue excavation by use of hand tools. Include such manual excavation in work to be done when incidental to normal excavation and under items involving normal excavation.

D.   Excavation Near Private Property:

1.   Record existing condition of features on adjacent property by means of dated photographs or cameras. Provide construction photographs according to Section 01 32 33.

2.   Operate excavating machinery and cranes so as to prevent injury to overhanging branches and limbs.

3.   Protect cultivated hedges, shrubs, and plants which would otherwise be damaged by the work.

4.   Where protection of vegetation is not possible, dig up, temporarily transplant, and maintain. After active construction operations in the area have ceased, transplant vegetation to the original positions and provide water and nursery care until growth is re-established.

5.   Do not use or operate tractors, bulldozers, or other power-operated equipment on paved surfaces. Provide protection on pavement or tracks if construction traffic is unavoidable.

3.4   RESTORATION:

A.   Existing surfaces, features, or utilities that are to remain but are damaged during construction shall be repaired or replaced to at least the condition in which they were found immediately before work began, unless noted otherwise.

B.   Cut all damaged branches, limbs, and roots smoothly and neatly without splitting or crushing. Neatly trim, cut the injured portions and cover with an application of grafting wax or tree healing paint. Replace damaged trees which subsequently die or continue to show lack of growth due to damage, one year after substantial completion.

C.   Includes, but is not limited to: hedges, shrubs, and plants. Vegetation that is damaged shall be replaced with equal kind and of at least the quality before work began.

3.5     EXCAVATION:

A.      As necessary, provide dewatering system to allow for working conditions in dry, stable area. Properly dispose of water to avoid damage to property and in accordance with laws and regulations.

B.      Locate stockpiled excavated material at least 3 feet from edge of excavations to prevent cave-ins or bank slides.

C.      Open excavations overnight are not permitted unless otherwise authorized by the Owner or Engineer. Steel plating may be used to protect any open excavations authorized by the Owner or Engineer. Plating shall be a minimum of ¾" thick and be of adequate size to support all legal axle loads. Plating shall overlap existing pavement by at least two feet on all sides of the edge of the excavation.

3.6     BACKFILL:

A.      Fill to lines and grades necessary to provide finish grades.

B.      Use a placement method that does not disturb or damage other work or existing features.

C.      Maintain fill materials within 3 percent of optimum moisture, to attain required compaction density.

D.      Place and compact material in equal continuous layers.

E.      Maximum compacted depth is 6 inches for aggregate materials and 8 inches for soil materials, unless noted otherwise.

3.7     COMPACTION:

A.      Compact to density specified and indicated for various types of material. Control moisture content of material being placed as specified, or if not specified - at a level slightly lower than optimum.

B.      Compaction Density: Existing subgrade and base materials shall be compacted to achieve minimum 95% maximum dry density.

3.8     FIELD QUALITY CONTROL:

A.      Compaction shall be deemed to comply with the specifications when no more than 1 test of any 3 consecutive tests falls below the specified relative compaction. The one test shall be no more than 3 percentage points below the specified compaction. The Contractor shall pay the costs for any retesting or additional testing of work not conforming to the specifications.

B.      Perform particle size distribution and gradation analyses using ASTM D422 and following standard practices in ASTM D421. Perform one test for every source and

submit results to Engineer for acceptance.  Repeat the moisture density test for every 5,000 cubic yard of material used.

C.     Perform field density testing in accordance with ASTM D1556, ASTM D2167, or ASTM D6938.

D.     Evaluate field density test results in relation to maximum dry density as determined by testing material in accordance with ASTM D1557 (Modified Proctor).

E.     Perform tests in accordance with ASTM D4318 to determine Liquid Limit, Plastic Limit and Plasticity Index and submit test results to Engineer for acceptance.

F.     Location of field density tests shall be mutually acceptable to testing laboratory and the Engineer as recommended by the Engineer.

G.     Owner may retain the services of an independent testing laboratory to conduct confirmatory testing and inspection.

3.9     SHRINKAGE:

A.     Backfill to a height above finished grade which will allow for the shrinkage or consolidation of material. Initially, provide at all points, an excess of at least one percent of total height of backfill measured from stripped surface to top of finished surface.

B.     Supply specified materials and build up low places, without additional cost if embankment or backfilling settles so as to be below the indicated level for proposed finished surface at any time before final acceptance of the work.

3.10     CLOSEOUT ACTIVITIES:

A.     Provide in accordance with Section 01 77 00.


END OF SECTION

SECTION 32 16 00

CONCRETE CURBS, GUTTERS, SIDEWALKS, AND DRIVEWAYS

PART 1 - GENERAL

1.1 DESCRIPTION:

A. Provide concrete curbs, gutters, sidewalks, and driveways as indicated and in compliance with Contract Documents.

1.2 REFERENCES:

A. ASTM International (ASTM):

1. A82/A82M:   Standard Specification for Steel Wire, Plain, for Concrete Reinforcement.

2. A185/A185M:   Standard Specification for Steel Welded Wire Reinforcement, Plain, for Concrete.

3. A497/A497M:   Standard Specification for Steel Welded Wire Reinforcement, Deformed, for Concrete.

4. C33/C33M:   Standard Specification for Concrete Aggregates.

5. C1602/C1602M:   Standard Specification for Mixing Water Used in the Production of Hydraulic Cement Concrete.

6. D1190:   Standard Specification for Concrete Joint Sealer, Hot-Applied Elastic Type (Withdrawn).

7. D6690:   Standard Specification for Joint and Crack Sealants, Hot Applied, for Concrete and Asphalt Pavements.

B. Michigan Department of Transportation (MDOT)

1. All work shall be completed in accordance with MDOT standards.

1.3 QUALITY ASSURANCE:

A. Comply with the requirements specified in Section 01 43 00.

B. Sustainability Standards Certifications.

1.4 DELIVERY STORAGE AND HANDLING:

A. Comply with the requirements specified in Section 01 66 10.

PART 2 - PRODUCTS

2.1    MATERIALS:

   A.    Water:  Potable water.

   B.    Aggregate Base:  Minimum 6 inches thick, unless noted otherwise.

2.2    CONCRETE FORMWORK:

   A.    Forms:  Section 03 10 00.

        1.    Forms shall be made of steel or wood or other material capable of supporting concrete and mechanical concrete placing equipment that is sufficiently rigid to maintain the specified tolerances.

        2.    Forms shall be clean and free of dirt, rust, and hardened concrete.

2.3    CONCRETE:

   A.    Concrete:  Section 03 30 00.

2.4    SIDEWALKS AND DRIVEWAYS:

   A.    Sidewalks: 4-inches thick

   B.    Driveways: 6-inches thick

   C.    Reinforcement:  ASTM A185/A185M.

2.5    CONCRETE FINISHES:

   A.    Sidewalks and driveways:  Float and normal broom finish.

   B.    Curbs and Gutters:  Normal broom finish.

2.6    ACCESSORIES:

   A.    Section 03 15 00.


PART 3 - EXECUTION

3.1    PREPARATION:

   A.    Excavate and shape subgrade to line, grade, and cross section. Previously entailed the removal of concrete material as necessary to facilitate the work. Existing subgrade below the concrete was typically no removed. Temporary restoration of sand and / or stone was placed to allow unimpeded pedestrian traffic and use of the sidewalk.

Temporary restoration material should be removed and properly disposed of prior to the placement of aggregate base material.

B.   Saw cut edges of existing curbing and gutter square and to a true vertical alignment unless otherwise directed by the Engineer. Saw cuts shall be made through the entire horizontal cross-section of existing curb and gutter such that no concrete material remains in the area intended to be restored. Remove and properly dispose of all concrete material debris. This debris material shall not remain in the area to be restored or used as base material.  Debris material shall not be stockpiled on-site overnight.

C.   Place aggregate base as specified and shown in the details. Remove all soft subgrade material encountered while compacting and backfill with aggregate base.

D.   Moisten aggregate base immediately before placing concrete to minimize absorption of water from fresh concrete.

E.   Provide concrete surfaces that are clean and dry - free of oil, dirt or foreign materials immediately before application of compounds or painting.

3.2    COMPACTION:

A.   Refer to Section 31 23 33 for additional compaction requirements.

B.   Subgrade:  Compact as specified in Section 31 23 33

C.   Aggregate Base:  Compact as specified in Section 31 23 33

3.3    CURB CONSTRUCTION:

A.   Fine grade and compact subgrade.

B.   Place aggregate base and compact.  Top of aggregate base shall be at the proper level to receive concrete.

C.   Set forms on face of curb to eliminate horizontal joints within 7 inches of the top of curb.

D.   Brace forms to prevent change of shape or movement in any direction resulting from the weight of the concrete during placement.

E.   Construct short-radius curved forms to exact radius.

F.   Construct curbs to line and grade required to match existing.

G.   Construct curbs in areas where existing curb was removed to facilitate work.

H.   Expansion Joints: Place preformed asphalt-impregnated expansion joints at intervals not exceeding 45 feet or less than 15 feet, at the beginning and end of curved portions of the

curb, at each change in thickness in section, at the end of curbs at buildings and other structures, and at connections to existing curbs.

I.    Contraction Joints: Place contraction joints in the curb at uniform intervals not exceeding 15 feet. Contraction joints shall be of the open-joint type. Construct by inserting a thin, oiled steel sheet vertically in the fresh concrete to force coarse aggregate away from the joint. Insert the steel sheet the full depth of the curb. After initial set has occurred in the concrete and prior to removing the front curb form, remove the steel sheet with a sawing motion. Finish top of curb with a steel trowel and finish edges with a steel edging tool.

J.    Remove forms after concrete has set sufficiently to support its own weight.

K.    Finish exposed surfaces of concrete by rubbing with a burlap sack or similar device that will produce a uniformly textured surface, free of form marks, honeycomb, and other defects.

L.    Remove and replace defective concrete.

M.    Finished curbs shall present a uniform appearance for both grade and alignment. Remove any section of curb showing abrupt changes in alignment or grade or that is more than 1/4 inch away from its location as staked and construct new curb in its proper location.

N.    Apply curing compound to exposed surfaces after finishing concrete. Curing shall continue for a minimum of 5 days.

O.    Allow at least 7 days before backfilling and compacting adjacent to curing concrete. Backfill with earth, free from foreign material and rocks that are 2 inches or larger. Tamp backfill firmly in place.

3.4    SIDEWALK AND DRIVEWAY CONSTRUCTION:

A.    Place, process, finish, and cure concrete according to Section 03 30 00.

B.    Cross slope shall not exceed 1/4-inch per foot.

C.    Slope sidewalks and driveways away from structures at 1/4-inch per foot unless noted otherwise.

D.    At locations where the new sidewalk or driveway is to abut existing concrete, saw concrete for a depth of 2 inches , chip the old concrete down to sound material and a plane surface, clean the surface, and apply a neat cement paste just prior to pouring the new concrete.

E.    Expansion Joints: Place preformed asphalt expansion joints at intervals not exceeding 45 feet or less than 15 feet, where the sidewalk or driveway ends at a curb, and around posts, poles, or other objects protruding through the sidewalk or driveway. Place

expansion joints where new sidewalk abuts existing sidewalk and between sidewalks and driveways, buildings, or other structures.

F.   Place preformed asphalt expansion joint material between back of curbs and sidewalks.

G.   Provide contraction joints transversely to the walks at locations opposite the contraction joints in the curb and at intervals along the sidewalk such that the distance between contraction joints does not exceed 1.5 times the sidewalk width. These joints shall be 3/16-inch by one-fourth of the slab thickness weakened plane joints. They shall be straight and at right angles to the surface of the walk.

H.   Broom concrete surface with a fine-hair broom at right angles to the length of the sidewalk or driveway and tool at all edges, joints, and markings. Mark the walks transversely at 5-foot intervals with a jointing tool, unless noted otherwise. Upon completion of the finishing, apply a curing compound to exposed surfaces.

I.   Finished sidewalk or driveway shall present a uniform appearance for both grade and alignment. Remove any section of sidewalk or driveway showing abrupt changes in alignment or grade or that is more than 2 inches away from its location as staked and construct new sidewalk or driveway in its proper location.

3.5   FINISHING:

A.   Float (for sidewalks, driveways and flatwork):

1.   Use magnesium or aluminum hand floats or power floats with slip on float shoes after concrete has stiffened to point where 1/4-inch maximum indentation can be imparted by normal foot pressure. Do not use combination blades for floating.

2.   Float finish shall result in uniform smooth granular texture.

3.   After floating, check slab tolerances with 10-foot straightedge. Fill low spots with fresh concrete.

4.   Do not sprinkle with dry cement or add water.

B.   Broom Finish:

1.   Normal Broom Finish: Use fine, soft-bristled broom to produce a non-skid surface.

2.   Texture shall be reviewed by Engineer.

3.   Sidewalks and Driveways: Texture perpendicular to direction of travel with trowel and radius edge using 1/4-inch radius.

4.   Curbs and Gutters: Texture parallel to travel direction of pavement.

3.6     TOLERANCES:

A.     Subgrade: Smooth and free from irregularities at the specified relative compaction. The subgrade shall be considered to extend over the full width of the base course.

    1.     Elevation: 1/2-inch, plus or minus from the indicated grade and cross-section.

B.     Forms: Check constructed forms are within tolerance by using a 10-foot straightedge along the top of forms. Allowable tolerance is:

    1.     Grade: 1/8-inch over 10 feet, plus or minus.

    2.     Alignment: 1/8-inch, plus or minus.

3.7     FIELD QUALITY CONTROL:

A.     Refer to Section 31 23 33 for compaction and testing requirements.

B.     Submit compaction test results to Engineer for review.

C.     Concrete Testing: Section 03 30 00. Maintain records of placed concrete including: record date, location of pour, quantity, air temperature, and test samples taken. Submit test results to Engineer for acceptance.

D.     Defective Concrete: As defined in Section 03 30 00.

3.8     PROTECTION:

A.     Protect concrete from damage and replace if damage occurs.

3.9     CLOSEOUT ACTIVITIES:

A.     Provide in accordance with Section 01 77 00.

END OF SECTION

SECTION 32 90 10

PLANTING

PART 1 - GENERAL

1.1     DESCRIPTION:

  A.   Provide for establishment of permanent vegetation.

  B.   Provide topsoiling, fertilizing, seeding, planting and related work as indicated and
       specified.

  C.   Restoration of grass and landscaped areas of site disturbed during completion of
       hydrovac investigations and service line replacement work.

1.2     REFERENCES:

  A.   Comply with local landscaping ordinance or state standard.

  B.   Comply with American National Standards Institute (ANSI) Z60.1-2004 American
       Standard for Nursery Stock.

  C.   ASTM International (ASTM):

       1.    D5268:  Standard Specification for Topsoil Used for Landscaping Purposes.

       2.    D5435:  Standard Test Method for Plant Growth and Food Chain Protection.

1.3     SUBMITTALS:

  A.   Product Data:

       1.    List indicating source of plant material to be provided, at least 4 weeks prior to
             digging. Include see list naming seeds, pounds per acre, and supplier's name,
             address and phone number.

       2.    Product Data, rates of application, and anticipated uses of pesticides, herbicides,
             and fumigants.

       3.    Certificates concerning seed mixture, purity, germinating value, and crop year
             identification.

  B.   Submit in accordance with Section 01 33 00.

1.4     QUALITY ASSURANCE:

  A.   Source Quality Control:

1. Certification: Material shall comply with governmental regulations prevailing at supply source and project. Investigate sources of supply and make assurances that plants will be supplied as indicated in the Planting Plan in sizes, variety and quality noted and specified before submitting bid.

2. Contractor will furnish two copies of written maintenance, instructions for maintenance and care of lawn areas.

3. Furnish suitable quantities of water, hose and appurtenances.

4. Provide topsoil that complies with ASTM 5268 – Standard Specification for Topsoil Used for Landscaping Purposes.

5. Begin maintenance immediately after planting.  Continue maintenance for 1 year.

6. Repair or replace seeded areas, which in judgment of Engineer, have not survived and grown in a satisfactory manner, for a period of 1 year after date of acceptance.

1.5    DELIVERY STORAGE AND HANDLING:

A.    Delivery:

1. Schedule shipping to minimize on-site storage of materials.

2. Fertilizer: Deliver fertilizer to site in original, unopened containers bearing weight, manufacturer's guaranteed chemical analysis, name, trade name, trademark, and conformance to state law.

3. Deliver topsoil in an unfrozen and non-muddy condition

1.6    PROJECT/SITE CONDITIONS:

A.    Inspection:

1. Prior to beginning Work, Contractor shall examine and verify acceptability of Site for conditions under which Work will be performed. Do not proceed with Work until unsatisfactory conditions have been corrected.

2. Starting Work constitutes acceptance of conditions under which Work is to be performed. After such acceptances, Contractor shall be responsible for correcting unsatisfactory and defective Work resulting from such unsatisfactory conditions.

3. It is the intent of this specification that existing trees within Work limits, not be disturbed by the Work and be saved and protected, except where specified to be removed.

B.    Utilities:

1. Locate underground utilities by servicing agencies.

    2.    Water shall be provided by Contractor.

C.    Planting Seasons:

    1.    Spring Planting: From time soil becomes workable to June 15. Consider current and forecasted weather conditions.

    2.    Fall Planting:  September 1 to November 15.

    3.    Summer Season:  Planting shall be considered unseasonable and requires approval by Engineer.

    4.    If special conditions exist which warrant installation outside normal planting seasons, Contractor shall submit written request to Engineer describing conditions and stating proposed variance. Approval to plant under such conditions shall in no way relieve Contractor from warranty.

D.    Plant when weather and soil conditions are suitable in accordance with industry practices.

E.    Protection:

    1.    Protect seeded areas against damage by trespass and other work until substantial completion.

    2.    Protect seeded areas from nuisance species as necessary.

    3.    Replace, repair, or replant lawn areas which are damaged.

    4.    Where planting occurs in close proximity to other site improvements, protect features prior to commencing Work. Any items damaged due to planting operations shall be repaired to their original condition.

1.7    WARRANTY:

A.    During 1 year correction period replace lawn areas which have died, are in dying condition, or which has failed to germinate or flourish so its usefulness or appearance has been impaired.

    1.    Replacement and Damages:

        a.    Decisions of Engineer for required replacements are final and binding upon Contractor.

        b.    Contractor is responsible for repairing damage to property caused by defective workmanship and materials.

    2.    Exclusions:

a.   Contractor is not liable for replacement cost of plants damaged by deicing compounds, fertilizers, pesticides or other materials not specified in Contract Documents or not applied by Contractor, by relocating or removal by others, by acts of God, or by vandalism, and losses due to curtailment of water by local authorities.

3.   Inspection of Maintenance:

a.   During correction period, Contractor shall, periodically inspect watering, cultivation, and other maintenance operations by property owners, and notify Owner of methods, practices or operations considered unsatisfactory and not in accordance with good horticultural practices.

b.   Failure of Contractor to inspect or report shall be construed as acceptance of property owner's maintenance operations, and Contractor shall not claim or assert defects which may later develop are result of such methods or practices or operations.

c.   Owner will notify Contractor when maintenance is to be performed so Contractor may observe maintenance procedures.

## PART 2 - PRODUCTS

2.1   PLANTS:

A.   Grass

1.   Provide seed mixes high in germinating value and latest year's crop mixture as follows:

| Name | Minimum Proportion by Weight | Percent Purity | Percent Germination |
|---|---|---|---|
| Kentucky bluegrass | 20 percent | 87 percent | 85 percent |
| Merion Kentucky bluegrass | 20 percent | 87 percent | 85 percent |
| Red Chewings Fescue | 45 percent | 98 percent | 85 percent |
| Manhattan Rye | 15 percent | 98 percent | 90 percent |

2.2   PLANTING MATERIALS:

A.   Topsoil:

1.   Obtained from natural well drained areas, and be fertile, friable soil, clean of undesirable materials such as plants, weeds, roots, stalks, stones, and other debris.

2.    Existing topsoil may be used if Engineer determines soil is suitable and of sufficient quantity. Topsoil must meet ASTM standard 5268 Standard Specification for Topsoil Used for Landscaping Purposes.

3.    Acidity range of pH 5.0 and pH 7.0 and shall contain no less than 4 percent organic matter as determined by loss on ignition of moisture free samples dried at 212 degrees F.

B.    Soil Amendments:

1.    Granular Fertilizer:

a.    Commercial type, uniform in composition, free flowing, conforming to state and federal laws, and suitable for application with equipment designed for that purpose.

b.    Contain minimum basis percentage by weight:

(1)    Nitrogen: 6 percent, 1/4 of nitrogen shall be in form of nitrates, 1/4-inch form of ammonia salts, and 1/2-inch form of organic nitrogen.

(2)    Phosphorus: 24 percent, available phosphoric acid shall be derived from super phosphate having minimum analysis of 20 percent available phosphate.

(3)    Potash: 24 percent, potash shall be in form of sulphate or potash.

(4)    Balance of fertilizer shall be materials usually present in such products, free from dust, sticks, sand, stone, and other debris.

(5)    Ground agricultural limestone containing not less than 85 percent total carbonates.

c.    Coordinate N-P-K requirements with agronomic soil testing lab recommendations.

2.    pH Adjusters:

a.    Lime: Ground dolomite limestone, containing not less than 85 percent calcium and magnesium carbonates, 50 percent passing through 100 mesh screen, 98 percent passing 20 mesh screen.

b.    Elemental sulphur: Finely ground horticultural grade material containing at least 95 percent purity.

C.    Water:

1. Obtain from fresh water sources and free from injurious chemical or other toxic substances harmful to plant life. Contractor to provide written authorization from owning authority if withdrawing water from a public water distribution system.

2. No water which is brackish may be used.

## PART 3 - EXECUTION

### 3.1  PREPARATION:

A.  Remove existing sand or temporary restoration material in areas to be restored.

B.  Compact existing subgrade to at least 95% standard proctor density to minimize differential settlement of restored areas.

### 3.2  INSTALLATION:

A.  Topsoil/Finish Grading:

1. Do not place or work topsoil in frozen or muddy condition.

2. Finish grade is established final grade. Grades not otherwise indicated are uniform levels or slopes between points where elevations given or between such points and existing finished grades.

3. Place a minimum of at least 4 inches of topsoil material in areas to be restored. Sufficient topsoil to be placed to ensure material settling does not result in restored areas being lower than existing grade. Mound topsoil as necessary to account for any settling that may occur.

B.  Preparation:

1. Place grass seed, fertilizer, and other specified materials at a rate meeting manufacturer instructions and as specified herein.

2. Protect seeded areas with straw until germination of grass is fully established.

3. Planting Season: Conform to planting seasons.

4. Preparation of Planting Areas: Cover surrounding turf (if existing) to protect turfed areas that are to be trucked or hauled over and upon which soil is to be temporarily stocked.

C.  Watering:

1. Water immediately after installation.

2. Water during period of temporary maintenance.

3.3     CLEAN UP AND PROTECTION

A.     Remove excess and waste material daily.

B.     Remove soil or similar material brought onto paved areas, keeping areas broom clean.

C.     Upon completion of planting, remove excess soil, stones, and debris and dispose of off-site.

D.     Damage to existing landscape, pavements, or other site features as result of Work shall be repaired to its original condition by the Contractor at no additional cost.

E.     Protect landscape Work and materials from damage due to landscape operations, operations by other contractors and trades, and trespassers. Maintain protection during installation and maintenance periods.

3.4     MAINTENANCE

A.     Temporary Maintenance:

1.     Maintain plant material until substantial completion as defined in section 3.06. Acceptance of this specification.

2.     Remove and replace dead and unacceptable grass as the condition becomes apparent.

3.     Place additional topsoil and seeding in areas that fail to germinate or where grass has died in order to provide a fully restored site.

3.5     ACCEPTANCE:

A.     Preliminary Planting Acceptance:

1.     Notify Engineer at conclusion of planting operations so Engineer can determine substantial completion by field inspection.

2.     Substantial completion requires:

a.     Plant material conforms to Contract Documents with respect to quality and location, except those items accepted or revised in field by Engineer.

b.     Plant material shall be in healthy condition as defined under warranty.

B.     Final Planting Acceptance:

1.     Final planting acceptance shall be granted after completion of replacement operations required to fulfill guarantee.

2.   On or about expiration of 1 year correction period, follow-up inspection will be made to determine replacements required to be made by Contractor in accordance with provisions of these Specifications. Engineer will document findings in field report, and forward copies to Contractor. Items identified for replacement will be tagged during inspection with plastic flagging.

3.   Upon completion of replacement program, Engineer will inspect to determine acceptability of required replacements. If acceptable, Engineer shall notify Contractor in writing, of final acceptance of Work.

3.6   CLOSEOUT ACTIVITIES:

A.   Provide in accordance with Section 01 77 00.

END OF SECTION

# Exhibit 9

| From: | Kalaya Thomas |
|---|---|
| To: | Rolnick, Addie; Tallman, Sarah |
| Cc: | Damon Garrett; Jackie Palmer; Erin Russell (russelle@Michigan.gov) |
| Subject: | City of Flint LSL compared to NRDC List |
| Date: | Monday, October 10, 2022 12:51:33 PM |
| Attachments: | image001.png |
| | Flint NRDC list with status - 10.10.22.xlsx |

Good afternoon,

It was a pleasure meeting with your team Thursday. We hope we have provided answers regarding the process we've used to identify the City of Flint Residential Lead Service Line universe. Attached is the list of homes include in the 31,187 number. Below is a breakdown of the information presented in this spreadsheet.

- Any address matched to a City of Flint phase list was marked as complete. The service line was verified or replaced.
- Status: a combination of the various data sets MCA received.
  - For example:
    - A resident at a particular address opted out of the service (declination), but a new resident moved in and opted into the service, and now it's completed.
    - An address status can be active/inactive, which has since changed.
- Yellow and pink highlights indicate properties marked as duplicates in the NRDC list.

If you have any questions or need additional information, don't hesitate to contact me.

Thank you,

**Kalaya Thomas**
**Operations Coordinator**
Metro Consulting Associates

Tel: 800.525.6016
Mobile: 313.495.4089



Stay connected! 

CONFIDENTIALITY STATEMENT

Metro Consulting Associates, LLC

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

PA-63

While this firm uses virus protection, the recipient should check this e-mail and any attachments for the presence of viruses. Neither the sender nor this firm accept any liability for any damage caused by any virus transmitted by this e-mail.

Exhibit 10

| From: | William Kim |
|---|---|
| To: | Tallman, Sarah; Rolnick, Addie; McLaughlin, Jolie; Xu, Cat |
| Cc: | Kuhl, Richard (AG); Angela Wheeler |
| Subject: | City"s Data Followup, re Concerned Pastors |
| Date: | Thursday, June 17, 2021 2:20:19 PM |
| Attachments: | 2021.06.17 City Resp to 05.14 NRDC Data Req.xlsx |
| | 2021-06-09 Filter Verification.xlsx |

Please find attached a number of files.  The "City Resp" file, in short, contains the analysis of the remaining addresses which you asked about last month.  That file has two tabs:

- The first tab, "inactive addresses" contains the addresses you requested followup on to verify why they were determined to be abandoned.  That information is contained in the fourth column.  Followup on the inactive addresses also identified a number of addresses that were determined to now be occupied, and consent contact attempts for those addresses are noted there as well.
- The second tab, "Missing Excavation Data" has been populated with such data where available.  In addition, additional consent attempts were completed on a number of the addresses (beginning at row 113), which had the wonky completion dates.

I've also attached this week's filter verification report.

Finally, in regards to your questions regarding the restoration progress, the Transportation department has been able to provide the following responses:

- **What parts of restoration work, if any, occur immediately after a service line has been excavated/replaced?**
- No restoration occurs immediately after the service line has been replaced.  The area requires a settling period of at least 30 days for compaction reasons.
- **What parts of restoration work occur later?**
- All required restoration work occurs later.
- **How does the City communicate to the entity or department doing the restoration that there is a new work order for a home that had a new excavation and/or replacement?**
- Upon completion of the replacement, a work order is entered into the system (Cityworks) on the replacement side, which in turn triggers our office to open a restoration work order  for inspection to determine what is required for restoration to be completed.
- **Does the Department of Transportation do any restoration work? Or is all the restoration work done by Goyette?**
- All restoration for Phases 5 and 6 have been completed by Goyette
- **Does Goyette do temporary restoration first? And if so, how does the City and/or Goyette keep track of which homes have only received temporary (not permanent) restoration?**
- There is NO temporary restoration. The disturb area is to be maintained for 90 days by the replacement company after which restoration is to be completed within a timely matter with weather conditions permitting.
- **Has Goyette been restoring lawns with topsoil, reseeding, and planting per the restoration contract that the City sent us on March 19, 2021 (see Section 32 90 10-1)? If not, when does Goyette plan to do the topsoil, reseeding, and planting work?**
- Yes Goyette has been doing all of the restoration work in the Greenbelt
- **When Goyette puts down topsoil, seed, and planting, where/how does it document**

that such work has been  completed?

- Information of completion should be entered into the same work order system
- **Has the City received any documentation from Goyette regarding the topsoil, reseeding, and planting work – both work that has already been done and work that still needs to be completed? If so, what documentation has been provided to the City**
- Goyette provides a weekly invoice of addresses and what work was completed for each
- **Is there a specific time of year that the topsoil, reseeding, and planting work needs to occur? If the restoration work occurs at a time of the year where reseeding/planting cannot be done, how does the City or Goyette keep track of homes that it needs to revisit to complete the reseeding/planting work?**
- Topsoil and reseeding work can be completed as long as there is not snow on the ground.  Until the restoration is completed it remains an open work order in the system (Cityworks).

My understanding is that the Your remaining questions regarding the contractual issues are not answerable because the restoration contract does not contain an end date.

--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079

# Exhibit 11

Online Services



Menu

(/)

Home (https://www.cityofflint.com/) / City of Flint suspends service line replacement work to help prevent spread of coronavirus

# City of Flint suspends service line replacement work to help prevent spread of coronavirus

April 2, 2020

FLINT, Michigan—The City of Flint filed notice today that it has temporarily suspended work on the service line replacement program to help prevent the spread of coronavirus.

Because work crews go door-to-door, work in close proximity to each other, and must have face-to-face contact with residents, the project creates an ideal environment for the spread of coronavirus.

Delaying work is necessary because residents may be — and should be — reluctant to let anyone in their home.

Under the Fast Start program, the service line replacement project was scheduled to be completed by Dec. 31, 2019, but fell behind under the previous administration. The City of Flint worked with its crew of contractors to overcome that failure to meet the previous deadline and was poised to complete the project quickly when spring weather arrived. Both the City of Flint and attorneys representing the Concerned Pastors previously had agreed in principle to a deadline of June 30 for completion of the project.

If the City had continued to push toward completion, it would have required an April deadline for residents to opt-in to the program.

"It is unreasonable, unrealistic and unfair to expect residents to participate in the service line replacement program at this time," Mayor Sheldon Neeley said. "We will get this job done and we will finish it as quickly as possible after shelter-in-place orders have lifted."

A new timeline for the project will be set after it is determined that it can continue without undue risk of spreading coronavirus.

As of March 20, 2020, the service line replacement project was approximately 85 percent complete. Pipes have been excavated at 25,409 homes and replaced at 9,554 locations where lead or galvanized steel service lines were present.

The city's water meter replacement program, which also required workers to enter residents' homes, also is on hold until further notice.

All emergency services (even those that require workers to go into residents' homes) will continue with additional safety precautions. These emergency services include service line repairs as well as reconnections to ensure all households have access to running water to help fight the spread of COVID-19.

Road work and similar construction that does not require workers go into residents' homes will continue.

###

---

## Share on Social:

Facebook (https://www.facebook.com/sharer/sharer.php?u=https://www.cityofflint.com/city-of-flint-suspends-service-line-replacement-work-to-help-prevent-spread-of-coronavirus/)

Twitter (http://twitter.com/share?text=City of Flint suspends service line replacement work to help prevent spread of coronavirus&url=https://www.cityofflint.com/city-of-flint-suspends-service-line-replacement-work-to-help-prevent-spread-of-coronavirus/)

LinkedIn (http://twi service li spread o coronavi flint-susp help-prev

PA-69



**ONLINE SERVICES**

Pay Water Bill

Pay Property Taxes

File Police Report

Search Properties

Income Tax Forms

Report Your Meter Read

All Online Services

1101 S. Saginaw Street Flint, MI 48502 (https://www.google.com/maps/place/FLINT+CITY+HALL/@43.0105837,-83.6868427,17z/data=!3m1!4b1!4m5!3m4!1s0x8823821b22∢ 83.6846541)

(810) 766-7015(tel:(810)%20766-7015)

Copyright © 2022 City of Flint Michigan. All rights reserved.

(https://www.instagram.com/cityofflint/?hl=en)

(https://www.facebook.com/City-of-Flint-MI)

(https://www.linkedin.com/company/city-of-flint/)

PA-70

Exhibit 12

| From: | Rolnick, Addie |
|---|---|
| To: | William Kim |
| Cc: | Angela Wheeler; McLaughlin, Jolie; Xu, Cat; Bonsitu Kitaba; Tallman, Sarah |
| Subject: | RE: Concerned Pastors - questions and information requests |
| Date: | Wednesday, February 3, 2021 1:41:40 PM |
| Attachments: | 02.03.21 List of addresses with outsanding obligations.xlsx |

Bill,

Attached is a spreadsheet containing updated versions of four lists of addresses for which our analysis of the City's data shows the City has remaining obligations under the Settlement. Our analysis includes the data most recently shared by the City, including the restoration data. As the parties have discussed, demonstration of compliance for homes in category 1 ("Missing Consent Attempts") is required before the City can set an opt-in deadline. As you discussed with Sarah, Plaintiffs would like to schedule a meet and confer once the City has provided its proposal concerning resetting the remaining deadlines.

1. The sheet titled "Missing Consent Attempts" contains 492  homes where the City's data indicates that the City has not completed the required in-person consent attempts. Based on our analysis, Plaintiffs believe the City has not yet demonstrated compliance with its outreach obligations and must continue accepting consent forms, pursuant to the Court's most recent order. *See* ECF No. 228 at 15-16.

2. The sheet titled "Consent, Missing Excavation" contains 443 homes where the City's data indicates that the City has received consent to perform an excavation but has not yet performed one.
   - The 411 homes that are not highlighted in blue are addresses where the City's records indicate the City received consent for an excavation, but do not indicate that an excavation, replacement, or restoration occurred.
   - The 32 homes highlighted in blue are addresses where the City's records indicate that the City received consent for an excavation and do not indicate than an excavation occurred, but there is a record of restoration. We are not sure if this means there has been an excavation that we do not have a record of. Please confirm how we should interpret the data for these addresses. If an excavation was performed, please provide the required reporting, including the date of excavation, what service line materials were discovered (public/private side), whether a replacement occurred, and if so, the required filter verification data.
   - It is possible that the City has complied with its obligations with respect to these addresses by completing the required post-consent scheduling attempts. As you discussed with Sarah, please provide data demonstrating compliance for addresses for which the City has completed its scheduling attempt obligations, but has not performed an excavation.

3. The sheet titled "Excavation, LSL, No Replacement" contains 55 homes where the City's data indicates that the City has identified a lead or galvanized steel service line but has not yet replaced that lead service line.
   - The 16 homes that are not highlighted in blue are addresses where the City's records indicate an excavation confirming a lead or galvanized steel service line, but there is no record of either replacement or restoration.
   - The 39 homes highlighted in blue are addresses where the City's records indicate an excavation confirming a lead or galvanized steel service line, where there is no record of a replacement, but there is a record of restoration. We are not sure if this means there has been replacement that we do not have a record of, or if these addresses were restored without a service line replacement. Please confirm how we should interpret the data for these addresses. If replacements have occurred at these addresses, please provide the required reporting, including the date of replacement,

PA-72

the filter verification data, and what portion of the service line was replaced (public/private/both).

4. The sheet titled "Missing Required Restoration" contains 8,015 homes where the City's data shows it has not completed the required restoration following an excavation. This includes both addresses where the City's data shows that it found and replaced lead service lines and addresses where the City did not find lead service lines.

Regards,

Addie

ADELINE ROLNICK
*Attorney\**

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

*ADMITTED ONLY IN NEW YORK; SUPERVISION BY A MEMBER OF THE D.C. BAR

---

**From:** Tallman, Sarah <stallman@nrdc.org>
**Sent:** Wednesday, January 6, 2021 5:59 PM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** 'awheeler@cityofflint.com' <awheeler@cityofflint.com>; Rolnick, Addie <ARolnick@nrdc.org>; Chaudhary, Dimple <dchaudhary@nrdc.org>; McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>
**Subject:** RE: Concerned Pastors - questions and information requests

Bill,

Following up on our discussion before the holidays, please provide the City's proposal for a new program completion deadline for the parties' discussion.

In response to the City's request during our discussion, I'm attaching a spreadsheet containing four lists of addresses for which our analysis of the City's data shows the City has remaining obligations under the Settlement. Each list appears as a different sheet/tab in the Excel file. We describe each list below in order from left to right in the Excel file, including some questions so that we can better assess the City's compliance. Please provide responses to the questions in Items A through D by no later than January 20. In addition, please provide responses to our outstanding questions from my December 22 email below.

A. The sheet titled "Missing Consent Attempts" contains 602 homes where the City's data indicates that the City has not completed the required in-person consent attempts. The

Settlement requires at least two in-person attempts at each address, with one attempts occurring on a weekend or after 5 pm. ECF No. 174 ¶ 15.a. Based on our analysis of the City's data, the City has not yet demonstrated compliance with its outreach obligations and must continue accepting consent forms pursuant to the Court's October 13, 2020 order. ECF No. 228 at 15-16.

B.  The sheet titled "Consent, Missing Excavation" contains 360 homes where the City's data indicates that the City has received consent to perform an excavation but has not yet performed one.

- The 335 homes that are not highlighted are addresses where the City's records indicate the City received consent for an excavation, but has not completed an excavation, replacement, or restoration.

- The 25 homes highlighted in blue are addresses where the City's records indicate that the City received consent for an excavation, that no excavation has occurred, but that restoration has occurred. We are not sure if this means there has been an excavation that we do not have a record of. Please confirm how we should interpret the data for these addresses. If excavations have occurred at these addresses, please provide the information about those excavations required by the Settlement, *see* ECF No. 147-1 ¶ 117.c.ii.

- It is possible that the City has complied with its obligations with respect to these addresses by completing the required post-consent scheduling attempts. *See* ECF No. 217 ¶ 6 (requiring three in-person scheduling attempts, with at least one attempt on a weekend or after 5 pm). But because the City has not provided data on these attempts, we cannot assess its compliance with the scheduling-attempt obligation. The City's failure to maintain this information violates the 2020 Stipulation, which requires the City to include in its status reports a list of addresses that have provided the City with consent to conduct an excavation but have not yet responded to the City's attempts to schedule an excavation, as well as reporting on the dates and times of scheduling attempts at those addresses, the result of the outreach, and documentation confirming a doorhanger was left if an in-person scheduling attempt was unsuccessful. ECF No. 217, ¶ 6. Please explain how the City intends to show compliance for these addresses.

C.  The sheet titled "Excavation, LSL, No Replacement" contains 56 homes where the City's data indicates that the City has identified a lead or galvanized steel service line but has not yet replaced the service line. We previously provided this list on December 22, but we're including it again here for your convenience.

- The 26 homes that are not highlighted are addresses where the City's records indicate an excavation confirming a lead or galvanized steel service line, but that neither replacement nor restoration has occurred.

- The 30 homes highlighted in blue are addresses where the City's records indicate an excavation confirming a lead or galvanized steel service line without any replacement, but where there *is* a record of restoration. We are not sure if this means there have been replacements at these addresses that we do not have records of, or if these addresses were restored without a service line replacement. Please confirm how we

should interpret the data for these addresses.

D. The sheet titled "Missing Required Restoration" contains 13,521 homes where we do not have data from the City confirming restoration occurred following an excavation. This includes both addresses where the City's data shows that it found and replaced lead service lines and addresses where the City did not find lead service lines.

- The City is required to provide an updated list of all homes where restoration has been completed with each monthly report. ECF No. 217, ¶ 7.iii. Plaintiffs to date have only received restoration data for Phases 5 and 6. Please provide the restoration data from the earlier phases as soon as possible, and no later than January 20, 2021.

Please let us know if the City's records indicate that the City has complied with its obligations with respect to any of these addresses, and if so, in what manner (i.e. by completing the requiring in-person consent attempts, performing an excavation, replacing a lead service line, and/or completing restoration) and on what date. The data we have received from the City may be incomplete, or we may be misreading the City's data.

Let us know if it would be helpful to discuss any of the above.

Regards,

Sarah

---

**From:** Tallman, Sarah
**Sent:** Tuesday, December 22, 2020 4:31 PM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** 'awheeler@cityofflint.com' <awheeler@cityofflint.com>; Chaudhary, Dimple <dchaudhary@nrdc.org>; Jolie McLaughlin (jdmclaughlin@nrdc.org) <jdmclaughlin@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>
**Subject:** RE: Concerned Pastors - questions and information requests

Bill,

As I mentioned on the phone today, here are Plaintiffs' follow-up questions concerning the information you provided on 12/11. Please let me know if you'd like to discuss any of the below.

(item 1.a) Data defining universe of eligible homes
It appears that the 2020-12-09 Unexcavated homes.xlsx list excludes unexcavated homes in University Park and Smith Village. Can you confirm that this is the case?

(item 2) Restoration data
The data the City provided concerns only Phases 5 and 6 of the pipe replacement program.

Paragraph 7 of the 2020 Stipulation requires the City to provide monthly "an updated list of all homes where restoration has been completed." ECF No. 217, ¶ 7. Please provide a complete list, including addresses where restoration was completed in Phases 1 through 4, with the City's next status report.

(item 3) Scheduling Attempt Data
- The file named 2020-12-09 Scheduling Attempts.xlsx has columns labeled "consent attempts." Please clarify whether this spreadsheet reflects attempts to obtain consent ("consent attempts"), attempts to schedule work after a resident has submitted a consent form ("scheduling attempts"), or a mix of both.
- We understand that the City's data does not distinguish between consent attempts and scheduling attempts. The 2020 Stipulation requires the City to include in its status reports a list of addresses that have provided the City with consent to conduct an excavation but have not yet responded to the City's attempts to schedule an excavation, as well as reporting on the dates and times of attempts to schedule an excavation at those addresses. ECF No. 217, ¶ 6. The City's failure to maintain this information violates the 2020 Stipulation. Once the parties understand the universe of remaining unexcavated homes, we would like to discuss the City's recordkeeping and how to determine whether the City has complied with its scheduling attempt obligations.

(item 5) Tap water sampling plan
- Regarding the second bullet under "Establishing a Sampling Pool," how will the City determine which Tier 2 sites have a "high probability" of lead?
- Regarding the "Capturing Samples" process, what, if any, efforts will be made to contact residents prior to dropping off a sampling kit to determine whether the resident is interested in participating in the program? What process will the Public Health Office or DPW follow to conduct outreach to these residents prior to dropping off kits?
- The plan doesn't specify how the Navigators will know when a resident has captured a sample. Do the instructions ask the resident to contact the City after they have captured the sample, to schedule a pick-up?
- How will the City work to recruit participants at eligible sites to participate in sampling? What specific outreach efforts are being planned, and who will undertake them?

(item 7) Filter replacement cartridges and test kits
Please confirm whether the data in the "Water Filter Distribution Report" file includes only those filter cartridges picked up at City Hall, or also at other locations and/or distributed by contractors for post-replacement filter installation. If these cartridges are distributed at other locations, please specify a list of those locations. In addition, if this information is known to the City, please let us know the total remaining available filter replacement cartridges at the Food Bank (or other site where these materials are warehoused).

Regards,

Sarah

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Friday, December 11, 2020 2:59 PM
**To:** Tallman, Sarah <stallman@nrdc.org>
**Cc:** awheeler@cityofflint.com; Chaudhary, Dimple <dchaudhary@nrdc.org>; McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>
**Subject:** Re: Concerned Pastors - questions and information requests

Sarah, here's are the City's responses to your questions:

**1(a):** See "2020-12-09 Unexcavated Homes.xlsx"
**1(b):** *See* "2020-12-09 Unexcavated Homes.xlsx"
**2(a):** 1110 addresses needing restoration work, as of 12/09/2020
**2(b):** *See* "Phase V and VI Restoration Complete.xlsx"
**3:** Door hangers are left at the residence after every in-person contact (both consent and scheduling).  Contact information previously provided includes both scheduling contact attempts and consent contact attempts, as the data recording system does not differentiate between the two types of contact attempts.  *See also* "2020-12-09 Scheduling Attempts.xlsx."
**4:** *See* "2020-12-11 UP_SV Status.xlsx"
**5:** *See* "COF LCR Sampling Plan rev 12.8.20.docx"; "LCR Sampling Instructions-Maintenance.xlsx"
**6.** Confirmed.
**7:** *See* "Water Filter Distribution Report.xlsx"
**8(a):** $114,270
**8(b):** $17,821,112
**8(c):** $4,869,010.83 (as of November 13, 2020)

Thank you,

On Fri, Dec 4, 2020 at 4:55 PM Tallman, Sarah <stallman@nrdc.org> wrote:

Bill,

We are still waiting for the City to respond to Plaintiffs' information requests from November 5 and 12, as well as items the City agreed to provide during the November 13 meet and confer. Please provide this information as soon as possible and by no later than Friday, December 11. We have prioritized the outstanding items below, with the first items being the highest priority for the City to resolve immediately. We have also included a follow-up item relating to the City's most recent status report (item 2.B). While we understand the City is juggling several projects, the Settlement requires prompt responses to Plaintiffs' information requests; several of our requests have been pending for longer than the 14-day window the Settlement provides. We appreciate the City's prompt attention to these issues.

In addition, given that the stipulated November 30 deadline for completion of all work has passed, it is necessary to revise the parties' agreement concerning the deadline for the close-out of the pipe replacement program. Please propose a modified deadline for completion of the service line

replacement program, including completion of restoration for all homes, based on the City's assessment of when the remaining work can be completed. Please also provide a proposal for how to resolve the issue the City raised concerning its outreach obligations for newly activated water accounts.

We'd like to schedule a meet and confer to discuss the deadline modifications. Please provide dates/times in the next two weeks when the City is available to discuss these issues.

Let us know if you need clarification on any of the items listed below:

1. <u>Data defining universe of eligible homes.</u>

   a. Please provide a list of all remaining unexcavated addresses, excluding declination and non-responsive homes that have received all required outreach. This information will allow the parties to come to an agreement on the full universe of replacement eligible homes. (requested on November 5 and 13)
   b. If the City maintains a master list of all of these unexcavated homes and the consent attempts for those homes, please provide the following information with the list described in A above: the date(s)/time(s) of all consent attempts made by the City to each address. This will aid Plaintiffs in assessing the City's compliance with its in-person outreach obligations. (requested on November 12)

2. <u>Restoration data</u>

   a. Please provide data showing the total number of homes where restoration work still needs to be completed. (requested on November 5)
   b. The restoration data you provided on 11/30/2020 is in PDF format. Please provide this data in Excel format.

3. <u>Scheduling attempt data.</u> The 2020 Stipulation requires the City to include in its status reports a list of addresses that have provided the City with consent to conduct an excavation but have not yet responded to the City's attempts to schedule an excavation. The lists must include the address, date/time of in-person outreach, and the result of the outreach, including documentation confirming a doorhanger was left at the address if an in-person scheduling attempt was unsuccessful. *See* ECF No. 217, ¶ 6. The spreadsheet provided by the City titled "2020-10-14 Homes w_consent Not Complete" does not provide the result of the City's scheduling attempts, nor does it include any documentation showing that the City left required doorhangers. Please confirm whether the "consent attempts" listed on this spreadsheet reflect attempts to obtain consent to conduct an excavation or attempts to *schedule* the excavation after consent was obtained. If the spreadsheet does not provide documentation of the scheduling attempts, please provide an updated spreadsheet that complies with Paragraph 6 of the 2020 Stipulation and provides, for each of these addresses, (a) the date/time of each scheduling attempt, and (b) the result of each

scheduling attempt, including confirmation that a door hanger was left at the address. (requested on November 12)

4. <u>Mailing data.</u> Please provide documentation demonstrating that the required mailings were distributed to the University Park and Smith Village homes at issue in Plaintiffs' Fourth Motion to Enforce.

5. <u>Tap water sampling plan.</u> Please provide a response to Plaintiffs' follow-up questions and request for a more detailed tap water sampling plan (requested November 30)

6. <u>Door hangers.</u> Please confirm whether the City's contractors are leaving door hangers at all addresses where the City is unable to obtain consent to conduct a service line excavation following an in-person attempt, as required by the Court's July 19, 2018 Order, ECF No. 174. (requested on November 12)

7. <u>Filter replacement cartridges and test kits.</u> Please provide an estimate of the number of filter replacement cartridges and test kits that are picked up from City Hall on a monthly basis, so that the parties can consider the State's proposal to end its obligations to provide filter replacement cartridges and test kits in June 2021. If the number has significantly dwindled since the start of the pandemic, please also provide data from a few months prior to the pandemic (early 2020 and late 2019). (requested on November 13)

8. <u>Remaining settlement funding.</u> Please provide the following information relating to settlement funding: (a) total outstanding program management/administrative costs, if any; (b) total value of contracts for service line replacement and restoration work, and (c) amounts remaining on those contracts. (requested on November 13)

Regards,

Sarah

SARAH C. TALLMAN (SHE/HER)
*Senior Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.651.7918
stallman@nrdc.org

**From:** Tallman, Sarah
**Sent:** Thursday, November 12, 2020 11:24 AM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** 'awheeler@cityofflint.com' <awheeler@cityofflint.com>; Chaudhary, Dimple
<dchaudhary@nrdc.org>; Jolie McLaughlin (jdmclaughlin@nrdc.org) <jdmclaughlin@nrdc.org>;
Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba
<bkitaba@aclumich.org>
**Subject:** RE: Concerned Pastors - questions and information requests

Bill,

I'm writing to follow up on my November 5 email. Please find below four information requests
and follow-up questions concerning the City's status reports, in addition to the three described in
the November 5 email (I've started them with number 4, for ease of reference with the initial
three November 5 requests). Please let me know if you have any questions or need clarification
regarding these requests and questions.

4. The 2020 Stipulation requires the City to include in its status reports a list of addresses that
   have provided the City with consent to conduct an excavation but have not yet responded
   to the City's attempts to schedule an excavation. The lists must include the address,
   date/time of in-person outreach, and the result of the outreach, including documentation
   confirming a doorhanger was left at the address if an in-person scheduling attempt was
   unsuccessful. *See* ECF No. 217, ¶ 6. The spreadsheet provided by the City in its most recent
   status report (titled "2020-10-14 Homes w_consent Not Complete") does not provide the
   result of the City's scheduling attempts, nor does it include any documentation showing
   that the City left required doorhangers. Please confirm whether the "consent attempts"
   listed on this spreadsheet reflect attempts to obtain consent to conduct an excavation or
   attempts to *schedule* the excavation after consent was obtained. If the spreadsheet does
   not provide documentation of the scheduling attempts, please provide an updated
   spreadsheet that complies with Paragraph 6 of the 2020 Stipulation and provides, for each
   of these addresses, (a) the date/time of each scheduling attempt, and (b) the result of each
   scheduling attempt, including confirmation that a door hanger was left at the address.

5. The City's September and October 2020 status reports are missing required updated lists of
   all homes where restoration has been completed. ECF No. 217, ¶ 7.iii. Please provide an
   updated restoration list as soon as possible, and please provide this list with each monthly
   status report going forward.

6. Please confirm whether the City's contractors are leaving door hangers at all addresses
   where the City is unable to obtain consent to conduct a service line excavation following an

in-person attempt, as required by the Court's July 19, 2018 Order, ECF No. 174.

7. Does the City maintain a database or spreadsheet containing all consent attempts at all homes that remain to be excavated? If so, please provide Plaintiffs with a master list of all unexcavated homes in Flint and, for each home, the date/time of all consent attempts made by the City. This will aid Plaintiffs in assessing the City's compliance with its in-person outreach obligations.

Thank you,

Sarah

---

**From:** Tallman, Sarah
**Sent:** Thursday, November 5, 2020 10:31 AM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** 'awheeler@cityofflint.com' <awheeler@cityofflint.com>; Chaudhary, Dimple <dchaudhary@nrdc.org>; Jolie McLaughlin (jdmclaughlin@nrdc.org) <jdmclaughlin@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>
**Subject:** Concerned Pastors - questions and information requests

Bill,

I'm writing with some questions and information requests concerning the City's efforts to implement the Settlement. Please let me know if you'd like to discuss any of the items below.

First, to make the November 13 meet and confer as productive as possible, Plaintiffs request, pursuant to Paragraph 118 of the Settlement, that the City provide us with the information listed in items 1 through 3 below. We would appreciate it if the City would provide this information by November 11, so we can review it before the meet and confer.

1. The City's projections of the amount of money needed to complete all remaining excavation, replacement, and restoration work under the Agreement. It would be helpful if the City could provide this information in the format previously provided in the "Full Inventory Cost Projection" spreadsheets, *see* ECF No. 207 at ¶ 11 n.2;
2. The total number of unexcavated homes, including the addresses, where the City has not yet completed all required outreach attempts; and
3. Total number of homes where restoration work still needs to be completed.

Second, can you confirm that the spreadsheet you provided on 10/29 titled, "2020-10-14 Homes w_required attempts.xlsx" reflects all addresses for which the City believes it has fulfilled its outreach obligations and at which it has not yet completed an excavation?

Third, we spoke to a Flint resident named Gabriel Paul who lives at 321 W. Second Street and wants to have his service line excavated. He informed us that the City is refusing to excavate his service line because the address is purportedly zoned as commercial. The Settlement defines eligible homes for purposes of the service line replacement program as "households" with active water accounts. Settlement Agmt. ¶ 11. In turn, a "household" is a "dwelling unit with plumbing that connects to the Flint Water System"—the Settlement does not define household by reference to municipal zoning. *Id*. ¶ 2.p. Mr. Paul's home, which is his principal residence, plainly meets the definition of a replacement eligible household, and he is entitled to a service line excavation. Please confirm that the City will conduct an excavation at this address.

Thank you,

Sarah


SARAH C. TALLMAN (SHE/HER)
*Senior Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.651.7918
stallman@nrdc.org


--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079

# Exhibit 13

**VIA EMAIL**

William Y. Kim
City of Flint Law Department
1101 South Saginaw Street, 3rd Floor
Flint, MI 48502
wkim@cityofflint.com

      Re: Draft Stipulation Modifying Settlement Agreement in *Concerned Pastors for Social
        Action v. Khouri*, Case No. 16-cv-10277 (E.D. Mich.)

Dear Mr. Kim:

      This letter confirms our mutual understanding that the attached list of 31,578 homes constitutes the 2022 Replacement Eligible Homes List referred to in Paragraph 1 of the Stipulation and Notice ("2022 Stipulation") that the parties intend to file with the court in the above-captioned matter. At this time, based on the data Plaintiffs have received from the City of Flint (City), Plaintiffs' assessment of the City's remaining outreach, excavation, and replacement obligations required by the Settlement Agreement—excluding restoration obligations—is as follows:

1. The City must complete the in-person and mailing outreach referred to in Paragraph 4(i) of the 2022 Stipulation at approximately 1,422 homes. For each of these homes where a resident provides the City with consent to conduct an excavation, the City must also complete an excavation (and if necessary, replacement), unless the criteria described in Paragraph 4(iv) of the 2022 Stipulation are met.

2. The City must complete the post-consent scheduling attempts required by Paragraph 6 of the 2020 Stipulation at approximately 397 homes where the resident has consented to an excavation but the City has not yet completed an excavation. The City must also complete an excavation (and if necessary, replacement) at these homes unless the criteria described in Paragraph 4(iv) of the 2022 Stipulation are met.

3. The City must complete replacements at approximately 112 homes where the City has completed an excavation and uncovered a lead or galvanized steel service line, but where the City has not yet replaced the service line.

In total, excluding restoration work, Plaintiffs' best estimate is that the City still needs to conduct work at approximately 1,931 addresses under the Settlement Agreement. However, even for

unexcavated homes where the City's obligations under the Settlement Agreement are complete, Plaintiffs urge the City to make all efforts to conduct excavations at those homes before the conclusion of the service line replacement program, to ensure that as many lead and galvanized steel service lines as possible are promptly identified and removed.

Sincerely,

Sarah C. Tallman*
Adeline S. Rolnick
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 289-6868
stallman@nrdc.org
arolnick@nrdc.org
*Admitted in Illinois only;
supervision by a member of the DC
bar

Jolie McLaughlin
Natural Resources Defense Council
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7900
jmclaughlin@nrdc.org

*Counsel for Concerned Pastors for
Social Action, Melissa Mays, and
Natural Resources Defense Council,
Inc.*

cc: Richard Kuhl, kuhlr@michigan.gov
Nate Gambill, gambilln@michigan.gov
Bonsitu Kitaba, bkitaba@aclumich.org

PA-85

# Exhibit 14



# CITY OF FLINT
## Department of Law

**Sheldon A. Neeley**
**Mayor**

October 7, 2022

Adeline S. Rolnick
Natural Resources Defense Counsel
1152 15th St. NW, Suite 300
Washington, DC 20005
ARolnick@nrdc.org

*Via Email*

Dear Ms. Rolnick,

The City of Flint is in receipt of your October 4, 2022 letter. In advance of our forthcoming meet and confer, the City would like to provide additional information for your consideration. While, for the most part, we provided much of this information to you verbally at our last meeting in September, we wanted to supplement that earlier information with additional details so that you could have a clearer understanding of the circumstances surrounding excavations and replacements of lead service lines in the City of Flint this year.

The most recent amendment to the settlement agreement was submitted to the Flint City Council for approval in early February of this year, along with a request that the Council approve the associated project management contract to manage and oversee the final stages of our service line replacement efforts. However, the Flint City Council did not act on those resolutions until late-April. Once the necessary legislative approvals were granted, the City of Flint pulled together resources to verify residential lead service line replacement data.

Through a series of meetings and communications with our consultants, contractors, and partners at the State of Michigan, we collected data identifying how many addresses were excavated, the status of those service lines, how many service lines were replaced, and how many locations were left to excavate. While collecting this data, the City released an Request for Proposal (RFP) for the final stretch of lead service line replacements and restorations. Upon completion of the RFP process and after securing Flint City Council approval, Lakeshore Global Corp (LGC) – the sole bidder – was contracted to perform this work.

As has been the longstanding practice of the City, its contractors, and the State of Michigan, a team was established to remove barriers to lead-line replacement. This team meets weekly and includes members from the City, the Governor's office, the Michigan Department of Environment, Great Lakes and Energy (EGLE), the Michigan Department of Technology, Management and Budget (DTMB), Rowe Professional Services Company, Metro Consulting, and LGC.

As previously discussed, challenges in the supply chain have been more acute than originally anticipated. The historic federal Bipartisan Infrastructure Law increased federal funding for water projects nationwide. At the same time, there has been an increase in housing starts. As a result, several parts necessary for line replacements are not readily available and are on back order throughout the country for 26 to 32 weeks.

The team has not been idle in response to this supply chain issue. First, we worked with our contractors and the State of Michigan's DTMB's Chief Procurement Officer to locate over 50 parts from various outlets. This allowed LGC to proceed with restoration work and line replacements – albeit at a reduced rate – while additional parts are sourced.

Second, the State of Michigan's DTMB's Chief Procurement Officer sent communication to Ford Meter Box requesting emergency release of parts over a discrete period. We are awaiting an answer. Should our request be granted, we can plan and schedule around a known number of parts that will be delivered in sequence. LGC has additional subcontractors available to provide the necessary work crews if the request is granted.

Third, the Governor's office is in contact with its counterparts in the federal government regarding efforts to mitigate the recently identified supply chain constraints.

Finally, we are currently exploring options with various engineering firms to see if they can fabricate these parts, thereby adding capacity. We have provided the design specifications and are waiting to hear whether they may be able to fabricate the parts—and, if so, whether they can do so on an accelerated schedule and in what capacity.

In the meantime, we are continuing to work with our residents to secure the necessary access agreements and schedule excavations and replacements. Among other things, we are evaluating use of an e-form that would allow residents to use mobile devices to sign up for service line replacements. We also remain focused on capturing accurate data and tracking database results for our ongoing efforts.

As part of our regular reporting, we would be happy to share additional information, in particular updated progress reports discussed during the previously mentioned weekly status meetings.

Sincerely,

/s/ William Kim
William Kim, City Attorney

cc: Sarah Tallman, NRDC; Melanie Calero, NRDC; Bonsitu Kitaba, ACLU of Michigan; Daniel Korobkin, ACLU of Michigan; Richard Kuhl, Assistant Attorney General; Nate Gambill, Assistant Attorney General; George Krisztian, EGLE; Clyde Edwards, City Administrator; Joseph Kuptz, Assistant City Attorney.

# Exhibit 15

**Department of
Public Works**

**22-007**

# CITY OF FLINT
# MICHIGAN



# CONTRACT

**Rowe Professional Services
Project Management Services
SLE-SLR and Restoration Projects
$2,900,000.00
Approved by City Council on 4/11/22
Resolution #220105**

PA-90



# City of Flint

## Department of Finance
## Division of Purchases & Supplies

**Sheldon A. Neeley**
**Mayor**

**April 18, 2022**

**TO:**        Michael Brown, DPW Supervisor

**FROM:**   Lauren Rowley, Purchasing Manager

**SUBJECT:**   <mark>NOTICE TO PROCEED TO ENTER INTO A CONTRACT</mark>
Professional Services/Project Managements Services/SLE-SLR and Restoration Projects–
Resolution #220105

Please be advised that the Resolution for Rowe Engineering, has been approved by City Council on April 11, 2022 for Professional Services/Project Management Services/SLE-SLR And Restoration Projects.

You are now authorized with this notice to proceed to enter a contract with Rowe Engineering.  Please see attached Resolution #220105.

**If you have any questions, please feel free to give me a call or send an email.**

*Lauren Rowley,*

Purchasing Manager

CITY HALL    1101 S. SAGINAW STREET, RM 203    FLINT, MICHIGAN 48502    TEL: 810-766-7340    FAX: 810-766-7240
Debarred Information updated – 01-02-20

PA-91



**STATE OF MICHIGAN DTMB**
**CONTRACT # 00829**
**BY THE CITY ADMINISTRATOR:**

RESOLUTION NO.: _220105_

PRESENTED: _2/23/2022_

ADOPTED: _APR 1 1 2022_

### RESOLUTION TO ROWE PROFESSIONAL SERVICES FOR PROJECT MANAGEMENT SERVICES FOR SERVICE LINE REPLACEMENT AND RESTORATION

The Division of Purchases & Supplies has utilized the State of Michigan's indefinite-scope cooperative contract for Rowe Professional Services, 540 S. Saginaw St. Suite 200, Flint MI, 48502, for the next phase of service line replacement and restorations.

WHEREAS The Department of Public Works has utilized Rowe Professional Services as the program manager for the exploration/replacement (SLE/SLR) project(s) since May of 2019. Due to their experience with the ongoing project, their knowledge of working with EGLE, The State of Michigan, and CityWorks software used by the city, they would like to continue working with Rowe for the next phase of these projects.

WHEREAS, The City of Flint, Department of Public Works is requesting authorization to enter into a contract with Rowe Professional Services, for Project Management Services for SLE/SLR management, in an amount not-to-exceed $400,000.00, and restoration management services, in an amount not-to-exceed $2,500,000.00 for an overall total contract price of $2,900,00.00.

Funding for said services are budgeted and will come from the following account:

| Account Number | Account Name | Grant Code | Amount |
|---|---|---|---|
| 496-540.006-801.051 | Project Management Svcs | FEPA 18WIIN-1 | $2,900,000.00 |
| | | **GRAND TOTAL** | **$2,900,000.00** |

IT IS RESOLVED, That the Appropriate City Officials are to Enter into a Contract with Rowe Professional Services for Project Management Services for the SLE/SLR and restoration projects for an overall amount not-to-exceed $2,900,000.00.

**APPROVED AS TO FORM:**

_William Kim (Feb 18, 2022 11:43 EST)_
**William Kim, Acting City Attorney**

**APPROVED AS TO FINANCE:**

_Jennifer Ryan_
_Jennifer Ryan (Feb 18, 2022 11:42 EST)_
**Robert Widigan, Chief Financial Officer**

**FOR THE CITY OF FLINT:**

_CLYDE D EDWARDS_
_CLYDE D EDWARDS (Feb 21, 2022 11:37 EST)_
**Clyde Edwards, City Administrator**

**APPROVED BY CITY COUNCIL:**

APPROVED BY
CITY COUNCIL

APR 1 1 2022

**APPROVED AS TO PURCHASING:**

_Lauren Rowley._
**Lauren Rowley, Purchasing Manager**

### PROJECT MANAGEMENT SERVICES/SLE-SLR AND RESTORATION PROJECTS

This agreement (hereinafter "Agreement") by and between the City of Flint, a Michigan Municipal Corporation, 1101 S. Saginaw Street, Flint, MI 48502, (hereinafter the "City"), and Rowe Professional Services, hereinafter referred to as "Contractor."

**1.     Applicable Law**:     This Agreement and all related disputes shall be governed by and interpreted in accordance with the laws of the State of Michigan.

**2.     Arbitration**:   Contractor agrees that for all claims, disputes, and other matters arising out of or relating to this agreement, Contractor must request the City's consent to arbitrate within 30 days from the date the Contractor knows or should have known the facts giving rise to the claim, dispute or question.

    (a)     Notice of a request for arbitration must be submitted in writing by certified mail or personal service upon the Chief Legal Officer.

    (b)     Within 60 days from the date a request for arbitration is received by the City, the City shall inform Contractor whether it agrees to arbitrate.  If the City does not consent, Contractor may proceed with an action in a court of competent jurisdiction within the State of Michigan.  If the City does consent, then within 30 days of the consent each party shall submit to the other the name of one person to serve as an arbitrator.  The two arbitrators together shall then select a third person, the three together shall then serve as a panel in all proceedings.  Any unanimous decision of the three arbitrators shall be a final binding decision.  The City's failure to respond to a timely, conforming request for arbitration is deemed consent to arbitration.

    (c)     The costs of the arbitration shall be split and borne equally between the parties and such costs are not subject to shifting by the arbitrator.

    (d)     Contractor's failure to comply with any portion (including timeliness) of this provision shall be deemed a permanent waiver and forfeiture of the claim, dispute, or question.

    (e)     This provision shall survive the expiration or termination of this Agreement in perpetuity.

**3.     City Income Tax Withholding**: Contractor and any subcontractor engaged in this contract shall withhold from each payment to his employees the City income tax on all of their compensation subject to City tax, after giving effect to exemptions, as follows:

    (a)     <u>Residents of the City:</u> At a rate equal to 1% of all compensation paid to the employee who is a resident of the City of Flint.

    (b)     <u>Non-residents:</u> At a rate equal to ½ % of the compensation paid to the employee for work done or services performed in the City of Flint.

These taxes shall be held in trust and paid over to the City of Flint in accordance with City ordinances and State law.  Any failure to do so shall constitute a material breach of this contract.

4.      **Compensation**:  The City shall pay for such services as have been set forth herein within 45 days of submission of properly detailed and itemized invoices, releases, affidavits, and the like. Notwithstanding, the contract price shall not to exceed $2,900,000.00.  Contractor recognizes that the City does not guarantee it will require any set amount of services.  Contractor's services will be utilized as needed and as determined solely by the City of Flint.   Contractor expressly acknowledges that it, without limitation, has no right to payment of an amount exceeding the amount set forth in this Section.  Contractor agrees that oral agreements by City officials to pay a greater amount are not binding.

(a)      Contractor shall submit itemized invoices for all services provided under this Agreement identifying:

(i)      The date of service
(ii)      The purchase order number
(ii)      The name of person providing the service and a general description of the service provided.
(iii)      The unit rate and the total amount due.
(iv)       Parts utilized for the service

Invoices shall be submitted to:

City of Flint
Accounts Payable
P.O. Box 246
Flint, MI 48501-0246 or accountspayable@cityofflint.com

It is solely within the discretion of the City as to whether Contractor has provided a proper invoice.   The City may require additional information or waive requirements as it sees fit.

5.      **Contract Documents**:  The invitation for bids, instructions to bidders, proposal, affidavit, addenda (if any), statement of bidder's qualifications (when required), general conditions, special conditions, performance bond, labor and material payment bond, insurance certificates, technical specifications, and drawings, together with this agreement, form the contract, and they are as fully a part of the contract as if attached hereto or repeated herein.

6.      **Disclaimer of Contractual Relationship With Subcontractors:** Nothing contained in the Contract Documents shall create any contractual relationship between the City and any Subcontractor or Sub-subcontractor.

7.      **Effective Date:** This contract shall be effective upon the date that it is executed by all parties and presented to the City of Flint Clerk. This contract shall terminate on 12/31/23.

Project Management Services for SLR and Restoration

**8.    Certification, Licensing, Debarment, Suspension and Other Responsibilities:** Contractor warrants and certifies that Contractor and/or any of its principals are properly certified and licensed to perform the duties required by this contract in accord with laws, rules, and regulations, and is not presently debarred, suspended, proposed for debarment or declared ineligible for the award of any Federal contracts by any Federal agency.  Contractor may not continue to or be compensated for any work performed during any time period where the debarment, suspension or ineligibility described above exists or may arise in the course of Contractor contractual relationship with the City.  Failure to comply with this section constitutes a material breach of this Contract.  Should it be determined that contractor performed work under this contract while in non-compliance with this provision, Contractor agrees to reimburse the City for any costs that the City must repay to any and all entities.

**9.    Force Majeure:**  Neither party shall be responsible for damages or delays caused by Force Majeure or other events beyond the control of the other party and which could not reasonably have been anticipated or prevented.  For purposes of this Agreement, Force Majeure includes, but is not limited to, adverse weather conditions, floods, epidemics, war, riot, strikes, lockouts, and other industrial disturbances; unknown site conditions, accidents, sabotage, fire, and acts of God.  Should Force Majeure occur, the parties shall mutually agree on the terms and conditions upon which the services may continue.

**10.    Good Standing**:  Contractor must remain current and not be in default of any obligations due the City of Flint, including the payment of taxes, fines, penalties, licenses, or other monies due the City of Flint or having any current or pending litigation against the City or be in violation of the Clean Water Act, or any permitting by the City, or Sewer Use Ordinances or any other City Ordinances, or any State or Federal regulatory agency, or be debarred by the City of Flint from consideration for a contract award pursuant to Section 18-21.5 (d) of Article IV of the "Purchasing Ordinance of the City of Flint".  Violations of this clause shall constitute a substantial and material breach of this contract.  Such breach shall constitute good cause for the termination of this contract should the City of Flint decide to terminate on such basis.

**11.    Indemnification**: To the fullest extent permitted by law, Contractor agrees to defend, pay on behalf of, indemnify, and hold harmless the City of Flint, its elected and appointed officials, employees and volunteers and other working on behalf of the City of Flint, against any and all claims, demands, suits, or losses, including all costs connected therewith, and for any damages which may be asserted, claimed, or recovered against or from the City of Flint, its elected and appointed officials, employees, volunteers or others working on behalf of the City of Flint, by reason of personal injury, including bodily injury or death and/or property damage, including loss of use thereof, which may arise as a result of Contractor's acts, omissions, faults, and negligence, or that of any of his employees, agents, and representatives in connection with the performance of this contract. Should the Contractor fail to indemnify the City in the above-mentioned circumstances, the City may exercise its option to deduct the cost that it incurs from the contract price forthwith or may file an action in a court of competent jurisdiction, the costs of which shall be paid by Contractor.  This provision shall survive the termination and/or expiration of this agreement, in perpetuity.

PA-95

**12.    Independent Contractor**:  No provision of this contract shall be construed as creating an employer-employee relationship.  It is hereby expressly understood and agreed that Contractor is an "independent contractor" as that phrase has been defined and interpreted by the courts of the State of Michigan and, as such, Contractor is not entitled to any benefits not otherwise specified herein.

**13.    Insurance/Worker's Compensation:** Contractor shall not commence work under this contract until he has procured and provided evidence of the insurance required under this section. All coverage shall be obtained from insurance companies licensed and authorized to do business in the State of Michigan unless otherwise approved by the City's Finance Department.  Policies shall be reviewed by the City's Finance Department for completeness and limits of coverage.  All coverage shall be with insurance carriers acceptable to the City of Flint. Contractor shall maintain the following insurance coverage for the duration of the contract.

(a)    <u>Commercial General Liability</u> coverage of not less than one million dollars ($1,000,000) combined single limit with the City of Flint, and including all elected and appointed officials, all employees and volunteers, all boards, commissions and/or authorities and their board members, employees and volunteers, named as "Additional Insureds." This coverage shall be written on an ISO occurrence basis form and shall include: Bodily Injury, Personal Injury, Property Damage, Contractual Liability, Products and Completed Operations, Independent Contractors; Broad Form Commercial General Liability Endorsement, (XCU) Exclusions deleted and a per contract aggregate coverage.  This coverage shall be primary to the Additional Insureds, and not contributing with any other insurance or similar protection available to the Additional Insureds, whether said other available coverage be primary, contributing, or excess.

(b)    <u>Workers Compensation Insurance</u> in accordance with Michigan statutory requirements, including Employers Liability coverage.

(c)    <u>Professional Liability - Errors and Omissions</u>.  All projects involving the use of Architects, civil engineers, landscape design specialists, and other professional services must provide the City of Flint with evidence of Professional Liability coverage in an amount not less than one million dollars ($1,000,000).  Evidence of this coverage must be provided for a minimum of three years after project completion.  Any deductibles or self-insured retention must be declared to and approved by the City.  In addition, the total dollar value of all claims paid out on the policy shall be declared.  At the option of the City, either the insurer shall reduce or eliminate such deductibles or self-insured retention with respect to the City, its officials, employees, agents and volunteers; or Contractor shall procure a bond guaranteeing payment of losses and related investigation, claim, administration, and defense expenses.

Contractor shall furnish the City with two certificates of insurance for all coverage requested with original endorsements for those policies requiring the Additional Insureds. All certificates of insurance must provide the City of Flint with not less than 30 days

advance written notice in the event of cancellation, non-payment of premium, non-renewal, or any material change in policy coverage. In addition, the wording "Endeavor to" and "but failure to mail such notice shall impose no obligation or liability of any kind upon the company, its agents or representatives" must be removed from the standard ACORD cancellation statement. These certificates must identify the City of Flint, Finance Department, as the "Certificate Holder." Contractor must provide, upon request, certified copies of all insurance policies. If any of the above polices are due to expire during the term of this contract, Contractor shall deliver renewal certificates and copies of the new policies to the City of Flint at least ten days prior to the expiration date. Contractor shall ensure that all subcontractors utilized obtain and maintain all insurance coverage required by this provision.

**14.    Laws and Ordinances**: Contractor shall obey and abide by all of the laws, rules and regulations of the Federal Government, State of Michigan, Genesee County and the City of Flint, applicable to the performance of this agreement, including, but not limited to, labor laws, and laws regulating or applying to public improvements.

**15.    Modifications:** Any modifications to this contract must be in writing and signed by the parties or the authorized employee, officer, board or council representative of the parties authorized to make such contractual modifications under State law and local ordinances.

**16.    No Third-Party Beneficiary:** No contractor, subcontractor, mechanic, materialman, laborer, vendor, or other person dealing with the principal Contractor shall be, nor shall any of them be deemed to be, third-party beneficiaries of this contract, but each such person shall be deemed to have agreed (a) that they shall look to the principal Contractor as their sole source of recovery if not paid, and (b) except as otherwise agreed to by the principal Contractor and any such person in writing, they may not enter any claim or bring any such action against the City under any circumstances. Except as provided by law, or as otherwise agreed to in writing between the City and such person, each such person shall be deemed to have waived in writing all rights to seek redress from the City under any circumstances whatsoever.

**17.    Non-Assignability:** Contractor shall not assign or transfer any interest in this contract without the prior written consent of the City provided, however, that claims for money due or to become due to Contractor from the City under this contract may be assigned to a bank, trust company, or other financial institution without such approval. Notice of any such assignment or transfer shall be furnished promptly to the City.

**18.    Non-Disclosure/Confidentiality:** Contractor agrees that Contractor will not disclose any such information provided to Contractor in furtherance of this Agreement, or in any other way make such documents public, without the express written approval of the City or the order of a court of competent jurisdiction.

**19.    Non-Discrimination**: The Contractor shall comply with the Elliott Larsen Civil Rights Act, 1976 PA 453, as amended, MCL 37.2101 et seq., the Persons with Disabilities Civil Rights Act, 1976 PA 220, as amended, MCL 37.1101 et seq., and all other federal, state, and local fair employment practices and equal opportunity laws and covenants that it shall not discriminate

against any employee or applicant for employment, to be employed in the performance of this Agreement, with respect to his or her hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, because of his or her race, religion, ethnicity, color, national origin, age, sex, sexual orientation, gender identity, height, weight, marital status, familial status, association with the federal government, or physical or mental disability that is unrelated to the individual's ability to perform the duties of a particular job or position or status with respect to public assistance. A breach of this covenant is a material breach of this Agreement.

**20. Anti-Lobbying**: The Contractor shall not use any of the grant funds awarded in this Agreement for the purpose of lobbying as defined in the State of Michigan's lobbying statute, MCL 4.415(2). "'Lobbying' means communicating directly with an official of the executive branch of state government or an official in the legislative branch of state government for the purpose of influencing legislative or administrative action." The Contractor shall not use any of the grant funds awarded in this Agreement for the purpose of litigation against the State or City. Further, the Contractor agrees to require that language of this assurance be included in the award documents of all subawards.

**21. Ethics:** Pursuant to the Flint City Charter §1-602 (I) entitled Notice, every public servant, volunteer and city, contractor is to receive training and be provided with a copy of these ethical standards upon passage of this Charter or at the time of appointment and or hire or the commencement of services (See Attached Flint City Charter §1-602 (I)). Therefore, Contractor acknowledges receipt of Flint City Charter §1-602 and agrees that Contractor and its staff shall abide by the terms and participate in any training provided by the City/or update orientation as may be necessary from time to time. Public servants are all persons employed or otherwise engaged by the corporation of the City of Flint to conduct business on its behalf including but not limited to elected officials, appointed employees, members of boards and commissions, classified employees, contractual employees, and volunteers, in accordance with Flint City Charter §1-602.

**22. COVID-19 Policies and Training:** Contractor acknowledges that the Country is in the middle of a COVID-19 pandemic and agrees that Contractor, its staff and its subcontractors will comply with Federal, State of Michigan Executive Orders, Michigan Department of Health and Human Services Epidemic Orders, Local guidance, CDC, OSHA, MIOSHA and other regulatory guidelines to mitigate risk and exposure to COVID-19. Contractor also agrees that Contractor, its staff and subcontractors if any, shall abide by City of Flint COVID-19 policies and procedures currently in existence, modified or that may be created, including but not limited daily temperature checks, social distancing, mitigation and disinfected measures and agree to participate in any trainings as required by the City of Flint. Contractor, its staff and its subcontractors agree that failure to comply with this provision shall constitute a substantial and material breach of this contract. Such a breach shall constitute good cause for the termination of this contract should the City of Flint decide to terminate on such basis.

**23. Notices**: Notices to the City of Flint shall be deemed sufficient if in writing and mailed, postage prepaid, addressed to **Michael J. Brown** and **Inez Brown, City Clerk, City of Flint, 1101 S. Saginaw Street, Flint, Michigan 48502**, or to such other address as may be designated in

writing by the City from time to time.  Notices to Contractor shall be deemed sufficient if in writing and mailed, postage prepaid, addressed to <u>Rowe Professional Services Company, 540 S. Saginaw St., Suite 200, Flint, Michigan 48502</u>, or to such other address as may be designated in writing by Contractor from time to time.

**24.     Records Property of City:** All documents, information, reports and the like prepared or generated by Contractor as a result of this contract shall become the sole property of the City of Flint and shall be provided to the City on request.

**25.     Scope of Services**:  Contractor shall provide all of the materials, labor, equipment, supplies, machinery, tools, superintendence, insurance and other accessories and services necessary to complete the project in accordance with the Proposal dated February 1, 2022 (see attached proposal).  Contractor shall perform the work in accordance with the Standard General Conditions and any Special Conditions provided for in this contract and warrants to the City that all materials and equipment furnished under this contract will be new unless otherwise specified, and that all work will be of good quality, free from faults and defects and in conformance with the contract documents.  All work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective.  In addition to any other remedies the City may have, if, within one year of the date of substantial completion of work, or within one year after acceptance by the City, or within such longer period of time as may be prescribed by law, any of the work is found to be defective or not in accord with the contract documents, Contractor shall correct promptly after receipt of a written notice from the City to do so, unless the City has previously given Contractor a written acceptance of such condition.

All work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective.  In addition to any other remedies the City may have, if, within one year of the date of substantial completion of work, or within one year after acceptance by the City, or within such longer period of time as may be prescribed by law, any of the work is found to be defective or not in accord with the contract documents, Contractor shall correct promptly after receipt of a written notice from the City to do so, unless the City has previously given Contractor a written acceptance of such condition.

**26.     Severability**:  In the event that any provision contained herein shall be determined by a court or administrative tribunal to be contrary to a provision of state or federal law or to be unenforceable for any reason, then, to the extent necessary and possible to render the remainder of this Agreement enforceable, such provision may be modified or severed by such court or administrative tribunal so as to, as nearly as possible, carry out the intention of the parties hereto, considering the purpose of the entire Agreement in relation to such provision.  The invalidation of one or more terms of this contract shall not affect the validity of the remaining terms.

**27.     Standards of Performance**: Contractor agrees to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices.  The City is relying upon the professional reputation, experience, certification, and ability of Contractor.  Contractor agrees that all of the obligations required by him under this Contract shall be performed by him or by others employed by him and working under his direction and control.  The continued

PA-99

effectiveness of this contract during its term or any renewal term shall be contingent upon Contractor maintaining any certifications in accordance with any applicable legal requirements.

**28.     Subcontracting**:  No subcontract work, if permitted by the City, shall be started prior to the written approval of the subcontractor by the City.  The City reserves the right to accept or reject any subcontractor.

**29.     Termination**:  This contract may be terminated by either party hereto by submitting a notice of termination to the other party.  The City, through its City Administrator, may terminate this agreement upon actual notice to Contractor.  Contractor may terminate this agreement by providing written notice that shall be effective 30 days from the date it is submitted unless otherwise agreed to by the parties hereto.  Contractor, upon receiving such notice and prorated payment upon termination of this contract shall give to the City all pertinent records, data, and information created up to the date of termination to which the City, under the terms of this contract, is entitled.

**30.     Time of Performance**: Contractor's services shall commence immediately upon receipt of the notice to proceed and shall be carried out forthwith and without reasonable delay.

**31.     Union Compliance:** Contractor agrees to comply with all regulations and requirements of any national or local union(s) that may have jurisdiction over any of the materials, facilities, services, or personnel to be furnished by the City.  However, this provision does not apply if its application would violate Public Act 98 of 2011.

**32.     Waiver:** Failure of the City to insist upon strict compliance with any of the terms, covenants, or conditions of this Agreement shall not be deemed a waiver of any term, covenant, or condition.  Any waiver or relinquishment of any right or power hereunder at any one or more times shall not be deemed a waiver or relinquishment of that right or power at any other time.

**33.     Whole Agreement**: This Agreement and the documents cited herein embody the entire agreement between the parties.  Any additions, deletions or modifications hereto must be in writing and signed by both parties.  This Agreement may be executed by facsimile and in counterparts, all of which, taken together, shall constitute a single agreement.

<SIGNATURES ON NEXT PAGE>

PA-100

Project Management Services for SLR and Restoration

**CONTRACTOR:**                                           **WITNESS(ES):**

*Leanne H. Panduren*                 04/27/2022          _____
Leanne H. Panduren Apr 27, 2022 11:41 EDT

**Rowe Professional Services**       **Date**            _____

**Its** CEO/President
_____


**CITY OF FLINT, a Michigan Municipal Corp.:**

_____              4/22/22
Sheldon A. Neeley, Mayor             **Date**

_____              4/21/22
Clyde Edwards, City Administrator    **Date**


**APPROVED AS TO FORM:**

_____              4.19.22
William Kim, Chief Legal Officer     **Date**


9 of 9

PA-101

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 12/8/2021

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: certs@pciaonline.com |
|---|---|
| Professional Concepts Insurance Agency, Inc. | PHONE (A/C, No, Ext): (800) 969-4041 / FAX (A/C, No): (800) 969-4081 |
| 1127 South Old US Highway 23 | E-MAIL ADDRESS: certs@pciaonline.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| Brighton        MI  48114-9861 | INSURER A: The Phoenix Insurance Co | 25623 |
| INSURED | INSURER B: Travelers Indem. Co of America | 25666 |
| Rowe Professional Services, Co | INSURER C: Travelers Prop Casualty of Ame | 25674 |
| 540 S Saginaw St | INSURER D: Travelers Casualty and Surety | 19038 |
| Ste 200 | INSURER E: XL Specialty Ins. Co. | 37885 |
| Flint          MI  48502-1858 | INSURER F: | |

## COVERAGES  CERTIFICATE NUMBER: 22-23 ALL  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY<br>CLAIMS-MADE X OCCUR<br>X X,C,U<br>X contractual Liability<br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY X PRO-JECT LOC<br>OTHER: | X | | 6805H9600862247 | 1-1-2022 | 1-1-2023 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 1,000,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| B | AUTOMOBILE LIABILITY<br>X ANY AUTO<br>ALL OWNED AUTOS / SCHEDULED AUTOS<br>X HIRED AUTOS X NON-OWNED AUTOS | | X | BA3R44572A2247 | 1-1-2022 | 1-1-2023 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| C | X UMBRELLA LIAB X OCCUR<br>EXCESS LIAB CLAIMS-MADE<br>DED X RETENTION $ 10,000 | | | CUP5C4944252247 | 1-1-2022 | 1-1-2023 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | | $ |
| D | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? N (Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | UB6N7328752247 | 1-1-2022 | 1-1-2023 | X PER STATUTE / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| E | Professional Liability | | | DPR9986957 | 1-1-2022 | 1-1-2023 | Per Claim | $ 1,000,000 |
| | | | | | | | aggregate | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
City of Flint and including all elected and appointed officials, all employees and volunteers, all boards, commissions and/or authorities and their board members, employees and volunteers are considered additional insured's with respects to general and auto liability coverage as long as required within a written contract. Coverage is considered primary and non-contributory on the general liability coverage.

Effective Date: This contract shall be effective upon the date that it is executed by all parties.  The contract will be placed on file with the City of Flint Clerk.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Flint<br>1101 S. Saginaw Street<br>Flint, MI  48502 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>Mike Cosgrove/SUNNY  *Michael Cosgrove* |

© 1988-2014 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2014/01)  The ACORD name and logo are registered marks of ACORD
INS025 (201401)

PA-102



February 1, 2022

Mr. Clyde Edwards
City of Flint
1101 S. Saginaw Street
Flint, MI 48502

RE:   2022 Service Line Exploration/Replacement and Restoration
      Professional Services Proposal

Dear Mr. Edwards:

ROWE Professional Services Company is pleased to submit this proposal to continue to assist
the City of Flint with your lead service line replacement project. As you are aware, ROWE has
been assisting the city as your program manager for the Service Line Exploration/Service Line
Replacement (SLE/SLR) project since May 2019. Throughout that timeframe, we have worked
with city departments, the Michigan Department of Environment, Great Lakes, and Energy
(EGLE), State of Michigan, and other stakeholders to research what residential properties have
not been explored/replaced and document that data into the Cityworks system. Not all residential
properties have had service lines explored or replaced for a variety of reasons, thus the reason
for our proposal to continue to assist the city as program managers.

In addition to the SLE/SLR program, there is the restoration of roads, walkways, drives, lawns,
etc., that needs to be completed once the SLE/SLR is complete at each property. To date, the
city has been managing the restoration work but, due to manpower constraints, ROWE has been
requested to be the program management for this component and assist the city. The work
involved with the program management of the restoration is very similar to the SLE/SLR where
data will be gathered and uploaded into the Cityworks software which ROWE is very familiar with.

We offer the following scope of services for the SLE/SLR program management:

**SLE/SLR Services**

- **Project Scope** – For purposes of developing our scope and budget, it is anticipated that there
  are up to 1,000 properties remaining that need have a SLE/SLR completed.

- **Prepare SLE/SLR Construction Bid Packages** – In coordination with the city, ROWE will
  prepare construction bid packages that include sufficient information for the contractors to
  understand and price the project work for the remaining residential properties. The bid package
  will be similar to the one the city produced in 2019 with minor changes that will be recommended
  based on our experience with this program over the past 2+ years.

Flint, MI (HQ): 540 S. Saginaw Street, Suite 200, 48502 | Phone: (810) 341-7500

Flint, MI (HQ) | Lapeer, MI | Farmington Hills, MI | Kentwood MI | Mt Pleasant, MI | Grayling MI | Myrtle Beach, SC | www.rowepsc.com

PA-103

Mr. Clyde Edwards
February 1, 2022
Page 2

- **Advertise and Receive Bids** – The city will advertise the project bid packet, conduct the pre-bid conference, and issue addenda required for the project. We will administer a pre-bid meeting with prospective contractors to explain the status of the SLE/SLR program, what is expected of the selected contractor(s), and overall schedule.

- **List of Remaining Homes** – ROWE will review the existing data that has been used in our previous contract to compile addresses of remaining homes. We will maintain records of these in the Cityworks software.

- **Contact Homeowners/Residents** – The contractor(s) will be responsible for contacting the property owners to obtain permission to perform work on private property. These permissions will be sent to ROWE to vet out and then develop a work order within the Cityworks software, if necessary.

- **Construction Coordination** – ROWE will coordinate weekly progress meeting to discuss items such as progress/schedule, issues with the contractor(s) and other stakeholders.

- **Construction Observation** – ROWE will provide one on-site inspector for each of the contractors' sites during all construction activities (excavations, service line material inspections, and LSL replacements).

- **Pay Applications/Change Orders** – By utilizing the data entered into Cityworks software, ROWE will work with the contractor(s) to develop monthly pay applications for approval by the city. If funding from outside the city is being utilized, we will verify that the documentation for each pay application and/or change order meets the funding requirements.

- **Reporting** – ROWE will prepare the required reporting for work completed. We anticipate that the reports will be similar to those prepared under our previous contract which includes weekly, monthly, and quarterly reports. We will work with the city departments early in the program to determine the frequency of such reports.

The following is our proposed scope of work for the Restoration Services program management.

### Restoration Services

- **Project Scope** – For purposes of developing our scope and budget, it is anticipated that there are up to 8,500 properties remaining that need restoration completed. The restoration for each property may vary from work in the street, sidewalk repair, drive repair, lawn restoration, and fence replacement.

- **Identifying List of Homes** – ROWE will review the existing data that can be provided by the city to develop an initial list of homes that need some form of restoration completed. Once we have compiled that data, we will perform a drive-by site visit to confirm that that the field conditions support the need for work to be performed. The observation from the field will be documented in Cityworks to assist with the development of the work orders. Since many of these homes have had SLE/SLR work completed for several years, the homeowner may have already taken care of the restoration, therefore there will be no work order generated for that address.

- **Prepare Service Restoration Construction Bid Packages** – In coordination with the city, ROWE will prepare construction bid packages that include sufficient information for the contractors to understand and price the project work. The bid package will be similar to the one the city produced in 2019 with recommended changes based on our understanding of how

Mr. Clyde Edwards
February 1, 2022
Page 3

restoration work was performed.  The quantities identified in the bid documents will be based on our review of the data plus our field visit.

- **Advertise and Receive Bids** – The city will advertise the project bid packet, conduct the pre-bid conference, and issue addenda required for the project.  We will administer a pre-bid meeting with prospective contractors to explain the status of the restoration program, what is expected of the selected contractor(s) and overall schedule

- **Contact Homeowners/Residents** – The contractor(s) will be responsible for contacting the property owners to confirm the restoration work completed and when the work will be completed.  Documentation of this meeting will need to be sent to ROWE to vet out and then develop a work order within the Cityworks software, if necessary.

- **Construction Coordination** – ROWE will coordinate weekly progress meeting to discuss items such as progress/schedule, issues with the contractor(s) and other stakeholders.

- **Construction Observation** – ROWE will provide an on-site inspector(s) to observe the restoration work being performed by the contractor(s).  We will keep the City Transportation department informed of locations and schedules when work will be performed in paved roadways so the city will have the opportunity to be on site to observe the work.

- **Pay Applications/Change Orders** – By utilizing the data entered into Cityworks software, ROWE will work with the contractor(s) to develop monthly pay applications for approval by the city.  If funding from outside the city is being utilized, we will verify that the documentation for each pay application and/or changes order meets the funding requirements.

- **Reporting** – ROWE will prepare the required reporting for work completed.  We will work with the city departments early in the program to determine what reports are required and the frequency of such reports.

## SCHEDULE

Based on our recent discussions, we understand the city is interested in getting this project bid out and award the contracts by late winter so work can begin as soon as the weather permits in the spring.  The following is our proposed schedule for our services:

| | |
|---|---|
| Proposal submitted to City for review | January 28th |
| City Council Award of ROWE Contract | February 9th |
| Project Kick Off with ROWE/City | February 10th or 11th |
| ROWE to analyze available data for Restoration | February 14th – 25th |
| ROWE to perform field site visit | February 21st - March 4th |
| Bid Package Complete For SLE/SLR | March 4th |
| Bid Package Complete for Restoration | March 18th |
| Advertisement of Both Bid Packages | Mid/Late March |
| Pre-Bid Meetings | Early April |
| Bid Opening of Both Bid Packages | April |
| Award of Contract(s) | Late April |
| Construction to Begin | May |
| Construction Complete | TBD |

## COMPENSATION

ROWE acknowledges that we will conform to the contractual agreement with our MIDEAL/ MDTMB State of Michigan Cooperative agreement submitted on January 17, 2019.  We note that

PA-105

Mr. Clyde Edwards
February 1, 2022
Page 4

we are in our fourth year of our contract and our rates will be adjusted in our next MDTMB ISID submittal anticipated for the end of 2022 or early 2023.

Compensation for our serviced will be billed on our hourly rate schedule. The work for the SLE/SLR is more defined since ROWE has been involved with this program for almost 3 years. The work associated with the restoration is less defined and will require more up-front time analyzing the data available and then performing field work. Our proposed fees are noted below:

| Task | Budget |
|------|--------|
| SLE/SLR Program Management | $400,000 |
| Restoration Program Management | $2,500,000 |
| Total Budget | $2,900,000 |

We appreciate the opportunity to continue to provide the City of Flint professional engineering services. With our corporate headquarters located in the downtown area, we are committed to assisting the city with your infrastructure improvements.

If you agree with our proposal, please prepare an engineering services contract for our review and execution. You can contact either Rick Freeman or Jeff Markstrom to discuss our proposal in more detail at (810) 341-7500.

Sincerely,
ROWE Professional Services Company

Jeffrey Markstrom, PE

Jeffrey B. Markstrom, PE
Design Services Division Manager

Rick Freeman

Rick A. Freeman, PE
Principal/Director of Engineering

R:\Projects\PROPOSAL\ENGINEER\City of Flint\2022 SLE Restoration\SLE-SLR and Resoration Proposal.docx

PA-106

# Exhibit 16

| | |
|---|---|
| **From:** | McLaughlin, Jolie |
| **To:** | Kuhl, Richard (AG) |
| **Cc:** | William Kim (wkim@cityofflint.com); Gambill, Nathan (AG); Tallman, Sarah; Bonsitu Kitaba; Rolnick, Addie; Xu, Cat |
| **Subject:** | RE: Concerned Pastors - minor revisions to stipulation |
| **Date:** | Friday, April 1, 2022 12:11:20 PM |
| **Attachments:** | 2022-04-01 FINAL stipulation_redline.docx |
| | image001.jpg |

Richard,

Plaintiffs and the City made some minor changes to paragraphs 5 and 6 of the stipulation to remove the specific deadlines for the City to complete the process for re-bidding its restoration contracts and for the parties to meet and confer regarding a new restoration-completion deadline. We made these change to account for the fact that Flint City Council has not yet approved Rowe's contract, and as a result, Bill expressed concerns about the City's ability to meet the April 30 deadline that was previously in the stipulation.

I've attached a redline of the stipulation showing these changes. Flint City Council has approved the stipulation, and we are hoping to file it on Monday, so to the extent you can review by then and let us know if the State approves the changes, we would appreciate it.

Thanks,
Jolie

JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

**From:** Kuhl, Richard (AG) <KuhlR@michigan.gov>
**Sent:** Monday, February 28, 2022 11:03 AM
**To:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Cc:** William Kim (wkim@cityofflint.com) <wkim@cityofflint.com>; Gambill, Nathan (AG) <GambillN@michigan.gov>; Tallman, Sarah <stallman@nrdc.org>
**Subject:** RE: Concerned Pastors - final stipulation

You have my consent to sign assuming the city council approves the stipulation during tonight's meeting.

Richard S. Kuhl
Assistant Attorney General
Environment, Natural Resources,
and Agriculture Division

th

6    Floor, G. Mennen Williams Building
525 West Ottawa Street
P.O. Box 30755
Lansing, MI  48909

Office: (517) 335-0696
Mobile: (517)575-9343
Fax: (517) 373-1610
Email: kuhlr@michigan.gov



**From:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Sent:** Monday, February 28, 2022 11:47 AM
**To:** Kuhl, Richard (AG) <KuhlR@michigan.gov>
**Cc:** William Kim (wkim@cityofflint.com) <wkim@cityofflint.com>; Gambill, Nathan (AG) <GambillN@michigan.gov>; Tallman, Sarah <stallman@nrdc.org>
**Subject:** FW: Concerned Pastors - final stipulation

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Hi Richard,

Flint city council will be voting on the stipulation at tonight's meeting. If they vote to approve the stipulation tonight, Plaintiffs would like to file the stipulation with the court tomorrow. Can you please let us know if we have permission to file on your behalf? I've re-attached the stipulation here for your reference.

Thanks,
Jolie

JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

**From:** McLaughlin, Jolie
**Sent:** Wednesday, February 23, 2022 12:29 PM
**To:** William Kim <wkim@cityofflint.com>

**Cc:** Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; GambillN@michigan.gov
**Subject:** RE: Concerned Pastors - letter re: remaining scope of work & final stipulation

Hi Bill,

I'm attaching the revised final version of the stipulation here. This includes the edits we circulated yesterday, as well as a new paragraph at the end of the stipulation that identifies the dispute about the city's obligations with respect to homes with lead service lines that have not yet received a service line replacement.

Thanks,
Jolie

JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

---

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Wednesday, February 23, 2022 11:24 AM
**To:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Cc:** Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; GambillN@michigan.gov
**Subject:** Re: Concerned Pastors - letter re: remaining scope of work & final stipulation

Jolie,

Yes, a homeowner's presence is required, as has been the case since the beginning of this program. The replacement process requires access to the interior of a house.   That's a hard process requirement.

My understanding is  that generally numerous scheduling attempts are/have been made for those addresses, especially since our construction contractors are highly motivated to schedule replacements since that is the only way that they get paid.  The City has no realistic ability to force residents to participate or to cooperate with scheduling.

However, your proposed language works.  Can you incorporate that into a draft?  I'd like to share the draft stip with our City Council tonight when I brief them in closed session.

Bill

On Wed, Feb 23, 2022 at 12:07 PM McLaughlin, Jolie <jdmclaughlin@nrdc.org> wrote:

Hi Bill – To confirm, does a resident need to be home when the City conducts a service line replacement such that scheduling is necessary? And if so, what has been the City's practice to date (i.e., how many scheduling attempts has the City been making at these addresses)? Plaintiffs would like to discuss further what efforts are appropriate and reasonable to ensure that all known lead and galvanized steel service lines are replaced as the part of the program. For these homes, the City both knows that there is a lead line, the resident has already given consent to participate in the program, and the resident has already cooperated in terms of scheduling the excavation. For these outlier homes where there is lag between the excavation and replacement, additional efforts to schedule replacements are warranted.

At this point, to avoid further delay, we suggest adding the following sentence in the stipulation to give the parties time to further discuss a reasonable solution for the 100 or so addresses that appear to fall within this category: "There is a dispute between the City and Plaintiffs concerning the City's obligations to complete a service line replacement at homes where the resident has already given consent to participate in the program and an excavation has already identified a lead or galvanized steel service line. The parties will confer to attempt to resolve this dispute."

We're confident the parties will be able to reach an agreement on this issue, but it may take some time, and we think it's important to get the stipulation filed next week as planned.

Thanks,
Jolie

JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Tuesday, February 22, 2022 3:55 PM
**To:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Cc:** Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; GambillN@michigan.gov
**Subject:** Re: Concerned Pastors - letter re: remaining scope of work & final stipulation

The only question I have relates to your change to Paragraph 4(iv). If residents that have an identified lead/galvanized steel service line do not cooperate with scheduling replacements, what do you believe are the obligations of the City? Absent cooperation from the

homeowner/resident, I'm not sure what you expect the City to do.

On Tue, Feb 22, 2022 at 2:33 PM McLaughlin, Jolie <jdmclaughlin@nrdc.org> wrote:

Bill,

As discussed, I'm attaching a letter describing Plaintiffs' understanding of the remaining scope of work (excluding restoration) under the Settlement, with attached replacement eligible homes list in excel format. Please let us know if you have any questions about this letter.

I'm also attaching the final version of the stipulation. We made a couple of changes to paragraphs 3 and 4 since the last version we circulated, to clarify that Paragraph 4(iv) (regarding post-consent scheduling attempts) applies only if no excavation has been conducted, and not when an excavation has already identified a lead/galvanized steel service line that has not yet been replaced. For your reference, I'm attaching a redline so you can more easily see these changes.

Please let us know if there is anything else you need from us in order to put the stipulation before the City Council at tomorrow's meeting.

Thanks,
Jolie

JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

--
William Kim, Acting City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2079



--

William Kim, Acting City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2079



# Exhibit 17

| | |
|---|---|
| **From:** | Joseph Kuptz |
| **To:** | kuhlr@michigan.gov; Tallman, Sarah; bkitaba@aclumich.org; William Kim; krisztiang@michigan.gov; russelle@michigan.gov; Clyde Edwards; Rolnick, Addie |
| **Subject:** | Concerned Pastors, et al. v City of Flint, et al. re: Weekly Reporting 10/26/2022 |
| **Date:** | Wednesday, October 26, 2022 9:34:21 AM |
| **Attachments:** | 2022-10-19 Filter Verification.xlsx |

Please find attached the most recent weekly filter status verification report.

Additional information:

In the past week, the contractor and its subcontractors have completed the following service line replacement activities:

- 27 explorations
- 8 full service line replacements
- 3 partial service line replacements
- 38 total (explorations + full/partial replacements)

The contractor and its subcontractors anticipate scheduling 60 houses in the next week. Actual numbers depend on factors such as weather and homeowner/occupant availability and cooperation.

The contractor and its subcontractors currently have parts to complete approximately 200 replacements.

Outreach - in the past week, the contractor and its subcontractors completed 3rd attempts with respect to the list from the NRDC of properties requiring outreach. They have completed a total of 423 3rd attempts from that list.

Please let me know if you have any questions or concerns.

Thank-you.


Joe Kuptz


--
Joseph N. Kuptz, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2085

# Exhibit 18



# City of Flint

## Department of Law

---

TO:        Counsel of Record, *Concerned Pastors et al v Khouri et al*
FROM:      Joseph N. Kuptz, Assistant City Attorney
RE:        September-October Status Report
DATE:      October 28, 2022

The City submits this status report for the September 15, 2022 – October 14, 2022 timeframe:

| Paragraph Reference/Description | Report |
|---|---|
| ¶(i), (ii) – Excavation/SLR Activity (9/15/22 – 10/14/22) | Report pending. |
| ¶(iii) – Construction Invoices Rec'd (9/15/22 – 10/14/22) | $251,972.50 |
| ¶(iv) – Project Mgmt Invoices Rec'd (9/15/22 – 10/14/22) | $43,108.00 |
| ¶(v) – Outreach Activities | Report pending. |
| A list of all addresses where the resident/and or property owner has declined to have their service line excavated and/or replaced | Report pending. |
| All addresses where consent to excavate have been received: | Report pending. |
| Monthly materials reporting:<br><br>a. The number of replacements the City can conduct with its current materials inventory.<br><br>b. Updated information on the date(s), if any, when the City (including any of its construction contractors) is scheduled to receive additional service line replacement materials based on orders accepted by suppliers, including specific information about the exact parts (and quantities) the City is scheduled to receive.<br><br>c. A description of the City's . . . efforts to obtain additional required materials, including a list of any potential suppliers or fabricators the City . . . communicated with in the previous month and the results of those communications. This must include whether the City . . . secured any parts for delivery; the exact parts and quantities; and the expected delivery date. | a. **LGC has materials to complete approximately 250 to 300 replacements with its current materials inventory (depending on whether replacements are full or partial)**<br><br>b. **Upon signing its contract with the City, LGC placed an order for all materials necessary to complete replacements at 1,200 addresses. That supplier is shipping materials as they receive them to fulfill the order from LGC.**<br><br>c. **It is believed that the State has been working to** |



# City of Flint

## Department of Law

| Paragraph Reference/Description | Report |
|---|---|
| | **procure materials and can provide information on their efforts directly.** |

# Exhibit 19

Case 2:16-cv-10277-DML-SDD ECF No. 242-4, PageID.11358 Filed 11/01/22 Page 126 of 274



# FLINT  CITY OF FLINT, MICHIGAN

(/)

Menu

Home (https://www.cityofflint.com/) / City of Flint reaches 95%+ completion of lead service line replacement project

# City of Flint reaches 95%+ completion of lead service line replacement project

September 29, 2022

FLINT, Mich.— September 29, 2022

To date, the City of Flint has completed 27,428 water service line excavations, bringing the project above 95% completion. Service line checks and replacements are ongoing throughout the City of Flint and will continue through completion.

"This is great news and we're making great strides," Mayor Sheldon Neeley said. "I'm so happy to announce that we've reached 95% completion and we're moving forward beyond all of our challenges."

The City has faced a series of challenges, from ongoing supply chain issues caused by the global pandemic, to multiple delays by city council, to a bad contractor. Nevertheless, Mayor Neeley says, the work continues to ensure that every resident in the City of Flint has safe water service lines.

Mayor Neeley urges residents to **sign up** (https://www.cityofflint.com/wp-content/uploads/2022/07/Consent-Form-Notification-Letter-mlr-10.06.2020.pdf) to have their water service lines inspected and replaced.



*To date, the City of Flint has completed 27,428 water service line excavations, bringing the project above 95% completion. Service line checks and replacements are ongoing throughout the City of Flint and will continue through completion.*

"We are encouraging residents to respond to our requests for consent to excavate and replace their water service lines," Mayor Neeley said. "According to the settlement with NRDC/Concerned Pastors, we can move on from those locations after making a number of attempts to contact the residents. But we don't want to do that. We're being very thorough, and right now, we have more than 95% of excavations completed."

Mayor Neeley said that the City of Flint is working with state and federal funding partners to ensure that funds remain available for service line excavation and replacement.

"From the beginning of my administration, I've made it clear that this project is a top priority and the best strategy available for ensuring that our city has safe drinking water," Mayor Neeley said. "We've overcome enormous obstacles and we are in a good place to protect water quality for all Flint residents."

In addition to the lead service line replacement project, the City recently completed a secondary water delivery system, which the City of Flint is using right now in the aftermath of a massive water main failure on the Great Lakes Water Authority line.

"Under this administration, we were able to take this massive infrastructure project from start to finish, ensuring that today, the City of Flint has safe water during an ongoing water emergency in our region," Mayor Neeley said.

## Share on Social:

Facebook (https://www.facebook.com/sharer/sharer.php?u=https://www.cityofflint.com/city-of-flint-reaches-95-completion-of-lead-service-line-replacement-project/)

Twitter (http://twitter.com/share?text=City of Flint reaches 95%+ completion of lead service line replacement project&url=https://www.cityofflint.com/city-of-flint-reaches-95-completion-of-lead-service-line-replacement-project/)

LinkedIn (http://twitter.c reaches 95%+ replacement project&url=ht flint-reaches-9 line-replacem

PA-121



**ONLINE SERVICES**

Pay Water Bill
Pay Property Taxes
File Police Report
Search Properties
Income Tax Forms
Report Your Meter Read
All Online Services

1101 S.
Saginaw
Street
Flint, MI
48502

(810) 766-7015 (tel:(810)%20766-7015)

(https://www.instagram.com/cityofflint/?hl=en)

(https://www.facebook.com/CityofFlintMI)

(https://www.linkedin.com/company/city-of-flint/)

(https://www.google.com/maps/place/FLINT+CITY+HALL/@43.0105837,-83.6868427,17z/data=!3m1!4b1!4m5!3m4!1s0x8823821b224...83.6846541)

Copyright © 2022 City of Flint Michigan. All rights reserved.

PA-122

# Exhibit 20



# CITY OF FLINT

## Department of Public Works & Utilities

**Dr. Karen Weaver**
**Mayor**

**Robert Bincsik**
**Director**

March 25, 2019

Miss Linda Holst, Director
Miss Jennifer Wilson, Environmental Engineer
Water Division, Region 5
United States Environmental Protection Agency
Ralph Metcalfe Federal Building
77 West Jackson Boulevard (W-15J)                    <u>**Sent via Email**</u>
Chicago, Illinois 60604-3590

Dear Miss Holst and Miss Wilson:

Below is the City's response to the EPA action item regarding service line material update. As of March 25, 2019 there have been 20,963 service lines replaced or identified as copper. The City of Flint has approximately 28,400 active residential water accounts. We have approximately 7,437 lines left to identify or replace. If we assume 20% of the remaining 7,437 lines to be lead and need replacement we have approximately 1,487 lead service lines remaining in the system. We continue to work on phase V and are gearing up to get phase VI started in April so these numbers will continue to change as we get closer to completion of this project.

Sincerely,

*Robert Bincsik*

Robert Bincsik

CC: Eric Oswald, MDEQ
    Steve Branch, City Administrator
    Angela Wheeler, Chief Legal Officer
    Hughey Newsome, Chief Financial Officer

# Exhibit 21

# NRDC

August 19, 2022

VIA EMAIL

William Kim
City of Flint Department of Law
1101 S. Saginaw Street, Third Floor
Flint, MI 48502
wkim@cityofflint.com

City of Flint
ATTN: City Administrator Clyde Edwards
City Hall
1101 S. Saginaw Street, First Floor
Flint, MI 48502
cedwards@cityofflint.com

> Re:    Request for Meet and Confer and Notice of City of Flint's Noncompliance with
> Settlement Agreement in *Concerned Pastors for Social Action v. Khouri*, No. 16-
> 10277 (E.D. Mich.)

Dear Messrs. Kim and Edwards:

Pursuant to Paragraph 128 of the Settlement Agreement ("Settlement"), Plaintiffs request a meet and confer to discuss the City's noncompliance with the Settlement, as well as its plan for complying with the September 2022 deadline for completing the required service line excavation and replacement work.

Plaintiffs are extremely troubled by the City's failure to conduct any pipe excavation, replacement, or restoration work under the Settlement so far in 2022. Given there are more than 2,000 homes that still need their service lines excavated (and potentially replaced), Plaintiffs are concerned that the City will not meet the September 2022 deadline for completing excavations and replacements, which would violate the Settlement. Plaintiffs have already accommodated the City's requests to extend the deadline to complete work twice, extending the deadline by more than two and a half years. *See* ECF Nos. 217 ¶ 1, 237 ¶ 1. The City already missed its previous two deadlines to complete this work (January 1, 2020, and November 30, 2020). Another missed deadline is simply unacceptable. A central part of the parties' agreement in resolving this litigation was an enforceable commitment by the City to find and remove lead service lines expeditiously and on a clear schedule. The City has not upheld its part of the agreement.

As described below, the City also continues to repeatedly violate its Settlement obligations to provide Plaintiffs with timely responses to information requests and monthly status reports, and must promptly remedy those violations.

## I.     The City's Failure to Perform Work Under the Settlement

This past April, all parties agreed to extend the City's deadline for completing service line excavations and replacements to September 30, 2022. *See* ECF No. 237 ¶ 1. The City has less than two months to complete the required work, which includes completing excavations at nearly 2,000 homes, 1,400 of which have not had any outreach to date.

It is Plaintiffs' understanding that the City has not conducted *any* service line excavations or replacements in 2022. This is both mystifying and troubling. The parties spent nearly a year negotiating the September 2022 deadline for completing excavation and replacement work. These negotiations involved specifying the addresses at which work is still required, so that the City could evaluate how long it needed to finish the work. The City committed to meeting the September 2022 deadline, including through approval by City Council. However, it appears that the City has failed to make all reasonable efforts to fulfill that commitment. Indeed, although the City was aware of the precise scope of remaining work as early as February 2022, it did not issue a request for proposals from contractors until several months later, in June. *See* City of Flint, Request for Proposals (June 10, 2022), https://www.cityofflint.com/wp-content/uploads/P22-527-SLR-SLE-FINAL.pdf.

Plaintiffs have accommodated the City multiple times over the last two years when the City sought extensions of the service line replacement program deadline. Specifically, Plaintiffs agreed to extend the Settlement deadline due to the coronavirus (COVID-19) pandemic. *See* ECF No. 217. And most recently, Plaintiffs agreed to extend the deadline to give the City more time to complete the required work. *See* ECF No. 237. It is essential that the City completes the remaining work promptly, and within the deadline set by the parties this past Spring. Flint residents have been waiting far too long for the City to finish removing this potential source of contamination in their tap water.

The City's failure to perform any work this year also raises questions about the City's use of the Settlement funds. Plaintiffs request, pursuant to Paragraph 118 of the Settlement, an itemized breakdown of all service line excavation/replacement and administrative costs that the City has incurred this year.

## II.     The City Must Have a System for Processing Consent Forms

Plaintiffs have received reports that some residents are facing difficulties when trying to submit their consent forms. Specifically, some residents have gone to the Water Department and Mayor's office to submit their consent forms, only to be told by City staff in those offices that they did not know what the forms were or what to do with them.

The City is required to maintain a list of residents who have completed consent forms. ECF No. 217 ¶ 4. The City must have systems in place to comply with this requirement. *See* ECF No. 147-1 ¶ 36. This includes ensuring that City staff in the relevant departments (Water Department, Department of Public Works, City Hall, Mayor's office) know about the consent forms and are able to assist residents in submitting those forms. That residents are experiencing this problem is especially troubling given the City's consent form explicitly states that it may be

submitted in person to City Hall or mailed to the Department of Public Works. *See* City of Flint, Consent Form Notification Letter (dated Oct. 2020), https://www.cityofflint.com/wp-content/uploads/2022/07/Consent-Form-Notification-Letter-mlr-10.06.2020.pdf (last visited Aug. 19, 2022). The pipe replacement program has been ongoing for more than five years, and it is unacceptable that City does not have clear systems in place for tracking and processing these forms. Moreover, the City's failure to properly process consent form submissions raises questions about its ability to properly track and complete its obligations at homes where residents have provided consent. *See* ECF No. 237 ¶¶ 3-4 (describing obligation to complete excavation if resident provides consent, unless resident does not respond to required scheduling attempts). If the City cannot keep accurate records of which homes have provided consent, it will be impossible for the City to identify which homes still require scheduling attempts and excavations.

Please confirm in writing that either you or another City staff member has notified all relevant City staff (1) that residents may submit consent forms directly to the City to obtain a service line excavation/replacement, and (2) where to transmit these consent forms so that they will be included in the City's records and transmitted to the City's pipe replacement program manager. This written confirmation should include the names and positions of who this explanation was given to, and how this information was conveyed (e.g., verbally, by email, etc.).

In addition, please provide Plaintiffs with a list of all addresses where residents have completed a consent form- but where no excavation has been completed. *See* ECF No. 217 ¶ 4 (requiring the City to provide Plaintiffs with a list of completed consent forms within 7 days of a request for the list).

## III. The City's Failures to Timely Respond to Plaintiffs' Reasonable Information Requests

The Settlement requires the City to respond to Plaintiffs' reasonable information requests within 14 days. ECF No. 147-1 ¶ 118. However, the City in several instances has failed to timely respond to Plaintiffs' requests, or has responded only after Plaintiffs have sent multiple emails requesting the information. The City's delays impede the parties' attempts to proactively resolve disputes and address concerns relating to the Settlement's implementation.

For example, on July 19, 2022, Plaintiffs emailed the City requesting copies of the City's contract with Rowe Engineering and the bids the City received for the remaining excavation, replacement, and restoration work. The City timely provided its contract with Rowe; however, Plaintiffs still have not received the bids or contracts for the excavation, replacement, and restoration work, despite sending follow-up requests for this information on July 25 and August 4. *See* July 25, 2022 Em. fr. S. Tallman to W. Kim; Aug. 4, 2022 Em. fr. J. McLaughlin to W. Kim.

Plaintiffs also emailed the City on April 15, 2022, requesting the contract between the City and the Karegnondi Water Authority that governs the supply of 5% Genesee County Drain Commission water to Flint. *See* Apr. 15, 2022 Em. fr. A. Rolnick to W. Kim & R. Kuhl. The City never responded to this information request.

3

Plaintiffs also never received a response to their January 4, 2022, email request for information about the City's GetTheLeadOut website and email address. *See* Jan. 4, 2022 Em. fr. S. Tallman to W. Kim; Jan. 21, 2022 Email fr. A. Rolnick to W. Kim (email from Plaintiffs' asking again for this information). Plaintiffs requested this information to ensure that the City's website has up-to-date and accurate information for Flint residents about the service line replacement program and relevant City contacts.

The City's delays in responding to Plaintiffs' requests for information is unacceptable. The City must promptly respond to the above information requests, and must timely respond to Plaintiffs' information requests in the future.

## IV.   The City's Reporting Violations

Plaintiffs recently sent the City a letter detailing the City's failure to provide the reporting required under the Settlement and asking the City to promptly remedy its violations. *See* May 6, 2022 Ltr. fr. S. Tallman to W. Kim et al. The City responded by providing an updated status report on May 26, 2022. However, the City did not provide the status reports due at the end of June and July. In response to an email from Plaintiffs, the City stated that it did not provide a June status report because there was no reportable activity that month. But the City has not yet provided a reason for failing to submit its July status report.

As we stated in our August 4, 2022, email, we understand that the City has not performed any service line excavation, replacement, or restoration work this year. But the Settlement also requires the City to report updated financial information each month. *See* ECF No. 208 ¶ 6. If the City has spent (or approved for payment) any additional money for which it is seeking reimbursement from Settlement funds since May 2022 (when we last received this information from the City), that information should have been included in the July report. And the City must provide that information to Plaintiffs immediately.

The City's monthly reports must also include updated lists of homes with completed lawn restoration. However, the City has not provided Plaintiffs with a list of restored homes since July 14, 2021. As Plaintiffs stated in a recent email to the City, *see* Aug. 4, 2022 Em. fr. J. McLaughlin to W. Kim, if the City has completed lawn restoration at any homes that were not on the list provided by the City in July 2021, the City was required to report that information to Plaintiffs in a status report and must provide that data immediately. *See* ECF No. 217 ¶ 7. If the City's July 14, 2021 list accurately reflects all homes that have been restored to date, please confirm that in writing.

The City's reporting deficiencies have persisted for years. *E.g.*, ECF No. 155. As Plaintiffs have reiterated on numerous occasions, it is critical that Plaintiffs have timely and complete reports from the City on the status of the service line replacement program. Timely and accurate information about the City's completed lawn restorations is particularly important, so that the parties can reach an agreement on a reasonable deadline for completing the remaining lawn restoration work. *See* ECF No. 237 ¶ 6. The City's failure to provide Plaintiffs with

accurate restoration information will impede the parties' negotiations, and only cause further delays of work that is already overdue to Flint residents.

*************

Plaintiffs request a meet and confer with City officials, including the City Administrator and appropriate officials from the Department of Public Works and Rowe, to discuss the City's plan for complying with the September 2022 deadline. Plaintiffs' counsel will be in Flint on August 29 through August 31, and are available for an in-person meeting in the afternoon on Monday, August 29, or in the morning or afternoon on Tuesday, August 30.

Further, to aid resolution of the issues described in this letter, Plaintiffs request the following information from the City as soon as possible, and no later than August 26:

- An itemized breakdown of any Settlement funds spent so far in 2022;

- A written explanation of the City's system, if any, for processing completed consent forms turned in by residents to City staff;

- A written confirmation that you or another City staff member has communicated to all relevant City staff (1) that residents may submit consent forms directly to the City to obtain a service line excavation/replacement, and (2) where to transmit these consent forms so that they can be recorded in the City's records and transmitted to the City's pipe replacement program manager. This written confirmation should include the names and positions of who this explanation was given to and the method by which the information was communicated;

- A list of all addresses where residents have completed consent forms but have not yet had their service lines excavated;

- The bid(s) and/or awarded contract(s) for the remaining service line excavation and replacement work;

- Answers to the following questions about the City's website and email address: (1) who is currently managing and responding to messages left on (810) 410-1133 (the number listed on the City's GetTheLeadOut page); (2) is (810) 766-7343, ext. 2 the correct number residents should be calling for restoration inquiries; (3) confirm that the GetTheLeadOut@cityofflint.com email account is being checked on a regular basis, and if so, the frequency with which it is being checked/messages responded to; (4) confirmation that the City has updated its website regarding consent forms to make sure that the information is up to date; and

- The City's July 2022 status report, if there is any reportable activity, including financial activity or completed restorations that were not included in the City's July

5

14, 2021 restoration list, or, if there is no reportable information, confirmation in writing that there is nothing to report.

Sincerely,

Sarah C. Tallman

cc (via email):    Jolie McLaughlin, jdmclaughlin@nrdc.org
Addie Rolnick, arolnick@nrdc.org
Bonsitu Kitaba, bkitaba@aclumich.org
Daniel Korobkin, dkorobkin@aclumich.org
Richard Kuhl, kuhlr@michigan.gov
Nate Gambill, gambilln@michigan.gov
George Krisztian, krisztiang@michigan.gov

PA-131

# Exhibit 22

# NRDC

May 4, 2021

VIA EMAIL

Angela Wheeler
William Kim
City of Flint Department of Law
1101 S. Saginaw Street, Third Floor
Flint, MI 48502
awheeler@cityofflint.com
wkim@cityofflint.com

City of Flint
ATTN: City Administrator Clyde Edwards
City Hall
1101 S. Saginaw Street, First Floor
Flint, MI 48502
cedwards@cityofflint.com

> Re:   Notice of City of Flint's Violations of Settlement Agreement and Court Order and Request for Information Showing Compliance, *Concerned Pastors for Social Action v. Khouri*, No. 16-10277 (E.D. Mich.)

Ms. Wheeler, Mr. Kim, and Mr. Edwards:

Pursuant to Paragraph 128 of the Settlement Agreement, Plaintiffs provide notice of the City's noncompliance with the Court's October 13, 2020 Order, ECF No. 228, and with the Settlement, ECF No. 147-1 (Agmt.), as modified in July 2018, February 2019, and August 2020. *See* ECF Nos. 174, 207, 208, 217.

The City was required to complete all in-person outreach by October 20, 2020, and to complete all remaining excavation work by November 30, 2020. *See* ECF No. 228 at 15-16. The City failed to meet both of those deadlines, and still has not completed the required outreach and excavation work. The City is also persistently failing to comply with its obligations to submit weekly reports of its outreach efforts and monthly reports of its excavation, replacement, and restoration activity, and to timely respond to Plaintiffs' reasonable requests for information related to Settlement implementation. These reporting failures are hindering the parties' ability to set new deadlines under the Settlement: Plaintiffs cannot assess how much time is needed for the

City to complete the required outreach, excavation, replacement, and restoration work without a clear understanding of the remaining scope of work.

Plaintiffs have attempted to resolve these issues with the City since December, and we would prefer to work with the City to agree to reasonable modifications to the remaining Settlement deadlines without having to seek the Court's adjudication of this issue. However, for Plaintiffs to continue these negotiations, the City must promptly remedy the violations of the Settlement described below.

## A.    Outreach Obligations

The Settlement requires the City to visit every home twice to try to obtain the resident's consent to conduct a service line excavation. ECF No. 174 ¶ 15.a. One of those outreach visits must occur after 5:00 pm or on a weekend. *Id.* The Court ordered the City to complete the required in-person outreach at all homes by October 20, 2020. *See* ECF No. 228 at 15-16. The Court also ordered the City to report weekly to Plaintiffs the dates of any in-person outreach, including the result of the outreach attempt. *Id.* These outreach requirements reflect the parties' agreement as to the appropriate minimum contact attempts required to ensure each resident has meaningful notice of their ability to participate in the pipe replacement program. The City has been in violation of the Court-ordered outreach deadline for six months, and has repeatedly violated the Court's order to provide Plaintiffs with weekly outreach reports.

### 1.    Failure to meet the Court-ordered outreach deadline

The City has not yet completed the required outreach to obtain residents' consent to excavate their service lines, and remains in violation of the Court's October 20, 2020 deadline. There is no excuse for the City's failure to prioritize completing this required outreach. Over the past several months, Plaintiffs have repeatedly provided the City with the list of addresses still missing required outreach. While the City has repeatedly assured Plaintiffs that it would complete outreach at those homes—and most recently represented to Plaintiffs that the outreach had been completed—Plaintiffs' analysis of the City's data shows that there are still more than 400 homes that have not received the required outreach. *See* Email from J. McLaughlin to W. Kim & A. Wheeler (Feb. 26, 2021) (attaching spreadsheeted titled "2.26.21 List of homes with outstanding outreach obligations.xlsx").

The City's ongoing delays in completing the remaining outreach are preventing the parties from agreeing to a new deadline for residents to submit consent forms. As Plaintiffs and the City have discussed and consistent with the Court's October 13, 2020 order, the City must complete this outreach as soon as possible, and must provide documentation that it has completed the required outreach before imposing a deadline for consent forms. *See* ECF No. 228

PA-134

at 15-16. Please complete the required outreach by no later than May 18 and provide documentation showing that the City has completed this work no later than May 25. *See infra* Part A.3 for Plaintiffs' request concerning the format of this documentation.

### 2.      Failure to provide weekly reports on outreach efforts

Despite the Court's order requiring the City to provide Plaintiffs with weekly outreach data, since the end of October 2020, the City has provided outreach data only on November 25, December 9, and December 14, 2020, and April 7, 2021. Although we understand that work was paused during some of this time, the City's routine failure to provide data weekly, especially since restarting work this spring, is unacceptable. Plaintiffs have repeatedly raised these issues with the City, including through countless emails and by filing two motions to enforce the Settlement with the Court. *See* Pls.' First Mot. to Enforce Settlement, ECF No. 155; Pls.' Fourth Mot. to Enforce Settlement, ECF No. 218.

By May 11, please (1) provide any outstanding data on outreach, (2) confirm the City will provide this data weekly going forward, and (3) identify what day of the week the City will submit its future weekly reports.

### 3.      Failure to respond to Plaintiffs' reasonable requests for documentation concerning outstanding outreach

The Settlement requires the City to respond to Plaintiffs' reasonable requests for "information, documents, or records related to implementation of this Agreement" within fourteen days of the request. Agmt. ¶ 118. Since the City failed to complete the required outreach by the Court-ordered deadline, Plaintiffs have repeatedly asked the City for documentation of its outreach attempts at certain homes identified by Plaintiffs as still requiring additional outreach. The City has failed provide the requested documentation.

Plaintiffs shared spreadsheets via email on January 6, February 3, and February 26 listing over 400 addresses at which Plaintiffs' analysis shows that outreach is still needed. With this Notice of Violation, Plaintiffs are providing an updated version of this list, which contains 441 homes. Plaintiffs have done so in an effort to reach an understanding with the City about whether the City has completed the required outreach and thus is permitted to set a consent-form deadline. During a call on February 26, the City explained that it would provide Plaintiffs with updated data that might show that the City had conducted additional outreach at these homes. More than a month later, on April 1, the City shared a spreadsheet titled "2020-03-31 Outstanding work orders.xlsx," purportedly listing all homes that have not yet received an excavation or replacement. On April 7, the City asserted that it had completed the required outreach at all homes and shared a spreadsheet listing recent outreach attempts at 36 homes. The

vast majority of addresses Plaintiffs had identified as needing outreach were not listed on either spreadsheet the City provided in April. Plaintiffs' analysis continues to show more than 400 homes with outstanding required outreach.

In light of the City's April 1 email proposing a May 7, 2021 consent-form deadline, Plaintiffs emailed the City on April 12 requesting again that the City explain this discrepancy between Plaintiffs' and the City's analyses of the outstanding outreach work. To date, the City has not responded to Plaintiffs' April 12 email. Pursuant to Paragraph 118, please provide an explanation of this discrepancy and/or documentation of outreach at the homes listed on the enclosed spreadsheet titled "5.3.21 List of homes with outstanding outreach obligations.xlsx" no later than May 25. Please ensure that the documentation the City provides includes a spreadsheet with rows listing each of these 441 homes, and for each home, the dates of outreach attempts made and an indication of whether consent has been obtained.

### B.      Excavation Obligations

The Court's August 24, 2020 Order modifying the Settlement required the City to complete all excavations by November 30, 2020. ECF No. 217 ¶ 1. In addition, this Order requires the City to share monthly reports of its excavation efforts. *Id.* ¶ 7. The City has violated both of these requirements for months.

### 1.      Failure to complete required excavations

The City does not dispute that it missed the Court-ordered deadline to complete all excavation work: As the City shared via email on April 1, 2021, it believes that at least 689 homes still require excavation.[1] To address this noncompliance, Plaintiffs remain willing to renegotiate new deadlines with the City that give the City sufficient time to finish the outstanding work. However, we have been unable respond to the City's proposed modified deadlines because the City's ongoing reporting violations described in this letter leave the amount of remaining work unclear.

---

[1] The City may deem an address "complete" for purposes of the Settlement if it completes an excavation at that address, if it completes the required in-person consent attempts and receives no response from the resident, or if it completes the required post-consent scheduling attempts and receives no response from the resident. ECF No. 217 ¶¶ 4 (excavation), 7 (consent attempts), 6 (scheduling attempts).

### 2.     Failure to provide monthly reports on excavation efforts

The City is also violating the Settlement's monthly reporting obligations. The City must provide monthly updated lists on the 28th of each month of (i) addresses where the City has completed excavations and replacements, (ii) addresses where residents have declined service line excavations and replacements, and (iii) addresses where the City was unable to obtain permission to conduct an excavation despite undertaking all required outreach. ECF No. 208 ¶ 6; ECF No. 217 ¶ 7. Despite the Court's October 2020 Order reiterating the City's reporting obligations, the City continues to fail to consistently provide this data on the required timeline. By May 11, please provide any outstanding data on excavation and replacement, including required lists of homes where residents have declined an excavation (declination list) or failed to respond to the City's outreach efforts (non-response list).

### C.     Restoration Obligations

The 2020 Stipulation requires the City to provide documentation of restoration on the 28th day of each month. ECF No. 217 ¶ 7.iii. As we have repeatedly informed the City—via email on January 6, February 26, and March 17, and during our February 26 call—the City is continuing to violate this requirement. The City has never provided monthly restoration data, instead providing documentation of restoration work only twice, via emails on December 11, 2020, and January 8, 2021. The documentation contains lists of addresses where restoration was completed during a "phase" of the City's work. *See*, *e.g.*, Email from W. Kim to S. Tallman (Dec. 11, 2020) (attaching spreadsheet titled "Phase 5 & 6 Restoration Complete.xlsx").

Based on the limited restoration data the City has provided, it appears that there is a significant number—over 8,000—of already-excavated addresses with restoration work outstanding. *See* Email from J. McLaughlin to W. Kim and A. Wheeler (Feb. 26, 2021) (attaching spreadsheet titled "2.26.21 List of homes with outstanding restoration obligations.xlsx").[2] Despite Plaintiffs' repeated requests for the City to confirm the scope of the remaining restoration work, the City has failed to confirm whether there are in fact 8,000 addresses that still need to be restored, or alternatively, whether it has not-yet-disclosed data showing completed restoration work at some or all of these 8,000 addresses. Indeed, the data the City has provided does not appear to cover all phases of the City's pipe replacement program. During a call on February 26, the City suggested that the Department of Transportation may have

---

[2] In the event that Plaintiffs identify some homes on the restoration lists the City provided that have not been properly or fully restored, additional restoration work may be required to fulfill the City's restoration obligations. This potential additional work would also affect Plaintiffs' willingness to agree to a modified deadline for completion of restoration work.

PA-137

some additional restoration data, and that the City would work with that department to share that data with Plaintiffs. Plaintiffs have not received any updated restoration data since January 8, 2021.

Because Plaintiffs do not know how much restoration work still needs to be completed, we cannot assess whether the City's proposed modified deadline to complete all restoration—September 30—is reasonable. Prompt sharing of this data is thus critical to facilitate the parties' agreement to new modifications to the Settlement's remaining deadlines. Resolving the possible restoration discrepancies will also help avoid future disputes as to whether the City has completed its obligations relating to the service line replacement program. *See* Agmt. ¶ 45.

By May 11, please (1) confirm that going forward the City will comply with its obligation to provide updated restoration data with its monthly status reports; (2) describe how the City tracks and maintains data on restoration, including what entities within the City or ROWE are responsible for keeping these records; and (3) provide any restoration data not previously shared with Plaintiffs, including by working with City departments, such as the Department of Transportation, to identify and compile the required data. Unless the City provides documentation demonstrating completed restoration at the 8,000 homes on the list Plaintiffs shared on February 26, Plaintiffs will consider the City's restoration obligations as to these homes incomplete.

Plaintiffs are available to meet and confer with the City to discuss these matters on Tuesday, May 11: 12-1pm or 4-5pm ET; Thursday, May 13: 12-1pm or 3-4pm ET; or Friday, May 14: 10am-2pm or 3-4pm ET. Please let us know if the City is available at any of these times.

Sincerely,

Sarah C. Tallman

Encl. ("5.3.21 List of addresses with outstanding outreach obligations.xlsx")

cc (via email):     Jolie McLaughlin, jdmclaughlin@nrdc.org; Addie Rolnick,
                    arolnick@nrdc.org; Bonsitu Kitaba, bkitaba@aclumich.org;
                    Richard Kuhl, kuhlr@michigan.gov; Nate Gambill, gambilln@michigan.gov;
                    George Krisztian, krisztiang@michigan.gov

6

PA-138

Exhibit 23

# NRDC

October 4, 2022

VIA EMAIL

William Kim
City of Flint Department of Law
1101 S. Saginaw Street, Third Floor
Flint, MI 48502
wkim@cityofflint.com

City of Flint
ATTN: City Administrator Clyde Edwards
City Hall
1101 S. Saginaw Street, First Floor
Flint, MI 48502
cedwards@cityofflint.com

> Re:   Notice of City of Flint's Noncompliance with Settlement Agreement and Dispute Concerning Restoration Obligations in *Concerned Pastors for Social Action v. Khouri*, No. 16-10277 (E.D. Mich.)

Dear Messrs. Kim and Edwards:

Pursuant to Paragraph 128 of the Settlement Agreement ("Settlement"), Plaintiffs provide notice of the City's noncompliance with certain obligations under the Settlement, as modified. *See* ECF Nos. 147-1, 174, 207, 208, 217, 237 ("2022 Stipulation"). The City did not complete all required excavations and service line replacements by the Court-ordered deadline of September 30, 2022 and is not meeting its obligations to maintain and share records of completed restorations. Plaintiffs also provide notice of a dispute concerning the identification of a deadline for the City to complete all required restoration work. *See* ECF No. 237 ¶ 6.

Plaintiffs are eager to promptly resolve these issues to ensure the City replaces the remaining lead service lines in Flint and restores all excavated properties as quickly as possible. Plaintiffs welcome the State's participation and contributions to the parties' efforts to expeditiously resolve these issues. If the parties are unable to promptly resolve the issues described below, Plaintiffs intend to seek relief from the Court.

## I.     The City missed the deadline to complete all excavations and replacements

The 2022 Stipulation required the City to complete all remaining excavations and replacements required by the Settlement by September 30, 2022. ECF No. 237 ¶ 1. The City did not meet this deadline.

The September 30 deadline was agreed to by all parties following more than a year of negotiations and after the deadline had already been extended twice previously. As early as

February 2022—before agreeing to the deadline and submitting it to the Court for approval—the parties specified the addresses at which excavation and replacement work was still required to ensure the parties shared an understanding of the scope of remaining required work. The City relied on this information to evaluate how long it would take to complete that work and identify a deadline it could commit to meeting. The City told the Court it could meet that deadline in April 2022.

At this stage, additional oversight and reporting is required to ensure the City finishes the remaining excavation and replacement work without further delay. Plaintiffs propose the following minimum measures to assure accountability and progress towards interim milestones. Plaintiffs may identify additional measures needed to fully resolve this dispute based on further discussion with the parties as they work to resolve these issues.

1. **Monthly reporting on materials inventory and sourcing:** Beginning with its October status report, the City must provide information monthly on its current inventory of materials needed for service line replacements. These submissions must include how many replacements it can conduct with the available materials and updated information about the City's efforts to procure additional materials.

2. **Project Plan:** The parties must agree on a detailed plan and schedule for completing the remaining excavation and replacement work required by the Settlement ("Project Plan").

    a. **Procedure for Creating a Plan:** The City must immediately create and provide a proposed plan to the other parties for review. The parties will then promptly meet and confer to discuss the adequacy of the City's proposal. All parties must agree that the Plan is adequate and sufficiently detailed to ensure prompt completion of the remaining work.

    b. **Contents of the Project Plan:**
        i. **Minimum rate of excavations:** The Project Plan must provide for the City to complete a minimum number of excavations every two weeks.

        ii. **Deadline for completing outreach:** There is no reason for further delays in the City's completion of the required outreach, and the City must demonstrate immediate progress on its outreach over the next week. The City must complete the required outreach to all homes on the 2022 Replacement Eligible Homes List by December 1, 2022. *See* ECF No. 237 ¶ 4.i. By December 15, 2022, the City must provide Plaintiffs with the documentation described in Paragraph 3.c of the 2022 Stipulation.

        iii. **Procedures for weather-related work stoppages:** The Project Plan must provide for the City to continue performing excavations and replacements in 2022 until weather conditions prevent further work, and to notify Plaintiffs within three business days once it determines that it must cease excavation and replacement work for the winter. It must also provide for the City to submit regular updates to Plaintiffs regarding when it expects

that weather conditions will allow it to resume replacement and excavation work. Finally, the Plan must provide for the City to begin performing excavations and replacements within two weeks of when weather conditions allow the City to resume that work.

iv. **Discussion with Lakeshore concerning outreach protocols and script.** The City must promptly coordinate an opportunity for interested Plaintiff representatives and other stakeholders to meet with Lakeshore to discuss Lakeshore's approach to resident outreach.

## II.    **The City has not met its obligations to maintain and disclose restoration records**

The Settlement requires the City to restore the property each address where it conducts an excavation. *See* ECF No. 217 ¶ 1. A completed restoration requires the City to leave the public and private property at that address in the same or better condition as before the service line at that address was excavated and/or replaced. For example, the City must fill the excavation trench; place topsoil, fertilizer, and seeding; and leave the topsoil free of undesirable materials such as plants, weeds, roots, stalks, stones, and other debris. *See* Contract between City of Flint and Lakeshore Global Corp. (Aug. 16, 2022), Suppl. Conditions §§ 31-23-33, 32-90-10.

Correspondingly, the Settlement requires the City to maintain and share records of completed restoration. The City agreed to provide, with each monthly report, "an updated list of all homes where restoration has been completed." ECF No. 217 ¶ 7.iii. When the City completes all required restoration work, it must provide the parties with an Excel spreadsheet listing all addresses where restoration has been completed and a description of the sources used to create that spreadsheet. ECF No. 237 ¶ 7. The Settlement further requires the City to "maintain records sufficient to comply with the reporting and disclosure requirements under th[e] Agreement." ECF No. 147-1 ¶ 36. And, when Plaintiffs reasonably request information related to the Settlement's implementation, the City must provide that information within 14 days. *Id*. ¶ 118.

The City is not complying with these provisions.

### A.    **Lapses in monthly reporting**

The City is not disclosing monthly updated lists of restored addresses. The City last provided Plaintiffs with a list of restored homes on July 14, 2021. To the extent any restoration has occurred in the last 14 months, the City has not provided an updated list with those restored addresses, as required. Moreover, the list the City has provided is inaccurate and underinclusive. In the parties' meet and confer on August 29, 2022, the City stated that it possessed additional restoration records not previously shared with Plaintiffs. These include records from EGLE indicating certain addresses where EGLE reimbursed the City for restoration work and records from ROWE analyzing those EGLE records. To comply with its reporting obligations, the City must provide an updated list of all addresses where restoration has been completed based on these additional records. Additionally, going forward, the City must provide an updated restoration list monthly. *See* ECF No. 217 ¶ 7.iii.

B.      **Failure to respond to information requests**

The City has not timely responded to Plaintiffs' reasonable requests for the City's additional records of completed restorations (the EGLE and ROWE records described above). Plaintiffs have requested those records via email four times. Sept. 1, 2022 Em. fr. A. Rolnick to W. Kim; Sept. 14, 2022 Em. fr. A. Rolnick to W. Kim; Sept. 19 Em. fr. A. Rolnick to W. Kim; Sept. 21 Em. fr. A. Rolnick to W. Kim. The City has not provided these records or a timeline for doing so. To comply with the Settlement, the City must promptly provide all restoration records.

C.      **Failure to maintain restoration records**

Most fundamentally, the City has not maintained records of every address at which it has completed a restoration. On August 30, 2022, and again on September 19, 2022, the City acknowledged that it does not have records of all addresses at which it previously conducted restoration, and that, as a result, the City does not currently know how many previously excavated homes still require restoration under the Settlement. These recordkeeping gaps constitute noncompliance with the Settlement's basic requirement that the City track addresses where it completes restoration.

Without such documentation, the parties have no way of assessing the scope of remaining required restoration work. The City's failure to maintain and report accurate restoration information is also impeding the parties' negotiations to identify a reasonable deadline for completing the remaining restoration work. *See* ECF No. 237 ¶ 6. This noncompliance has generated three challenges that must be promptly resolved.

First, the parties must agree on a plan and timeline to identify how many addresses remain to be restored. The City has stated that it needs more time to evaluate the remaining scope of restoration work. This evaluation must be done as quickly as practicable.

Second, under the 2022 Stipulation, the parties must agree on a deadline by which the City must complete the remaining restoration work. During the parties' meet and confer, Mr. Kim suggested that December 31, 2023, may be a conservative estimate for when the City could complete all restoration. While Plaintiffs remain willing to agree to a restoration deadline that is reasonable and workable, the deadline must be tailored to a reasonable estimate of the amount of work remaining—an estimate the City has not yet generated.

Third, the parties must agree on a process for retroactively filling in the City's restoration recordkeeping gaps. The City stated that it intends to conduct visual inspections of as many as 20,000 previously excavated homes to confirm whether restoration was completed at those addresses at any point in the last several years. In effect, the City is proposing that in lieu of maintaining a contemporaneous record of completed restoration at every address, it will retroactively "deem" some addresses restored if a visual inspection reveals that restoration has been completed—whether by the City, the resident, or someone else. The parties must agree to the scope of this exemption, the criteria for visual inspection, and a process for notifying residents of the City's determination.

Plaintiffs propose the following process for reaching agreement on these three issues. Plaintiffs may identify additional measures needed to fully resolve this dispute concerning restoration based on further discussion among the parties.

1. **Reporting on scope of restoration work:** Within the next week, the City must update the parties with a list of addresses where it has already conducted a visual inspection and the result of such inspection. Beginning with its October monthly status report, the City must include information on its efforts to determine the scope of remaining restoration work required by the Settlement, including information about the homes where the City confirmed by visual inspection that an address has been previously restored.

2. **Restoration Plan:** The parties must agree on a detailed plan and schedule for identifying the scope of remaining restoration work and completing that work.

   a. **Procedure for Creating a Plan:** The City must immediately create and provide a proposed plan to the other Parties for review. The parties will then promptly meet and confer to discuss the City's proposal. All parties must agree that the Restoration Plan is adequate and sufficiently detailed to ensure prompt identification of the scope of remaining restoration work and completion of that work.

   b. **Contents of the Restoration Plan:**

      i. **Determining the scope of remaining restoration work:** As explained in Plaintiffs' September 21, 2022 email, the City must share a proposal for evaluating the scope of remaining restoration work, including the City's schedule for visually confirming whether addresses still require restoration, and for how to proceed in light of the Parties' upcoming October 31, 2022 deadline to negotiate a restoration deadline.

      ii. **Basis for deeming a home restored and communicating that determination to residents:** As discussed during the parties' September 19, 2022 meeting, the City must propose criteria for determining, based on visual inspection, that a previously excavated address with no record of prior full restoration no longer requires restoration. The City must also propose processes for communicating to residents the results of ROWE's visual inspection and resolving any disputes concerning the City's determination about whether additional restoration is needed.

      iii. **Proposal for completing restoration work:** The proposed Restoration Plan must also include a detailed proposed schedule for completing the remaining restoration work.

### III.     Additional outstanding information requests

In their August 19, 2022 letter, Plaintiffs made a number of requests for written information related to the implementation of the Settlement. While the City answered some of these questions orally during the parties' meeting on August 30, 2022, it has not provided any answers in writing, as required by the Settlement. *See* ECF No. 147-1 ¶ 118. Please provide written answers to the questions in the second, third, and sixth bullets in the August 19 letter as soon as possible.

*     *     *

Plaintiffs have separately reached out to counsel for the City and State concerning scheduling a meet and confer in person in Flint the week of October 10. Plaintiffs request that the City Administrator, Mayor Neeley, and appropriate officials from the Department of Public Works and ROWE attend this meeting. Plaintiffs also request that a representative from Lakeshore Global Services attend this meeting; as the contractor performing the remaining excavation, replacement, and restoration work, Lakeshore's perspective and input is critical to resolving the parties' disputes.

Thank you for your prompt attention to these issues.

Sincerely,

Adeline S. Rolnick

cc (via email):     Sarah Tallman, stallman@nrdc.org; Melanie Calero, mcalero@nrdc.org, Bonsitu Kitaba, bkitaba@aclumich.org; Daniel Korobkin, dkorobkin@aclumich.org; Richard Kuhl, kuhlr@michigan.gov; Nate Gambill, gambilln@michigan.gov; George Krisztian, krisztiang@michigan.gov

# Exhibit 24

| | |
|---|---|
| **From:** | Rolnick, Addie |
| **To:** | William Kim |
| **Cc:** | Tallman, Sarah; Calero, Melanie; Vandal, Nicole; Kuhl, Richard (AG); Bonsitu Kitaba |
| **Subject:** | Concerned Pastors v. Khouri - follow-up items from 9/19 call |
| **Date:** | Wednesday, September 21, 2022 5:50:00 PM |

Bill,

Thank you for the productive call on Monday. We appreciate the City making its representatives and a Rowe representative available to discuss the City's implementation of the work required under the 2022 Stipulation. ECF 237. To further aid Plaintiffs' understanding of the Phase VII of the service line replacement work and move forward the Parties' discussion of a reasonable restoration deadline, please provide the following information by Wednesday, October 5. *See* ECF 147-1 ¶ 118.

1.  **Confirm status of materials shortages:** On Monday, the City shared with Plaintiffs that the City currently has enough connectors and fittings to complete 50 service line replacements, and that it does not currently know when it will be able to obtain additional connectors and fittings. The City's representatives also stated that the City's suppliers for brass connectors and fittings currently estimate that it will take between 20 and 40 weeks to fulfill further orders for these parts, and that suppliers have been experiencing these delays for at least the past six months. Please confirm that this information is up-to-date, or if City has received any further or refined estimates for when it will receive additional parts. Please also confirm the exact parts (fittings, connectors, valves, or otherwise) that the City is facing delays in sourcing, either by reference to the parts list on PDF pages 567 to 571 of the Phase VII Lakeshore Global contract the City provided on August 19, 2022, or by providing copies of the relevant purchasing order or other communication with the sourcing agent identifying the relevant parts.

2.  **Provide construction schedules:** Based on the information ROWE shared on Monday, Plaintiffs understand that Lakeshore is providing information on its weekly planned schedule for excavation and replacement work. Plaintiffs and their community partners are working on targeted outreach to facilitate maximum participation in this phase of the program, and it will be helpful to have a real-time understanding of the blocks and areas where Lakeshore is working. Per Paragraph 8 of the 2019 Stipulation, please provide Lakeshore's schedule every other week to Plaintiffs. *See* ECF 208 ¶ 8. If Wednesdays are no longer the best day for these submittals, please let us know the day of the week that works best for the City and ROWE.

3.  **Availability of restoration records:** Based on Monday's discussion, Plaintiffs understand that the City does not have records of all addresses at which it previously conducted restoration, and that, as a result, the City does not currently know how many previously excavated homes still require restoration under the Agreement. On our call on Monday, the City said it needed more time to evaluate the remaining scope of work (and thus how long such work will take). Please let us know how long the City needs to evaluate that question and provide a proposal for how to proceed in light of the Parties' upcoming October 31 deadline to negotiate a restoration deadline. Plaintiffs would like to identify a date that is reasonable and workable for the City, but that deadline must be tailored to the amount of work remaining.

4.  **Share proposal for visually confirming that restoration has been completed:** During Monday's meeting, the City agreed to provide a proposal concerning (i) the City's criteria for determining, based on visual inspection, that a previously excavated address with no record of prior full restoration no longer requires restoration, and (ii) the City's process for communicating to residents the results of ROWE's visual inspection concerning the status of restoration at their address.

5.  **Provide all restoration records:** As Plaintiffs explained in their August 19, 2022 letter, the City has not provided Plaintiffs with a list of restored homes since July 14, 2021. Based on the City's statements on August 30 and September 19, the restoration records previously shared

with Plaintiffs do not reflect all addresses for which the City has a record of completed restoration. In particular, the City stated that it has records of addresses at which EGLE has reimbursed the City for restoration work and that ROWE has used the EGLE records to identify homes that may have been restored. Plaintiffs have requested the City's additional restoration records, including records maintained by ROWE and EGLE, by email three times over the last three weeks. *See* Sept. 1, 2022 Em. fr. A. Rolnick to W. Kim; Sept. 14, 2022 Em. fr. A. Rolnick to W. Kim; Sept. 19 Em. fr. A. Rolnick to W. Kim. The City has not yet provided these records. Please share these records as soon as possible, so that the Parties may begin to reach a shared understanding of the remaining scope of the restoration work required by the Agreement.

If you have any questions concerning these information requests, please let us know.

Regards,

Addie

ADELINE ROLNICK
*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

# Exhibit 25

| From: | Rolnick, Addie |
|---|---|
| To: | William Kim |
| Cc: | Tallman, Sarah; Vandal, Nicole; Kuhl, Richard (AG); Calero, Melanie; Bonsitu Kitaba |
| Subject: | RE: Concerned Pastors for Social Action v. Khouri - Paragraph 128 Letter/Request for Meet and Confer |
| Date: | Monday, September 19, 2022 9:28:21 AM |

Bill,

Below is a proposed agenda for the meeting this afternoon. Please let us know if the City has any additions.

1. **Phase VII of the service line replacement program**
   a. Plaintiffs understand that Lakeshore may have begun excavations on September 14. Were these the first excavations performed by Lakeshore? How many excavations has Lakeshore performed? Did any of these excavations result in a replacement?
   b. Has Lakeshore begun consent attempts?
   c. Has Lakeshore begun restoration?
   d. How many crews are currently working?
   e. Does Lakeshore plan to hire additional crews? If so, what efforts are being made to pursue that additional labor?
   f. What information has Lakeshore shared about when it can complete the work?
   g. What is the status of the materials shortage the City identified? What are the specific materials the City is having difficulty obtaining? What is the City's timeline for obtaining these materials? What efforts is the City making to obtain these materials?
   h. In our meeting on August 30, the City Administrator stated that the City was open to receiving additional State assistance, and EGLE stated that if the City were to request assistance, the State may be able to make additional resources available to the City to help finish the remaining pipe replacement work. Has the City made a request to the State for additional materials, crews, or any other assistance?

2. **Funding**
   a. What is the status of the City's request to EPA for an extension of the deadline to spend remaining WIIN Act funding?
   b. What information was EPA missing? Has the City provided EPA with all requested information?

3. **Restoration**
   a. Does the City still believe that approximately 8,500 previously excavated homes require restoration?
   b. When does the City plan to begin restoration of previously excavated addresses?
   c. In the City's view, what is a reasonable deadline for restoration given the remaining work required? Will this work be completed by December 31, 2022?
   d. Specifics of the restoration process
      i. How long does it take to restore a single address?
      ii. About how many addresses could Lakeshore restore in a day? In a week?
      iii. Does Lakeshore have crews working on restoration full time?
      iv. How many crews will be required to finish the remaining restoration work?
   e. Discussion of City's process for communicating to residents at previously excavated addresses the results of ROWE's visual inspection concerning the status of restoration.

4. **Other issues**
   a. At the Parties' August 30 meeting, the City stated that it would confirm whether there are any outstanding invoices from contractors who performed work required by the Agreement. Are there any outstanding invoices or requests for payment?

Finally, please either provide the list of 8,500 previously excavated addresses Rowe has identified as still requiring restoration, along with any additional records of restoration the City has not previously

provided to Plaintiffs, or provide a timeline for doing so. As you know, now that the City has executed its last contract for remaining restoration work, the Parties are required to submit a restoration deadline to the Court by Monday, October 31. It is essential that the City share all available restoration data as quickly as possible so that the Parties may productively negotiate towards an agreement by this deadline.

Regards,

Addie


**ADELINE ROLNICK**
*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

---

**From:** Rolnick, Addie
**Sent:** Friday, September 16, 2022 4:18 PM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** Tallman, Sarah <stallman@nrdc.org>; Vandal, Nicole <nvandal@nrdc.org>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; Calero, Melanie <mcalero@nrdc.org>
**Subject:** RE: Concerned Pastors for Social Action v. Khouri - Paragraph 128 Letter/Request for Meet and Confer

Bill,

We're confirmed for 3pm on Monday. We'll circulate an agenda by Monday morning.

-Addie


**ADELINE ROLNICK**
*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Friday, September 16, 2022 2:59 PM
**To:** Rolnick, Addie <ARolnick@nrdc.org>
**Cc:** Tallman, Sarah <stallman@nrdc.org>; Vandal, Nicole <nvandal@nrdc.org>
**Subject:** Re: Concerned Pastors for Social Action v. Khouri - Paragraph 128 Letter/Request for Meet and Confer

Monday 3PM will work best for us.  Do you have specific topics you'd like to discuss on Monday?

Join Zoom Meeting https://us02web.zoom.us/j/87262552379?pwd=azhybjZkZjBDaWZnY0Y5ZUZQenBmZz09 Meeting ID: 872 6255 2379 Passcode: 708530
One tap mobile +13092053325,,87262552379#,,,,*708530# US
+13126266799,,87262552379#,,,,*708530# US (Chicago)

On Wed, Sep 14, 2022 at 1:59 PM Rolnick, Addie <ARolnick@nrdc.org> wrote:

> Bill,
>
> Thank you for that update. Plaintiffs are available on Monday from 11am-12pm and 3-5pm, or Tuesday from 10am-1pm and 3pm-4pm. Please let us know if the City is available during any of those times.
>
> In advance of that meeting, please provide the list of 8,500 previously excavated addresses Rowe has identified as still requiring restoration, along with any additional records of restoration the City has not previously provided to Plaintiffs. As explained in my September 1 email, it is essential that the City share all available restoration data so that the Parties may have a productive discussion about a reasonable deadline for the City to complete all restoration work required under the Agreement.
>
> -Addie
>
> ADELINE ROLNICK
> *Attorney*
>
> NATURAL RESOURCES DEFENSE COUNCIL
> 1152 15TH STREET NW, SUITE 300
> WASHINGTON, DC 20005
> T 202.513.6240
> AROLNICK@NRDC.ORG
> PRONOUNS: SHE/HER
> NRDC.ORG

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Wednesday, September 14, 2022 9:43 AM
**To:** Rolnick, Addie <ARolnick@nrdc.org>
**Cc:** Tallman, Sarah <stallman@nrdc.org>; Vandal, Nicole <nvandal@nrdc.org>
**Subject:** Re: Concerned Pastors for Social Action v. Khouri - Paragraph 128 Letter/Request for Meet and Confer

Addie,

Sorry, been dealing with things, including the retirement/resignation of our Clerk less than 2 months before an election, along with a number of personal issues of key City staff.  Do you have times on Monday or Tuesday that would work?

Quick update - while they're still sourcing parts, LGC has excavations scheduled for today, and a small number of parts that should keep them going for a bit, with the hope that they'll be able to source more by next week.

On Tue, Sep 13, 2022 at 10:32 AM Rolnick, Addie <ARolnick@nrdc.org> wrote:

Bill,

I'm writing to follow up on Plaintiffs' request for a meeting this week. Please let us know when the City is available during the following windows:

Wednesday 9/14: 11am-12pm ET, 3-4pm ET
Thursday 9/15: 9-10am ET, 12pm-1pm ET, 4pm-5pm ET
Friday 9/16: 9am-3pm ET, 4pm-5pm ET

Regards,

Addie

ADELINE ROLNICK
*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Friday, September 2, 2022 2:53 PM
**To:** Rolnick, Addie <ARolnick@nrdc.org>
**Cc:** Clyde Edwards <cedwards@cityofflint.com>; McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Tallman, Sarah <stallman@nrdc.org>; Vandal, Nicole <nvandal@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Dan Korobkin <dkorobkin@aclumich.org>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; Gambill, Nathan (AG) <GambillN@michigan.gov>; Krisztian, George (EGLE) <krisztiang@michigan.gov>; Joseph Kuptz <jkuptz@cityofflint.com>
**Subject:** Re: Concerned Pastors for Social Action v. Khouri - Paragraph 128 Letter/Request for Meet and Confer

Thanks Addie.

As you might imagine, vacations and the holiday weekend make planning difficult right now  I'll try to coordinate something next week, but we're probably looking at something more in the 9/14-9/16 window.

On Thu, Sep 1, 2022 at 1:23 PM Rolnick, Addie <ARolnick@nrdc.org> wrote:

> Bill,
>
> Thank you for the productive meeting on Tuesday. We appreciate the City making its representatives and a Rowe representative available to discuss the City's implementation of Phase VII of the pipe replacement program. To discuss both the City's progress towards meeting the September 30 deadline and a reasonable deadline for the City to complete all restoration work required under the Agreement, Plaintiffs request a follow-up meeting the week of September 12. **Please let us know when the City is available for a meet and confer by videoconference during the following windows:**
>
> Monday 9/12: 3pm-5pm ET
> Tuesday 9/13: 3pm-4pm ET
> Wednesday 9/14: 9am-10am ET, 11am-12pm ET, 3-4pm ET
> Thursday 9/15: 9-10am ET, 11am-1pm ET, 3:30-5pm ET
> Friday 9/16: 9am-5pm ET
>
> As we discussed, the City must take the following steps immediately to comply with its obligations under the Agreement and ensure that it maintains access to already-appropriated federal funds to finish the work:
>
> 1. **Begin outreach, replacement, and excavation work as quickly as possible.** It is imperative that the City use all available resources to complete the remaining outreach, excavation, and replacement work by the Court-ordered deadline of September 30, 2022. Plaintiffs urge the City to take all reasonable steps within its power to meet this deadline. This includes, but is not limited to, immediately beginning performing outreach to those addresses that have not yet received the required outreach. *See* ECF 237 ¶ 4(i). The City identified no reason why this work could not move forward immediately.

2. **Immediately respond to any outstanding information requests from EPA to secure an extension of the deadline to use WIIN funding.** Based on statements from EGLE and the City during Tuesday's meeting, Plaintiffs understand that the City's remaining WIIN Act funding must be used before the end of 2022; that the City has requested that EPA extend this deadline to the end of 2023; and that EPA requested additional information from the City on August 12, but that the City has not yet provided this information. To ensure that the City does not lose access to millions of dollars that Congress has already appropriated for water-infrastructure work in Flint and that EGLE has already approved for use on the pipe replacement program, the City must promptly respond to EPA's outstanding information request.

In addition, it is Plaintiffs' understanding that the City executed the last contract for remaining restoration work on August 16, 2022. This triggered the thirty-day deadline for the Parties to meet and confer to discuss a reasonable deadline for the City to complete all restoration work required under the Agreement (as modified). *See* ECF 237 ¶ 6. During Tuesday's meeting, the City agreed to provide **the list of 8,500 previously excavated addresses Rowe has identified as still requiring restoration.** Please provide this list in advance of the Parties' meet and confer, along with **any additional records of restoration** the City has not previously provided to Plaintiffs. Based on the City's statements on Tuesday, the restoration records previously shared with Plaintiffs do not reflect all addresses for which the City has a record of completed restoration. It is essential that the City share all available restoration data with Plaintiffs, including records maintained by EGLE and Rowe, so that the Parties may reach a shared understanding of the remaining scope of the restoration work required by the Agreement.


Regards,


Addie


ADELINE ROLNICK
*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

---

**From:** Rolnick, Addie
**Sent:** Friday, August 26, 2022 12:39 PM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** Clyde Edwards <cedwards@cityofflint.com>; McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Tallman, Sarah <stallman@nrdc.org>; Vandal, Nicole <nvandal@nrdc.org>; Bonsitu Kitaba

<bkitaba@aclumich.org>; Dan Korobkin <dkorobkin@aclumich.org>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; Gambill, Nathan (AG) <GambillN@michigan.gov>; Krisztian, George (EGLE) <krisztiang@michigan.gov>

**Subject:** RE: Concerned Pastors for Social Action v. Khouri - Paragraph 128 Letter/Request for Meet and Confer

Bill,

Thanks again for helping coordinate a time to meet next Tuesday. We hope this will be a productive meeting. I'll be there, as will Jolie McLaughlin, Sarah Tallman, Bonsitu Kitaba, and Plaintiff representatives Pastor Allen Overton and Melissa Mays.

Below is a proposed agenda for the meeting. Please ensure that appropriate City officials and other personnel will be at the meeting who will be able to discuss these issues. Please let us know if the City has any additions.

1. **Phase VII of the service line replacement program**

    a. Clarification on the scope of the Lakeshore contract: Does the contract cover all remaining excavation, replacement, and restoration work? If not, what are the City's plans for bidding out and contracting for the remaining work?

    b. Is the City going to meet the September 30 deadline to finish the remaining excavation and replacement work? What efforts is the City making to meet this deadline?

    c. When will the next phase of work begin?

    d. What information has the contractor shared about when it can complete the work? Who is the main point of contact at the City for Lakeshore?

    e. Specifics of this next phase of work:

        i. How many crews will be working?

        ii. Are these crews conducting the remaining outreach?

        iii. How many homes will receive outreach, excavations, and/or replacements per week?

        iv. When will the City be completing excavations and replacements along major roads?

        v. Will the excavation/replacement of new addresses and restoration of previously excavated addresses be done simultaneously?

    f. Has the City pursued additional support from EGLE to use EGLE resources (including EGLE contractors) to complete the work on time? What are the barriers to using such resources?

PA-156

2. **Funding**

   a. The City requested and received $531,352 in State funding during the most recent reporting period. Given that no excavation work occurred during this period, for what purpose was this funding requested? How have Settlement funds been used in 2022?

   b. Plaintiffs' understanding is that the Lakeshore contract is funded by $17 million in WIIN Act funding. Based on the State's most recent quarterly report, the State has paid out $25,889,000 ($4,111,000 remaining) in WIIN funds. Is the remaining $12,889,000 ($17M - $4,111,000) funded from WIIN funding beyond the $30 million originally earmarked for the program? *See* ECF 147-1 ¶¶ 22, 27. If so, from which other identified project were the monies taken from? *See* Mich. EGLE, Flint Water Infrastructure Funding as of Nov. 26, 2021 (listing projects).

   c. Do the WIIN funds still need to be spent by the end of this year? If so, what is the City doing to ensure that it uses all available resources appropriated through the WIIN Act?

3. **Restoration**

   a. The City's current contract with Rowe refers to restoration at 8,500 addresses. Where did the 8,500 number come from? The City has given Plaintiffs a record of restoration at only roughly 8,200 addresses. Adding in 8,500 to these 8,200 addresses still leaves roughly 10,000 of the 27,000 addresses the City has excavated unaccounted for.

   b. How many previously excavated homes still need restoration? What is the City's plan to ensure it identifies all homes that still need restoration?

   c. In the City's view, what is a reasonable deadline for restoration given the remaining work required? Will this work be completed by December 31, 2022?

   d. What is the City's system for keeping records of restoration completed in Phase VII?

4. **Consent forms**

   a. What systems are in place to ensure that City staff in the Water Department, Department of Public Works, City Hall, and the Mayor's office know about the consent forms and are able to assist residents in submitting those forms?

   b. Who is currently managing the City's GetTheLeadOut web page; monitoring the City'sGetTheLeadOut@cityofflint.com email account on a regular basis; and managing and responding to messages left on (810) 410-1133 (the number listed on the City's GetTheLeadOut page)?

   c. Does the City maintain a list of all addresses where residents have completed a consent form? Does this list include addresses where residents submitted a consent form in person at City Hall or mailed a consent form to the Department of Public Works?

PA-157

5. **Water main break**

  a. Once the GLWA water main break is repaired, how does the City plan to transition back to a 95/5 blended water supply? Will the City transition directly from 100% GCDC to 95% GLWA/5% GCDC, or will the transition be graduated?
  b. Did EGLE or the City perform any bacteria testing in connection with the water main break?
  c. Given continued changes in the water source blend based on the water main break, is it possible for the City to continue sequential sampling at at least the six sites it had been conducting this sampling at prior to May 2022? Such sampling will continue to be important, especially given the rise in the 90th percentile lead level during the last six-month monitoring period.

6. **Other Issues**

  a. Outstanding responses to information requests in Plaintiffs' August 19, 2022 letter.
  b. Did the City respond to EGLE's June 2, 2022 request that it update its SOPs for chemical treatment? If so, please provide the new SOPs.
  c. Have any other SOPs been updated with the transition to a blended water supply? If so, please provide the current SOPs.

Looking forward to a productive meeting,

Addie

ADELINE ROLNICK
*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

---

**From:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Sent:** Wednesday, August 24, 2022 5:50 PM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** Clyde Edwards <cedwards@cityofflint.com>; Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Vandal, Nicole <nvandal@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Dan Korobkin <dkorobkin@aclumich.org>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; Gambill, Nathan (AG) <GambillN@michigan.gov>; Krisztian, George

(EGLE) <krisztiang@michigan.gov>

**Subject:** RE: Concerned Pastors for Social Action v. Khouri - Paragraph 128 Letter/Request for Meet and Confer

Thanks, Bill. 3pm on Tuesday, August 30, works for us. I'll circulate a calendar invite so that we have it on our calendars. And if you could let us know who from the City/Rowe will be attending, that would be great.

Jolie

JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

---

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Wednesday, August 24, 2022 1:45 PM
**To:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Cc:** Clyde Edwards <cedwards@cityofflint.com>; Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Vandal, Nicole <nvandal@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Dan Korobkin <dkorobkin@aclumich.org>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; Gambill, Nathan (AG) <GambillN@michigan.gov>; Krisztian, George (EGLE) <krisztiang@michigan.gov>
**Subject:** Re: Concerned Pastors for Social Action v. Khouri - Paragraph 128 Letter/Request for Meet and Confer

Jolie,

We can meet 3:00 Tuesday, in the Mayor's conference room at City Hall.

Bill

On Wed, Aug 24, 2022 at 9:58 AM McLaughlin, Jolie <jdmclaughlin@nrdc.org> wrote:

> Hi Bill,
>
> Thanks for your email. I wanted to check whether you've had time to review your calendars and can propose some times that work for a meeting either on August 29 or August 30?
>
> Thanks,
> Jolie
>
> JOLIE MCLAUGHLIN

*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

---

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Friday, August 19, 2022 3:55 PM
**To:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Cc:** Clyde Edwards <cedwards@cityofflint.com>; Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Vandal, Nicole <nvandal@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Dan Korobkin <dkorobkin@aclumich.org>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; Gambill, Nathan (AG) <GambillN@michigan.gov>; Krisztian, George (EGLE) <krisztiang@michigan.gov>
**Subject:** Re: Concerned Pastors for Social Action v. Khouri - Paragraph 128 Letter/Request for Meet and Confer

Thank you for your letter.  We will review our calendars and determine if either of the dates/times proposed will work for us.

I've attached a copy of the SLR construction contract here, via a google drive link.  As you are aware, the City cannot enter into contracts over $75,000.00 without the approval of the City Council.  City Council approved the contract last week, and negotiations regarding the details of the contract stretched into this week, when we executed the final contract with Lakeshore Global Corp.  Both Lakeshore Global and Rowe have been working with City personnel since that time to expedite activities, and we expect to begin replacement activity sometime next week.

For the record, there has been no SLR activity through 8/15/2022, and so there is no activity to report either for July 2022 or August 2022.

Enjoy your weekends.

| 📄 **Lakeshore Global Corp 8.19.2022.pdf** |
|---|

On Fri, Aug 19, 2022 at 2:12 PM McLaughlin, Jolie <jdmclaughlin@nrdc.org> wrote:

> Bill and Clyde,
>
> Please see the attached letter. Plaintiffs request a meet and confer to discuss the City's plan for complying with the September 2022 deadline for completing service line excavation and replacement work, as well as the other issues discussed in this letter. Sarah, Addie, and I will be in Flint from August 29-31, and would like to meet in-person with both of you, the appropriate officials from the Department of Public Works, and Rowe. We are available for a meeting in the afternoon on Monday, August 29, or the

morning or afternoon on Tuesday, August 30. Please let us know what times the City is available.

Thanks,
Jolie

JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

--

William Kim, City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2079



--

William Kim, City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2079



--

William Kim, City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502

PA-161

(810) 237-2079



--

William Kim, City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2079



--

William Kim, City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2079



# Exhibit 26

October 17, 2022

VIA EMAIL

William Kim
City of Flint Department of Law
1101 S. Saginaw Street, Third Floor
Flint, MI 48502
wkim@cityofflint.com

      Re:    City of Flint's Noncompliance with Settlement Agreement in *Concerned Pastors for Social Action v. Khouri*, No. 16-10277 (E.D. Mich.)

Bill:

      Thank you for the productive meeting last week. We hope that we can continue to work towards resolving the issues from Plaintiffs' October 4 letter at the in-person meeting on Thursday, October 20. Below, we summarize each area of the City's noncompliance and the status of the parties' negotiations towards a resolution. As we emphasized, to facilitate a productive meeting, we would appreciate it if the City shared concrete counterproposals to Plaintiffs' October 4 proposals for remedying the City's violations that address the concerns the City raised during last week's discussion.

      Plaintiffs provide notice pursuant to Paragraph 130 of the Settlement that if the parties are unable to promptly resolve these issues, Plaintiffs intend to file a motion to enforce the Settlement.

## I.    Outreach

      The City was required to complete outreach at all homes on the 2022 Replacement Eligible Homes list by September 30, 2022. The City has represented that it has sufficient labor to move forward with the remaining work, and thus there is no reason for further delay in completing this outreach. The City suggested that it could likely complete the remaining required outreach by December 1, 2022, as Plaintiffs proposed. Please confirm whether the City will agree to complete the remaining outreach by December 1. **[AGENDA ITEM 1]** (For ease of reference, Plaintiffs have included references to "AGENDA ITEMS" for discussion on Thursday.)

      Despite requirements under the Settlement to do so, the City has not provided any detailed information about the outreach completed this year (e.g., the addresses, dates, times, and outcomes of such outreach). *See* ECF No. 208 ¶ 6.v. Last week, Mr. Kuptz stated that he recalled that as of October 5, 2022, the City had conducted 570 consent attempts. None of those attempts were reflected in the City's September 2022 status report.

      During Thursday's meeting, please confirm (i) the total number of consent attempts the City has made to date in 2022; (ii) the total number of homes at which the City has completed its

outreach obligations in 2022 (i.e., completed the mailing and two required in-person attempts); and (iii) the total number of weeks over which the consent attempts were made. In addition, please provide (iv) as soon as possible, the information required by the Settlement about any outreach conducted before October 1, 2022; and (v) in the City's October status report, the required information about the City's outreach during the relevant reporting period. **[AGENDA ITEM 2]**

Finally, as of October 11, the City was not yet able to provide a response to Plaintiffs' request that the City facilitate a meeting between Lakeshore and community members to discuss best practices for effective resident outreach. Mr. Kim said he would raise this issue and get back to Plaintiffs. At Thursday's meeting, please let us know whether the City will agree to facilitate the requested meeting. **[AGENDA ITEM 3]**

## II.    Excavations and Replacements

To create additional transparency and accountability regarding the delayed excavations and replacements, Plaintiffs proposed in their October 4 letter that the City develop, and the parties agree, to a Project Plan describing the City's plan for completing the remaining work as quickly as possible. In response, the City offered to provide weekly backwards-looking reporting and projections about how many excavations the City plans to complete in the coming week. This additional week-by-week reporting is a helpful step towards providing Plaintiffs with timely insights into the City's progress. Plaintiffs propose that the parties agree that the City will continue providing weekly status reports describing the outreach, excavation, replacement, and restoration work completed in the previous week and work planned for the upcoming week, for each week until the City completes all required outreach, excavation, replacement, and restoration work. Thank you for providing the first of these reports last week. Plaintiffs request that future weekly progress reports include the following informational elements: **[AGENDA ITEM 4]**

    a.  Total number of addresses where the City obtained a new consent form based on outreach.
    b.  Total number of addresses where the City completed all required outreach, including those addresses encompassed in (a) above.
    c.  Total number of addresses where the City attempted to schedule an excavation, but was unsuccessful.
    d.  Total number of addresses where work was conducted in the previous week in each of the following categories: (i) an excavation (but no replacement); and (ii) an excavation and replacement or solely a replacement.
    e.  Total number of addresses where a restoration was completed.

On Thursday, Plaintiffs would also like to discuss the most useful and efficient informational elements for the forward-looking part of the weekly progress report. **[AGENDA ITEM 5]**

Beginning with its October 28 monthly status report, the City agreed that it will include information on its current inventory of materials needed for service line replacements. These submissions will include (a) the number of replacements the City can conduct with its current

inventory, including specific information about the exact parts the City has in stock (e.g., which fittings, connectors, valves, or otherwise), and (b) updated information on when the City expects to receive additional materials, including specific information about the exact parts (and quantities) the City expects to receive. The City has repeatedly stated that it has a shortage of required materials, but has not yet provided any details on which parts it is missing, despite Plaintiffs' repeated requests for that information. *E.g.*, Sept. 21, 2022 Em. fr. A. Rolnick to W. Kim; Oct. 7, 2022 Em. fr. A. Rolnick to W. Kim. **[AGENDA ITEM 6]**

Beyond these week-by-week progress reports, it is essential that Plaintiffs have assurances that the City has long-term plans in place to expeditiously complete the remaining work. This request is reasonable: Given the City's failure to conduct *any* excavations or replacements between April 2022 (when the 2022 Stipulation was filed) and mid-September, Plaintiffs are concerned that the City has not engaged to date in the kind of reasonable and necessary planning required to ensure that it meets its commitments to Plaintiffs, the Court, and the community about the completion of the remaining work. More transparency is needed to assure Plaintiffs that the City is now taking and will continue to take all reasonable and available steps to immediately come into compliance with the Settlement by finishing the outstanding work.

Last week, the City expressed concerns that a Project Plan may not align with how the City is managing the service line replacement program. That the City does not already have on hand the specific plan Plaintiffs requested does not render the request unreasonable or impractical, especially when Plaintiffs remain flexible as to the specific format of the Project Plan. As we explained, Plaintiffs' goals are to: (1) provide transparency into the City's efforts to complete the remaining required work as quickly as possible; and (2) provide assurances that the work will continue without undue delay. To that end, we proposed that a Project Plan include, at minimum, benchmarks for the pace of work and a requirement that work will continue in 2022 until weather precludes it and will start up in the spring as soon as the weather permits. The City has not explained why such basic commitments are impractical or overly burdensome. At Thursday's meeting, please provide a counterproposal as to the kind of forward-looking Project Plan the City can agree to provide, if any. **[AGENDA ITEM 7]**

## III.   Restoration

Plaintiffs' October 4 letter proposed that the City promptly provide a plan for identifying the scope of remaining restoration work and completing that work. In response, the City proposed waiting until February before it begins even developing a plan for assessing how much restoration work remains. This additional four-month delay before the City even begins planning to complete the remaining restorations is not acceptable. The parties agreed to negotiate a restoration deadline within 75 days after the City entered into the last contract for the remaining restoration work. *See* ECF 237 ¶ 6. There is no reason not to move forward with that process immediately.

The City had access to information about gaps in its own restoration recordkeeping at the time it negotiated the 75-day window—indeed, Plaintiffs have pointed out these gaps numerous times before the City agreed to this term. *See, e.g.*, May 4, 2021 Ltr. fr. S. Tallman to W. Kim, et

al. at 5-6. The City's attempts to further extend the uncertainty around when it can commit to complete restoration are unreasonable at this late stage and risk delaying completion of the restoration work beyond the end of 2023, when the City's contract with Lakeshore expires. The City must promptly identify the scope of remaining restoration work to avoid having to rebid additional work and obtain additional authorization from City Council—a process that, based on the City's most recent contracting round, could take many months.

If Plaintiffs' proposal is not acceptable to the City, please propose alternative planning and documentation that the City will provide to Plaintiffs this fall to demonstrate progress towards determining the scope of remaining restoration work and identifying a reasonable deadline for that work. **[AGENDA ITEM 8]**

## IV. Additional action items and agreements from October 11 meeting

At last week's meeting, the State agreed that, going forward, it would timely respond to Plaintiffs' questions via email about the City and State's efforts to procure additional materials needed for service line replacements.

Plaintiffs agreed to re-review the data the parties exchanged in early 2022 and compare it to the data Plaintiffs recently received from Metro Consulting to explore whether Plaintiffs can assist the City in resolving any data discrepancies concerning the scope of remaining excavation and replacement work.

Finally, Plaintiffs are waiting for responses to a number of outstanding information requests, as described by email on September 21, 2022, and by letters dated August 19, 2022, and October 4, 2022. Please respond to these requests as soon as possible, as required by the Settlement. **[AGENDA ITEM 9]**

## V. Questions for October 20 meeting [AGENDA ITEM 10]

Plaintiffs have requested that representatives from the City's Department of Public Works, ROWE, and Lakeshore be present at Thursday's meeting to facilitate a detailed dialogue about the status of the City's current efforts to complete work and what additional steps may be available to the City. This dialogue is not possible if the City relays the questions to the relevant personnel and obtains answers that Plaintiffs cannot follow up on in further detail. To assist the City's preparations for the meeting, below are the questions Plaintiffs would like to cover on Thursday. These questions are aimed at assisting the parties in assessing how best to resolve these disputes in light of the City's existing processes and decision-making structures. We have asked some of these questions before, but the City has not been able to provide responses to date.

**Excavation and Replacement:**

1. How many crews are currently working?
2. Are these crews doing both excavations and outreach? Are any crews dedicated to outreach? If so, how many? How many consent attempts could these crews complete per week?

3. When did the City begin conducting in-person consent attempts in 2022? Has the City been conducting consent attempts every week since then? How many total consent attempts has the City completed in 2022?

4. How does the City (and/or its contractors) decide how many consent attempts to make each day or week and where to complete them? Who is involved in making these decisions? How far in advance are these decisions made?

5. Assuming an adequate supply of materials and that all residents are home at the scheduled time, how many excavations could the City complete per week with the number of crews it currently has?

6. The City shared that it plans to schedule 60-70 excavations the week of October 17. How and when did the City, ROWE, and/or Lakeshore arrive at this number?

7. The City shared that it may be able to complete the remaining outreach, excavations, and replacements by December 31, 2022. Who was involved in coming up with this estimate? What was the basis for this estimate?

8. How does ROWE and/or Lakeshore decide which and how many excavations will be scheduled in the coming week? Who is involved in these decisions? How far in advance does ROWE and/or Lakeshore plan upcoming excavations?

9. Does ROWE and/or Lakeshore have any short or long-term goals for completing work? For example, does ROWE and/or Lakeshore set a goal of completing a certain number of consent attempts and excavations per week or per month?

10. The City shared that it holds a weekly meeting about the service line replacement program with the Governor's office, EGLE, DTMB, ROWE, Metro Consulting, and Lakeshore. Who sets the agenda for these meetings? What is discussed at these meetings? How long do these meetings typically last? Do these meetings include a discussion of how and when the City will complete the excavation and replacement work?

**Restoration:**

1. When did ROWE begin analyzing the available restoration data to determine the scope of remaining work? What portion of this data analysis was completed before the RFP for the remaining work was issued?

2. When did ROWE and/or Lakeshore begin driving to homes to determine whether those homes still require restoration? Did any of this occur before the RFP for the remaining work was issued?

3. How many homes has ROWE and/or Lakeshore visited to visually inspect restoration status? Over what periods did those visits occur, and are those visits ongoing?

4. What criteria is ROWE and/or Lakeshore using to visually determine that an address was previously restored?

5. How much time is ROWE and/or Lakeshore currently devoting to identifying the scope of remaining restoration work? Are their specific ROWE and/or Lakeshore staff working on this matter?

6. What is ROWE's current proposal for how and on what schedule it will identify the scope of remaining restoration work? When does ROWE anticipate completing this process?

Please let me know if you would like to discuss any of these items in advance of Thursday's meeting.

Sincerely,

Sarah C. Tallman

cc (via email):    Joseph Kuptz, jkuptz@cityofflint.com; Addie Rolnick, arolnick@nrdc.org; Melanie Calero, mcalero@nrdc.org, Bonsitu Kitaba, bkitaba@aclumich.org; Daniel Korobkin, dkorobkin@aclumich.org; Richard Kuhl, kuhlr@michigan.gov

# Exhibit 27

**The New York Times** | https://www.nytimes.com/2021/08/30/business/supply-chain-shortages.html

# The World Is Still Short of Everything. Get Used to It.

Pandemic-related product shortages — from computer chips to construction materials — were supposed to be resolved by now. Instead, the world has gained a lesson in the ripple effects of disruption.

 

**By Peter S. Goodman and Keith Bradsher**

Published Aug. 30, 2021   Updated Nov. 14, 2021

Like most people in the developed world, Kirsten Gjesdal had long taken for granted her ability to order whatever she needed and then watch the goods arrive, without any thought about the factories, container ships and trucks involved in delivery.

Not anymore.

At her kitchen supply store in Brookings, S.D., Ms. Gjesdal has given up stocking place mats, having wearied of telling customers that she can only guess when more will come. She recently received a pot lid she had purchased eight months earlier. She has grown accustomed to paying surcharges to cover the soaring shipping costs of the goods she buys. She has already placed orders for Christmas items like wreaths and baking pans.

"It's nuts," she said. "It's definitely not getting back to normal."

The challenges confronting Ms. Gjesdal's shop, Carrot Seed Kitchen, are a testament to the breadth and persistence of the chaos roiling the global economy, as manufacturers and the shipping industry contend with an unrelenting pandemic.

Delays, product shortages and rising costs continue to bedevil businesses large and small. And consumers are confronted with an experience once rare in modern times: no stock available, and no idea when it will come in.

In the face of an enduring shortage of computer chips, Toyota announced this month that it would slash its global production of cars by 40 percent. Factories around the world are limiting operations — despite powerful demand for their wares — because they cannot buy metal parts, plastics and raw materials. Construction companies are paying more for paint, lumber and hardware, while waiting weeks and sometimes months to receive what they need.

PA-171



A container ship in Port Miami this month. Shipping is at the center of what has gone awry in the global economy.  Scott McIntyre for The New York Times

In Britain, the National Health Service recently advised that it must delay some blood tests because of a shortage of needed gear. A recent survey by the Confederation of British Industry found the worst shortages of parts in the history of the index, which started in 1977.

The Great Supply Chain Disruption is a central element of the extraordinary uncertainty that continues to frame economic prospects worldwide. If the shortages persist well into next year, that could advance rising prices on a range of commodities. As central banks from the United States to Australia debate the appropriate level of concern about inflation, they must consider a question none can answer with full confidence: Are the shortages and delays merely temporary mishaps accompanying the resumption of business, or something more insidious that could last well into next year?

"There is a genuine uncertainty here," said Adam S. Posen, a former member of the Bank of England's monetary policy committee and now the president of the Peterson Institute for International Economics in Washington. Normalcy might be "another year or two" away, he added.

In March, as global shipping prices spiked and as many goods became scarce, conventional wisdom had it that the trouble was largely the result of a surplus of orders reflecting extraordinary shifts in demand. Consumers in the United States and other wealthy countries had taken pandemic lockdowns as the impetus to add gaming consoles and exercise bikes to their homes, swamping the shipping industry with cargo, and exhausting the supplies of many components. After a few months, many assumed, factories would catch up with demand, and ships would work through the backlog.

PA-172



Construction companies are paying more for lumber and hardware, while waiting weeks and sometimes months to receive what they need.  Karen E. Segrave for The New York Times

That is not what happened.

Just as the health crisis has proved stubborn and unpredictable, the turmoil in international commerce has gone on longer than many expected because shortages and delays in some products have made it impossible to make others.

At the same time, many companies had slashed their inventories in recent years, embracing lean production to cut costs and boost profits. That left minimal margin for error.

> **Daily business updates**  The latest coverage of business, markets and the economy, sent by email each weekday. Get it sent to your inbox.

A giant ship that became lodged in the Suez Canal this year, halting traffic on a vital waterway linking Europe to Asia for a week, added to the mayhem on the seas. So did a series of temporary coronavirus-related closures of key ports in China.

The world has gained a painful lesson in how interconnected economies are across vast distances, with delay and shortages in any one place rippling out nearly everywhere.

A shipping container that cannot be unloaded in Los Angeles because too many dockworkers are in quarantine is a container that cannot be loaded with soybeans in Iowa, leaving buyers in Indonesia waiting, and potentially triggering a shortage of animal feed in Southeast Asia.

An unexpected jump in orders for televisions in Canada or Japan exacerbates the shortage of computer chips, forcing auto manufacturers to slow production lines from South Korea to Germany to Brazil.

"There is no end in sight," said Alan Holland, chief executive of Keelvar, a company based in Cork, Ireland, that makes software used to manage supply chains. "Everybody should be assuming we are going to have an extended period of disruptions."

PA-173



PP Control & Automation designs and builds systems for companies that make machinery for a wide range of industries.  Mary Turner for The New York Times

In the West Midlands of England, Tony Hague has tired of trying to predict when the madness will end.

His company, PP Control & Automation, designs and builds systems for companies that make machinery used in a range of industries, from food processing to power generation. Demand for his products is expanding, and his roughly 240 employees have been working at full capacity. Still, he is contending with shortages.

One customer in England that makes machines to seal packaged food has been hobbled by its inability to secure needed parts. Its supplier in Japan used to take four to six weeks to deliver key devices; now it takes half a year. The Japanese factory has struggled to secure its own electrical components, most of them produced in Asia and using computer chips. Auto manufacturers' desperation to secure chips has made those components harder to obtain.

"It's definitely getting worse," Mr. Hague said. "It hasn't bottomed out yet."

For the global economy, shipping is at the center of the explanation for what has gone awry.

As Americans enduring lockdowns filled basements with treadmills and kitchens with mixers, they generated extra demand for Chinese-made factory goods. At the same time, millions of shipping containers — the building blocks of sea cargo — were scattered around the globe, used to deliver protective equipment like face masks.

The container shortages were exacerbated by delays in unloading cargo at American ports, because workers stayed home to slow the pandemic's spread.

Then, in late March, came the fiasco in the Suez Canal, the pathway for about 12 percent of the world's trade. With hundreds of other ships blocked, the impact played out for months.

In May, China shut down a huge container port near Shenzhen — one of the nation's leading industrial cities — after a small outbreak of a coronavirus variant. The port did not resume operations for several weeks.

Then, in the middle of August, Chinese authorities shut down a container terminal near the city of Ningbo after one employee tested positive. Ningbo is the world's third-largest container port, so its closure held the potential to snowball into a global event, even threatening the supply of goods to American stores in time for Black Friday sales around Thanksgiving.

PA-174

By Wednesday, the Ningbo terminal was back in operation. But China's decision to close it because of a single Covid case resonated as a warning that the government might shut other ports.



Eric Poses has seen international shipping costs for his board games soar, from $6,000 to $7,000 before the pandemic to $26,000 now, and they are expected to go even higher.  Scott McIntyre for The New York Times

In Miami Beach, Eric Poses, an inventor of board games, developed a product aptly named for the pandemic: The Worst-Case Scenario Card Game, a title that could also be applied to his experience relying on China to make and ship the product.

Before the pandemic, shipping a 40-foot container of games from Shanghai to the warehouse he uses in Michigan cost $6,000 to $7,000, Mr. Poses said. His next shipment, scheduled to leave China in mid-September, will cost at least $26,000. And his freight agent warned him that the price will most likely rise, to $35,000, because of rail and trucking difficulties in the United States.

Cheap and reliable sea transport has long been a foundational part of international trade, allowing manufacturers to shift production far and wide in search of low-wage labor and cheap materials.

Columbia Sportswear has typified the trend, expanding from its base in Portland, Ore., to become a global outdoor gear brand. The company has relied on factories in Asia to make its goods and taken the ocean cargo network for granted.

"It's sort of like, every day when you get up in the morning, you turn on the lights and the lights always work," said Timothy Boyle, Columbia's chief executive.

But the price of moving goods to the United States from Asia is up as much as tenfold since the beginning of the pandemic, and Columbia might have to reconsider its traditional mode.

"It's a question of how long this lasts," Mr. Boyle said.

PA-175



When a small virus outbreak closed a huge container port near Shenzhen from late May through late June, huge numbers of extra containers flooded other Chinese ports like Shanghai, shown here.  Keith Bradsher/The New York Times

Some trade experts suggest that product shortages are now being exacerbated by rational reactions to recent events. Because of the pandemic, humanity now knows the fear of running out of toilet paper. That experience may be driving consumers and businesses to order more and earlier than previously needed.

Ordinarily, the peak demand for trans-Pacific shipping begins in late summer and ends in the winter, after holiday season products are stocked. But last winter, the peak season never ended, and now it has merged with the rush for this holiday season — reinforcing the pressure on factories, warehouses, ships and trucks.

"We have this vicious cycle of all the natural human instincts responding, and making the problem worse," said Willy C. Shih, an international trade expert at Harvard Business School. "I don't see it getting better until next year."

Li You contributed research.

PA-176

# Exhibit 28

69˚     66˚     60˚

_____

**GENERAL ALERT:** Nov. 8 Midterm Election

ADVERTISEMENT

ADVERTISEMENT

## Pandemic fallout leads to Flint lawn, sidewalk restoratation delays, say contractor

by Ron Hilliard
Thursday, May 13th 2021





*Sidewalk and grass in Flint, which needs restoration. (Photo credit: Ron Hilliard/Mid-Michigan NOW)*

PA-178

69°      66°      60°

_____

FLINT, Mich. - Seven years after the Flint Water Crisis began, lead line replacement continues. After checking or replacing pipes, grass and sidewalk often needs to be restored.

ADVERTISEMENT

Some Flint residents have been waiting a while to see green grass.

**The Best Way to Withdraw From…**
SmartAsset | Sponsored

"So, it's been like this since the end of last summer, and I'm tired of looking at this," said Tyrone Johnson as he looked at the area of dirt in front of his home. "It looks bad."

He was relieved to get service line work done, but he was ready to see his lawn restored. He was considering getting "the grass seeds or whatever I may have to do to get it right."

Flint City Councilman Eric Mays said he gets several calls a week about restoration work.

PA-179

69° 66° 60°

Goyette Mechanical is contracted to repair hard and soft surfaces--such as grass and sidewalks--following service line replacements, which are overseen by Rowe Professional Services. Goyette Mechanical is focusing on grass seed only as it nears completion of its contract, according to a statement the company provided to Mid-Michigan NOW.

Why are people like Johnson still waiting?

Goyette Mechanical states that the pandemic put them behind by forcing them to stop due to state orders, workers getting ill, and subcontractors having a hard time getting workers after the shutdown.

How long should it take to get restoration work at your home from the time of line replacement?

"The average time to begin restorations at a home from the time the SL (service line) was dug varies depending on the time we get the work order from the City to our crew's current work location from that home, as well as what work items needs to be restored (i.e.: sidewalk, curb, driveway, road, landscaping). We also must wait a total of 30 days from the time the service was dug to allow for the ground to settle. Once that time has elapsed, concrete work needs to be completed first, then landscaping and asphalt after," according to Goyette Mechanical.

**RELATED SERVICE:Flint lead pipe replacement program back on track after City Council vote**

The company said it has completed restoration work at about 15,000 addresses. It has funding under its current contract with the City of Flint to complete work for "roughly 200 homes" through the end of May.

Goyette Mechanical seeks to obtain a change order to finish work at remaining homes, but there could be additional delays. The company anticipates the possibility of "some delays as our subcontractors have already booked most of their workload for the season and will have to commit less crews to work here in Flint."

The company estimates that there could be 1,000 to 2,800 addresses that could require restoration work currently or in the future, but it had not received work orders for any of those

PA-180

69°          66°          60°

In its statement, the Goyette Mechanical shared the following details about its contracts with the City of Flint:

"Our initial contract was for $6.9 million, this was for 3 "areas" out of 4 per the bid documents. We then received a change order for another $2 million last year for half the 4th area. However, as we continued to work on restoring properties, service line contractors were and still are out replacing service lines. We also were asked to pick up the phase 4 addresses that needed to be restored, therefore there is a need for additional funding for restorations. The City currently owes Goyette Mechanical a retainer withheld from work completed from March 2020 to December 2020."

Mays learned new details from Goyette Mechanical's response to Mid-Michigan NOW.

"Dated May 11th to you, Mr. Hilliard," he read from the letter. "Once I read this and I see details, these are the most details I've seen in months. So, this let's me know, it's time to call people in."

Mays said if there were any unresolved financial matters, including a retaining fee, "I would urge Goyette to come forward. Let's talk details and let's get this project done, especially when we have extra money coming in. This would be the right time to come forward."

A City of Flint spokesperson responded to the letter, and explained that the process for securing additional funding would move forward, and go before city council for authorization, as necessary for each contract:

"We continue working to complete all service line replacements and associated restoration work as quickly as possible. Covid-19 and shelter in place requirements severely slowed restorations last year. However, work is now continuing this year. The administration already had begun the process of securing additional funding to be approved by council to complete the project and will continue working internally and with contractors to get the work completed as quickly as possible."

PA-181



*Restorations Re-Zone-Area Map Color (Courtesy of Goyette Mechanical)*



*Restorations Re-Zone-Area Map Color copy.jpg*

69°     66°     60°

Goyette Mechanical would like to issue the following statement in response to your questions on the City of Flint's Restorations after Service Line Repairs.

"Goyette Mechanical is currently contracted to perform restorations of hard and soft surfaces after the service line replacements completed during phases 5 and 6. Late in the 2020 season year we were instructed to restore any phase 4 addresses that had been missed. We are currently focused on grass seed only, as we are very close to fulfilling our current contract. We are only able to work at roughly 200 homes with the remaining balance of our contract, we will work until our funds have ran out. Our subcontractor is trying to cover as many areas as possible throughout the City. I have attached a map of how the City has been broken down by areas, our current plan for grass seed is as follows (weather permitting):

Week of May 3rd - Areas 1,2,3,5,6, and parts of 7. We are allowing for 2-3 days of work to complete this area.

Week of May 10th & 17th - Area 16 we are allowing two weeks in this area which will involve Areas 12,13 and 15

Week of May 24th - Areas 14,19, and 20. We are allowing one week for these areas as well.

"We will work until the current contract is spent but cannot guarantee all areas will get grass seed. This schedule for grass seed only where no hard surface needs repaired.

"As with most of the Country the COVID-19 pandemic had put us quite behind last year. We started much later in the season and had to stop work several times due to the Governors orders, workers getting ill, and subcontractors having a difficult time getting people back to work after the initial shutdown. For the 2021 season, the only delay we foresee will be additional funding for the restoration work items that will be left undone after we finish with the current contract by the end of May. If we can obtain a change order from the City to complete the remaining work, I would also expect some delays as our subcontractors have already booked most of their workload for the season and will have to commit less crews to the work here in Flint.

"The average time to begin restorations at a home from the time the SL was dug varies depending on the time we get the work order from the City to our crew's current work location

PA-183

69°        66°        60°

allow for the ground to settle. Once that time has elapsed, concrete work needs to be completed first, then landscaping and asphalt after.

"Goyette Mechanical and our subcontractors has currently restored approximately 15,000 addresses. It is difficult to gage how many are left to do as we do not know the information on the service line replacement side and how many homes they have dug that we do not have work orders for and how many are going to dig this year. But if I were to guess, I would say 1000 to 2800 addresses left to complete.

"Our initial contract was for $6.9 million, this was for 3 "areas" out of 4 per the bid documents. We then received a change order for another $2 million last year for half the 4th area. However, as we continued to work on restoring properties, service line contractors were and still are out replacing service lines. We also were asked to pick up the phase 4 addresses that needed to be restored, therefore there is a need for additional funding for restorations. The City currently owes Goyette Mechanical a retainer withheld from work completed from March 2020 to December 2020, and we have no pending litigation between us and the City of Flint.

"Goyette is and always has been fully committed to the residents of this good City, to provide them with the professional, fair, and quality workmanship and products. We stive to provide the most up to date and honest information that we have. We truly appreciate the patience of the residents of Flint, we know this has been a long road and we will be here to see this through to the end."

## WATCH REPORT:

PA-184

69˚ 66˚ 60˚

_____

*Pandemic causing restoration delays after line replacement, says contractor*

ADVERTISEMENT

**MORE TO EXPLORE**

**Son's images show him rescuing Mom from Ian's floodwaters**

**'She was 12, I was 30': Biden's off-the-cuff remark during speech leaves many confused**

**9-year-old boy dies after drowning while taking a shower, police say**

**SPONSORED CONTENT**

by Taboola

PA-185

69˚    66˚    60˚

**Goodgame Empire** | **SPONSORED**

### The Best Way to Withdraw From Retirement Accounts
SmartAsset | **SPONSORED**

### If You Need To Kill Time On Your Computer, This Vintage Game Is A Must-Have. No Install.
Forge Of Empires | **SPONSORED**

Loading ...

PA-186

# Exhibit 29

Water Research 157 (2019) 40–54



Contents lists available at ScienceDirect

# Water Research

journal homepage: www.elsevier.com/locate/watres





# Sequential drinking water sampling as a tool for evaluating lead in flint, Michigan

Darren A. Lytle [a, *], Michael R. Schock [a], Kory Wait [a], Kelly Cahalan [a], Valerie Bosscher [b], Andrea Porter [b], Miguel Del Toral [b]

[a] U.S. Environmental Protection Agency, ORD, NRMRL, WSWRD, TTEB, 26 W. Martin Luther King Drive, Cincinnati, OH 45268, USA
[b] U.S. Environmental Protection Agency, Region 5, Ground Water & Drinking Water Branch, 77 Jackson Blvd, Chicago, IL 60604, USA

## ARTICLE INFO

Article history:
Received 11 October 2018
Received in revised form
15 March 2019
Accepted 21 March 2019
Available online 24 March 2019

Keywords:
Lead
Drinking water
sequential samples
Orthophosphate

## ABSTRACT

Eliminating the sources of human lead exposure is an ongoing public health goal. Identifying the make-up of household plumbing and service line material type is important for many reasons including understanding lead release sources and mechanisms, targeting locations for lead service line (LSL) removal, and assessing the effectiveness of lead remediation strategies. As part of the response to Flint, Michigan's drinking water lead public health crisis, a return to their original drinking water source (Lake Huron) and an increase in orthophosphate dose was implemented in late 2015. In 2016, EPA performed multiple rounds of sequential or "profiling" water sampling to evaluate corrosion control effectiveness and identify lead sources in homes and service lines, as well as to evaluate the effectiveness of corrosion control treatment with time on the different plumbing components. The results showed that lead levels, including high lead levels likely associated with particles, decreased with time in homes sampled during the 11-month evaluation period. Although sequential sampling indicated that brass fittings, brass fixtures, and galvanized pipes were lead sources, LSLs were the greatest source of lead when present. Following the removal of LSLs, the total mass of lead contributed to the drinking water decreased by 86% on average.

Published by Elsevier Ltd.

## 1. Introduction

Eliminating the sources of lead exposure from the environment is an ongoing public health goal. Lead is a neurotoxicant that can cause permanent cognitive and behavioral impairments in children, and cardiovascular and kidney problems in adults (Fowler and Duval, 1991; ATSDR, 2007; Lanphear et al. 2018). Major regulatory and primary prevention strides have reduced lead concentrations in water, paint, dust, gasoline and soil, with corresponding reductions in observed blood lead levels (BLL) (Pirkle et al. 1994; Jain, 2016; Tsoi et al. 2016). These changes, however, have not occurred fast enough to keep up with the continually decreasing threshold for the level of lead exposure known to be harmful. In 2012, after concluding that no BLL could be considered "safe," the Centers for Disease Control and Prevention (CDC) reduced its former BLL of concern from $10 \, \mu g/dL$ to a reference value of $5 \, \mu g/dL$

to be used for the screening of children (CDC, 2012; CDC, 2016). Recent research has indicated intellectual, behavioral, and attention deficits linked to children's BLLs below $5 \, \mu g/dL$ (NTP, 2012; EPA, 2013). In order to mitigate health effects, efforts to eliminate lead sources continue.

Although lead levels in water have decreased since the 1970s (Karalekas et al. 1975), drinking water can still be the dominant source of total daily lead exposure (Triantafyllidou et al. 2007). Lead in drinking water originates from the corrosion or dissolution of lead-containing plumbing materials. Lead service lines (LSLs), which connect the water main to the premise (i.e., indoor or household) plumbing, are considered the largest contributor to total lead in drinking water, responsible for up to 75% of the lead measured in drinking water (Sandvig et al. 2008). The use of LSLs was banned in the United States in 1986 (U.S. EPA, 1986). Estimates vary widely for the number of full or partial LSLs remaining, ranging from approximately 6.1 million (Cornwell et al. 2016) to 10.2 million (EPA, 1991a; 1991b; 1991c; 1992). Other important plumbing sources of lead include brass fixtures and fittings, lead solder (Subramanian et al. 1995), flux, water meters, lead

* Corresponding author.
   E-mail address: lytle.darren@epa.gov (D.A. Lytle).

https://doi.org/10.1016/j.watres.2019.03.042
0043-1354/Published by Elsevier Ltd.

D.A. Lytle et al. / Water Research 157 (2019) 40—54

goosenecks, and galvanized steel pipes (HDR Engineering, Inc., 2009).

Identifying the make-up and material type of drinking water service lines and premise plumbing is important for many reasons, including understanding lead release sources and release mechanisms, targeting locations for LSL removal, and assessing the effectiveness of lead corrosion control strategies. However, service lines and other plumbing materials are often buried beneath soil or inside finished walls, preventing direct observation. Uncertain and unique configurations of mixed premise plumbing materials, as well as nonexistent or unreliable utility LSL records (Karalekas et al. 1975), also make identifying plumbing materials a challenge. Furthermore, unpredictable and inconsistent drinking water lead levels across the distribution system of a community (Del Toral et al. 2013; Wang et al. 2014), in addition to other water quality fluctuations, are often observed. There is a critical need to establish a drinking water sampling protocol that can inform and address these challenges.

Many reasons to perform lead drinking water sampling exist, including lead exposure assessment, corrosion control efficacy benchmarking, lead source determination, LSL identification, and regulatory compliance assessment. Also, many factors can affect lead sample concentration and potential variability in lead concentrations. Therefore, the sampling protocol must be carefully selected and implemented to allow meaningful results and interpretation.

"Sequential" sampling or "profiling" can be a valuable approach to identify lead sources in plumbing and service lines, as well as to evaluate corrosion control effectiveness over time. Plumbing lengths and inside diameter (ID), and visible material are surveyed for interior premise plumbing and service lines, using the approximate route to the water main. After stagnation, a series of successive drinking water samples are collected. Sample volumes can vary depending on the precision needed to differentiate components such as bubblers, faucets, valves, tubing, and inside-wall plumbing. Sample results for metals including lead (Pb), zinc (Zn), copper (Cu), tin (Sn), and iron (Fe) can then be related to plumbing volumes and distance from a sampling faucet to identify the location of leaded materials, including a partial LSL.

Although there are multiple potential assessment benefits of sequential sampling, very little work has demonstrated the practical value of sequential sampling particularly in a full-scale field setting. An extensive sequential sampling effort was initiated and documented by EPA in Flint, Michigan. The objective of this work is to summarize the findings of the sequential sampling program in Flint. The findings will illustrate the usefulness of sequential sampling as a tool for identifying lead sources, assessing corrosion control treatment and other related benefits.

## 2. Background

Sequential samples arguably provide the clearest picture of the lead leaching from plumbing sources at a given sampling location. The protocol involves taking a predetermined number of samples, typically 10 to 20, in series from the same tap after a defined stagnation period. The first few samples are usually smaller volumes, such as 125 mL or 250 mL, in order to isolate the contributions from the different short sections of plumbing typical of brass faucets, elbows, lead-tin solder, and valves. The remaining samples can be larger, such as 1 L, as the plumbing moves away from the faucet and becomes more uniform. The specific sample volumes and sequence can be customized for each case, based on previous inspection of the lengths and diameter of premise plumbing and service line materials.

Together, the samples create a lead (and other metal)

concentration profile of the plumbing from the faucet all the way to the water main. Matching the water sample volumes to the plumbing volume can identify which part of the plumbing is the biggest source of lead (van den Hoven and Slaats, 2005; Sandvig et al. 2008; Clark et al. 2014). Taking the appropriate number of samples at the appropriate sample volume, combined with the accurate mapping of these volumes, has been shown to achieve acceptable resolution of the different plumbing parts (Schock and Lemieux, 2010). Samples as small as 50 mL can successfully detail materials down to the contribution of lead-tin solder (Hoekstra et al. 2004; Triantafyllidou et al. 2015). Lytle et al. (1996) applied sequential sampling to identify lead sources in a new building with elevated lead levels and evaluate the success of corrosion control strategies (orthophosphate and silicate addition) to reduce lead corrosion. A series of 30-mL and 60-mL samples were used to distinguish between brass and leaded solder lead sources and demonstrate the relative effectiveness of the corrosion inhibitors to reduce lead (Lytle et al. 1996).

Sequential sampling is particularly informative when combined with the identification of other metals within the sample. For example, the presence of lead along with an appreciable concentration of tin suggests the lead source is lead-tin solder, while the co-occurrence of zinc and lead may indicate that a brass fixture is the lead contributor. Diffusion effects will skew the metal contributions to a degree (Hayes et al. 2013; Leer et al. 2002), and this effect is seen as a gentle curve (approximately bell shaped) with the middle of the LSL at the peak, instead of sharp increases (Giani et al. 2004). However, not all peaks necessarily correspond to the LSL. For example, lead stagnation profile peaks after 6 h of stagnation in one report varied from 9.1 μg/L to 96.5 μg/L at LSL sites, and lead peaks did not always correspond to the LSL volume-estimated location (Hayes et al. 2016). Because discrete lead contributions can be diluted by larger sample volumes (Cartier et al. 2011), accurately isolating smaller fixtures requires appropriately small samples (Schock, 1990) and an accurate plumbing inspection (Hoekstra et al. 2009). At the lowest end of the sample size spectrum, the large number of samples to represent the plumbing volume would increase the analytical costs.

"Spikes" occasionally occur in the profiling samples, representing the presence of colloidal or particulate lead-containing materials suspended in the water. The exact source of the particles cannot be precisely determined, because it is physically unlikely that they were carried along with the background "parcel" of water with the dissolved lead. However, it can be inferred that the particulates originated somewhere between the tap where the sample is drawn, and the position in the pipe network represented by the location from which the background water "parcel" originated, because the particles cannot flow faster than the dissolved ions and complexes in the water. The presence of lead particulate-related spikes is sporadic and would not necessarily be captured during a single sampling event. By sampling the water at flow rates most similar to typical household use, over multiple sampling events, the frequency and amount of particulate release will give the best approximation of the degree to which consumers could be exposed to the particulates in normal use.

While expensive relative to other sampling protocols, due primarily to the analyses of the large number of water samples, sequential sampling creates the most comprehensive and informative view of the degree of the lead exposure sources at a residence. The large number of sequential water samples ensures that the local water concentration is obtained from every piece of plumbing that could leach lead (Clark et al. 2014). Creating a full profile is especially useful for identifying LSL peaks, which are typically past the fifth liter (Giani et al. 2004), although the number can vary depending on home plumbing configuration, location of

D.A. Lytle et al. / Water Research 157 (2019) 40—54

sampling tap relative to service line location, etc. Another practical benefit of this sampling procedure is that a more accurate estimate for flushing duration can be calculated if the resident wishes to implement a flushing regimen (Clark et al. 2014). Flushing the tap before using water for consumption after long stagnation periods has been standard advice from both the EPA and state agencies in the United States. Advice for flushing time varies, with some suggesting a mere 30 s; however, this is often insufficient for flushing the full length of premise plumbing (Cartier et al. 2011; Del Toral et al. 2013; Clark et al. 2014). Profile sampling in Washington, D.C., for example, indicated that a 10 min flush at 2 gallons per minute was required to reach the lowest lead levels at those residences (Giani et al. 2004). Thus, sampling programs that rely on timed samples (e.g., after 30 s or 45 s) are inherently inaccurate at reliably intercepting the elevated lead release from water stagnated in the service line. This is because the "distance", in terms of water volume between the sampled tap and the water in contact with the LSL, will be a function of the effective ID and length of the interior piping network to the entry point to the house. These parameters are additionally affected by decreases in clear ID caused by corrosion tuberculation, changes in pipe ID throughout the house, and even hydraulic drag from the nature of deposits in the pipes. Because these factors and water flow rate are very site-specific, time-based sampling is prone to error. Profiling gives a much more accurate and reliable estimate of the "location" of a LSL relative to the amount of water used (or intentionally wasted) during sampling.

## 3. Materials and methods

Sequential drinking water sampling was conducted at single-family residences in four rounds using comparable protocols in Flint, MI, between January 28, 2016 and November 15, 2016 (Table 1). EPA selected the sampling locations based on records provided by the City of Flint, available analytical results showing high lead levels in first draw samples, and field observations. The locations included a variety of residential plumbing configurations (e.g., LSLs and copper interior plumbing, LSLs and galvanized iron interior plumbing, and LSLs and plastic interior plumbing). The number of sites sampled in each round varied with changes in participation and inclusion of new sites.

At each sampling site, a sample tap was identified where water was drawn for human consumption (e.g., drinking, cooking, formula preparation, etc.). Any existing filter was removed from the faucet (or put in bypass mode) prior to flushing or sampling. At least 6 h prior to sampling, any point-of-use filter was removed (or bypassed) and water was run at the sample tap for at least 5 min. Flushing the pipes prior to sequential sampling is necessary so the lead contribution from individual pipe segments can be more clearly distinguished.

Following the above actions, residents were asked not to use any water from the home plumbing for at least 6 h prior to samples being collected (i.e., no showering, no flushing toilets, no washing laundry, no usage of other water taps, etc.). After at least 6 h of stagnation time, two 125-mL water samples followed by approximately 15 sequential 1-L water samples were collected for metals analysis, depending on the lengths and diameters of plumbing materials to the water main. Cold water (with the tap opened fully) was used to fill each sample bottle. Samples were collected without the water being shut off in between samples and with minimal water spillage.

Distribution system water quality characterization sampling, consisting of a fully flushed "distribution system" sample collected after running the water for 5 min following the completion of sequential sampling, was conducted at each location. Water samples for water quality parameters including total phosphorous, alkalinity, chloride, sulfate, and fluoride were placed in ice-packed coolers as soon as possible after collection. Water samples were also collected for field analysis of pH and chlorine, and, if chlorine residual was low, samples were also collected for laboratory analysis of coliform bacteria.

EPA field sampling coordinators collected samples, maintained field sampling records, and shipped properly preserved samples under chain-of-custody to an EPA regional laboratory. EPA field sampling coordinators worked with the residents to collect information, if possible, regarding plumbing, including any recent repairs and whether any water outlet in the home (regardless of whether they were used for human consumption or not) was leaking. EPA field sampling coordinators recorded the stagnation time prior to sequential sampling based on information from the resident; EPA considered resampling if the resident reported water had been used.

EPA regional laboratory personnel received samples under chain-of-custody and analyzed them for total metals and other water quality parameters based on EPA drinking water methods. Metals analysis was consistent with EPA 200.7/200.8 (EPA, 1990; 1994), using inductively coupled plasma mass spectroscopy (ICP-MS) and inductively coupled plasma atomic emission spectroscopy (ICP-AES). Quality assurance and data verification reviews were performed by the EPA regional laboratories analyzing a given sample set before data reporting. Field sampling records and laboratory analytical results were stored in a project database and reviewed with respect to the sampling objectives. The analytical results have been shared with the residents of participating sample sites and have been posted on the EPA website. Specifically, EPA support efforts to Flint including sampling data and technical assistance documents can be found at: https://www.epa.gov/flint.

Each sampling round contained sampling location "exceptions"

**Table 1**
Summary of sampling effort by round.

|  | Round A | Round B | Round C | Round D |
|---|---|---|---|---|
| **Dates** | 1-28 to 3-31-16 | 7-12 to 7-22-16 | 9-1 to 9-24-16 | 10-26 to 11-15-16 |
| **Number of Distinct Sites Sampled** | 105 | 48 | 53 | 46 |
| **Sites Included** | 77 | 42 | 48 | 41 |
| **Total Number of Samples** | 1672 | 758 | 833 | 747 |
| **Included Samples** | 1132 | 654 | 753 | 660 |
| **Private-Side Service Line Material (Included Sites)** |  |  |  |  |
| **(Total Sites/Total Samples)** |  |  |  |  |
| Copper/Brass | 41/603 | 19/272 | 18/276 | 14/213 |
| Galvanized Iron | 19/267 | 7/108 | 10/146 | 10/159 |
| LSL Intact | 4/56 | 12/196 | 16/268 | 12/208 |
| LSL Replaced | 4/79 | 4/78 | 4/62 | 5/80 |
| Unknown | 9/127 | 0/0 | 0/0 | 0/0 |

D.A. Lytle et al. / Water Research 157 (2019) 40–54

that, based on field observations and other information, had reasonable cause to be excluded from analysis. Reasons for exceptions included: an in-line filter was in place (or very likely in place) during sequential sampling, no pre-stagnation flushing was performed, it was a non-residential site, home was outside Flint limits (Genesee County water), home was unoccupied, uncertain or insufficient stagnation time was indicated (e.g., water use occurred during stagnation), and disturbances to the pipes were thought to have occurred between rounds.

## 4. Results

Four rounds of samples were collected with comparable protocols during 2016 and are the focus of this evaluation. A total of 252 sets of sequential samples, collected from 124 homes, comprised 4010 individual samples. After removing exceptions, a total of 208 sets of sequential samples, comprising 3199 individual samples and representing 107 different homes, were included in this evaluation (see Table 1). For each home, the two initial 125-mL samples were followed by anywhere from 8 to 28 1-L samples in each round, based on estimates of the plumbing structure at that location.

Samples were grouped according to the observed service line material entering the homes. Copper, galvanized iron, 'LSL intact', 'LSL replaced', and unknown were the identified categories (Table 1). Sites labeled as LSL intact had a confirmed LSL entering the home and those labeled as 'LSL replaced' had their LSL removed and replaced with copper pipe before the time of the sampling event. An important point of clarification is that these categorizations do not reflect what the pipe material may be on the city-owned side of the service line. In most cases, the material of the city-owned side of the service line was unknown. As a result, sites that might have a lead portion on the city side of the service line could be included in the copper, galvanized iron, and unknown categories. Lastly, the city only performed full LSL replacements and galvanized iron service line sections were also reviewed.

Home plumbing surveys were compiled by the EPA field team. Information regarding the diameter of plumbing materials and components, and the associated length from the sampling tap to the water main were directly measured by hired plumbers, estimated when not visible (e.g., behind walls, underground, etc.) and/or based on city records in the case of service lines. Plumbing schematics are superimposed on sequential water sample profiles in following discussions as equivalent plumbing volumes (based on diameter and length) for comparison. Given the uncertainty of measurement estimates (where necessary) and service line records, the schematics are approximations.

### 4.1 Water treatment effectiveness on LSLs

LSLs are the largest source of lead in water contamination when present (Sandvig et al. 2008). Beginning in late 2015, the intended strategy to reduce the release of lead from LSLs in Flint was to form relatively insoluble lead-phosphate minerals on the lead pipe wall and other leaded surfaces over time by adding orthophosphate at the Flint water treatment plant. Examination of sequential lead, copper, zinc, and iron profiles over time can be used to assess the effectiveness of the orthophosphate passivation strategy at reducing lead originating from LSLs. A full benefit analysis, however, was not possible because the sequential sampling program was not initiated until the return to Detroit water and enhanced orthophosphate treatment had started.

Home "eq" had a verified LSL entering the home. Lead sequential profiles collected in three successive sampling rounds showed the gradual decrease in lead peaks over time (Fig. 1a). Lead levels

reached a maximum at about 2.25 L, then dropped off to a high and relatively constant level between approximately 2.25 L and 7.25 L, which is consistent with the location of the LSL based on the plumbing configuration. The first 2.25 L also contained a significant but generally smaller amount of lead (except for the first 125 mL sample in Round C of 36 μg/L), and may have reflected the contribution of lead accumulated in the galvanized iron scale in the internal premise plumbing and elevated zinc levels in the same volume (Fig. 1c). In addition, brass fittings that could also contribute lead to the water separated the galvanized and lead pipes. The location of the brass fittings was near the sample volume (2.25 L) containing the maximum lead, suggesting a mixed lead source contribution or galvanic corrosion activity (Nguyen et al. 2010; Wang et al. 2012; DeSantis et al., 2018). Peak lead levels dropped over time from 27 μg/L (Round B in July 2016) to 9 μg/L (Round D in November 2016) (Fig. 1a). Lead levels were similarly reduced across the entire sequential range (Fig. 1a), indicating that treatment was effective at reducing lead from all sources at this site. However, orthophosphate was not effective at reducing LSL lead (Fig. 1c).

A second site with a confirmed LSL, home "ex," with a less complicated plumbing configuration showed similar reductions in lead between July 2016 and November 2016 (Fig. 2). Interestingly, lead levels reached peaks at approximately 3.25 L and 6.25 L (Fig. 2a). The two peaks in lead were separated by a drop at 5.25 L that corresponded to the location of the shutoff. At the same location, copper increased, likely associated with a copper service shutoff (Fig. 2b). Zinc and iron were not detected in any of the samples, except for zinc detections at 0.125 L and 0.25 L associated with interior plumbing and one low iron detection at 5.25 L likely associated with the service shutoff (Fig. 2c and d) and originally from the main. Lead levels dropped similarly across the entire sequential range at this site with time; maximum lead levels decreased from 22 μg/L (Round B in July 2016) to 15 μg/L (Round D in November 2016) (Fig. 2a).

### 4.2 Lead source and plumbing material identification

Examination of the lead concentration of sequential samples can be valuable in identifying plumbing materials and revealing the relative location of lead source(s). When lead concentration profiles are compared to accompanying zinc, copper, and iron profiles, as well as plumbing surveys, the specific type and relative contribution of each lead source (e.g., brass, solder, galvanized pipe, LSL) can be assessed. The application of sequential sampling to identify whether LSLs are present is particularly useful and of great interest. Fig. 3 illustrates a series of sequential sampling profiles collected over multiple rounds/dates from home "dk," observed to have a copper service line visible entering the home. All of the lead profiles showed consistent lead curves between approximately 10 and 20 L of water, with peaks ranging from 17.2 μg/L to 28.7 μg/L originating from the approximate distance from the "unknown" service line portion of the plumbing (Fig. 3a) in each round. No corresponding peaks in copper (Fig. 3b), zinc (Fig. 3c), or iron (Fig. 3d) were observed in that same volume range and copper dropped to the lowest levels (Fig. 3b). These results suggest a LSL is most likely present on the city owned portion of the service line. In contrast, two large lead peaks as high as 87 μg/L were present in the first 2.25 L of water in Round B (July 2016) only (Fig. 3). The initial (0.125 L) lead peak co-occurred with a zinc peak that was as high as 220 μg/L in the same volume (Fig. 3c), and considering the relative sequence location, a brass fixture observed directly adjacent to the faucet during the plumbing survey was the most likely lead source. Similar co-occurrence of lead and zinc in other sampling rounds confirmed the brass fixture as the lead source in the first 0.125 L. The second lead peak (1.25 L–2.25 L) in July 2016 corresponded to a



**Fig. 1.** Sequential drinking water sample metal profiles of verified lead service lines site eq: a) lead, b) copper, c) zinc, and d) iron (note the detection limit change because the regional laboratory running the samples changed).

relatively high spike of iron at 260 µg/L (Fig. 3d) and a copper spike of 180 µg/L (Fig. 3b). Although not separated in the field, based on the theoretical solubility of Fe(III), iron was assumed to be particulate in nature, and lead and copper were assumed to be associated. The plumbing survey did not identify an iron source such as galvanized pipe, and iron was not detected in the same volume during other sampling rounds. The most reasonable conclusion was that iron particles from the mains entered the service line and home, settled out in the premise plumbing, and accumulated lead (and copper), then were re-suspended during sampling as noted by others (Camara et al. 2013; Masters and Edwards, 2015).

A second example, home "cd," represents a home where a galvanized iron was observed as the service line material entering the home and used throughout the home's internal plumbing (Fig. 4). Two significant broad lead peaks were obvious in all sampling rounds with maximums at sequential volumes of 2.25 L and 8.25 L, respectively (Fig. 4a). The first broad lead peak located within the home's internal plumbing ranged between 6.11 µg/L and 61.8 µg/L, and corresponded to elevated zinc and, in two rounds, elevated iron concentrations (Fig. 4c and d, respectively). Zinc concentrations in these volumes (1.25 L—3.25 L) were excessive and as high as 1910 µg/L. These observations suggested that the brass

D.A. Lytle et al. / Water Research 157 (2019) 40—54   45



**Fig. 2.** Sequential drinking water sample metal profiles of verified lead service lines site ex: a) lead, b) copper, c) zinc, and d) iron (note the detection limit change because the regional laboratory running the samples changed).

faucet and fitting, and galvanized iron pipe, were the source of the first lead peak. The concentration of lead in the zinc coating on galvanized pipe installed from 1950 to 2008 was reported to range from non-detect to nearly 2% based on surface analysis (Clark et al. 2015). Additionally, iron corrosion by-products can accumulate lead from the coating or other sources of lead in the upstream plumbing and service line (Camara et al. 2013; Masters and Edwards, 2015), making the exact source of the lead leached or released as particulate into the water difficult to precisely apportion. The second lead peak between 7.25 L and 9.25 L was located in the "unknown" service line region of the sequential profile, and ranged between 3.39 µg/L and 21.7 µg/L (Fig. 4a). Corresponding elevated zinc and iron peaks (Fig. 2c and d, respectively) were not

apparent, suggesting that a city-side partial LSL was likely present in the "unknown" plumbing region. Lastly, copper levels were generally very low (Fig. 2b), consistent with galvanized iron premise plumbing, with the exception of two peaks at 3.25 L and 7.25—8.25 L. The two copper peaks corresponded with the location of a brass meter and shutoff valve well particularly considering the elongated profile expected with diffusion considerations (van der Leer et al., 2002).

### 4.3 Lead service line removal effectiveness assessment

The city of Flint is implementing a program referred to as the 'FAST Start Initiative' to remove all LSLs from their distribution

PA-193

*D.A. Lytle et al. / Water Research 157 (2019) 40—54*



**Fig. 3.** Sequential drinking water sample metal profiles of site dk with private-side copper service line and apparent public-side LSL: a) lead, b) copper, c) zinc, and d) iron (note the detection limit change because the regional laboratory running the samples changed).

system and set a goal of doing so in three years (City of Flint, 2018). There is interest in quantifying the benefit of removing LSLs given the cost associated with excavation and replacement. The value of removing LSLs has been noted by others (Smargiassi et al. 2006; Sandvig et al. 2008; Muylwyk et al. 2009) and can be illustrated in this work by examining sequential sampling profiles collected before and after LSLs removal. EPA sequential sampling included eleven homes where pre- and post-LSL removal profiles were collected. In five of the homes, the LSLs were removed following

sequential sampling at the sites during Round A, and monitoring was continued in multiple sampling rounds, with the first post-removal sampling also during Round A ("Round A LSLR"). The other six homes were only monitored one round after LSL removal and were left out of detailed analysis in this section.

The LSL in home "eh" was removed in mid-March 2016 (Fig. 5). Prior to LSL removal (Round A), a very high lead spike of 149 µg/L was observed at 1.25 L, and lead then remained elevated for several samples before dropping to 8 µg/L by 12.25 L (Fig. 5a). The same

PA-194

D.A. Lytle et al. / Water Research 157 (2019) 40—54                                                                47



**Fig. 4.** Sequential drinking water sample metal profiles of site cd with private-side galvanized service line and apparent public-side LSL: a) lead, b) copper, c) zinc, and d) iron.

peak shape at approximately 1.25 L was observed for copper and iron (Fig. 5b and d, respectively) and, to a lesser extent, zinc (Fig. 5c). These results, in combination with a complex mix of plumbing materials including galvanized iron pipe and brass, suggest a complicated mix of lead sources. Following LSL removal, the large spike of lead disappeared (Fig. 5a). However, a lead peak, as high as 19.5 μg/L, remained between 1.25 L and 2.25 L, within the interior plumbing volume of approximately 2.6 L. Zinc and iron peaks were present in the same area (Fig. 5c and d, respectively). The lead reflects the contribution of lead from the galvanized iron

and possibly brass. After the LSL removal, copper peaks were evident between 3.25 L and 10.25 L, consistent with the region where the LSL was replaced with new copper pipe (Fig. 5b).

Home "ed" also had a LSL removed in Round A (mid-March 2016), but had a relatively simple plumbing configuration (Fig. 6). Prior to the LSL removal, a broad elevated lead peak as high as 21 μg/L was observed between 4.25 L and 10.25 L (Fig. 6a), consistent with the service line observed to begin at approximately 4.1 L. No other metal peaks corresponded to the same peak (Fig. 6b to d), indicating that the LSL was the primary lead source. Elevated zinc



**Fig. 5.** Sequential drinking water sample metal profiles before and after the removal of a lead service line, site eh: a) lead, b) copper, c) zinc, and d) iron.

levels were observed in the first several sequential samples, consistent with brass plumbing components with minimal contribution of lead. Following LSL removal, a small lead peak as high as 11 μg/L was noted between 2.25 L and 5.25 L during Round B (July 2016) (Fig. 6a), and lead up to 5.7 μg/L in the first 0.25 L is likely attributed to brass fixture and fittings. Otherwise, lead levels following LSL removal were below approximately 5 μg/L, with most at or near the reporting limit. The source of lead in the Round B (July 2016) samples may have been scale dislodged from the LSL during excavation that was trapped in the home plumbing and subsequently released, as suggested by the lack of corresponding zinc and iron peaks (Fig. 6c and d, respectively). Copper spikes were again evident after the LSL removal between 3.25 L and 11.25 L, consistent with the region where the LSL was replaced with a new

copper pipe (Fig. 6b). Peak copper levels generally decreased over time following LSL removal, demonstrating the effectiveness of orthophosphate for rapidly reducing copper associated with new copper plumbing.

### 4.4 Occurrence of elevated lead spikes

Elevated lead concentration "spikes" were reported by all investigators (State of Michigan, university researcher, other federal government sampling events) collecting drinking water samples in Flint in 2016 while the distribution system was recovering (Dolan, 2016a, 2016b, Wisely, 2016; Pieper et al. 2018; EPA, 2016). Considering the theoretical solubility of hypothetical Pb(II)-orthophosphate solid phases in Flint water, the co-presence of



**Fig. 6.** Sequential drinking water sample metal profiles before and after the removal of a lead service line site ed: a) lead, b) copper, c) zinc, and d) iron (9-23-16 sampling was flagged because the stagnation time was short at 4.5 h).

elevated metals other than lead, and other unpublished EPA Flint water sampling events (https://www.epa.gov/flint), lead concentration spikes generally were assumed to be associated with particles, although no filtered water analyses were performed by EPA in this study to confirm the assumption. Sequential sampling provides some indication as to the nature of the lead (i.e., particulate versus dissolved) by examining whether lead peaks are observed in repeat sampling events at the same locations, and the amount of deviation of individual samples from the background shape of the profile. Performing filtrations on all or a subset of sequential water samples would conclusively distinguish between lead forms. The release of particulate lead was attributed in part to low water usage patterns in Flint homes. With input from the state and EPA, the city initiated a "Flush for Flint" flushing program in May 2016 (EPA, 2016) to encourage residents to use their water to flush any lead particles from household plumbing.

Sequential sample analysis can be valuable in identifying the extent to which elevated lead spikes and particulate lead release

PA-197

50                                             *D.A. Lytle et al. / Water Research 157 (2019) 40—54*

are important, and how corrosion control treatment, time and water use trends reduce their frequency. Unfortunately particle filtrations were not performed in this work, so the fraction of individual sequential samples with lead levels above an elevated 20 μg/L cutoff were examined to reflects trends in lead spikes and possibly lead particulate release. The 20 μg/L concentration serves solely as a benchmark for trend comparisons. In Round A (January to March 2016), 127 of the 1132 sequential samples collected (11% of the samples in the round) were greater than 20 μg/L (Fig. 7). In Round B (July 2016), 94 of the 654 sequential samples collected (14% of the samples in the round) were above 20 μg/L, which was very similar to Round 1 (January to March 2016). In Round C (September 2016) and Round D (November 2016), respectively, were only 12 (1.6%) and 31 (4.7%) sequential samples were greater than 20 μg/L. The reduction in the fraction of sequential samples with lead levels greater than 20 μg/L, possibly associated with particulate lead, greatly decreased over time. This reduction in elevated lead spikes is attributed to increased effectiveness of orthophosphate treatment over time and efforts to increase water usage in Flint.

With the exception of Round A (January to March 2016), where the number of samples identified as having a copper service line entering the home far outweighed the number of samples in other categories (Table 1), homes identified as having intact LSLs had the greatest occurrence of lead spikes. The trend in reduction of lead spikes associated with intact LSLs followed that of all samples. The fraction of LSL homes with lead spikes greater than 20 μg/L decreased from 14% to 27% in Rounds A and B, respectively (January to March 2016 and July 2016) to 3% and 9%, respectively, in Rounds C and D (September 2016 and November 2016) (Fig. 7). No lead levels above 20 μg/L were measured in sequential samples collected from homes that had had the LSL removed.

Another broader indicator of change in the occurrence of high lead spikes was by comparing the maximum levels at each

sequential sampling location. The arithmetic means of the maximum lead concentration of all sequential profiles in Rounds A, B, C, and D (January-March 2016, July 2016, September 2016, and November 2016) were 85 μg/L, 49 μg/L, 14 μg/L, and 40 μg/L, respectively. Alternatively, the geometric means of the maximum concentration of all sequential profiles in Rounds A, B, C, and D (January-March 2016, July 2016, September 2016, and November 2016) were 14 μg/L, 13 μg/L, 8 μg/L, and 9 μg/L, respectively. Analysis using the Kruskal-Wallis One-Way ANOVA on Ranks test (data failed normality test, P < 0.001) indicated that the median values among the sampling datasets were not statistically different. The statistical results were not surprising given the relatively large range in maximum sequential lead values and resulting standard deviations in each round.

### 4.5 Weighted average sequential lead concentration (WASLC) and lead exposure estimate

Given the complicated nature of lead release, multiple lead sources, differences in lengths and positions of LSL segments, random water use patterns, water quality variability, and other factors, lead levels can range widely across a set of sequential samples from different houses. The profile is a snapshot of the highest and lowest lead levels a homeowner could consume based on a period of stagnation and current water quality not considering the random presence of elevated particulate lead release. The total mass released across the sequential profile or the WASLC can be used to assess system recovery over time and the effectiveness of corrosion control treatment. And while not a measurement of exposure, the WASLC gives an indication of the lead concentration across a household's plumbing.

The WASLC (μg/L) is defined as the total lead mass in all sequential samples divided by the total volume of all samples collected in the sequence and calculated according to:

$$WASLC = \frac{\sum_{i=1}^{n}(C_i)(V_i)}{\sum_{i=1}^{n} V_i}$$

where n is the number of sequential samples, C is the lead concentration (μg/L), and V is the sample volume (L).

In theory, the WASLC can be used to evaluate both the effectiveness of corrosion control over time and the benefit in lead reduction after LSL removal. The WASLC is presented as a percentile plot in Fig. 8, broken down by sampling round and plumbing material. The 90th percentile WASLC dropped from a high of 37 μg/L in Round A (January-March 2016), to 27 μg/L and 9 μg/L in Rounds B and C, respectively (July 2016 and September 2016). A slight uptick to 19 μg/L was observed in Round D (November 2016). Trends were broken down further by type and round in Fig. 9. It should be noted that analysis using the Kruskal-Wallis One-Way ANOVA on Ranks test (data failed normality test, P < 0.001) indicated that the median values among the sampling datasets were not statistically different.

Five homes (sites ec, ed, eh, az, and f) had a LSL removed in March 2016 and were sequentially sampled both before LSL removal (Round A, January-March 2016) and after replacement (Rounds B, C, and D in July, August, and November 2016). The average total lead mass (or WASLC) reduction in the four sampling rounds after LSL removal ranged between 80% and 94%. The average lead reduction of all five locations was 86%, illustrating the benefit of LSL removal. Because only one sequential profile set was collected prior to LSL removal, statistical comparisons between pre- and post-LSL data removal could not be performed. The results are considerably greater than the findings of Sandvig et al. (2008) that reported LSLs were responsible for 50%—75% of the total mass of lead measured at the tap. Many site-specific factors including water



**Fig. 7.** Sequential sampling results by round showing percent (%) of all samples collected greater than 20 μg/L (Round A,1—28 to 3-31-16; Round B, 7—12 to 7-22-16; Round C, 9-1 to 9-24-16; Round D,10—26 to 11-15-16).

D.A. Lytle et al. / Water Research 157 (2019) 40–54                    51



**Fig. 8.** Weighted Average Site Concentration Data for all rounds of testing with 90% LCR values (Round A,1–28 to 3-31-16; Round B, 7–12 to 7-22-16; Round C, 9-1 to 9-24-16; Round D.



**Fig. 9.** Summarized sequential sampling results represented as weighted average lead concentrations by Round (Round A,1–28 to 3-31-16; Round B, 7–12 to 7-22-16; Round C, 9-1 to 9-24-16; Round D, 10–26 to 11-15-16).

quality, degree of corrosion control and the presence of other leaded sources could explain the difference. Also, although close examination of the sequential profiles showed that the LSLs were by far the main lead source, it can't be ruled out that a small fraction of lead reduction associated with other lead sources within the household plumbing or indirectly associated with the LSL (e.g.,

particles that released from the LSL and moved in to the plumbing) with time and treatment could have existed. The authors anticipate more significant reductions would be expected by implementing additional precautions (ANSI/AWWA, 2017) and if no galvanized plumbing is present in the home.

In principle, the benefits of corrosion control treatment (orthophosphate addition) over time could also be evaluated based on change in WASLC over time. However, several critical limitations of the dataset for this purpose were immediately apparent. A clear limitation that was expected was that sequential sampling did not begin until 2016, after treatment started in late 2015 (returning to Detroit drinking water with subsequently boosted orthophosphate dose). Additionally, the number of sites that had repeated sampling in multiple rounds was minimal, and there was inadequate representation of the different plumbing material types and only one site was sampled through all rounds. It is also possible that some of the remnant lead following LSL replacement can be attributed to dislodged scale and sediment from the LSL entering the home due to water usage during the excavation activities leading up to the LSL replacement. Therefore, conclusions are necessarily very limited and may be unreliable with respect to this evaluation. On average, a 37% decrease in WASLC was observed from Round B to D (July 2016 to November 2016), but there was a great amount of variability in the data.

### 4.6 Relative contribution of lead sources

Sequential sampling provides an opportunity to examine the relative contribution of lead sources from each sample bottle collected. The total mass present in each sequential sampling set was calculated as the sum product of each sample volume and sample lead level. The percentage of total lead mass in each sequential bottle during each round was examined (Fig. 10). Although outliers do exist where a significant portion of total lead mass occurs in the first two 125-mL bottles (specifically in Round A, Fig. 10a), in general a larger contribution of lead mass is found in subsequent bottles. Due to these subsequent bottles having a larger volume (1 L versus 125 mL), it is expected that they would contain a greater percentage of total lead mass. However, by comparing the average total volume represented by these bottles to the total mass they contained, a more accurate comparison can be made. While the first two 125-mL samples contain an average of 1.7%–1.9% of the sample volume from a site, they contain an average of anywhere from 2.2% to 6.1% of the total mass. Even this difference might not be entirely attributable to the relative sources of lead, however, as the flow rate of water from the tap changed between the collection of 125 mL samples (Samples 1 and 2) and the 1 L samples (Samples 3 and higher) in most cases. This was due to practical testing limitations, as any consistent flow rate between the two would have been either too large to avoid spilling from the much smaller 125-mL bottles or too small to fill the much larger 1-L bottles in a practical amount of time. While the exact effects of such a difference in flow rate are unknown, it is believed that flow rate does have some impact on exposure to particulate lead by creating the hydraulic and physical conditions to mobilize particles, and thus would have a relevant effect on relative contributions between samples within a site.

## 5. Conclusions

Sequential or profile water sampling was used by the EPA to assess lead in Flint, Michigan's drinking water between January 28, 2016 and November 15, 2016, as the distribution system recovered from a major upset triggered in large part by temporary source water and treatment changes and the absence of corrosion control.

*D.A. Lytle et al. / Water Research 157 (2019) 40—54*



**Fig. 10.** Box plots showing percent of total mass collected in each sample bottle: a) Round A (1—28 to 3-31-16), b) Round B (7—12 to 7-22-16), c) Round C (9-1 to 9-24-16), and d) Round D (10—26 to 11-15-16) (samples 1 and 2 are 125 mL bottles, and others are 1000 mL bottles).

A total of 208 sets of sequential samples, collected in four sampling rounds from 107 different locations during the reporting period, were included in this evaluation. In addition to lead sequential sampling profiles, corresponding copper, zinc, and iron profiles were also examined. The following conclusions were drawn:

- Sequential sampling profiles (lead as well as copper, iron, and zinc) were valuable in identifying drinking water lead sources in homes that included brass fixtures and other brass components, galvanized iron pipes, and LSLs. Profiles were particularly valuable at identifying public-side LSLs not visible entering the home.
- Sequential sampling data can help evaluate corrosion control over time. The results showed that lead levels, including high lead levels likely associated with particles, decreased with time in homes sampled during the 11-month evaluation period.
- The first two 125-mL sequential samples represented approximately 4—7 feet of plumbing that included the faucet (presumably composed of lead-containing brass) and only

contributed between 2.2% and 6.1% of the total mass of lead in the homes. LSLs and possibly other lead sources (galvanized pipe, brass components, leaded solders, etc.) beyond the first 5.5 feet of plumbing contributed to the majority of lead to drinking water in homes.
- The removal of LSLs reduced the total mass of lead contributed to the drinking water on average by 86% in homes, which demonstrates LSLs were by far the greatest source of lead in homes when present as also illustrated in profiles. More significant reductions would be expected by implementing additional precautions (ANSI/AWWA, 2017), considering other lead sources, and if no galvanized plumbing is present in the home.

### Declaration of interests

The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

D.A. Lytle et al. / Water Research 157 (2019) 40–54    53

## Acknowledgements

The authors would like to thank the residents of Flint who provided drinking water samples as part of this work. We would also especially like to thank the EPA field sampling team led by Peggy Donnelly, Thomas Mendez, Dean Maraldo and Jennifer Welch; EPA field data management team; EPA data QA and Database team led by Brian Cooper, John Gulch, and Andrew Tschampa; EPA GIS Team led by Paisly Kauth; EPA Qlik Team led by Jan Krysa and Shea Caspersen; EPA laboratory team led by Dennis Wesolowski, George Schupp, Daniel France, Ernest Waterman, Margaret St. Germain, and Barry Pepich; EPA's Flint Task Force members; John Canar and Charles Roth (EPA Superfund FIELDS), Christy Muhlen and Daniel Williams (ORD); Jonathan Burian, Silvia Griffin and other EPA staff from multiple regions and HQ for their indispensible support and contributions.

Any opinions expressed in this paper are those of the author(s) and do not, necessarily, reflect the official positions and policies of the EPA. Any mention of products or trade names does not constitute recommendation for use by the EPA.

## References

ANSI/AWWA, 2017. AWWA C810-17 Replacement and Flushing of Lead Service Lines, first ed. AWWA, p. 15. AWWA Catalog #43810-2017.

ATSDR, 2007. Toxicological Profile for Lead. August 2007. CAS# 7439-92-1.

Camara, E., Montreuil, K.R., Knowles, A.K., Gagnon, G.A., 2013. Role of the water main in lead service line replacement: a utility case study. J. Am. Water Works Assoc. 105 (8), e423–e431.

Cartier, C., Deshommes, E., Edwards, M., Laroche, L., Nour, S., Pravost, M., 2011. Investigating dissolved lead at the tap using various sampling protocols. J. Am. Water Works Assoc. 103 (3), 55–67. https://doi.org/10.1002/j.1551-8833.2011.tb11420.x.

CDC, 2012. CDC Response to Advisory Committee on Childhood Lead Poisoning Prevention Recommendations in "Low Level Lead Exposure Harms Children: A Renewed Call of Primary Prevention". www.cdc.gov/nceh/lead/acclpp/cdc_response_lead_exposure_recs.pdf.

CDC, 2016. CDC's Childhood Lead Poisoning Prevention Program: Update on Blood Lead Levels in Children. https://www.cdc.gov/nceh/lead/acclpp/blood_lead_levels.htm. (Accessed 29 June 2016).

City of Flint, 2018. "FAST Start Initiative." City of Flint, City of Flint. www.cityofflint.com/fast-start/. (Accessed 14 February 2018).

Clark, B.N., Edwards, M.A., Masters, S.V., 2014. Profile sampling to characterize particulate lead risks in potable water. Environmental Science & Technology 48 (12), 6836–6843. https://doi.org/10.1021/es501342j.

Clark, B.N., Edwards, M.A., Masters, S.V., 2015. Lead release to drinking water from galvanized steel pipe coatings. Environ. Eng. Sci. 32 (8), 713–721. https://doi.org/10.1089/ees.2015.0073.

Cornwell, D.A., Brown, R.A., Via, S.H., 2016. National survey of lead service line occurrence. J. Am. Water Works Assoc. 108 (4), e182–e191. https://doi.org/10.5942/jawwa.2016.108.0086.

Del Toral, M.A., Porter, A., Schock, M.R., 2013. Detection and evaluation of elevated lead release from service lines: a field study. Environ. Sci. Technol. 47 (16), 9300–9307. https://doi.org/10.1021/es4003636.

DeSantis, M.K., Triantafyllidou, S., Schock, M.R., Lytle, D.A., 2018. Mineralogical evidence of galvanic corrosion in drinking water lead pipe joints. Environ. Sci. Technol. 52 (6), 3365–3374. https://doi.org/10.1021/acs.est.7b06010.

Dolan, M., 2016a. Michigan DEQ to Target Flint Faucets as Lead Source. Detroit Free Press. www.freep.com/story/news/local/michigan/flint-water-crisis/2016/09/08/deq-target-flint-faucets/89998022/.

Dolan, M., 2016b. Study: Flint Lead Contamination Goes beyond Service Pipes. Detroit Free Press. www.freep.com/story/news/local/michigan/flint-water-crisis/2016/09/08/study-flint-lead-contamination-goes-beyond-service-pipes/89994636/.

EPA, 1990. Method 200.7: Determination of Metals and Trace Elements in Water and Wastes by ICP Atomic Emission Spectroscopy, Revision 3.2. Environmental Monitoring Systems Laboratory, Office of Research and Development, Cincinnati, OH.

EPA, 1991a. Drinking water regulations; maximum contaminant level goals and national primary drinking water regulations for lead and copper. In: Federal Register, 40 CRF Parts 141 and 142, vol. 56. U. S. EPA., p 32112

EPA, 1991b. Maximum contaminant level goals and national primary drinking water regulations for lead and copper. Fed. Regist. 40. CFR Part 141, Subpart I. 56: 26460.

EPA, 1991c. Final Regulatory Impact Analysis of National Primary Drinking Water Regulations for Lead and Copper (1991.W.91.E.A). EPA, Washington

EPA, 1992. Drinking water regulations: maximum contaminant level goals and national primary drinking water regulations for lead and copper. Fed. Regist. 40.

CFR Parts 141 and 142. 57:28785.

EPA, 1994. Method 200.8: Determination of Trace Elements in Waters and Wastes by Inductively Coupled Plasma-Mass Spectrometry. Revision 5.4. Environmental Monitoring Systems Laboratory, Office of Research and Development, EPA, Cincinnati, Ohio.

EPA, DEQ and city of flint recommend flushing water to speed recovery of system. United States Environmental Protection Agency, United States Environmental Protection Agency, 19 January 2017. snapshot.epa.gov/newsreleases/epa-deq-and-city-flint-recommend-flushing-water-speed-recovery-system.html.

EPA, 2013. Integrated Science Assessment (ISA) for Lead (Final Report, Jul 2013). EPA, Washington, DC. EPA/600/R-10/075F.

EPA, 2016. Flint, MI filter challenge assessment attachment: ATSDR letter to EPA Administrator June 22, 2016 Prepared by EPA in coordination with the Unified Command Group. https://www.epa.gov/sites/production/files/2016-06/documents/filter_challenge_assesment_field_report_-_epa_v5.pdf.

EPA (United State Environmental Protection Agency), 1986. Safe Drinking Water Act Amendments of 1986. "Prohibition on Use of Lead Pipes, Solder, and Flux", 42 U.S.C. § 300g-6(d). Pub.L. 99—359, approved 1986-06-19.

Fowler, B.A., Duval, G., 1991. Effects of lead on the kidney: Roles of high-affinity lead-binding proteins. Environmental Health Perspectives 91, 77–80. https://doi.org/10.2307/3430986.

Giani, R., Edwards, M., Chung, C., Wujek, J., 2004. Use of lead profiles to determine source of action level exceedances from residential homes in Washington, D.C. In: Proc. 2004 AWWA Water Quality Technical Conference, San Antonio, TX.

Hayes, C., Croft, T., Campbell, A., Douglas, I., Gadoury, P., Schock, M., 2013. Optimization of corrosion control for lead in drinking water using computational modeling techniques. Jour. New England Water Works Assoc. 127 (3), 232—251.

Hayes, C.R., Croft, N., Phillips, E., Craik, S., Schock, M., 2016. An evaluation of sampling methods and supporting techniques for tackling lead in drinking water in Alberta Province. J. Water Supply Res. Technol. - Aqua 65 (5), 373–383. https://doi.org/10.2166/aqua.2016.117.

HDR Engineering, Inc., 2009. An Analysis of the Correlation between Lead Released from Galvanized Iron Piping and the Contents of Lead in Drinking Water. Bellevue, WA.

Hoekstra, E.J., Pedroni, V., Passarella, R., Trincherini, P.R., Eisenreich, S.J., 2004. Elements in tap water part 3: effect of sample volume and stagnation time on the concentration of the element. http://publications.jrc.ec.europa.eu/repository/bitstream/111111111/10768/1/EUR%2020672%20EN%20(part%203).pdf.

Hoekstra, E.J., Hayes, C.R., Aertgeerts, R., Becker, A., Jung, M., Postawa, A., Russell, L., Witczak, S., 2009. Guidance on Sampling and Monitoring for Lead in Drinking Water. JRC-IHCP. http://publications.jrc.ec.europa.eu/repository/bitstream/JRC51562/jrc51562.pdf.

Jain, R.B., 2016. Trends and variability in blood lead concentrations among US children and adolescents. Environ. Sci. Pollut. Res. Int. 23 (8), 7880—7889.

Karalekas, P.C., Craun, G.F., Hammonds, A.F., Ryan, C.R., Worth, D.J., 1975. Lead and Other Trace Metals in Drinking Water in the Boston Metropolitan Area. AWWA 95th Annual Conference. Minneapolis, MN.

Lanphear, B.P., Rauch, S., Auinger, P., Allen, R.W., Hornung, R.W., 2018. Low-level lead exposure and mortality in US adults: a population-based cohort study. Lancet Public Health 3 (4), e177—e1843. https://doi.org/10.1016/s2468-2667(18)30025-2.

Leer, D.V., Weatherill, N., Sharp, R., Hayes, C., 2002. Modelling the diffusion of lead into drinking water. Appl. Math. Model. 26 (6), 681–699. https://doi.org/10.1016/s0307-904x(01)00077-4.

Lytle, D.A., Schock, M.R., Sorg, T.J., 1996. Controlling lead corrosion in the drinking water of a building by orthophosphate and silicate treatment. Jour. New England Water Works Assoc. 110 (3), 202.

Masters, S., Edwards, M., 2015. Increased lead in water associated with iron corrosion. Environ. Eng. Sci. 32 (5), 361—369.

Muylwyk, Q., Gilks, J., Suffoletta, V., Olesiuk, J., 2009. Lead occurrence and the impact of LSL replacement in a well buffered groundwater. In: Proceedings of the 2009 AWWA Water Quality Technology Conference. Seattle, WA.

Nguyen, C.K., Stone, K.R., Dudi, A., Edwards, M.A., 2010. Corrosive microenvironments at lead solder surfaces arising from galvanic corrosion with copper pipe. Environ. Sci. Technol. 44 (18), 7076—7081.

NTP, 2012. https://ntp.niehs.nih.gov/pubhealth/hat/noms/lead/index.html.

Pieper, K.J., Martin, R., Tang, M., Walters, L., Parks, J., Roy, S., Devine, C., Edwards, M.A., 2018. Evaluating water lead levels during the Flint water crisis. Environ. Sci. Technol. 52 (15), 8124—8132.

Pirkle, J.L., Brody, D.J., Hunter, E.W., Kramer, R.A., Paschal, D.C., Flegal, K.M., Matte, T.D., 1994. The decline in blood lead levels in the United States - the national health and nutrition examination surveys (NHANES). J. Am. Med. Assoc. 272 (4), 284—291. https://doi.org/10.1001/jama.1994.03520040046039.

Sandvig, A., Kwan, P., Kirmeyer, G., Maynard, B., Mast, D., Trussell, R.R., Trussell, S., Cantor, A., Prescott, A., 2008. Contribution of Service Line and Plumbing Fixtures to Lead and Copper Compliance Issues. American Water Works Research Foundation. Report 91229.

Schock, M.R., 1990. Causes of temporal variability of lead in domestic plumbing systems. Environ. Monit. Assess. 15 (1), 59–82. https://doi.org/10.1007/bf00454749.

Schock, M.R., Lemieux, F.G., 2010. Challenges in addressing variability of lead in domestic plumbing. Water Sci. Technol. Water Supply 10 (5), 792–798. https://doi.org/10.2166/ws.2010.173.

Smargiassi, S., Steinkrauss, J., Sandvig, A., Young, T., 2006. Impacts of lead service line replacement on lead levels at the tap. In: Presented June 2006 AWWA

Annual Conference, San Antonio, TX.

Subramanian, K.S., Sastri, V.S., Elboujdaini, M., Connor, J.W., Davey, A.B.C., 1995. Water contamination: impact of tin-lead solder. Water Res. 29 (8), 1827—1836. https://doi.org/10.1016/0043-1354(95)00005-6.

Triantafyllidou, S., Parks, J., Edwards, M., 2007. Lead particles in potable water. J. Am. Water Works Assoc. 99 (6), 107—117. https://doi.org/10.1002/j.1551-8833.2007. tb07959.x.

Triantafyllidou, S., Schock, M.R., Desantis, M.K., White, C, 2015. Low contribution of PbO$_2$ coated lead service lines to water lead contamination at the tap. Environ. Sci. Technol. 49 (6), 3746—3754. https://doi.org/10.1021/es505886h.

Tsoi, M.F., Cheung, C.L., Cheung, T.T., Cheung, M.M.Y., 2016. Continual decrease in blood lead level in Americans: United States national health nutrition and examination survey 1999-2014. Am. J. Med. 129 (11), 1213—1218.

van den Hoven, T., Slaats, N., 2005. Lead monitoring. In: Analytical Methods for Drinking Water: Advances in Sampling and Analysis. John Wiley & Sons, Ltd, Chichester, UK. https://doi.org/10.1002/0470094931.ch3.

Wang, Y., Jing, H., Mehta, V., Welter, G.J., Giammar, D.E., 2012. Impact of galvanic corrosion on lead release from aged lead service lines. Water Res. 46 (16), 5049—5060.

Wang, Z.M., Devine, H.A., Zhang, W., Waldroup, K., 2014. Using a GIS and GIS-assisted water quality model to analyze the deterministic factors for lead and copper corrosion in drinking water distribution systems. J. Environ. Eng. 140 (9) https://doi.org/10.1061/(asce)ee.1943-7870.0000816.

Wisely, J., 2016. Random Lead Spikes in Flint Water Continue, vol. 1. Detroit Free Press, 07 p.m. ET April 22, 2016; Updated 5:59 pp..m. ET April 22, 2016. https://www.freep.com/story/news/local/michigan/flint-water- crisis/2016/04/ 22/random-lead-spikes-flint-water/83386668/.

# Exhibit 30

| | |
|---|---|
| **From:** | Tallman, Sarah |
| **To:** | William Kim; "awheeler@cityoffint.com" |
| **Cc:** | McLaughlin, Jolie; Rolnick, Addie; Xu, Cat; Bonsitu Kitaba; "kuhlr@michigan.gov" |
| **Subject:** | Concerned Pastors - meet/confer follow-up |
| **Date:** | Monday, May 17, 2021 5:46:12 PM |
| **Attachments:** | 2021-05-14 Outreach list with outstanding obligations and questions.xlsx |

Bill and Angela,

Thank you for the productive conversation Friday morning. We've now reviewed the data the City shared on Thursday. Based on this information and the additional excavation data the State shared, Plaintiffs have compiled the attached spreadsheet ("2021-05-14 Outreach list with outstanding obligations and questions.xlsx") listing 193 homes that still require additional outreach or documentation.

Regarding the City's request to set announce a deadline for consent forms this week, the City must first resolve the outreach violations for the addresses in categories A (homes missing a weekend/evening door knock) and B (inactive water accounts) described below. Plaintiffs cannot agree to a consent form deadline until this outreach is completed. *See* ECF No. 228 at 15-16. Once the City completes the required outreach to the 64 homes in categories A and B below and provides documentation of completion, Plaintiffs will agree to set a deadline for consent forms that is 4 weeks later. As we've discussed, the City must give residents at least 28 days' notice of the deadline.

In addition, based on our discussion on Friday, please provide a revised proposal for the deadlines for completing all excavation/replacement work and for completing all restoration work. As discussed, Plaintiffs believe it would be prudent to build in a cushion to the City's projections to account for potential unforeseen delays and avoid another renegotiation of the deadlines.

Follow-ups from the City's 5/13 data disclosures:

A. **Outreach attempts missing weekend/evening door knock:** Plaintiffs have identified six addresses which, according to the updated data provided by the City, have still not received the required in-person consent attempts, including one attempt after 5 PM or on a weekend. These addresses are highlighted in yellow on the attached spreadsheet. Please complete the required outreach by making an additional in-person consent attempt after 5PM or on a weekend and provide Plaintiffs with documentation demonstrating completion of this missing outreach.

B. **Homes the City marked as inactive:** Based on Plaintiffs' records, 58 homes, highlighted in blue on the attached spreadsheet, had active water accounts as of March 2017. Indeed, 50 of these addresses appeared on the list of replacement eligible households provided by the City pursuant to Paragraph 13 of the 2019 Stipulation. *See* ECF No. 208 ¶ 13; Email from W. Kim to S. Tallman (Feb. 14, 2019) (attaching spreadsheet titled "Phase VI Addresses – Para 13 data"). These homes are thus eligible for replacement and the Settlement requires the City to complete outreach at these homes—including giving residents an opportunity to reactivate their water account so they can participate in the program—unless they are abandoned. *See* ECF No. 147-1 ¶¶ 11-12. Please complete all required outreach for these 58 homes and provide documentation of this outreach to Plaintiffs. If the City concludes that any of these homes are "abandoned" as that term is defined in the Settlement, *id.* ¶ 12, please note that in the documentation provided to Plaintiffs, including a description of the basis supporting the City's conclusion. Pursuant to section 24-109 of the Flint Code of Ordinances, evidence of abandonment may include "overgrown or dead vegetation, accumulation of newspapers, circulars, flyers or mail, past due utility notices, accumulation of junk, litter, trash or debris, absence of window treatments such as blinds, curtains or shutters, absence of furnishings and personal items, and statements by neighbors, delivery agents or similarly situated persons that the property is vacant."

C. **Additional documentation required for homes the City marked as completed:** The other 129 addresses on the attached spreadsheet (not highlighted) are homes marked as completed on either the City's spreadsheet titled "2021.05.13 NRDC 5.3.21 Outreach List w Rowe-City Data.xlsx" or the State's spreadsheet titled "MDEQ Final SLE SLR Update 3-5-19.xlsx" but for which the City has not yet provided full documentation as required by the Settlement. Please provide the full, required documentation of these excavations, including the date of excavation, private and public side service line composition, and replacement status. *See* ECF No. 147-1, ¶ 117.c.ii.

In addition, Plaintiffs have the following questions about restoration:

A. **General restoration process questions**

1. What parts of restoration work, if any, occur immediately after a service line has been excavated/replaced? What parts of restoration work occur later? How does the City communicate to the entity or department doing the restoration that there is a new work order for a home that had a new excavation and/or replacement?

2. Does the Department of Transportation do any restoration work? Or is all the restoration work done by Goyette?

3. Does Goyette do temporary restoration first? And if so, how does the City and/or Goyette keep track of which homes have only received temporary (not permanent) restoration?

4. Has Goyette been restoring lawns with topsoil, reseeding, and planting per the restoration contract that the City sent us on March 19, 2021 (*see* Section 32 90 10-1)? If not, when does Goyette plan to do the topsoil, reseeding, and planting work?

    i. When Goyette puts down topsoil, seed, and planting, where/how does it document that such work has been completed?

    ii. Has the City received any documentation from Goyette regarding the topsoil, reseeding, and planting work – both work that has already been done and work that still needs to be completed? If so, what documentation has been provided to Plaintiffs?

    iii. Is there a specific time of year that the topsoil, reseeding, and planting work needs to occur? If the restoration work occurs at a time of the year where reseeding/planting cannot be done, how does the City or Goyette keep track of homes that it needs to revisit to complete the reseeding/planting work?

B. **Restoration contract questions**

1. Does the contract the City provided to Plaintiffs on March 19, 2021 govern the City's remaining restoration work? If not, does the City need to extend the contract with Goyette for the remaining work?

2. How much does the City expect to pay Goyette under the new contract (if new contract will be signed)?

    i. If the City does not have all data showing which homes have been completed, how will it determine the cost of the remaining work?

    ii. How much of this contract will be devoted to the topsoil, reseeding, planting work?

3. If the City needs to extend the contract with Goyette, does the City expect this process to delay completion of restoration work? If so, how long of a delay?

4. If there are any new contracts for restoration work, please provide them to Plaintiffs.

5. The contract says that Goyette will provide property owners with 2 copies of written maintenance and instructions for maintenance and care of lawn areas. *See* Section 32 90 10-2. Is Goyette providing these to the property owners?

6. The contract says that Goyette must repair or replace seeded areas that have not grown in a satisfactory manner for a period of 1 year after date of acceptance. *See* Section 32 90 10-3.

    i. How has the City been keeping track of this requirement and determining which homes need to be revisited within the 1-year period because the seeded areas haven't survived/grown?

7. Section 32 90 10-8 says that a follow-up inspection will be made by the Engineer to determine whether the contract requirements have been met, and that the Engineer's findings will be documented in a field report.

    i. Is the Engineer ROWE? If not, who is the Engineer?

    ii. Does the City have copies of these field reports?

8. Under Section 32 90 10-7, the contract says that Goyette must notify the Engineer at the conclusion of planting operations so that the engineer can determine substantial completion. Where are these site visits documented?

Please let us know if you have any questions concerning any of the above.

Regards,
Sarah

---

**From:** Tallman, Sarah
**Sent:** Friday, May 14, 2021 5:32 PM
**To:** William Kim <wkim@cityofflint.com>; 'awheeler@cityofflint.com' <awheeler@cityofflint.com>
**Cc:** Jolie McLaughlin (jdmclaughlin@nrdc.org) <jdmclaughlin@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; 'kuhlr@michigan.gov' <kuhlr@michigan.gov>
**Subject:** Concerned Pastors - outreach follow-up

Bill and Angela,

Thanks for the productive phone call today. We are still analyzing the data you provided last night, but wanted to draw your attention to six addresses where our analysis shows that additional outreach is needed. We assume that consent has not been obtained for any of these six homes, which appear on the "2021.05.13 NRDC 5.3.21 Outreach List w Rowe-City Data" spreadsheet. If this is the case, then the City must make an additional contact attempt to comply with the Settlement's requirements, as provided in the right-most column below.

Regards,
Sarah

| | | |
|---|---|---|
| 1414 BERRYWOOD LN | Marked "See NRDC consent attempts spreadsheet" | The listed attempts do not include an attempt after 5PM or on a weekend. Please complete the required outreach by making an additional in-person consent attempt after 5PM or on a weekend. |
| 347 BROWNING AVE | Marked "See NRDC consent attempts spreadsheet" | The listed attempts do not include an attempt after 5PM or on a weekend. Please complete the required outreach by making an additional in-person consent attempt after 5PM or on a weekend. |
| 1925 GREENBRIAR LN | Marked "See NRDC consent attempts spreadsheet" | The listed attempts do not include an attempt after 5PM or on a weekend. Please complete the required outreach by making an additional in-person consent attempt after 5PM or on a weekend. |
| 2826 HILLCREST AVE | Consent attempts made 4/25/19 (Mailing), 6/19/19 12:00 PM, 8/7/19 10:30 AM | The listed attempts do not include an attempt after 5PM or on a weekend. Please complete the required outreach by making an additional in-person consent attempt after 5PM or on a weekend. |
| 1515 WYOMING AVE | Consent attempts 4/25/19 (Mailing), 6/17/19 12:00 PM, 7/23/19 12:00 PM | The listed attempts do not include an attempt after 5PM or on a weekend. Please complete the required outreach by making an additional in-person consent attempt after 5PM or on a weekend. |
| 935 HURON ST | Consent attempts made 4/25/19 (Mailing), 7/30/19 11:33 AM, 8/1/19 8:01 AM | The listed attempts do not include an attempt after 5PM or on a weekend. Please complete the required outreach by making an additional in-person consent attempt after 5PM or on a weekend. |

SARAH C. TALLMAN (SHE/HER)
*Senior Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.651.7918
stallman@nrdc.org

# Exhibit 31

| From: | Tallman, Sarah |
| --- | --- |
| To: | William Kim |
| Cc: | Angela Wheeler; Rolnick, Addie; McLaughlin, Jolie; Xu, Cat; Bonsitu Kitaba |
| Subject: | RE: Service Line Excavation/Replacement Revised Completion Deadlines |
| Date: | Thursday, June 24, 2021 1:26:30 PM |

Bill,

Thank you for providing Plaintiffs with updated reporting and a proposal concerning the remaining deadlines for the pipe replacement program.

Plaintiffs' assessment of the City's recently provided data indicates that the City has remedied the outreach violations Plaintiffs first identified on 1/6/21 (we most recently shared an updated list of these violations on 5/17/21). Accordingly, Plaintiffs will agree to a consent-form deadline of July 23, 2021, as the City proposed. We urge the City to publicize this deadline as widely and through as many channels as possible, to ensure that the message circulates throughout the community. We also encourage the City to communicate the consent-form deadline in other languages spoken in Flint, including Spanish, Chinese, Arabic, and Hmong. *Accord* ECF No. 147-1 ¶ 77.c.iv.

Plaintiffs' agreement to this consent-form deadline does not change any of the City's obligations under the Settlement to complete required work at all replacement eligible homes. *See* ECF No. 217 ¶¶ 1-2. If the City's reporting reveals eligible homes where the City has not yet completed the required outreach attempts and/or post-consent scheduling attempts, Plaintiffs will bring those addresses to the City's attention and the City must remedy those violations immediately. If the City did not timely complete the required outreach and/or scheduling attempts and the resident chooses to join the program, the City must complete the required excavation (and replacement, if appropriate).

Plaintiffs are concerned about the City's ability to meet its other two proposed deadlines (September 3 for excavations and replacements, and December 31 for restoration). As we've discussed, Plaintiffs want to avoid repeatedly renegotiating these deadlines in the event the City is again unable to meet the commitments it makes to the parties and the Court. To ensure the City has sufficient time to finish its work, Plaintiffs propose deadlines of **December 31, 2021**, for completion of all excavation and replacement work, and **June 30, 2022**, for completion of all restoration work. Extending these deadlines will not prevent the City from finishing the required work earlier (and in line with its proposed fall/winter 2021 deadlines). The Settlement provides a clear process for the City to provide notice to the other parties when it believes it has completed its obligations. ECF No. 147-1 ¶ 45. Rather, the extended deadlines will help avoid future disputes and possible motion practice in the event the City does not complete all required work under the Settlement, including restoration, by the end of 2021.

Plaintiffs also have follow-up questions about restoration, the recent filter reports, and the most recent consent attempts spreadsheet, listed below. Please provide responses to these questions no later than July 8, 2021.

**Restoration**

PA-207

1. Please confirm whether restoration work for roads in Flint has begun. We received reports that there may have been delays moving forward with Goyette's contract to do road restoration.
2. You stated that Goyette has been using topsoil, reseeding, and planting "in the Greenbelt." What is considered "in the Greenbelt"? Is Goyette also doing topsoil, reseeding, and planting work on lawns?
3. Please send us copies of Goyette's past invoices, including the documentation that it provided to the City regarding the addresses that were completed and what work was done at each address.
4. You stated that the City could not provide answers to certain questions that concerned the end-date for Goyette's contract because the contract does not contain an end date. To make sure we understand, are you saying that the contract with Goyette that the City provided to Plaintiffs on March 19, 2021 governs all of the City's remaining restoration work?
5. There were a few questions unrelated to the contract's end date that the City did not answer. Please provide answers to these outstanding questions (recopied below).
   a. The contract provides that Goyette will provide property owners with 2 copies of written maintenance and instructions for maintenance and care of lawn areas. *See* Section 32 90 10-2. Is Goyette providing these to the property owners?
   b. The contract provides that Goyette must repair or replace seeded areas that have not grown in a satisfactory manner for a period of 1 year after date of acceptance. *See* Section 32 90 10-3. How has the City been tracking this requirement and determining which homes need to be revisited within the 1-year period because the seeded areas haven't survived/grown?
   c. Section 32 90 10-8 provides that a follow-up inspection will be made by the Engineer to determine whether the contract requirements have been met, and that the Engineer's findings will be documented in a field report. (i) Is the Engineer ROWE? If not, who is the Engineer? (ii) Does the City have copies of these field reports, and if so, can you please send them to us?
   d. Under Section 32 90 10-7, the contract provides that Goyette must notify the Engineer at the conclusion of planting operations so that the engineer can determine substantial completion. Please confirm that these site visits are occurring. Where are these site visits documented?

**Filter reports**

The three addresses Plaintiffs noted as still requiring follow-up visits in our 6/4/21 email did not appear on the two most recent filter reports. We expect follow-up visits to these addresses (1407 W PATERSON ST, 821 LEXINGTON AVE, and 710 CRAPO ST) to be documented in the next weekly report to resolve this violation of the Settlement's filter verification requirements.

**Consent attempts spreadsheet**

We have a question about the color coding on the City's "2021-05-14 Consent attempts" spreadsheet: the spreadsheet notes that green cells represent scheduling attempts while blue cells represent consent attempts, but a number of the blue cells post-date the green cells, which confuses us. Can you clarify?

Please let us know if you have any questions or would like to discuss these issues by phone.

Regards,

Sarah

SARAH C. TALLMAN (SHE/HER)
*Senior Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.651.7918
stallman@nrdc.org

---

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Tuesday, June 22, 2021 2:08 PM
**To:** Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Xu, Cat <CXu@nrdc.org>
**Cc:** Angela Wheeler <awheeler@cityofflint.com>; Clyde Edwards <cedwards@cityofflint.com>
**Subject:** Service Line Excavation/Replacement Revised Completion Deadlines

Sarah,

The City's team met internally yesterday to assess the progress in completing service line replacement and excavation.  After reviewing the progress to date, the City believes it is critical that we make a public announcement about the opt-in deadline ASAP, as our contractors are reporting a significant lack of cooperation from residents due to people believing that they have an indefinite period in which to opt in and schedule the excavation/replacement of their service lines.  In addition, the City believes that it has worked in good faith to satisfy all of the NRDC's expressed concerns regarding consent attempts, in particular addressing any issues identified by the NRDC to date, and that the City has completed all required consent attempts.

In terms of a project completion schedule, the City believes that the following are achievable.
**Deadline for residents to opt-in:** July 23, 2021
**Deadline for completion of service line excavation/replacement:** September 3, 2021
**Deadline for completion of restoration work:** December 31, 2021 (The City's goal is to complete restoration ASAP after SLE/R completion, but efforts will necessarily be constrained by  the weather and availability of materials.

As a result, the City intends to announce this Friday, 6/25, that residents will have 28 days in which to opt-in to the SLE/R program.  Please let us know no later than this Thursday, 6/24, if there are any objections to us proceeding on this basis.

Thank you,
--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079

PA-209

# Exhibit 32

| | |
|---|---|
| **From:** | Rolnick, Addie |
| **To:** | William Kim; "awheeler@cityofflint.com" |
| **Cc:** | McLaughlin, Jolie; Tallman, Sarah; Xu, Cat; Bonsitu Kitaba; "kuhlr@michigan.gov" |
| **Subject:** | Concerned Pastors - action steps from 11/23/21 call |
| **Date:** | Wednesday, November 24, 2021 11:54:19 AM |
| **Attachments:** | 8 2 21 List of addresses missing documentation w response.xlsx |
| | 11.10.21 Pls." List of Homes Missing from Replacement Eligible Homes List.xlsx |

Bill,

Thank you for the productive conversation yesterday. Below are the next steps and timeline the parties agreed to:

**Plaintiffs:**
1. **By Wednesday, December 1**
   a. Plaintiffs will share new draft stipulation language regarding the restoration deadline. Per our discussion, this language will state that the City is planning to re-bid its restoration contract, that this bidding process will be concluded in spring 2022, and that within 30 days of the date the City concludes the bidding process and awards the contract, the parties will meet and confer to agree on a specific deadline for the City to complete all restoration work.
   b. After consulting with their clients, Plaintiffs will respond to the City's proposal to remove the recitals language the City identified from the draft Stipulation.

**The City:**
1. **By Wednesday, December 1**
   a. The City will respond to Plaintiffs' counter-proposal to the City's proposed excavation deadline: to ensure that the Stipulation includes an achievable deadline and to create a cushion to allow for potential unforeseen circumstances that may delay completion, Plaintiffs propose setting the excavation deadline as September 30th, 2022.
   b. As discussed, the 748 homes with currently inactive accounts—included on the list of homes Plaintiff shared via email on August 2, 2021 and marked "inactive" by the City in column F of the attached spreadsheet, "8 2 21 List of addresses missing documentation w response.xlsx." —all had active water accounts at some point prior to the July 2021 opt-in deadline. These homes thus should have the opportunity to participate in the pipe replacement program and are properly included in the 2021 Replacement Eligible Homes List. The City will respond to Plaintiffs as to whether it will agree that these 748 homes are part of the 2021 Replacement Eligible Homes List.
2. **By Wednesday, December 8**
   a. The City will provide updated numbers to include in the paragraph on the bottom of page 2 of the draft stipulation, reflecting the status of work at the close of work for 2021. These numbers include the number of homes that have provided consent forms but still need to be scheduled for excavation and possible replacement and homes that have had their service lines excavated or replaced and still need to have their properties restored.
   b. The City will provide updated copies of the spreadsheets composing the 2021 Replacement Eligible Homes List. These spreadsheets will include the 1190 additional homes identified by Plaintiffs and listed on the attached spreadsheet titled "11.10.21 Pls.' List of Homes Missing from Replacement Eligible Homes List.xlsx."
3. **As soon as possible:**
   a. The City will clarify whether there are addresses where an excavation found a public or private side lead service line but that lead line was not replaced and provide a list of these addresses to Plaintiffs.
   b. The City will ask for the base numbers behind its estimate of how much funding is needed to complete restoration and will share this information with Plaintiffs.

Happy Thanksgiving!

PA-211

Addie

**ADELINE ROLNICK**
*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

---

**From:** Tallman, Sarah <stallman@nrdc.org>
**Sent:** Wednesday, November 17, 2021 12:49 PM
**To:** William Kim <wkim@cityofflint.com>; 'awheeler@cityofflint.com' <awheeler@cityofflint.com>
**Cc:** Rolnick, Addie <ARolnick@nrdc.org>; McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; 'kuhlr@michigan.gov' <kuhlr@michigan.gov>
**Subject:** RE: Concerned Pastors - action steps from 9/14/21 call

Bill,

I'm following up on several items from our call last week. This email can also serve as an agenda for our scheduled meet and confer on 11/19/21. Please let us know if you have anything to add to the agenda.

1. **Scheduling next meet and confer**: You should have received a calendar invite from Addie for 4 pm ET on Friday, 11/19 for a Microsoft Teams meeting. We anticipate that having only the lawyers on the line will be sufficient for that call.

2. **Finalization of the Stipulation:** As discussed and described in my 11/5/21 email, Plaintiffs are eager to file the 2021 Stipulation as soon as possible, and at the latest by the end of 2021. We'd like to use the call on Friday to make progress in narrowing the remaining outstanding issues, as described below.

   A. **Sign-off on Stipulation language**: As requested, I'm attaching the most recent version of the Stipulation, which Plaintiffs sent to you on August 30 and reminded the City about by email on September 13, October 5, October 13, and November 5. This is the sixth time Plaintiffs are requesting that the City review this language. Please let us know whether this language—excluding the content of the 2021 Replacement Eligible Homes List and the deadlines in Paragraphs 1 and 4—is acceptable to the City.

B. **Deadlines for 2021 Stipulation:** As discussed and as Plaintiffs previously requested, on our call on Friday, please provide a proposal for revised deadlines to insert into Paragraphs 1 and 4 of the Stipulation (the deadlines to complete all excavations/replacements and all restoration, respectively). We understand that there may be some remaining uncertainty at this stage of the exact number of homes where remaining work is required, given that the 2021 Replacement Eligible Homes List still is not finalized. To that end, Plaintiffs believe it is appropriate for the City to set conservative deadlines that give sufficient cushion to account for these remaining uncertainties. As Plaintiffs have repeatedly emphasized, we want to avoid having to renegotiate these terms again in 2022.

C. **Finalization of the 2021 Replacement Eligible Homes List**:

i. As I mentioned last week, I am attaching a revised list of the homes Plaintiffs identified as missing from the City's proposal for the 2021 Replacement Eligible Homes List. The revised list now contains 1190 homes (instead of 1690), and is attached, labeled "11.10.21 Pls.' List of Homes Missing from Replacement Eligible Homes List." As I mentioned, adding these homes to the 2021 Replacement Eligible Homes List will not materially expand the City's remaining required work. Only 8 of these homes still require additional work from the City (because the resident has consented, but work hasn't been completed yet).

ii. On our call on Friday, as requested in our 11/5/21 email, **please confirm the City's agreement that the addresses on the attached spreadsheet are included in the 2021 Replacement Eligible Homes List**. Based on our analysis, the 2021 Replacement Eligible Homes List is comprised of 31,093 addresses, subject to the addition of the 748 addresses discussed in outstanding item 2.C.iii below.

iii. **748 currently inactive accounts**: I'm confirming that the City has represented that it has provided all of the information it has concerning mailings it sent pursuant to the Settlement. If the City's data in the Phase VI mailing list and the mailing list shared on 9/1/2020 does not indicate that the City sent a mailing to a home, then Plaintiffs will assume that no mailing was sent. Plaintiffs are still conferring concerning a proposal concerning these homes. Better understanding how much Settlement funding remains, and what sources of additional funding the City plans to use for the remaining work, will facilitate further discussion of these issues. See Item 2.D below.

iv. **Agreement on content of sublists.** You requested that the parties come to an agreement regarding each of the sublists the City provided on 10/13/21. Plaintiffs do not think it's appropriate to do that full analysis now. That is the work contemplated in Paragraph 2 of the draft Stipulation, which Plaintiffs have agreed to do *after* the City finishes all of the required excavations and replacements. Nonetheless, Plaintiffs agree that it will be useful to come to an agreement on the following sublists now: (1) list of homes that have submitted

consent forms but that still need excavation/replacement work and/or scheduling attempts; and (2) list of all homes that still need outreach. These lists will comprise all of the outstanding required work (excluding restorations). There is a third possible category where remaining work is required—(3) list of homes where the City has conducted an excavation, identified a lead line, but has not yet replaced it yet. Our initial analysis indicates that there may be some homes in this category. This is confusing, because we thought that when the City did an excavation and found a lead line, it immediately replaced the line. **Is it true that the City immediately replaces a lead line when it is identified through an excavation? Or is there sometimes a lag?**

v. **Data clarification question:** Please provide a response to the following question from Addie's 10/13/21 email: Please clarify what the three different tabs—"non-resp," "outstanding," and "consent"—mean in the "2021-09-14 Non-responsive.xlsx" file the City provided. Have all of these addresses received the required outreach but neither submitted a consent form nor declined excavation, or do some of these addresses fall into some other category?

D. **Remaining Settlement Funding:** Last week, you explained that the City has between $5M and $7M left in Settlement funding, and that the City estimates it will need up to an additional $10M beyond that to finish the remaining work. On our call on Friday, please provide responses to the following questions:
- What is the basis for this $10M estimate? How was it calculated? What assumptions were made?
- How much additional funding does the City expect to spend on administrative and project management costs (as opposed to excavation, replacement, and restoration costs)?
- What sources of additional funding does the City plan to use to complete work once the $97M is exhausted? Is the City planning to use any funds it has received or anticipates it will receive through American Rescue Plan Act (ARPA)? Does the City anticipate that it will receive funds to assist with lead service line replacement through the recently signed federal infrastructure law? If funds will be diverted from other projects the City had planned to complete using the WIIN funding, please identify which projects those are. Has the City asked the State for additional funds to complete this work?

3. **Outstanding reports:** Please provide the outstanding reports described in my 11/5/21 email. Plaintiffs have not received the City's October monthly reporting data and have not received weekly filter verification data for the past two months. **Please provide this reporting as soon as possible and confirm whether excavations, replacements, and restoration work is ending on 11/19/21, as you stated on our call last week.**

We appreciate your prompt attention to these outstanding issues. The City's continued delays in responding to Plaintiffs' questions over periods of months is preventing the parties from finalizing the Stipulation. If you have any questions or need clarification on any of the items described above,

please call me at 847-254-8329.

Regards,

Sarah

---

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Tuesday, November 9, 2021 4:47 PM
**To:** Tallman, Sarah <stallman@nrdc.org>
**Subject:** Re: Concerned Pastors - action steps from 9/14/21 call

Sarah,

Things have been crazy around her due to the election, and I'm a bit behind on all of the SLR stuff. Can we chat this week and make sure I understand what you're requesting/asking?

Also, we can make some time available next Friday afternoon, 3 or 4 would work fine.

B

On Fri, Nov 5, 2021 at 5:44 PM Tallman, Sarah <stallman@nrdc.org> wrote:

> Bill and Angela,
>
> Thank you for sharing the spreadsheets comprising the City's proposed 2021 Replacement Eligible Homes List. We'd like to set up a meet and confer to discuss finalizing the List and the draft 2021 Stipulation, including the various outstanding issues described below. **Please let us know whether the City is available for a call during any of the following windows:**
>
> - 11/17, 1 or 2 pm ET
> - 11/19, 2, 3, or 4 pm ET
>
> Plaintiffs have reviewed the data the City submitted on 10/13, and, based on data the City previously shared, the City's 10/13 lists are missing 1,690 addresses at which the City's past reporting shows that the City either completed required outreach, received consent to perform and excavation, completed an excavation, or where the resident declined excavation. The parties have agreed that the 2021 Replacement Eligible Homes List includes (1) all excavated homes; (2) all declination homes; (3) all non-consent homes; (4) all homes that consented but the city was unable to schedule excavation; (5) all outstanding work orders (including the 672 addresses on Plaintiffs' 8/2 list with active water accounts); and (6) any homes on Plaintiffs' 8/2 list of eligible homes with currently inactive water accounts at which the parties agree additional work is needed. Accordingly, the 1,690 addresses we identified must be included in the 2021 Replacement Eligible Homes List. These addresses are listed on the attached spreadsheet, "11.4.21 Pls.' List of Homes Missing from Replacement Eligible Homes List." **Please confirm the**

**City's agreement that the addresses on the attached spreadsheet are included in the 2021 Replacement Eligible Homes List**. Based on our analysis, the 2021 Replacement Eligible Homes List is comprised of 31,032 addresses, subject to the addition of the 748 addresses discussed in outstanding item 1 below.

Second, please confirm the status of homes on City's 2021 Replacement Eligible Homes List that occur both on the Outstanding Work Orders List and on another list. For example, 70 addresses appear on both the Outstanding Work Orders List and the Declinations List, and 1,530 homes appear on both the Outstanding Work Orders List and the Nonresponsive List. Based on our previous conversations, we understand that the contractors may, but are not required to, return to homes that occur on the Nonresponsive List and/or the Declination List to attempt to obtain consent to complete work, and these addresses remain on the Outstanding Work Orders List because they are eligible but have not yet been excavated/replaced. In this way, the Outstanding Work Orders List may be in some ways overinclusive of the addresses with remaining *required* work under the Settlement. **Please confirm whether this is accurate.**

Third, we wanted to make you aware of some discrepancies between the spreadsheets comprising the 2021 Replacement Eligible Homes List and the City's past reporting. Some of these discrepancies affect the scope of the City's required remaining work. For example, for seven addresses that now appear on the City's Nonresponsive List or Declination List, Plaintiffs' analysis of the City's data shows that the City received consent to complete an excavation. These addresses are listed in "11.5.21 Homes with consent received.xlsx" (attached). Because consent was provided, the City must conduct the further required work before its obligations as to that address have been met. *See* 2020 Stipulation ¶ 4, ECF No. 217.

Other discrepancies do not affect the scope of remaining required work, but will affect Plaintiffs' future assessment of whether the City has provided documentation showing completion of all excavation and replacement requirements under Paragraph 2 of the revised 2021 Stipulation. For example, there are a number of addresses where, according to the City's "2021-09-14 Completed SLE SLR All Phases" file, a lead or galvanized service line was found and no replacement was completed. However, the City's past reporting shows that the City did complete replacements at some of these addresses. Similarly, the service line composition data in the "2021-09-14 Completed SLE SLR All Phases" file for some addresses conflicts with the service line composition data previously provided by the City. Plaintiffs have not at this time exhaustively catalogued all of the discrepancies between the City's 10/13 data submissions and the City's previous reporting. However, when the City submits its written statement and supporting documentation pursuant to Paragraph 2 of the 2021 Stipulation, these kinds of discrepancies will impede Plaintiffs' ability to assess the City's completion of its excavation and replacement obligations.

Fourth, Plaintiffs have not received the City's October monthly reporting data and have not received weekly filter verification data for the past seven weeks. **Please provide this reporting as soon as possible and confirm whether replacement work is ongoing this fall.**

Finally, we are still waiting for the City to respond to several items from our 9/14/21 call. Further delay on these items is unwarranted. Please provide updates on these items as soon as possible so

we can resolve the remaining issues and then promptly finalize the Stipulation, submit it to City Council for review, and file it.

1. **Mailing information concerning 470 Inactive Addresses on Plaintiffs' 8/2/21 List.** Nearly two months ago, the City agreed to confirm whether mailings were sent to the 748 "inactive" addresses on Plaintiffs' 8/2/21 spreadsheet. The City's failure to respond to this request is a violation of Settlement ¶ 118. This information is crucial to finalizing the 2021 Replacement Eligible Homes List: Understanding the outreach completed at these homes will inform Plaintiffs' understanding and the parties' discussion of what, if any, remaining outreach needs to be completed.

Plaintiffs have since confirmed that, according to the City's reporting, 272 of these addresses received a mailing in April 2019. For the remaining approximately 470 addresses, listed on the attached spreadsheet titled "11.5.21 Inactive Homes - mailing data requested.xlsx," please confirm whether a mailing was sent. If the property owner's address is different from the address on Plaintiffs' spreadsheet (the "service address"), please indicate whether the mailing was sent to the service address or the property owner address. **Please provide this information as soon as possible so that the parties can finalize the 2021 Replacement Eligible Homes List.**

2. **Final Review of Stipulation Language.** Plaintiffs provided the City with a revised draft of the stipulation on August 30, 2021. We have not heard back from the City about whether it consents to this revised language (apart from the content of the 2021 Replacement Eligible Homes List and the listed deadlines). **Please let us know as soon as possible whether the City agrees to the revised language**.

3. **Remaining Available Settlement Funds.** The City agreed that, if such information is available, the City will share the amount of available funding remaining for the Settlement. At minimum, the City is required to track the amount of funding it receives as reimbursement from the State. *See* Settlement Agmt. ¶ 117.c. **Please provide this information as soon as possible.**

Regards,
Sarah

---

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Thursday, October 14, 2021 4:01 PM
**To:** Rolnick, Addie <ARolnick@nrdc.org>
**Cc:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; kuhlr@michigan.gov; Tallman, Sarah <stallman@nrdc.org>; awheeler@cityofflint.com

**Subject:** Re: Concerned Pastors - action steps from 9/14/21 call

I've asked Rowe to clarify the first set of Qs.

On the second 3, I'll have to follow up with some other folks.

Bill

On Wed, Oct 13, 2021 at 5:48 PM Rolnick, Addie <ARolnick@nrdc.org> wrote:

> Bill,
>
> Thank you for sharing the spreadsheets making up the 2021 Replacement Eligible Homes List and the excavation data for last month. We will review this and get back to you. To aid that review, can you clarify what the three different tabs—"non-resp," "outstanding," and "consent"—mean in the "2021-09-14 Non-responsive.xlsx" file? Have all of these addresses received the required outreach but neither submitted a consent form nor declined excavation, or do some of these addresses fall into some other category?
>
> We're also eager to move forward on the other outstanding items from our September 14 call. Can you provide any updates on (1) mailing information concerning the 748 inactive addresses on Plaintiffs' 8/2/21 list; (2) the City's position on the most recent stipulation language; and (3) the amount of state funding remaining for the Settlement?
>
> Regards,
>
> Addie
>
>
> ADELINE ROLNICK
> *Attorney*
>
> NATURAL RESOURCES DEFENSE COUNCIL
> 1152 15TH STREET NW, SUITE 300
> WASHINGTON, DC 20005
> T 202.513.6240
> AROLNICK@NRDC.ORG
> PRONOUNS: SHE/HER
> NRDC.ORG

---

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Wednesday, October 13, 2021 3:03 PM
**To:** Rolnick, Addie <ARolnick@nrdc.org>
**Cc:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; kuhlr@michigan.gov; Tallman, Sarah <stallman@nrdc.org>;

awheeler@cityofflint.com

**Subject:** Re: Concerned Pastors - action steps from 9/14/21 call

Colleagues,

Please see the following files:

- **2021-09-14 Completed SLE SLR All Phases.xlsx**  A list of all addresses where excavations/replacements have occurred since 2016
- **2021-09-14 Declinations.xlsx** A list of all declinations
- **2021-09-14 Non-responsive.xlsx**  A list of all non-responsive addresses
- **2021-09-14 Homes with consent received.xlsx**  A list of all addresses with consents on file that have not been scheduled
- **2021-09-14 Outstanding Work Orders.xlsx**  A list of the remaining outstanding work orders (including the 682 addresses recently identified by the NRDC)

Let us know when you've had a chance to review and can discuss further.

Also attached are the files 2021-09-14 Fast Start Exploration Status.xlsx and 2021-09-14 Filter Verification.xlsx, which should have been the information reported at the end of last month.

On Tue, Oct 12, 2021 at 2:07 PM William Kim <wkim@cityofflint.com> wrote:

Addie and company, I'm back from my vacation, and am going through all of the issues that have piled up.  I expect I'll respond to you with all of the requested information by tomorrow.

Thanks,

Bill

On Tue, Oct 5, 2021 at 11:04 AM Rolnick, Addie <ARolnick@nrdc.org> wrote:

Bill,

I'm writing to follow up on the below action steps from Plaintiffs' 9/14/21 call with the City. As a reminder, Plaintiffs are waiting for the City to share the (1) 2021 Replacement Eligible Homes List; (2) mailing information concerning the 748 inactive addresses on Plaintiffs' 8/2/21 list; (3) the City's position on the most recent stipulation language; and (4) the amount of state funding remaining for the Settlement. Please provide this information as soon as possible.

Regards,
Addie

ADELINE ROLNICK

PA-219

*Attorney\**

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

---

**From:** Tallman, Sarah <stallman@nrdc.org>
**Sent:** Tuesday, September 14, 2021 6:52 PM
**To:** William Kim <wkim@cityofflint.com>; 'awheeler@cityofflint.com' <awheeler@cityofflint.com>
**Cc:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; 'kuhlr@michigan.gov' <kuhlr@michigan.gov>
**Subject:** Concerned Pastors - action steps from 9/14/21 call

Bill and Angela,

Thank you for the productive call this morning. As discussed, Plaintiffs would like to keep this process moving as expeditiously as possible to resolve the remaining issues. Here are the next steps the parties agreed to:

1. **Compilation of 2021 Replacement Eligible Homes List.** As soon as possible, the City will provide Plaintiffs with the full list of replacement eligible homes that comprise the "2021 Replacement Eligible Homes List" in the draft Stipulation, including:

   a. All excavated addresses.
   b. All declination addresses.
   c. All non-responsive addresses (i.e., addresses where the resident did not provide consent after the City completed all required consent attempts).
   d. All addresses where the resident consented to excavation, but the City was unable to schedule an excavation after completing the required post-consent scheduling attempts. *See* ECF No. 217 ¶ 6.
   e. All addresses with outstanding work orders. This includes the 672 addresses listed on the spreadsheet shared by Plaintiffs on August 2, 2021, that have current active water accounts and where the City has not completed the required in-person consent attempts. *See* ECF No. 174 ¶ 15.a. The City and Plaintiffs agree that these 672 homes are replacement eligible and must receive the required in-person outreach.
   f. [Placeholder for additional homes pending resolution of the parties'

discussions concerning the 748 inactive addresses identified on Plaintiffs'
8/2/2021 spreadsheet (see item 2 below).]

2. **Mailing information concerning 748 Inactive Addresses on Plaintiffs' 8/2/21 List.**
   The City will confirm whether mailings were sent to the 748 "inactive" addresses on
   Plaintiffs' 8/2/21 spreadsheet. If the property owner's address is different from the
   address on Plaintiffs' spreadsheet (the "service address"), the City will indicate
   whether the mailing was sent to the service address or the property owner
   address.

3. **Final Review of Stipulation Language.** The City will review the near-final stipulation
   Plaintiffs shared via email on August 30, 2021 and confirm whether it agrees to the
   language in the stipulation, apart from the content of the 2021 Replacement Eligible
   Homes List and the listed deadlines.

4. **Remaining Available Settlement Funds.** If such information is available, the City will
   share the amount of state funding remaining for the Settlement.

Regards,

Sarah

SARAH C. TALLMAN (SHE/HER)
*Senior Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.651.7918
stallman@nrdc.org

--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079



--
William Kim, Assistant City Attorney

City of Flint, Department of Law

1101 S. Saginaw St., 3rd Floor

Flint, MI 48502

(810)237-2079



--

William Kim, Assistant City Attorney

City of Flint, Department of Law

1101 S. Saginaw St., 3rd Floor

Flint, MI 48502

(810)237-2079



--

William Kim, Assistant City Attorney

City of Flint, Department of Law

1101 S. Saginaw St., 3rd Floor

Flint, MI 48502

(810)237-2079



Exhibit 33

| | |
|---|---|
| **From:** | Joseph Kuptz |
| **To:** | kuhlr@michigan.gov; Tallman, Sarah; Rolnick, Addie; bkitaba@aclumich.org; William Kim; krisztiang@michigan.gov; russelle@michigan.gov; Clyde Edwards |
| **Subject:** | Concerned Pastors, et al. v City of Flint, et al. re: Weekly Reporting 10/19/2022 |
| **Date:** | Wednesday, October 19, 2022 3:54:19 PM |
| **Attachments:** | 2022-10-12 Filter Verification.xlsx |

Please find attached the most recent weekly filter status verification report.

Additional information:

In the past week, the contractor and its subcontractors have completed the following service line replacement activities:

- 18 explorations
- 2 full service line replacements
- 1 partial service line replacements
- 21 total (explorations + full/partial replacements)

The contractor and its subcontractors anticipate scheduling 70 houses in the next week. Actual numbers depend on factors such as weather and homeowner/occupant availability and cooperation.

The contractor and its subcontractors currently have parts to complete approximately 150 replacements.

Outreach - the contractor and its subcontractors completed approximately 50 3rd attempts in the past week.

Please let me know if you have any questions or concerns.

Thank-you.


Joe Kuptz

--
Joseph N. Kuptz, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2085

PA-224

# Exhibit 34

| | |
|---|---|
| **From:** | Joseph Kuptz |
| **To:** | kuhlr@michigan.gov; Tallman, Sarah; Rolnick, Addie; bkitaba@aclumich.org; William Kim; krisztiang@michigan.gov; russelle@michigan.gov; Clyde Edwards |
| **Subject:** | Concerned Pastors, et al. v City of Flint, et al. re: Weekly Reporting |
| **Date:** | Wednesday, October 12, 2022 9:39:41 AM |
| **Attachments:** | 2022-10-05 Filter Verification.xlsx |

Please find attached the most recent weekly filter status verification report.

Additional information:

In the past week, the contractor and its subcontractors have completed the following service line replacement activities:

- 12 explorations
- 6 full service line replacements
- 2 partial service line replacements
- 20 total explorations + full/partial replacements

The contractor and its subcontractors anticipate scheduling 60 to 70 houses in the next week. Actual numbers depend on factors such as weather and homeowner/occupant availability and cooperation.

The contractor and its subcontractors currently have parts to complete approximately 100 restorations.

Outreach - the contractor and its subcontractors completed approximately 50 3rd attempts in the past week. Of the 50 attempts, there were 3 responses, with no follow up contacts from homeowners/occupants.


Please let me know if you have any questions or concerns.

Thank-you.


Joe Kuptz

--
Joseph N. Kuptz, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2085

PA-226

Exhibit 35

**From:** Joseph Kuptz
**To:** kuhlr@michigan.gov; Tallman, Sarah; Rolnick, Addie; bkitaba@aclumich.org; William Kim; krisztiang@michigan.gov; russelle@michigan.gov; Clyde Edwards
**Subject:** Concerned Pastors, et al. v City of Flint, et al. re: Weekly Filter Status Verification Report
**Date:** Thursday, October 6, 2022 11:01:19 AM
**Attachments:** 2022-09-28 Filter Verification.xlsx

Please see attached the most recent weekly filter status verification report.

Please let me know if you have any questions or concerns.

Thank-you.


Joe Kuptz


--
Joseph N. Kuptz, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2085

# Exhibit 36

| | |
|---|---|
| **From:** | Joseph Kuptz |
| **To:** | kuhlr@michigan.gov; Tallman, Sarah; Rolnick, Addie; bkitaba@aclumich.org; William Kim; krisztiang@michigan.gov; russelle@michigan.gov; Clyde Edwards |
| **Subject:** | Concerned Pastors, et al. v City of Flint, et al. re: Monthly Report |
| **Date:** | Wednesday, September 28, 2022 2:29:53 PM |
| **Attachments:** | 2022-09-23 Declinations.xlsx |
| | 2022-09-23 Homes with consent received.xlsx |
| | 2022.09.28 CoF Status Report.pdf |
| | 2022-09-23 Non-responsive.xlsx |
| | 2022-09-21 Filter Verification.xlsx |
| | 2022-09-23 Exploration Status.xlsx |

Please find attached the City of Flint's most recent monthly report in this matter.

If there are any questions or concerns, please do not hesitate to contact me.

Thank-you.


Joe Kuptz

--
Joseph N. Kuptz, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2085

PA-230

# Exhibit 37

| From: | William Kim |
|---|---|
| To: | Rolnick, Addie |
| Cc: | Kuhl, Richard (AG); Joseph Kuptz; Tallman, Sarah; Calero, Melanie; Vandal, Nicole; Bonsitu Kitaba |
| Subject: | Re: Concerned Pastors – request for position on two motions |
| Date: | Thursday, October 27, 2022 2:04:08 PM |

Addie,

Thank you for providing a more detailed proposal for us to review.  With the exception of #5, we agree to all of your requested relief, and assuming we can agree on a proposed stip, will be happy to submit it to the Flint City Council for their approval as an amendment to the settlement agreement.

Our concern with #5 is that the 120-day deadline does not acknowledge or take into account the availability of raw materials from third-party vendors.  In particular, we expect asphalt plants in Michigan to shut down in the next month and to not reopen until mid-April.  Until those plants reopen, there will be no sources of asphalt to conduct those restoration activities. Similarly, as we discussed last week, sourcing sufficient concrete is also becoming an issue. In addition, concrete cannot cure properly if the weather is cold (i.e. below 40 degrees F, to my understanding).  However, moving the trigger date in #5 from Oct 1, 2022 to sometime in April, 2023, would alleviate those concerns.

Given that we agree in principle to your requested relief, I believe your request for additional pages is moot.

Please let us know when you have a proposed stip ready for review.

Thank you

Bill

On Wed, Oct 26, 2022 at 5:58 PM Rolnick, Addie <ARolnick@nrdc.org> wrote:

> Bill and Richard,
>
>
> Following the notice we provided in our 10/17/22 letter to the City, Plaintiffs intend to file a motion to enforce the Settlement Agreement concerning the City of Flint's violations of the Agreement outlined in our 10/4/22 Notice of Violation. We also intend to file a motion requesting an additional 7 pages beyond the Local Rules' default 25-page limit for our brief supporting the motion to enforce (32 total pages).
>
>
> **Please let us know your clients' position on the motion for more pages by 3 pm ET on Thursday.** If Defendants consent to the motion, Plaintiffs would consent to the City and/or State filing a response brief of the same length on the motion to enforce, if needed.

On the motion to enforce, Plaintiffs' requested relief includes the 11 items listed below. These remedial requests flow from the proposals Plaintiffs have outlined in our ongoing discussions concerning the 10/4 Notice of Violation. They are necessary to effectuate the Agreement and ensure the City promptly completes the remaining required excavation, replacement, and restoration work without further delay. We have included first the two items that we understand the City has already agreed to as part of our negotiations. **Please let us know the City's and State's positions on the motion to enforce, including whether your clients consent to any of the relief described below, by Friday at 5 pm ET.**

Please let me know if you have any questions or would like to discuss. Plaintiffs remain eager to narrow the disputed issues as much as possible to conserve the Court's resources, and we remain open to further negotiation on these issues. Thank you for your prompt attention to this matter.

Relief to be requested:

1. **Weekly progress updates:** The City must provide by email weekly reports to Plaintiffs each Wednesday including the data elements listed below. The report will clarify the specific seven-day period the data covers.
   a. Total number of excavations completed where no replacement was needed, including the date of each excavation and the address where it was completed.
   b. Total number of service line replacements (partial and full) completed, including the date of each replacement and the address where it was completed.
   c. Total number of addresses where the City has performed the final required consent attempt in the previous week, including at how many addresses the City obtained consent to conduct work.
   d. Total number of excavations and/or replacements the City has scheduled (not just how many it "anticipates scheduling") with residents for the upcoming 7 days (Thursday to Wednesday).
   e. Number of service line replacements the City can perform based on the current total number of parts in its materials inventory.

Please confirm that the City agrees to provide these weekly updates going forward.

2. **Monthly materials reporting:** The City must send by email, with its monthly status reports, information on its current inventory of materials needed for service line replacements, including the following informational elements:

   a. The number of replacements the City can conduct with its current materials inventory.
   b. Updated information on the date(s), if any, when the City (including any of its construction contractors) is scheduled to receive additional service line replacement materials based on orders accepted by suppliers, including specific

PA-233

information about the exact parts (and quantities) the City is scheduled to receive.

   c. A description of the City's and State's efforts to obtain additional required materials, including a list of any potential suppliers or fabricators the City or State communicated with in the previous month and the results of those communications. This must include whether the City or State secured any parts for delivery; the exact parts and quantities; and the expected delivery date.

Please confirm that the City agrees to provide this information going forward, beginning with the City's October 28, 2022 status report.

3. **Modified deadline to complete all service line excavations and replacements (excluding restoration):** August 1, 2023. Based on Plaintiffs' analysis of the remaining number of required excavations and the City's historical pace of work, August 1, 2023, is a reasonable completion date—it includes 6 months of additional work (excluding December, January, and February).

4. **Deadline to fix restoration recordkeeping gaps and propose a revised restoration deadline:** The City must compile a list of all previously excavated addresses at which restoration is still needed by May 1, 2023, and email that list to Plaintiffs by that date. No later than seven days after submitting that list to Plaintiffs, the City must propose a modification to the deadline to complete all required restoration work. The proposed deadline must be as soon as practicable and no later than December 31, 2023. The City's proposal shall be accompanied by a revised Restoration Plan (described in item 8 below) explaining the basis for the City's proposed deadline.

5. **Prompt restoration of properties with excavated service lines:** For each address where the City completes a service line excavation or replacement after October 1, 2022, the City must complete restoration within 120 days of when the City excavated the service line or completed a replacement at that address. This 120-day period will be stayed for long-term (two weeks or longer) work stoppage over the winter. Per item (6) below, the City must notify Plaintiffs of the date when it stops restoration for the winter due to cold weather, and of the date when the weather permits continuation of restoration in the spring.

6. **Procedures for weather-related work stoppages**. The City must continue performing excavations, replacements, and restoration in 2022 until cold weather conditions prevent further work, and notify Plaintiffs within three business days once it determines that it must cease excavation, replacement, and restoration work for the winter. Beginning on February 15, 2023, the City must submit weekly updates to Plaintiffs regarding when it expects that weather conditions will allow it to resume replacement, excavation, and restoration work. The City shall begin performing excavations, replacements, and restoration in 2023 within two weeks of when weather conditions permit.

Plaintiffs are working to identify specific criteria defining when weather will require the City to cease work and permit it to resume work. If the City has proposed criteria —such as a certain soil temperature, a certain number of days with a temperature above a threshold, or similar—please let us know. We will update you if we develop a revised proposal.

7. **Service Line Replacement Plan:** The City must create a detailed plan describing all reasonable steps the City will take to complete the remaining excavation and replacement work (excluding restoration) required by the Agreement as quickly as practicable, and no later than August 1, 2023 ("Service Line Replacement Plan"). The Plan must describe how the City is anticipating and planning for the following factors:
   a. Securing and maintaining an adequate inventory of materials necessary for service line replacements, including planning for how to address materials shortages, supply chain delays and challenges, and changes in prices of needed materials.
   b. Maintaining sufficient labor to complete the required work as quickly as practicable, including how many crews the City will maintain and what rate of excavations those crews can complete per week.
   c. Weather-related work disruptions, including both seasonal work stoppage for the winter and short-term disruptions caused by inclement weather (e.g., storms).
   d. Resident cooperation with scheduling excavations and replacements. Given the City's representation that approximately two-thirds of scheduled excavations are not completed due to residents not being home, the Plan must describe increased efforts the City will make to conduct outreach and coordinate with residents to ensure that excavations and replacements are completed as scheduled.
   e. If excavation work remains along major roads, the Plan must list the addresses of those excavations and explain the City's plans and schedule for obtaining the necessary road-closure permits and completing those excavations.
   f. If excavation work remains at any of the 253 addresses flagged by Michigan's State Historic Preservation Office (SHPO) that the City identified by email on December 10, 2018, the Plan must describe how the City will complete those excavations, including ensuring it has the appropriate permits and support from any necessary archaeologists needed to complete the work by August 1, 2023.

8. **Restoration Plan:** The City must create a detailed plan describing all reasonable steps the City will take to complete the remaining restoration work required by the Agreement as quickly as practicable, including identifying the remaining scope of that work. The Plan must describe how the City is anticipating and planning for the following factors:
   a. Work needed to identify how many and which previously excavated addresses still require restoration. To the extent the City plans to visually inspect homes as part of this process, the Plan must provide a timeline for completing these visual inspections, including the total number of homes it will inspect; how many addresses the City plans to inspect weekly, the number of staff who will be

performing driving inspections, how many hours/week those staff will perform the inspections, and how many homes those staff can inspect per 8-hour period. The City must consider and document in the Plan what additional resources, if any, it can marshal to finish identifying the scope of remaining restoration work. The Plan must describe how it will finish filling the gaps in the City's restoration records of previously excavated addresses through these visual inspections as quickly as possible, and by no later than May 1, 2023.

b. Securing and maintaining an adequate inventory of materials necessary for restorations (e.g., asphalt, concrete, and topsoil), including planning for how to address materials shortages, supply chain delays and challenges (including seasonal closure of the asphalt plant the City uses), and changes in the prices of materials;

c. Maintaining sufficient labor to complete the required work as quickly as practicable, including how many restoration crews the City will maintain and how many addresses those crews can restore per week;

d. Weather-related work disruptions (including long-term stoppage over the winter months and short-term delays due to storms or other conditions preventing work); and

e. Outreach to residents to ensure cooperation with scheduling, if applicable.

f. The Plan must describe how the City will meet the 120-day requirement in item 5 above, including how it will coordinate between its project management and construction contractors to ensure that the appropriate work orders are timely issued.

9. **Dispute resolution concerning the City's Service Line Replacement and Restoration Plans**: Within 7 days after the City submits the proposed Plans described in items 7 and 8 above, any Party that does not concur that one or both Plans include all reasonable steps the City can take to finish the required work under the Agreement as soon as practicable must notify the other Parties. The Parties must meet and confer within 7 days thereafter to try to resolve the disputes informally. If the Parties are unable to resolve the disputes, the Party that objected to the City's Plan may submit a supplemental brief to the Court no later than 30 days after the City submitted the proposed Plans on what additional relief is needed to effectuate the Court's order.

10. **Restorations "deemed" complete without contemporaneous records:** The City's obligation to complete restoration at an address will be deemed complete, even if the City does not have a contemporaneous record of completing restoration at that address, if it completes the actions described in (a), (b), and (c) below and provides the reporting as to the address described in item (11.a) below.

a. **Visual inspection criteria:** The City conducts a visual inspection of that address and has confirmed that all of the following criteria are true: (i) No asphalt, concrete, or other debris remains; (ii) The address has a complete, uniform sidewalk with no gaps or holes, and the sidewalk is uniform in both grade and alignment; (iii) the address has a complete, uniform driveway with no gaps or holes, and the driveway is uniform in both grade and alignment; (iv) the address has a complete, uniform curb, with no gaps or missing pieces, and the curb has a uniform grade and alignment; (v) the lawn is free of holes or trenches

PA-236

and is of a uniform grade, with no visible depressions; (vi) any visible topsoil on the greenbelt or lawn is free of debris and the greenbelt or lawn has a consistent and uniform plant cover; and (vii) the water shut-off valve is flush with the surface of the lawn and does not pose a tripping hazard.

b. **Photo documentation.** As part of the visual inspection described in (a) above, the City takes a photo or photos sufficient to document the condition the lawn, sidewalk, driveway, curb, and any other areas the City's inspection covers. The City shall maintain these photos and provide them to Plaintiffs upon request.

c. **Notice to residents:** If the City conducts a visual inspection and determines that all of the criteria in (a) above are true and that no further restoration is needed, the City must leave a door hanger at that address notifying the resident of that determination. The City must take a photo of every door hanger it leaves to document compliance with this provision and provide those photos to Plaintiffs upon request. The door hanger must include a City phone number and email address that the resident may use to contact the City if the resident disagrees with the City's determination or has questions. The City must provide proposed door hanger language for Plaintiffs' review and approval.

11. **Modified monthly restoration reporting:**

a. Because the City does not have records sufficient to comply with the current requirement to report monthly cumulative lists of all homes previously restored, Plaintiffs request that with each monthly status report, the City include an Excel spreadsheet listing, in separate tabs (or in a single tab with indicators to distinguish each category):

    i. All previously excavated addresses where the City has a contemporaneous record of completed restoration, including the date of restoration.

    ii. All previously excavated addresses where the City's records indicate restoration is still required, without the need for a visual inspection to confirm the address's restoration status; and

    iii. All previously excavated addresses where the City has no contemporaneous record of completed restoration, noting which of the following categories each address falls into: (A) City confirmed by visual inspection that restoration was completed, including the date of the inspection; (B) City confirmed by visual inspection that restoration is still needed, including the date of the inspection; (C) determination of whether restoration is still needed is pending a visual inspection.

b. With each monthly report, the City must provide Plaintiffs with any emails the City received during the reporting period from residents concerning the visual inspections described in item 10 above, so that Plaintiffs may evaluate the City's compliance with the Agreement's restoration requirements. The City must also provide Plaintiffs with a log documenting all calls from residents or property owners to the City phone number listed on the door hanger concerning

the visual inspections described in item 10 above during the reporting period. The log must include both calls when a City staff member (or one of the City's contractors) answered the phone and spoke with the caller and voicemails.

If Plaintiffs identify additional relief that they intend to request, we will promptly notify you and request your position on that relief.

Regards,

Addie

ADELINE ROLNICK

*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL

1152 15TH STREET NW, SUITE 300

WASHINGTON, DC 20005

T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER

NRDC.ORG

--
William Kim, City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2079



Exhibit 38

| From: | McLaughlin, Jolie |
|---|---|
| To: | William Kim |
| Cc: | Kuhl, Richard (AG); Tallman, Sarah; Rolnick, Addie; Xu, Cat; Bonsitu Kitaba; Angela Wheeler |
| Subject: | RE: Concerned Pastors - stipulation |
| Date: | Friday, February 11, 2022 2:56:24 PM |
| Attachments: | 2022.02.11 Pls." List of Homes Missing from Replacement Eligible Homes List.xlsx |
| | Re Concerned Pastors - data exchange.msg |
| | Rowe"s Review of the 8221 Addresses.msg |

Bill,

To help the parties make progress on finalizing the replacement eligible homes list, we're writing to provide more information about the 1276 homes Plaintiffs added to the City's list.

For **1109** homes, Plaintiffs' records show that the City has completed its obligations as to these homes. These homes are listed in rows 45 to 1153 on the "Other Addresses" tab of the attached spreadsheet.

With respect to the remaining **167** homes:

- **124** addresses were included in the City's spreadsheet titled "2021-09-14 Outstanding work orders.xlsx" that the City shared with Plaintiffs on October 29, 2021. These 124 addresses are listed on the "Oct. Outstanding Work Orders" tab of the attached spreadsheet. 33 of these addresses were also included in the spreadsheet that the parties exchanged last August (see attached email).

- **7** addresses were included in the City's monthly reporting data as having consented to an excavation. These addresses are listed in rows 38 to 44 on the "Other Addresses" tab of the attached spreadsheet. For each of these 7 addresses, we've identified the status report where the City listed the address, to the extent you would like to cross check these addresses.

- **36** addresses were included in the City's spreadsheet titled "Phase VI Addresses - Para 13 Data" that the City shared with Plaintiffs via email on February 14, 2019 (see attached email). These addresses are listed in rows 2 to 37 on the "Other Addresses" tab of the attached spreadsheet.

As I mentioned in my prior emails, we're happy to go through these address in more detail over the phone if that would be helpful.

Thanks,
Jolie


JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

**From:** McLaughlin, Jolie
**Sent:** Wednesday, February 9, 2022 9:02 AM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** Kuhl, Richard (AG) <KuhlR@michigan.gov>; Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Angela Wheeler <awheeler@cityofflint.com>
**Subject:** RE: Concerned Pastors - stipulation

Thanks for the update, Bill. As you work on reconciling the lists, please let us know if it would be helpful to set up a phone call. Angela, it's been nice working with you over the past several years, and we wish you best of luck in your new role.

Jolie

**JOLIE MCLAUGHLIN**
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Wednesday, February 9, 2022 8:14 AM
**To:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Cc:** Kuhl, Richard (AG) <KuhlR@michigan.gov>; Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Angela Wheeler <awheeler@cityofflint.com>
**Subject:** Re: Concerned Pastors - stipulation

Sorry, things have been crazier than usual. Among other things:
https://www.mlive.com/news/flint/2022/02/flint-city-attorneys-resignation-the-latest-departure-inside-city-hall.html

We weren't able to get the stip on the agenda for the FCC Committee meetings tonight, but City Administration agrees that we can get the stip on the next committee mtg on 2/23, hopefully to be approved at the council meeting on 2/28. I'm reviewing and trying to reconcile the list so that we're in agreement on the specifics, but for some reason I'm being called into a large number of additional meetings.

Bill

On Tue, Feb 8, 2022 at 10:21 AM McLaughlin, Jolie <jdmclaughlin@nrdc.org> wrote:

> Hi Bill,

PA-241

I'm following up on my email from Friday. Is there a time tomorrow when the City is available for a phone call to discuss these 1,276 addresses that Plaintiffs included in the replacement eligible homes list?

Thanks,
Jolie

JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

---

**From:** McLaughlin, Jolie
**Sent:** Friday, February 4, 2022 3:34 PM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** Kuhl, Richard (AG) <KuhlR@michigan.gov>; Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Angela Wheeler <awheeler@cityofflint.com>
**Subject:** RE: Concerned Pastors - stipulation

Hi Bill – thanks for your email. We would like to schedule a call with the City either on Monday or Tuesday of next week to discuss so that we can make progress on this. I'm attaching the January 7 email from Addie where she explained the reasons why we believe those 1,276 addresses should be included in the replacement eligible homes list. For the vast majority of these homes (1,144), we have data showing that the City has already completed its obligations and so no additional work is required. Of the remaining 130 or so addresses, those addresses either appeared on prior lists that the City shared with Plaintiffs or are addresses that the parties previously agreed were eligible homes.

Please let us know what times on Monday or Tuesday you and relevant City administration or Rowe personnel are available for a phone call.

Thanks,
Jolie

JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

PA-242

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Friday, February 4, 2022 3:03 PM
**To:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Cc:** Kuhl, Richard (AG) <KuhlR@michigan.gov>; Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Angela Wheeler <awheeler@cityofflint.com>
**Subject:** Re: Concerned Pastors - stipulation

Jolie, thanks for your email - I was just drafting the following:

Sorry for the delay, but the snowstorm this week closed down City Hall and not everyone was working remotely.

I've completed cross-referencing your latest "Replacement Eligible Homes" list and I've identified 1276 addresses that have not previously been listed by the City. Those addresses are contained in the attached spreadsheet.  Them being new necessarily means that they have not been completed, have not provided consent, were not previously provided by the NRDC in your August 2021 lists (representing addresses that you asserted were added but not previously listed), are not registered declinations, and have not been nonresponsive to scheduling attempts.  Furthermore, that would also mean that they did not provide consent for excavation and replacement prior to last summer's agreed-upon July deadline for homeowners and residents to provide consent, despite numerous public announcements regarding the same.

Frankly, I have no idea where these additional addresses came from, why they would be eligible, nor why they have been added at this late date.

In short, these additional addresses appear to have come from nowhere and represent a potentially non-trivial addition to the project's scope.  It could increase the work remaining by a double or more.  Furthermore, any additional addresses at this time would have failed to provide consent by the agreed-upon consent deadline of last July.  I am uncertain at this time as to whether sufficient funding is available, and these additions could potentially require revisions to the contractual scope currently in development, which could likely result in further delays.

Please let me know what additional information you can provide about these unexpected additions that have been added.

Bill

On Fri, Feb 4, 2022 at 3:55 PM McLaughlin, Jolie <jdmclaughlin@nrdc.org> wrote:

> Richard,
>
> I'm attaching the final version of stipulation that the Plaintiffs' and City's attorneys have agreed to. This is subject to final approval by the City administration, and the stipulation also needs to be approved by City council. Bill, please confirm that you'll be able to put the stipulation on the agenda for the City council's upcoming meeting this Wednesday, February 9, as we discussed.

I'm also attaching a redline comparing this version to the draft that Addie circulated on December 2, so you can more easily see the changes that were made to the prior version. The new language in paragraph 3 is the same language that the State approved via email last month, except that we changed "is" in the last part of the sentence to "are." Please let us know if the stipulation looks fine to the State.

I'm also attaching the replacement eligible homes list that Plaintiffs sent the City. This list is an iteration of the list we received from the City, except that it adds some homes that Plaintiffs determined were missing from the City's list and removes some duplicate addresses from the City's list. Plaintiffs have asked the City to confirm whether this list is final or if any additional changes need to be made.

Thanks,
Jolie

JOLIE MCLAUGHLIN
*Attorney*

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079



--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079

PA-244

# Exhibit 39



September 14, 2022

Clyde Edwards
1101 S. Saginaw Street
Flint, MI 48502

Dear Mr. Edwards,

On April 14, 2022, the United States District Court for the Eastern District of Michigan Southern Division issued a modified Settlement Agreement for the lawsuit of the Concerned Pastors, Melissa Mays, the American Civil Liberties Union of Michigan, and the Natural Resources Defense Council (NRDC) against the City of Flint. The modified Settlement Agreement (ECF No. 237) provided the updated number of eligible residential lead service lines (31,578) that need replacing in the City of Flint.

In May 2022, Metro Consulting Associates (MCA) was informed of the modified settlement (referenced above) and the eligible residential lead service line number. MCA began reviewing the service line replacement data provided by the City of Flint. The compilation of numbers we received in the spreadsheets from the City of Flint was less than the number provided in the modified Settlement Agreement by the NRDC.

After investigating the number discrepancy, MCA concluded that the number provided by the NRDC included 325 duplicate addresses and 3,683 addresses that could not be matched between the NRDC and the City of Flint eligible residential homes list. This was due to errors in how the data was entered into the spreadsheets, for example, Street vs. Avenue (123 Main St. or 123 Main Street or 123 Main Ave. or 123 Main Avenue), directional designation east vs. west (123 E. Main St. and 123 W. Main St.), etcetera. Additionally, the NRDC list included declinations, demolitions, inactive (ineligible for replacement), a park, and vacant properties. Below is a breakdown of the service lines.

| Revised NRDC Number Breakdown | | |
|---|---|---|
| | **NRDC** | **Exclusions** |
| **Matched Service Lines to the City of Flint Phases (removing duplicates)** | 28,687 | |
| **Declinations** | 203 | |
| **Demolitions** | 88 | |
| **Inactive and Vacant (ineligible for replacement)** | 635 | |
| **Remaining Service Lines to Excavate or Replace** | ~1,574 | |
| **Commercial Properties** | | 65 |
| **Duplicates** | | 325 |
| **Park** | | 1 |
| **Total** | 31,187 | 391 |



45345 Five Mile Road
Plymouth, MI 48170

800.525.6016

info@metroca.net
metroca.net

PA-246

Metro Consulting Associates, LLC

Based on the residential lead service line information provided by the City of Flint and discussions with ROWE Professional Services Company below is a breakdown of the residential services lines excavated and replaced as of December 31, 2021.

| Work Completed and Remaining Services Lines | |
|---|---|
| Excavations (as of 12/31/2021) | 17,258 |
| Service Line Replacements (as of 12/31/2021) | 10,126 |
| Remaining Service Lines to Excavate or Replace | ~1,574 |

Based on the findings, MCA recommends that the City of Flint eligible residential lead service lines be revised to 31,187.

If you have any questions or comments, please feel free to contact me at dgarrett@metroca.net or Kalaya Thomas at kthomas@metroca.net.

Sincerely,
Metro Consulting Associates, LLC

Damon L. Garrett, PE
President | Director of Operations

# Exhibit 40

| | |
|---|---|
| **From:** | William Kim |
| **To:** | Kuhl, Richard (AG) |
| **Cc:** | McLaughlin, Jolie; Gambill, Nathan (AG); Tallman, Sarah |
| **Subject:** | Re: Concerned Pastors - final stipulation |
| **Date:** | Monday, February 28, 2022 5:48:49 PM |

City Council referred the matter back to committee.  No action will be taken by the City Council at this time.

On Mon, Feb 28, 2022 at 12:02 PM Kuhl, Richard (AG) <KuhlR@michigan.gov> wrote:

> You have my consent to sign assuming the city council approves the stipulation during tonight's meeting.
>
>
> Richard S. Kuhl
>
> Assistant Attorney General
>
> Environment, Natural Resources,
>
> and Agriculture Division
>
> 6th Floor, G. Mennen Williams Building
>
> 525 West Ottawa Street
>
> P.O. Box 30755
>
> Lansing, MI  48909
>
>
> Office: (517) 335-0696
>
> Mobile: (517)575-9343
>
> Fax: (517) 373-1610
>
> Email: kuhlr@michigan.gov
>
> 

**From:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Sent:** Monday, February 28, 2022 11:47 AM
**To:** Kuhl, Richard (AG) <KuhlR@michigan.gov>
**Cc:** William Kim (wkim@cityofflint.com) <wkim@cityofflint.com>; Gambill, Nathan (AG) <GambillN@michigan.gov>; Tallman, Sarah <stallman@nrdc.org>
**Subject:** FW: Concerned Pastors - final stipulation

---

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

---

Hi Richard,

Flint city council will be voting on the stipulation at tonight's meeting. If they vote to approve the stipulation tonight, Plaintiffs would like to file the stipulation with the court tomorrow. Can you please let us know if we have permission to file on your behalf? I've re-attached the stipulation here for your reference.

Thanks,

Jolie

JOLIE MCLAUGHLIN

*Attorney*

NATURAL RESOURCES

DEFENSE COUNCIL

20 N. WACKER DR., SUITE 1600

CHICAGO, ILLINOIS 60606

T 312.961.1287
jdmclaughlin@nrdc.org

# Exhibit 41

# City of Flint, Michigan

*Third Floor, City Hall*
*1101 S. Saginaw Street*
*Flint, Michigan 48502*
*www.cityofflint.com*



## Meeting Agenda - Final

**Monday, March 14, 2022**

**5:30 PM**

**Council Chambers**

## <u>CITY COUNCIL</u>

*Eric Mays, President, Ward 1*
*Allie Herkenroder, Vice President, Ward 7*

*Ladel Lewis, Ward 2*
*Judy Priestley, Ward 4*
*Tonya Burns, Ward 6*

*Quincy Murphy, Ward 3*
*Jerri Winfrey-Carter, Ward 5*
*Dennis Pfeiffer, Ward 8*

*Eva L. Worthing, Ward 9*

*Inez M. Brown, City Clerk*

*Davina Donahue, Deputy Clerk*

## CALL TO ORDER

## ROLL CALL

## PLEDGE OF ALLEGIANCE

## PRAYER OR BLESSING

## READING OF DISORDERLY PERSONS CITY CODE SUBSECTION

*Any person that persists in disrupting this meeting will be in violation of Flint City Code Section 31-10, Disorderly Conduct, Assault and Battery, and Disorderly Persons, and will be subject to arrest for a misdemeanor.  Any person who prevents the peaceful and orderly conduct of any meeting will be given one warning.  If they persist in disrupting the meeting, that individual will be subject to arrest.  Violators shall be removed from meetings.*

## PRESENTATION OF MINUTES

## SPECIAL ORDERS

**220117**          Special Order/City Trees

A Special Order as requested by Council President Eric Mays concerning a possible ordinance for City trees that fall on properties with the city of Flint.

## PUBLIC HEARINGS

**220068.6**          Public Hearing/Ordinance 220068/Ward 3

A Public Hearing for Ordinance No. 220068, an ordinance to amend the Code of the City of Flint as requested by Darren Dado (PC-21-419) to change the District boundaries or regulations established in Chapter 50 thereof, specifically allowing under 50-4 a zoning map amendment, as follows: 3801 West Boulevard Drive, Flint MI 48502, Parcel No. 41-18-154-038, legally described as GENERAL MOTORS PARK NUMBER ONE LOTS 630 THRU 635 INCL, LOTS 678 THRU 691 INCL PART OF LOTS 734 THRU 742 INCL ALL DESC AS FOLLS: BEG AT A PT THAT IS S 89 DEG 16 MIN 24 SEC W, 576.29 FT AND S 11 DEG 00 MIN 09 SEC W, 234.70 FT AND S 36 DEG 50 MIN 43 SEC E, 621.43 FT AND S 26 DEG 30 MIN 52 SEC E, 499.08 FT AND S 21 DEG 55 MIN 01 SEC E, 184.51 FT AND S 00 DEG 21 MIN 36 SEC E, 1356.17 FT AND N 89 DEG 11 MIN 28 SEC E, 544.08 FT AND S 01 DEG 39 MIN 43 SEC E, 327.92 FT AND S 12 DEG 48 MIN 41 SEC W, 160.0 FT AND S 4 DEG 11 MIN 30 SEC W, 412.91 FT FROM NW COR OF SEC 32, T8N, R7E; TH S 4 DEG 11 MIN 30 SEC W, 29.36 FT; TH S 01 DEG 46 MIN 02 SEC W, 80.12 FT; TH S 01 DEG 46 MIN 02 SEC W, 170.3 FT; TH S 01 DEG 39 MIN 59 SEC E, 500.03 FT; TH N 28 DEG 14 MIN 59 SEC E, 288.57 FT ALG THE WLY ROW LINE OF W BLVD DR; TH CONT ALG SD WLY LINE N 28 DEG 13 MIN 08

PA-253

SEC E, 484.34 FT; TH N 28 DEG 13 MIN 08 SEC E, 125.93 FT; TH S 88 DEG 20 MIN 01 SEC W, 430.0 FT TO POB from "D-6" General and Highway-Commercial Service District and future zoned City Corridor to "E" Heavy Commercial-Limited Manufacturing District. THE PLANNING COMMISSION RECOMMENDS DENIAL.

## PUBLIC SPEAKING

*Per the amended Rules Governing Meetings of the Council (as adopted by the City Council on Monday, June 12, 2017), three (3) minutes per speaker.  Only one speaking opportunity per speaker.  Numbered slips will be provided prior to the start of the meeting to those wishing to speak during this agenda item.*

## COUNCIL RESPONSE

*Per the amended Rules Governing Meetings of the Council (as adopted by the City Council on Monday, June 12, 2017), Councilpersons may respond to any public speaker, but only one response and only when all public speakers have been heard. Individual council response is limited to two minutes.*

## PETITIONS AND UNOFFICIAL COMMUNICATIONS

## COMMUNICATIONS (from Mayor and Other City Officials)

## ADDITIONAL COMMUNICATIONS

## APPOINTMENTS

## APPOINTMENTS (May Be Referred from Special Affairs)

**220060**        Appointment/Economic Development Corporation (EDC) Board of Directors/Moteez Wilson

Resolution resolving that the Flint City Council approves the appointment of Moteez Wilson (2310 Clement Street, Flint, MI 48504) to the Economic Development Corporation (EDC) Board of Directors, for the remainder of a six-year term, commencing immediately upon adoption of this resolution, and expiring March 27, 2024, replacing Maurice Davis.

## RECONSIDERATION

*[NOTE: Reso No. 220115, a Resolution to Respond to the Public Health and Negative Economic Impacts of the Pandemic by Addressing Blight, FAILED to Move to Council during the March 9th Committee Meetings.  It is presented here for Council's (re)consideration.]*

**220115**        Public Health Response/Addressing Blight/American Rescue Plan Act (ARPA) Funding

Resolution resolving that the appropriate City Officials are authorized to do all things necessary to address blight and to implement this [Blight] program, with

PA-254

the City of Flint's ARPA administration, compliance and implementation firm reviewing and ensuring compliance with the latest US Department of Treasury final rules, and funding coming from the American Rescue Plan Act (ARPA) Fund (287).

# RESOLUTIONS

**220095**     Amendment/Settlement Agreement/Concerned Pastors et al v Nick Khouri et al, File No. 16-10277

Resolution resolving that the Flint City Council approves and consents to amending the Settlement Agreement in Concerned Pastors, et al v Khouri, et al, as described. [NOTE: The parties have agreed to extend the deadline for completing the excavation and replacement of residential service lines to 2022, along with other related amendments to account for the current circumstances.]

**220105**     Contract/Rowe Professional Services/Project Management Services/SLE-SLR and Restoration Projects

Resolution resolving that the appropriate City Officials are to enter into a contract with Rowe Professional Services for Project Management Services for the SLE/SLR and restoration projects for an overall amount not-to-exceed $2,900,000.00.

**220109**     Contract/Carriage Town Ministries/CARES Entitlement Funding/Covid-19 Related Activities

Resolution resolving that the appropriate City Officials are authorized to do all things necessary to enter into a contract with Carriage Town Ministries for CARES Act funding, in the amount of $81,590.00, for shelter operations related to Covid relief.

**220110**     CO#1/Contract/Lang Construction/Chemical Systems Feed Building

Resolution resolving that the appropriate City Officials are authorized to issue a Change Order to Lang Construction for chemical feed system, in an amount NOT-TO-EXCEED $330,107.21 for FY22, for the total aggregate Purchase Order amount NOT-TO-EXCEED $4,416,064.21 for FY22.

**220113**     CO#1/Contract/Spaulding DeDecker/Added Engineering Costs/Miller Road Water Main Rehabilitation

Resolution resolving that the appropriate City Officials are authorized to do all things necessary to enter into Change Order No. 1 to the contract with Spaulding DeDecker to add water main engineering services to the project to rehabilitate Miller Road, in an amount NOT-TO-EXCEED $300,000.00, and a revised aggregate amount of $576,591.00, with the City of Flint's ARPA administration, compliance and implementation firm reviewing and ensuring compliance with the latest US Department of Treasury final rules, and funding coming from the American Rescue Plan Act (ARPA) Fund (287).

PA-255

# Exhibit 42

# City of Flint, Michigan

*Third Floor, City Hall*
*1101 S. Saginaw Street*
*Flint, Michigan 48502*
*www.cityofflint.com*



## Meeting Agenda - Final

### Monday, March 28, 2022

### 5:30 PM

### Council Chambers

## <u>CITY COUNCIL</u>

*Eric Mays, President, Ward 1*
*Allie Herkenroder, Vice President, Ward 7*

*Ladel Lewis, Ward 2*

*Judy Priestley, Ward 4*

*Tonya Burns, Ward 6*

*Quincy Murphy, Ward 3*

*Jerri Winfrey-Carter, Ward 5*

*Dennis Pfeiffer, Ward 8*

*Eva L. Worthing, Ward 9*

*Inez M. Brown, City Clerk*

*Davina Donahue, Deputy Clerk*

PA-257

# CALL TO ORDER

# ROLL CALL

# PLEDGE OF ALLEGIANCE

# PRAYER OR BLESSING

# READING OF DISORDERLY PERSONS CITY CODE SUBSECTION

*Any person that persists in disrupting this meeting will be in violation of Flint City Code Section 31-10, Disorderly Conduct, Assault and Battery, and Disorderly Persons, and will be subject to arrest for a misdemeanor. Any person who prevents the peaceful and orderly conduct of any meeting will be given one warning. If they persist in disrupting the meeting, that individual will be subject to arrest. Violators shall be removed from meetings.*

# REQUESTS FOR CHANGES OR ADDITIONS TO AGENDA

*Council shall vote to adopt any amended agenda.*

# PRESENTATION OF MINUTES

# PUBLIC HEARINGS

# PUBLIC SPEAKING

*Per the amended Rules Governing Meetings of the Council (as adopted by the City Council on Monday, June 12, 2017), three (3) minutes per speaker. Only one speaking opportunity per speaker. Numbered slips will be provided prior to the start of the meeting to those wishing to speak during this agenda item.*

# COUNCIL RESPONSE

*Per the amended Rules Governing Meetings of the Council (as adopted by the City Council on Monday, June 12, 2017), Councilpersons may respond to any public speaker, but only one response and only when all public speakers have been heard. Individual council response is limited to two minutes and is subject to all rules of decorum and discipline.*

# PETITIONS AND UNOFFICIAL COMMUNICATIONS

220131      Financial Report/Karegnondi Water Authority (KWA)

Communication received February 24, 2022, re: The Karegnondi Water Authority (KWA) January 2022 Financial Report is available.

220132      Flyer/Genesee County Habitat for Humanity/Show Me the Money Day

PA-258

Flyer received February 2022, re: The Genesee County Habitat for Humanity will hold a free, financial, community resource fair from 10 a.m. to 2 p.m. Saturday, February 26, 2022 at Berston Field House.

**220134**      Press Release/Michigan Department of Environment, Great Lakes, and Energy [EGLE]/Public Comment/Draft EJ Mapping & Screening Tool

Press Release dated March 21, 2022, from Michigan Department of Environment, Great Lakes, and Energy [EGLE], re: EGLE is accepting public comment on the draft EJ Mapping & Screening Tool.

## COMMUNICATIONS (from Mayor and other City Officials)

**220133**      Ramp Closures/I-69 and I-475 Reconstruction Projects

Emails received March 2022, from Traffic Engineering and DPW, identifying lane closures and ramp closures for the I-69 and I-475 Reconstruction projects.

**220135**      Traffic Engineering/Closure Permits

Sidewalk, Lane and Street Closure permits (7) dated February and March 2022, for requested activities/events, with noted responsibility for the placement of the required traffic control devices, and/or personnel, for the protection of traffic and event participants.

## ADDITIONAL COMMUNICATIONS

## APPOINTMENTS

## RESOLUTIONS

**220059**      Recreation Agreement/City of Flint/Mott Park Recreation Association (MPRA)

Resolution resolving that the Flint City Council hereby authorizes entering into this 50-year lease agreement with Mott Park Recreation. [NOTE: MPRA has maintained the property described in this agreement since 2011, and is dedicated to expanding access to quality recreational facilities and programs to all citizens of the City of Flint.  The parcels are described as: 40-11-351-098, 40-14-128-001, 40-14-128-002, 40-14-101-001,40-14-101-002, 40-14-101-003 and 40-14-251-001.]

**220095**      Amendment/Settlement Agreement/Concerned Pastors et al v Nick Khouri et al, File No. 16-10277

Resolution resolving that the Flint City Council approves and consents to amending the Settlement Agreement in Concerned Pastors, et al v Khouri, et al, as described. [NOTE: The parties have agreed to extend the deadline for completing the excavation and replacement of residential service lines to 2022, along with other related amendments to account for the current

PA-259

**CITY COUNCIL**                     **Meeting Agenda - Final**                     **March 28, 2022**

circumstances.]

**220105**       Contract/Rowe Professional Services/Project Management Services/SLE-SLR and Restoration Projects

Resolution resolving that the appropriate City Officials are to enter into a contract with Rowe Professional Services for Project Management Services for the SLE/SLR and restoration projects for an overall amount not-to-exceed $2,900,000.00.

**220110**       CO#1/Contract/Lang Construction/Chemical Systems Feed Building

Resolution resolving that the appropriate City Officials are authorized to issue a Change Order to Lang Construction for chemical feed system, in an amount NOT-TO-EXCEED $330,107.21 for FY22, for the total aggregate Purchase Order amount NOT-TO-EXCEED $4,416,064.21 for FY22.

**220114**       Contract/Zito Construction Company/Miller Road Water Main Replacement

Resolution authorizing the appropriate City Officials to do all things necessary to enter into a contract with Zito Construction to replace the water main during the rehabilitation of Milelr Road, between Hammerberg Road and Ballenger Highway, in an amount NOT-TO-EXCEED $1,873,634.27, with the City of Flint's ARPA administration, compliance and implementation firm reviewing and ensuring compliance with the latest US Department of Treasury final rules, and funding coming from the American Rescue Plan Act (ARPA) Fund (287).

**220118**       Retention/Outside Legal Counsel/Flint City Council/Transfer of Tax-Reverted Properties

Resolution resolving that the City Council requests that outside legal counsel be retained to prosecute a lawsuit on behalf ot the City, seeking recovery of 46 properties specified in the City Council's December 21, 2021 Resolution.

**220120**       Participation/Michigan State Housing Development Authority (MSHDA)/Michigan Homeowner Assistance Fund

Resolution resolving that the City Administrator is authorized to do all things necessary to effectuate the City of Flint's participation in the Michigan State Housing Development Authority's (MSHDA) Michigan Homeowner Assistance Fund (MIHAF) program, including but not limited to executing the necessary agreements with MSHDA.

**220121**       CO#1/Contract/Lasercom LLC/Additional Postage Costs

Resolution resolving that the appropriate City Officials are authorized to do all things necessary to enter into Change Order No. 1 to the contract with Lasercom LLC to provide additional postage for the mailing of City water and sewer bills for FY2022, in the amount of $24,500.00, for an aggregate a FY2022 total amount of $173,590.00 under the same terms and conditions.

PA-260

Exhibit 43

# NRDC

May 6, 2022

VIA EMAIL

William Kim
City of Flint Department of Law
1101 S. Saginaw Street, Third Floor
Flint, MI 48502
wkim@cityofflint.com

City of Flint
ATTN: City Administrator Clyde Edwards
City Hall
1101 S. Saginaw Street, First Floor
Flint, MI 48502
cedwards@cityofflint.com

Re:   Notice of City of Flint's Violations of Settlement Agreement in *Concerned Pastors for Social Action v. Khouri*, No. 16-10277 (E.D. Mich.)

Dear Messrs. Kim and Edwards:

Pursuant to Paragraph 128 of the Settlement Agreement ("Settlement"), Plaintiffs provide notice of the City's noncompliance with its obligations under the Settlement, ECF No. 147-1, as modified, *see* ECF Nos. 174, 207, 208, 237. The Settlement requires the City to provide the parties with monthly and quarterly reports of the City's compliance. However, for nearly a year, the City has either failed entirely to provide the required reporting or has provided incomplete reports. On multiple occasions, Plaintiffs' counsel informed the City's counsel that Plaintiffs were missing the required reports. However, Plaintiffs still have not received the missing reporting.

Plaintiffs appreciate that the City provided Plaintiffs with data at various points last year to facilitate the parties' determination of the scope of work remaining under the Settlement. Nonetheless, the City must satisfy its obligations under the Settlement, and the City's failure to fulfill its reporting obligations is unacceptable. Plaintiffs request that the City remedy this failure promptly by providing Plaintiffs with a comprehensive report that contains up-to-date datasets of all information that would have been included in the City's missing monthly and quarterly reports.

## I.   The City's Reporting Obligations under the Settlement

The Settlement requires the City to provide the parties with monthly and quarterly reports. The monthly reports, due on the 28th of each month, must include the following information:

1. An updated list of homes at which residents have declined a service line excavation and replacement;

2. An updated list of homes where the City's outreach obligations are complete, but at which the residents have not responded to the City's outreach;

3. An updated list of homes that have received restoration;

4. A list of all excavations and replacements during the reporting period, including the date of excavation/replacement, the material(s) of the service line confirmed or discovered, and the portion of the service line that was replaced, if any;

5. The date, recipient, and address of any letter sent to meet the written outreach requirements of the Settlement, *see* ECF No. 208 ¶ 14; ECF No. 217 ¶ 5; ECF No. 237 ¶ 4.i.a (requirement to provide documentation of letters sent to all addresses on the 2022 Replacement Eligible Homes List);

6. An updated list of homes at which residents have consented to an excavation but have not responded to the City's attempts to schedule an excavation, and the date, time, and result of the City's scheduling attempts, including documentation confirming that a door hanger was left after the first unsuccessful in-person attempt and the date, time, and result of any phone calls made to that home;

7. The date and time of any in-person outreach conducted during the reporting period and the result of the outreach attempt;

8. The total amount of money approved for payment by the City for excavation and replacement work based on weekly contractor reports and invoice processing by Department of Public Works; and

9. The total amount of money approved for payment by the City for program management and administrative work for the service line replacement program based on invoice processing by the Department of Public Works and/or the Finance Department.

*See* ECF No. 208 ¶ 6; ECF No. 217 ¶ 7.

The City's quarterly reports, which are due by the 28th of February, May, August, and November of each year, must include the following information:

1. The total number and addresses of homes that have received a service line replacement since the effective date of the Settlement;

2. The number and addresses of homes that received an excavation and service line replacement during the reporting period, with service line composition and which

2

PA-263

portion of line was replaced if any, and whether proper installation of faucet filter was verified;

3. The number and addresses of homes at which residents declined an excavation and service line replacement during the reporting period;

4. The total amount of money reimbursed to or paid on behalf of the City in WIIN and non-WIIN categories;

5. A list of any requests for reimbursements or payments that have been denied by EGLE, including the amount requested, amount denied, and reason for denial;

6. Copies of any financial or performance auditing results obtained pursuant to Paragraph 25 of the Settlement or relating to the City's use of Allocated or Reserved Monies;

7. Results of all tap water monitoring conducted at households during the reporting period, including the address of each sampling site, service line material, and whether the sampling site qualifies as Tier 1;

8. Results of water quality parameter monitoring conducted during the reporting period; and

9. Any formal communications that the City submitted to or received from EPA.

*See* ECF No. 147-1 ¶ 117.

The City also has other reporting obligations under the Settlement. Within 30 days after a resident activates a new water account, the City must provide the parties with the name, address, Parcel ID, and phone number (if provided by the resident). *See* ECF No. 211 ¶ 5. In addition, the City is required to provide weekly reports of its efforts to install faucet filters immediately after service line replacements. *See* ECF No. 192 ¶ 3.

The City's reporting obligations are critical to the Settlement's successful implementation. Plaintiffs rely on these reports to monitor the City's compliance and help safeguard the health of Flint residents. The reports also help Plaintiffs track the City's excavation and replacement work, and will help Plaintiffs timely assess when and whether the City has completed that work. It is therefore essential for the City to provide the parties with complete, accurate, and timely reporting.

## II.    The City's Reporting Violations

The City has consistently failed to comply with its Settlement reporting obligations. On numerous occasions over the past several years, Plaintiffs had to resort to the Settlement's dispute resolution process to address the City's noncompliance with its reporting obligations. *See, e.g.*, Mar. 15, 2019 Ltr. fr. S. Tallman to A. Wheeler et al.; June 15, 2019 Ltr. fr. S. Tallman

to A. Wheeler et al.; Aug. 18, 2020 Ltr. fr. S. Tallman to A. Wheeler et al. These efforts followed Plaintiffs' prior attempts to enforce the Settlement's reporting provisions, including by seeking the Court's intervention. *E.g.*, Pls.' Mot. to Enforce Settlement Agmt., ECF No. 155. Plaintiffs are disappointed in the City's continuing failure to comply with its reporting obligations.

### A.     Monthly status reports

Last year, the City did not provide the parties with the required monthly reports that were due in October 2021, November 2021, and December 2021. On November 7 and 17, 2021, Plaintiffs' counsel emailed the City's counsel requesting the missing monthly reports. On phone calls, Plaintiffs' counsel also informed the City that the monthly reports were missing. However, the City never provided the missing reports.

The monthly reports the City did submit in 2021 were incomplete. For example, the monthly reports provided by the City on January 8, February 19, April 1, and July 14 did not include the required financial information. Timely disclosure of this financial information is important to facilitate the parties' understanding of how much Settlement funding remains for the outstanding required work with as little lag time as possible.

Most of the City's 2021 monthly reports were also missing the required restoration information (this information was only included in the reports provided by the City on June 2 and July 14). Further, the City has not been consistently including information about its post-consent scheduling attempts and whether a door hanger was left at the address; this information was not included in the City's reports provided on February 19, May 13, or September 20.

Plaintiffs also have not received any monthly reports from the City so far in 2022. In total, there are at least 14 monthly status reports that are either entirely missing or missing some required information. It is our understanding that service line replacement work stopped during the winter months, as well as for a period of time this spring due to the delay in renewing the City's contract with Rowe Professional Services Company. However, if there is any reportable activity, the City must provide the other parties with that information, or should let the parties know that there is no new information to report. The recent disruptions with Rowe's contract also do not explain the City's failure to provide complete reporting last year.

### B.     Quarterly status reports

In 2021, the City provided the parties with only one complete quarterly status report, in June. Although the City provided Plaintiffs with some reporting information in September 2021, that information was incomplete. For example, the September 2021 submittal did not include the required financial information. Plaintiffs never received the City's quarterly status reports that were due in February 2021, November 2021, February 2022, or the omitted parts of the September 2021 report.

**C.      Other missing reports**

Plaintiffs are concerned that the City has failed to provide other required reporting as well. Although Plaintiffs received a list of new active water accounts from the City in April 2022, Plaintiffs did not receive any active water account lists from the City between December 2021 and March 2022.

Plaintiffs also have not received any reports regarding the City's filter installation efforts since October 13, 2021. If there have been any service lines replaced since October, the City must provide Plaintiffs with the reporting to show that the City has installed (or attempted to install) water filters at those homes within the required time period.

*******

The City's violations of the Settlement's reporting requirements are serious and must be remedied promptly. Any delay in reporting may delay Plaintiffs' ability to monitor the City's work and notify the City of potential non-compliance that may require further pipe replacement work. Please provide, by no later than June 6, a status report that contains up-to-date datasets of all information that would have been included in the City's missing reports. Specifically, the status report should include:

a.  an updated list of all homes that declined a service line excavation or replacement;

b.  an updated list of all homes where the City's outreach obligations are complete, but at which the residents have not responded to the City's outreach;

c.  an updated list of all homes that have received restoration;

d.  a list of homes that have received a service line excavation or replacement since September 2021, including the date of excavation/replacement, the materials(s) of the service line confirmed or discovered, the portion of the service line that was replaced, if any, and (if applicable), whether proper installation of faucet filter was verified;

e.  the date, recipient, and address of letters sent to meet the written outreach requirements of the Settlement;

f.  an updated list of homes that have consented to an excavation but have not responded to the City's attempts to schedule an excavation, and the date, time, and result of the City's scheduling attempts;

g.  the date and time of any in-person outreach conducted since September 2021 and the result of those outreach attempts;

h.  the total amount of money approved for payment by the City for excavation and replacement work based on weekly contractor reports and invoice processing by the Department of Public Works;

5

i.  the total amount of money approved for payment by the City for program management and administrative work for the service line replacement program based on invoice processing by the Department of Public Works and/or the Finance Department;

j.  the total number and addresses of homes that have received a service line replacement since the effective date of the Settlement;

k.  the total amount of money reimbursed to or paid on behalf of City in WIIN and non-WIIN categories;

l.  a list of any requests for reimbursements or payments that have been denied by EGLE since May 2021, including the amount requested, amount denied, and reason for denial;

m.  copies of any financial or performance auditing results obtained pursuant to Paragraph 25 of the Settlement or relating to the City's use of Allocated or Reserved Monies since May 2021;

n.  formal communications that the City submitted to or received from EPA since May 2021; and

o.  any missing reports of the City's filter installation efforts since October 13, 2021.[1]

Plaintiffs will propose times in the next two weeks when we are available to meet and confer on these issues. We are available to answer any questions in the meantime.

Sincerely,

*Sarah C. Tallman*

Sarah C. Tallman

cc (via email):    Jolie McLaughlin, jdmclaughlin@nrdc.org; Addie Rolnick, arolnick@nrdc.org; Bonsitu Kitaba, bkitaba@aclumich.org; Daniel Korobkin, dkorobkin@aclumich.org; Richard Kuhl, kuhlr@michigan.gov; Nate Gambill, gambilln@michigan.gov; George Krisztian, krisztiang@michigan.gov

---

[1] Plaintiffs are not requesting the tap water monitoring and water quality parameter monitoring information that has already been provided by the State Parties in their quarterly status reports.

6

# Exhibit 44

| | |
|---|---|
| **From:** | Joseph Kuptz |
| **To:** | kuhlr@michigan.gov; Tallman, Sarah; Rolnick, Addie; bkitaba@aclumich.org; William Kim; krisztiang@michigan.gov; russelle@michigan.gov; Clyde Edwards |
| **Subject:** | Fwd: Concerned Pastors, et al. v City of Flint, et al. re: Monthly Report |
| **Date:** | Tuesday, November 1, 2022 8:30:31 AM |
| **Attachments:** | 2022-10-14 Outreach attempts.xlsx |
| | 2022-10-14 Non-responsive.xlsx |
| | 2022-10-14 Homes with consent received.xlsx |
| | 2022-10-14 Exploration Status.xlsx |
| | 2022-10-14 Declinations.xlsx |
| | 2022.10.28 CoF Status Report v2.pdf |

Please find attached the City of Flint's updated monthly report in this matter.

Thank-you.

Joe Kuptz

---------- Forwarded message ---------
From: **Joseph Kuptz** <jkuptz@cityofflint.com>
Date: Fri, Oct 28, 2022 at 5:03 PM
Subject: Concerned Pastors, et al. v City of Flint, et al. re: Monthly Report
To: <kuhlr@michigan.gov>, Tallman, Sarah <stallman@nrdc.org>, <arolnick@nrdc.org>, <bkitaba@aclumich.org>, William Kim <wkim@cityofflint.com>, <krisztiang@michigan.gov>, <russelle@michigan.gov>, Clyde Edwards <cedwards@cityofflint.com>

Please find attached the City of Flint's most recent monthly report in this matter.

Thank-you.

Joe Kuptz

--
Joseph N. Kuptz, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2085

--
Joseph N. Kuptz, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2085

PA-269