UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, MELISSA MAYS, AMERICAN
CIVIL LIBERTIES UNION OF MICHIGAN,
and NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

                Plaintiffs,                                Case Number 16-10277

v.                                              Honorable David M. Lawson

NICK A. KHOURI, FREDERICK HEADEN,
MICHAEL A. TOWNSEND, JOEL
FERGUSON, MICHAEL A. FINNEY,
SYLVESTER JONES, and CITY OF FLINT,

                Defendants.

_____/

## ORDER GRANTING PLAINTIFFS' FIFTH MOTION
## TO ENFORCE SETTLEMENT AGREEMENT

The City of Flint continues to miss deadlines for completing the water service line

replacement work it promised to do when it entered into a Settlement Agreement on March 28,

2017. Those original deadlines have been extended several times. Among the tasks that the City

promised to perform were to identify and replace lead service lines for thousands of Flint

residences, restore the property after the excavations, and furnish reports of its work. In their

continuing efforts to secure the Agreement's benefits to the residents of Flint, the plaintiffs have

filed their fifth enforcement motion, alleging that the City has violated and is violating the

agreement by (1) failing to complete the remaining required service line excavations and

replacements by the latest Court-ordered deadline of September 30, 2022; (2) failing to track and

maintain records of the addresses where the City has completed restoration; (3) neglecting to

provide timely monthly reports, including cumulative lists of all addresses where the City has completed restoration; and (4) failing to complete the remaining required restoration work.

The defendants do not dispute these allegations. After the motion was filed, the parties agreed to most of the relief proposed by the plaintiffs, with one exception. A dispute remains regarding a proposed procedure for remedying the City's incomplete restoration efforts.

The Court held a hearing on the remaining disputed item on February 15, 2023. The City argued that the remedial measures proposed by the plaintiffs would expand its obligations beyond that called for by the Settlement Agreement and would create an intolerable burden on its limited resources. However, the City put itself in this position by its mismanagement of the service line replacement process, it has grossly exaggerated the "burden" that would be imposed by the inspection and notice procedures proposed by the plaintiffs, and those remedial measures are well within the means available to the Court to enforce the Settlement Agreement it has been supervising for almost five years. The plaintiffs' fifth motion to enforce the Settlement Agreement will be granted.

I.

The plaintiffs filed their latest enforcement motion on November 1, 2022, pointing out the failures listed above. The parties have agreed to most of the plaintiffs' proposals to address these concerns, but a dispute remains over a proposed procedure for inspecting and restoring certain property excavations.

The Settlement Agreement initially required the City of Flint to complete service line excavations for at least 18,000 eligible homes in Flint and replace those lines composed of lead or galvanized steel by January 1, 2020. In August 2020, adopting a stipulation of the parties, the Court modified the Settlement Agreement to establish a new, November 20, 2020 deadline by

which the City would complete all remaining excavation and replacement work.  Aug. 2020 Modification Order, ¶ 1, ECF No. 217, PageID.10409.  The modification specified that "completion of an excavation or service line replacement includes completion of restoration work at the address," *ibid.*, and required the City to report monthly cumulative lists of the homes where restoration work had been completed, *id.* at ¶ 7, PageID.10413.  However, the City has failed to furnish monthly lists to the plaintiffs; it has provided a cumulative list of restored homes only twice, most recently in July 2021.  *See* May 2021 Notice of Violation, ECF No. 242-2, PageID.11374; October 2022 Notice of Violation, ECF No. 242-4, PageID.11377.

In April 2022, the parties again stipulated to a new deadline — September 30, 2022 — for completing all excavations and service-line replacements.  Again, the Court approved the modified deadline.  Apr. 2022 Modification Order, ¶ 1, ECF No. 237, PageID.11071.  Based on the parties' stipulation and the City's efforts to re-bid its restoration contracts, however, the Court did not modify the deadline for completing restoration work.  Instead, the parties broadly agreed that "[t]he City shall complete restoration at every address where it has conducted or conducts an excavation pursuant to the Settlement Agreement, as modified."  *Id.* at ¶ 2.  They also agreed that they would later jointly file a stipulation specifying an agreed-upon modification for the restoration deadline. *Id.* at ¶ 6, PageID.11074-75.  Because no such stipulation has been filed, the plaintiffs now invoke the Settlement Agreement's dispute resolution provisions to ensure the City's compliance with its restoration obligations.  *See ibid.*; 5th Mot. to Enforce, ECF No. 242, PageID.11109.

The City acknowledges that, as the result of certain decisions made from 2017 through 2019 regarding restoration activities, its recordkeeping is incomplete, and it does not know the exact status of restoration at certain previously-excavated addresses.  *See* Resp., ECF No. 248, PageID.11560; October 2022 Notice of Violation, ECF No. 242-4, PageID.11380.  It has suggested

-3-

to the plaintiffs that the only way for it accurately to assess the scope of restoration work remaining is to visually inspect thousands of previously-excavated homes to confirm whether restoration in fact was completed and retroactively deem homes restored. The City therefore agreed to take certain actions in response to the plaintiffs' fifth motion to enforce the Settlement Agreement to demonstrate completion of its obligation to restore the lawn, curb, sidewalk, and driveway at the addresses where it has excavated and replaced service lines. *See* Stip. to Modify, ¶ 16, ECF No. 256, PageID.11625-26. For each address where restoration has been completed as called for by the Settlement Agreement, the City will provide either contemporaneous documentation of completed restoration or make an in-person visual inspection. *Id.* at ¶ 16, PageID.11625-26. The visual inspection shall verify that

> (a) no asphalt, concrete, or other debris remains; (b) the address has a complete, uniform sidewalk with no gaps or holes, and the sidewalk is uniform in both grade and alignment; (c) the address has a complete, uniform driveway with no gaps or holes, and the driveway is uniform in both grade and alignment; (d) the address has a complete, uniform curb, with no gaps or missing pieces, and the curb has a uniform grade and alignment; (e) the lawn is free of holes or trenches and is of a uniform grade, with no visible depressions; (f) any visible topsoil on the greenbelt or lawn is free of debris and the greenbelt or lawn has a consistent and uniform plant cover; and (g) the water shut-off valve is flush with the surface of the lawn and does not pose a tripping hazard.

*Idi.* at PageID.11626-27. The City also has agreed to take a photo or photos to document the condition of the property, to provide the plaintiffs with the photos upon request, and to make monthly reports to the plaintiffs of the restored homes. *Ibid.* With each monthly report, the City will provide the plaintiffs with any emails and any logged calls it received during the reporting period from residents concerning the visual inspections. *Id.* at ¶ 18, PageID.11628.

In addition to this agreed-upon relief, the plaintiffs propose a notice requirement: They ask that the Court order that, if the City conducts a visual inspection of an address and determines that no further restoration is needed, the City leave a door hanger at that address notifying the

-4-

resident of its determination.  5th Mot. to Enforce, ¶ 6, ECF No. 242, PageID.11121.  The plaintiffs further propose that the City take and maintain a photo of every such door hanger left on a residence and include on the door hanger a City phone number and email address that residents may use to contact the City if they disagree with the City's determination or have any questions.  *See* Stip. to Modify, ECF No. 256, PageID.11629-30.  By the plaintiffs' accounting, there are approximately 6,000 residences in Flint where the City lacks a contemporaneous record of restoration.  Rolnick Decl., ¶ 4, ECF No. 242-2, PageID.11128-29.  The owner of one such residence, Sidney Hemphill, submitted a declaration stating that the City twice dug up her front yard and sidewalk to replace, then fix, her service line in 2019.  Hemphill Decl., ECF No. 257-3, PageID.11650-51.  The City never returned to restore Hemphill's property or otherwise communicated with her.  *Ibid.*  Hemphill states that she would like to be notified if the City decides that it will not complete restoration so that she can contact the City to protest its decision and decide whether to complete the restoration work herself.  *Id.* at PageID.11652.

The City opposes the new proposed door hanger notice procedure as unduly burdensome and outside the parameters of the Settlement Agreement.  In support of its argument, it presented an affidavit of its Director Public Works, Michael J. Brown, attesting that the requirement would "impose an undue and heavy burden on the City."  Brown Aff., ¶ 9, ECF No. 248-1, PageID.11564.  Brown explains in the affidavit that the extent of the restoration issue is unknown, as is the number of employees that would be needed to print door hangers and personally deliver them to thousands of addresses.  *Id.* at ¶¶ 10-11.  He also explains that it would be time-consuming for the City to respond to the calls and emails from residents in response to the door hangers.  *Id.* at ¶ 12, PageID.11565.  Drawing upon his prior experience with this matter and other large-scale public-

works projects, Brown concluded that the proposed notice process would "impose a tremendous financial and time burden upon the City." *Id.* at ¶ 13.

The plaintiffs point out that the City previously has agreed to leave door hangers on homes to fulfill its obligations under the Settlement Agreement. The original agreement, for example, obligated Community Outreach and Resident Education (CORE) teams to leave door hangers with information about faucet filters when they failed to make contact with eligible households, or when residents refused filter inspections. Agreement, ¶¶ 75, 80, ECF No. 147-1, PageID.7394, 7400. Later, the parties also stipulated to amend the settlement agreement to require the City to leave door hangers on service line-replacement-eligible households. *See* Jul. 2018 Modification Order, ECF No. 174, PageID.8711; Aug. 2020 Modification Order, ¶ 6, ECF No. 217, PageID.10413. The amendment requires the City to "undertake reasonable efforts to schedule a time to complete the work" at each address where the resident has given the City permission "to conduct an excavation and replacement (if necessary)." *Ibid.* If the City is unsuccessful at contacting said residents, the amendment requires the City to "leave a door hanger with information explaining that the City is trying to contact the resident to schedule a time to conduct the excavation and replacement (if necessary) and providing information about how the resident can schedule the work." *Ibid.*

The plaintiffs sought leave to take Brown's deposition to inquire about the conclusory statement he made in his affidavit about the burdens imposed by the proposed notification procedure. The Court granted that request over the City's objection, and Brown sat for a deposition on January 10, 2023. His responses to the questioning revealed that Brown was not very careful with the underlying facts when he drafted his affidavit. He testified, for example, that he understood that the proposed notification procedure would require the City to evaluate past

-6-

restoration work, update records, and provide notice to every home where an excavation had been completed.  Brown dep., ECF No. 257-4, PageID.11657-61, 11671.  He thus believed "that there was going to be this much larger job scope of work that needed to be done," which would prevent his department from successfully evaluating and putting a door hanger on "every single house" asking people if they were "satisfied" with whatever restoration work had been done.  *Id.* at PageID.11567-69.  However, Brown admitted that he had not actually evaluated the costs of a door hanger program, calculated the personnel time that would be required to perform in-person visual inspections, or consulted any other data.  *Id.* at PageID.11661, 11665-67.  He also admitted that he was not aware that the City already planned on going to the relevant homes in person to complete visual inspections of the properties.  *Id.* at PageID.11660-64.  If the City already had agreed to complete visual inspections, Brown allowed that it would take "a small amount of time probably to go and put the door hanger on the door."  *Id.* at PageID.11664.  And Brown admitted that if residents reached out to the City to report mistakes made during the restoration process, it was "quite probable" that the City would benefit by learning where additional servicing work is needed.  *Id.* at PageID.11669-70.

Despite the undermining of Brown's affidavit and his acknowledgements at the deposition, the City persisted in its argument at the hearing that the inspection and door-hanger notification procedure proposed by the plaintiffs poses an unreasonable burden on the City.

## II.

The Settlement Agreement states that the dispute resolution mechanism outlined there is the "sole and exclusive mechanism" for resolving disputes and disagreements arising out of the Agreement, and that the Court has jurisdiction to enforce its terms.  Settlement Agreement, ¶¶ 125-26, ECF No. 147-1, PageID.7423.  It also states that no modification may be made to the

Agreement absent a "joint stipulation of all of the Parties and a Court order." *Id.* at ¶ 138, PageID.7426-27.

In most cases, as here, the settlement results in the dismissal of a lawsuit. Thereafter, "[t]he court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement." *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988). "There is a deeply embedded judicial and legislative policy in favor of keeping final judgments final." *Cummings v. Greater Cleveland Reg. Transit Auth.*, 865 F.3d 844, 846 (6th Cir. 2017) (citations omitted). "That is especially true for settlement agreements." *Ibid.* However, the Sixth Circuit has explained that a district court possesses broad, inherent authority and equitable power to enforce the terms of a settlement agreement entered into by the parties to litigation. *Brock*, 841 F.2d at 154.

A settlement agreement in essence is a contract. *Cogent Sols. Grp., LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013). When enforcing a contract, the first objective is to "honor the intent of the parties," *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 29 n.28 (1994), and the prime source of that intent is the plain language of the agreement, *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 61, 664 N.W.2d 776, 787 (2003) ("Well-settled principles of contract interpretation require one to first look to a contract's plain language.").

As the Court explained when dealing with earlier enforcement motions in this case, the Settlement Agreement entered by the parties operates as a consent decree — that is, a "settlement agreement subject to continued judicial policing." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). A consent decree is "a strange hybrid in the law," *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1149 (6th Cir. 1992) (quoting *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981), in that it is "at once 'a voluntary settlement agreement which could be fully effective without

-8-

judicial intervention' and 'a final judicial order . . . plac[ing] the power and prestige of the court behind the compromise struck by the parties,'" *ibid.* (quoting *Williams*, 720 F.2d at 920).  Consent decrees therefore "may be 'treated as contracts for some purposes but not for others.'"  *Ibid.* (quoting *United States v. ITT Continental Baking*, 420 U.S. 223, 236 n.10 (1975).  The "scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it or by what might have been written had the plaintiff established his factual claims and legal theories in litigation."  *Ibid.* (quoting *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) (internal quotations omitted)).  But a consent decree also "should be construed to preserve the position for which the parties bargained." *Vanguards*, 23 F.3d at 1018 (quoting *Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir.), *cert. denied*, 506 U.S. 827 (1992).  Thus, courts effectuating the purposes or accomplishing the goals of a decree "are not bound under all circumstances by the terms contained within the four corners of the parties' agreement," *Lorain NAACP*, 979 F.2d at 1149, but rather, in enforcing a consent decree, may exercise "broad equitable remedial powers," *Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 532-33 (6th Cir. 2012).

A court's power to enforce a consent decree includes the "inherent equitable power to modify a consent decree if satisfied that the decree 'has been turned through changing circumstances into an instrument of wrong.'"  *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1146 (6th Cir. 1997) (quoting *United States v. Knote*, 29 F.3d 1297, 1302 (8th Cir. 1994)).  This power arises from the "injunctive quality of a consent decree," which "compels the approving court to . . . modify the decree if 'changed circumstances' subvert its intended purpose." *Vanguards*, 23 F.3d at 1018 (quoting *Williams*, 720 F.2d at 920).  "[E]ven if the consent decree does not expressly grant the district court jurisdiction to modify the decree, it is well-settled that

'courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them.'" *Ibid.* (quoting *Sarabia v. Toledo Police Patrolman's Ass'n*, 601 F.2d 914, 917 (6th Cir. 1979)).   Whether a situation rises to the level where judicial modification is appropriate "is a factual issue for the district court to decide in the first instance." *Waste Mgmt. of Ohio*, 132 F.3d at 1146.

The plaintiffs do not contend that the proposed door hanger notification procedure is explicitly required by the language of the Settlement Agreement.   Rather, they contend that the Court properly may impose the procedure to enforce what the Settlement Agreement unambiguously requires: that the City "complete restoration at every address where it has conducted or conducts an excavation," Apr. 2022 Modification Order, ¶ 2, ECF No. 237, PageID.11071, while maintaining monthly records of its progress, Aug. 2020 Modification Order, ¶ 7, ECF No. 217, PageID.10413.   Because the City has not done what it has promised to do, and it has not even kept records of the work it has completed, it is appropriate to install a sensible enforcement device to see that the City's performance of its part of the agreement is achieved.

The Settlement Agreement plainly contemplates that the Court will enforce its terms by resolving disputes among the parties.   Settlement Agreement, ¶¶ 125-30, ECF No. 147-1, PageID.7423-24.   Because it does not otherwise "specify the consequences of a breach," it implicitly leaves the remedies for breach to the Court's "equitable discretion." *Cook v. City of Chicago*, 192 F.3d 693, 698 (7th Cir. 1999).   That discretion is significant, *ibid.*, and may include the imposition of "additional affirmative conduct" not required by the underlying agreement, *Roman v. Korson*, 307 F. Supp. 2d 908, 919 (W.D. Mich. 2004) (citing *In re Arthur Teacher's Franchise Litig.*, 689 F.2d 1150, 1158 (3rd Cir. 1982); *N.L.R.B. v. J.P. Stevens & Co., Inc.*, 563 F.2d 8, 15 (2d Cir. 1977)).

-10-

The City plainly is struggling to comply with the Settlement Agreement's restoration requirements.  It admits that it does not know the scope of the restoration it already has completed and that visual inspections of thousands of residences are necessary to determine which addresses have been restored.  It also admits that it has performed excavations and service line replacements at certain addresses without also performing any or all restoration work.  *See* Resp., ECF No. 248, PageID.11560.  That, in fact, appears to be what is motivating the City's opposition to the door hanger proposal: it fears that residents will call to lodge complaints about the City's incomplete restoration work and that it might feel the need to respond to many of those calls.  The plaintiffs reasonably interpret the City's opposition as an effort to avoid its obligation to restore every property it excavated.

The plaintiffs' concern that the City will not accurately determine whether restoration has been completed in every case also is well-founded.  This is the fifth occasion in which the plaintiffs have been obliged to seek judicial relief in aid of the Settlement Agreement to remedy the City's repeated failure to meet Court-ordered deadlines for completing excavation and service line replacement.  Again, that work, per the terms of the Settlement Agreement, "includes completion of restoration work" at each address. Aug. 2020 Modification Order, ¶ 1, ECF No. 217, PageID.10409.  It therefore is within the Court's discretion to impose "more stringent and complete measures" than it previously ordered to ensure the City restores properties excavated pursuant to the Settlement Agreement.  *Screw Mach. Tool Co. v. Slater Tool & Eng'g Corp*., 683 F.2d 159, 163 (6th Cir. 1982).  "[B]road" equitable relief is appropriate to remedy the latest violations of the agreement "in the light of the violations which preceded them." *Ibid.*

The City's argument that the notification procedure is unduly onerous is belied by the testimony of its own affiant, who stated that it would take little time to leave a door hanger at each

residence the City visually inspects.  Moreover, the City already has contemplated that it will receive comments from property owners from its visual inspections, and it committed to provide a record of said concerns to the plaintiffs on a monthly basis.  Stip. to Modify, ¶ 18, ECF No. 256, PageID.11628.  The City also has committed to leave door hangers at certain properties per the terms of the modified Settlement Agreement.  *See* Jul. 2018 Modification Order, ECF No. 174, PageID.8711; Aug. 2020 Modification Order, ¶ 6, ECF No. 217, PageID.10413.  Leaving door hangers with information about the City's restoration efforts is in keeping with those commitments.

 When enforcing a settlement agreement, as with a contract, the first objective is to "honor the intent of the parties."  *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 29 n.28 (1994).  The City intended to restore every property it excavated per the terms of the Settlement Agreement.  The plaintiffs' requested notice remedy appears reasonably tailored to address the City's failure to honor that intention — and, perhaps, its efforts to avoid doing so.

III.

The parties' stipulation filed in response to this fifth enforcement motion outlines appropriate procedures to bring current the City's responsibilities.  The plaintiffs also have demonstrated that they are entitled to the relief they request to enforce the terms of this Settlement Agreement that is so important to the welfare of the City's residents, and which promotes the interests of the City and the State of Michigan in restoring confidence in the municipal water system.

Accordingly, it is **ORDERED** that the plaintiffs' fifth motion to enforce the Settlement Agreement (ECF No. 242) is **GRANTED**.

It is further **ORDERED** that the City of Flint shall complete excavations and replace service lines made of lead or galvanized steel (excluding restoration) at all 31,578 replacement eligible homes appearing on the "2022 Replacement Eligible Homes List," which has been agreed to and exchanged among the Settling Parties, as quickly as practicable and by no later than August 1, 2023.

It is further **ORDERED** that, for addresses where the City has scheduled an excavation or replacement, the day before each scheduled excavation or replacement, the City shall make a telephone call to the resident at whose address an excavation is scheduled if the City has a contact phone number for the household.  This caller shall remind the resident of the scheduled excavation or replacement and inform the resident that if they are not home at the scheduled time, the City will be unable to complete the work and the resident will be required to reschedule.  This reminder shall be conveyed through a voicemail if the resident does not answer the call.  The City shall maintain a log documenting these calls, including the address(es) the calls concerned and whether the caller spoke to the resident or left a voicemail, and shall provide this log to the plaintiffs upon request.

It is further **ORDERED** that, for addresses where the City has scheduled an excavation or replacement with a resident, but the resident is not home at the time of the scheduled excavation and/or replacement, the City must undertake reasonable efforts to reschedule the work at that address.  These reasonable efforts shall include, at minimum:

    a. If the City has not yet completed the minimum post-consent scheduling attempts required by Paragraph 6 of the August 24, 2020 Court order modifying the Agreement ("August 2020 Order"), ECF No. 217, Page ID.10413, the City must complete those attempts.

b.  The City must leave a door hanger (i) with information explaining that the City was unable to complete a scheduled excavation and/or replacement because the resident was not home and that the resident must reschedule with the City, and (ii) providing information about how the resident can reschedule the work.  The City shall take a photo of every door hanger it leaves to document compliance with this provision and provide those photos to the plaintiffs upon request.

c.  The City must make at least two telephone calls to the resident if the City has a contact phone number for the household, one of which must occur the same day as the scheduled excavation and the second of which must occur between one and seven days after the scheduled excavation.  The caller shall attempt to reschedule the work with the resident, and shall inform the resident that this is the City's second-to-last or last attempt (as applicable) to reschedule, but that the resident may contact the City to schedule another time to complete the work.  The caller shall convey this information by voicemail if the resident does not answer.  The City shall maintain a log documenting these calls and the address(es) the calls concerned, including whether the caller spoke to the resident or left a voicemail, whether the caller successfully rescheduled the work, and the date of the rescheduled work (if applicable), and shall provide this log to the plaintiffs upon request.

d.  If the City does not have a contact phone number for the household, the City must complete two additional in-person outreach attempts to reschedule the excavation and/or replacement beyond the minimum number of attempts required by Paragraph 6 of the August 2020 Order.  The City shall document these attempts and provide reporting to the plaintiffs as described in Paragraph 6 of the August 2020 Order.

If a resident who has given the City permission to conduct an excavation and replacement (if necessary) at their address contacts the City to reschedule an excavation or replacement at any time before the City completes the work described in this order, the City must schedule a time with the resident to complete work at that address.  The City shall maintain a log documenting any requests it receives from residents to reschedule excavations or replacements, including the address(es) those communications concerned, whether the work was rescheduled, and if so, the date it was rescheduled for, and shall provide this log to the plaintiffs upon request.

It is further **ORDERED** that, within 14 days of when the City determines that it has completed the excavations and replacements required above, the City shall provide to the other Settling Parties the notification, written statement, and supporting information described in Paragraph 3 of the April 2022 Order.  In addition to the information listed in that Paragraph, the City shall include the following spreadsheet:

   a. **City unable to complete scheduled excavation.**  All addresses, including Parcel IDs, where the resident provided consent to conduct an excavation and where the City scheduled an excavation or replacement, but where the City has been unable to complete an excavation or replacement despite having completed the outreach required by Paragraphs 2 and 3 of this order and Paragraph 6 of the August 2020 Order.  This spreadsheet shall include, for each address, the dates and times of at least three in-person post-consent outreach attempts to schedule the excavation or replacement, one of which occurred during the evening (after 5 p.m.) or on a weekend (Saturday or Sunday); the date and time of a phone call confirming the excavation or replacement time with the resident 24 hours in advance (if applicable); the date and time the excavation or replacement was scheduled to occur; the dates and times of at least two phone calls attempting to reschedule

the excavation or replacement (if applicable); and the dates and times of at least two in-person attempts to reschedule the excavation or replacement (if applicable).

It is further **ORDERED** that, as soon as practicable, and by no later than May 1, 2023, the City shall compile and provide to the plaintiffs an Excel spreadsheet listing all previously excavated addresses on the 2022 Replacement Eligible Homes List at which either of the following is true: (i) the City has contemporaneous documentation indicating that it completed restoration at that address, including the date(s) of restoration; or (ii) the requirements of Paragraph 16.b of the Stipulation, ECF No. 256, PageID.11625, have been met.  A data entry or entries identifying the date(s) of restoration at an address in the City's Cityworks system shall be considered "contemporaneous documentation" of restoration at the address under this Paragraph and Paragraphs 16 and 17 of the Stipulation only if the entry or entries are created contemporaneously with the completion of restoration at that address and indicate completion of both hard and soft surface restoration.  No later than seven days after submitting that list to the plaintiffs, the City shall propose a modification of the deadline in Paragraph 1 of the August 2020 Order for the City to complete all restoration work required under the Agreement (as modified). The proposed deadline must be as soon as practicable.  The City's proposal shall be accompanied by a revised Restoration Plan (described in Paragraph 12 of the Stipulation) explaining the basis for the City's proposed deadline.

It is further **ORDERED** that, within seven days of the date the City proposes a modified restoration deadline, the Settling Parties shall meet and confer to attempt in good faith to agree on whether the City's proposal is a reasonable modification of the deadline in Paragraph 1 of the August 2020 Order for the City to complete all remaining required restoration work described in Paragraph 2 of the April 2022 Order.  If the Settling Parties reach an agreement to modify the

City's restoration-completion deadline, no later than 14 days after the City proposes the modified restoration deadline, the Settling Parties shall jointly file a Stipulation specifying the agreed-upon modification for the Court's approval.  If the Settling Parties are unable to reach an agreement following good-faith negotiations, then the parties shall submit, no later than 28 days after the City proposes a modified restoration deadline, simultaneous supplemental briefs asking the Court to set the soonest practicable deadline for the City to complete all remaining required restoration work described in Paragraph 2 of the April 2022 Order.

It is further **ORDERED** that, for each address where the City completes a service line excavation or replacement between September 1, 2022, and March 1, 2023, the City shall complete restoration by June 30, 2023, or 60 days after reopening of the asphalt plant or plants the City uses, whichever is later.  For each address where the City completes a service line excavation or replacement on or after March 2, 2023, the City shall complete restoration by the last day of the fourth month following the month when the City either excavated the service line or completed a replacement at that address, whichever is later.

It is further **ORDERED** that the deadlines and obligations set forth above shall supersede Paragraph 6 of the April 2022 Order.

It is further **ORDERED** that, within 14 days of when the City determines that it has completed all required restoration work described in Paragraph 2 of the April 2022 Order, the City shall provide to the other Settling Parties the notice, written statement, and documentation described in Paragraph 7 of the April 2022 Order.

It is further **ORDERED** that the City shall continue performing excavations, replacements, and restoration until the cold weather conditions it identifies in Paragraphs 11.c and 12.d of the Stipulation prevent further work and notify the plaintiffs within three business days if it determines

that it must cease excavation, replacement, or restoration work for the winter. Beginning on February 28, 2023, the City shall submit bi-weekly updates to the plaintiffs regarding when it expects that the weather conditions it identifies in Paragraphs 11.c and 12.d of the Stipulation will occur such that it can resume excavation, replacement, or restoration work, as applicable. The City shall begin performing excavations, replacements, and restoration in 2023 within two weeks of when weather conditions permit.

It is further **ORDERED** that the City shall create a detailed written plan for completing the remaining excavation and replacement work described above ("Service Line Replacement Plan") and provide that Plan to all other parties by March 8, 2023. The Service Line Replacement Plan shall describe the steps the City will take to complete the remaining excavation and replacement work (excluding restoration) required by the Agreement as quickly as practicable, and no later than August 1, 2023. This description must include, but is not limited to, how the City is anticipating and planning for the following factors:

a. Securing and maintaining an adequate inventory of materials necessary for service line replacements, including planning for how to address materials shortages, supply chain delays and challenges, and changes in prices of needed materials.

b. Maintaining sufficient labor to complete the required work as quickly as practicable, including how many crews the City will maintain and what rate of excavations those crews can complete per week.

c. Weather-related work disruptions, including both seasonal work stoppage for the winter and short-term disruptions caused by inclement weather. The Plan shall describe the specific weather conditions that will trigger seasonal work stoppage for the winter, and

the specific conditions that will allow work to resume following seasonal stoppage for the winter.

  d. Resident cooperation with scheduling excavations and replacements, including what efforts the City will make to conduct outreach and coordinate with residents to ensure that excavations and replacements are completed as scheduled.

  e. If excavation work remains along major roads, the Plan must list the addresses of those excavations and explain the City's plans and schedule for obtaining any necessary road-closure permits and completing those excavations.

  f. If excavation work remains at any of the 253 addresses the City shared with the plaintiffs on December 10, 2018, and identified as flagged by Michigan's State Historic Preservation Office (SHPO), the Plan must describe how the City will complete those excavations, including ensuring it has the appropriate permits and support from any necessary archaeologists to complete the work by August 1, 2023.

  g. Completing outreach as quickly as practicable and no later than March 1, 2023.

It is further **ORDERED** that the City shall create a detailed written plan for identifying and completing the remaining restoration work required by the Agreement ("Restoration Plan") and provide that Plan to all other parties by March 8, 2023.  The Restoration Plan shall describe how the City will meet the deadlines in Paragraph 7 above, including how it will coordinate between its project management and construction contractors to ensure that the appropriate work orders are timely issued.  The Restoration Plan shall also describe the steps the City will take to complete the remaining restoration work required by the Agreement as quickly as practicable, including identifying the remaining scope of that work.  The description in the Plan must include, but is not limited to, how the City is anticipating and planning for the following factors:

a.   Work needed to identify as quickly as practicable how many and which previously excavated addresses still require restoration.  To the extent the City plans to visually inspect homes (in accordance with Paragraph 16.b of the Stipulation) to help it identify which addresses still require restoration, the Plan must provide a timeline for completing these visual inspections, including the total number of homes it will inspect; how many addresses the City plans to inspect weekly; the number of staff who will perform visual inspections; how many hours per week those staff will perform the inspections; and how many homes those staff can inspect per eight-hour day.  The City shall consider and document in the Plan what additional resources, if any, it can marshal to finish identifying the scope of remaining restoration work;

b.   Securing and maintaining an adequate inventory of materials necessary for restorations (e.g., asphalt, concrete, and topsoil), including planning for how to address materials shortages, supply chain delays and challenges (including seasonal closure of the asphalt plant or plants the City uses), and changes in the prices of materials;

c.   Maintaining sufficient labor to complete the required work as quickly as practicable, including how many restoration crews the City will maintain and how many addresses those crews can restore per week;

d.   Weather-related work disruptions, including both seasonal work stoppage for the winter and short-term disruptions caused by inclement weather.  The Plan shall describe the specific weather conditions that will trigger seasonal work stoppage for the winter, and the specific conditions that will allow work to resume following seasonal stoppage for the winter;

e.   Outreach to residents to ensure cooperation with scheduling, if applicable;

f.  If restoration work remains along major roads, the Plan must list the addresses of those restorations and explain the City's plans and schedule for obtaining any necessary road-closure permits and completing those restorations;

g.  If restoration work remains at any of the 253 addresses the City shared with the plaintiffs on December 10, 2018, and identified as flagged by Michigan's State Historic Preservation Office (SHPO), the Plan must describe how the City will complete those restorations, including ensuring it has the appropriate permits and support from any necessary archaeologists to complete the work by any applicable deadline.

It is further **ORDERED** that the City shall provide the plaintiffs weekly reports every Wednesday until it has completed excavations and service line replacements at all eligible addresses. These reports shall specify which specific seven-day period the data cover.  These reports shall include the total number of excavations and/or replacements the City has scheduled with residents for the upcoming seven days (Thursday to Wednesday), as well as the addresses where this work has been scheduled.

It is further **ORDERED** that with each monthly status report required under Paragraph 6 of the March 26, 2019 Court order modifying the Agreement ("March 2019 Order"), ECF No. 208, PageID.10348, and Paragraph 7 of the 2020 Order, the City shall provide the following information, current as of the 21st day of the month in which the report is submitted:

a.  The total number of addresses where the City has performed the final consent attempt, as required by Paragraph 15 of the March 2019 Order, during the reporting period, including at how many addresses the City obtained consent to conduct work.

b.   The number of service line replacements the City can perform based on the current total number of parts in its materials inventory.

c.   The informational elements described in Paragraph 6.i and 6.ii of the 2019 Order. The City shall also provide the informational elements described in sub-paragraphs (a), (b), and (c) above on the 14th day of each month.  The data covered by reports submitted on the 14th day of the month shall cover at least the two-week period ending on the 7th day of the month of the report. If the 14th day of the month falls on a day that is not a business day, then the City shall submit its report on the first business day thereafter.  The City's obligations to produce monthly reports and reporting on the 14th day of each month shall terminate 30 days after the Completion of Service Line Replacement.

It is further **ORDERED** that with each monthly status report required by Paragraph 6 of the March 2019 Order, the City shall provide the plaintiffs the following information related to its current inventory of materials needed for service line replacements:

a.   The number of service line replacements the City can perform based on the current total number of parts in its materials inventory.

b.   The date(s) or projected date(s), if any, when the City (including any of its contractors) is scheduled to receive additional service line replacement materials based on orders accepted by suppliers, including specific information about the exact parts (and quantities) the City is scheduled to receive; and

c.   A description of the City's and State's efforts to obtain additional required materials, including a list of any potential suppliers or fabricators the City or State communicated with in the previous month and the results of those communications.  The City must communicate at least twice per month with the State to obtain the information necessary to fulfill the reporting requirements in this Paragraph.

It is further **ORDERED** that the City's obligations under the Agreement, as modified, to restore the lawn, curb, sidewalk, and driveway at an address shall apply only to damage related to service line excavations and replacements completed by the City.

      a.  The City must demonstrate completion of its obligations under Paragraph 2 of the April 2022 Order as to an address by producing contemporaneous documentation of completed restoration at that address, unless it uses the method permitted by Paragraph 16.b of the Stipulation and the restoration occurred before November 1, 2022.

      b.  If the City lacks contemporaneous documentation of completed restoration at an address, the City may instead demonstrate compliance with its obligations under Paragraph 2 of the April 2022 Order by using in-person visual inspections.  Such visual inspections must, at a minimum, follow the procedures described in (i), (ii), and (iii) below.  The City shall educate any person performing these inspections about the requirements of this Paragraph.  The City may use alternative methods of visual inspection only upon written agreement by all parties memorialized in a stipulation filed with the Court.

      i.  <u>Visual inspection criteria</u>. The City must verify, as part of the in-person visual inspection of that address, that all of the following criteria are true: (a) no asphalt, concrete, or other debris remains; (b) the address has a complete, uniform sidewalk with no gaps or holes, and the sidewalk is uniform in both grade and alignment; (c) the address has a complete, uniform driveway with no gaps or holes, and the driveway is uniform in both grade and alignment; (d) the address has a complete, uniform curb, with no gaps or missing pieces, and the curb has a uniform grade and alignment; (e) the lawn is free of holes or trenches and is of a uniform grade, with no visible depressions; (f) any visible topsoil on the greenbelt or lawn

is free of debris and the greenbelt or lawn has a consistent and uniform plant cover; and (g) the water shut-off valve is flush with the surface of the lawn and does not pose a tripping hazard.

  ii. <u>Photo documentation</u>. The City shall take a photo or photos sufficient to document the condition of the lawn, sidewalk, driveway, curb, and any other areas relevant to the City's visual inspection. The City shall maintain these photos and must provide them to Plaintiffs upon request.

  iii. <u>Reporting.</u> The City must provide the plaintiffs with the reporting as to the address described in Paragraph 17 below.

It is further **ORDERED** that Paragraph 7.iii of the August 2020 Order is superseded by this Paragraph. With each monthly report required under Paragraph 6 of the March 2019 Order, the City shall provide an Excel spreadsheet listing, in separate tabs (or in a single tab with indicators to distinguish each category described in a, b, c.i, c.ii, and c.iii below):

  a. All previously excavated addresses where the City has contemporaneous documentation of completed restoration, including the date(s) of restoration.

  b. All previously excavated addresses where the City's records indicate restoration is still required, without the need for a visual inspection to confirm the address's restoration status; and

  c. All previously excavated addresses where the City has no contemporaneous documentation of completed restoration, noting which of the following categories each address falls into: (i) City confirmed by an in-person visual inspection complying with Paragraph 16.b above that restoration was completed, including the date of the inspection; (ii) City confirmed by an in-person visual inspection complying with Paragraph 16.b above

-24-

that restoration is still needed, including the date of the inspection; (iii) determination of whether restoration is still needed pending a visual inspection or further records review by the City.

It is further **ORDERED** that, with each monthly report required under Paragraph 6 of the March 2019 Order, the City shall provide the plaintiffs with any emails the City received during the reporting period from residents concerning the visual inspections described in Paragraph 16.b of the Stipulation.  The City must also provide the plaintiffs with a log documenting all calls from residents or property owners to the City concerning the visual inspections described in Paragraph 16.b during the reporting period.  The log must include both calls when a City staff member (or one of the City's contractors) answered the phone and spoke with the caller and voicemails, and must include the address(es) the call concerned.

It is further **ORDERED** that if the City conducts a visual inspection of an address and determines that no further restoration is needed, the City shall

a.  leave a door hanger notifying the resident when, as a result of the City's visual inspection (described in Paragraph 16 of the Stipulation), the City determines that all of the criteria in Paragraph 16.b.i. are met and the City will not be completing future restoration at the resident's address;

b.  take a photo of every door hanger it leaves to document compliance with this notice provision and provide those photos to the plaintiffs upon request; and

c.  provide proposed language for the door hangers described above to the plaintiffs for their review and approval on or before March 3, 2023.  The language must include a City phone number and email address that the resident may use to contact the City if the resident disagrees with the City's determination or has questions. The plaintiffs may

propose edits to the proposed door hanger until 14 days after the City provides the proposed language.  If the City objects to any of the plaintiffs' proposed edits, the parties shall meet and confer to achieve language for the door hanger that is acceptable to all parties.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:  February 24, 2023

-26-