```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3    Concerned Pastors for
      Social Action, et al.,
 4
                          Plaintiffs,
 5    v.
                                         Case No. 16-10277
 6    Nick A. Khouri, et al.,

 7                        Defendants.
      _____/
 8
                 MOTIONS TO ENFORCE SETTLEMENT AGREEMENT
 9
                 BEFORE THE HONORABLE DAVID M. LAWSON
10                    United States District Judge
                 Theodore Levin United States Courthouse
11                    231 West Lafayette Boulevard
                            Detroit, Michigan
12                         February 15, 2023
      APPEARANCES:
13
      FOR THE PLAINTIFFS:   Sarah C. Tallman
14                          Adeline Rolnick
                            Melanie Calero
15                          Natural Resources Defense Council
                            1152 15th Street NW, Suite 300
16                          Washington, DC  20005

17    FOR THE DEFENDANT     Richard Kuhl
      STATE OF MICHIGAN:    State of Michigan
18                          Department of Attorney General
                            P.O. Box 30754
19                          Lansing, Michigan  48909

20    FOR THE DEFENDANT     William Young Kim
      CITY OF FLINT:        Joseph Kuptz
21                          City of Flint
                            1101 S. Saginaw Street, Third Floor
22                          Flint, Michigan  48502

23

24            To Obtain a Certified Transcript Contact:
               Rene L. Twedt, CSR-2907, RDR, CRR, CRC
25                      www.transcriptorders.com
```

1

## **TABLE OF CONTENTS**

2

**MATTER** _____ **PAGE**

3
MOTION TO ENFORCE THE SETTLEMENT AGREEMENT
Argument by Ms. Rolnick................................   4
4
Argument by Mr. Kuptz..................................   5
Further Argument by Ms. Rolnick.......................  12
5
Further Argument by Mr. Kuptz.........................  19
Motion Taken Under Advisement by the Court............  23
6

7
CERTIFICATE OF COURT REPORTER.........................  24

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

     1   Detroit, Michigan

     2   February 15, 2023

     3   1:57 p.m.

     4                         *       *       *

     5           THE CLERK:  All rise.  The United States District

     6   Court for the Eastern District of Michigan is now in session,

     7   the Honorable David M. Lawson presiding.

     8           THE COURT:  You may be seated.

     9           THE CLERK:  Now calling the case of Concerned

    10   Pastors v. Khouri, Case Number 16-10277.

    11           THE COURT:  Good afternoon, counsel.  May I have an

    12   appearance for the plaintiffs, please?

    13           MS. ROLNICK:  Yes.  Adeline Rolnick, your Honor.

    14           THE COURT:  Again.

    15           MS. ROLNICK:  Adeline Rolnick.

    16           THE COURT:  For all of the plaintiffs?

    17           MS. ROLNICK:  For all plaintiffs, yes.

    18           THE COURT:  Anybody else?

    19           MS. TALLMAN:  Sarah Tallman for all plaintiffs.

    20           MS. CALERO:  Melanie Calero for all plaintiffs.

    21           THE COURT:  I didn't hear you.

    22           MS. CALERO:  Melanie Calero for all plaintiffs.

    23           THE COURT:  All right.  And for the City?

    24           MR. KUPTZ:  Joseph Kuptz for the City of Flint.

    25           MR. KIM:  William Kim for the City of Flint,

 1     your Honor.

 2             THE COURT:  All right.  And Mr. Kuhl, are you just

 3     kind of observing today?

 4             MR. KUHL:  That's it, your Honor.

 5             THE COURT:  And put your appearance on the record,

 6     please.

 7             MR. KUHL:  Richard Kuhl for the State defendant.

 8             THE COURT:  All right.  Thank you.

 9             The matter is before the Court on a motion to enforce

10     the settlement agreement.

11             I have a stipulation that was filed on January 19

12     that is quite elaborate and detailed, and apparently the only

13     thing left in dispute over the -- that arises out of the

14     motion has to do with how to address the situation of prior

15     line replacements where the restoration wasn't completed at

16     the houses and to notify those -- how those homeowners would

17     be notified and how they could seek some relief to get that

18     job finished.

19             Ms. Rolnick, is that accurate?

20             MS. ROLNICK:  Yes, that's the remaining disputed --

21     yes, that's the remaining disputed issue.

22             THE COURT:  All right.  And have you had a chance --

23     it seems to me that this boils down to pretty much whether or

24     not it's reasonable to require the City to put door hangers on

25     the residences so that those individuals can be notified.  Is

1   that sort of where we are at this -- with this?

2          MS. ROLNICK:  Yes.  The notice provision, to be

3   specific, the plaintiffs have proposed is that as part of

4   the visual inspections the City has agreed to, if the City

5   visits a home where it doesn't have a record of restoration,

6   determines that the City will not need to do future restoration

7   at the home, the City would then leave a door hanger notifying

8   the resident so that the resident knows they should not expect

9   the City to return.

10          THE COURT:  Okay.  So these are only homeowners

11   who -- whom the City determines to be residing in residences

12   where the work is all finished?

13          MS. ROLNICK:  Yes, that's correct.

14          THE COURT:  And if the homeowner disagrees, then they

15   can contact somebody at the City and take it up with them; is

16   that --

17          MS. ROLNICK:  Certainly.  Or the resident could also

18   decide to perform repairs to their property on their own.  But

19   the important thing is that they would know the City's

20   decision.

21          THE COURT:  All right.  Mr. --  is it Kuptz?

22          MR. KUPTZ:  Kuptz, your Honor.

23          THE COURT:  Kuptz.  I'm sorry.

24          So what's the problem?

25          MR. KUPTZ:  Your Honor, because of restoration and

1    recordkeeping decisions made by the City of Flint between

2    2017 and 2019, the City of Flint doesn't have a full handle

3    on the extent of restorations that still need to be completed

4    during those years.  So the concern, your Honor, is --

5            THE COURT:  So whose decision was it not to keep

6    track?

7            Actually, counsel, I'll tell you what, let's use the

8    lectern here, because I think that way it would make everybody

9    more hearable.

10           You can straighten that out, if you like.  We just

11   had a hearing where people were interrogating witnesses.

12           MR. KUPTZ:  Thanks, Judge.

13           So as I indicated, between 2017 and 2019 there were

14   certain decisions made under the prior administration of this

15   program where the records are not complete as to the extent of

16   the restoration.

17           THE COURT:  Right.  And my question was, who made

18   that decision?

19           MR. KUPTZ:  It's my understanding it was someone in

20   that prior administration or a combination of decisions that

21   were made over those years.

22           THE COURT:  Was it somebody in one of the political

23   branches or an elective office that made that decision?

24           MR. KUPTZ:  I'm not sure the exact root origination

25   of those decisions, your Honor.

1          THE COURT:  So that is as much a mystery as which

2    restorations are incomplete; right?

3          MR. KUPTZ:  Correct, your Honor.

4          THE COURT:  So do you dispute the idea that if a yard

5    was dug up and hasn't been restored that the homeowner has a

6    right to have that work completed?

7          MR. KUPTZ:  Well, the City of Flint is absolutely

8    committed to completing restorations for prior service line

9    excavations and replacements.  The only concern is, because

10   we don't know the scope of the issue, we don't know the cost.

11   And at this point, your Honor, the total of the amount spent

12   or already under contract are all of the monies that have been

13   allocated to this -- to date to this project.

14         THE COURT:  Well, do you agree that the work has to

15   be done?

16         MR. KUPTZ:  We would agree that restorations, if

17   there was a prior excavation or replacement, need to be

18   done and the City is absolutely committed to doing that.

19         THE COURT:  Okay.  And that means the City is

20   committed to funding that work?

21         MR. KUPTZ:  And that's not an answer that I have,

22   your Honor, because all I know is -- at this point is that

23   the monies that have been committed already have already been

24   spent or allocated to contracts.

25         THE COURT:  Well, I heard you the first time when you

1    said that.  But you said the City is absolutely committed to

2    doing the work, but then I asked if you're willing to pay for

3    it, and you kind of waffled on me.  So how do we approach that?

4         MR. KUPTZ:  I think the biggest concern, your Honor,

5    is finding the source of funds and when those funds will be

6    available.

7         THE COURT:  Okay.  Before you can do that, you have

8    to find out the extent of the work that's necessary; right?

9         MR. KUPTZ:  Correct.

10         THE COURT:  All right.  How many houses or how many

11   parcels are possibly -- or are involved in -- well, let me try

12   to state this more artfully.

13         Do you have a record of how many parcels are involved

14   in actual line replacements where the work is fully completed

15   and restoration is finished?

16         MR. KUPTZ:  Where restoration is finished, no.  We

17   are in the process of compiling that list.

18         THE COURT:  Okay.  So that's one of the problems;

19   right?

20         MR. KUPTZ:  Correct, your Honor.

21         THE COURT:  All right.  How are you going about

22   determining that?  Are you going door to door?

23         MR. KUPTZ:  Well, there's a number of ways that's

24   being accomplished.  The project manager, ROWE Engineering,

25   has an individual who is responsible for -- in the City's

1  tracking database, number one, there are properties where

2  excavation and or replacement have occurred and there is a

3  contemporaneous record of restoration.

4          THE COURT:  Okay.  So you can eliminate those

5  parcels; right?

6          MR. KUPTZ:  Correct, your Honor.

7          THE COURT:  All right.  Do you have a numerical count

8  for me today on that?

9          MR. KUPTZ:  I don't, at this point.

10          THE COURT:  Okay.

11          MR. KUPTZ:  That's still being compiled.

12          THE COURT:  All right.  And then apparently there is

13  a universe of the parcels where rest- -- where replacement has

14  been achieved but restoration was not completed; is that fair

15  to say?

16          MR. KUPTZ:  That's true.  And there's also parcels

17  where restoration may have been completed previously but there

18  is no contemporaneous record of that restoration in the City's

19  tracking database.

20          THE COURT:  All right.  Set that one aside for a

21  minute.

22          The one that I just mentioned, where replacement has

23  occurred but restoration is.

24  A.  Not completed, that's really the main focus of our

25  discussion here; is that fair to say?

1          MR. KUPTZ:  I believe so.

2          THE COURT:  All right.  Although, I imagine the

3   plaintiff would say that where the City believes restoration

4   was completed but the homeowner doesn't, there ought to be a

5   mechanism for dealing with that, I would think.  But let's set

6   that aside for a minute.

7          So are you going -- do you have a database of all the

8   replacements?

9          MR. KUPTZ:  Yes, your Honor.

10         THE COURT:  All right.  And then from that you could

11  exclude the database where you know that restoration was

12  completed?

13         MR. KUPTZ:  Correct, your Honor.

14         THE COURT:  And so then you have a universe of

15  parcels where possibly restoration would be needed; correct?

16         MR. KUPTZ:  Correct.

17         THE COURT:  And how do you eliminate from that set of

18  parcels ones -- houses that you don't think need restoration?

19         Are you going door to door and inspecting?  Is that

20  how it's done?

21         MR. KUPTZ:  Well, as part of this fifth motion to

22  enforce, as part of what the City of Flint has already

23  stipulated to is a set of visual inspection criteria that the

24  project manager is currently using to assess those parcels to

25  determine whether restoration is, in fact, complete at that

1    parcel.

2           THE COURT:  And there is an agreement on that; right?

3           MR. KUPTZ:  That's correct.  It's part of the fifth

4    motion to enforce that has already been stipulated to by the

5    City.

6           THE COURT:  All right.  And so what's left then?

7           MR. KUPTZ:  What's left that the City is objecting

8    to is the requirement that a door hanger be placed on those

9    addresses stating that the City of Flint believes restoration

10   activity is complete at that address.

11          As proposed by plaintiffs in their proposed order,

12   that door hanger would require a telephone number and an email

13   address for the resident to contact the City of Flint if they

14   believed that restoration is not complete at their house.

15          THE COURT:  All right.  Just to clarify, you're not

16   talking about an email address and telephone number of the

17   resident, you're talking about a -- some contact information

18   for someone in the City; right?

19          MR. KUPTZ:  That's correct, your Honor, so they could

20   contact the City.

21          THE COURT:  All right.  And why are you resisting

22   that?

23          MR. KUPTZ:  For a number of reasons, your Honor.

24          Number one, the City, when they receive a call or

25   an email from a resident, the City is obligated to respond

 1    to that resident's concern.  The order as proposed by

 2    plaintiffs does not require the City to follow up with the

 3    resident, only to maintain a database or a listing of those

 4    contacts.

 5          But the City as a government is responsive to its

 6    citizens and would feel compelled to respond, and that

 7    requires time and resources that the City does not have at

 8    this point.

 9          THE COURT:  Well, that's not a legal requirement,

10    that's a policy requirement, a policy determination; right?

11          MR. KUPTZ:  And I think you're right, your Honor.

12    It gets back to the funding issue.  The City has --

13          THE COURT:  I'm not talking about funding.  You

14    said that the City is compelled to respond to residents

15    that reach out to them, but I'm trying to determine what you

16    believe is the source of the compulsion.  Is it law or is it

17    policy?

18          MR. KUPTZ:  I think that would be a policy argument

19    which requires resources from the City.

20          THE COURT:  Okay.  All right.  I'll tell you what,

21    let me hear from Ms. Rolnick, then, and I will let you follow

22    up with that.

23          MS. ROLNICK:  Good afternoon, your Honor.

24          To respond to a few points that the City made, $11

25    million, which is what the City has by its own accounting

1    remaining under this agreement, is enough to complete this

2    remaining work, including the restoration backlog.

3              THE COURT:  Do you have any conception of how many

4    houses would be involved in that possible universe or subset

5    of parcels that had replacement lines installed but

6    restoration is not completed?

7              MS. ROLNICK:  The number the City has shared with

8    plaintiffs is 6,000 as the universe of sort of unknowns.

9              THE COURT:  Oh, okay.  So -- but maybe some of those

10   have satisfied homeowners living there; right?

11             MS. ROLNICK:  Yes.  It's an unknown.  But that's

12   plaintiffs' understanding of the scope here.  And the notice

13   would only be required at a subset of those homes that --

14   where the City deems restoration have been completed.

15             THE COURT:  Oh, if restoration hasn't been completed,

16   then they are going to restore?

17             MS. ROLNICK:  Exactly.

18             THE COURT:  All right.

19             MS. ROLNICK:  Notice would not be required under

20   plaintiffs' proposal.

21             In addition, the City has already allocated contract

22   money to identify the scope of restoration work in its

23   contract with its project manager, ROWE, and that's at

24   plaintiffs' appendix page 104.

25             And the City, as you noted, has already agreed to

 1    these visual inspections, and the cost of the notice provision

 2    specifically is quite small.  The cost of printing the door

 3    hangers, plaintiffs made some basic inquiries in preparation

 4    for this hearing.  The City could print 10,000 door hangers

 5    for $1,000.

 6            THE COURT:  Well, they are already printing door

 7    hangers under the stipulation, right, for other reasons?

 8            MS. ROLNICK:  That's true.  In paragraph 3 the City

 9    has agreed to another door hanger requirement, and the City

10    has agreed to many other door hanger requirements under this

11    agreement, which makes their objection here all the more

12    baffling, frankly.

13            THE COURT:  Well, not exactly.  But I'm not sure that

14    they are pushing back on the cost of printing door hangers.  I

15    think they are concerned about the consequences of that.

16            If there is -- if there are door hangers with contact

17    information inviting complaints, then, they -- as I understand

18    counsel, the present administration feels obliged to respond

19    to those complaints and to actually allocate funding for

20    someone to make those return calls and possibly to go out and

21    take a look.

22            MS. ROLNICK:  Yes.  Plaintiffs understand that to be

23    one of the City's concerns.  If the City's inspections are

24    accurate and are correctly identifying where restoration work

25    does and does not remain, there is no reason to think that

1    the City is going to be deluged with calls from its residents

2    as a result of these visual inspections.

3          And if the City's inspections are inaccurate and are

4    not identifying where restoration work does remain correctly,

5    that's information the City should be receiving from its

6    residents and it's information that the City's witness

7    conceded would benefit the City's visual inspection process.

8          THE COURT:  Is there another way of distributing the

9    contact information to residents --

10         MS. ROLNICK:  Contact --

11         THE COURT:  -- other than door hangers?  Like publish

12   it in some sort of general circulation newspaper or putting it

13   on the City's website or something like that?

14         MS. ROLNICK:  The City's contact information is

15   publicly available.  Not all residents have the technological

16   access to look that up on the internet.

17         But what's meaningful about the notice is not only

18   that it lists the City's contact information, but that it

19   informs the resident that the City has made a decision about

20   their property.

21         Residents have essentially been in limbo for years,

22   not knowing whether the City is coming back or when the

23   City might be coming back to fix damage to their lawns and

24   sidewalks.  They might be confused whether it's their

25   responsibility or the City's responsibility.  And if the City

1    is not going to be finishing this overdue work at residents'

2    homes, the least the City can do is provide notice about its

3    decision.

4         THE COURT:  All right.  What would be the legal

5    basis for me to order that under the settlement agreement?

6         MS. ROLNICK:  This is appropriate as enforcement

7    of the settlement.  Plaintiffs brought their fifth motion

8    to enforce to effectuate compliance with some of the core

9    requirements of the agreement, both the requirement to find

10   and replace service lines and to restore properties.

11        The notice is part of this remedial scheme to remedy

12   the City's failure to both timely complete restoration by the

13   deadline it agreed to and to keep track of where it completed

14   that work.

15        THE COURT:  Are you suggesting that if the City had

16   kept track you could go out and check it out yourself?

17        MS. ROLNICK:  If the City had kept track and was able

18   to provide contemporaneous documentation of everywhere it had

19   completed restoration, we wouldn't be here.  The only reason

20   that plaintiffs are seeking this relief is because the City

21   does not know where restoration does or does not remain and

22   residents also don't know whether they can expect the City to

23   come back and fix their properties or when the City might be

24   coming back.

25        THE COURT:  What sort of contact have you had from

1    residents about this as a problem?

2              MS. ROLNICK:  The scope of the problem is unclear,

3    but it certainly exists.  Plaintiffs --

4              THE COURT:  And as a result -- and you believe that

5    because of what?

6              MS. ROLNICK:  Because of both media reports on this

7    and because of residents that plaintiffs have spoken to,

8    including the two declarants whose affidavits we submitted

9    with our reply brief.

10             THE COURT:  Are there more than two?

11             MS. ROLNICK:  I don't know, your Honor.

12             THE COURT:  Have you been contacted by more than two?

13             MS. ROLNICK:  We have heard from others.  I don't

14   have an exact number.

15             THE COURT:  Can you approximate?

16             MS. ROLNICK:  Probably under a dozen, but, you know,

17   plaintiffs --

18             THE COURT:  It hasn't been 6,000, has it?

19             MS. ROLNICK:  It hasn't been 6,000.  You know, I

20   would speculate that many residents have been patiently

21   waiting for the City to come back and finish their work.

22             And, you know, the City has now committed to

23   finishing that work, but if the City is not going to be doing

24   more work for a particular resident, they should let the

25   resident know.

1        THE COURT:  All right.  Thank you.  Anything else?

2        MS. ROLNICK:  I would like to just briefly touch upon

3    the stipulation the parties filed and why we're asking the

4    Court to approve that, if I may.

5        THE COURT:  Oh, if you think it's necessary.  I have

6    been through it and I don't have a particular issue with

7    anything.

8        MS. ROLNICK:  Okay.  Then we will rest on our papers.

9    Thank you.

10       THE COURT:  Is there something else that you want to

11   bring to my attention out of the stipulation?

12       MS. ROLNICK:  Just the importance of the court order

13   approving those remedies.  Despite filing the stipulation,

14   counsel for the City has not yet been able to confirm to

15   plaintiffs whether the City has begun complying with these

16   remedies, so without a court order, plaintiffs have no way

17   of ensuring the City follows through on its commitments.

18       THE COURT:  Oh, no, I understand that.  Have you

19   asked them?

20       MS. ROLNICK:  Yes.

21       THE COURT:  And they haven't been able to tell you?

22       MS. ROLNICK:  My understanding is that they have a

23   request out to their contractor for information, and we're

24   awaiting confirmation on exactly to what extent they have

25   begun complying and when.

1              THE COURT:  Thank you.

2              MS. ROLNICK:  Thank you.

3              THE COURT:  Mr. Kuptz, do you want to address the

4    Court further?

5              MR. KUPTZ:  Your Honor, just a few follow-up notes.

6              As to the labor costs associated with this

7    requirement that's been proposed by plaintiffs, it's the

8    City's understanding that those labor costs are outside of the

9    scope of the current contracts as they were entered into.

10             THE COURT:  Labor costs for what?

11             MR. KUPTZ:  For placing the door hangers, responding

12   to citizen calls, verifying restoration status, those types

13   of things.

14             THE COURT:  Well, placing the door hangers would

15   be the function of a -- would be the process by which an

16   individual who's already going out to inspect the property

17   would simply have one and hang it on a door; right?

18             MR. KUPTZ:  Correct.  As far as placing the door

19   hanger, there would be a minimal amount of time associated

20   with that.  It would be more on the other end of things, the

21   taking the calls, logging the emails.

22             THE COURT:  All right.

23             MR. KUPTZ:  Those activities.

24             THE COURT:  Sure.

25             MR. KUPTZ:  And I would just note that all additional

1    activities related to this proposed requirement would just

2    draw from that total pool of funds that is available for

3    excavations and replacements.

4         THE COURT:  Doesn't the City have some mechanism in

5    place already for responding to citizen complaints?

6         MR. KUPTZ:  They do, your Honor.  Citizens do, on

7    occasion, contact the City with a concern regarding either

8    their service line or their restoration of excavation work,

9    and those concerns are responded to.

10        THE COURT:  And what's the -- how is that staffed?

11        MR. KUPTZ:  It's essentially staffed -- the call

12   either comes into the Department of Public Works and it's

13   answered by one of their employees or by the front desk at

14   City Hall, and then that concern is routed to the Department

15   of Public Works.  Again, we're just concerned about the

16   potential scope of the number of emails, the number of phone

17   calls that are coming in.

18        THE COURT:  How many DPW complaints do you get a day?

19        MR. KUPTZ:  I don't have that exact number.  From

20   speaking with the Director of the Department of Public Works,

21   there are several that come in, at least, a day, not

22   necessarily related to excavation or replacement or

23   restoration but any type of Department of Public Works issue.

24        THE COURT:  Well, that was my question.  I wasn't

25   trying to limit it just to issues in this case.  But there

1   is a mechanism in place already to address that; right?

2          MR. KUPTZ:  There is.  Again, your Honor, it's just

3   the expansion in the scope and how many potential phone calls

4   or emails might come in.

5          THE COURT:  I guess I'm not following you as to how

6   you would measure additional costs to basically pursue a

7   policy that you tell me is already in place to respond to

8   citizens' complaints.

9          MR. KUPTZ:  Well, for example, your Honor, Mr. Brown,

10  he is the Director of the City of Flint's Department of Public

11  Works.  His deposition was taken in advance of this motion

12  hearing today, and he testified, in part, at the deposition

13  that there is a number of key roles within the Department of

14  Public Works that are currently vacant, and so staffing is

15  an issue.  The cost of filling those positions is an issue.

16  And, again, we don't know the extent, how many personnel would

17  be required to respond to any of these concerns that are

18  brought.

19         THE COURT:  Right.  But isn't that kind of a general

20  department issue that is not isolated to the lead line

21  replacements?

22         MR. KUPTZ:  It is not, your Honor.  But Mr. Brown

23  indicated in the affidavit that we attached to our response

24  brief that based on his experience working on other

25  large-scale Public Works projects, he anticipates if this

1    were to be a requirement that were imposed on the City that

2    it would cause an undue burden because it would increase the

3    number of calls and emails that are received from residents.

4            THE COURT:  Right.  Didn't his deposition pretty

5    much undermine all of the conclusions that he made in that

6    affidavit?

7            MR. KUPTZ:  I would disagree, Judge.

8            THE COURT:  It seemed that he was not able to support

9    much of his conclusory language with facts and figures; am I

10   not fairly reading that?

11           MR. KUPTZ:  Well, I -- my position would be that he

12   testified at his deposition essentially what I have been

13   arguing this afternoon, is that the scope of the problem

14   isn't fully known.

15           THE COURT:  Okay.  Do you have any other argument you

16   would like to present?

17           MR. KUPTZ:  Your Honor, I would just indicate that

18   the City of Flint has begun implementing major provisions

19   of the fifth motion to enforce settlement agreement.  In

20   fact, we have a conference set with plaintiffs and their

21   representatives at our office tomorrow to work through that

22   and to continue working through this.

23           THE COURT:  Is the contractor on board with the

24   provisions of the stipulation?

25           MR. KUPTZ:  Yes, your Honor.  The contractor and the

1    project manager are both aware of the requirements in that

2    stipulation.

3              THE COURT:  All right.  Anything else, Mr. Kuptz?

4              MR. KUPTZ:  I don't believe so, Judge.

5              THE COURT:  All right.  Mr. Kuhl, anything?

6              MR. KUHL:  No, your Honor.

7              THE COURT:  Thank you.

8              MR. KUHL:  Nothing to say.

9              THE COURT:  Anything else?

10             MS. ROLNICK:  Nothing further.

11             THE COURT:  All right.  I'll take the motion under

12   advisement.  I will incorporate the stipulation, the terms

13   of the stipulation, in an order with respect to this last

14   disputed item.

15             Thank you for your presentations today, and good luck

16   with your project.

17             MR. KUPTZ:  Thank you, Judge.

18             THE COURT:  You may recess court.

19             THE CLERK:  All rise.  Court is now in recess.

20                 (Proceedings adjourned at 2:23 p.m.)

21                          *      *      *

22

23

24

25

1

2                    CERTIFICATE OF COURT REPORTER

3

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7          _____*s/ Rene L. Twedt*_____          **February 28, 2023**
       RENE L. TWEDT, CSR-2907, RDR, CRR, CRC     Date
8          Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25