# Exhibit F

Plaintiffs' Appendix

# TABLE OF CONTENTS

| Exhibit | Description | Bates Number |
|---|---|---|
| 1 | Email from Adeline Rolnick, NRDC, to William Kim, City of Flint, et al. (Feb. 3, 2021) | 1 |
| 2 | Email from Adeline Rolnick, NRDC, to Richard Kuhl, Assistant Attorney General, Environment, Natural Resources, and Agriculture Division, et al. (Feb. 23, 2022) | 13 |
| 3 | Letter from Sarah Tallman, NRDC, to William Kim, City of Flint (Feb. 22, 2022) | 16 |
| 4 | Excerpts of contract between Lakeshore Global Corporation and the City of Flint (executed Aug. 16, 2022) | 19 |
| 5 | Excerpts of the City of Flint Charter (last visited on May 24, 2023) | 23 |
| 6 | Except of the City of Flint Code of Ordinances (last visited May 24, 2023) | 32 |
| 7 | *City of Flint agrees to adopt changes to NRDC, Concerned Pastors settlement agreement,* a City of Flint press release (Nov. 2, 2022) | 34 |
| 8 | Webpage, Get the Lead out of Flint, City of Flint, (last visited May 24, 2023) | 37 |
| 9 | News article by Carrie Cochran et al., *Records missing, phones out: Flint water crisis not over,* Scripps News (May 16, 2023) | 41 |
| 10 | *State of Michigan: Flint enters final phase of lead service line replacement,* a City of Flint press release (Sep. 30, 2022) | 51 |

i

11      *City of Flint launches final push to Get the Lead Out;*
        *Service line replacement project set to finish by*
        *Nov. 30, 2020,* a City of Flint press release
        (Aug. 13, 2020)........................................................................ 54

12      Letter from Sarah Tallman, NRDC to William Kim,
        City of Flint (May 25, 2017) ................................................... 58

13      Letter from Sarah Tallman, NRDC to William Kim,
        City of Flint (Jun. 16, 2017) ................................................... 68

14      Letter from William Kim, City of Flint to
        Sarah Tallman, NRDC (Jul. 10, 2017) .................................... 75

15      Email from Sarah Tallman, NRDC to William Kim,
        City of Flint, et al., (Sep. 14, 2021) ....................................... 79

16      Email from William Kim, City of Flint, to
        Adeline Rolnick, NRDC, et al., (Dec. 1, 2021) ...................... 81

17      Letter from Adeline Rolnick, NRDC, to William Kim and
        Clyde Edwards, City of Flint (Oct. 4, 2022) .......................... 99

18      Letter from Sarah Tallman, NRDC, to Angela Wheeler,
        City of Flint, et al., (May 4, 2021) ......................................... 106

19      Letter from Adeline Rolnick, NRDC, to Joseph Kuptz,
        City of Flint (May 3, 2023) .................................................... 113

20      News article by Kelly House, *Flint misses new*
        *deadline in long-overdue lead line replacement effort,*
        Bridge Michigan (May 4, 2023)............................................. 117

21      Email from Melanie Calero, NRDC, to Joseph Kuptz,
        City of Flint, et al., (May 2, 2023) ......................................... 125

22      Letter from Adeline Rolnick, NRDC, to Joseph Kuptz,
        City of Flint (Mar. 10, 2023).................................................. 129

23      Letter from Adeline Rolnick, NRDC, to Joseph Kuptz,
        City of Flint (Apr. 12, 2023) ..................................................... 137

24      Email from Adeline Rolnick, NRDC, to Joseph Kuptz,
        City of Flint, et al., (May 15, 2023) ......................................... 143

25      Contract between ROWE Professional Services
        and the City of Flint (executed Apr. 27, 2022) ........................ 147

26      Email from Adeline Rolnick, NRDC, to Joseph Kuptz,
        City of Flint, et al., (Mar. 22, 2023) ......................................... 166

27      Email from Joseph Kuptz, City of Flint, to Adeline Rolnick,
        NRDC, et al., (Apr. 28, 2023) ................................................... 170

28      Excerpt of City of Flint Fiscal Year 2021-2022 Adopted
        budget, Flint City Council (adopted Jun. 14, 2021) ................ 176

29      News article by Tom Travis, *Flint City Council passes
        $64 million "balanced" budget after Winfrey-Carter's
        dramatic pause during rollcall vote,*
        East Village Magazine (June 7, 2023) ...................................... 180

30      Email from Joseph Kuptz, City of Flint, to Adeline Rolnick,
        NRDC, to et al., (May 10, 2023) ............................................... 188

31      Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
        Assistant Attorney General, Environment, Natural
        Resources, and Agriculture Division, to et al.,
        (Feb. 28, 2023) .......................................................................... 195

32      Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
        Assistant Attorney General, Environment, Natural
        Resources, and Agriculture Division, to et al.,
        (Mar. 28, 2023).......................................................................... 197

33      Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
        Assistant Attorney General, Environment, Natural
        Resources, and Agriculture Division, to et al.,
        (May 1, 2023) ............................................................................. 199

34     Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
Assistant Attorney General, Environment, Natural
Resources, and Agriculture Division, to et al.,
(May 22, 2023) ........................................................................ 201

35     Letter from Sarah Tallman, NRDC to William Kim,
and Steven Branch City of Flint (Nov. 15, 2018) ................... 203

36     Letter from Adeline Rolnick, NRDC, to Joseph Kuptz,
City of Flint (Feb. 2, 2022) ..................................................... 207

37     Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
Assistant Attorney General, Environment, Natural
Resources, and Agriculture Division, to et al.,
(Apr. 12, 2021) ....................................................................... 211

38     Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
Assistant Attorney General, Environment, Natural
Resources, and Agriculture Division, to et al.,
 (Apr. 19, 2023) ....................................................................... 214

39     Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
Assistant Attorney General, Environment, Natural
Resources, and Agriculture Division, to et al.,
(Apr. 26, 2023) ....................................................................... 216

40     Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
Assistant Attorney General, Environment, Natural
Resources, and Agriculture Division, to et al.,
(May 3, 2023) ......................................................................... 218

41     Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
Assistant Attorney General, Environment, Natural
Resources, and Agriculture Division, to et al.,
(May 17, 2023) ....................................................................... 220

42     Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
Assistant Attorney General, Environment, Natural
Resources, and Agriculture Division, to et al.,
(May 24, 2023) ....................................................................... 222

43          Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
            Assistant Attorney General, Environment, Natural
            Resources, and Agriculture Division, to et al.,
            (May 10, 2023) .......................................................................... 225

44          Email from Joseph Kuptz, City of Flint, to Richard Kuhl,
            Assistant Attorney General, Environment, Natural
            Resources, and Agriculture Division, to et al.,
            (Apr. 28, 2023) .......................................................................... 228

45          Email from William Kim, City of Flint, to Sarah Tallman,
            NRDC, to et al., (Jan. 5 , 2023) ................................................. 230

46          Email from Joseph Kuptz, City of Flint, to Adeline Rolnick,
            NRDC, to et al., (Apr. 30, 2023) .............................................. 233

47          City of Flint Quarterly Report (Feb. 28, 2023) ............................. 239

# Exhibit 1

| | |
|---|---|
| **From:** | Rolnick, Addie |
| **To:** | William Kim |
| **Cc:** | Angela Wheeler; McLaughlin, Jolie; Xu, Cat; Bonsitu Kitaba; Tallman, Sarah |
| **Subject:** | RE: Concerned Pastors - questions and information requests |
| **Date:** | Wednesday, February 3, 2021 1:41:40 PM |
| **Attachments:** | 02.03.21 List of addresses with outsanding obligations.xlsx |

Bill,

Attached is a spreadsheet containing updated versions of four lists of addresses for which our analysis of the City's data shows the City has remaining obligations under the Settlement. Our analysis includes the data most recently shared by the City, including the restoration data. As the parties have discussed, demonstration of compliance for homes in category 1 ("Missing Consent Attempts") is required before the City can set an opt-in deadline. As you discussed with Sarah, Plaintiffs would like to schedule a meet and confer once the City has provided its proposal concerning resetting the remaining deadlines.

1. The sheet titled "Missing Consent Attempts" contains 492  homes where the City's data indicates that the City has not completed the required in-person consent attempts. Based on our analysis, Plaintiffs believe the City has not yet demonstrated compliance with its outreach obligations and must continue accepting consent forms, pursuant to the Court's most recent order. *See* ECF No. 228 at 15-16.

2. The sheet titled "Consent, Missing Excavation" contains 443 homes where the City's data indicates that the City has received consent to perform an excavation but has not yet performed one.
   - The 411 homes that are not highlighted in blue are addresses where the City's records indicate the City received consent for an excavation, but do not indicate that an excavation, replacement, or restoration occurred.
   - The 32 homes highlighted in blue are addresses where the City's records indicate that the City received consent for an excavation and do not indicate than an excavation occurred, but there is a record of restoration. We are not sure if this means there has been an excavation that we do not have a record of. Please confirm how we should interpret the data for these addresses. If an excavation was performed, please provide the required reporting, including the date of excavation, what service line materials were discovered (public/private side), whether a replacement occurred, and if so, the required filter verification data.
   - It is possible that the City has complied with its obligations with respect to these addresses by completing the required post-consent scheduling attempts. As you discussed with Sarah, please provide data demonstrating compliance for addresses for which the City has completed its scheduling attempt obligations, but has not performed an excavation.

3. The sheet titled "Excavation, LSL, No Replacement" contains 55 homes where the City's data indicates that the City has identified a lead or galvanized steel service line but has not yet replaced that lead service line.
   - The 16 homes that are not highlighted in blue are addresses where the City's records indicate an excavation confirming a lead or galvanized steel service line, but there is no record of either replacement or restoration.
   - The 39 homes highlighted in blue are addresses where the City's records indicate an excavation confirming a lead or galvanized steel service line, where there is no record of a replacement, but there is a record of restoration. We are not sure if this means there has been replacement that we do not have a record of, or if these addresses were restored without a service line replacement. Please confirm how we should interpret the data for these addresses. If replacements have occurred at these addresses, please provide the required reporting, including the date of replacement,

the filter verification data, and what portion of the service line was replaced (public/private/both).

4. The sheet titled "Missing Required Restoration" contains 8,015 homes where the City's data shows it has not completed the required restoration following an excavation. This includes both addresses where the City's data shows that it found and replaced lead service lines and addresses where the City did not find lead service lines.

Regards,

Addie

ADELINE ROLNICK
*Attorney\**

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

*ADMITTED ONLY IN NEW YORK; SUPERVISION BY A MEMBER OF THE D.C. BAR

---

**From:** Tallman, Sarah <stallman@nrdc.org>
**Sent:** Wednesday, January 6, 2021 5:59 PM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** 'awheeler@cityofflint.com' <awheeler@cityofflint.com>; Rolnick, Addie <ARolnick@nrdc.org>; Chaudhary, Dimple <dchaudhary@nrdc.org>; McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>
**Subject:** RE: Concerned Pastors - questions and information requests

Bill,

Following up on our discussion before the holidays, please provide the City's proposal for a new program completion deadline for the parties' discussion.

In response to the City's request during our discussion, I'm attaching a spreadsheet containing four lists of addresses for which our analysis of the City's data shows the City has remaining obligations under the Settlement. Each list appears as a different sheet/tab in the Excel file. We describe each list below in order from left to right in the Excel file, including some questions so that we can better assess the City's compliance. Please provide responses to the questions in Items A through D by no later than January 20. In addition, please provide responses to our outstanding questions from my December 22 email below.

A. The sheet titled "Missing Consent Attempts" contains 602 homes where the City's data indicates that the City has not completed the required in-person consent attempts. The

Settlement requires at least two in-person attempts at each address, with one attempts occurring on a weekend or after 5 pm. ECF No. 174 ¶ 15.a. Based on our analysis of the City's data, the City has not yet demonstrated compliance with its outreach obligations and must continue accepting consent forms pursuant to the Court's October 13, 2020 order. ECF No. 228 at 15-16.

B. The sheet titled "Consent, Missing Excavation" contains 360 homes where the City's data indicates that the City has received consent to perform an excavation but has not yet performed one.
   - The 335 homes that are not highlighted are addresses where the City's records indicate the City received consent for an excavation, but has not completed an excavation, replacement, or restoration.
   - The 25 homes highlighted in blue are addresses where the City's records indicate that the City received consent for an excavation, that no excavation has occurred, but that restoration has occurred. We are not sure if this means there has been an excavation that we do not have a record of. Please confirm how we should interpret the data for these addresses. If excavations have occurred at these addresses, please provide the information about those excavations required by the Settlement, *see* ECF No. 147-1 ¶ 117.c.ii.
   - It is possible that the City has complied with its obligations with respect to these addresses by completing the required post-consent scheduling attempts. *See* ECF No. 217 ¶ 6 (requiring three in-person scheduling attempts, with at least one attempt on a weekend or after 5 pm). But because the City has not provided data on these attempts, we cannot assess its compliance with the scheduling-attempt obligation. The City's failure to maintain this information violates the 2020 Stipulation, which requires the City to include in its status reports a list of addresses that have provided the City with consent to conduct an excavation but have not yet responded to the City's attempts to schedule an excavation, as well as reporting on the dates and times of scheduling attempts at those addresses, the result of the outreach, and documentation confirming a doorhanger was left if an in-person scheduling attempt was unsuccessful. ECF No. 217, ¶ 6. Please explain how the City intends to show compliance for these addresses.

C. The sheet titled "Excavation, LSL, No Replacement" contains 56 homes where the City's data indicates that the City has identified a lead or galvanized steel service line but has not yet replaced the service line. We previously provided this list on December 22, but we're including it again here for your convenience.
   - The 26 homes that are not highlighted are addresses where the City's records indicate an excavation confirming a lead or galvanized steel service line, but that neither replacement nor restoration has occurred.
   - The 30 homes highlighted in blue are addresses where the City's records indicate an excavation confirming a lead or galvanized steel service line without any replacement, but where there *is* a record of restoration. We are not sure if this means there have been replacements at these addresses that we do not have records of, or if these addresses were restored without a service line replacement. Please confirm how we

should interpret the data for these addresses.

D. The sheet titled "Missing Required Restoration" contains 13,521 homes where we do not have data from the City confirming restoration occurred following an excavation. This includes both addresses where the City's data shows that it found and replaced lead service lines and addresses where the City did not find lead service lines.
- The City is required to provide an updated list of all homes where restoration has been completed with each monthly report. ECF No. 217, ¶ 7.iii. Plaintiffs to date have only received restoration data for Phases 5 and 6. Please provide the restoration data from the earlier phases as soon as possible, and no later than January 20, 2021.

Please let us know if the City's records indicate that the City has complied with its obligations with respect to any of these addresses, and if so, in what manner (i.e. by completing the requiring in-person consent attempts, performing an excavation, replacing a lead service line, and/or completing restoration) and on what date. The data we have received from the City may be incomplete, or we may be misreading the City's data.

Let us know if it would be helpful to discuss any of the above.

Regards,

Sarah

---

**From:** Tallman, Sarah
**Sent:** Tuesday, December 22, 2020 4:31 PM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** 'awheeler@cityofflint.com' <awheeler@cityofflint.com>; Chaudhary, Dimple <dchaudhary@nrdc.org>; Jolie McLaughlin (jdmclaughlin@nrdc.org) <jdmclaughlin@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>
**Subject:** RE: Concerned Pastors - questions and information requests

Bill,

As I mentioned on the phone today, here are Plaintiffs' follow-up questions concerning the information you provided on 12/11. Please let me know if you'd like to discuss any of the below.

(item 1.a) Data defining universe of eligible homes
It appears that the 2020-12-09 Unexcavated homes.xlsx list excludes unexcavated homes in University Park and Smith Village. Can you confirm that this is the case?

(item 2) Restoration data
The data the City provided concerns only Phases 5 and 6 of the pipe replacement program.

Paragraph 7 of the 2020 Stipulation requires the City to provide monthly "an updated list of all homes where restoration has been completed." ECF No. 217, ¶ 7. Please provide a complete list, including addresses where restoration was completed in Phases 1 through 4, with the City's next status report.

(item 3) Scheduling Attempt Data
- The file named 2020-12-09 Scheduling Attempts.xlsx has columns labeled "consent attempts." Please clarify whether this spreadsheet reflects attempts to obtain consent ("consent attempts"), attempts to schedule work after a resident has submitted a consent form ("scheduling attempts"), or a mix of both.
- We understand that the City's data does not distinguish between consent attempts and scheduling attempts. The 2020 Stipulation requires the City to include in its status reports a list of addresses that have provided the City with consent to conduct an excavation but have not yet responded to the City's attempts to schedule an excavation, as well as reporting on the dates and times of attempts to schedule an excavation at those addresses. ECF No. 217, ¶ 6. The City's failure to maintain this information violates the 2020 Stipulation. Once the parties understand the universe of remaining unexcavated homes, we would like to discuss the City's recordkeeping and how to determine whether the City has complied with its scheduling attempt obligations.

(item 5) Tap water sampling plan
- Regarding the second bullet under "Establishing a Sampling Pool," how will the City determine which Tier 2 sites have a "high probability" of lead?
- Regarding the "Capturing Samples" process, what, if any, efforts will be made to contact residents prior to dropping off a sampling kit to determine whether the resident is interested in participating in the program? What process will the Public Health Office or DPW follow to conduct outreach to these residents prior to dropping off kits?
- The plan doesn't specify how the Navigators will know when a resident has captured a sample. Do the instructions ask the resident to contact the City after they have captured the sample, to schedule a pick-up?
- How will the City work to recruit participants at eligible sites to participate in sampling? What specific outreach efforts are being planned, and who will undertake them?

(item 7) Filter replacement cartridges and test kits
Please confirm whether the data in the "Water Filter Distribution Report" file includes only those filter cartridges picked up at City Hall, or also at other locations and/or distributed by contractors for post-replacement filter installation. If these cartridges are distributed at other locations, please specify a list of those locations. In addition, if this information is known to the City, please let us know the total remaining available filter replacement cartridges at the Food Bank (or other site where these materials are warehoused).

Regards,

Sarah

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Friday, December 11, 2020 2:59 PM
**To:** Tallman, Sarah <stallman@nrdc.org>
**Cc:** awheeler@cityofflint.com; Chaudhary, Dimple <dchaudhary@nrdc.org>; McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>
**Subject:** Re: Concerned Pastors - questions and information requests

Sarah, here's are the City's responses to your questions:

**1(a):** See "2020-12-09 Unexcavated Homes.xlsx"
**1(b):** *See* "2020-12-09 Unexcavated Homes.xlsx"
**2(a):** 1110 addresses needing restoration work, as of 12/09/2020
**2(b):** *See* "Phase V and VI Restoration Complete.xlsx"
**3:** Door hangers are left at the residence after every in-person contact (both consent and scheduling).  Contact information previously provided includes both scheduling contact attempts and consent contact attempts, as the data recording system does not differentiate between the two types of contact attempts.  *See also* "2020-12-09 Scheduling Attempts.xlsx."
**4:** *See* "2020-12-11 UP_SV Status.xlsx"
**5:** *See* "COF LCR Sampling Plan rev 12.8.20.docx"; "LCR Sampling Instructions-Maintenance.xlsx"
**6.** Confirmed.
**7:** *See* "Water Filter Distribution Report.xlsx"
**8(a):** $114,270
**8(b):** $17,821,112
**8(c):** $4,869,010.83 (as of November 13, 2020)

Thank you,

On Fri, Dec 4, 2020 at 4:55 PM Tallman, Sarah <stallman@nrdc.org> wrote:

Bill,

We are still waiting for the City to respond to Plaintiffs' information requests from November 5 and 12, as well as items the City agreed to provide during the November 13 meet and confer. Please provide this information as soon as possible and by no later than Friday, December 11. We have prioritized the outstanding items below, with the first items being the highest priority for the City to resolve immediately. We have also included a follow-up item relating to the City's most recent status report (item 2.B). While we understand the City is juggling several projects, the Settlement requires prompt responses to Plaintiffs' information requests; several of our requests have been pending for longer than the 14-day window the Settlement provides. We appreciate the City's prompt attention to these issues.

In addition, given that the stipulated November 30 deadline for completion of all work has passed, it is necessary to revise the parties' agreement concerning the deadline for the close-out of the pipe replacement program. Please propose a modified deadline for completion of the service line

replacement program, including completion of restoration for all homes, based on the City's assessment of when the remaining work can be completed. Please also provide a proposal for how to resolve the issue the City raised concerning its outreach obligations for newly activated water accounts.

We'd like to schedule a meet and confer to discuss the deadline modifications. Please provide dates/times in the next two weeks when the City is available to discuss these issues.

Let us know if you need clarification on any of the items listed below:

1. <u>Data defining universe of eligible homes.</u>

   a. Please provide a list of all remaining unexcavated addresses, excluding declination and non-responsive homes that have received all required outreach. This information will allow the parties to come to an agreement on the full universe of replacement eligible homes. (requested on November 5 and 13)
   b. If the City maintains a master list of all of these unexcavated homes and the consent attempts for those homes, please provide the following information with the list described in A above: the date(s)/time(s) of all consent attempts made by the City to each address. This will aid Plaintiffs in assessing the City's compliance with its in-person outreach obligations. (requested on November 12)

2. <u>Restoration data</u>

   a. Please provide data showing the total number of homes where restoration work still needs to be completed. (requested on November 5)
   b. The restoration data you provided on 11/30/2020 is in PDF format. Please provide this data in Excel format.

3. <u>Scheduling attempt data.</u> The 2020 Stipulation requires the City to include in its status reports a list of addresses that have provided the City with consent to conduct an excavation but have not yet responded to the City's attempts to schedule an excavation. The lists must include the address, date/time of in-person outreach, and the result of the outreach, including documentation confirming a doorhanger was left at the address if an in-person scheduling attempt was unsuccessful. *See* ECF No. 217, ¶ 6. The spreadsheet provided by the City titled "2020-10-14 Homes w_consent Not Complete" does not provide the result of the City's scheduling attempts, nor does it include any documentation showing that the City left required doorhangers. Please confirm whether the "consent attempts" listed on this spreadsheet reflect attempts to obtain consent to conduct an excavation or attempts to *schedule* the excavation after consent was obtained. If the spreadsheet does not provide documentation of the scheduling attempts, please provide an updated spreadsheet that complies with Paragraph 6 of the 2020 Stipulation and provides, for each of these addresses, (a) the date/time of each scheduling attempt, and (b) the result of each

scheduling attempt, including confirmation that a door hanger was left at the address. (requested on November 12)

4. <u>Mailing data.</u> Please provide documentation demonstrating that the required mailings were distributed to the University Park and Smith Village homes at issue in Plaintiffs' Fourth Motion to Enforce.

5. <u>Tap water sampling plan.</u> Please provide a response to Plaintiffs' follow-up questions and request for a more detailed tap water sampling plan (requested November 30)

6. <u>Door hangers.</u> Please confirm whether the City's contractors are leaving door hangers at all addresses where the City is unable to obtain consent to conduct a service line excavation following an in-person attempt, as required by the Court's July 19, 2018 Order, ECF No. 174. (requested on November 12)

7. <u>Filter replacement cartridges and test kits.</u> Please provide an estimate of the number of filter replacement cartridges and test kits that are picked up from City Hall on a monthly basis, so that the parties can consider the State's proposal to end its obligations to provide filter replacement cartridges and test kits in June 2021. If the number has significantly dwindled since the start of the pandemic, please also provide data from a few months prior to the pandemic (early 2020 and late 2019). (requested on November 13)

8. <u>Remaining settlement funding.</u> Please provide the following information relating to settlement funding: (a) total outstanding program management/administrative costs, if any; (b) total value of contracts for service line replacement and restoration work, and (c) amounts remaining on those contracts. (requested on November 13)

Regards,

Sarah

SARAH C. TALLMAN (SHE/HER)
**Senior Attorney**

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.651.7918
stallman@nrdc.org

PCA-9

**From:** Tallman, Sarah
**Sent:** Thursday, November 12, 2020 11:24 AM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** 'awheeler@cityofflint.com' <awheeler@cityofflint.com>; Chaudhary, Dimple <dchaudhary@nrdc.org>; Jolie McLaughlin (jdmclaughlin@nrdc.org) <jdmclaughlin@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>
**Subject:** RE: Concerned Pastors - questions and information requests

Bill,

I'm writing to follow up on my November 5 email. Please find below four information requests and follow-up questions concerning the City's status reports, in addition to the three described in the November 5 email (I've started them with number 4, for ease of reference with the initial three November 5 requests). Please let me know if you have any questions or need clarification regarding these requests and questions.

4. The 2020 Stipulation requires the City to include in its status reports a list of addresses that have provided the City with consent to conduct an excavation but have not yet responded to the City's attempts to schedule an excavation. The lists must include the address, date/time of in-person outreach, and the result of the outreach, including documentation confirming a doorhanger was left at the address if an in-person scheduling attempt was unsuccessful. *See* ECF No. 217, ¶ 6. The spreadsheet provided by the City in its most recent status report (titled "2020-10-14 Homes w_consent Not Complete") does not provide the result of the City's scheduling attempts, nor does it include any documentation showing that the City left required doorhangers. Please confirm whether the "consent attempts" listed on this spreadsheet reflect attempts to obtain consent to conduct an excavation or attempts to *schedule* the excavation after consent was obtained. If the spreadsheet does not provide documentation of the scheduling attempts, please provide an updated spreadsheet that complies with Paragraph 6 of the 2020 Stipulation and provides, for each of these addresses, (a) the date/time of each scheduling attempt, and (b) the result of each scheduling attempt, including confirmation that a door hanger was left at the address.

5. The City's September and October 2020 status reports are missing required updated lists of all homes where restoration has been completed. ECF No. 217, ¶ 7.iii. Please provide an updated restoration list as soon as possible, and please provide this list with each monthly status report going forward.

6. Please confirm whether the City's contractors are leaving door hangers at all addresses where the City is unable to obtain consent to conduct a service line excavation following an

in-person attempt, as required by the Court's July 19, 2018 Order, ECF No. 174.

7. Does the City maintain a database or spreadsheet containing all consent attempts at all homes that remain to be excavated? If so, please provide Plaintiffs with a master list of all unexcavated homes in Flint and, for each home, the date/time of all consent attempts made by the City. This will aid Plaintiffs in assessing the City's compliance with its in-person outreach obligations.

Thank you,

Sarah

---

**From:** Tallman, Sarah
**Sent:** Thursday, November 5, 2020 10:31 AM
**To:** William Kim <wkim@cityofflint.com>
**Cc:** 'awheeler@cityofflint.com' <awheeler@cityofflint.com>; Chaudhary, Dimple <dchaudhary@nrdc.org>; Jolie McLaughlin (jdmclaughlin@nrdc.org) <jdmclaughlin@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>
**Subject:** Concerned Pastors - questions and information requests

Bill,

I'm writing with some questions and information requests concerning the City's efforts to implement the Settlement. Please let me know if you'd like to discuss any of the items below.

First, to make the November 13 meet and confer as productive as possible, Plaintiffs request, pursuant to Paragraph 118 of the Settlement, that the City provide us with the information listed in items 1 through 3 below. We would appreciate it if the City would provide this information by November 11, so we can review it before the meet and confer.

1. The City's projections of the amount of money needed to complete all remaining excavation, replacement, and restoration work under the Agreement. It would be helpful if the City could provide this information in the format previously provided in the "Full Inventory Cost Projection" spreadsheets, *see* ECF No. 207 at ¶ 11 n.2;
2. The total number of unexcavated homes, including the addresses, where the City has not yet completed all required outreach attempts; and
3. Total number of homes where restoration work still needs to be completed.

Second, can you confirm that the spreadsheet you provided on 10/29 titled, "2020-10-14 Homes w_required attempts.xlsx" reflects all addresses for which the City believes it has fulfilled its outreach obligations and at which it has not yet completed an excavation?

Third, we spoke to a Flint resident named Gabriel Paul who lives at 321 W. Second Street and wants to have his service line excavated. He informed us that the City is refusing to excavate his service line because the address is purportedly zoned as commercial. The Settlement defines eligible homes for purposes of the service line replacement program as "households" with active water accounts. Settlement Agmt. ¶ 11. In turn, a "household" is a "dwelling unit with plumbing that connects to the Flint Water System"—the Settlement does not define household by reference to municipal zoning. *Id*. ¶ 2.p. Mr. Paul's home, which is his principal residence, plainly meets the definition of a replacement eligible household, and he is entitled to a service line excavation. Please confirm that the City will conduct an excavation at this address.

Thank you,

Sarah


SARAH C. TALLMAN (SHE/HER)
**Senior Attorney**

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.651.7918
stallman@nrdc.org


--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079

PCA-12

# Exhibit 2

| | |
|---|---|
| From: | Rolnick, Addie |
| To: | Kuhl, Richard (AG) |
| Cc: | Tallman, Sarah; Xu, Cat; Bonsitu Kitaba; McLaughlin, Jolie; William Kim (wkim@cityofflint.com); Gambill, Nathan (AG) |
| Subject: | RE: Concerned Pastors - letter re: remaining scope of work & final stipulation |
| Date: | Wednesday, February 23, 2022 4:35:00 PM |
| Attachments: | 2022.2.23 Plaintiffs" list of homes with remaining work.xlsx |

Richard,

That spreadsheet is attached here. Please let us know if you have any questions.

-Addie

**ADELINE ROLNICK**
**Attorney**

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

---

**From:** Kuhl, Richard (AG) <KuhlR@michigan.gov>
**Sent:** Tuesday, February 22, 2022 3:31 PM
**To:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>; William Kim (wkim@cityofflint.com) <wkim@cityofflint.com>
**Cc:** Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Gambill, Nathan (AG) <GambillN@michigan.gov>
**Subject:** RE: Concerned Pastors - letter re: remaining scope of work & final stipulation

To avoid any confusion, can you point me to a spreadsheet listing the approximately 1931 residences listed in Paragraphs 1-3 of the attached February 22, 2022 letter?

Richard S. Kuhl
Assistant Attorney General
Environment, Natural Resources,
and Agriculture Division

6th Floor, G. Mennen Williams Building
525 West Ottawa Street
P.O. Box 30755
Lansing, MI  48909

Office: (517) 335-0696

Mobile: (517)575-9343
Fax: (517) 373-1610
Email: kuhlr@michigan.gov



---

**From:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>
**Sent:** Tuesday, February 22, 2022 2:34 PM
**To:** William Kim (wkim@cityofflint.com) <wkim@cityofflint.com>
**Cc:** Tallman, Sarah <stallman@nrdc.org>; Rolnick, Addie <ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Kuhl, Richard (AG) <KuhlR@michigan.gov>; Gambill, Nathan (AG) <GambillN@michigan.gov>
**Subject:** Concerned Pastors - letter re: remaining scope of work & final stipulation

> **CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Bill,

As discussed, I'm attaching a letter describing Plaintiffs' understanding of the remaining scope of work (excluding restoration) under the Settlement, with attached replacement eligible homes list in excel format. Please let us know if you have any questions about this letter.

I'm also attaching the final version of the stipulation. We made a couple of changes to paragraphs 3 and 4 since the last version we circulated, to clarify that Paragraph 4(iv) (regarding post-consent scheduling attempts) applies only if no excavation has been conducted, and not when an excavation has already identified a lead/galvanized steel service line that has not yet been replaced. For your reference, I'm attaching a redline so you can more easily see these changes.

Please let us know if there is anything else you need from us in order to put the stipulation before the City Council at tomorrow's meeting.

Thanks,
Jolie

JOLIE MCLAUGHLIN
**Attorney**

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.961.1287
jdmclaughlin@nrdc.org

# Exhibit 3

**VIA EMAIL**

William Y. Kim
City of Flint Law Department
1101 South Saginaw Street, 3rd Floor
Flint, MI 48502
wkim@cityofflint.com

      Re: Draft Stipulation Modifying Settlement Agreement in *Concerned Pastors for Social Action v. Khouri*, Case No. 16-cv-10277 (E.D. Mich.)

Dear Mr. Kim:

      This letter confirms our mutual understanding that the attached list of 31,578 homes constitutes the 2022 Replacement Eligible Homes List referred to in Paragraph 1 of the Stipulation and Notice ("2022 Stipulation") that the parties intend to file with the court in the above-captioned matter. At this time, based on the data Plaintiffs have received from the City of Flint (City), Plaintiffs' assessment of the City's remaining outreach, excavation, and replacement obligations required by the Settlement Agreement—excluding restoration obligations—is as follows:

1. The City must complete the in-person and mailing outreach referred to in Paragraph 4(i) of the 2022 Stipulation at approximately 1,422 homes. For each of these homes where a resident provides the City with consent to conduct an excavation, the City must also complete an excavation (and if necessary, replacement), unless the criteria described in Paragraph 4(iv) of the 2022 Stipulation are met.

2. The City must complete the post-consent scheduling attempts required by Paragraph 6 of the 2020 Stipulation at approximately 397 homes where the resident has consented to an excavation but the City has not yet completed an excavation. The City must also complete an excavation (and if necessary, replacement) at these homes unless the criteria described in Paragraph 4(iv) of the 2022 Stipulation are met.

3. The City must complete replacements at approximately 112 homes where the City has completed an excavation and uncovered a lead or galvanized steel service line, but where the City has not yet replaced the service line.

In total, excluding restoration work, Plaintiffs' best estimate is that the City still needs to conduct work at approximately 1,931 addresses under the Settlement Agreement. However, even for

PCA-17

unexcavated homes where the City's obligations under the Settlement Agreement are complete, Plaintiffs urge the City to make all efforts to conduct excavations at those homes before the conclusion of the service line replacement program, to ensure that as many lead and galvanized steel service lines as possible are promptly identified and removed.

Sincerely,

Sarah C. Tallman*
Adeline S. Rolnick
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 289-6868
stallman@nrdc.org
arolnick@nrdc.org
*Admitted in Illinois only;
supervision by a member of the DC
bar

Jolie McLaughlin
Natural Resources Defense Council
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7900
jmclaughlin@nrdc.org

*Counsel for Concerned Pastors for
Social Action, Melissa Mays, and
Natural Resources Defense Council,
Inc.*

cc:     Richard Kuhl, kuhlr@michigan.gov
        Nate Gambill, gambilln@michigan.gov
        Bonsitu Kitaba, bkitaba@aclumich.org

# Exhibit 4






# City of Flint

## Department of Finance
## Division of Purchases & Supplies

**Sheldon A. Neeley**
**Mayor**

August 10, 2022

**TO:**  Michael Brown, DPW Supervisor

**FROM:**  Lauren Rowley, Purchasing Manager

**SUBJECT:**  <mark>NOTICE TO PROCEED TO ENTER INTO A CONTRACT</mark>
Phase VII Lead Line Restorations & Replacements (SLE/SLR)

Please be advised that the Flint City Council approved Resolution # 220330 on August 8, 2022 authorizing City Officials to enter into a contract with Lakeshore Global Corporation, Detroit, Michigan for the SLE/SLR project(s).

You are now authorized with this notice, to proceed into (2) contractual agreements with Lakeshore Global Corporation (LGC).

**If you have any questions, please feel free to give me a call or send an email.**

*Lauren Rowley*

Purchasing Manager

CITY HALL   1101 S. SAGINAW STREET, RM 203   FLINT, MICHIGAN 48502   TEL: 810-766-7340   FAX: 810-766-7240
Debarred Information updated – 01-02-20

PCA-20

 Phase VII lead line SLR/SLE

subcontractors agree that failure to comply with this provision shall constitute a substantial and material breach of this contract. Such a breach shall constitute good cause for the termination of this contract should the City of Flint decide to terminate on such basis.

**25.** **Notices**: Notices to the City of Flint shall be deemed sufficient if in writing and mailed, postage prepaid, addressed to **Michael Brown, DPW Director** and **Inez Brown, City Clerk, City of Flint, 1101 S. Saginaw Street, Flint, Michigan 48502,** or to such other address as may be designated in writing by the City from time to time. Notices to Contractor shall be deemed sufficient if in writing and mailed, postage prepaid, addressed to Lakeshore Global Corporation, 7310 Woodward Ave., Suite 500, Detroit, MI 48202, or to such other address as may be designated in writing by Contractor from time to time.

**26.** **Records Property of City:** All documents, information, reports and the like prepared or generated by Contractor as a result of this contract shall become the sole property of the City of Flint, and shall be disclosed to the City upon request.

**27.** **Scope of Services**: Contractor shall provide all of the materials, labor, equipment, supplies, machinery, tools, superintendence, insurance and other accessories and services necessary to complete the project in accordance with Proposal #22000526, #22000527 submitted on June 27, 2022. Contractor shall conduct residential water service line replacements and restorations under the direction of the City's project management team. Contractor may also be directed by a representative of the City to cut and cap the service line of a property deemed as abandoned.

Contractor will perform said service based on the price submitted under "Exhibit A, Article 5" of their proposal. Contractor shall be responsible for any and all damages resulting from the installation of the service line replacement. Contractor shall maintain each address for six months post inspection for settling on soft surfaces and 90 days for temporary restoration and road way repair. Contractor shall perform the work in accordance with the Standard General Conditions and any Special Conditions provided for in this contract and warrants to the City that all materials and equipment furnished under this contract will be new unless otherwise specified, and that all work will be of good quality, free from faults and defects and in conformance with the contract documents. All work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. In addition to any other remedies the City may have, if, within one year of the date of substantial completion of work, or within one year after acceptance by the City, or within such longer period of time as may be prescribed by law, any of the work is found to be defective or not in accord with the contract documents, Contractor shall correct promptly after receipt of a written notice from the City to do so, unless the City has previously given Contractor a written acceptance of such condition.

Contractor will complete all forms that have been provided by the City and provide information as requested by the City that may be germane to this project.

Contractor shall be responsible for the removal and proper disposal of all sidewalk, pavement or other surfacing, curbs, driveways and excavated materials necessary for installation of the complete water service line and/or the permanent restoration of a previously explored/replaced



Phase VII lead line SLR/SLE

service line. If old service line material is removed, Contractor is to take old, removed service line material to the Water Service Center, 3301 E. Court St., Flint, MI 48506. Contractor will take approximately two (2) feet of removed service line, place duct tape on the material and place the address of which the pipe was removed on duct tape.

**28. Severability**: In the event that any provision contained herein shall be determined by a court or administrative tribunal to be contrary to a provision of state or federal law or to be unenforceable for any reason, then, to the extent necessary and possible to render the remainder of this Agreement enforceable, such provision may be modified or severed by such court or administrative tribunal so as to, as nearly as possible, carry out the intention of the parties hereto, considering the purpose of the entire Agreement in relation to such provision. The invalidation of one or more terms of this contract shall not affect the validity of the remaining terms.

**29. Standards of Performance**: Contractor agrees to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices. The City is relying upon the professional reputation, experience, certification, and ability of Contractor. Contractor agrees that all of the obligations required by him under this Contract shall be performed by him or by others employed by him and working under his direction and control. The continued effectiveness of this contract during its term or any renewal term shall be contingent upon Contractor maintaining any certifications in accordance with any applicable legal requirements.

**30. Termination**: In the event of a failure by either party to perform any material provision of this Contract, the other side shall give written notice of the breach along with 30 days to cure the breach. If after the 30 day period the breach has not been cured, the non-breaching party may terminate the contract. Either party may also terminate the contract if required by law to do so.

**31. Time of Performance**: Contractor's services shall commence immediately upon receipt of the notice to proceed and shall be carried out forthwith and without reasonable delay.

**32. Union Compliance:** Contractor agrees to comply with all regulations and requirements of any national or local union(s) that may have jurisdiction over any of the materials, facilities, services, or personnel to be furnished by the City. However, this provision does not apply if its application would violate Public Act 98 of 2011.

**33. Waiver:** Failure of the City to insist upon strict compliance with any of the terms, covenants, or conditions of this Agreement shall not be deemed a waiver of any term, covenant, or condition. Any waiver or relinquishment of any right or power hereunder at any one or more times shall not be deemed a waiver or relinquishment of that right or power at any other time.

**34. Whole Agreement**: This Agreement and the documents cited herein embody the entire agreement between the parties. Any additions, deletions or modifications hereto must be in writing and signed by both parties. This Agreement may be executed by facsimile and in counterparts, all of which, taken together, shall constitute a single agreement.

<SIGNATURES ON NEXT PAGE>

# Exhibit 5

# FLINT CITY CHARTER



# ADOPTED BY VOTERS: AUGUST 7, 2017

# EFFECTIVE DATE: JANUARY 1, 2018

ARTICLE 1 – IN GENERAL

Sec. 1-101 NAME

The Municipal Corporation previously created and presently existing, known and designated as the "City of Flint" shall continue as a corporate body under the same name.

Sec. 1-201 BOUNDARIES

The boundaries of the City of Flint existing when this Charter takes effect shall continue in force until changed in accordance with law.

Sec. 1-301 FORM OF GOVERNMENT

The voters of the City of Flint shall elect a Chief Executive for the City of Flint and a Legislative Body for the City of Flint under this Charter. This Charter may be amended pursuant to the law in order to improve the form of government stated in this section.

Sec. 1-401 POWERS OF THE CITY

A. The City of Flint has comprehensive home rule powers and all other powers conferred by the Michigan Constitution and State law. The City of Flint's powers are subject only to the limitations contained in this Charter or State law.

B. To the extent allowed by law, the City of Flint may establish, or enter into an agreement to establish, as permitted by law, an insurance system to provide, support, supplement or otherwise assist in the provision of automobile and/or property insurance for home owners and renters for City of Flint residents. No less than sixty (60) days prior to any legislative action, the City Attorney shall advise the City Council and Mayor, in writing, on the legal requirements necessary to implement the insurance systems contemplated by this chapter and whether there exists any legal prohibition to implementing the insurance system.

   No insurance system shall be implemented without the Mayor and City Council jointly commissioning a feasibility study that must demonstrate the ability of the City of Flint to fund, sustain, and operate the insurance system in a fiscally responsible manner. Any insurance system implemented by the City of Flint shall be done pursuant to ordinance adopted no less than 30 day after introduction of such ordinance and a public hearing no less than 30 days prior to adoption of such ordinance, and in accordance with applicable laws.

May 9, 2017 Final.1 pal                3

Sec. 3-303 PUBLICATION OF SUMMARY BEFORE PUBLIC HEARING.

A. Upon introduction of any ordinance, the City Clerk shall:

　　1. Distribute a copy to each City Council member and to the Mayor;

　　2. File a reasonable number of copies in the office of the City Clerk and such other public places as the City Council may designate; and

　　3. Provide notice of the proposed ordinance including the title, the proposed ordinance, or summary thereof, including effective date, the time and place for a public hearing, and the time and date for its consideration by City Council.

B. The public hearing may not be held sooner than five (5) days after the publication. The public hearing may be held separately or with a regular or special City Council meeting and may be convened from time to time.

C. All interested persons shall have an opportunity to be heard.

Sec. 3-304 PUBLICATION OF ORDINANCES AND RESOLUTIONS AFTER ENACTMENT.

A. The City Clerk shall keep a printed journal in the English language of every session of the City Council.

B. The City Clerk shall authenticate by signature and record all ordinances and resolutions in a properly indexed book kept for the purpose.

C. After enactment of any ordinance or resolution having the effect of law, the City Clerk shall have it published on the city's website and provide public notice of its adoption in the manner required by this charter.

D. Every ordinance, resolution having the effect of law, and amendment to this Charter, shall be printed promptly after enactment and shall be made available to the public on the city's website.

Sec. 3-305 VETO.

A. Every ordinance and resolution passed by the City Council is subject to review by the Mayor unless otherwise stated in this Charter.

B. No ordinance or resolution of the City Council subject to review by the Mayor shall have any force or effect if:

PCA-26

    1.  The Mayor or person acting in his or her stead prepares a notice in writing suspending the operation of such ordinance or resolution which sets forth reasons therefor; and

    2.  Such notice is filed in the office of the City Clerk within 168 hours after the delivery of the ordinance or resolution to the office of the Mayor by the City Clerk, or an agent of the City Clerk.

C.  If the ordinance is an emergency ordinance, the Mayor will have only twenty-four (24) hours to exercise the veto after receipt of written notice of adoption.

D.  In each case where such notice of veto is filed, such ordinance or resolution shall not become law without further affirmative vote of two-thirds (2/3) of the members elect on the City Council at a meeting held within two (2) weeks of the notice of veto.

If two-thirds (2/3) of the members elect vote in favor of overriding the veto, the ordinance or resolution shall be adopted without further review by the Mayor.

## Sec. 3-306  EFFECTIVE DATE OF ORDINANCE.

A.  No ordinance shall be effective until published as provided in Sec. 3-303 of this Charter.

B.  Every ordinance which has been published shall become effective on the thirtieth (30th) day after enactment or at any later date specified.

C.  The City Council may, by an affirmative vote of two-thirds (2/3) of its members elect, provide that any ordinance take immediate effect after publication.

## Sec. 3-307  EMERGENCY ORDINANCES.

A.  No emergency ordinance shall be effective until published as provided in Sec. 3-303 of this Charter.

B.  Emergency ordinances may be enacted to meet a public emergency affecting life, health, property or the public peace. However, an emergency ordinance may not levy taxes; grant, renew or extend a franchise; or regulate the rate charged by any public utility for its services.

C.  An emergency ordinance shall be introduced in the form and manner required for ordinances generally, except that it shall contain, after the enacting clause, a declaration stating that an emergency exists and describing it in clear and specific terms.

May 9, 2017 Final.1 pal        30

## ARTICLE 4 – EXECUTIVE BRANCH

Sec. 4-101  MAYOR.

The Mayor is the Chief Executive Officer of the City of Flint and shall have such powers and duties as are granted by State law and this Charter.

Sec. 4-102  TERM OF OFFICE.

Commencing with the election in 2022 as provided in §9-102, which governs Mayoral terms until 2022, the Mayor shall serve for a period of four (4) years commencing at 12 o'clock noon on Monday following the regular certification of the gubernatorial general election and shall serve in that office until the next general gubernatorial election and until a successor is elected and qualified.

Sec. 4-103  OBLIGATION OF LEADERSHIP.

The Mayor shall take care that the laws be enforced and shall recommend to the City Council from time to time proposals for dealing with the problems of the City of Flint.  At least once a year, the Mayor shall present at the State of the City Address to the City Council and to the public-at-large.

Sec. 4-201  CITY ADMINISTRATOR.

The City Administrator shall be appointed by the Mayor with the approval by City Council in accordance to § 1-501 and shall serve at the will of the Mayor.

Sec. 4-202  EXECUTIVE STAFF.

The Mayor shall, in accordance with law appoint five (5) executive staff, including the City Administrator appointed in accordance with § 1-501, who shall serve at the will of the Mayor.

Sec. 4-203  EXECUTIVE DEPARTMENTS.

A. The City shall create the following executive departments:

  1. The Law Department, which shall be headed by the City Attorney.

  2. The Department of Human Resources, which shall be headed by the Human Resources Director.

  3. The Department of Finance, which shall be headed by the Chief Financial Officer.

PCA-28

ARTICLE 7 – FINANCE

Sec. 7-101  BUDGET.

A.  The City of Flint's budget shall be developed through the following process:

1.  The fiscal year shall begin on July 1st.

2.  The City of Flint shall maintain a balanced budget in accordance with State law.

3.  On or before the first Monday of September the City Council shall pass and the Mayor shall adopt a resolution updating the City of Flint's strategic plan for the next fiscal year. The plan shall state the City of Flint's goals, prioritized objectives, and measures for success for the next fiscal year. The City Council shall utilize the City of Flint's Comprehensive Plan, input from the Mayor, and input from the public in updating the strategic plan. The Mayor shall have the power to veto a resolution updating the strategic plan in the same manner as provided in this Charter for the veto of resolutions.

4.  On or before the first Monday of December the Mayor shall submit a preliminary budget to the City Council for the next fiscal year. This preliminary budget shall also be posted to the City of Flint's website and be available for public review at the City Clerk's office. The budget shall align with the City of Flint's strategic, comprehensive, and capital improvement plans. The Mayor shall present to and receive input on the preliminary budget from the City Council. No earlier than ten (10) business days after the presentation of the preliminary budget and no later than twenty (20) business days after the presentation of the preliminary budget, the Mayor and City Council shall hold a public hearing to receive input on the preliminary budget from the public. The notice for the hearing to be published in a newspaper of general circulation or as otherwise provided by law, shall include notice to the public that the preliminary budget is available.

5.  On or before the first Monday of March, the Mayor shall submit a final proposed budget to the City Council for the next fiscal year. This proposed budget shall be posted to the City of Flint's website and be available for public review at the City Clerk's office. No earlier than ten (10) business days after the presentation of the proposed budget and no later than twenty (20) business days after the presentation of the proposed budget, the Mayor and City Council shall hold a public hearing on the proposed budget. The notice for the hearing, to be published in a newspaper of general circulation, or as otherwise provided by law, shall include notice to the public that the proposed budget is available.

PCA-29

6. On or before the first Monday in June the City Council shall adopt a budget with or without amendment for the next fiscal year. The adoption of the budget may be accomplished by resolution. Adoption of the budget shall constitute appropriations of the amounts specified therein from the funds indicated and a levy of the property tax specified therein. The final adopted budget shall be posted to the city's website and be available for public review at the City Clerk's office.

B. With the presentation of the final City Budget to Council, the Mayor's budget message shall explain the budget both in fiscal terms and in terms of the work programs, demonstrating how spending priorities are guided by and adherent to the City of Flint's comprehensive plan. It shall outline the proposed financial policies of the City of Flint for the ensuing fiscal year and the impact of those policies on future years. It shall describe the important features of the budget, indicate any major changes from the current year in financial policies, expenditures, and revenues together with the reasons for such changes, summarize the City of Flint's debt position, including factors affecting the ability to raise resources through debt issues, and include such other material as the Mayor deems desirable.

C. The budget shall provide a three (3) year financial plan of all City of Flint funds and activities, with five (5) years of revenue projection, and, except as required by law or this Charter, shall be in such form as the Mayor deems desirable or the City Council may require for effective management and an understanding of the relationship between the budget and the City of Flint's strategic goals. The budget shall begin with a clear general summary of its contents; shall show in detail all estimated income, indicating the proposed property tax levy, and all proposed expenditures, including debt service, for the ensuing fiscal year; and shall be so arranged as to show comparative figures for actual and estimated income and expenditures of the current fiscal year and actual income and expenditures of the preceding fiscal year. It shall indicate in separate sections:

1. The proposed goals and expenditures for current operations, detailed for each fund by department or by other organization unit, and program, purpose or activity, method of financing such expenditures, and methods to measure outcomes and performance related to goals;

2. Proposed longer-term goals and capital expenditures, detailed for each fund by department or by other organization unit when practical, the proposed method of financing each such capital expenditure, and methods to measure outcomes and performance related to the goals; and

3. The proposed goals, anticipated income and expense, profit and loss for each utility or other enterprise fund or internal service fund operated by the City of Flint, and methods to measure outcomes and performance

related to the goals. For any fund, the total of proposed expenditures shall not exceed the total estimated income plus carried forward fund balance exclusive of reserves.

D. The City of Flint shall establish a budget stabilization fund which shall be separate and distinct from the city's general fund. Appropriations to the fund and expenditures from the fund shall be made in compliance with 1978 PA 30, MCL141.441 *et seq.*, as amended.

Sec. 7-102  ITEM VETO ON BUDGET CHANGES.

A. The Mayor may veto any changes to the budget, proposed by the Mayor, in the manner provided in this Charter for veto of ordinances and resolutions.

B. Within 168 hours after receipt of the notice of veto, the City Council shall complete its reconsideration of the budget changes disapproved by the Mayor.

C. No changes from the budget originally proposed by the Mayor, that are disapproved by the Mayor shall have any force or effect unless two-thirds (2/3) of the Council members elect, vote in favor of those changes at the time they are reconsidered.

Sec. 7-103 BUDGET MONITORING

A. The Chief Financial Officer of the City of Flint shall present and answer questions on a monthly basis to the City Council on the actual and estimated income and expenditures of the current fiscal year, on any variance from spending plans, and on any other financial issues of interest.

B. On the first monthly presentation for any fiscal year, the Chief Financial Officer shall present a complete 12-month spending plan for each department and fund.

Sec. 7-104 REVENUE ESTIMATION

A. A Revenue Estimating Commission will be established with the following members: one member appointed by a majority vote of City Council and one member appointed by the Mayor and a third member selected by the other two.  The appointed members must each have experience with managing or auditing municipal finances and shall not be employees of the City of Flint. The Committee shall establish its rules and procedures, consistent with law. The Finance Department shall provide administrative support to the Committee.

B. Revenue Estimating Commission will make public reports to the Mayor and to City Council on the anticipated revenue for the City of Flint.  The reports are to

# Exhibit 6

## ARTICLE XVI. DEPARTMENT OF PUBLIC WORKS AND UTILITIES

### § 2-110  CREATED.

There is hereby created a Department of Public Works and Utilities in accordance with Section 4-203 of the Charter of the City of Flint.

(Ord. 2569, passed 11-8-1976)

### § 2-111  DIRECTOR OF DEPARTMENT; APPOINTMENT, TERM.

The head of the Department shall be known as the Director of Public Works and Utilities and shall be appointed by the Mayor, with the approval of the City Council, and shall serve at the pleasure of the Mayor.

(Ord. 2569, passed 11-8-1976)

### § 2-112  ESTABLISHMENT OF DIVISIONS WITHIN DEPARTMENT.

The Director of Public Works and Utilities, with the approval of the Mayor, may establish divisions within the Department of Public Works and Utilities as required for the efficient administration and operation of the Department.

(Ord. 2569, passed 11-8-1976)

### § 2-113  APPOINTMENT OF SUBORDINATES AND EMPLOYEES.

The Director of Public Works and Utilities shall have the authority to appoint all subordinates and employees within the Department of Public Works and Utilities pursuant to personnel policies of the City developed pursuant to the provisions of Section 4-302 of the Charter of the City of Flint.

(Ord. 2569, passed 11-8-1976)

### § 2-114  PROMULGATION OF RULES AND REGULATIONS FOR OPERATION OF DEPARTMENT.

The Director of Public Works and Utilities with the approval of the Mayor, shall promulgate rules and regulations necessary for the efficient administration and operation of such Department, such rules to be adopted in the manner prescribed in Section 1-801 of the Charter of the City of Flint.

(Ord. 2569, passed 11-8-1976)

### §§ 2-115 – 2-119  RESERVED.

# Exhibit 7

Online Services



**CITY OF FLINT, MICHIGAN**

Menu

(/)

Home (https://www.cityofflint.com/) / City of Flint agrees to adopt changes to NRDC, Concerned Pastors settlement agreement

# City of Flint agrees to adopt changes to NRDC, Concerned Pastors settlement agreement

November 2, 2022

FLINT, Mich. – Pending City Council approval, the City of Flint has tentatively agreed to implement changes requested by Natural Resources Defense Council (NRDC) to the *Concerned Pastors for Social Action* settlement agreement, to refine the planning and data management for the final phase of the City's service line replacement project.

The City looks forward to working collaboratively with NRDC as the pipe replacement project nears completion. The City is working to complete lead pipe replacement and restoration as fast as possible, in the face of national supply chain challenges affecting the availability of materials like asphalt, concrete, and parts. The City is working with the State of Michigan to source critical supplies from across the state.

This year, for the first time since these activities began in 2016, the City of Flint centralized the oversight of excavation, replacement, and restoration activities under a single project management team. Centralizing management consolidates disparate recordkeeping from 2016-2019.

Enhanced data collection and tracking procedures allow the City to prepare weekly reports on replacement progress and share that information among its partners. Those reports are now being provided to NRDC on an ongoing basis.

At the request of the Neeley administration, the U.S. Environmental Protection Agency (EPA) has granted a one-year extension to the City of Flint for over $100 million in federal funding. This funding will be used to complete the remaining 5% of residential addresses that still need excavation and replacement of their water service lines.

Flint residents can still take advantage of this no-cost opportunity to remediate potential lead water pipes leading into their homes. Flint residents can still schedule service line replacements at this website (https://www.cityofflint.com/get-the-lead-out/).

"More than 95% of lead pipes in Flint have been replaced, and we will continue the work until the job is done," Flint Mayor Sheldon Neeley said. "I will work with anyone who is committed to making that happen. I ask those remaining homeowners to give our crews right of entry so that we can fix this once and for all."

Flint is in the final phase of its water service line replacement efforts and has completed over 27,000 excavations, replacing any lead or galvanized steel service lines identified. Approximately 1,000 addresses still need to be excavated, and an indeterminate number of residences still require restoration. Flint already has contracts with Rowe Professional Services Co. and Lakeshore Global Corporation to complete all remaining work by the end of 2023.

For the past six years, Flint water has met state and federal standards for lead in drinking water. Since July 2016, the city's water system has tested below action levels for the state's lead and copper rule during 12 consecutive monitoring periods. In 2018, Michigan adopted the nation's most stringent lead rules for drinking water mandating that all lead service lines in the state be removed.

Flint's testing results are available online here (https://www.michigan.gov/flintwater). Additional information about Michigan's new testing requirements and results state-wide can be found here (https://www.michigan.gov/mileadsafe/). The State of Michigan's MI Lead Safe website includes valuable guidance and information on reducing lead exposure.

PCA-35

5/17/23, 2:36 PM · City of Flint agrees to adopt changes to NRDC, Concerned Pastors settlement agreement | City of Flint

Case 2:16-cv-10277-DML-SDD   ECF No. 360-7, PageID.1844   Filed 05/26/23   Page 42 of 142

## Share on Social:

Facebook (https://www.facebook.com/sharer/sharer.php?u=https://www.cityofflint.com/city-of-flint-agrees-to-adopt-changes-to-nrdc-concerned-pastors-settlement-agreement/)

Twitter (http://twitter.com/share?text=City of Flint agrees to adopt changes to NRDC, Concerned Pastors settlement agreement&url=https://www.cityofflint.com/city-of-flint-agrees-to-adopt-changes-to-nrdc-concerned-pastors-settlement-agreement/)

LinkedIn (http://twitter.com/share?text=City of Flint agrees to adopt changes to NRDC, Concerned Pastors settlement agreement&url=https://www.cityofflint.com/city-of-flint-agrees-to-adopt-changes-to-nrdc-concerned-pastors-settlement-agreement/)



**ONLINE SERVICES**

Request a Water Service Line Replacement
Pay Water Bill
Pay Property Taxes
File Police Report
Income Tax Forms
Report Streetlight Outage
Report Blight

1101 S. Saginaw Street
Flint, MI 48502
(https://www.google.com/maps/place/FLINT+CITY+HALL/@43.0105837,-83.6868427,17z/data=!3m1!4b1!4m5!3m4!1s0x8823821b22...83.6846541)

(810) 766-7015 (tel:(810)%20766-7015)

(https://www.instagram.com/city_of_flint/?hl=en)

(https://www.facebook.com/CityofFlintMI)

(https://www.linkedin.com/company/city-of-flint/)

Copyright © 2023 City of Flint Michigan. All rights reserved.

# Exhibit 8

Online Services



**FLINT** CITY OF FLINT, MICHIGAN

Menu

(/)

Home (https://www.cityofflint.com/)   /   Get The Lead Out

# Get The Lead Out

The City of Flint Lead Service Line Replacement project is nearing completion. Please IMMEDIATELY submit consent forms to have your water service lines inspected and replaced. You will be contacted to schedule service. Sign up today to take advantage of this FREE program for all Flint residents and help Get the Lead Out!

**Consent Form** (https://www.cityofflint.com/wp-content/uploads/2020/10/Consent-for-Service-Line-Replacement.pdf)

**Email your form to GetTheLeadOut@cityofflint.com** →(mailto:GetTheLeadOut@cityofflint.com)

## Please note that you must be home for our crews to work on your water service line.

If you completed a consent form prior to March 15, 2019, and your service line has not yet been checked, you must submit another consent form.

**Lead Service Line Replacement**

| | |
|---|---|
| PHONE | 810-410-1133 (tel:810-410-1133) |
| EMAIL | gettheleadout@cityofflint.com |



## Important information about your service line replacement

Your water will be shut off for a period of 4 to 24 hours while the line is being replaced. The contractor will make every effort to have your water restored the same day that installation begins. Please maintain a clear path to the water meter and clear material away from the water meter so work crews can run the replacement pipe to it.

The contractor will flush the water in your home for 15 minutes after the pipe is replaced to remove any residue or sediment from the water line. You should flush your pipes a second time for at least 15 minutes at the highest flow rate once the contractor has left. This additional water usage should add less than 10 cents to your water bill.

PCA-38

## Service Line Replacement Process

You will also be provided with a water filter and/or filter replacement cartridges if you do not already have them. Please continue to use your water filters for at least 6 months after service line replacement.

All turf areas disturbed will be seeded and mulched as soon as practicable. Pavement areas disturbed will be replaced with similar pavement surfaces. The city will not be responsible for any damage to trees or landscaping affected by the replacement of the service line.



## Service Line Replacement Request

"*" indicates required fields

**Name**

**Phone**

**Email**

**Address**

Street Address

Street Address 2

ZIP Code

**Consent** *

☐ In consideration of the City of Flint's efforts to remove non-copper water services lines, I hereby affirm that I am the owner or resident of the property described above, and I grant permission to the City of Flint and/or its officials, employees, or contractors to excavate, investigate, and replace non-copper water services on the property described above. No other promises have been made except as shown here.

**Request Service Line Replacement**



## Submit your consent form now

The City of Flint is in the final stage of the pipe replacement program. We need your help to ensure we **get the lead out** of the City of Flint.

This work is so important. We must at now to protect you and your family as well as future generations.

Please participate.

We have temporarily extended the deadline to opt into the service line replacement program. Please immediately submit consent forms. We will check your water service lines, replace them if they are not safe, and make any needed repairs to your yard or sidewalk **at no cost to you**.

PCA-39



You must be home for us to perform this work. Please contact us at 810-410-1133 to set up an appointment.

Consent Form **(https://www.cityofflint.com/wp-content/uploads/2020/10/Consent-for-Service-Line-Replacement.pdf)**

**ONLINE SERVICES**

(https://www.cityofflint.com/get-the-lead-out/)

Pay Water Bill

Pay Property Taxes

File Police Report

Income Tax Forms

Report Streetlight Outage

Report Blight

1101 S. Saginaw Street Flint, MI 48502 (https://www.google.com/maps/place/FLINT+CITY+HALL/@43.0105837,-83.6868427,17z/data=!3m1!4b1!4m5!3m4!1s0x8823821b224...83.6846541)

(810) 766-7015(tel:(810)%20766-7015)

(https://www.instagram.com/city_of_flint/?hl=en)

(https://www.facebook.com/CityofFlintMI)

(https://www.linkedin.com/company/city-of-flint/)

Copyright © 2023 City of Flint Michigan. All rights reserved.

PCA-40

# Exhibit 9

WATCH LIVE

FOLLOW US

**Scripps News Investigates**

# Records missing, phones out: Flint water crisis not over

Nine years later, Scripps News Investigates found residents still waiting for the city to remove corroded pipes leaching lead into the drinking water.



00:00 / 07:04

*Scripps News*

By Carrie Cochran and Mark Greenblatt and Amy Fan

PCA-42

WATCH LIVE

FOLLOW US

May 16, 2023

On a recent spring morning, Adia McCullough poured bottled water over her son's toothbrush. Robbie, a second-grader who loves science, doesn't use a drop of tap water from the bathroom faucet. At 7 years old, he's never done it any other way.

That morning, Adia washed Robbie's grapes for his school lunch with bottled water. She boiled his eggs with bottled water. She filled the cat bowl with bottled water.

"You're just vigilant every day. You shouldn't have to be vigilant for years and years and years and years and years," Adia said.

Nearly a decade after one of the nation's largest public health scandals was set into motion, a Scripps News investigation found many residents here still waiting for the city to remove and replace the corroded pipes that have been leaching lead into Flint's water supply. It's something the city was court-ordered to finish years ago, but today residents in Flint are still advised by the Environmental Protection Agency (EPA) and the state of Michigan not to drink the tap water without getting special filters installed – until the city finishes the job.

In an historic legal settlement in 2017, the city agreed to dig up the underground water service lines for tens of thousands of Flint homes and inspect them for materials that could leach more lead into drinking water. Using state and federal dollars, the city promised to replace all of the lead and galvanized steel lines by January of 2020. More than three years later the work remains ongoing, as city officials let one court deadline pass after the next.

Just this past February, a federal judge determined "the city has violated and is violating the [settlement] agreement" to remove the threat of lead from area homes. Citing the city's "mismanagement" of the program, U.S. District Court Judge David Lawson concluded the city "has not done what it has promised to do."

Scripps News found the $100 million excavation project slowed to a crawl, with its management so disorganized city officials still don't know where much of the work needs to be done.

PCA-43

### Stuck at 'more than 90% complete' — for years

Our independent analysis of the city's progress reports, which Flint officials turned over to plaintiffs as part of the court settlement, found the pace of inspecting residents' service lines dropped more than 95% from a peak in 2018. In 2018, 10,946 homes had their pipes explored. In 2022, that number was just 385.

## Water line explorations have dropped over 95% from 2018 to 2022.

In 2018, 10,946 homes had their pipes explored. In 2022, that number was just 385.

|      |      |      |
| 2018 | 2020 | 2022 |

Chart: Amy Fan / Scripps News • Source: NRDC • Get the data • Created with Datawrapper

"We will not rush through this process just to say we got it done," Flint Mayor Sheldon Neeley told Scripps News.

Neeley took office in November 2019 and is now in his second term. Under his watch, the city has missed three court-ordered deadlines.

PCA-44

the most recent court-ordered deadline his administration agreed to, but then missed, last September.

"Deadlines were set and deadlines were missed. I admit to that," he said. "Some could be contributed to me and some could be contributed to other pieces."

Scripps News asked Neeley if the city could provide a specific number of homes that still need their water pipes inspected for lead.

"Well, definitely we are in the 90th percentile," he said. When pressed for more detail, Neeley declined to provide an approximate number of homes where work still remains to be done.

"Giving you an approximate number, though I want to give it to you — I'm not being elusive with my answer here — but we're rounding out this project that we're scheduled to be able to complete this very, very soon."

Neeley said pinning down numbers was difficult, given the variables in the project, calling it a "moving target."

"It is very important to this administration to make sure that the life, health and welfare of every resident inside of this community is taken care of," he said. "We're going to stick with the number of more than 90% has been completed and we're finishing out the rest."

Scripps News discovered "more than 90% complete" is also the same claim Neeley's administration made nearly three years ago in August 2020, when the city put out a press release saying it was in its "final push to get the lead out."

**Broken promises**

The city's failed promises have trapped Adia McCullough in a bureaucratic maze.

"They came and spray painted the pipeline, they put down little flags and then they left and they never did the work," she said.

She said she signed paperwork multiple times over the years and has called the city repeatedly.

Scripps News talked to other Flint residents like her who say they've been waiting for years for the city to come to their house to find and replace the dangerous underground pipes that

PCA-45

"It feels like you have no power, no support," McCullough said. "It feels like the world just keeps going on, and you keep going on. But like, you don't matter. Like, everyone here is not important enough."

It's a feeling she hasn't shaken since the crisis began. She recalls how in April 2014, she and many other residents had concerns about the discolored and smelly water coming from their taps soon after the city switched its water source in a cost-cutting move.

"I definitely remember just instinctively not crawling into a bathtub because when you fill it up, it's brown water," McCullough said.

In October, six months after the switch, McCullough found out she was pregnant with her first child. That same month, General Motors (GM) announced it would stop using the Flint River as a water source at one of its plants, because it was corroding its engines. Officials permitted GM to make the move, but still reassured residents the water was safe to drink.

Finally, in October of 2015, a year and a half after the City of Flint changed its water source, officials told residents their water was not safe to drink. It came after unusually high levels of lead were found in the blood of many Flint children.

By then, McCullough had given birth to Robbie and he was four months old. She remembers the feeling of terror that hit her: *Did I switch to bottled water soon enough?*

### Health risks up from 2021

The need to get the work done today remains urgent. The Centers for Disease Control (CDC) is among those that say there is "no safe blood level" for lead in young children, as it is known to cause learning delays and behavioral issues.. Though Flint's water has stayed below the federal action level at 15 parts per billion for lead, testing by federal guidelines now shows levels trending in the wrong direction.

WATCH LIVE

FOLLOW US

## Flint: The Poisoning Of An American City

When Flint, Michigan, changed its municipal water supply source in 2014, distribution pipes corroded and lead leached out into the drinking water.

LEARN MORE

Since the crisis began, lead levels reached a low in 2021, testing at 3 ppb. But over subsequent testing cycles, they have crept up, with the most recent cycle showing levels tripling to 9 ppb in the July-December 2022 testing period.

"The lead levels in Flint's drinking water have not descended to the kind of low, consistent level that we would ideally like to see," said Addie Rolnick, an attorney for the Natural Resources Defense Council, an environmental advocacy group that helped sue the state of Michigan and the city of Flint.

Rolnick said the most recent lead levels in Flint were concerning and characterized them as "high."

She said the lead water service lines, which connect water directly to people's homes from the city's main water lines, are the biggest contributor to lead in Flint's drinking water.

"Our goal is to get the lead pipes out," Rolnick said, adding that the NRDC has taken the city of Flint back to federal court five times to try to get it to comply with the settlement agreement, which the city has still not met.

"Flint is being left behind again, and that cannot happen."

In Flint, residents reported more hair loss, rashes and nausea after the crisis. The full extent of the damage is yet to be seen, but other studies of residents here have shown long-term impacts from lead exposure.

Last May, University of Michigan research showed "math achievement for school-age children in Flint decreased and the proportion of children with special needs increased as a result of the

PCA-47

Yale researchers found. Boston University researchers found nearly 1 in 4 Flint residents has PTSD — three times higher than national estimates.

"People look at you differently if you say you're from Flint," said McCullough.

She said kids and adults are living with the stigma the water crisis has left, in part because it's still not over. She's seen simple rights of passage for a child — like having a friend over for a sleepover — isn't an easy ask of other parents.

"They might not want to ask the uncomfortable question: 'Do you use bottled water?'"

**Not just a Flint problem**

Most cities don't know where their lead service lines are buried. But this January, the EPA gave what it calls its most accurate picture of the national issue, estimating 12 million of the nation's water service lines are made from lead or galvanized steel. Those estimates can be traced back to Flint, which helped to attract national attention to this issue.

Municipal, state and the federal governments began looking to Flint to learn as they decided to take on the issue of lead in America's drinking water.

"The residents and activists of Flint deserve a ton of credit for that," said NRDC attorney Addie Rolnick. "You know, they've turned their personal crisis into a national issue."

Just last month, the EPA  announced it is investing $3 billion to replace lead service lines across the country.

"There's funding being put in place," Rolnick said. "EPA is currently revisiting its federal standards for lead in drinking water, and we hope that they'll propose a strong rule that requires replacement of lead service lines nationwide."

**No one at the wheel**

But in Flint, how the project moves forward remains uncertain. Scripps News found key city leadership positions remain unfilled. After just a year on the job, the city's most recent director of public works, who oversees the city's water infrastructure and has historically led the project,

PCA-48

That concerns Flint Councilmember Tonya Burns. She said public works is the city's largest department — making up more than a third of all city employees. And since the crisis, she said it's clear just how important that department is to Flint.

"And now we have nobody over that department. There's no DPW director."

Just as residents cannot get answers, apparently elected officials cannot either. Burns said without a director, quarterly reports that are supposed to be given to council members aren't being turned over.

"This is a failure that could've been avoided," she said. "Those service lines should've been done."

**More promises**

Scripps News told Mayor Neeley we had spoken to residents of seven Flint homes, including McCullough, who said they tried and failed to get city inspectors to examine their water pipes. But, he had a hard time believing that could be true.

"I can't accept that as a statement of fact," Neeley said. "If they're calling here, we have health navigators going door to door … City Hall is open every day. Our phone lines are active and operational."

The same day the mayor made that statement, residents alerted Scripps News that the city's "Get the lead out" phone number was not operational. When we tried the line ourselves, we heard a recorded message saying its message box was full, before the call promptly hung up.

Scripps News later reviewed emails from one Flint resident, who had written city officials last July to complain about outages with the city's "Get the lead out" phone number. After we let the city know, a spokesperson told us Flint would request their contractor come up with a "permanent fix." We found the number worked for several days before going offline again. City spokesperson Caitie O'Neill later told us the issue was due to higher-than-normal call volume and wrote: "We have set up internal processes to monitor that the phone line facilitated by our engineering contractor is working."

Back in Mayor Neeley's office after wrapping up the interview, the mayor agreed to let us watch as he called his water department to inquire about the residents we brought to his attention. An

WATCH LIVE

FOLLOW US

residents Scripps News spoke to still needed their water pipes inspected.

O'Neill said, after our interview and follow-up questions, the city had decided to double the number of inspection crews that were out documenting where the city still needed to repair properties it had damaged over the years in the process of excavating residents' water pipes. She also said the city's contractor placed a work order for the McCulloughs' home, and was scheduling and completing work for 275 other Flint residents who had still needed their water pipes inspected.

Adia McCullough said she doesn't have reason yet to trust more promises from Flint officials.

"Something that shouldn't have happened, should have been fixed immediately," McCullough said. "And we shouldn't still be here years later trying to prove that it's not fixed."

*We'll be following this story. Email Carrie.Cochran@Scripps.com and Mark.Greenblatt@Scripps.com with questions or tips.*

PCA-50

# Exhibit 10

Online Services



(/)

Menu

Home (https://www.cityofflint.com/) / State of Michigan: Flint enters final phase of lead service line replacement

# State of Michigan: Flint enters final phase of lead service line replacement

October 3, 2022

FLINT, Mich. – September 30, 2022

The City of Flint and the Michigan Department of Environment, Great Lakes, and Energy (EGLE) announced today that the city has reached a major milestone of 95 percent of lead service lines replaced, capping off a multi-million dollar residential lead line replacement program and water system infrastructure modernization effort.

Flint has signed a $17.9 million contract with Lakeshore Global Corporation to complete the final phase of lead service line replacement targeting roughly 1,600 remaining water service lines. The lines will be excavated and replaced with new copper pipe if lead or galvanized pipe is found. EGLE estimates that roughly 30 percent of the remaining lines will be lead or galvanized.

Federal Water infrastructure Improvements for the Nation (WIIN) Act grant dollars are expected to provide the bulk of the funding.

The 1,600 remaining lines represent the last five percent of suspected lead service lines in the city. The city has already completed 27,428 water service line excavations.

"This is great news and we're making great strides," Mayor Sheldon Neeley said. "I'm so happy to announce that we've reached 95 percent completion and we're moving forward beyond all of our challenges."

The pace of service line work slowed during the past several months as the city completed major infrastructure upgrades to the Flint water plant and worked through pandemic, supply chain, and contractor issues.

In May of this year, Flint completed a nearly year-long, multi-million dollar infrastructure project modernizing the city's water plant and establishing a critical secondary connection to Lake Huron.

At the center of this important infrastructure project is a $14 million pipeline connecting Flint to the Genesee County Drain Commissioner's water treatment plant which, like Flint's main supplier the Great Lakes Water Authority (GLWA), sources water from Lake Huron.

This new emergency back-up pipeline proved its value when it provided an immediate back-up supply of water to the city in August when GLWA encountered a water main failure. The GLWA line failure would have severely impacted Flint had it not been for the back-up pipeline.

Other significant water infrastructure upgrades include:

- Construction completed this year on a new, $5 million chemical feed building featuring state-of-art controls monitoring and treating water entering the water plant
- $22 million in water main replacements
- $11 million in new water meters

"We applaud the city's steadfast work toward this milestone," said EGLE director Liesl Clark. "The team at EGLE including the Office of the Clean Water Public Advocate stand ready to help in the final stage of this effort. We want to hear from residents who suspect they may still have a lead service line. There is still more work to be done and EGLE is committed to working with the City of Flint to complete this critical infrastructure work."

City officials urge any remaining water customers who may potentially have lead service lines to call the city at 810-410-1133 and opt into the city's free **replacement program** (https://www.cityofflint.com/wp-content/uploads/Consent-Form-Notification-Letter-mlr-10.06.2020.pdf).

Flint is now in its sixth year of meeting state and federal standards for lead in drinking water. Since July 2016, the city of Flint's water system has tested below action levels for the state's Lead and Copper Rule (LCR) during 12 consecutive monitoring periods.

PCA-52

Michigan in 2018 adopted the nation's toughest lead rules for drinking water. The state's Lead and Copper Rule (LCR) requires that all lead service lines in the state be removed.

Flint's testing results can be found by visiting https://www.michigan.gov/flintwater (https://www.michigan.gov/flintwater/). Additional information about Michigan's new testing requirements and results state-wide can be found at https://www.michigan.gov/mileadsafe/ (https://www.michigan.gov/mileadsafe/). The State of Michigan's Mi Lead Safe web site includes valuable guidance and information on reducing lead exposure.

## Share on Social:

Facebook (https://www.facebook.com/sharer/sharer.php?u=https://www.cityofflint.com/state-of-michigan-flint-enters-final-phase-of-lead-service-line-replacement/)

Twitter (http://twitter.com/share?text=State of Michigan: Flint enters final phase of lead service line replacement&url=https://www.cityofflint.com/state-of-michigan-flint-enters-final-phase-of-lead-service-line-replacement/)

LinkedIn (http:// enters replace michig replace



### ONLINE SERVICES

Request a Water Service Line Replacement
Pay Water Bill
Pay Property Taxes
File Police Report
Income Tax Forms
Report Streetlight Outage
Report Blight

(https://www.instagram.com/city_of_flint/?hl=en)

(https://www.facebook.com/City of Flint MI)

(https://www.linkedin.com/company/city-of-flint/)

1101 S. Saginaw Street Flint, MI 48502

(https://www.google.com/maps/place/FLINT+CITY+HALL/@43.0105837,-83.6868427,17z/data=!3m1!4b1!4m5!3m4!1s0x8823821b22... 83.6846541)

(810) 766-7015 (tel:(810)%20766-7015)

Copyright © 2023 City of Flint Michigan. All rights reserved.

PCA-53

# Exhibit 11

5/18/23, 10:24 AM    City of Flint launches final push to Get the Lead Out; Service line replacement project set to finish by Nov. 30, 2020 | City of Flint
Case 2:16-cv-10277-DML-SDD   ECF No. 260-7, PageID.11863   Filed 05/26/23   Page 61 of 142

Online Services



# FLINT  CITY OF FLINT, MICHIGAN

Menu

(/)

Home (https://www.cityofflint.com/) / City of Flint launches final push to Get the Lead Out; Service line replacement project set to finish by Nov. 30, 2020

# City of Flint launches final push to Get the Lead Out; Service line replacement project set to finish by Nov. 30, 2020

August 13, 2020

FLINT, Michigan—With work crews nearing completion of the service line replacement project, Mayor Sheldon Neeley is asking all residents to participate NOW while funding remains available to replace lead and galvanized steel pipes carrying water to residential homes in the City of Flint.

The service line replacement project has been ongoing in the City of Flint for more than four years. Now more than 90 percent complete, work crews expect to complete service line replacement work this year — so Mayor Neeley is leading a special push to ask residents to help to *Get the Lead Out.*

**Residents must to consent to having their pipes replaced by Sept. 18, 2020 to guarantee they can be replaced for free as part of this program.** A downloadable consent form is available below.

To opt-in to the service line replacement program, residents may:

Call:        810-410-1133
Email:      GetTheLeadOut@cityofflint.com (mailto:GetTheLeadOut@cityofflint.com)
Online:     cityofflint.com/GetTheLeadOut
Mail:        Flint City Hall
DPW Service line replacement program
1101 S. Saginaw St.
Flint, MI  48502

Please note: Even after residents consent to work at their home, someone over the age of 18 must be home in order for the work to be completed.

This is an extended deadline agreed upon by the City of Flint and the National Resources Defense Council. Previous deadlines also had been set for November 2019 and March 2019, but both the City and NRDC agreed to the new date in part because the NRDC raised concerns over inadequate sharing of records by contractors operating under the previous administration and the potential for consent forms to have been lost in the transition between contractors.

Prior to the current administration, a series of different contractors managed the service line replacement project and failed to meet its original 2019 completion deadline. In the transitions between project managers, data provided to the next contractor was sometimes missing or otherwise inadequate. Paperwork filed before March 15, 2019 remains of particular concern.

**If you submitted a consent form prior to March 15, 2019, and your service line has not yet been checked, you must submit another consent form.** If there are any questions, call the service line replacement hotline at (810) 410-1133.

Given the historic lack of proper recordkeeping, the Neeley administration and the NRDC agreed extra precautions should be made to ensure residents are given another opportunity to consent to the work and extended the deadline to consent to the work to Sept. 18, 2020.

"We are going to get the job done and make sure it is done the right way," Mayor Neeley said. "We need all residents to come together to help us 'Get the Lead Out.' Getting your lines checked is quick, easy and free — but time is running out. Replacing lead service lines is an important safety measure for you, your family, and future generations."

The project has excavated 25,953 service lines in the City of Flint as of Aug. 7, 2020. Of those, 9,695 included lead or galvanized steel and pipes that were replaced. The remaining 16,258 homes already had safe, copper service lines. Only about 2,500 more households still need their service lines checked.

**Any and all Flint households can still participate, even those who have declined to participate previously.**

PCA-55

5/18/23, 2:59 PM City of Flint launches final push to Get the Lead Out; Service line replacement project set to finish by Nov. 30, 2020 | City of Flint

Case 2:16-cv-10277-DML-SDD ECF No. 260-7, PageID.1864 Filed 05/26/23 Page 62 of 142

In April, the City filed notice that work was halted on the project because of COVID-19 and the governor's executive orders requiring residents to stay home. Work resumed on May 29.

Residents do not have to have the work on their water service lines completed by the Sept. 18, 2020, deadline, but they must consent to the work by then to guarantee their service line will be checked and replaced, if necessary, before the project ends.

Under the agreement with the NRDC, which was negotiated by the administration and approved Wednesday by Flint City Council, excavation, pipe replacement and property restoration work will be completed by Nov. 30, 2020, on all homes where residents have consented to this service by Sept. 18, 2020.

As part of the effort, the City of Flint also is conducting additional outreach to residents to encourage them to participate in the service line replacement: including letters to households, new informational door hangers, and a revised *Get the Lead Out* page on the City of Flint's website at CityofFlint.com/GetTheLeadOut. (The former Fast Start page will automatically redirect users to this page.)

Mayor Neeley urged residents to cooperate with work crews doing the service line replacement project — answering the door, consenting to the work, and being home at the time of scheduled service.

The process is simple, but a resident 18 years or older must be home to consent to the service:

— Crews dig a hole to check the home's pipes.
— If the pipes are copper, they are safe and do not need to be replaced. The hole is filled and crews stop asking for permission to check your service lines.
— If the pipes are lead or galvanized steel, the pipes will be immediately replaced in most circumstances. Crews will briefly need to enter the home to ensure the service line is connected properly. Workers will wear face masks and other protective equipment as well as follow additional safety precautions.
— Crews return to the residence to make additional yard, sidewalk, and grounds repairs as needed. A resident does not need to be home for restoration work to occur.

All work associated with the water service line replacement project is being done at ZERO COST TO FLINT RESIDENTS.

It is important to supply your contact information when consenting to the service line replacement program so that our workers can contact you and schedule the work. Someone 18 years old or older must be home for our crews to check your water service lines.

Workers will remain a minimum of 6 foot from all residents. They also will wear gloves, face masks and face shields when going door-to-door. They also will ask residents how they are feeling and if it would be an appropriate time to do service line replacement. All work areas inside the home will be thoroughly cleaned and sanitized.

The team of work crews are doing repeated outreach residents to schedule work. Workers are making contact at least three times — including at least one mailed letter and at least two visits to the residence, one of which is done after 5 p.m. or on the weekend.

Testing continues to show that water quality in the City of Flint has stabilized. Testing at the end of 2019 showed lead at 4 parts per billion in Flint (90th percentile score, the standard used nationwide) far below its high of 20 ppb in 2016. The federal action level for lead is 15 ppb.

The $97 million service line replacement project is being paid for by the state of Michigan, which also received federal dollars to fund the project.

Important phone numbers:

- Water Service Line Replacement hotline to consent to service or check on the status of your home's water pipes: (810) 410-1133.
- City of Flint Street Maintenance Division for questions about property restoration after service line replacement: (810) 766-7343.
- Public Health Navigators for water service reconnection to homes without water service: (810) 410-2020.

###

[pdf-embedder url="https://cityofflint.wpengine.com/wp-content/uploads/2020/08/Consent-Form-Notification-Letter-mlr-8.13.2020-1.pdf" title="Consent-Form-Notification-Letter-mlr-8.13.2020"]

---

## Share on Social:

(https://www.facebook.com/sharer/sharer.php?u=https://www.cityofflint.com/city-of-flint-launches-final-push-to-get-the-lead-out-service-line-replacement-project-set-to-finish-by-nov-30-2020/)
Facebook

(http://twitter.com/share?text=City of Flint launches final push to Get the Lead Out; Service line replacement project set to finish by Nov. 30, 2020&url=https://www.cityofflint.com/city-of-flint-launches-final-push-to-get-the-lead-out-service-line-replacement-project-set-to-finish-by-nov-30-2020/)
Twitter

(http://twitter.co launches final p Service line rep by Nov. 30, 2020&url=https flint-launches-fi service-line-rep finish-by-nov-3(
LinkedIn

(h

PCA-56

5/18/23, 2:19 PM    City of Flint launches final push to get the Lead Out Service Line replacement project set to finish by Nov. 30 2020 | City of Flint

Case 2:16-cv-10277-DML-SDD    ECF No. 260-7, PageID.1865    Filed 05/26/23    Page 63 of 142



**ONLINE SERVICES**

Request a Water Service Line Replacement
Pay Water Bill
Pay Property Taxes
File Police Report
Income Tax Forms
Report Streetlight Outage
Report Blight

1101 S. Saginaw Street
Flint, MI 48502
(https://www.google.com/maps/place/FLINT+CITY+HALL/@43.0105837,-83.6868427,17z/data=!3m1!4b1!4m5!3m4!1s0x8823821b224...83.6846541)

(810) 766-7015(tel:(810)%20766-7015)

(https://www.instagram.com/city_of_flint/?hl=en)

(https://www.facebook.com/CityofFlinMI)

(https://www.linkedin.com/company/city-of-flint/)

Copyright © 2023 City of Flint, Michigan. All rights reserved.

PCA-57

# Exhibit 12

# NRDC

May 25, 2017

VIA EMAIL

William Kim
Assistant City Attorney
City of Flint Department of Law
1101 Saginaw Street, Third Floor
Flint, MI 48502
wkim@cityofflint.com

> Re:   Follow-up Items from May 18, 2017 Meeting Regarding Compliance with
> *Concerned Pastors* Settlement Agreement

Bill:

We write to follow up on several issues Plaintiffs discussed with the City during the May 18, 2017 meeting concerning the City's compliance with the Settlement Agreement. We appreciate the City's willingness to engage in a dialogue concerning its progress towards implementing the Agreement, and we hope the parties will continue to work together to ensure Flint residents receive the benefits and protections the Agreement provides. To that end, we describe below some of the requirements discussed at the May 18 meeting, including Plaintiffs' understanding of the status of the City's compliance with those requirements.

      1.     <u>Abandoned Homes List, ¶ 13</u>

Under Paragraph 13 of the Agreement, the City must maintain a "list of households it determines are abandoned and that would otherwise be eligible for service line replacement." You stated at the meeting that the City has not yet created this list, and that Amanda Trujillo, an employee at the City's Water Service Center, will be the custodian of the list and will be responsible for maintaining it.

      2.     <u>New Water Accounts, ¶¶ 14, 16</u>

Paragraphs 14 and 16 require the City to undertake reasonable efforts to ensure that residents who activate new water accounts after March 28, 2017, are provided an opportunity to opt in to the service line replacement program if the previous occupant of

the household declined replacement or the household was previously on the Abandoned Homes List. Under the Agreement, reasonable efforts include sending at least two written requests to the new account owner. To identify the households to which the City must send written requests under Paragraphs 14 and 16, the City must cross-reference the addresses of new water accounts against the Refusal and Abandoned Homes Lists described in Paragraphs 13 and 16. Prompt compliance with this requirement will enable the City to maximize contractor efficiencies by replacing service lines on a particular street sequentially (as opposed to returning to a street at several different times during the three-year period during which the City will be replacing service lines).

At the meeting, you represented that the City is not currently cross-referencing the addresses of new water accounts for purposes of complying with Paragraphs 14 and 16. You also stated that the City has not sent any letters to new water account holders at replacement eligible households requesting permission to replace their service lines.

3.   Written requests for permission to replace service lines, ¶ 15.a

Paragraph 15.a requires the City to mail at least two requests to property owners seeking permission to replace service lines at eligible households if an initial attempt to obtain permission through in-person contact with the property owner was unsuccessful. The City indicated that it has neither drafted nor sent letters seeking permission from property owners with whom an initial in-person attempt to obtain permission was unsuccessful. If the City or its contractors have sent such a letter, Plaintiffs request a copy of the letter. If the City or its contractors are in the process of drafting and finalizing the letter, Plaintiffs request an opportunity to review and comment on the proposed language.

4.   Informing residents of three-month window to grant permission to replace service line after they refuse permission, ¶ 15.b

Paragraph 15.b requires the City to provide property owners with a three-month window to grant permission to replace their service line after they initially refuse to grant permission. As we discussed, this three-month window is meaningful only if property owners who decline to participate in the service line replacement program are informed that they have three months to change their minds. The City stated that it is planning to send letters to residents who refuse to grant permission informing them of the three-month window, but that no such letters have been sent yet. The City agreed to share a draft of that letter with Plaintiffs. In addition, the City discussed the possibility of instructing its contractors to inform residents who decline to grant permission of the three-month

2

window. Plaintiffs encourage the City to do so, to better ensure that residents will understand their options under the Agreement concerning service line replacement.

     5.    <u>Documenting service line replacement declinations, ¶ 16</u>

Paragraph 16 requires the City to maintain a list of the addresses of replacement eligible households at which the property owner refuses permission to replace a service line (the "Refusal List"). Gen. McDaniel indicated that the City is tracking the addresses where residents have declined to grant permission, but that the City has not yet generated a Refusal List for purposes of complying with the Agreement. Plaintiffs discussed with the City the importance of documenting the date on which the property owner refuses to grant permission, for purposes of calculating the three-month window during which the property owner can change his or her mind under Paragraph 15.b.

     6.    <u>Online opt-in form, ¶ 18</u>

Paragraph 18 requires the City to "make available on its website a form permitting property owners to opt in to the service line replacement program" under the Agreement. The City indicated at the meeting that the opt-in form is not yet available on the City's website. Ms. Wheeler stated that she will work with the City's Communications team to post the opt-in form online. Ms. Wheeler also stated that she will explore whether the City can create a web-based opt-in form that residents can fill in online (instead of having to print the form, complete it, and submit it in paper form). She represented that she would communicate with the City's contractors as soon as the form is online so that they can inform residents that they can access the permission form online.

     7.    <u>Goyette letter</u>

During the meeting, Gen. McDaniel distributed a letter (attached as Exhibit A) circulated by Goyette Mechanical to Flint residents. The letter states that attendance by owners and renters at a "neighborhood meeting" is "mandatory" and "required" for residents to have their service lines replaced. All parties at the meeting agreed that this information is contrary to the terms of the Agreement and might have created confusion in the community. Gen. McDaniel stated that he had advised Goyette of the problem, and that Goyette had distributed a new, revised letter. The City agreed to provide Plaintiffs with the revised letter. Plaintiffs have not yet received the new letter.

Pursuant to Paragraph 118, within 14 days, please provide the following

information: (i) a description of the residents to whom Goyette distributed the initial letter (Exhibit A); (ii) confirmation that a corrected letter has been distributed, the date of distribution, and to who it was distributed; and (iii) a copy of the corrected letter. Plaintiffs also request that the City instruct Goyette and all other contractors working on service line replacements not to distribute information to residents concerning eligibility for service line replacement under the Agreement without the City's review of the information for accuracy.

        8.        <u>Updating cost and service line estimates, ¶¶ 29-30</u>

Plaintiffs and the City reviewed the City's obligations under Paragraphs 29 and 30 to reevaluate its estimates of the total number of lead and galvanized steel service lines in the City as of March 28, 2017, and whether the Allocated and Reserve Monies ($97 million) will be sufficient to cover the costs of completing the excavations and service line replacements required under the Agreement. The parties also discussed the thirty-day deadline for the City to finish this evaluation after completion of the work under Proposal Nos. 17-560 and 17-564, and the benefits to the City of beginning work on the evaluation before the thirty-day window starts. The thirty-day window will begin even if surface restorations for service lines replaced under those proposals are not completed contemporaneously with the service line replacements. If the surface restoration work lags behind the service line replacement work, the City should use all available data to estimate the total costs of completing the excavations and replacements required under the Agreement.

        9.        <u>Notice of lead or galvanized steel premise plumbing, ¶ 35</u>

Under Paragraph 35, "[i]f the City discovers that a household has premise plumbing made of lead or galvanized steel, the City shall provide notice to the property owner and residents of the household of the premise plumbing material, and that the premise plumbing in the household may be a source of lead in drinking water." At the meeting, Gen. McDaniel stated that the City is tracking information concerning the premise plumbing discovered at households at which contractors are conducting service line replacements. Gen. McDaniel also stated that the contractors are verbally informing residents of the material of their premise plumbing if the resident is home at the time (which is not always the case). You stated that the City has not sent any written notices concerning premise plumbing.

Based on this information, it appears that the City does not have a system in place that is adequate to ensure compliance with Paragraph 35 for each household at which lead

or galvanized steel premise plumbing is discovered. You indicated that the City plans to send written notices in batches, but has not yet drafted the notice. Plaintiffs requested an opportunity to review and comment on the draft notice.

10.   Faucet filter maintenance after service line replacement, ¶ 38

As described in Plaintiffs' May 19, 2017 letter, Plaintiffs understand that the coordination between the City and CORE staff has not been adequate to ensure that CORE teams visit households immediately following service line replacement to ensure proper filter installation. You and Gen. McDaniel stated at the meeting that the City is providing CORE with a list of households at which service lines have been replaced roughly biweekly. More frequent communication between the City and CORE staff is necessary to comply with Paragraph 38's requirement to make a "good faith effort to ensure that each household has a properly installed Faucet Filter immediately after its service line replacement is complete."

11.   Information requested for Independent Monitor, ¶ 53

Through a May 22, 2017 letter, Plaintiffs requested records that will help Dr. Masten promptly identify sampling sites for the Independent Monitoring program. Please provide the requested records as soon as possible, and no later than June 5, 2017.

12.   Log of tap water testing kits drop-offs, ¶¶ 63-65

Paragraphs 63 through 65 require Government Parties to "implement an information check and log system at all locations where residents can drop off household tap water testing kits." The information check and log is intended to help ensure that residents promptly receive their testing results, and to create a record of the samples submitted. During the May 18 meeting, you informed Plaintiffs that CORE employees are staffing the drop-off location at City Hall, and that the City is not managing the information check and log system. Plaintiffs will follow up directly with the State to ascertain whether the log system has been implemented as described in Paragraphs 63 to 65.

13.   CORE visits for new water system customers, ¶ 85

Under Paragraph 85, the City must "notify CORE staff of any new Flint Water System customer within 30 days after activation of a new water account for the customer's household." Immediate compliance with this provision is important to ensure that

PCA-63

residents who move into a new house or apartment in Flint have properly installed and maintained faucet filters. You represented at the meeting that the City is not currently providing this notification to CORE staff, because the City is not yet tracking newly activated water accounts for purposes of complying with the Agreement.

14.     CORE program publicity, ¶ 91

Paragraph 91 requires the City to include a link on its website to a webpage publicizing the CORE program. You stated at the May 18 meeting that the City has not yet done so. Including this link is critical to help publicize the availability of CORE visits for filter installation and maintenance for residents.

15.     Status Reports, ¶ 117

As described in Plaintiffs' May 10, 2017 letter, the City's May 2 status report appears to omit certain information concerning service line replacements completed between March 28 and April 28, 2017. Plaintiffs have not yet received a revised status report that includes all of the required information under Paragraph 117.c.

*       *       *

Based on our discussion, it appears that the City is presently not complying with Paragraphs 13, 14, 15, 16, 18, 35, 38, 53, 85, 91, and 117 of the Settlement Agreement. We expect that the City will promptly come into compliance with these provisions. Pursuant to Paragraph 118, please provide an update to Plaintiffs within 14 days with information documenting the City's compliance with Paragraphs 13, 14, 15, 16, 18, 35, 38, 53, 85, 91, and 117 of the Agreement. We remain available to discuss any of these issues further by telephone, and thank the City for its attention to this matter.

Sincerely,

Sarah C. Tallman

encl.

6

PCA-64

cc (via email):    Richard Kuhl, kuhlr@michigan.gov
                   Nate Gambill, gambilln@michigan.gov
                   Todd Mendel, tmendel@bsdd.com
                   Sheldon Klein, klein@butzel.com
                   Angela Wheeler, awheeler@cityofflint.com

PCA-65

# EXHIBIT A

# GOYETTE
## MECHANICAL

3842 Gorey Avenue
P.O. Box 33
Flint, MI 48506
Phone: (810) 743-6883
Fax: (810) 743-9090

## Please Join Us for a Neighborhood Meeting
## Regarding your FREE Water Service Line Replacement

Dear Homeowner/Resident,

Your attendance in required at our neighborhood meeting to have your water service line replaced. Owners and renters attendance is mandatory in order to have your home scheduled for the free replacement. It is my hope that you can attend one of these meetings to get all the information you need as well as sign your permission forms for both owners and renters (if applicable) prior to construction starting. We must have your written consent to perform the work and replace your service line.

**Meeting Locations and Times:**

Staff will be on hand to direct you to the meeting area at both locations:

*AFTERNOON*
- Swartz Creek Golf Course, 1902 Hammerberg Rd. Flint, MI
  - Tuesday May 16th at 1:00 pm
  - Thursday May 18th at 1:00 pm
  - Tuesday May 23rd at 1:00 pm
  - Thursday May 25th at 1:00 pm

*EVENING*
- Powers Catholic High School, 1505 W. Court St. Flint MI
  - Tuesday May 16th at 6:00 pm
  - Thursday May 18th at 6:00 pm
  - Tuesday May 23rd at 6:00 pm
  - Thursday May 25th at 6:00 pm

This is an invitation only event and only residents that have received this letter and are on our list for replacements from the City need attend.

Refreshments will be provided. We look forward to meeting you and be of assistance to you and the City at making Flint's water clean and safe for you and your family.

Sincerely,
Flint Water Project Team
Goyette Mechanical

**Please note that if you have already met with one of my canvassers and completed the required paperwork, you do not need to attend a meeting.**

# Exhibit 13

# NRDC

June 16, 2017

VIA EMAIL

William Kim
Assistant City Attorney
City of Flint Department of Law
1101 Saginaw Street, Third Floor
Flint, MI 48502
wkim@cityofflint.com

Angela Wheeler
City Attorney
City of Flint Department of Law
1101 Saginaw Street, Third Floor
Flint, MI 48502
awheeler@cityofflint.com

      Re:    Continued Noncompliance with *Concerned Pastors* Settlement Agreement

Bill and Angela,

      We write concerning several aspects of the City's implementation of the Settlement Agreement. This letter follows up on our May 25 letter concerning the City's noncompliance with numerous requirements of the Agreement and responds to the City's May 30 status report.

## I.    The City's failure to provide a complete response to Plaintiffs' May 25 letter

      Our May 25 letter described Plaintiffs' understanding concerning the City's noncompliance with the requirements of Paragraphs 13, 14, 15, 16, 18, 35, 38, 53, 85, 91, and 117 of the Agreement. Pursuant to Paragraph 118, Plaintiffs requested that the City provide an update "within 14 days with information documenting the City's compliance" with the specified Paragraphs. *See* May 25 Letter from Tallman to Kim at 6; Settlement Agmt. ¶ 118. The City's response was due on June 8, 2017. Plaintiffs have not received a

complete update that documents compliance with the requirements identified in the May 25 letter.[1]

We have summarized below the requirements that the City was failing to meet as of May 25, and for which the City has not provided documentation of compliance. For ease of reference, we have listed the requirements using the numbering from the May 25 letter:

1.    maintaining a list of households that are abandoned but would otherwise be eligible for service line replacement ("Abandoned Homes List"), ¶ 13;

2.    ensuring that residents who activate new water accounts are provided an opportunity to opt in to the service line replacement program, including by systematically cross-referencing the addresses at which new water accounts are activated with the Abandoned Homes List and a list of homes at which residents have previously declined service line replacement, and by sending at least two written requests to the addresses identified by such cross-referencing, ¶¶ 14, 16;

3.    sending at least two written requests to property owners seeking permission to replace service lines at eligible households where an initial attempt to obtain permission through in-person contact was unsuccessful, ¶ 15.a;

4.    informing residents that they have three months after declining to give the City permission to replace their service line to change their minds and grant permission, ¶ 15.b;

5.    documenting the date on which residents decline to grant permission to replace their service lines as part of maintaining a list of addresses at which property owners have refused service line replacement, ¶ 16;

---

[1] The City's responses to date have been limited to items 7 and 11 in the May 25 letter, including providing Plaintiffs and the Independent Monitor with information requested pursuant to Paragraph 53, *see* June 8, 2017 Email from Kim to Tallman; June 9, 2017 Email from Kim to Tallman, and providing Plaintiffs with a draft of a new notice to be distributed by Goyette concerning eligibility for service line replacement, *see* May 31, 2017 Email from Kim to Tallman et al.

PCA-70

6.      posting on the City's website a form allowing property owners to opt in to the service line replacement program, ¶ 18;

7.      providing a description of the residents to whom Goyette distributed an initial letter containing misinformation about eligibility for service line replacement, and confirming that a corrected letter has been distributed, including the date of distribution and to who it was distributed;

.      .      .

9.      developing and implementing a system to ensure that, when the City discovers that a household has premise plumbing made of lead or galvanized steel, the City provides notice to the property owner and residents of the premise plumbing material and that the premise plumbing may be a source of lead in drinking water, ¶ 35;

10.     ensuring that the City coordinates and communicates with the State and CORE with sufficient frequency to allow CORE teams to ensure that each household has a properly installed faucet filter immediately following the completion of service line replacement, ¶ 38;

.      .      .

13.     notifying CORE staff of new Water System customers within 30 days of the activation of a new water account, ¶ 85;

14.     publicizing the CORE program by posting a link on the City's website to a webpage publicizing the availability of CORE visits, ¶ 91; and

15.     coordinating with the State to ensure that Government Parties report, for each household at which a service line is replaced during the previous reporting period, whether installation of a filter following replacement was verified, ¶ 117.c.ii.5.

Immediate compliance with these provisions is necessary to ensure the success of the service line replacement program under the Agreement, including by providing all Flint residents eligible for service line replacement with a meaningful opportunity to participate

PCA-71

in the program. In addition, immediate compliance with these provisions is critical to protecting residents from spikes in lead levels in tap water that may occur following service line replacement, and to ensuring that residents have the information they need to take appropriate steps to protect themselves and their families from the risks of lead in drinking water from lead or galvanized steel premise plumbing. We hope that the City's failure to respond to Plaintiffs' May 25 letter does not indicate a lack of diligence towards ensuring that Flint residents obtain the full benefits of the *Concerned Pastors* Settlement Agreement.

Plaintiffs renew their request that the City provide an update concerning the City's efforts to comply with these requirements, including information documenting the City's compliance with Paragraphs 13, 14, 15, 16, 18, 35, 38, 85, 91, and 117 of the Agreement. Please provide this update no later than June 23, 2017. If the City determines that it cannot respond by June 23, please let Plaintiffs know in writing, including an explanation for why the City is unable to respond within four weeks of Plaintiffs' May 25 letter.

Plaintiffs also request an opportunity to discuss these issues by phone with the City. As part of this teleconference, Plaintiffs would like to discuss the process by which the City and its contractors are currently communicating with residents about the service line replacement program, and the steps the City and its contractors are taking to seek permission from residents and property owners to replace service lines. Plaintiffs anticipate that the participation of Gen. McDaniel in the call will help facilitate a productive conversation. Please identify windows when you and Gen. McDaniel are available between now and June 30 for a teleconference.

## II.    May 30 status report

In addition, Plaintiffs have identified two concerns with respect to the City's May 30 status report, which overlap in part with items 5 and 15 described above.

Information required under Paragraph 117.c.ii.5. As we outlined in our June 14 letter to you and Richard (and as referenced in item 15 above), the City's May 30 status report does not contain the information required by Paragraph 117.c.ii.5, including, for each household at which a service line replacement was completed during the reporting period, whether proper installation of a faucet filter was verified. Plaintiffs also notified the City that this required information was missing from its May 2 status report in letters dated May 10 and May 25.

The only response that the City has provided to Plaintiffs' multiple requests that the City comply with this provision is the following footnote in its May 30 status report: "[t]o the best of the City's knowledge, the DEQ is tracking this data and dispatching CORE staff accordingly." This statement does not include any information about whether the City has coordinated or communicated with the State or DEQ about the need to track and report this information, or to decide which of Government Parties is best suited to report this information for the first 6,000 service line replacements completed under the Agreement.

To the extent the City has not tracked this information to date, Plaintiffs request that the City work with the State and DEQ to provide Plaintiffs with this information for the addresses at which service lines were replaced during the first and second reporting periods (March 28 to April 27, and April 28 to May 28, respectively). Plaintiffs also ask that the City work with the State and DEQ to ensure that this information is reported with either the City's or the State's status reports moving forward, as required under Paragraph 117.c.ii.5.

List of households that declined service line replacement. The City's May 30 status report included a list, pursuant to Paragraph 117.c.iii, of addresses of households for which service line replacement was refused. This list does not contain the date on which the resident declined to grant permission to replace the service line. While this information is not required as part of the City's status report, tracking this information is necessary to comply with Paragraph 15.b of the Agreement (as described in item 5 above and in Plaintiffs' May 25 letter). Moving forward and pursuant to Paragraph 118, Plaintiffs request that the City provide the dates of residents' declinations with its status reports. This will facilitate Plaintiffs' efforts to conduct outreach to residents who have declined service line replacement.

To date, the City has not provided any response containing information about whether and how it is tracking the dates on which households decline to participate in the service line replacement program. Pursuant to Paragraph 118, please provide information concerning the process by which the City is tracking the dates on which households decline service line replacement.

We expect that the City will promptly come into compliance with Paragraphs 13, 14, 15, 16, 18, 35, 38, 85, 91, 117, and 118 of the Agreement. We remain available to discuss

any of these issues by phone. Thank you for your prompt attention to this matter.

Sincerely,

Sarah C. Tallman

cc (via email):     Richard Kuhl, rkuhl@michigan.gov
                    Nate Gambill, gambilln@michigan.gov
                    Todd Mendel, tmendel@bsdd.com
                    Sheldon Klein, klein@butzel.com

6

Exhibit 14



**CITY OF FLINT, MICHIGAN**
**Department of Law**

**Angela Wheeler**
**Chief Legal Officer**

**Dr. Karen W. Weaver**
**Mayor**

July 10, 2017

VIA EMAIL

Sarah C. Tallman
Natural Resources Defense Council
210 N. Wacker Dr., Suite 1600
Chicago, IL 60606
stallman@nrdc.org

Re:    Response to May 22 Letter

Ms. Tallman,

This letter is in response to your May 25 letter, and is intended to inform you about the progress made by the City since our meeting in May.

1.   Abandoned Homes List, ¶13

The Water Service Center (WSC) has generated a list of "inactive addresses" that has been submitted to the FAST office. This list contains all inactive addresses, with demolished and/or duplicate entries excluded.  The FAST office is currently reviewing that list to identify which homes would otherwise be eligible for LSL replacement.

2.   New Water Accounts, ¶¶14, 16

The WSC has generated a list of new water accounts that have been opened since March 28, 2017. The list has been provided to the FAST office for review and comparison with the ongoing LSL replacements.  To date, no declinations of LSL replacements have corresponded with any new accounts.

3.   Written requests for permission to replace service lines, ¶15a

The FAST office has requested that one of the City's public relations consultants, Martin Waymire, draft an appropriate letter.  However, the previous contract with Martin Waymire has expired and the new contract is currently undergoing the approval process.

4.   Informing residents of 3-month window

The City's current intention is to have the previously-mentioned letter include this information.

5.  Documenting Service Line Replacement Declinations

The City's LSL contractors have been asked to collect this information, and the City has received spreadsheets with this data from two of the City's contractors.

6.  Online Opt-In Form

A request to develop an online opt-in form on the City's website has been submitted to the City's Public Information Officer.  Development of the form is in process.

7.  Goyette Letter

Attached to this letter is the information provided to the City by Goyette detailing where the referred-to mailings were sent.  Per Goyette, any residences that were sent these mailings who did not attend a meeting or sign a permission slip were sent a revised final mailing, also attached.

8.  Updating Costs and Service Line Estimates

The City agrees that updating costs and service line estimates at the end of the year will need to be a priority.

9.  Notice of lead or galvanized steel plumbing

The City is collecting this data but is currently relying on contractors to inform the homeowners as they are collecting the data.  However, contrary to what you state in your 5-22 letter, the homeowner or a resident must be home, when the contractors are conducting LSL replacements, because the contractors must be able to access the interior of the home.  The City is thus verbally informing all addresses when the contractors determine that the interior plumbing is lead or galvanized steel that may be a source of lead in drinking water, pursuant to paragraph 35 of the settlement agreement.

10. Notification to CORE of LSL replacements

As we discussed on one of our June conference calls, CORE has been given access to the City's LSL replacement database and is able to conduct visits to ensure that each household has a properly installed faucet filter.  Our understanding is that this is sufficient for current needs.

11. Information regarding independent monitor

This information was provided via e-mail on June 9.

12. Log of tap water testing kits

The City agrees with Plaintiffs' Counsel intended course of action here.

13. Notification to CORE of new Water Accounts

The WSC has generated a list of new accounts opened since March 28, 2017, and is confirming with CORE personnel appropriate points of contact.  The WSC will provide an updated list to CORE on a monthly basis.

14. CORE program publicity

   Information about the CORE program is provided through various pages on the City's website, including links located on the following pages:

   https://www.cityofflint.com/how-can-i-help/
   https://www.cityofflint.com/flint-water-faq/

15. Status Reports

   The revised information requested was included with the 5/30 status report

If you have any further requests for information, please do not hesitate to contact us.

Sincerely,

/s William Kim
William Kim
Asst. City Attorney

cc (via email):
Richard Kuhl, kuhlr@michigan.gov                Michael J. Steinberg, msteinberg@aclumich.org
Nate Gambill, gambilln@michigan.gov             Bonsitu Kitaba, bkitaba@aclumich.org
Todd Mendel, tmendel@bsdd.com                   Glenn Simmington, gsimmington@gmail.com
Sheldon Klein, klein@butzel.com                 Dimple Chaudhary, dchaudhary@nrdc.org
Angela Wheeler, awheeler@cityofflint.com        Jared Knicley, jknicley@nrdc.org

# Exhibit 15

| | |
|---|---|
| From: | Tallman, Sarah |
| To: | William Kim; "awheeler@cityofflint.com" |
| Cc: | McLaughlin, Jolie; Rolnick, Addie; Xu, Cat; Bonsitu Kitaba; "kuhlr@michigan.gov" |
| Subject: | Concerned Pastors - action steps from 9/14/21 call |
| Date: | Tuesday, September 14, 2021 6:51:37 PM |

Bill and Angela,

Thank you for the productive call this morning. As discussed, Plaintiffs would like to keep this process moving as expeditiously as possible to resolve the remaining issues. Here are the next steps the parties agreed to:

1. **Compilation of 2021 Replacement Eligible Homes List.** As soon as possible, the City will provide Plaintiffs with the full list of replacement eligible homes that comprise the "2021 Replacement Eligible Homes List" in the draft Stipulation, including:
   a. All excavated addresses.
   b. All declination addresses.
   c. All non-responsive addresses (i.e., addresses where the resident did not provide consent after the City completed all required consent attempts).
   d. All addresses where the resident consented to excavation, but the City was unable to schedule an excavation after completing the required post-consent scheduling attempts. *See* ECF No. 217 ¶ 6.
   e. All addresses with outstanding work orders. This includes the 672 addresses listed on the spreadsheet shared by Plaintiffs on August 2, 2021, that have current active water accounts and where the City has not completed the required in-person consent attempts. *See* ECF No. 174 ¶ 15.a. The City and Plaintiffs agree that these 672 homes are replacement eligible and must receive the required in-person outreach.
   f. [Placeholder for additional homes pending resolution of the parties' discussions concerning the 748 inactive addresses identified on Plaintiffs' 8/2/2021 spreadsheet (see item 2 below).]
2. **Mailing information concerning 748 Inactive Addresses on Plaintiffs' 8/2/21 List.** The City will confirm whether mailings were sent to the 748 "inactive" addresses on Plaintiffs' 8/2/21 spreadsheet. If the property owner's address is different from the address on Plaintiffs' spreadsheet (the "service address"), the City will indicate whether the mailing was sent to the service address or the property owner address.
3. **Final Review of Stipulation Language.** The City will review the near-final stipulation Plaintiffs shared via email on August 30, 2021 and confirm whether it agrees to the language in the stipulation, apart from the content of the 2021 Replacement Eligible Homes List and the listed deadlines.
4. **Remaining Available Settlement Funds.** If such information is available, the City will share the amount of state funding remaining for the Settlement.

Regards,

Sarah

SARAH C. TALLMAN  SHE/HER
  en or Attorney

NATURAL RESOURCES
DEFENSE COUNCIL
20 N. WACKER DR., SUITE 1600
CHICAGO, ILLINOIS 60606
T 312.651.7918
  allman@nrdc.org

# Exhibit 16

| | |
|---|---|
| From: | William Kim |
| To: | Rolnick, Addie |
| Cc: | awheeler@cityofflint.com; McLaughlin, Jolie; Tallman, Sarah; Xu, Cat |
| Subject: | Re: Concerned Pastors - action steps from 11/23/21 call |
| Date: | Wednesday,  ecember 1, 2021 4:12:45 PM |

Addie.

Thanks for the update.  On the 2nd issue you're waiting for stuff from us on, the City will agree to add the 748 names to the eligible homes list, and make sure that adequate contact attempts are made or the homes are otherwise confirmed as abandoned.  On the 1st issue (excavation/replacement deadline), I should have an answer for you by tomorrow.

Bill

On Wed, Dec 1, 2021 at 3:19 PM Rolnick, Addie <ARolnick@nrdc.org> wrote:

> Hi Bill,
>
>
> We're working on the revisions to the stipulation that we discussed last week and will get those to you by midday tomorrow.
>
>
> Thanks,
>
>
> Addie
>
>
> ADELINE ROLNICK
>
> **Attorney**
>
>
> NATURAL RESOURCES DEFENSE COUNCIL
>
> 1152 15TH STREET NW, SUITE 300
>
> WASHINGTON, DC 20005
>
> T 202.513.6240
> AROLNICK@NRDC.ORG
> PRONOUNS: SHE/HER
>
> NRDC.ORG

**From:** Rolnick, Addie
**Sent:** Wednesday, November 24, 2021 11:54 AM
**To:** William Kim <wkim@cityofflint.com>; 'awheeler@cityofflint.com'
<awheeler@cityofflint.com>
**Cc:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Tallman, Sarah <stallman@nrdc.org>;
Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; 'kuhlr@michigan.gov'
<kuhlr@michigan.gov>
**Subject:** Concerned Pastors - action steps from 11/23/21 call

Bill,

Thank you for the productive conversation yesterday. Below are the next steps and timeline
the parties agreed to:

**Plaintiffs:**

1. **By Wednesday, December 1**
   a. Plaintiffs will share new draft stipulation language regarding the restoration
      deadline. Per our discussion, this language will state that the City is planning to
      re-bid its restoration contract, that this bidding process will be concluded in
      spring 2022, and that within 30 days of the date the City concludes the bidding
      process and awards the contract, the parties will meet and confer to agree on a
      specific deadline for the City to complete all restoration work.
   b. After consulting with their clients, Plaintiffs will respond to the City's proposal
      to remove the recitals language the City identified from the draft Stipulation.

**The City:**

1. **By Wednesday, December 1**
   a. The City will respond to Plaintiffs' counter-proposal to the City's proposed
      excavation deadline: to ensure that the Stipulation includes an achievable
      deadline and to create a cushion to allow for potential unforeseen circumstances
      that may delay completion, Plaintiffs propose setting the excavation deadline as
      September 30th, 2022.
   b. As discussed, the 748 homes with currently inactive accounts—included on the
      list of homes Plaintiff shared via email on August 2, 2021 and marked
      "inactive" by the City in column F of the attached spreadsheet, "8 2 21 List of
      addresses missing documentation w response.xlsx." —all had active water
      accounts at some point prior to the July 2021 opt-in deadline. These homes thus
      should have the opportunity to participate in the pipe replacement program and
      are properly included in the 2021 Replacement Eligible Homes List. The City
      will respond to Plaintiffs as to whether it will agree that these 748 homes are
      part of the 2021 Replacement Eligible Homes List.
2. **By Wednesday, December 8**
   a. The City will provide updated numbers to include in the paragraph on the
      bottom of page 2 of the draft stipulation, reflecting the status of work at the
      close of work for 2021. These numbers include the number of homes that have

      provided consent forms but still need to be scheduled for excavation and possible replacement and homes that have had their service lines excavated or replaced and still need to have their properties restored.

    b. The City will provide updated copies of the spreadsheets composing the 2021 Replacement Eligible Homes List. These spreadsheets will include the 1190 additional homes identified by Plaintiffs and listed on the attached spreadsheet titled "11.10.21 Pls.' List of Homes Missing from Replacement Eligible Homes List.xlsx."

3. **As soon as possible:**

    a. The City will clarify whether there are addresses where an excavation found a public or private side lead service line but that lead line was not replaced and provide a list of these addresses to Plaintiffs.

    b. The City will ask for the base numbers behind its estimate of how much funding is needed to complete restoration and will share this information with Plaintiffs.

Happy Thanksgiving!

Addie

ADELINE ROLNICK

**Attorney**

NATURAL RESOURCES DEFENSE COUNCIL

1152 15TH STREET NW, SUITE 300

WASHINGTON, DC 20005

T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER

NRDC.ORG

**From:** Tallman, Sarah <stallman@nrdc.org>
**Sent:** Wednesday, November 17, 2021 12:49 PM
**To:** William Kim <wkim@cityofflint.com>; 'awheeler@cityofflint.com'
<awheeler@cityofflint.com>
**Cc:** Rolnick, Addie <ARolnick@nrdc.org>; McLaughlin, Jolie <jdmclaughlin@nrdc.org>;
Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; 'kuhlr@michigan.gov'
<kuhlr@michigan.gov>
**Subject:** RE: Concerned Pastors - action steps from 9/14/21 call

Bill,

I'm following up on several items from our call last week. This email can also serve as an
agenda for our scheduled meet and confer on 11/19/21. Please let us know if you have
anything to add to the agenda.

1. **Scheduling next meet and confer**: You should have received a calendar invite from
   Addie for 4 pm ET on Friday, 11/19 for a Microsoft Teams meeting. We anticipate
   that having only the lawyers on the line will be sufficient for that call.

2. **Finalization of the Stipulation:** As discussed and described in my 11/5/21 email,
   Plaintiffs are eager to file the 2021 Stipulation as soon as possible, and at the latest by
   the end of 2021. We'd like to use the call on Friday to make progress in narrowing the
   remaining outstanding issues, as described below.

   A. **Sign-off on Stipulation language**: As requested, I'm attaching the most recent
      version of the Stipulation, which Plaintiffs sent to you on August 30 and
      reminded the City about by email on September 13, October 5, October 13, and
      November 5. This is the sixth time Plaintiffs are requesting that the City review
      this language. Please let us know whether this language—excluding the content
      of the 2021 Replacement Eligible Homes List and the deadlines in Paragraphs 1
      and 4—is acceptable to the City.

   B. **Deadlines for 2021 Stipulation:** As discussed and as Plaintiffs previously
      requested, on our call on Friday, please provide a proposal for revised deadlines
      to insert into Paragraphs 1 and 4 of the Stipulation (the deadlines to complete all
      excavations/replacements and all restoration, respectively). We understand that
      there may be some remaining uncertainty at this stage of the exact number of
      homes where remaining work is required, given that the 2021 Replacement
      Eligible Homes List still is not finalized. To that end, Plaintiffs believe it is
      appropriate for the City to set conservative deadlines that give sufficient

cushion to account for these remaining uncertainties. As Plaintiffs have
repeatedly emphasized, we want to avoid having to renegotiate these terms
again in 2022.

C.  **Finalization of the 2021 Replacement Eligible Homes List**:

    i.  As I mentioned last week, I am attaching a revised list of the homes
Plaintiffs identified as missing from the City's proposal for the 2021
Replacement Eligible Homes List. The revised list now contains 1190
homes (instead of 1690), and is attached, labeled "11.10.21 Pls.' List of
Homes Missing from Replacement Eligible Homes List." As I mentioned,
adding these homes to the 2021 Replacement Eligible Homes List will
not materially expand the City's remaining required work. Only 8 of
these homes still require additional work from the City (because the
resident has consented, but work hasn't been completed yet).

    ii.  On our call on Friday, as requested in our 11/5/21 email, **please confirm
the City's agreement that the addresses on the attached spreadsheet
are included in the 2021 Replacement Eligible Homes List**. Based on
our analysis, the 2021 Replacement Eligible Homes List is comprised of
31,093 addresses, subject to the addition of the 748 addresses discussed
in outstanding item 2.C.iii below.

    iii.  **748 currently inactive accounts**: I'm confirming that the City has
represented that it has provided all of the information it has concerning
mailings it sent pursuant to the Settlement. If the City's data in the Phase
VI mailing list and the mailing list shared on 9/1/2020 does not indicate
that the City sent a mailing to a home, then Plaintiffs will assume that no
mailing was sent. Plaintiffs are still conferring concerning a proposal
concerning these homes. Better understanding how much Settlement
funding remains, and what sources of additional funding the City plans to
use for the remaining work, will facilitate further discussion of these
issues. See Item 2.D below.

    iv.  **Agreement on content of sublists.** You requested that the parties come
to an agreement regarding each of the sublists the City provided on
10/13/21. Plaintiffs do not think it's appropriate to do that full analysis
now. That is the work contemplated in Paragraph 2 of the draft
Stipulation, which Plaintiffs have agreed to do *after* the City finishes all
of the required excavations and replacements. Nonetheless, Plaintiffs
agree that it will be useful to come to an agreement on the following

sublists now: (1) list of homes that have submitted consent forms but that still need excavation/replacement work and/or scheduling attempts; and (2) list of all homes that still need outreach. These lists will comprise all of the outstanding required work (excluding restorations). There is a third possible category where remaining work is required—(3) list of homes where the City has conducted an excavation, identified a lead line, but has not yet replaced it yet. Our initial analysis indicates that there may be some homes in this category. This is confusing, because we thought that when the City did an excavation and found a lead line, it immediately replaced the line. **Is it true that the City immediately replaces a lead line when it is identified through an excavation? Or is there sometimes a lag?**

    v. **Data clarification question:** Please provide a response to the following question from Addie's 10/13/21 email: Please clarify what the three different tabs—"non-resp," "outstanding," and "consent"—mean in the "2021-09-14 Non-responsive.xlsx" file the City provided. Have all of these addresses received the required outreach but neither submitted a consent form nor declined excavation, or do some of these addresses fall into some other category?

  D. **Remaining Settlement Funding:** Last week, you explained that the City has between $5M and $7M left in Settlement funding, and that the City estimates it will need up to an additional $10M beyond that to finish the remaining work. On our call on Friday, please provide responses to the following questions:
  - What is the basis for this $10M estimate? How was it calculated? What assumptions were made?
  - How much additional funding does the City expect to spend on administrative and project management costs (as opposed to excavation, replacement, and restoration costs)?
  - What sources of additional funding does the City plan to use to complete work once the $97M is exhausted? Is the City planning to use any funds it has received or anticipates it will receive through American Rescue Plan Act (ARPA)? Does the City anticipate that it will receive funds to assist with lead service line replacement through the recently signed federal infrastructure law? If funds will be diverted from other projects the City had planned to complete using the WIIN funding, please identify which projects those are. Has the City asked the State for additional funds to complete this work?

3. **Outstanding reports:** Please provide the outstanding reports described in my 11/5/21 email. Plaintiffs have not received the City's October monthly reporting data and have not received weekly filter verification data for the past two months. **Please provide this reporting as soon as possible and confirm whether excavations, replacements, and restoration work is ending on 11/19/21, as you stated on our**

**call last week.**

We appreciate your prompt attention to these outstanding issues. The City's continued delays in responding to Plaintiffs' questions over periods of months is preventing the parties from finalizing the Stipulation. If you have any questions or need clarification on any of the items described above, please call me at 847-254-8329.

Regards,

Sarah

---

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Tuesday, November 9, 2021 4:47 PM
**To:** Tallman, Sarah <stallman@nrdc.org>
**Subject:** Re: Concerned Pastors - action steps from 9/14/21 call

Sarah,

Things have been crazy around her due to the election, and I'm a bit behind on all of the SLR stuff.  Can we chat this week and make sure I understand what you're requesting/asking?

Also, we can make some time available next Friday afternoon, 3 or 4 would work fine.

B

On Fri, Nov 5, 2021 at 5:44 PM Tallman, Sarah <stallman@nrdc.org> wrote:

Bill and Angela,

Thank you for sharing the spreadsheets comprising the City's proposed 2021 Replacement Eligible Homes List. We'd like to set up a meet and confer to discuss finalizing the List and the draft 2021 Stipulation, including the various outstanding issues described below. **Please let us know whether the City is available for a call during any of the following windows:**

- 11/17, 1 or 2 pm ET
- 11/19, 2, 3, or 4 pm ET

Plaintiffs have reviewed the data the City submitted on 10/13, and, based on data the City previously shared, the City's 10/13 lists are missing 1,690 addresses at which the City's past reporting shows that the City either completed required outreach, received consent to perform and excavation, completed an excavation, or where the resident declined excavation. The parties have agreed that the 2021 Replacement Eligible Homes List includes (1) all excavated homes; (2) all declination homes; (3) all non-consent homes; (4) all homes that consented but the city was unable to schedule excavation; (5) all outstanding work orders (including the 672 addresses on Plaintiffs' 8/2 list with active water accounts); and (6) any homes on Plaintiffs' 8/2 list of eligible homes with currently inactive water accounts at which the parties agree additional work is needed. Accordingly, the 1,690 addresses we identified must be included in the 2021 Replacement Eligible Homes List. These addresses are listed on the attached spreadsheet, "11.4.21 Pls.' List of Homes Missing from Replacement Eligible Homes List." **Please confirm the City's agreement that the addresses on the attached spreadsheet are included in the 2021 Replacement Eligible Homes List**. Based on our analysis, the 2021 Replacement Eligible Homes List is comprised of 31,032 addresses, subject to the addition of the 748 addresses discussed in outstanding item 1 below.

Second, please confirm the status of homes on City's 2021 Replacement Eligible Homes List that occur both on the Outstanding Work Orders List and on another list. For example, 70 addresses appear on both the Outstanding Work Orders List and the Declinations List, and 1,530 homes appear on both the Outstanding Work Orders List and the Nonresponsive List. Based on our previous conversations, we understand that the contractors may, but are not required to, return to homes that occur on the Nonresponsive List and/or the Declination List to attempt to obtain consent to complete work, and these addresses remain on the Outstanding Work Orders List because they are eligible but have not yet been excavated/replaced. In this way, the Outstanding Work Orders List may be in some ways overinclusive of the addresses with remaining *re uired* work under the Settlement. **Please confirm whether this is accurate.**

Third, we wanted to make you aware of some discrepancies between the spreadsheets comprising the 2021 Replacement Eligible Homes List and the City's past reporting. Some of these discrepancies affect the scope of the City's required remaining work. For example, for seven addresses that now appear on the City's Nonresponsive List or

Declination List, Plaintiffs' analysis of the City's data shows that the City received consent to complete an excavation. These addresses are listed in "11.5.21 Homes with consent received.xlsx" (attached). Because consent was provided, the City must conduct the further required work before its obligations as to that address have been met. *See* 2020 Stipulation ¶ 4, ECF No. 217.

Other discrepancies do not affect the scope of remaining required work, but will affect Plaintiffs' future assessment of whether the City has provided documentation showing completion of all excavation and replacement requirements under Paragraph 2 of the revised 2021 Stipulation. For example, there are a number of addresses where, according to the City's "2021-09-14 Completed SLE SLR All Phases" file, a lead or galvanized service line was found and no replacement was completed. However, the City's past reporting shows that the City did complete replacements at some of these addresses. Similarly, the service line composition data in the "2021-09-14 Completed SLE SLR All Phases" file for some addresses conflicts with the service line composition data previously provided by the City. Plaintiffs have not at this time exhaustively catalogued all of the discrepancies between the City's 10/13 data submissions and the City's previous reporting. However, when the City submits its written statement and supporting documentation pursuant to Paragraph 2 of the 2021 Stipulation, these kinds of discrepancies will impede Plaintiffs' ability to assess the City's completion of its excavation and replacement obligations.

Fourth, Plaintiffs have not received the City's October monthly reporting data and have not received weekly filter verification data for the past seven weeks. **Please provide this reporting as soon as possible and confirm whether replacement work is ongoing this fall.**

Finally, we are still waiting for the City to respond to several items from our 9/14/21 call. Further delay on these items is unwarranted. Please provide updates on these items as soon as possible so we can resolve the remaining issues and then promptly finalize the Stipulation, submit it to City Council for review, and file it.

1. **Mailing information concerning 470 Inactive Addresses on Plaintiffs' 8/2/21 List.** Nearly two months ago, the City agreed to confirm whether mailings were sent to the 748 "inactive" addresses on Plaintiffs' 8/2/21 spreadsheet. The City's failure to respond to this request is a violation of Settlement ¶ 118. This information is crucial to finalizing the 2021 Replacement Eligible Homes List: Understanding the outreach completed at these homes will inform Plaintiffs' understanding and the parties' discussion of what, if any, remaining outreach needs to be completed.

Plaintiffs have since confirmed that, according to the City's reporting, 272 of these

addresses received a mailing in April 2019. For the remaining approximately 470 addresses, listed on the attached spreadsheet titled "11.5.21 Inactive Homes - mailing data requested.xlsx," please confirm whether a mailing was sent. If the property owner's address is different from the address on Plaintiffs' spreadsheet (the "service address"), please indicate whether the mailing was sent to the service address or the property owner address. **Please provide this information as soon as possible so that the parties can finalize the 2021 Replacement Eligible Homes List.**

2. **Final Review of Stipulation Language.** Plaintiffs provided the City with a revised draft of the stipulation on August 30, 2021. We have not heard back from the City about whether it consents to this revised language (apart from the content of the 2021 Replacement Eligible Homes List and the listed deadlines). **Please let us know as soon as possible whether the City agrees to the revised language**.

3. **Remaining Available Settlement Funds.** The City agreed that, if such information is available, the City will share the amount of available funding remaining for the Settlement. At minimum, the City is required to track the amount of funding it receives as reimbursement from the State. *See* Settlement Agmt. ¶ 117.c. **Please provide this information as soon as possible.**

Regards,

Sarah

---

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Thursday, October 14, 2021 4:01 PM
**To:** Rolnick, Addie <ARolnick@nrdc.org>
**Cc:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; kuhlr@michigan.gov; Tallman, Sarah <stallman@nrdc.org>; awheeler@cityofflint.com
**Subject:** Re: Concerned Pastors - action steps from 9/14/21 call

I've asked Rowe to clarify the first set of Qs.

On the second 3, I'll have to follow up with some other folks.

Bill

On Wed, Oct 13, 2021 at 5:48 PM Rolnick, Addie <ARolnick@nrdc.org> wrote:

Bill,

Thank you for sharing the spreadsheets making up the 2021 Replacement Eligible Homes List and the excavation data for last month. We will review this and get back to you. To aid that review, can you clarify what the three different tabs—"non-resp," "outstanding," and "consent"—mean in the "2021-09-14 Non-responsive.xlsx" file? Have all of these addresses received the required outreach but neither submitted a consent form nor declined excavation, or do some of these addresses fall into some other category?

We're also eager to move forward on the other outstanding items from our September 14 call. Can you provide any updates on (1) mailing information concerning the 748 inactive addresses on Plaintiffs' 8/2/21 list; (2) the City's position on the most recent stipulation language; and (3) the amount of state funding remaining for the Settlement?

Regards,

Addie

ADELINE ROLNICK

**Attorney**

NATURAL RESOURCES DEFENSE COUNCIL

1152 15TH STREET NW, SUITE 300

WASHINGTON, DC 20005

T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER

NRDC.ORG

**From:** William Kim <wkim@cityofflint.com>
**Sent:** Wednesday, October 13, 2021 3:03 PM
**To:** Rolnick, Addie <ARolnick@nrdc.org>
**Cc:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu
Kitaba <bkitaba@aclumich.org>; kuhlr@michigan.gov; Tallman, Sarah
<stallman@nrdc.org>; awheeler@cityofflint.com
**Subject:** Re: Concerned Pastors - action steps from 9/14/21 call

Colleagues,

Please see the following files:

- **2021-09-14 Completed SLE SLR All Phases.xlsx**  A list of all
addresses where excavations/replacements have occurred since 2016

- **2021-09-14 Declinations.xlsx** A list of all declinations

- **2021-09-14 Non-responsive.xlsx**  A list of all non-responsive addresses

- **2021-09-14 Homes with consent received.xlsx**  A list of all addresses
with consents on file that have not been scheduled

- **2021-09-14 Outstanding Work Orders.xlsx**  A list of the remaining
outstanding work orders (including the 682 addresses recently identified by
the NRDC)

Let us know when you've had a chance to review and can discuss further.

Also attached are the files 2021-09-14 Fast Start Exploration Status.xlsx and 2021-09-
14 Filter Verification.xlsx, which should have been the information reported at the end
of last month.

On Tue, Oct 12, 2021 at 2:07 PM William Kim <wkim@cityofflint.com> wrote:

Addie and company, I'm back from my vacation, and am going through all of the issues that have piled up.  I expect I'll respond to you with all of the requested information by tomorrow.

Thanks,

Bill

On Tue, Oct 5, 2021 at 11:04 AM Rolnick, Addie <ARolnick@nrdc.org> wrote:

> Bill,
>
> I'm writing to follow up on the below action steps from Plaintiffs' 9/14/21 call with the City. As a reminder, Plaintiffs are waiting for the City to share the (1) 2021 Replacement Eligible Homes List; (2) mailing information concerning the 748 inactive addresses on Plaintiffs' 8/2/21 list; (3) the City's position on the most recent stipulation language; and (4) the amount of state funding remaining for the Settlement. Please provide this information as soon as possible.
>
> Regards,
>
> Addie
>
> ADELINE ROLNICK
>
> **Attorney**
>
> NATURAL RESOURCES DEFENSE COUNCIL
>
> 1152 15TH STREET NW, SUITE 300
>
> WASHINGTON, DC 20005
>
> T 202.513.6240
> AROLNICK@NRDC.ORG
> PRONOUNS: SHE/HER
>
> NRDC.ORG

**From:** Tallman, Sarah <stallman@nrdc.org>
**Sent:** Tuesday, September 14, 2021 6:52 PM
**To:** William Kim <wkim@cityofflint.com>; 'awheeler@cityofflint.com'
<awheeler@cityofflint.com>
**Cc:** McLaughlin, Jolie <jdmclaughlin@nrdc.org>; Rolnick, Addie
<ARolnick@nrdc.org>; Xu, Cat <CXu@nrdc.org>; Bonsitu Kitaba
<bkitaba@aclumich.org>; 'kuhlr@michigan.gov' <kuhlr@michigan.gov>
**Subject:** Concerned Pastors - action steps from 9/14/21 call

Bill and Angela,

Thank you for the productive call this morning. As discussed, Plaintiffs would like
to keep this process moving as expeditiously as possible to resolve the remaining
issues. Here are the next steps the parties agreed to:

1. **Compilation of 2021 Replacement Eligible Homes List.** As soon as
   possible, the City will provide Plaintiffs with the full list of replacement
   eligible homes that comprise the "2021 Replacement Eligible Homes List" in
   the draft Stipulation, including:

   a. All excavated addresses.
   b. All declination addresses.
   c. All non-responsive addresses (i.e., addresses where the resident did
      not provide consent after the City completed all required consent
      attempts).
   d. All addresses where the resident consented to excavation, but the City
      was unable to schedule an excavation after completing the required
      post-consent scheduling attempts. *See* ECF No. 217 ¶ 6.
   e. All addresses with outstanding work orders. This includes the 672
      addresses listed on the spreadsheet shared by Plaintiffs on August 2,
      2021, that have current active water accounts and where the City has
      not completed the required in-person consent attempts. *See* ECF No.
      174 ¶ 15.a. The City and Plaintiffs agree that these 672 homes are
      replacement eligible and must receive the required in-person outreach.

f. [Placeholder for additional homes pending resolution of the parties' discussions concerning the 748 inactive addresses identified on Plaintiffs' 8/2/2021 spreadsheet (see item 2 below).]

2. **Mailing information concerning 748 Inactive Addresses on Plaintiffs' 8/2/21 List.** The City will confirm whether mailings were sent to the 748 "inactive" addresses on Plaintiffs' 8/2/21 spreadsheet. If the property owner's address is different from the address on Plaintiffs' spreadsheet (the "service address"), the City will indicate whether the mailing was sent to the service address or the property owner address.

3. **Final Review of Stipulation Language.** The City will review the near-final stipulation Plaintiffs shared via email on August 30, 2021 and confirm whether it agrees to the language in the stipulation, apart from the content of the 2021 Replacement Eligible Homes List and the listed deadlines.

4. **Remaining Available Settlement Funds.** If such information is available, the City will share the amount of state funding remaining for the Settlement.

Regards,

Sarah

SARAH C. TALLMAN  SHE/HER

en or Attorney

NATURAL RESOURCES

DEFENSE COUNCIL

20 N. WACKER DR., SUITE 1600

CHICAGO, ILLINOIS 60606

T 312.651.7918
 allman@nrdc.org

--

PCA-96

William Kim, Assistant City Attorney

City of Flint, Department of Law

1101 S. Saginaw St., 3rd Floor

Flint, MI 48502

(810)237-2079



--

William Kim, Assistant City Attorney

City of Flint, Department of Law

1101 S. Saginaw St., 3rd Floor

Flint, MI 48502

(810)237-2079



--

William Kim, Assistant City Attorney

City of Flint, Department of Law

1101 S. Saginaw St., 3rd Floor

Flint, MI 48502

(810)237-2079



--

William Kim, Assistant City Attorney

City of Flint, Department of Law

1101 S. Saginaw St., 3rd Floor

Flint, MI 48502

(810)237-2079



--
William Kim, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810)237-2079

# Exhibit 17

October 4, 2022

VIA EMAIL

William Kim
City of Flint Department of Law
1101 S. Saginaw Street, Third Floor
Flint, MI 48502
wkim@cityofflint.com

City of Flint
ATTN: City Administrator Clyde Edwards
City Hall
1101 S. Saginaw Street, First Floor
Flint, MI 48502
cedwards@cityofflint.com

> Re:   Notice of City of Flint's Noncompliance with Settlement Agreement and Dispute Concerning Restoration Obligations in *Concerned Pastors for Social Action v. Khouri*, No. 16-10277 (E.D. Mich.)

Dear Messrs. Kim and Edwards:

Pursuant to Paragraph 128 of the Settlement Agreement ("Settlement"), Plaintiffs provide notice of the City's noncompliance with certain obligations under the Settlement, as modified. *See* ECF Nos. 147-1, 174, 207, 208, 217, 237 ("2022 Stipulation"). The City did not complete all required excavations and service line replacements by the Court-ordered deadline of September 30, 2022 and is not meeting its obligations to maintain and share records of completed restorations. Plaintiffs also provide notice of a dispute concerning the identification of a deadline for the City to complete all required restoration work. *See* ECF No. 237 ¶ 6.

Plaintiffs are eager to promptly resolve these issues to ensure the City replaces the remaining lead service lines in Flint and restores all excavated properties as quickly as possible. Plaintiffs welcome the State's participation and contributions to the parties' efforts to expeditiously resolve these issues. If the parties are unable to promptly resolve the issues described below, Plaintiffs intend to seek relief from the Court.

## I.   The City missed the deadline to complete all excavations and replacements

The 2022 Stipulation required the City to complete all remaining excavations and replacements required by the Settlement by September 30, 2022. ECF No. 237 ¶ 1. The City did not meet this deadline.

The September 30 deadline was agreed to by all parties following more than a year of negotiations and after the deadline had already been extended twice previously. As early as

February 2022—before agreeing to the deadline and submitting it to the Court for approval—the parties specified the addresses at which excavation and replacement work was still required to ensure the parties shared an understanding of the scope of remaining required work. The City relied on this information to evaluate how long it would take to complete that work and identify a deadline it could commit to meeting. The City told the Court it could meet that deadline in April 2022.

At this stage, additional oversight and reporting is required to ensure the City finishes the remaining excavation and replacement work without further delay. Plaintiffs propose the following minimum measures to assure accountability and progress towards interim milestones. Plaintiffs may identify additional measures needed to fully resolve this dispute based on further discussion with the parties as they work to resolve these issues.

1. **Monthly reporting on materials inventory and sourcing:** Beginning with its October status report, the City must provide information monthly on its current inventory of materials needed for service line replacements. These submissions must include how many replacements it can conduct with the available materials and updated information about the City's efforts to procure additional materials.

2. **Project Plan:** The parties must agree on a detailed plan and schedule for completing the remaining excavation and replacement work required by the Settlement ("Project Plan").

   a. **Procedure for Creating a Plan:** The City must immediately create and provide a proposed plan to the other parties for review. The parties will then promptly meet and confer to discuss the adequacy of the City's proposal. All parties must agree that the Plan is adequate and sufficiently detailed to ensure prompt completion of the remaining work.

   b. **Contents of the Project Plan:**
      i. **Minimum rate of excavations:** The Project Plan must provide for the City to complete a minimum number of excavations every two weeks.

      ii. **Deadline for completing outreach:** There is no reason for further delays in the City's completion of the required outreach, and the City must demonstrate immediate progress on its outreach over the next week. The City must complete the required outreach to all homes on the 2022 Replacement Eligible Homes List by December 1, 2022. *See* ECF No. 237 ¶ 4.i. By December 15, 2022, the City must provide Plaintiffs with the documentation described in Paragraph 3.c of the 2022 Stipulation.

      iii. **Procedures for weather-related work stoppages:** The Project Plan must provide for the City to continue performing excavations and replacements in 2022 until weather conditions prevent further work, and to notify Plaintiffs within three business days once it determines that it must cease excavation and replacement work for the winter. It must also provide for the City to submit regular updates to Plaintiffs regarding when it expects

that weather conditions will allow it to resume replacement and excavation work. Finally, the Plan must provide for the City to begin performing excavations and replacements within two weeks of when weather conditions allow the City to resume that work.

     **iv.**  **Discussion with Lakeshore concerning outreach protocols and script.** The City must promptly coordinate an opportunity for interested Plaintiff representatives and other stakeholders to meet with Lakeshore to discuss Lakeshore's approach to resident outreach.

## II.  The City has not met its obligations to maintain and disclose restoration records

The Settlement requires the City to restore the property each address where it conducts an excavation. *See* ECF No. 217 ¶ 1. A completed restoration requires the City to leave the public and private property at that address in the same or better condition as before the service line at that address was excavated and/or replaced. For example, the City must fill the excavation trench; place topsoil, fertilizer, and seeding; and leave the topsoil free of undesirable materials such as plants, weeds, roots, stalks, stones, and other debris. *See* Contract between City of Flint and Lakeshore Global Corp. (Aug. 16, 2022), Suppl. Conditions §§ 31-23-33, 32-90-10.

Correspondingly, the Settlement requires the City to maintain and share records of completed restoration. The City agreed to provide, with each monthly report, "an updated list of all homes where restoration has been completed." ECF No. 217 ¶ 7.iii. When the City completes all required restoration work, it must provide the parties with an Excel spreadsheet listing all addresses where restoration has been completed and a description of the sources used to create that spreadsheet. ECF No. 237 ¶ 7. The Settlement further requires the City to "maintain records sufficient to comply with the reporting and disclosure requirements under th[e] Agreement." ECF No. 147-1 ¶ 36. And, when Plaintiffs reasonably request information related to the Settlement's implementation, the City must provide that information within 14 days. *Id*. ¶ 118.

The City is not complying with these provisions.

### A.  Lapses in monthly reporting

The City is not disclosing monthly updated lists of restored addresses. The City last provided Plaintiffs with a list of restored homes on July 14, 2021. To the extent any restoration has occurred in the last 14 months, the City has not provided an updated list with those restored addresses, as required. Moreover, the list the City has provided is inaccurate and underinclusive. In the parties' meet and confer on August 29, 2022, the City stated that it possessed additional restoration records not previously shared with Plaintiffs. These include records from EGLE indicating certain addresses where EGLE reimbursed the City for restoration work and records from ROWE analyzing those EGLE records. To comply with its reporting obligations, the City must provide an updated list of all addresses where restoration has been completed based on these additional records. Additionally, going forward, the City must provide an updated restoration list monthly. *See* ECF No. 217 ¶ 7.iii.

## B.    Failure to respond to information requests

The City has not timely responded to Plaintiffs' reasonable requests for the City's additional records of completed restorations (the EGLE and ROWE records described above). Plaintiffs have requested those records via email four times. Sept. 1, 2022 Em. fr. A. Rolnick to W. Kim; Sept. 14, 2022 Em. fr. A. Rolnick to W. Kim; Sept. 19 Em. fr. A. Rolnick to W. Kim; Sept. 21 Em. fr. A. Rolnick to W. Kim. The City has not provided these records or a timeline for doing so. To comply with the Settlement, the City must promptly provide all restoration records.

## C.    Failure to maintain restoration records

Most fundamentally, the City has not maintained records of every address at which it has completed a restoration. On August 30, 2022, and again on September 19, 2022, the City acknowledged that it does not have records of all addresses at which it previously conducted restoration, and that, as a result, the City does not currently know how many previously excavated homes still require restoration under the Settlement. These recordkeeping gaps constitute noncompliance with the Settlement's basic requirement that the City track addresses where it completes restoration.

Without such documentation, the parties have no way of assessing the scope of remaining required restoration work. The City's failure to maintain and report accurate restoration information is also impeding the parties' negotiations to identify a reasonable deadline for completing the remaining restoration work. *See* ECF No. 237 ¶ 6. This noncompliance has generated three challenges that must be promptly resolved.

First, the parties must agree on a plan and timeline to identify how many addresses remain to be restored. The City has stated that it needs more time to evaluate the remaining scope of restoration work. This evaluation must be done as quickly as practicable.

Second, under the 2022 Stipulation, the parties must agree on a deadline by which the City must complete the remaining restoration work. During the parties' meet and confer, Mr. Kim suggested that December 31, 2023, may be a conservative estimate for when the City could complete all restoration. While Plaintiffs remain willing to agree to a restoration deadline that is reasonable and workable, the deadline must be tailored to a reasonable estimate of the amount of work remaining—an estimate the City has not yet generated.

Third, the parties must agree on a process for retroactively filling in the City's restoration recordkeeping gaps. The City stated that it intends to conduct visual inspections of as many as 20,000 previously excavated homes to confirm whether restoration was completed at those addresses at any point in the last several years. In effect, the City is proposing that in lieu of maintaining a contemporaneous record of completed restoration at every address, it will retroactively "deem" some addresses restored if a visual inspection reveals that restoration has been completed—whether by the City, the resident, or someone else. The parties must agree to the scope of this exemption, the criteria for visual inspection, and a process for notifying residents of the City's determination.

Plaintiffs propose the following process for reaching agreement on these three issues. Plaintiffs may identify additional measures needed to fully resolve this dispute concerning restoration based on further discussion among the parties.

1. **Reporting on scope of restoration work:** Within the next week, the City must update the parties with a list of addresses where it has already conducted a visual inspection and the result of such inspection. Beginning with its October monthly status report, the City must include information on its efforts to determine the scope of remaining restoration work required by the Settlement, including information about the homes where the City confirmed by visual inspection that an address has been previously restored.

2. **Restoration Plan:** The parties must agree on a detailed plan and schedule for identifying the scope of remaining restoration work and completing that work.

   a. **Procedure for Creating a Plan:** The City must immediately create and provide a proposed plan to the other Parties for review. The parties will then promptly meet and confer to discuss the City's proposal. All parties must agree that the Restoration Plan is adequate and sufficiently detailed to ensure prompt identification of the scope of remaining restoration work and completion of that work.

   b. **Contents of the Restoration Plan:**

      i. **Determining the scope of remaining restoration work:** As explained in Plaintiffs' September 21, 2022 email, the City must share a proposal for evaluating the scope of remaining restoration work, including the City's schedule for visually confirming whether addresses still require restoration, and for how to proceed in light of the Parties' upcoming October 31, 2022 deadline to negotiate a restoration deadline.

      ii. **Basis for deeming a home restored and communicating that determination to residents:** As discussed during the parties' September 19, 2022 meeting, the City must propose criteria for determining, based on visual inspection, that a previously excavated address with no record of prior full restoration no longer requires restoration. The City must also propose processes for communicating to residents the results of ROWE's visual inspection and resolving any disputes concerning the City's determination about whether additional restoration is needed.

      iii. **Proposal for completing restoration work:** The proposed Restoration Plan must also include a detailed proposed schedule for completing the remaining restoration work.

### III.    Additional outstanding information requests

In their August 19, 2022 letter, Plaintiffs made a number of requests for written information related to the implementation of the Settlement. While the City answered some of these questions orally during the parties' meeting on August 30, 2022, it has not provided any answers in writing, as required by the Settlement. *See* ECF No. 147-1 ¶ 118. Please provide written answers to the questions in the second, third, and sixth bullets in the August 19 letter as soon as possible.

*        *        *

Plaintiffs have separately reached out to counsel for the City and State concerning scheduling a meet and confer in person in Flint the week of October 10. Plaintiffs request that the City Administrator, Mayor Neeley, and appropriate officials from the Department of Public Works and ROWE attend this meeting. Plaintiffs also request that a representative from Lakeshore Global Services attend this meeting; as the contractor performing the remaining excavation, replacement, and restoration work, Lakeshore's perspective and input is critical to resolving the parties' disputes.

Thank you for your prompt attention to these issues.

Sincerely,

_____

Adeline S. Rolnick

cc (via email):    Sarah Tallman, stallman@nrdc.org; Melanie Calero, mcalero@nrdc.org,
Bonsitu Kitaba, bkitaba@aclumich.org; Daniel Korobkin,
dkorobkin@aclumich.org; Richard Kuhl, kuhlr@michigan.gov; Nate Gambill,
gambilln@michigan.gov; George Krisztian, krisztiang@michigan.gov

# Exhibit 18

PCA-106

# NRDC

May 4, 2021

VIA EMAIL

Angela Wheeler
William Kim
City of Flint Department of Law
1101 S. Saginaw Street, Third Floor
Flint, MI 48502
awheeler@cityofflint.com
wkim@cityofflint.com

City of Flint
ATTN: City Administrator Clyde Edwards
City Hall
1101 S. Saginaw Street, First Floor
Flint, MI 48502
cedwards@cityofflint.com

> Re:  Notice of City of Flint's Violations of Settlement Agreement and Court Order and Request for Information Showing Compliance, *Concerned Pastors for Social Action v. Khouri*, No. 16-10277 (E.D. Mich.)

Ms. Wheeler, Mr. Kim, and Mr. Edwards:

Pursuant to Paragraph 128 of the Settlement Agreement, Plaintiffs provide notice of the City's noncompliance with the Court's October 13, 2020 Order, ECF No. 228, and with the Settlement, ECF No. 147-1 (Agmt.), as modified in July 2018, February 2019, and August 2020. *See* ECF Nos. 174, 207, 208, 217.

The City was required to complete all in-person outreach by October 20, 2020, and to complete all remaining excavation work by November 30, 2020. *See* ECF No. 228 at 15-16. The City failed to meet both of those deadlines, and still has not completed the required outreach and excavation work. The City is also persistently failing to comply with its obligations to submit weekly reports of its outreach efforts and monthly reports of its excavation, replacement, and restoration activity, and to timely respond to Plaintiffs' reasonable requests for information related to Settlement implementation. These reporting failures are hindering the parties' ability to set new deadlines under the Settlement: Plaintiffs cannot assess how much time is needed for the

City to complete the required outreach, excavation, replacement, and restoration work without a clear understanding of the remaining scope of work.

Plaintiffs have attempted to resolve these issues with the City since December, and we would prefer to work with the City to agree to reasonable modifications to the remaining Settlement deadlines without having to seek the Court's adjudication of this issue. However, for Plaintiffs to continue these negotiations, the City must promptly remedy the violations of the Settlement described below.

## A.    Outreach Obligations

The Settlement requires the City to visit every home twice to try to obtain the resident's consent to conduct a service line excavation. ECF No. 174 ¶ 15.a. One of those outreach visits must occur after 5:00 pm or on a weekend. *Id.* The Court ordered the City to complete the required in-person outreach at all homes by October 20, 2020. *See* ECF No. 228 at 15-16. The Court also ordered the City to report weekly to Plaintiffs the dates of any in-person outreach, including the result of the outreach attempt. *Id.* These outreach requirements reflect the parties' agreement as to the appropriate minimum contact attempts required to ensure each resident has meaningful notice of their ability to participate in the pipe replacement program. The City has been in violation of the Court-ordered outreach deadline for six months, and has repeatedly violated the Court's order to provide Plaintiffs with weekly outreach reports.

### 1.    Failure to meet the Court-ordered outreach deadline

The City has not yet completed the required outreach to obtain residents' consent to excavate their service lines, and remains in violation of the Court's October 20, 2020 deadline. There is no excuse for the City's failure to prioritize completing this required outreach. Over the past several months, Plaintiffs have repeatedly provided the City with the list of addresses still missing required outreach. While the City has repeatedly assured Plaintiffs that it would complete outreach at those homes—and most recently represented to Plaintiffs that the outreach had been completed—Plaintiffs' analysis of the City's data shows that there are still more than 400 homes that have not received the required outreach. *See* Email from J. McLaughlin to W. Kim & A. Wheeler (Feb. 26, 2021) (attaching spreadsheeted titled "2.26.21 List of homes with outstanding outreach obligations.xlsx").

The City's ongoing delays in completing the remaining outreach are preventing the parties from agreeing to a new deadline for residents to submit consent forms. As Plaintiffs and the City have discussed and consistent with the Court's October 13, 2020 order, the City must complete this outreach as soon as possible, and must provide documentation that it has completed the required outreach before imposing a deadline for consent forms. *See* ECF No. 228

at 15-16. Please complete the required outreach by no later than May 18 and provide documentation showing that the City has completed this work no later than May 25. *See infra* Part A.3 for Plaintiffs' request concerning the format of this documentation.

### 2.      Failure to provide weekly reports on outreach efforts

Despite the Court's order requiring the City to provide Plaintiffs with weekly outreach data, since the end of October 2020, the City has provided outreach data only on November 25, December 9, and December 14, 2020, and April 7, 2021. Although we understand that work was paused during some of this time, the City's routine failure to provide data weekly, especially since restarting work this spring, is unacceptable. Plaintiffs have repeatedly raised these issues with the City, including through countless emails and by filing two motions to enforce the Settlement with the Court. *See* Pls.' First Mot. to Enforce Settlement, ECF No. 155; Pls.' Fourth Mot. to Enforce Settlement, ECF No. 218.

By May 11, please (1) provide any outstanding data on outreach, (2) confirm the City will provide this data weekly going forward, and (3) identify what day of the week the City will submit its future weekly reports.

### 3.      Failure to respond to Plaintiffs' reasonable requests for documentation concerning outstanding outreach

The Settlement requires the City to respond to Plaintiffs' reasonable requests for "information, documents, or records related to implementation of this Agreement" within fourteen days of the request. Agmt. ¶ 118. Since the City failed to complete the required outreach by the Court-ordered deadline, Plaintiffs have repeatedly asked the City for documentation of its outreach attempts at certain homes identified by Plaintiffs as still requiring additional outreach. The City has failed provide the requested documentation.

Plaintiffs shared spreadsheets via email on January 6, February 3, and February 26 listing over 400 addresses at which Plaintiffs' analysis shows that outreach is still needed. With this Notice of Violation, Plaintiffs are providing an updated version of this list, which contains 441 homes. Plaintiffs have done so in an effort to reach an understanding with the City about whether the City has completed the required outreach and thus is permitted to set a consent-form deadline. During a call on February 26, the City explained that it would provide Plaintiffs with updated data that might show that the City had conducted additional outreach at these homes. More than a month later, on April 1, the City shared a spreadsheet titled "2020-03-31 Outstanding work orders.xlsx," purportedly listing all homes that have not yet received an excavation or replacement. On April 7, the City asserted that it had completed the required outreach at all homes and shared a spreadsheet listing recent outreach attempts at 36 homes. The

3

vast majority of addresses Plaintiffs had identified as needing outreach were not listed on either spreadsheet the City provided in April. Plaintiffs' analysis continues to show more than 400 homes with outstanding required outreach.

In light of the City's April 1 email proposing a May 7, 2021 consent-form deadline, Plaintiffs emailed the City on April 12 requesting again that the City explain this discrepancy between Plaintiffs' and the City's analyses of the outstanding outreach work. To date, the City has not responded to Plaintiffs' April 12 email. Pursuant to Paragraph 118, please provide an explanation of this discrepancy and/or documentation of outreach at the homes listed on the enclosed spreadsheet titled "5.3.21 List of homes with outstanding outreach obligations.xlsx" no later than May 25. Please ensure that the documentation the City provides includes a spreadsheet with rows listing each of these 441 homes, and for each home, the dates of outreach attempts made and an indication of whether consent has been obtained.

### B.     Excavation Obligations

The Court's August 24, 2020 Order modifying the Settlement required the City to complete all excavations by November 30, 2020. ECF No. 217 ¶ 1. In addition, this Order requires the City to share monthly reports of its excavation efforts. *Id.* ¶ 7. The City has violated both of these requirements for months.

#### 1.     Failure to complete required excavations

The City does not dispute that it missed the Court-ordered deadline to complete all excavation work: As the City shared via email on April 1, 2021, it believes that at least 689 homes still require excavation.[1] To address this noncompliance, Plaintiffs remain willing to renegotiate new deadlines with the City that give the City sufficient time to finish the outstanding work. However, we have been unable respond to the City's proposed modified deadlines because the City's ongoing reporting violations described in this letter leave the amount of remaining work unclear.

---

[1] The City may deem an address "complete" for purposes of the Settlement if it completes an excavation at that address, if it completes the required in-person consent attempts and receives no response from the resident, or if it completes the required post-consent scheduling attempts and receives no response from the resident. ECF No. 217 ¶¶ 4 (excavation), 7 (consent attempts), 6 (scheduling attempts).

PCA-110

### 2.      Failure to provide monthly reports on excavation efforts

The City is also violating the Settlement's monthly reporting obligations. The City must provide monthly updated lists on the 28th of each month of (i) addresses where the City has completed excavations and replacements, (ii) addresses where residents have declined service line excavations and replacements, and (iii) addresses where the City was unable to obtain permission to conduct an excavation despite undertaking all required outreach. ECF No. 208 ¶ 6; ECF No. 217 ¶ 7. Despite the Court's October 2020 Order reiterating the City's reporting obligations, the City continues to fail to consistently provide this data on the required timeline. By May 11, please provide any outstanding data on excavation and replacement, including required lists of homes where residents have declined an excavation (declination list) or failed to respond to the City's outreach efforts (non-response list).

### C.      Restoration Obligations

The 2020 Stipulation requires the City to provide documentation of restoration on the 28th day of each month. ECF No. 217 ¶ 7.iii. As we have repeatedly informed the City—via email on January 6, February 26, and March 17, and during our February 26 call—the City is continuing to violate this requirement. The City has never provided monthly restoration data, instead providing documentation of restoration work only twice, via emails on December 11, 2020, and January 8, 2021. The documentation contains lists of addresses where restoration was completed during a "phase" of the City's work. *See*, *e.g.*, Email from W. Kim to S. Tallman (Dec. 11, 2020) (attaching spreadsheet titled "Phase 5 & 6 Restoration Complete.xlsx").

Based on the limited restoration data the City has provided, it appears that there is a significant number—over 8,000—of already-excavated addresses with restoration work outstanding. *See* Email from J. McLaughlin to W. Kim and A. Wheeler (Feb. 26, 2021) (attaching spreadsheet titled "2.26.21 List of homes with outstanding restoration obligations.xlsx").[2] Despite Plaintiffs' repeated requests for the City to confirm the scope of the remaining restoration work, the City has failed to confirm whether there are in fact 8,000 addresses that still need to be restored, or alternatively, whether it has not-yet-disclosed data showing completed restoration work at some or all of these 8,000 addresses. Indeed, the data the City has provided does not appear to cover all phases of the City's pipe replacement program. During a call on February 26, the City suggested that the Department of Transportation may have

---

[2] In the event that Plaintiffs identify some homes on the restoration lists the City provided that have not been properly or fully restored, additional restoration work may be required to fulfill the City's restoration obligations. This potential additional work would also affect Plaintiffs' willingness to agree to a modified deadline for completion of restoration work.

PCA-111

some additional restoration data, and that the City would work with that department to share that data with Plaintiffs. Plaintiffs have not received any updated restoration data since January 8, 2021.

Because Plaintiffs do not know how much restoration work still needs to be completed, we cannot assess whether the City's proposed modified deadline to complete all restoration—September 30—is reasonable. Prompt sharing of this data is thus critical to facilitate the parties' agreement to new modifications to the Settlement's remaining deadlines. Resolving the possible restoration discrepancies will also help avoid future disputes as to whether the City has completed its obligations relating to the service line replacement program. *See* Agmt. ¶ 45.

By May 11, please (1) confirm that going forward the City will comply with its obligation to provide updated restoration data with its monthly status reports; (2) describe how the City tracks and maintains data on restoration, including what entities within the City or ROWE are responsible for keeping these records; and (3) provide any restoration data not previously shared with Plaintiffs, including by working with City departments, such as the Department of Transportation, to identify and compile the required data. Unless the City provides documentation demonstrating completed restoration at the 8,000 homes on the list Plaintiffs shared on February 26, Plaintiffs will consider the City's restoration obligations as to these homes incomplete.

Plaintiffs are available to meet and confer with the City to discuss these matters on Tuesday, May 11: 12-1pm or 4-5pm ET; Thursday, May 13: 12-1pm or 3-4pm ET; or Friday, May 14: 10am-2pm or 3-4pm ET. Please let us know if the City is available at any of these times.

Sincerely,

Sarah C. Tallman

Encl. ("5.3.21 List of addresses with outstanding outreach obligations.xlsx")

cc (via email):     Jolie McLaughlin, jdmclaughlin@nrdc.org; Addie Rolnick,
                    arolnick@nrdc.org; Bonsitu Kitaba, bkitaba@aclumich.org;
                    Richard Kuhl, kuhlr@michigan.gov; Nate Gambill, gambilln@michigan.gov;
                    George Krisztian, krisztiang@michigan.gov

PCA-112

Exhibit 19

May 3, 2023

VIA EMAIL

Joseph Kuptz
William Kim
City of Flint Department of Law
1101 S. Saginaw Street, Third Floor
Flint, MI 48502
jkuptz@cityofflint.com
wkim@cityofflint.com

City of Flint
ATTN: City Administrator Clyde Edwards
City Hall
1101 S. Saginaw Street, First Floor
Flint, MI 48502
cedwards@cityofflint.com

Re:     Notice of City of Flint's Violations of Settlement Agreement in *Concerned Pastors for Social Action v. Khouri*, No. 16-10277 (E.D. Mich.)

Dear Messrs. Kuptz, Kim, and Edwards:

Pursuant to Paragraph 128 of the Settlement Agreement ("Agreement"), Plaintiffs provide notice of the City's noncompliance with the Agreement, as modified. *See* ECF Nos. 147-1, 174, 207, 208, 217, 237, 258. The City did not finish filling its restoration recordkeeping gaps and provide a complete list of previously excavated addresses and their restoration status by the Court-ordered deadline of May 1, 2023. *See* ECF No. 258 at 16. The City is also not meeting its obligations to complete and report outreach and to provide reporting on restoration.

Plaintiffs are eager to resolve these issues to ensure the City completes the excavation, replacement, and restoration work as quickly as possible, and have endeavored to resolve disputes concerning the City's noncompliance in good faith over the last two months. *See* Feb. 22, 2023 Ltr. Fr. A. Rolnick to J. Kuptz; Mar. 10, 2023 Ltr. Fr. A. Rolnick to J. Kuptz; Mar. 22, 2023 Em. Fr. A. Rolnick to J. Kuptz; April 12, 2023 Ltr. Fr. A. Rolnick to J. Kuptz; Apr. 25, 2023 Em. Fr. A. Rolnick to J. Kuptz. Despite these efforts, the City's violations continue. Plaintiffs provide notice pursuant to Paragraph 130 of the Agreement that, if the City does not expeditiously cure the violations detailed below, Plaintiffs intend to file a motion to enforce the Agreement and hold the City and Mayor Sheldon Neeley[1] in contempt for its repeated violations of the Agreement.

---

[1] Mayor Neeley is bound by the Agreement as Flint's chief executive officer. *See* Fed. R. Civ. P. 65(d)(2)(B).

I.      **The City missed the deadline to determine the remaining scope of restoration work**

The Court ordered the City to confirm the restoration status of all previously excavated homes and provide a list to Plaintiffs detailing this information by May 1, 2023. ECF No. 258 at 16. The City did not meet this deadline. And, a week before the deadline, it still could not provide an estimate of the remaining number of addresses where visual inspections are required to confirm restoration status. Apr. 25, 2023 Em. fr. A. Rolnick to J. Kuptz. This missed deadline impedes the parties' ability to promptly negotiate a restoration deadline and thereby exacerbates the already significant delay in the City's required repair of residents' properties. *See* ECF No. 217 ¶ 1. The City must verify the restoration status of all previously excavated addresses and provide that information to Plaintiffs as soon as possible.

II.     **The City is failing to comply with its outreach obligations**

As Plaintiffs have previously documented and the City has confirmed, the City failed to meet its March 1, 2023 deadline to complete outreach to all homes on the 2022 Replacement Eligible Homes List. *See* ECF No. 258 at 19, Feb. 22, 2023 Ltr. fr. A. Rolnick to J. Kuptz; Mar. 10, 2023 Ltr. fr. A. Rolnick to J. Kuptz; Mar. 30, 2023 Em. fr. A. Rolnick to J. Kuptz; April 12, 2023 Ltr. fr. A. Rolnick to J. Kuptz; Apr. 25, 2023 Em. fr. A. Rolnick to J. Kuptz; Apr. 28, 2023 Em. fr. A. Rolnick to J. Kuptz. The City has explained that it missed this deadline in part because it wrongly instructed its contractors not to complete outreach at homes on the 2022 Replacement Eligible Homes List without current active water accounts. The City also failed to document the times of consent attempts performed during the fall of 2022 and submitted incomplete reporting. ECF No. 208 ¶ 6(v)(2); April 12, 2023 Ltr. fr. A. Rolnick to J. Kuptz; February 22, 2023 Ltr. fr. A. Rolnick to J. Kuptz.

The City has not yet cured either of these violations. As of April 25, the City stated that it had remaining outreach obligations to at least 674 homes. Apr. 25, 2023 Em. fr. A. Rolnick to J. Kuptz. The City also stated that it has outstanding outreach obligations to 98 addresses where it performed consent attempts in the fall of 2022, but did not record the times of those consent attempts. Apr. 30, 2023 Em. fr. J. Kuptz to A. Rolnick. While the City shared on April 30 that it has since completed outreach at "most[]" of these homes, *id.*, the City has not yet provided documentation of this outreach. The City must remedy its violations by completing this overdue outreach and providing documentation to Plaintiffs as quickly as practicable, so as to avoid further use of the parties' and the court's resources on this dispute. To that end, please provide reporting demonstrating that the City has cured this violation as soon as the City comes into compliance, including if the City comes into compliance before its next monthly report is due.

III.    **The City is failing to provide compliant restoration reporting**

The City is failing to comply with the Agreement's clear restoration reporting requirements. *See* ECF No. 258 at 24-25. The City provided reporting for only some addresses on May 1, and this report did not cure the violations Plaintiffs previously noticed. *See* Mar. 10, 2023 Ltr. fr. A. Rolnick to J. Kuptz; Apr. 12, 2023 Ltr. fr. A. Rolnick to J. Kuptz. Indeed, the report is missing data for thousands of previously excavated addresses, including addresses where the City has purportedly conducted visual inspections. *See* May 2, 2023 Em. fr. M. Calero

to J. Kuptz. The City must cure its violation by providing a compliant restoration report including all previously excavated addresses as soon as possible.

*    *    *

Plaintiffs are available to discuss these matters at the following times (all EST):

Monday, May 8: 10:00 am – 1:00 pm, 4:00 pm – 5:00 pm
Tuesday, May 9: 4:00 pm – 5:00 pm
Wednesday, May 10: 11:00 am – 12:00 pm
Thursday, May 11: 10:00 am – 1:00 pm
Friday, May 12: 9:00 am – 1:00 pm

Sincerely,

Adeline S. Rolnick

cc (via email):    Sarah Tallman, stallman@nrdc.org; Melanie Calero, mcalero@nrdc.org, Bonsitu Kitaba, bkitaba@aclumich.org; Richard Kuhl, kuhlr@michigan.gov; Nate Gambill, gambilln@michigan.gov

Exhibit 20



**Michigan's nonpartisan, nonprofit news source**

MENU

**If you care about Michigan, please support our work.**

**DONATE TODAY**

**TRENDING:**

**Coronavirus Michigan** | **Michigan K-12 schools** | **Gov. Gretchen Whitmer** |
**Rural Michigan** | **2022 Michigan election**

Michigan Environment Watch

# Flint misses new deadline in long-overdue lead line replacement effort



Flint has repeatedly missed deadlines to remove all lead service lines from the city's water system. (Bridge file photo)

 **May 4, 2023**

 **Kelly House** (**Email**)

PCA-118



**Michigan Environment Watch**

🏷 **Flint water crisis**

**SHARE THIS:**

---

Listen To The Article  ⓘ

≡₊ Listen later

᛫ᚦ ADAURIS

---

- *Flint originally agreed to finish replacing the city's lead service lines by 2020*
- *After multiple missed deadlines, a judge in February ordered the work completely done by August*
- *Plaintiffs say the city is already missing deadlines related to that order*

---

Two months after a judge ordered new deadlines for lead line replacement work that was supposed to be done three years ago, plaintiffs in a settlement with the city of Flint say the city has again fallen behind.

As Bridge reported earlier this year, up to thousands of Flint resident are still waiting for service line inspections or dealing with torn-up yards and sidewalks because work crews failed to clean up after past inspections.

As part of a 2017 settlement that Flint reached with city residents and advocacy groups (Concerned Pastors for Social Action, Flint resident Melissa Mays, the Natural Resources Defense Council and the ACLU of Michigan), the city was supposed to excavate some 31,500 service lines at Flint homes, and replace those that might contain lead by January 2020.

**Related:**

- **U.S. Judge: Flint has 5 months to finish long-overdue lead pipe replacement**
- **Flint residents still fighting to replace lead pipes, get torn yards fixed**
- **Why Flint's lead pipe replacement costs so much, and moves so slowly**
- **Flint finds replacing lead pipes isn't easy. Even when state promises to pay**

But that work has dragged on for years longer than it was supposed to, as Flint struggled against pandemic work stoppages, supply chain issues, trouble with contractors and recordkeeping lapses.

U.S. District Court Judge David M. Lawson in February set a new deadline of May 1 for Flint officials to figure out which properties are still damaged. Lawson gave the city until August 1 to finish the rest of the $97 million lead line replacement effort.

But Addie Rolnick, a Washington, D.C. based lawyer with the Natural Resources Defense Council, one of the plaintiffs, told Bridge that Flint has missed the May 1 deadline as well as a March deadline to conduct outreach to all residents still eligible for service line inspections.

"The city has mismanaged this program for years," Rolnick said, and the latest setbacks are "deeply concerning."

"There are residents who have been waiting years for the city to come back and repair their properties, who have really been in limbo," Rolnick said.

Flint officials acknowledge they missed the deadlines, but city spokesperson Caitie O'Neill said the city is working to catch up and isn't far behind.

"Our crews have doubled," O'Neill said, "and they're closing in on it."

At the time of the February court order, plaintiffs estimated that about 1,000 Flint homes still needed their pipes checked for lead, and thousands more may be dealing with property damage from past excavations.

The lead line replacement effort is a crucial step in the city's recovery from the Flint water crisis, which began in 2014 after a state-appointed emergency manager approved a disastrous switch of Flint's water supply from Detroit's system to the Flint River in a cost-cutting measure, without requiring anti-corrosion treatment.

The change in water chemistry allowed lead to leach from city pipes, prompting a crisis that grabbed national headlines and coincided with a Legionnaires' disease outbreak that killed at least 12 people.

Although the city has since switched back to Detroit water, health experts advise Flint residents to drink only filtered water until all city lead lines have been replaced.

Rolnick said plaintiffs are "considering all options," in light of the latest missed deadline.

**Related Articles:**



## Opinion | Flint vowed to replace lead pipes by 2020. We're still waiting

April 14, 2023 | **Allen Overton**, **Melissa Mays** in **Guest Commentary**



## New appeal of $626 million Flint water deal in dispute over lawyer fees

April 4, 2023 | **Kelly House** in **Michigan Environment Watch**



## Michigan judge approves $626 million Flint water crisis settlement

March 21, 2023 | **Kelly House** in **Michigan Environment Watch**

# Michigan Environment Watch

Michigan Environment Watch examines how public policy, industry, and other factors interact with the state's trove of natural resources.

- See full coverage
- Subscribe
- Share tips and questions with Bridge environment reporter Kelly House

Michigan Health Watch is made possible by generous financial support from:

  

Our generous Environment Watch underwriters encourage Bridge Michigan readers to also support civic journalism by becoming Bridge members. Please consider joining today.

  

**MOST READ**

PCA-122

1  **Michigan home values among lowest in U.S. What do they sell for in your ZIP?**

2  **Ticks in Michigan. What you need to know and how to protect yourself.**

3  **'Red flags' surround $25M health campus pushed by ex-Michigan House speaker**

**EDITOR'S CHOICE**

**No criminal charge? No problem! Michigan police can still take your car**

**Bridge Lunch Break to discuss preparing for careers in Michigan**

**DeSantis brings war on 'woke' to Michigan, teases run against Trump**

**Only donate if we've informed you about important Michigan issues**

See what new members are saying about why they donated to Bridge Michigan:

- "In order for this information to be accurate and unbiased it must be underwritten by its readers, not by special interests." - Larry S.
- "Not many other media sources report on the topics Bridge does." - Susan B.
- "Your journalism is outstanding and rare these days." - Mark S.

If you want to ensure the future of nonpartisan, nonprofit Michigan journalism, **please become a member today**. You, too, will be asked why you donated and maybe we'll feature your quote next time!

  


DONATE NOW



   

[Home](#)

PCA-123

Popular

Topics

Special Reports

Archive

About

Subscribe

Contact

---

©2023 Bridge Michigan. All rights reserved.

 Website by Gravity Works

Exhibit 21

From:        Calero, Melanie
To:          Joseph Kupt ; Kuhl, Richard A. ; Tallman, Sarah ; William Kim ; kris_tiang@michigan.gov ; Russell, rin L. ;
             Clyde dwards ; Rolnick, Addie ; Bonsitu Kitaba ; andal, icole
Subject:     R : Concerned Pastors, et al v City of lint, et al re: April 2023 Monthly Report
Date:        Tuesday, May 2, 2023 4:20:00 PM

Joe,

Thank you for sharing this information.

This report does not comply with the restoration reporting requirements delineated in the Court's order. For every previously excavated address, the City must report whether (1) the City has a contemporaneous record of restoration or (2) the City has no contemporaneous record of restoration and either has completed or plans to complete a visual inspection or further records review. *See* ECF No. 258 at 24-25. This report reflects data for a total of only approximately 16,000 excavated addresses, rather than providing information on restoration status for the total number of addresses (over 27,000) the City has excavated to date. The City is also required to report "[a]ll previously excavated addresses where the City has contemporaneous documentation of completed restoration," but there does not appear to be a tab in the report containing this information. *Id*. Finally, the call log documenting calls from residents or property owners regarding visual inspections is missing address information for one of the entries—please ensure that, going forward, address information is logged, as required by the order. *Id*.

We also have some follow-up questions regarding this report. **Please provide written responses to these questions as soon as possible:**

1. **Can you please explain what the data in the "TBD" tab reflects?** It seems to include addresses where the City has records of partial or complete restoration and addresses where the City does not have records of restoration. **Do the listed addresses need to be categorized into the correct tabs following further records review, or do all of these addresses require visual inspections? In particular, if an address has blank cells in the columns regarding dates of restoration, does that mean that address requires a visual inspection, or is that entry reflecting that the address is a "known home to complete"?**

2. The report includes data for 2,056 homes that have been visually inspected, but the City previously stated that it has completed nearly 6,000 visual inspections. **Does this report document every visual inspection the City has completed (as of the end of the reporting period) that complied with the terms of the February 2023 order?**

3. The report seems to include data for only 37 of the homes inspected in the fall. **Does the City have additional records for the addresses that were inspected in the fall?**

4. Some of the addresses in the "homes completed based on VI" tab seem to have contemporaneous documentation of fully completed restoration. **Can you confirm that all addresses for which the City is conducting visual inspections are addresses for which the City concluded it lacks contemporaneous records of fully completed restoration?**

5. With respect to communications from residents or property owners regarding the visual inspections, we have noticed that the phone number goes straight to voicemail when called. **Is the City/ROWE answering calls to this number during business hours, or is it only responding to voicemails? In addition, did the City receive any emails from residents or**

**property owners during the reporting period concerning the visual inspections?**

6. You mentioned that the number of crews conducting visual inspections has increased. **Does the City have an updated estimate as to how many addresses still require visual inspections? In addition, does the City have an expected completion date for the visual inspection work?**

Regards,
Melanie

MELANIE CALERO
**Attorney**

NATURAL RESOURCES DEFENSE COUNCIL
40 W 20TH STREET
NEW  ORK, N  10011
MCALERO@NRDC.ORG
PRONOUNS: SHE/HER

---

**From:** Joseph Kuptz <jkuptz@cityofflint.com>
**Sent:** Monday, May 1, 2023 4:40 PM
**To:** Kuhl, Richard (AG) <kuhlr@michigan.gov>; Tallman, Sarah <stallman@nrdc.org>; William Kim <wkim@cityofflint.com>; krisztiang@michigan.gov; Russell, Erin (EGLE) <russelle@michigan.gov>; Clyde Edwards <cedwards@cityofflint.com>; Rolnick, Addie <ARolnick@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Calero, Melanie <mcalero@nrdc.org>; Vandal, Nicole <nvandal@nrdc.org>
**Subject:** Re: Concerned Pastors, et al v City of Flint, et al re: April 2023 Monthly Report

Please see the attached updated monthly report in this matter. I have only attached new spreadsheets that were not included in the previous email.

I also note that, effective today, Rowe has essentially doubled the number of teams, to 7, that are conducting restoration status site visits.

Thank-you.


Joe


On Fri, Apr 28, 2023 at 7:39 PM Joseph Kuptz <jkuptz@cityofflint.com> wrote:

Please find attached the City of Flint's April, 2023 monthly report in this matter.

Thank-you.

Joe

--
Joseph N. Kuptz, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2085

--
Joseph N. Kuptz, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2085

# Exhibit 22

March 10, 2023

VIA EMAIL

Joseph Kuptz
William Kim
City of Flint Department of Law
1101 S. Saginaw Street, Third Floor
Flint, MI 48502
jkuptz@cityofflint.com
wkim@cityofflint.com

      Re:     Notice of Violation and Request for Meet and Confer in *Concerned Pastors for Social Action v. Khouri*, No. 16-10277 (E.D. Mich.)

Dear Messrs. Kuptz and Kim:

      We write to provide notice of the City's violations of the Settlement Agreement ("Agreement") and the Court's order granting Plaintiffs' Fifth Motion to Enforce the Agreement. *See* ECF No. 258. Plaintiffs sought to enforce the Agreement a fifth time to ensure the City finishes its long-overdue work as soon as practicable. Despite the Court's recent grant of Plaintiffs' motion, the City continues to persistently violate the Court's orders, including as to issues the parties litigated over the past four months.

      Plaintiffs are deeply troubled by the City's continuing violations. Immediate compliance with all requirements is imperative to ensure that the parties work towards a shared understanding of the City's implementation of its obligations and that the City completes the remaining service line replacement and restoration work by the upcoming deadlines. Moreover, the City's pattern of noncompliance is inefficient and time-consuming for all parties. Plaintiffs' counsel are spending significant time and resources documenting the City's violations, notifying the City of those violations, and resolving disputes. All of this would be unnecessary if the City complied with its obligations in the first instance.

      At the parties' upcoming meeting on March 17, 2023, please be prepared to discuss the following.

## I.    The City's continuing and persistent violations of the Court's orders

###     A.    The City must immediately complete any remaining required consent attempts and provide documentation showing that it has completed this work

      After failing to complete outreach at all homes on the 2022 Replacement Eligible Homes List by September 30, 2022, in violation of the Agreement, *see* ECF No. 237 ¶ 1, the City stipulated to completing this outreach as quickly as practicable and by no later than January 24,

2023, ECF No. 256 ¶ 11.g. The City has either failed to meet that deadline, failed to provide required reporting on its consent attempts, or both.

During the parties' meeting on February 16, 2023, Mr. Kuptz stated that the City had completed the required consent attempts at all homes on the 2022 Replacement Eligible Homes List. However, as reflected in the enclosed spreadsheet (file titled, "2023-03-10 Outreach Scope of Work"), this statement is inconsistent with the City's reporting.[1] That reporting shows that the City has completed the required attempts, or otherwise fulfilled its obligations, at only 236 of the over 1,200 addresses where it had remaining outreach obligations a year ago. And the City has reported *no* attempts at 825 of these homes.

The City's failure to either complete and/or document outreach as to these homes is unacceptable. The City agreed to perform outreach at all of these homes in fall 2021. Sept. 14, 2021 Em. fr. S. Tallman to W. Kim; Dec. 1, 2021 Em. fr. W. Kim to A. Rolnick. Since then, Plaintiffs have repeatedly identified these addresses as homes where the City has outstanding outreach obligations. *See* Feb. 23, 2022 Em. fr. A. Rolnick to R. Kuhl & W. Kim; Vandal Decl. Ex. 2, ECF No. 242-3. If the City has completed outreach at these homes, its failure to report that outreach violates the Agreement. ECF No. 208 ¶ 6.v. And if the City has not completed outreach at these homes, it has violated the March 1, 2023 deadline to do so. ECF No. 258 at 19.

Before the parties' meet and confer, **please provide documentation of any consent attempts completed in 2022 or 2023 that were not previously reported.** If the City has not completed required outreach at all homes on the 2022 Replacement Eligible Homes List, **at our upcoming March 17 meeting, please explain the discrepancies between the City's statements to Plaintiffs on February 16 and its reporting; describe the City's plans for completing this work as quickly as practicable; and identify the date by which the City will complete this work.** These discrepancies make it difficult for Plaintiffs to reasonably rely on the City's oral statements, which is why Plaintiffs have been requesting responses in writing.

### B.     The City must provide reporting that distinguishes between consent attempts and scheduling attempts

At the parties' February 16 meeting, the City stated that its reporting system does not distinguish between consent attempts and post-consent scheduling attempts. As Plaintiffs have explained multiple times, the Agreement requires the City to distinguish these attempts. ECF 217 ¶ 6; *see, e. .*, Jan. 6, 2021 Em. fr. S. Tallman to W. Kim; March 19, 2021 Em. fr. J. McLaughlin to W. Kim.

---

[1] Plaintiffs' 2023-03-10 Outreach Scope of Work spreadsheet contains information on the City's outreach progress thus far, and shows what addresses still require outreach. It was created by extracting addresses that needed outreach from Plaintiffs' October 2022 Scope of Work List, *see* Vandal Decl. Ex. 2, ECF No. 242-3, and cross-referencing the City's reporting to assess the City's progress. Addresses in the "Progress Made" column marked as "Complete," "Complete outreach reported," "Declination," and "Consent received" do not require further consent attempts. In this same column, addresses marked as "Incomplete outreach reported" and "No outreach reported" require further outreach.

If the City does not do so, Plaintiffs have no way of evaluating whether the City is complying with its post-consent scheduling obligations, an increasingly crucial issue as the City nears the end of the pipe replacement program.

Plaintiffs have previously suggested that if the City provided the date when the resident provided consent, that would enable them to understand which outreach attempts pre- and post-date the consent. The City has not indicated whether this solution is acceptable. **At or in advance of the upcoming meet and confer, please provide a proposal for how the City will distinguish between consent attempts and post-consent scheduling attempts in its reporting.**

### C.     The City continues to violate its restoration reporting requirements

Plaintiffs are mystified by the City's continuing violations of the Agreement's and the February 2023 Order's restoration reporting requirements. ECF No. 217 ¶ 7; ECF No. 258, at 24-25. During the parties' February 16 meeting, the City represented that it completed some restoration during fall 2022. *See* Feb. 22, 2023 Ltr. fr. A. Rolnick to J. Kuptz. The City has yet to provide any compliant reporting of this work. *See* Feb. 22, 2022 Ltr. fr. A. Rolnick to J. Kuptz & C. Edwards; Mar. 1, 2023 Em. Fr. M. Calero to J. Kuptz. In addition, the City failed to provide any restoration reporting—including the reporting required by the Court's order, ECF No. 258 at 24-25—in its February 28, 2023 monthly report. These failures are contumacious, directly contravening the City's recent commitment and the Court's order to provide monthly reporting on ongoing restoration and ongoing efforts to confirm which previously excavated addresses still require restoration. There is no excuse for the City's violations of unambiguous requirements to which the City consented and that permit the City to report addresses as having an unknown restoration status. ECF No. 258 at 24-25.

The City must comply with these requirements so that Plaintiffs can understand the potential scope of remaining restoration work and track the City's progress towards identifying the scope of that work by May 1, 2023. *Id*. at 16. **Please explain the City's efforts to come into compliance, and provide the missing reporting, including reporting on all restoration work completed in 2022, as soon as possible.**

## II.     Additional Restoration Issues

In addition to the above violations of the Agreement, Plaintiffs would also like to discuss the following issues related to the City's work to remedy its restoration recordkeeping violations and identify the remaining scope of restoration work.

### A.     In-person Visual Inspections

On February 16, the City stated that it had completed some visual inspections that did not comply with the Court's February 2023 Order, ECF No. 258, and that the City began employing the Stipulation criteria in its visual inspections on an unknown date in early 2023. The City also stated that it has begun restoring some addresses where it verified incomplete restoration through visual inspections. Notwithstanding that this work has been ongoing for months, the City was unable to answer basic questions about the status of its visual inspections and its progress

towards meeting its May 1, 2023 deadline to identify the remaining scope of restoration work. *See* ECF No. 258 at 16. This information-sharing is essential so that Plaintiffs can confirm that the City is making progress towards filling the gaps in its restoration records by May 1, 2023. The parties must also discuss what processes are appropriate for homes where the City completed visual inspections that do not comply with the Court's order. **Before or at the parties' upcoming March 17 meeting, please provide answers to the following questions:**

1. Please provide (i) the date when the City began conducting visual inspections, and (ii) the date when the City began conducting visual inspections that comply with ¶ 16.b.i of the 2023 Stipulation.

2. Please confirm the date when the City began taking photos of addresses where it has conducted visual inspections, in compliance with ¶ 16.b.ii of the 2023 Stipulation.

3. How many visual inspections has the City performed (i) in total, and (ii) that complied with the terms in ¶ 16.b.i of the 2023 Stipulation?

4. Did the City maintain records concerning any visual inspections performed before the Court issued the February 2023 Order? If so, please describe what informational elements were captured in those records.

5. Do the City's records differentiate between those visual inspections that comply with the 2023 Stipulation terms in ¶16.b.i and 16.b.ii and those that do not?

6. As of February 16, the City was unable to confirm the accuracy of its prior estimate that approximately 6,000 addresses require visual inspections to confirm restoration status. Please confirm that this estimate is accurate or provide an updated number.

7. At the parties' February 16 meet and confer, the City was unable to explain how it has educated personnel conducting inspections about the visual inspection criteria identified in the 2023 Stipulation. Please explain how the City has been educating personnel about the criteria.

In addition, the Court's order requires the City to provide notice to residents if the City decides, as the result of a visual inspection, that it will not be completing future restoration at a home. To the extent the City completed visual inspections without providing this notice, those inspections are insufficient to establish that the City has fulfilled its restoration obligations. *See* ECF No. 258 at 23, 25. To resolve this, Plaintiffs propose that the parties stipulate that the City may send a mailing to any homes where the City completed a visual inspection before the Court's order and determined that the City would not perform future restoration, in lieu of returning to those homes to leave a door hanger. At or in advance of the parties' upcoming meeting, **please share the City's position on this proposal.**

B.       **City's Proposed Use of Aerial Imagery**

Based on the parties' February 16 meeting, Plaintiffs understand the following about the City's proposed use of aerial imagery to identify where restoration work remains:

1.   The City proposes using aerial imagery for as many visual inspections as possible. An individual ROWE employee will examine the corresponding image for each address and determine whether the criteria in Paragraph 16.b.i of the 2023 Stipulation are satisfied. As part of this process, the City will take a screenshot of the aerial image of each address and store that image in CityWorks.

2.   If the restoration status of an address cannot be verified through viewing the aerial images, the City will go to that address in person to determine whether the visual inspection criteria are met. For example, the City will go to an address in person if a tree blocks the relevant part of the aerial image, or if it is not apparent from the aerial image whether a missing piece of sidewalk aligns with the curb box.

3.   The City proposes to use free aerial imagery provided by Genesee County. This imagery has a resolution of 3 inches.

4.   The images the City plans to use were taken in March and April 2022. The City also has access to older images. Where older images are available, the City plans to compare images of an address from different dates to determine whether property damage was caused by a service line excavation.

The parties have a shared goal of identifying the remaining scope of restoration work as quickly and efficiently as practicable, and Plaintiffs remain open to negotiating a process to permit the City to use aerial imagery as part of that work. The City has now shared by email two sample aerial images and a link to the Genesee County aerial imagery the City proposes to use, which Plaintiffs are evaluating. However, as we explained on February 16, Plaintiffs will agree to the aerial imagery process only if the parties agree on a set of consistent procedures that are designed to yield accurate, reliable determinations about where restoration work remains. For example, will the City instruct its contractors to use a checklist when reviewing aerial imagery? When will the City compare images from different dates to evaluate whether property damage was caused by a service line excavation? Under what circumstances will the City inspect a home in person after reviewing its aerial image? What quality assurance/quality control processes will the City use to validate the accuracy and reliability of its methods? In advance of the parties' next meet and confer, **please share in writing what procedures the City proposes to follow in its use of aerial imagery for visual inspections.**

C.       **Settling Period Prior to Restoration**

In the past, the City has represented to Plaintiffs that it must allow the ground to settle for between 30 and 90 days after the pipe excavation and replacement before completing restoration. *See* June 17, 2021 Em. fr. W. Kim to S. Tallman. Based on this representation, Plaintiffs proposed, the City agreed to, and the Court ordered a 120-day restoration deadline for homes

excavated after March 2, 2023. *See* ECF No. 258 at 17. Yet in the parties' meet and confer on February 16, 2023, the City stated that it is completing restoration immediately after excavating properties, with no specified settling period. Plaintiffs are baffled by the City's apparent about-face and would like to clarify what settling period, if any, is needed. Such clarity will help avoid future miscommunication and disputes, particularly as the parties prepare to negotiate a modified restoration deadline in May. At the parties' meet and confer, **please explain whether and why the City changed its policy on a settling period.**

### III. Outstanding information requests

The City's responses to the following information requests are over three weeks overdue. *See* Feb. 1 2022 Ltr fr. A. Rolnick to J. Kuptz; Feb. 22, 2022, Ltr. fr. A. Rolnick to J. Kuptz & C. Edwards. There is no excuse for the City's nonresponse, which violates the Agreement. ECF No. 147-1 ¶ 118. Please provide this information as soon as possible.

1. A copy of the door hanger described in ¶ 3.b of the 2023 Stipulation, ECF No. 256.

2. Sample images of door hangers left at five addresses where the resident was not home at the time of the scheduled excavation and/or replacement. *See* ECF No. 258 at 14.

3. Sample images of five addresses where the City has conducted visual inspections. *See* ECF 258 at 24.

In addition, the City agreed on February 16 to provide the following information related to the City's obligations to reschedule excavations. *See* ECF No. 258 at 13-15. Please provide the following call logs for the month of February by no later than March 17, 2023. *See id.* at 14.

4. Log of advance notice phone calls to residents concerning scheduled excavation work.

5. Log of additional rescheduling outreach to residents.

6. Log of requests from residents to reschedule excavations, as provided under the 2023 Stipulation.

Sincerely,

_____

Adeline S. Rolnick

encl: 2023-03-10 Outreach Scope of Work.xlsx

cc (via email):   Sarah Tallman, stallman@nrdc.org; Melanie Calero, mcalero@nrdc.org, Bonsitu Kitaba, bkitaba@aclumich.org; Richard Kuhl, kuhlr@michigan.gov; Nate Gambill, gambilln@michigan.gov