Motion Hearing - 6/30/2023

1              **UNITED STATES DISTRICT COURT**
               **EASTERN DISTRICT OF MICHIGAN**
2                    **SOUTHERN DIVISION**

3     CONCERNED PASTORS FOR SOCIAL ACTION, ET AL,

4                    Plaintiffs,

5        vs.                              Case No. 16-10277

6     NICK A. KHOURI, ET AL,

7                    Defendants.

8     _____/

9                       **MOTION HEARING**
                **BEFORE THE HONORABLE DAVID M. LAWSON**
10              United States District Judge
              Theodore Levin United States Courthouse
11               231 West Lafayette Boulevard
                      Detroit, Michigan
12               Friday, June 30, 2023
      **APPEARANCES:**
13

14    **FOR THE PLAINTIFF:**

15    Adeline Rolnick              Sarah C. Tallman
      Natural Resources Defense Council   Natural Resources Defense
16    1152 15th Street NW          Council
      Suite 300                    20 North Wacker Drive
17    Washington, DC 20005         Suite 1600
      202.513.6240                 Chicago, IL 60606
18                                 312.651.7918

19    **FOR THE DEFENDANT:**
      Joseph N. Kuptz
20    JoAnne Gurley
      City of Flint Department of Law
21    1101 S. Saginaw Street
      3rd Floor
22    Flint, MI 48502
      810.237.2085

23

24                       - - -
              To obtain a certified transcript, contact:
25                 April A. Kurtz, CSR-7347, RPR
                      www.transcriptorders.com
         Concerned Pastors for Social Action v. Nick A. Khouri, et al - 16-10277

TABLE OF CONTENTS

MATTER                                                        PAGE

**MOTION HEARING**


WITNESS

**Noah Attal**

Direct Examination by Ms. Tallman.................. 21

Cross-Examination by Mr. Kuptz.................... 51

Redirect Examination by Ms. Tallman............... 58

Redirect Examination by Ms. Tallman............... 67


**Jeffrey Markstrom**

Direct Examination by Mr. Kuptz................... 69

Cross-Examination by Ms. Tallman................. 96

Redirect Examination by Mr. Kuptz................ 126

Re-Cross-Examination by Ms. Tallman............. 127

Redirect Examination by Mr. Kuptz................ 130

Re-Cross-Examination by Ms. Tallman............. 132


EXHIBIT                                              RECEIVED

Plaintiff Exhibit 25............................ 34

Plaintiff Exhibit 31............................ 122

Plaintiff Exhibit 35............................ 118

Plaintiff Exhibit 48............................ 99

Motion Hearing – 6/30/2023
TABLE OF CONTENTS CONTINUED

EXHIBIT                                                    RECEIVED

Plaintiff Exhibit 57.............................. 29

Plaintiff Exhibit 58.............................. 24

Plaintiff Exhibit 64.............................. 18

Defendant Exhibit 1-1............................. 45

Defendant Exhibit 1-2............................. 45

Defendant Exhibit 1-3............................. 45

Defendant Exhibit 4-1............................. 45


CERTIFICATE OF REPORTER......................... 137

1  sounds right.  I think some weeks the City has completed as

2  many as 30.  I think it varies depending on how close together

3  addresses are and, you know, whether every address requires a

4  replacement, which would require more time at each home.

5            THE COURT:  Okay.  Thank you.

6            MS. ROLNICK:  Thank you.

7            THE COURT:  Mr. Kuptz, would you like to make a

8  preliminary statement before we begin hearing evidence?

9            MR. KUPTZ:  Yes, Judge.

10           Judge, as to the allegation that the City of Flint

11  had not completed the restoration site visits by the deadline

12  set in the Court's prior order, that is technically accurate.

13  The City did not meet that deadline in full.  However, that --

14  all of those restoration site visits are now complete.

15           Judge, I'm just checking my notes for the exact

16  number.

17           But since the Court issued that order, the City of

18  Flint has completed almost 27,000 in-person visual inspections

19  of property that are compliant with the court order, meaning a

20  two-person team personally went to each of those almost 27,000

21  addresses, checked the visual inspection criteria, took a

22  photograph of the property, and left a door hanger if they made

23  a determination that restoration was complete.

24           THE COURT:  And do they -- did they photograph the

25  door hanger as well?

Motion Hearing - 6/30/2023

1    MR. KUPTZ:  Yes, Judge.

2    THE COURT:  All right.  Now, how is the plaintiff

3 able to verify that?

4    MR. KUPTZ:  That is all tracked in the City's

5 Cityworks database.

6    THE COURT:  Well, right, but you were supposed to

7 furnish a report and you were supposed to do that on a monthly

8 basis, correct?

9    MR. KUPTZ:  Correct, Judge.  And some restoration

10 reporting was provided to plaintiffs as far back as March of

11 this year.  And in that reporting, restoration reporting,

12 provided to plaintiffs back on June 22nd, it did contain a list

13 of all of the addresses where visual inspection indicated

14 restoration was complete, where visual inspection indicated

15 restoration was needed and a list of known restoration

16 addresses without a visual inspection being conducted and a

17 report indicating where restoration had occurred since November

18 1st.

19    So that information has been provided to plaintiffs.

20 It's my understanding the dispute now --

21    THE COURT:  When?

22    MR. KUPTZ:  I'm sorry?

23    THE COURT:  When?

24    MR. KUPTZ:  That report was provided on June 22nd,

25 Judge.

Motion Hearing - 6/30/2023

14

 1  excavation.

 2          THE COURT:  All right.  What can you tell me about

 3  restoration?

 4          MR. KUPTZ:  As far as restoration, Judge, 26,679

 5  visual inspections were conducted.  Homes to complete based on

 6  visual inspection was 4,201.  And in addition, there were

 7  another 805 addresses where restoration was known.  Those are

 8  the addresses since November 1st --

 9          THE COURT:  Where restoration was known?

10          MR. KUPTZ:  Where the need for restoration was known.

11          THE COURT:  So what does the 4,201 number represent?

12          MR. KUPTZ:  4,201 was restoration needed based on a

13  visual inspection, but the addresses that Lakeshore Global has

14  performed an excavation at since November 1st, some of those

15  addresses still need restoration.  We knew about those as a

16  city, because Lakeshore Global had been keeping accurate and

17  complete records regarding those, and that number is 805.

18          So, as of last Thursday, there was 5,006 addresses in

19  the City of Flint requiring restoration.

20          THE COURT:  So the 4,200 number is -- represents

21  sites that you didn't know about until you did your

22  inspections?

23          MR. KUPTZ:  That's correct.

24          THE COURT:  And that 805 you knew about, but just

25  hadn't gotten to them yet?

Motion Hearing - 6/30/2023

1    MR. KUPTZ:  That's correct.  And there were 22,478
2  that were deemed complete based on the visual inspection and
3  that received that door hanger with the information to contact
4  the City if there were concerns.
5    THE COURT:  Have you had any contact from any of
6  those deemed complete that the homeowners disputed?
7    MR. KUPTZ:  There has been some contact.  And under
8  the terms of the prior order resulting from the hearing back in
9  February of this year, the City, through its project manager,
10  ROWE, is required to keep a log of those and we have been
11  keeping that log.  There have been some contacts.  I don't know
12  the exact number right offhand, but it's been --
13    THE COURT:  Can you estimate?
14    MR. KUPTZ:  I can't estimate.  I know it's been
15  statistically insignificant.
16    THE COURT:  Not to the homeowner.
17    MR. KUPTZ:  I -- I understand.  And the City remains
18  fully and absolutely committed to restoring each of these 5,006
19  properties.
20    THE COURT:  Okay.  Anything further?
21    MR. KUPTZ:  Judge, I would just also note that
22  restoration is currently underway.  545 addresses, as of last
23  Thursday, had received the 22nd -- had received some form of
24  restoration, because, as the Court knows, there's basically
25  three types:  There's grass and lawn, there's asphalt and

1  there's concrete.

2        THE COURT:  I also thought that there was some

3  requirement to ensure that the water shut-off valve was flush

4  with the ground so it didn't pose a trip hazard.

5        MR. KUPTZ:  That's correct.  That is a component,

6  also.  And LGC has been working -- the contractor, LGC, has

7  been working on the curb stop boxes to make that they're flush

8  and unobstructed.

9        THE COURT:  Yeah.  Where are those installed mostly?

10  Are those in the curb?  In the concrete?  In the lawn?  In the

11  sidewalk?

12        MR. KUPTZ:  Well, in the City of Flint, it just

13  varies depending on the neighborhood.  Some areas are older,

14  some are newer, it just depends if the road has been widened at

15  times, if a tree has grown up.

16        It's my understanding they're typically, I believe,

17  between the road and the sidewalk.

18        THE COURT:  Is that an easement?

19        MR. KUPTZ:  It is, I believe, Judge.

20        THE COURT:  Yeah.  All right.

21        MR. KUPTZ:  And, Judge, just the last thing I would

22  note is that the -- the number of properties that plaintiff

23  asserts should be on the City's restoration reporting, but they

24  allege weren't, was a total of 704 out of 28,215.

25        As I told the Court, Judge, the City remains

19

1   finished verifying the restoration status of every previously

2   excavated address.

3          THE COURT:  And how many are they short?

4          MS. ROLNICK:  The June report shows that they're

5   short by 704.

6          THE COURT:  That's the one he just mentioned, right?

7          MS. ROLNICK:  Yes.

8          THE COURT:  Okay.  So where do you want to take this

9   then?

10          MS. ROLNICK:  So plaintiffs would now like to put on

11   their expert, Noah Attal, to explain his analysis and

12   conclusion that the City's June restoration reporting did not

13   show the restoration status of every previously excavated

14   address.

15          THE COURT:  Well, it sounds to me like there's an

16   agreement that at least 704 have not -- or that there has not

17   been a completed report for 704 sites.

18          MS. ROLNICK:  I believe the City disputes that --

19   that fact, your Honor.

20          THE COURT:  All right.  Did -- am I -- did I

21   misunderstand you?

22          MR. KUPTZ:  That's correct, Judge.  We do dispute

23   that 704 number.

24          THE COURT:  Oh, all right.  So that's really what's

25   an issue here?

Motion Hearing - 6/30/2023

 1          MR. KUPTZ:  Correct, yes.  That 704 number, that's

 2   correct, Judge.

 3          THE COURT:  All right.  Then go ahead and call your

 4   first witness.

 5          MS. ROLNICK:  Thank you.  And my colleague,

 6   Ms. Tallman, will be handling the examination.

 7          THE COURT:  Oh, all right.

 8          MS. TALLMAN:  Good morning, your Honor.  Sarah

 9   Tallman on behalf of plaintiff.

10          We'd like to call Noah Attal to the stand.

11          THE COURT:  Do you have other witnesses besides

12   Mr. Attal?

13          MS. TALLMAN:  No.

14          THE COURT:  All right.  Is Mr. Attal in the

15   courtroom?

16          MS. TALLMAN:  Yes.

17          THE COURT:  Would you step forward, please?  Pause

18   right there for a moment.  Raise your right hand and be sworn.

19          (Oath administered at 8:44 a.m.)

20          THE COURT:  Would you have a seat right over here in

21   the witness box.

22          THE COURT:  Ms. Tallman, you can rotate that lectern

23   so you can face the witness.

24          MS. TALLMAN:  Thank you, your Honor.

25          THE COURT:  Mr. Attal, adjust that microphone,

Motion Hearing - 6/30/2023

1  please, so you can speak right into the tip of it.  You can

2  pull the microphone closer to you if you wish.  The chair is

3  not going to move but the microphone will.

4          Would you state your full name and spell your last

5  name for the record.

6          THE WITNESS:  My full name is Noah Attal.  Last name

7  is spelled A-T-T-A-L.

8          THE COURT:  Thank you.

9          And hold on for a minute, Ms. Tallman.

10          All right.  You may proceed.

11          MS. TALLMAN:  Thank you, your Honor.

12                    DIRECT EXAMINATION

13  BY MS. TALLMAN:

14  Q.  Good morning, Mr. Attal.

15          Can you describe your educational background for the

16  Court?

17  A.  Yes.  I did an undergraduate degree at the University of

18  Michigan in Earth and Environmental Science and I'm currently

19  pursuing my Master's Degree in Public Policy and Information

20  Science at the University of Michigan.

21  Q.  Do any of those degrees involve the study of data

22  analysis?

23  A.  Yes, I did data analysis in both my undergraduate degree

24  and currently my master's degree.

25  Q.  Are you currently employed?

1    100,000 observations for Detroit.

2        And with Safe Water Engineering, I did a lot of data

3    analysis of lead service line replacement, a complete analysis

4    of the DC -- the District of Columbia's proposed lead service

5    line replacement plan and some in Benton Harbor as well.

6    Q.   Do you use software tools to conduct your work in data

7    analysis?

8    A.   Yeah, I primarily relay on STATA, which is the statistical

9    software package for --

10            THE COURT:  I'm sorry.  What do you rely on?

11            THE WITNESS:  I rely on a package known as STATA.

12   It's --

13            THE COURT:  How do you spell it?

14            THE WITNESS:  S-T-A-T-A.

15            It is a statistical package primarily used by

16   economists, similar to R, if you're familiar with R, and that's

17   a tool used for data management and statistical analysis.

18            I also rely on ArcGIS and SAR's ArcGIS platform,

19   which is an industry standard for mapping and spatial

20   statistics.

21   BY MS. TALLMAN:

22   Q.   And just for clarity of the record, STATA is generally

23   spelled in all caps; is that correct?

24   A.   That is correct, STATA is spelled in all caps.

25   Q.   Mr. Attal, do you consider yourself a data analyst?

1   A.   Yes, I do.

2   Q.   And what is a data analyst?

3   A.   Depending on the industry, data analysts look very

4   different.  I assume that data -- or my understanding is that

5   data analysts take information and produce results that can

6   inform decisions.  So working with spreadsheets and large

7   amounts of data to inform decisions.

8           MS. TALLMAN:  Your Honor, I could go in more detail

9   through Mr. Attal's qualifications but in the interest of time

10  and unless defense counsel has any objections, I would like to

11  offer Mr. Attal as an expert in data analysis and refer to his

12  CV, which is part of Plaintiff Exhibit 64.

13          Oh, I'm sorry, it is not part of 64.  It is

14  Plaintiff's -- Plaintiff's Exhibit Number 58, which we provided

15  in advance to the Court, and defense counsel has stipulated to

16  its authenticity and admissibility.

17          Thank you, your Honor.

18          May I offer that exhibit into evidence?

19          THE COURT:  Any objection to 58?

20          MR. KUPTZ:  No, Judge.  No objection.

21          THE COURT:  It is received.

22          MS. TALLMAN:  Thank you, your Honor.

23  BY MS. TALLMAN:

24  Q.   Mr. Attal, have you been asked by plaintiffs --

25          THE COURT:  Where is 58?

1    Q.    And on what topic?

2    A.    I've been asked to testify on whether or not the

3    restoration data provided on June 22nd was inclusive of all

4    previous excavations and service line replacements reported to

5    the plaintiffs from 2017 onwards.

6    Q.    So, in other words, you were asked to compare excavation

7    and replacement data with the City's June 22nd reporting on

8    restoration status?

9    A.    That is correct.

10   Q.    Did you prepare a written declaration to be submitted in

11   this case?

12   A.    Yes, I did.

13           MS. TALLMAN:  Your Honor, I'd like to prepare to

14   offer another exhibit into evidence.  This has been pre-marked

15   as Exhibit 57.

16           Joe, do you need a copy?  It's the declaration.

17           MR. KUPTZ:  I have it.  Thank you.

18           MS. TALLMAN:  You have it.  Good.

19           Permission to approach the witness with the document?

20           THE COURT:  Do you have the exhibits that you're

21   going to be asking the witness about in a binder for him?

22           MS. TALLMAN:  We do not.

23           THE COURT:  So are you going to be walking back and

24   forth every time you have an exhibit?

25           MS. TALLMAN:  Yes.

1    I can hand him -- if you give me one moment, I can

2  compile the couple that I'm going to prepare to present to him.

3  We can also pull them up on the computer.

4           THE COURT:  Do you have them up on your screen?

5           MS. TALLMAN:  We can -- we can pull them up, yes.

6           Nicole, can you please pull up Plaintiff's Exhibit

7  57?

8           Would the Court --

9           THE COURT:  Mr. Attal, do you see that up there?

10          THE WITNESS:  Yes, I see Exhibit 1, declaration of

11  Noah Attal.

12          THE COURT:  Okay.

13          MS. TALLMAN:  Your Honor, would you like a paper copy

14  of the exhibit?

15          THE COURT:  No.

16          MS. TALLMAN:  Okay.

17  BY MS. TALLMAN:

18  Q.   Mr. Attal, have you seen this document before?

19  A.   Yes, I have.

20  Q.   What is it?

21  A.   This is the declaration that I submitted.

22  Q.   And if you page through it to confirm on the last page is

23  your signature there?

24  A.   Yes, the last page contains my signature.

25          MS. TALLMAN:  Your Honor, I'd like to offer into

Motion Hearing - 6/30/2023

 1 | evidence the declaration of Noah Attal, Plaintiff's Exhibit

 2 | Number 57.  It has also been previously filed as attached to

 3 | plaintiff's reply on the motion to contempt, ECF number 266-1.

 4 |         THE COURT:  His declaration is basically summarizing

 5 | what's he's going to testify about today?

 6 |         MS. TALLMAN:  Correct.

 7 |         THE COURT:  So why shouldn't that be a hearsay

 8 | document?  Why should we receive it?

 9 |         MS. TALLMAN:  Mr. Attal has verified to its

10 | authenticity and he is prepared here to testify --

11 |         THE COURT:  I don't think anybody's questioning his

12 | authenticity.

13 |         Do you have a response to my question?

14 |         MS. TALLMAN:  Yes, your Honor, it's not hearsay

15 | because Mr. Attal has personal knowledge and prepared the

16 | declaration for this case, so he is prepared to describe that

17 | it's -- it's his words and that he recalled and has personal

18 | knowledge of it.

19 |         THE COURT:  And that's your response to a hearsay

20 | concern?

21 |         MS. TALLMAN:  Yes, your Honor.

22 |         THE COURT:  Do you have an objection to 57?

23 |         MR. KUPTZ:  Judge, I -- I understand the Court's

24 | concern about hearsay.  The City leaves it to the Court's

25 | discretion.

1          THE COURT:  My question is, do you have an objection

2   to 57?

3          MR. KUPTZ:  I do not, Judge.

4          THE COURT:  All right.  I'll receive 57.

5          MS. TALLMAN:  Thank you, your Honor.

6   BY MS. TALLMAN:

7   Q.   Mr. Attal, did plaintiffs ask you to analyze a particular

8   question for purposes of developing your declaration?

9   A.   Yes, I was asked to analyze, as stated previously, whether

10  or not restoration -- the restoration data provided on June

11  22nd was comprehensive of all service line excavations and

12  replacements that the City had documented and provided to the

13  plaintiffs.

14  Q.   And do you have the skills necessary to analyze that

15  question?

16  A.   Yes, I do.

17  Q.   Is this similar to work you've done before?

18  A.   It's very similar work I've done before.

19  Q.   Have you reached any conclusions about the City's progress

20  towards identifying the restoration status of every excavated

21  home in Flint?

22  A.   Yes, I've reached conclusion there's approximately 700

23  addresses that the City has not included in its restoration

24  files, that the City has reported excavations and replacements

25  on previously.

1    THE COURT:  I'm sorry.  There's 700 addresses not

2    included in their files and what now?

3    THE WITNESS:  There are approximately 700 addresses

4    that were not reported in the restoration files provided to the

5    plaintiffs on June 22nd that were reported previously to the

6    plaintiffs as addresses with excavations and/or service line

7    replacements.

8    So the City had non-reported a restoration status

9    whether that restoration is complete or incomplete.

10    THE COURT:  Oh, okay.  These are -- these 700

11    addresses, there were -- there was excavation activity but no

12    restoration status reported, is that what you're saying?

13    THE WITNESS:  Yes.

14    THE COURT:  I get it.  Okay.  Thank you.

15    BY MS. TALLMAN:

16    Q.   And so, to confirm, you found some addresses where the

17    data showed an excavation or service line replacement but they

18    were not included on the City's June 2023 reporting concerning

19    restoration status?

20    A.   That is correct.

21    Q.   I'm going to ask you now about that conclusion and the

22    scientific bases to support that conclusion.

23    Can you describe at a high level how you completed your

24    analysis?

25    A.   Yeah.  At a high level, I compiled all the addresses that

1  the City had reported excavations or service line replacements

2  into a very long list and -- and then I geocoded that list.

3          THE COURT:  And where did you get that data to begin

4  with?

5          THE WITNESS:  That data was provided to me by the

6  plaintiffs.

7          THE COURT:  In the form of what, previous reports and

8  so forth?

9          THE WITNESS:  Yes, monthly, quarterly, a couple

10 comprehensive reports to date from 2017 to -- until present.

11         THE COURT:  All right.  Did you work off

12 spreadsheets?

13         THE WITNESS:  They were given to me in Excel

14 spreadsheets and I uploaded the data into the statistical date.

15         THE COURT:  Did you have to code all of that by hand?

16         THE WITNESS:  So I didn't have to code the data

17 itself, as it was already in an Excel spreadsheet.

18         What I was able to do is I was able to upload it to

19 the platform I was working with and then append and merge the

20 data from there.

21         THE COURT:  So your processing software could

22 interface with Excel?

23         THE WITNESS:  Yes, the processing software can

24 interface with Excel.

25         THE COURT:  I see.  I'm sorry.

1    Go ahead.

2    BY MS. TALLMAN:

3    Q.   And so, you -- after you looked at the data, what was the

4    first step in your analysis?

5    A.   So the first step was to create a comprehensive list of

6    where there were all service line excavations or replacements.

7    So I took all the spreadsheets, around 40 spreadsheets that

8    were given -- that was my understanding the City gave to the

9    plaintiffs, and the plaintiffs provided to me, from 2017

10   onwards and I compiled them into a long list of where the City

11   has completed service line excavations and replacements.

12       I then took that and I uploaded it into ArcGIS software,

13   which -- I then took that long list and I uploaded it into an

14   ArcGIS software, which allows me to geocode the addresses,

15   which is an important aspect of this analysis.

16           THE COURT:  Okay.  Let me just step back for a

17   minute.

18           Now, you were identifying locations where the City

19   had completed service line replacements?

20           THE WITNESS:  Service line replacements or

21   excavations.

22           THE COURT:  Or excavations.  Okay.

23           THE WITNESS:  Correct.

24           THE COURT:  And how many sites were those?

25           THE WITNESS:  I don't have the exact number off the

1   top of my head.

2            THE COURT:  Did you have it available to you

3   somewhere?

4            THE WITNESS:  The City completed -- is it

5   restorations?

6            THE COURT:  I don't remember if you included that in

7   your declaration or not.

8            THE WITNESS:  Yes, there's 28,215 addresses where the

9   City must complete property restoration under the settlement

10  agreement.

11           THE COURT:  All right.  Thank you.

12           Go ahead.

13           THE COURT:  Well, I guess we should wait for a

14  question.

15           MS. TALLMAN:  Nicole, can you please pull up

16  Plaintiff's Exhibit 55 -- or, sorry, 25 on the screen?

17           THE COURT:  This is a proposed exhibit, right?

18           MS. TALLMAN:  This is, yeah, proposed Plaintiff's

19  Exhibit 25.

20           MS. TALLMAN:  Your Honor, in advance of this hearing,

21  defense counsel has stipulated that this document shown on the

22  screen was attached to an email, dated April 29th, 2019, and

23  it's part of the City of Flint's status report, dated April

24  29th, 2019, describing addresses where a service line was

25  excavated or replaced by the City.

Motion Hearing - 6/30/2023

1          Plaintiffs would like to offer this proposed exhibit

2   into evidence.

3          Joe, do you have a copy?

4          THE COURT:  How do you characterize it?

5          MS. TALLMAN:  Excel file, titled 2019.04.29, monthly

6   report --

7          THE COURT:  It's an Excel file?

8          MS. TALLMAN:  Yes.

9          THE COURT:  All right.  Any objection to 25?

10          MR. KUPTZ:  No objections, Judge.

11          THE COURT:  25 is received.

12  BY MS. TALLMAN:

13  Q.   Mr. Attal, do you recognize this document?

14  A.   Yes, this is one of the documents that I had included in

15  the service line restoration exploration.

16  Q.   And can you read the -- the top line above the box?

17  A.   Yes, the top line is 2019.04.29 monthly report.

18  Q.   And do you understand 29 -- 2019.04.29 to be a date?

19  A.   Yes.

20  Q.   And that would be April 29th, 2019?

21  A.   That's what I understand.

22  Q.   Can you read the heading of the column furthest to the

23  left?

24  A.   Furthest to the left is address of service line

25  exploration.

1  Q.   And what do you see beneath that column?

2  A.   I see a list of addresses.

3  Q.   And the column second from the left, can you read that

4  title?

5  A.   Service line exploration date.

6  Q.   And what do you understand exploration to mean?

7  A.   My understanding of exploration is when the City went to

8  an address to determine whether or not they needed to replace

9  the service line, so they did what's called, like, a test bid

10 to determine the service line material.  And then if the

11 service line material needed to be replaced, an exploration

12 would include replacing that service line material.

13 Q.   And another word used for exploration would be excavation;

14 is that right?

15 A.   Yeah, excavation could be used.

16 Q.   Okay.  Mr. Attal, what do you understand this document to

17 reflect?

18 A.   I understand this document to reflect a list of addresses

19 where the City has completed service line explorations and

20 replaced or identified where they need to replace service

21 lines.

22 Q.   Did you consider other files similar to this in your

23 analysis?

24 A.   Yes, this is fairly similar to all the files I considered

25 as a service exploration or restoration files.

Motion Hearing - 6/30/2023

1    Sorry, not restoration, service exploration or

2  replacement files.

3  Q.   Okay.  And how did you determine whether a spreadsheet or

4  file you were looking at reflected excavation or replacement

5  data?

6  A.   The City used a couple different terms when providing

7  spreadsheets.  The fast exploration was a common one.  Most of

8  the variables were similar to the ones in this spreadsheet so

9  they would have an address, it would have a date labeled, some

10 variation of service line exploration date or SLE date

11 sometimes.  And then it would usually include the service line

12 or what the findings of the material was, so copper, non-copper

13 on the public side and the private side, which indicates that

14 they had actually excavated.

15 Q.   And that information was contained -- was it contained in

16 multiple files?

17 A.   Yes, it was contained in approximately 40 different files.

18 Q.   And what did you do with the information in those 40

19 files?

20 A.   The first step of my analysis was taking the addresses

21 from those 40 different files and compiling them into a large

22 list of addresses.

23        THE COURT:  I'm looking at what's on the screen now.

24 As far as what I can see, there are 29 addresses there.

25        Are you familiar with the actual work that was

1  required to be done in order to excavate and determine what the

2  composition of the service line was?

3        THE WITNESS:  I'm familiar with the --

4        Like, the process?  I haven't seen it done in person

5  but I'm familiar that the City for a service line exploration

6  would go and dig close to where the boundary was between the

7  private side and the public side of the service line and

8  determine the material on either side of that and then

9  sometimes also go in the house and determine the material on

10  the inside of the house to verify whether or not a line is

11  copper or not copper.  And those materials could be different

12  depending on when they were installed.

13        THE COURT:  All right.  And looking at the exhibit,

14  what do you understand the second column from the left to mean?

15        THE WITNESS:  The second column to the left, service

16  line portion -- oh, second to the left.  Sorry.  Service line

17  exploration date.  I understand that to be the date in which

18  the City has excavated, so determined the material, not

19  necessarily the date that it was replaced.

20        THE COURT:  Okay.

21        THE WITNESS:  So, in other cities, or in cities like

22  DC, often a crew will excavate a bunch of houses in a row,

23  determine the ones that need to be replaced and replace them

24  later, so that's why I see a difference between the service

25  line excavation date and the service line replacement date.

Motion Hearing - 6/30/2023

1    THE COURT:  All right.  And what do you -- what do

2  you understand the last column on the right to be?

3    THE WITNESS:  The service line replacement date.  I

4  understand the service line replacement date to be the date

5  that the City completed any service line replacement needed at

6  that address, if a service line replacement was needed.

7    THE COURT:  All right.  And in this particular

8  example, are there any differences between the date of

9  excavation and the date of replacement?

10    THE WITNESS:  In this example, I don't see a

11  difference.

12    THE COURT:  All right.  Do you know if it's feasible

13  to complete 29 excavations in a single day?

14    THE WITNESS:  Twenty-nine excavations in a single

15  day?  Depending if there was multiple crews, I could see it

16  very feasible to complete 29 excavations in a single day.

17    THE COURT:  And how about eight replacements in a

18  single day?

19    THE WITNESS:  Again, depending how many crews are

20  working, that's something that could be feasible.

21    I have absolutely no knowledge, though, of how many

22  crews or contractors were working on these projects.

23    THE COURT:  All right.  In looking at this document

24  that has the same dates for all of these addresses, at least

25  the ones on the screen, did it cause you to question the

1   veracity of the representations?

2           THE WITNESS:  Not at all.  I -- I think when doing

3   service line explorations and replacements, especially when you

4   need to do 28,000, there's probably a ramp-up period.  And once

5   crews are moving and they have their addresses that they need

6   to do, they can move quickly through them.

7           THE COURT:  Okay.  Thank you.

8           Go ahead, Ms. Tallman.

9           MS. TALLMAN:  Thank you, your Honor.

10  BY MS. TALLMAN:

11  Q.   Mr. Attal, if for those homes where you see an address in

12  the left-hand column and a date in the second to the left

13  column, under service line exploration date, do you understand

14  there to have been an excavation there on the date listed?

15  A.   Yes, that is my understanding.

16  Q.   Okay.  And how did you go about combining all of the data

17  that had excavation and replacement in it?

18  A.   Yes, so I relied very heavily on this data as statistical

19  package to do so, so I would upload all 40-some spreadsheets

20  into the package via code and that would create a long list of

21  addresses where the City has reported service line exploration.

22  Q.   Were there any duplicates in that list?

23  A.   Yeah, there were multiple duplicates, which can pose quite

24  a problem.  There was also a couple misspellings of addresses,

25  alternate spellings of addresses.  Those were the biggest

1  concerns that needed to be addressed.

2        So the next step was to geocode every single address

3  and I did that in ArcGIS, and that process allowed me to

4  condense that list so that there was only -- every -- each

5  address was only represented once in the list, not multiple

6  times.

7  Q.   And what does geocode mean for those of us who are not

8  data analysts?

9  A.   Geocoding is the process of taking an address.  Most

10  likely, these are partial addresses, they're not full addresses

11  with, like, zip lines and, like, all the data that address

12  usually has and determining where that address is on a map.

13        There's -- ArcGIS uses a geocoding service that is

14  pretty industry standard in determining where addresses are.

15  Q.   So after you compiled a single list of every home where

16  the City had -- where you had data showing excavations and

17  replacements, what was the next step in your analysis?

18  A.   The next step of the analysis was to do the same for the

19  restoration data, so I took the tabs of the restoration data

20  and all the addresses reported in the restoration data and I

21  did a very similar process in which I compiled them into a long

22  list and I geocoded them as well to make sure there was no

23  duplicates or addresses reported in multiple different tabs.

24  Q.   And for the restoration data you're referring to, were

25  there specific files that you considered?

41

1    A.    Yes, I considered the two files that were, if my

2    understanding were given to the plaintiffs by the City on June

3    22nd and they had given to me.

4              THE COURT:  Was that -- were those more Excel

5    spreadsheets?

6              THE WITNESS:  Yes.

7              MS. TALLMAN:  Nicole, if you could please pull up

8    Defense Exhibit -- what is labeled 1-1, 1-2 and 1-3 on the

9    screen.

10             THE COURT:  Those are proposed exhibits?

11             MS. TALLMAN:  Proposed -- I apologize, your Honor.

12   It's proposed defense Exhibit 1-1, 1-2, 1-3.  It's a single

13   Excel file with three different tasks.

14             THE COURT:  Are those defense exhibits or yours?

15             MS. TALLMAN:  Defense exhibits.

16             THE COURT:  Okay.

17             MS. TALLMAN:  Your Honor, the parties have stipulated

18   to the authenticity and the admissibility of the Excel file

19   shown on the screen.  This is an Excel file that was produced

20   by the City's counsel to plaintiff's counsel in June 2023.

21             THE COURT:  All right.  The screen has some very

22   limited information on it.  I take it it's broader than that?

23             MS. TALLMAN:  Yes.

24             THE COURT:  And these are Excel files that represent

25   restorations completed?

1    MS. TALLMAN:  Yes.  There are three tabs.  And so tab

2  1, if -- your Honor, may I go closer to the screen so I can

3  read it more clearly?

4             THE COURT:  Yeah, sure.

5             MS. TALLMAN:  Okay.  Thank you.  So the tab furthest

6  to the left, Mr. Attal, can you read the tab furthest to the

7  left, the title of that?

8             THE COURT:  Is that column A, you're talking about?

9             MS. TALLMAN:  So if you look at the very bottom of

10  the --

11             THE COURT:  Oh, down at the bottom.  Okay.

12             THE WITNESS:  Yes.  So that tab is known homes to

13  complete.

14  BY MS. TALLMAN:

15  Q.   And what do you -- and if -- what is the row one in column

16  A, the title of that column?

17  A.   Address.

18  Q.   And what do you understand this tab to reflect?

19  A.   I understand this tab to reflect the addresses in which

20  the City understood they needed to complete restoration despite

21  not having visually inspecting it.

22             MS. TALLMAN:  Nicole, can you please click over to

23  that middle tab?

24  BY MS. TALLMAN:

25  Q.   Mr. Attal, can you read the title of that middle tab on

1  the bottom?

2  A.   Homes to complete based on VI.

3  Q.   And what do you understand VI to mean?

4  A.   My understanding of VI is visual inspection.

5  Q.   And what is the title of the first column on the left?

6  A.   Address.

7  Q.   And what is the title column E?  It's the third column

8  over.

9  A.   Visual inspection date.

10 Q.   And what do you understand this tab to reflect?

11 A.   I understand this tab to reflect the list of addresses

12 which the City understood they need to complete restoration

13 based on visual inspection.

14      MS. TALLMAN:  And, Nicole, can you please click over

15 to the third tab on the right?

16 BY MS. TALLMAN:

17 Q.   Mr. Attal, can you read the title of this tab?

18 A.   Homes completed based on VI.

19 Q.   And what do you understand VI to mean?

20 A.   VI is -- I understand VI to mean visual inspection.

21 Q.   And what is the title of the first column on the left?

22 A.   Address.

23 Q.   And what is the title of column E?

24 A.   Visual inspection date.

25 Q.   And what do you understand this spreadsheet to reflect?

1      I'm sorry.  I apologize.  What do you understand the

2   tab on this to reflect?

3   A.   I understand this tab to reflect the homes that the City

4   has completed restoration on based on visual inspection.

5   Q.   If an address was --

6           THE COURT:  Excuse me, Ms. Tallman.

7   BY MS. TALLMAN:

8   Q.   Mr. Attal, if an address was listed on any tab -- well,

9   strike that.

10          Mr. Attal, did you consider this file in your

11  analysis?

12  A.   Yes, I considered this file in all three tabs on this

13  file.

14  Q.   And what -- if an address was listed in any of the three

15  tabs in this file, what did you -- what did you conclude about

16  that address?

17  A.   I understood if an address was listed on any of these

18  three tabs that the City had reported restoration status,

19  whether they reported they knew it need to be completed or that

20  it's been completed.

21          MS. TALLMAN:  Thank you.  Plaintiffs would like to

22  move to admit proposed defense Exhibit 1-1, 1-2, 1-3 into

23  evidence.

24          THE COURT:  Since they're your exhibits, I presume

25  you have no objection.

1  MR. KUPTZ:  I don't object, Judge.

2  THE COURT:  They are received.

3  MS. TALLMAN:  Thank you, your Honor.

4  Nicole, can you please pull up proposed defense

5  Exhibit 4-1?

6  Nicole, can you zoom out a little bit?

7  THE COURT:  Are these all part of the disclosures

8  from June 22nd?

9  MS. TALLMAN:  Yes, these two files, proposed defense

10  Exhibit 1-1, 1-2, 1-3 and 4-1, correct.

11  THE COURT:  Okay.

12  MS. TALLMAN:  Plaintiffs would like to offer proposed

13  defense Exhibit 4-1 into evidence.  I will --

14  THE COURT:  Describe it for the record.

15  MS. TALLMAN:  Yes.  This is a spreadsheet that the

16  City's counsel produced to plaintiff's counsel.  It's an Excel

17  file, titled 2023-06-21, restoration completed and current

18  phase.  And it's an Excel file with a single tab.

19  THE COURT:  Any objection to 4-1?

20  MR. KUPTZ:  None, Judge.

21  THE COURT:  4-1 is received.

22  MS. TALLMAN:  Thank you, your Honor.

23  BY MS. TALLMAN:

24  Q.  Mr. Attal, have you seen this file before?

25  A.  Yes, I have.

```
 1   Q.   Did you consider this file in your analysis?

 2   A.   Yes, I did.

 3   Q.   Can you read the name of the tab at the bottom of the

 4   screen?

 5   A.   Restoration complete.

 6   Q.   And what is the title of column A?

 7   A.   Address.

 8   Q.   And what is the title of column E?

 9        MS. TALLMAN:  And, Nicole, can you expand column E so

10   it's visible?

11        Yeah.  Thank you.

12   BY MS. TALLMAN:

13   Q.   What is the title of column E?

14   A.   I still can't read part of title -- column E.

15        Hard service start date.

16   Q.   And what's the title of column F?

17   A.   Soft surface -- oh, hard surface.

18        MS. TALLMAN:  And, Nicole, can you click on F- -- F1?

19        THE WITNESS:  I'm sorry.  Column F, I couldn't see

20   completely.  It's hard service complete date.

21   BY MS. TALLMAN:

22   Q.   And the title of column G?

23   A.   Soft surface start date.

24   Q.   And the title of column H?

25        Give us one moment to expand it.
```

1  A.   Soft service complete date.

2  Q.   Okay.  What do you understand this spreadsheet to reflect?

3  A.   I understand this spreadsheet to reflect the list of

4  addresses in which the City has completed restoration.

5  Q.   And do you understand that to be the case even if there's

6  some blank cells?  For example, on the screen, I see there's

7  some blanks in column E and column F.  So, for example, what

8  did you conclude about the home listed in row 4?

9           MS. TALLMAN:  And, Nicole, can you highlight row 4?

10          THE WITNESS:  My conclusion of the home in row 4 was

11  there was no need to complete any hard surface restoration, so

12  soft service restoration was completed and restoration was

13  therefore completed at the home.

14  BY MS. TALLMAN:

15  Q.   So if an address was listed at all on this spreadsheet,

16  what did you conclude about that address?

17  A.   I concluded that all addresses on this spreadsheet had the

18  restoration completed.

19  Q.   Okay.  And were the two spreadsheets that we've just

20  looked at, defense Exhibit 4-1 and defense Exhibit 1-1, 1-2,

21  1-3, two Excel files, were those the only restoration reporting

22  involved in the comparison in your declaration?

23  A.   In my declaration, yes.

24  Q.   Thank you.

25          So once you had the list of homes where the City

Case 2:16-cv-10277-DML-SDD   ECF No. 273-1, PageID.22967 Filed 07/14/23 Page 36 of 99

1  reported a restoration status and a list of homes that you

2  talked about earlier where the City reported an excavation and

3  replacement, what was the next step in your analysis?

4  A.    It was geocoding both of those lists.  And the geocoding

5  process allowed me to condense those lists so that each list

6  only showed an address once on the list and it also allowed me

7  to standardize the address as sometimes addresses appear in

8  multiple forms, like you could have a 555 North Stevenson

9  versus 555 Stevenson.  The standardization allowed much easier

10 to compare which addresses were on which list.

11 Q.    And then once you had done that process of geocoding, what

12 did you do next?

13 A.    I compared the two lists together to determine which

14 addresses were present on which list.  And my conclusion was

15 there was approximately 700 addresses that were present within

16 the excavation and service line replacement files but not

17 present on these restoration files.

18 Q.    Okay.  So there were several hundred homes where you

19 understood the City's spreadsheets to show an excavation or

20 service line replacement, but those did not appear on the two

21 spreadsheets we just looked at earlier, defense Exhibit 4-1 and

22 defense Exhibit 1-1, 1-2, 1-3?

23 A.    Correct.

24 Q.    Okay.  Was your analysis limited to data that you

25 understood to be reported by the City?

1   A.   Yes, my analysis was limited to data that I understood to

2   be reported by the City and that was given to me by the

3   plaintiffs.

4   Q.   And who do you understood to have created those data

5   files?

6   A.   It was my understanding that all the files I looked at

7   were created by the City of Flint.

8   Q.   Is it possible that you're missing a file that contains

9   excavation and/or replacement data?

10  A.   It is possible that I'm missing a file that contains

11  excavation or replacement data.

12  Q.   If you were missing such a file, would that -- how would

13  that affect your analysis?

14  A.   If I was missing an excavation or replacement file, it

15  would just -- including that file would only -- could only

16  serve to increase the number of homes that were not present on

17  the restoration file.  It wouldn't take away from the homes

18  that I've identified that are not listed.

19  Q.   Okay.  After you submitted the declaration in your case,

20  did you conduct any additional analysis?

21  A.   Yes, I did.

22  Q.   What was that analysis?

23  A.   The geocoding process that I referred to was something

24  that I conducted after this analysis and that was a robustness

25  check to ensure that the addresses identified in my declaration

1  were also identified during the geocoding process.

2  Q.   And did you also consider any additional data files after

3  you submitted your declaration?

4  A.   Yes.  After I submitted my declaration, I also did another

5  robustness check, which involved looking at all the restoration

6  data that the City has provided or that plaintiffs had provided

7  me.  And that data goes back to March and I wanted to ensure

8  that the addresses that I've identified as missing on the

9  restoration -- in the restoration data weren't present in

10  previous reporting that I had just missed.

11  Q.   And what did you find when you included that additional

12  restoration status reporting?

13  A.   I found 168 addresses that I had identified missing in the

14  June reporting were present in the May reporting, but only

15  present as TBD, to be determined.  Therefore, I did not have

16  status.

17       There were six addresses that were reported in May

18  with status that were not reported in the June data.

19  Q.   And did you understand when you conducted your original

20  analysis, the one that's in the declaration, did you understand

21  -- or did you assume that the City's June reporting was

22  cumulative for all addresses for which they were reporting a

23  restoration status?

24  A.   Yeah, for the purpose of the declaration, my assumption

25  was the June data was cumulative and that assumption was based

1   off my understanding of the court order.

2   Q.   And when you did your initial -- your subsequent

3   cross-check with the spreadsheet provided earlier in May by the

4   City, you found a handful of addresses that appeared that

5   reported a restoration status in May but they had fallen off

6   the June list, correct?

7   A.   That is correct.

8              MS. TALLMAN:  Nothing further, your Honor.

9              THE COURT:  All right.  Do you have questions for the

10  witness, Mr. Kuptz?

11             MR. KUPTZ:  Yes, Judge.

12             THE COURT:  You may proceed.

13                       CROSS-EXAMINATION

14  BY MR. KUPTZ:

15  Q.   Mr. Attal, am I pronouncing that right?  Mr. Attal?

16  A.   Yep.

17  Q.   My name is Joe Kuptz.  I'm an assistant attorney with the

18  City of Flint and I'm here representing the City of Flint.  I

19  listened to your testimony and I just have a few questions for

20  you.

21             Have you reviewed the original settlement agreement

22  entered in this lawsuit or any of the amendments or

23  stipulations that came after that?

24  A.   Yes, the plaintiffs provided me with sections of those

25  stipulations and the original settlement.

1    THE COURT:  All right.  Thank you.

2    Let me see if I can understand what you have

3    testified to in a nutshell.

4    As I understand it, you received various Excel

5    spreadsheets that were represented as having come from the City

6    of Flint; is that correct?

7    THE WITNESS:  Yes.

8    THE COURT:  All right.  And you reviewed the files

9    that recited the sites where excavations had occurred; is that

10   correct?

11   THE WITNESS:  Yes, excavations and replacements.

12   THE COURT:  Well, excavation -- replacement really

13   doesn't matter if it was replaced or not.  If there's an

14   excavation, it has to be restored whether replacement occurred,

15   right?

16   THE WITNESS:  Yeah, that's my understanding.

17   THE COURT:  All right.  And then you received files

18   were restorations were completed also represented to you as

19   having come from the City of Flint?

20   THE WITNESS:  Yes, I received those files.

21   THE COURT:  All right.  And then you used your tools

22   to duplicate the addresses including the geolocation features,

23   correct?

24   THE WITNESS:  Correct, I would add, along with just

25   restorations completed, I was also given a list of restorations

1  that were not completed but the City identified they needed to

2  complete.

3            THE COURT:  But they were started?

4            THE WITNESS:  No.

5            THE COURT:  Oh, I see.  Okay.

6            THE WITNESS:  I was given a list of all addresses

7  that the City had determined they needed to complete or that

8  they had already completed.

9            THE COURT:  All right.  If an address needed to be

10 complete, it doesn't mean that work was started on it; is that

11 right?

12           THE WITNESS:  That's my understanding.

13           THE COURT:  Okay.  So that really didn't figure into

14 where restorations had to be completed because the work hadn't

15 even been started, right?

16           THE WITNESS:  I'm sorry.  I don't understand.

17           THE COURT:  Yeah.  How did that -- how did the

18 information about addresses where work had to be completed

19 figure into whether restorations had to be completed?

20           THE WITNESS:  So it's my understanding that the

21 plaintiffs -- the question that the plaintiffs had asked me was

22 the list of restoration status, so all the addresses that the

23 City had reported they needed to complete that were completed

24 or were in the process of completion, that list very

25 comprehensive, 28,000 plus addresses, did that cover every

1  single excavation that the City had reported?  And my finding

2  was, there are approximately 700 addresses where I -- the City

3  has reported an excavation but has not reported they need to

4  complete a restoration or reported that a restoration has been

5  completed.

6       THE COURT:  All right.  So if there's a -- if there's

7  an address where work has to be done but hasn't started yet,

8  did you include that in that 700 number if there was no

9  restoration reported?

10       THE WITNESS:  I'm sorry.  Do you mind asking that

11  question again?

12       THE COURT:  Yeah.  This is what I'm trying to find

13  out.  If a contractor starts digging on the property but

14  doesn't restore the landscape or hard surface, or whatever it

15  happens to be, that certainly would have been a location that

16  went into one of your 700 addresses, right?

17       THE WITNESS:  Not necessarily.

18       THE COURT:  Oh, explain.

19       THE WITNESS:  So -- so the City has reported -- my

20  understanding of the restoration data that was given to us is

21  there's a -- you know, the City has provided data on

22  28,000-plus homes in which either they've completed the

23  restoration or they've identified someone was digging and

24  didn't complete the restoration.  And that is a comprehensive

25  list.  And what I do is I took that comprehensive list and I

1  compared it to my understanding where they reported excavations

2  and I found there was roughly 700 addresses that there's

3  reported an excavation but the City has not determined or not

4  even listed that they need to restore that address or that

5  they've checked it and it has been restored.  There's

6  absolutely no status associated with it.

7          THE COURT:  All right.

8          THE WITNESS:  It's missing.

9          THE COURT:  So I go back to my question a little bit

10  earlier.

11          How does the data that recites parcels where

12  excavation has yet to be performed figure into that

13  differential?

14          THE WITNESS:  It is -- I've -- I've determined that

15  parcels in which a restoration has yet to be performed.

16          THE COURT:  Not restoration, excavation.

17          THE WITNESS:  Oh, excavation.  I'm sorry.  I misheard

18  you.

19          So excavations that have yet to be informed, I have

20  not included in this analysis.

21          THE COURT:  All right.

22          THE WITNESS:  So only excavations that I've known --

23  that are -- it's my understanding that have been completed.

24          THE COURT:  All right.  So, basically, what you did

25  is identify the parcels where excavations occurred and then

1 identified the parcels where restoration was reported completed

2 or didn't have to be done and extracted the difference and came

3 up with 704 houses, right?

4          THE WITNESS:  I compared where excavations had been

5 completed to where the City has reported that they either need

6 to restore, it has been restored, or they know they need to

7 restore it.  So any -- any restorations status.

8          THE COURT:  All right.  And the 704 parcel number

9 represents what then?

10          THE WITNESS:  Represents addresses that the City has

11 not given us any sort of restoration information on so we don't

12 know if the City has determined it needs to be restored, not

13 restored, completed, et cetera.

14          THE COURT:  Okay.  So among those 704 parcels, it's

15 conceivable that no restoration was needed or that it was

16 completed, or that it still need -- work still needs to be

17 done?

18          THE WITNESS:  We don't know.

19          THE COURT:  Right.  But it could be any one of those

20 three categories, right?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.  So the 704 parcel number

23 represents essentially an information void?

24          THE WITNESS:  That is correct.

25          THE COURT:  Okay.  I understand.

1        Now, do you have any further questions, Ms. Tallman,

2   after my inquiry there?

3        MS. TALLMAN:  Just a few to hopefully clarify some of

4   your questions.

5        THE COURT:  Yeah, go ahead.

6                        REDIRECT EXAMINATION

7   BY MS. TALLMAN:

8   Q.   Mr. Attal, considering the two June spreadsheets that you

9   considered, so defense Exhibit 4-1 and 1-1, 1-2, 1-3, did you

10  understand that those spreadsheets were to provide a yes or no

11  answer as to whether the addresses either needed restoration or

12  do not need restoration?

13  A.   It's my understanding that those sheets provided

14  essentially a yes or no with context of whether or not they

15  determined that via visual inspection or not.

16  Q.   And the 704 addresses you identified as missing, there was

17  data showing an excavation or replacement, they were not on

18  those two restoration reporting spreadsheets, those homes,

19  based on your assessment are question marks as to whether

20  restoration is still required at those addresses?

21  A.   Correct.

22  Q.   So the two defense exhibits, 4-1, 1-1, 1-2, 1-3, those do

23  not fully answer the question of where restoration is still

24  needed in the City of Flint; is that correct?

25  A.   That is my understanding.

1    MS. TALLMAN:  Nothing further, your Honor.

2    MR. KUPTZ:  Nothing further, Judge.

3    THE COURT:  Mr. Attal, thank you.  You may stand

4    down.

5    THE WITNESS:  Thank you.

6    THE COURT:  Ms. Tallman, do you have any further

7    witnesses?

8    MS. TALLMAN:  No, your Honor.

9    THE COURT:  Mr. Kuptz, does the City have any

10   witnesses you'd like to call?

11   MR. KUPTZ:  Yes, Judge.  The City has one witness.

12   We anticipated having two and informed the Court we had two.

13   Unfortunately, our second witness was unavailable due to a

14   medical exclusion, so we do have one, Judge.

15   THE COURT:  Medical exclusion, you mean they were

16   contaminated and couldn't get in the building or something?

17   MR. KUPTZ:  No.  It's actually my understanding she

18   had an outpatient surgical procedure yesterday and she was

19   under a medical restriction --

20   THE COURT:  I see.

21   MR. KUPTZ:  -- by her physician or surgeon not to

22   attend today.

23   THE COURT:  Well, I hope she's doing well.

24   Who is the witness you'd like to call?

25   MR. KUPTZ:  The witness is Jeff Markstrom.

69

1    May we call him now?

2          THE COURT:  I'm sorry, Jeffrey?

3          MR. KUPTZ:  First name is Jeff, last name is spelled

4    M-A-R-K-S-T-R-O-M, Markstrom.

5          THE COURT:  Thank you.

6          Is Mr. Markstrom in the courtroom?

7          Mr. Markstrom, will you step forward, please?

8          Pause right there for a moment and raise your right

9    hand and be sworn.

10         (Oath administered at 10:05 a.m.)

11         THE COURT:  Mr. Markstrom, would you please have a

12   seat in the witness box.

13         Would you please adjust the microphone so that you

14   can speak into the tip of it and would you state your full name

15   and, once again, spell your last name for the record.

16         THE WITNESS:  Sure.  My name is Jeff Markstrom.  My

17   last name is spelled M-A-R-K-S-T-R-O-M.

18         THE COURT:  Thank you.

19         Mr. Kuptz, you may proceed.

20                      DIRECT EXAMINATION

21   BY MR. KUPTZ:

22   Q.   Mr. Markstrom, we met and talked on lots of occasions, but

23   again, my name is Joe Kuptz.  I'm an Assistant City Attorney

24   with the City of Flint.  I'm here representing the City.

25         Where are you currently employed?

1  A.   I'm employed at ROWE Professional Services Company.   ROWE,

2  R-O-W-E, Professional Services Company.

3  Q.   And I'm just -- so we're on the same page, I'm going to

4  refer to it as ROWE throughout the questions that I have.

5        So what is your job title at ROWE?

6  A.   I am the Design Services Manager at ROWE.

7  Q.   How long have you been employed at ROWE in total?

8  A.   Just a little over 15 years.

9  Q.   What is ROWE's involvement under its current contract with

10  the City of Flint as a company with respect to the City of

11  Flint's lead pipe replacement and restoration?

12  A.   Sure.  Our current contract ROWE is the project manager,

13  program manager, interchangeable-type terms, for overseeing the

14  service line exploration and/or replacement and the restoration

15  component.

16  Q.   And how long has that current contract with the City of

17  Flint been in place?

18  A.   I don't remember the exact month but it was in mid-2022

19  when we're under our current contract.

20  Q.   And since that current contract has been in place, have

21  you been involved with that contract and that project?

22  A.   Yes, I have.

23  Q.   Prior to the current contract that was implemented in

24  mid-2022, did ROWE have a contract with the City of Flint for

25  this type of work?

1  A.   Yes, we had a contract in May -- started in May 2019 for

2  just the service line exploration and replacement component.

3  Q.   So what are the fundamental differences between the

4  contract that started in May of 2019 and the contract that

5  started in mid-2022?

6  A.   The major difference is that in our original contract from

7  May '19, we only administered as a program manager the service

8  line exploration and replacement component.

9       When the new contract started in mid-2022, we took on

10 the program management also of administering the restoration

11 component.

12 Q.   To your knowledge, before the current contract that was

13 implemented in mid-2022, who did the management of the

14 restoration component?

15 A.   It's my understanding the City of Flint administered that

16 component of the project.

17 Q.   Okay.  Do you have general knowledge of the requirements

18 of ROWE under both of those contracts?

19 A.   Yes, I do.

20 Q.   Under the contract between ROWE and the City of Flint, who

21 retains ownership of all documents that are created by ROWE or

22 provided to ROWE as part of this project?

23 A.   The City of Flint.

24 Q.   Now, you've told us what your job title is.  Specifically,

25 on a day-to-day basis, what are your job responsibilities with

1   respect to the current contract?

2   A.   I am the project manager at ROWE.  My day-to-day duties

3   are just general oversight of all of our work that we're doing,

4   making sure that we're completing our tasks and as we -- as

5   required.  I'm a liaison between our firm and the City of Flint

6   and just administering the program.

7   Q.   You said you're a liaison between ROWE and the City of

8   Flint.  Are you a liaison between ROWE and any other entities

9   such as subcontractors?

10  A.   So there is a contractor that's doing the -- performing

11  the work.  LGC is their name.  And yes, ROWE is also -- I'm the

12  liaison between us and the contractor, also, so...

13  Q.   And just to clarify, does LGC have a contract with ROWE or

14  with the City of Flint?

15  A.   LGC's contract is directly with the City of Flint.

16  Q.   As the project manager overseeing the day-to-day

17  operations on this project, are there other ROWE employees that

18  report to you?

19  A.   Yes.  On this project, we have approximately three to four

20  office staff that are working on the project.  And then on a

21  daily basis, four to six field staff that are in the field

22  working on the project.

23  Q.   Who are the office staff that report to you on this

24  project?

25  A.   Tammy Phaneuf is one, Armando Lopez is a second and Krista

 1   A.    Sure.  LGC is the direct contractor that has the direct

 2   contract with the City of Flint to perform the excavation

 3   and/or replacement at every individual home that's eligible,

 4   along with coordinating and performing the restoration at every

 5   home that still needs restoration.

 6   Q.    And just to clarify, give a full picture, they have done

 7   outreach work as well?

 8   A.    I apologize.  Yes, they are also the -- responsible for

 9   doing the outreach to obtain consent forms if needed.  And

10   then, also, to do the scheduling of the work as needed to

11   perform the service line replacement.

12   Q.    At some point -- I'm changing gears now.

13          At some point, were you informed by the City of Flint

14   that it was under an obligation to determine the restoration

15   status of addresses in the City of Flint where excavation had

16   occurred and potentially restoration had occurred but no

17   contemporaneous record of restoration existed?

18   A.    Yes.

19   Q.    When were you informed of that obligation on the part of

20   the City of Flint?

21   A.    I guess, can you clarify exactly what date you're looking

22   for?

23   Q.    Well, if --

24          THE COURT:  He's looking --

25          THE WITNESS:  I apologize.  Can you restate the

1   question?

2   BY MR. KUPTZ:

3   Q.   I'm just looking for the date when you learned of that

4   obligation to determine that the City of Flint had to determine

5   the restoration status of properties, where a contemporaneous

6   record of restoration might not exist.

7   A.   Okay.  I apologize.  On May 10th, I received an email from

8   the City of Flint saying to proceed with the remaining

9   properties where there was no contemporaneous documentation,

10  so...

11               THE COURT:  Is that May 10th this year?

12               THE WITNESS:  May 10th of 2023, yes.

13  BY MR. KUPTZ:

14  Q.   You said the remaining.  Had you been informed prior to

15  May 10th of that obligation?

16  A.   There was some discussion, I believe, that there would be

17  the need for it but we were not officially authorized to

18  proceed with that until the May 10th, 2023, date.

19  Q.   Okay.  Again, you used the word additional when you talked

20  about the May 10th.  Had there been restoration status site

21  visits prior to May 10th?

22  A.   Yes, there was a significant number of properties where a

23  two-person scouting team went out and performed visual

24  inspections, yes.  I apologize.

25  Q.   And when did that process originally begin?

1  A.   I believe we started that -- I don't have the exact date

2  but we started that in the fall of '22, but then continued on

3  early in spring and worked through, I believe it was April and

4  into May, if I remember correctly.

5  Q.   Okay.  And then on May 10th, you said the City informed

6  you about additional two-man site inspections that needed to

7  occur?

8  A.   That's correct.

9  Q.   Okay.  Now, you indicated that those site inspections to

10  determine restoration status began in the fall of 2022; is that

11  correct?

12  A.   That's correct.

13  Q.   At some point, did the City of Flint inform you that those

14  inspections did not meet the criteria established by this

15  Court's order?

16  A.   That is correct.

17  Q.   And what was your understanding of the Court's --

18  court-ordered requirements of those site inspection visits?

19  A.   There was, I believe, seven criteria that we had to

20  conform to, which included a visual inspection, a door hanger,

21  a vid -- a snap -- a photo, all that -- I think there was -- I

22  can't remember the exact seven items we had to look at but that

23  was the requirement that had to be performed as part of those

24  site inspection.

25  Q.   Generally speaking, I know you said you couldn't remember

80

1  exactly what seven criteria it is, but, generally speaking,

2  what were those two-man crews looking for?

3  A.   So when a two-man crew went to a site, they would look at

4  the address, they would identify where the service line

5  excavation and/or replacement took place, they would look at

6  the restoration that was in and around those areas to determine

7  if it was complete or if additional restoration was required.

8           From there, a determination was made if we -- if we

9  determined that there was still work to be completed, there

10  would be identified the type of work needed and then brought

11  that back to the office for generating a work order.

12  Q.   Okay.  So you previously told us that these inspections

13  started in the fall of 2022.  At some point later, you

14  determined -- you were informed by the City of Flint that there

15  were certain criteria that had to be followed.  Did some of the

16  inspections between fall of 2022 and when you were informed by

17  the City of Flint about those court-ordered requirements, did

18  some or all of those inspections not meet the court-ordered

19  requirement?

20  A.   Yes.

21  Q.   And did ROWE go back and essentially redo those in that

22  gap period from fall of 2022 until you were informed about

23  those court-ordered requirements, essentially redo those?

24  A.   That's my understanding, yes.  Our staff did that.

25  Q.   Do you know approximately -- let me go back and clarify.

1           You indicated that you were informed at some point

2   about the court-ordered inspection, site inspection

3   requirements.  And then, on May 10th, you were asked by the

4   City of Flint to conduct more site inspections.  So I'm going

5   to call that, just for ease of reference, set one and set two.

6           So, in set one, approximately how many restoration

7   site visits did ROWE conduct or were conducted at ROWE's

8   behest, approximately?

9   A.   Yeah, I do not have that exact number but I believe it was

10  right around 13 to 14,000 number, if I recall correctly, of

11  site visits.

12  Q.   And then, approximately, how many were conducted in set

13  two?

14  A.   I believe that was around 11,000, plus or minus,

15  properties.

16  Q.   And what's your understanding of why the City of Flint

17  asked that that set two site visits be conducted?

18  A.   The set two number was properties where there was not

19  contemporaneous information to prove that the -- that the

20  restoration was complete.  And therefore, we were asked to go

21  out and continue to do the visual inspection on that additional

22  set two just for -- for -- for further documentation.

23  Q.   Couple more background questions.

24          Why a two-person crew on these restoration site

25  visits?

1   A.   We did it for a number of reasons.  One is safety.  We

2   wanted our staff to be on site with a second individual because

3   we are working in and around resident's homes.

4        Two, we wanted to have a second set of eyes to look

5   at the -- the -- what is -- what the restoration status is and

6   if the two of them can compare what -- what they feel is

7   necessary to be complete.  And then, obviously, just

8   documentation.  We have to take a photo, just working together

9   as a partner.

10  Q.   So, to summarize, safety, quality and accountability?

11  A.   Yes.

12  Q.   Did anything change with respect to the site visits

13  between the set one addresses and the set two addresses?

14  A.   From what ROWE was doing in the field, no, it was the same

15  visual inspection just with a different set of data, so -- that

16  we were working from.

17  Q.   Okay.  So who were the two-man crews in set one employed

18  by?

19  A.   So, initially, we started out with just two ROWE -- two

20  staff from ROWE.  We then asked for -- got some assistance from

21  the contractor where we'd have one ROWE staff and one staff

22  from LGC, which allowed us to expand our capacity level and

23  perform more -- more site observations, visual inspections per

24  day, per week, so we asked -- we had some assistance from the

25  contractor for part of the set one, but mostly the set two,

Case 2:16-cv-10277-DML-SDD ECF No. 273-1, PageID.2548 Filed 07/14/23 Page 57 of 99

1  so...

2  Q.   And approximately, how many two-man crews at its peak was

3  -- were being utilized for this work?

4  A.   Between six and eight two-man crews were in the field all

5  at one time.

6  Q.   And can you give me a rough estimation of approximately

7  how many restoration site visits one crew could accomplish in

8  any given day or week, depending on how you can estimate it for

9  me?

10  A.   Sure.  We tried to give the -- the -- the individual

11  crews, the two-person crews a block of addresses that are

12  relatively close to each other to make it more efficient for

13  them.  And when we were able to do that, we were seeing numbers

14  anywhere from the 120 to 140 residential visual inspections per

15  day, per crew.

16  Q.   Generally speaking, are there different factors that

17  impacted when the restoration site visits could begin in 2023?

18  A.   Yes, one was weather.  We had to -- we elect -- we made a

19  determination to make sure that all the snow had been melted

20  from the lawns so that we could have a good visual inspection

21  of the -- the property that we were going to.

22          We had to wait -- we had to generate a language for a

23  door knocker.  We had to get that approved, working through the

24  city and get that approved.  And once we had that language, we

25  had to order the door hangers -- sorry, not door knocker --

1   door hangers.  And once we had those in place, then we could

2   start the work.  So we had a couple factors there, so...

3   Q.   And can you just briefly explain to the Court what those

4   door knockers are or what they say?

5   A.   So, basically, it just said we have performed a visual

6   inspection of your property and it's been determined that there

7   be no additional restoration required for your property.  If

8   you have any questions, there was a phone number, I believe,

9   and I believe also an email you can call into, but it was left

10  on the individual property's door or fence, or whatever the

11  most appropriate place was to leave once we left that site.

12  Q.   So that door hanger was only left at properties where that

13  two-crew determined that restoration was in fact complete?

14  A.   That is correct.

15  Q.   So we've talked about set one with the site visits and

16  we've talked about set two with the site visits.

17  Approximately, how long did it take to complete the set two

18  addresses of about, I believe you indicated approximately

19  11,000?

20  A.   So, based on the authorization to proceed with -- I'm

21  using May 10th as the date -- we completed the set two, I

22  believe it was the Friday before the 22nd, so I guess I --

23  somewhere in that range, Friday or Monday.  And I can't

24  remember what exactly dates.  I apologize for those.  Like, the

25  19-ish of June.  Somewhere in that plus or minus range is when

1    that set two was complete.

2    Q.   So those set two addresses of about 11,000 were completed

3    between about May 10th and about June 19th?

4    A.   Somewhere around that range, yes, approximately.

5    Q.   Was the City of Flint invoiced by ROWE and/or LGC for

6    these site visits?

7    A.   ROWE, yes.  It would have been included in our -- our

8    monthly invoice for the month of May.  The work performed by

9    the -- with the assistance of LGC, I do not believe has been

10   included as of yet.

11   Q.   So I guess my point is, the City of Flint is paying for

12   these site visits whether they've already paid for them or will

13   be paying for them?

14   A.   Yes, it will be included.  Yes.

15   Q.   About how much did the City of Flint pay or is responsible

16   for paying for the set one site visits?

17   A.   I don't have that exact number because it was kind of a

18   gray area where we stopped -- where we got to the end of set

19   one and started set two.

20   Q.   If you can approximate.  Don't guess.

21   A.   Yeah, I -- I'm just -- I apologize.  I don't have any

22   numbers of exactly where that was, but...

23   Q.   Do you know about what the cost was to the City of Flint

24   for the set two visits?

25   A.   I believe the overall cost, I'll start with that because I

1  think that I got that number roughly, is about 1.5 million, 1.6

2  million, is what the overall cost would be between the two --

3  set one and set two.  And I apologize.  I do not know the

4  breakdown, so...

5  Q.  Okay.  So about one and a half to 1.6 million for both set

6  one and set two?

7  A.  Correct.

8  Q.  But, to your knowledge as project manager on this project,

9  there was an additional cost to complete the set two addresses?

10  A.  Absolutely, yes.

11  Q.  Were you in the courtroom during the testimony of

12  Mr. Attal?

13  A.  Yes, I was.

14  Q.  And you heard his testimony?

15  A.  Yes, I did.

16  Q.  And is it your understanding from listening to his

17  testimony that essentially he generated a list of 704 addresses

18  at which he asserts excavation and potentially a replacement

19  had occurred but those 704 addresses did not -- were not

20  present on any of the restoration reporting provided by the

21  City of Flint?

22  A.  That's my understanding.

23  Q.  Okay.  Have you had a chance to look at that list of 704

24  addresses?

25  A.  Yeah, I received it yesterday.  I did a quick look at it,

1    yes.

2    Q.   Okay.  Have you had a chance to review in detail all of

3    those 704 addresses?

4    A.   No, I have not.

5    Q.   Okay.  Did you have a chance to review some of those 704

6    addresses?

7    A.   I did.

8    Q.   Did you take a sampling or how did you go about reviewing

9    that?

10   A.   I -- I took the list and I looked at approximately ten of

11   the addresses just to try to get an understanding where they

12   were coming from and -- and looked at where -- what data we had

13   or what information we might have in our system that would --

14   would document why they're on or -- on the list, so...

15   Q.   Okay.  And what was your result of that sampling of

16   approximately 10 addresses?

17   A.   There was one that I did -- or I looked at, actually, is

18   in the hands of LGC, the contractor, to do the restoration.  So

19   that one is on that list already.  And then I had some

20   addresses I looked at that had inactive water accounts and/or

21   just looking at the GIS database for the City of Flint -- or

22   for Genesee County, which include the City of Flint that look

23   like the houses may be abandoned or -- or non-livable.  So I

24   just kind of looked at that from that standpoint.

25          And then I looked at, also, the active and inactive

1   water account, so just did a quick look, so...

2   Q.   And typically, if a report of that nature were sent to you

3   or to ROWE by the City of Flint, who would be assigned to

4   investigate essentially what's going on with those 704

5   addresses?

6   A.   Absolutely, yeah.  Tammy Phaneuf.  Ms. Phaneuf would be

7   the one that would take the data that we got if we got a

8   spreadsheet of what we did and she would bounce it off of all

9   the data that we have received over the years and see what we

10  can come up with from why -- why they're on there or what --

11  what information we could provide.

12  Q.   Does ROWE have regular and irregular meetings with the

13  City of Flint and LGC regarding this project?

14  A.   Yes.  Every week, we hold a progress meeting on Wednesday

15  morning with the ROWE team, the City of Flint team, the

16  contractor's team, and some representatives from the State of

17  Michigan.

18  Q.   And very briefly, generally speaking, what is discussed on

19  those Wednesday, 8 a.m. meetings?

20  A.   Sure.  We start out with the service line replacement and

21  exploration side of the program and we talk about progress to

22  date, issues that may have come up over the last week, because

23  we have these on a weekly basis, and -- and discuss kind of the

24  next steps on moving forward, the schedule, any upcoming

25  deadlines.

1      CROSS-EXAMINATION

2  BY MS. TALLMAN:

3  Q.   Good morning, Mr. Markstrom.

4  A.   Good morning.

5  Q.   This is the first time you've provided sworn testimony in

6  this case, correct?

7  A.   Correct.

8  Q.   And you've never submitted an affidavit in this case

9  before, right?

10  A.   Correct.

11  Q.   You never submitted a sworn written statement in this case

12  before?

13  A.   Correct.

14  Q.   And the testimony today that you've provided is being

15  presented to the Court for the first time this morning,

16  correct?

17  A.   Correct.

18  Q.   You mentioned earlier that ROWE wanted to wait until the

19  snow cover had completely dissipated to conduct visual

20  inspections; is that right?

21  A.   That was one thing we looked at, yes.

22  Q.   And how long have you lived -- do you live in Flint,

23  Mr. Markstrom?

24  A.   I do not.

25  Q.   Where do you live?

1   A.   I live in the Lansing area.

2   Q.   And how far away from Flint is that?

3   A.   45 minutes.

4   Q.   Are you aware of -- you know that winter and spring

5   weather in Flint and in the Lansing area can be uncertain,

6   correct?

7   A.   Correct.

8   Q.   And you knew that prior to February 2023, correct?

9   A.   Yes.

10  Q.   Okay.  It wasn't that the uncertainty of Flint's weather

11  came up as a surprise to ROWE in February 2023, correct?

12  A.   Correct.

13  Q.   Okay.  Are you aware that the Court ordered the City to

14  finish identifying the restoration status of all previously

15  excavated homes in Flint by May 1st, 2023?

16  A.   Yes.

17  Q.   Okay.  Are you aware that the Court issued an order

18  setting that May 1st deadline in February 2023?

19  A.   I don't recall what date it was issued, but I do recall

20  the date of May 1st, yes.

21  Q.   Okay.  Were you aware of that deadline in March?

22  A.   I believe so, but I can't be certain of that, yes, so...

23  Q.   Okay.  Were you aware of it in February?

24  A.   I'm sure we were made aware of a -- the deadline of May

25  1st.  I don't remember exactly when we were made aware of it,

1  yes.

2  Q.   Okay.  Mr. Markstrom, you can -- ROWE or LGC can perform

3  restoration at an address if there's an inactive water account

4  at that address, correct?

5  A.   Yes, the contractor can perform restoration if it's

6  inactive.

7  Q.   And if a residence has an inactive water account, it's not

8  necessarily abandoned, is it?

9  A.   Not necessarily, no.

10 Q.   It could be a rental property that's owned by a landlord

11 but it's currently vacant, correct?

12 A.   I would assume so, yes.

13       MS. TALLMAN:  Okay.  Nicole, can you please pull up

14 plaintiff's proposed Exhibit 47?

15       Mr. Kuptz, do you have a copy of that, or can you see

16 it?

17       MR. KUPTZ:  I can see it and I believe I have a copy.

18       MS. TALLMAN:  Okay.

19 BY MS. TALLMAN:

20 Q.   Mr. Markstrom -- Mr. Markstrom, do you recognize this

21 document?

22 A.   I'm not sure if I have seen this directly.

23 Q.   Okay.  Can you read the title at the top?

24 A.   Sure.  It says, Exhibit B, outreach work remaining as of

25 June 2023.

1    Q.   Okay.  And apologies.

2           MS. TALLMAN:  Nicole, can you please pull up

3    Plaintiff's Exhibit 48, proposed Exhibit 48?

4    BY MS. TALLMAN:

5    Q.   Okay.  Mr. Markstrom, do you recognize this document?

6    A.   I'm not sure if I have seen this one.

7    Q.   Okay.  Do you -- can you read the title of it there?

8    A.   Sure.  Exhibit C, excavated addresses missing from June

9    2023 restoration reporting.

10           MS. TALLMAN:  Okay.  Your Honor, we'd like to offer

11   into evidence proposed Plaintiff's Exhibit -- this one is

12   labeled 48 on our index.  It's -- the index -- the description

13   of it is actually listed under 47.  This is a spreadsheet

14   called excavated addresses missing from June 2023 reporting

15   unredacted.

16           THE COURT:  Is there an objection to 48?

17           MR. KUPTZ:  Can I just clarify?

18           Is this Mr. Attal's unredacted --

19           MS. TALLMAN:  Correct.

20           MR. KUPTZ:  No objections, Judge.

21           THE COURT:  Exhibit 48 is received.

22           MS. TALLMAN:  Thanks.

23   BY MS. TALLMAN:

24   Q.   Mr. Markstrom, you said you had seen a list of addresses

25   that Mr. Attal produced, the 700 or so addresses that

1  plaintiffs are missing from the City's restoration reporting,

2  correct?

3  A.   Yes, I received that list yesterday.

4  Q.   You received it yesterday.

5       Okay.  I'm going to represent to you that this is a

6  PDF print-out of that spreadsheet.

7       So assuming you -- you did review the Excel version

8  of that spreadsheet, correct?

9  A.   I looked at it briefly, yes.

10  Q.   Okay.  Thank you.

11      Mr. Markstrom, you are the project manager of ROWE's

12  work on this Flint service line replacement project, correct?

13  A.   Yes, I am.

14  Q.   Are you familiar with -- you're familiar with the

15  reporting that the City produces relating to its service line

16  replacement efforts, correct?

17  A.   Yes, in general.  Yes.

18  Q.   Does ROWE produce Excel reports for the City to produce to

19  plaintiffs in this case?

20  A.   If the -- yes, if there's a report requested by the City,

21  we will produce it and provide it to the City.

22  Q.   And the City requested -- the City requests monthly

23  reports of excavation and service line replacement data,

24  correct?

25  A.   Correct.

1      MS. TALLMAN:  Nicole, can you please pull up defense

2  Exhibit 4-1?

3  BY MS. TALLMAN:

4  Q.    Mr. Markstrom, do you recognize this Excel file?

5  A.    Yes, I do.

6  Q.    What is it?

7  A.    This is a list of addresses where restoration work has

8  been completed under the current contract by LGC.

9  Q.    Okay.  So if -- and in column A, there's a list of

10  addresses, correct?

11  A.    Correct.

12  Q.    That list of addresses appears to be in alphabetical order

13  by street name; is that correct?

14  A.    It appears that way, yes.

15  Q.    Okay.  And if an address appears on this list, you

16  understand that restoration has been completed at that address,

17  correct?

18  A.    That is correct.

19  Q.    What time period is covered by current phase?  That phrase

20  is in the title of the file.

21  A.    It would be from the time frame when LGC became under

22  contract with the City of Flint, and I believe that was

23  September-ish of 2022 up until present.

24  Q.    Okay.  So if I wanted to determine whether a specific

25  address is on this spreadsheet, for example, 3202 Parkhurst

1  Ave., starting with P, like pizza, on this list, one way I can

2  do that is to scroll down to the streets that start with the

3  letter P; is that right?

4  A.   I assume you can do that, yes.

5       MS. TALLMAN:   Okay.  Nicole, can you scroll down to

6  the street names that start with P?

7  BY MS. TALLMAN:

8  Q.   Okay.  Mr. Markstrom, you see in row 336, the address

9  listed is 854 Paddington Avenue?

10 A.   Yes, I do.

11 Q.   Looking at this, what's visible on your screen, does the

12 address 3202 Parkhurst Ave. appear?

13 A.   I do not see that.

14 Q.   So the address 3202 Parkhurst Ave does not appear on this

15 spreadsheet; is that correct?

16 A.   That's not what I -- yeah, I do not see it, correct.

17 Q.   Okay.  Is there any other method you'd like to conduct to

18 confirm that 3202 Parkhurst Ave. does not appear on this

19 spreadsheet?

20 A.   The only other way I would know is do a search and filter

21 and type in 3202 or Parkhurst and it would search for it, so...

22      MS. TALLMAN:   Nicole, can you please click control

23 find?

24 BY MS. TALLMAN:

25 Q.   Is this a way that -- this is a way you can search for

1  something in an Excel spreadsheet, correct?

2  A.   That's the way I would do it, yes.

3  Q.   Okay.  And would you type in 3202 space Parkhurst, capital

4  P-A-R-K-H-U-R-S-T?  That's the way you would search for it,

5  correct?

6  A.   Yes, one way.

7  Q.   And then you would click find next to have the computer

8  search for that address, correct?

9  A.   Correct.

10       MS. TALLMAN:  Nicole, can you click find next?

11  BY MS. TALLMAN:

12  Q.   This results in a box that says, we couldn't find what you

13  were looking for.  Click options for more ways to search,

14  correct?

15  A.   Correct.

16  Q.   And that means that the search function did not find the

17  address 3202 Parkhurst Ave., correct?

18  A.   Correct.

19  Q.   Okay.  I'd like to use -- identify two other addresses on

20  this spreadsheet.  The first one is 1809 Delaware Ave.  Could

21  we use the same method we just used to see if 1809 Delaware

22  Ave. is on this spreadsheet?

23  A.   I would assume so, yes.

24       MS. TALLMAN:  Okay.  Nicole, can you please click

25  control find and type in 1809 space Delaware, capital

1    D-E-L-A-W-A-R-E?  And then, Nicole, please click find next.

2              A box popped up that says, we couldn't find what you

3    were looking for.  Click options for more ways to search.

4    BY MS. TALLMAN:

5    Q.    Do you see that, Mr. Markstrom?

6    A.    Yes, I do.

7    Q.    So the address 1809 Delaware Ave. does not appear on this

8    spreadsheet, correct?

9    A.    I believe so, yes.

10   Q.    Okay.  Do you have any reason to believe that the search

11   function somehow messed up or made a mistake in conducting this

12   search?

13   A.    No, I wouldn't.

14   Q.    I'm just going to write it up here so we can remember it.

15            I'm going to do one more address to try to find it.

16   620 Lincoln Ave.  I'm just going to write it up here.

17            Mr. Markstrom, we can use the same method as we used

18   for the other two addresses to find 620 Lincoln Ave. on this

19   spreadsheet, correct?

20   A.     Correct.

21            MS. TALLMAN:  Nicole, can you saw please type in 620

22   space capital L-I-N-C-O-L-N into the search bar and click?

23   BY MS. TALLMAN:

24   Q.    Mr. Markstrom, a text box popped up, we couldn't find what

25   you were looking for.  Click options for more ways to search.

1        Do you see that?

2   A.   Yes, I do.

3   Q.   So the address 620 Lincoln Ave. does not appear on defense

4   Exhibit 4-1, correct?

5   A.   Correct.

6   Q.   And the address 3202 Parkhurst does not appear on defense

7   Exhibit 4-1, correct?

8   A.   Correct.

9   Q.   And the address 1809 Delaware does not appear on the

10   spreadsheet defense Exhibit 4-1, correct?

11   A.   Correct.

12        MS. TALLMAN:  Okay.  Nicole, can you please pull up

13   defense Exhibit 1-1, 1-2, 1-3?  It's a single spreadsheet with

14   three tabs.

15        Thanks.

16   BY MS. TALLMAN:

17   Q.   Mr. Markstrom, do you recognize this document?

18   A.   Yes, I do.

19   Q.   What is it?

20   A.   It's a -- a list of addresses that -- where a visual

21   inspection had been performed by our -- the ROWE team and also

22   an address list of where we know that additional -- or service

23   line will be -- needs to be completed by the contractor without

24   a visual inspection.

25   Q.   Do you see the date on the top of this file after it says

1    Exhibits 1-1, 1-2 and 1-3, it says 2023-06-21, correct?

2    A.    Correct.

3    Q.    And that is a date, June 21st, 2023?

4    A.    Correct.

5    Q.    Do you understand this to be the restoration status

6    reporting that ROWE produced -- ROWE created this document,

7    correct?

8    A.    Yes, we did.

9    Q.    And do you understand this to be the data ROWE submitted

10   to the City concerning restoration status around June 21st?

11   A.    Correct.

12   Q.    Okay.  So I'm going to look for these three addresses

13   again or I'd like you to look for them on this spreadsheet.

14            There are three tabs here, correct?

15   A.    There are.

16   Q.    You're familiar with Excel -- Microsoft Excel, correct?

17   A.    Yes.

18   Q.    Are you aware that there's a way to search three different

19   tabs at once?

20   A.    I'm not familiar with that.

21   Q.    Okay.  We're going to use a different method then.

22            So, do you see that this spreadsheet has three

23   different tabs?

24   A.    Yes.

25   Q.    And the tab that's highlighted or showing right now, the

1   title is, homes completed based on VI.  Do you see that?

2   A.   Yes, I do.

3   Q.   VI stands for visual inspection?

4   A.   Correct.

5   Q.   So this is a list of homes that the City determined were

6   already all set, already restored based on a site inspection,

7   correct?

8   A.   Correct.

9        MS. TALLMAN:  Okay.  Nicole, can you please click

10  control find?

11  BY MS. TALLMAN:

12  Q.   This is a way to search a spreadsheet, correct?

13  A.   Correct.

14       MS. TALLMAN:  Okay.  And can you type in that first

15  address, 3202 Parkhurst?

16       I think there's a typo, Nicole, if you want to --

17  BY MS. TALLMAN:

18  Q.   Nicole is typing in 3202 space Parkhurst, and that appears

19  in the find what box, correct?

20  A.   Correct.

21  Q.   Do you see that?

22  A.   Yes, I do.

23       MS. TALLMAN:  Nicole, please click find next.

24  BY MS. TALLMAN:

25  Q.   A text box popped up that says, we couldn't find what you

108

```
1    were looking for.  Click more ways to search.  Do you see that?
2    A.   Yes, I do.
3    Q.   So the address 3202 Parkhurst does not appear on the tab,
4    homes completed based on VI in this document, correct?
5    A.   Correct.
6    Q.   Okay.  Let's do the next address.
7              MS. TALLMAN:  Nicole, can you please click okay and
8    then go back to the search bar?
9    BY MS. TALLMAN:
10   Q.   Let's search for 1809 Delaware.  So Nicole is typing in
11   1809 space Delaware.  Can you -- do you see that,
12   Mr. Markstrom?
13   A.   Yes, I do.
14             MS. TALLMAN:  Can you click find next, Nicole?
15   BY MS. TALLMAN:
16   Q.   That same text box popped up saying, we couldn't find what
17   you were looking for.  Click more way -- click options for more
18   ways to search.  Do you see that, Mr. Markstrom?
19   A.   Yes, I do.
20   Q.   So do you -- you conclude that the address 1809 Delaware,
21   does not appear on this tab, homes completed based on VI,
22   correct?
23   A.   Correct.
24   Q.   Let's try to find the third address.
25             MS. TALLMAN:  Nicole, can you type into the find what
```

1   box, 620 space Lincoln?

2   BY MS. TALLMAN:

3   Q.   Mr. Markstrom, do you see that the words -- or 620 space

4   Lincoln appears in the find what box, correct?

5   A.   Yes, I do.

6          MS. TALLMAN:  Nicole, can you click find next?

7   BY MS. TALLMAN:

8   Q.   A text box popped up saying, we couldn't find what you

9   were looking for.  Click options for more ways to search.  You

10  see that, correct?

11  A.   Yes, I do.

12  Q.   So the three address -- none of the three addresses, 3202

13  Parkhurst, 1809 Delaware and 620 Lincoln appear on this tab,

14  homes completed based on VI, correct?

15  A.   Correct.

16         MS. TALLMAN:  Okay.  Nicole, can you please click

17  over to that middle tab?

18  BY MS. TALLMAN:

19  Q.   This says, homes to complete based on VI, correct?

20  A.   Correct.

21  Q.   That's the name of this tab, right?

22         VI means visual inspection, correct?

23  A.   Exactly, yes.

24  Q.   And so this tab reflects addresses.  Do you see there's a

25  list of addresses in column A on the left?

1  A.   Yes.

2  Q.   So this tab reflects addresses where the City determined

3  it still needs to go back and restore that property based on a

4  visual inspection it conducted, correct?

5  A.   Correct.

6  Q.   Okay.  I'd like to use the same method to try to find

7  these three addresses.

8         MS. TALLMAN:  Nicole, can you please open the text

9  box?

10  BY MS. TALLMAN:

11  Q.   Mr. Markstrom, do you see 620 Lincoln is showing in the

12  find box?

13  A.   Yes.

14         MS. TALLMAN:  Nicole, can you click find next?

15  BY MS. TALLMAN:

16  Q.   Mr. Markstrom, do you conclude from this pop-up box

17  saying, we couldn't find what you were looking for, that the

18  computer did not find 620 Lincoln in this tab?

19  A.   Yes.

20  Q.   And so 620 Lincoln does not appear in this tab, the middle

21  tab, homes to complete based on VI?

22  A.   Correct.

23         MS. TALLMAN:  Okay.  Nicole, can you reopen the find

24  text box and type in 3202 space Parkhurst?

25  BY MS. TALLMAN:

1   Q.   Mr. Markstrom, do you see that 3202 Parkhurst -- space

2   Parkhurst appears in that find?

3   A.   Yes, I do.

4        MS. TALLMAN:  Nicole, can you click find next,

5   please?

6   BY MS. TALLMAN:

7   Q.   A pop-up box popped up saying, we couldn't find what you

8   were looking for.  Click options for more ways to search.  Do

9   you see that?

10  A.   Yes, I do.

11  Q.   So the address 3202 Parkhurst does not appear in the

12  middle tab, homes to complete based on VI, correct?

13  A.   Correct.

14  Q.   Okay.  Let's do the last address.

15       MS. TALLMAN:  Nicole, can you please type in 1809

16  Delaware?

17  BY MS. TALLMAN:

18  Q.   Mr. Markstrom, can you confirm you see 1809 Delaware in

19  that search box?

20  A.   I do.

21       MS. TALLMAN:  Nicole, can you click find next?

22  BY MS. TALLMAN:

23  Q.   A pop-up box popped up saying, we couldn't find what you

24  were looking for.  Click options for more ways to search.  Do

25  you see that?

112

1    A.    Yes, I do.

2    Q.    So the address 1809 Delaware does not appear in this

3    middle tab, homes to complete based on VI?

4    A.    Correct.

5    Q.    Okay.  So, in this middle tab, none of the three

6    addresses, 3202 Parkhurst, 620 Lincoln and 1809 Delaware appear

7    in this middle tab, homes to complete based on VI, correct?

8    A.    Correct.

9    Q.    Okay.  There's one last tab in this spreadsheet.  It's

10   called, known homes to complete.  Do you see that?

11   A.    Yes, I do.

12   Q.    And this appears to be a list of addresses, correct?

13   A.    Yes.

14   Q.    And you understand that this is a list of addresses where

15   the City knows ROWE and the City know, based on their records,

16   that they still need to go back to that home to conduct

17   property restoration, correct?

18   A.    Correct.

19         MS. TALLMAN:  Nicole, can you please click control

20   find and pull up that find box?

21   BY MS. TALLMAN:

22   Q.    Mr. Markstrom, we can use the same method to search for

23   addresses in this tab, correct?

24   A.    Correct.

25   Q.    And, Mr. Markstrom, you see that 1809 Delaware appears in

113

1    that search box?

2    A.   Correct.

3         MS. TALLMAN:  Nicole, can you click find next?

4    BY MS. TALLMAN:

5    Q.   A pop-up box says, we couldn't find what you were looking

6    for.  Click options for more ways to search.

7         So, Mr. Markstrom, the address 1809 Delaware does not

8    appear in this tab, known homes to complete, correct?

9    A.   Yes.

10        MS. TALLMAN:  Nicole, can you please type in to the

11   find box 3202 Parkhurst?

12   BY MS. TALLMAN:

13   Q.   Mr. Markstrom, the address -- or the text 3202 space

14   Parkhurst appears in the find what box in this find and replace

15   function, correct?

16   A.   Yes, it does.

17        MS. TALLMAN:  Nicole, can you click find next?

18   BY MS. TALLMAN:

19   Q.   That same pop-up box popped up.

20        Mr. Markstrom, do you conclude from that that the

21   address 3202 Parkhurst does not appear in the tab, known homes

22   to complete?

23   A.   I do.

24   Q.   And let's do the last one.

25        MS. TALLMAN:  Nicole, can you please type in 620

114

1   space Lincoln?

2   BY MS. TALLMAN:

3   Q.   Mr. Markstrom, do you see 620 space Lincoln typed in the

4   find what box?

5   A.   I do.

6        MS. TALLMAN:  Nicole, can you please click find next?

7   BY MS. TALLMAN:

8   Q.   That same pop-up box popped up saying, we couldn't find

9   what you were looking for.  Click options for more ways to

10  search.  Do you see that?

11  A.   Yes, I do.

12  Q.   And you conclude from that that 620 Lincoln does not

13  appear on that tab, known homes to complete, correct?

14  A.   Correct.

15  Q.   So the three addresses, 3202 Parkhurst, 1809 Delaware and

16  620 Lincoln, do not appear on any tabs in this spreadsheet,

17  correct?

18  A.   Correct.

19  Q.   Are there any other tabs in the spreadsheet that I've

20  missed?

21  A.   No.

22  Q.   Do you have any reason to believe that the three addresses

23  we've been discussing are in this spreadsheet?

24  A.   No, I do not.

25  Q.   Okay.  And the two spreadsheets we just looked at this one

1   with three tabs and the previous exhibit, the current phase

2   addresses, that's defense Exhibit 4-1, those two files are the

3   entirety of the June reporting that ROWE provided to the City

4   on restoration status, correct?

5   A.   I believe so, yes.

6          MS. TALLMAN:   Okay.  Nicole, can you please pull up

7   defense -- or, excuse me, Plaintiff's Exhibit 25 on the screen?

8   BY MS. TALLMAN:

9   Q.   Mr. Markstrom, do you recognize this document?

10  A.   I do not.

11  Q.   Okay.  Can you read the title at the top of that, of the

12  file?

13  A.   Sure.  I -- real quick.  Apologies.

14          Right.  Thank you.

15  2019.04.29 monthly reporting -- monthly report.  Sorry.

16  Q.   Was ROWE contracted with the City in April 2019 to conduct

17  work on the service line replacement program?

18  A.   No, we were not.

19  Q.   Okay.  Do you see the column on the left?

20  A.   Yes, I do.  Yep.

21  Q.   Can you read the title of that column?

22  A.   Sure.  Address of service line exploration.

23  Q.   And beneath that, there's a list of addresses, correct?

24  A.   Correct.

25  Q.   And then the next column over from the left, do you see

1 the title of that column?

2 A.   Yes.

3 Q.   Can you read it?

4 A.   Sure.  Service line exploration date.

5 Q.   And then there's a series of dates beneath that title,

6 correct?

7 A.   Correct.

8 Q.   I'm going to represent to you that -- or looking at this

9 -- looking at this spreadsheet, how do you interpret it?

10 A.   It appears to be dates that work was completed at

11 individual addresses.

12 Q.   Okay.  And part -- part of your contract with the City was

13 to determine which homes that it had previously excavated,

14 needed restoration, correct?

15 A.   Correct.

16 Q.   And you spoke with the City about what records they might

17 have about where they've conducted excavations and

18 replacements, correct?

19 A.   We've had communication, yes.

20 Q.   And the City has provided you with all the data that they

21 have concerning where they've conducted excavations and

22 replacements, correct?

23 A.   They provided us data.  I don't know if I would say all

24 the data, but they provided us data, yes.

25 Q.   So you're not sure whether the City has provided you

1  complete data on where excavations and replacements have

2  occurred, correct?

3  A.    Correct.

4         MS. TALLMAN:  Nicole, can you please scroll down to

5  page 5 of this document?  This is 5.

6  BY MS. TALLMAN:

7  Q.    Okay.  Mr. Markstrom, about halfway down the page in that

8  first column, do you see the address 2302 Parkhurst Ave listed?

9  A.    I do.

10  Q.    And do you see a date listed next to it?

11  A.    Yes.

12         THE COURT:  You've been searching for 3202 Parkhurst,

13  not 2302 Parkhurst.

14         MS. TALLMAN:  Oh, correct.  Thank you, your Honor.

15         THE COURT:  So look at your easel there.

16         MS. TALLMAN:  Yes.  Nicole, can you please find --

17  see if 3202 Parkhurst is on this spreadsheet?  Can you click

18  control find here?

19         Okay.  Nicole, can you please pull up proposed

20  Plaintiff's Exhibit 35?

21         THE COURT:  Well, I can tell you, based on your

22  Exhibit 48, which I think were Mr. Attal's summary, there is no

23  3202 Parkhurst.

24         MS. TALLMAN:  Okay.  Thank you, your Honor.

25         This is proposed Plaintiff's Exhibit 35.  Defense

1  counsel has stipulated that it is a monthly report produced by

2  -- produced by the City in this case.

3          Plaintiffs move to admit this document into evidence.

4          THE COURT:  Monthly report for 2017, May 30 -- or

5  June 30?

6          MS. TALLMAN:  May 30.

7          THE COURT:  Yes.  Is there any objection to 35?

8          MR. KUPTZ:  None, Judge.

9          THE COURT:  35 is received.

10         MS. TALLMAN:  Okay.

11  BY MS. TALLMAN:

12  Q.   Mr. Markstrom, do you recognize this document?

13  A.   I do not.

14  Q.   Can you read the title of the document?

15  A.   Sure.  2017.05.30 LSL replacement data.

16  Q.   Do you understand LSL to refer to lead service line?

17  A.   That's the way I would interpret it, yes.

18  Q.   And in the middle column, it says, address of resident --

19  residence, correct?

20  A.   It does, yes.

21  Q.   Okay.  And the far column on the right says, date work was

22  performed, correct?

23  A.   Yes, it does.

24  Q.   And beneath that, there's a series of dates, correct?

25  A.   Correct.

1  Q.   And the one through third column from the left says, what

2  material type was the service line's public portion, correct?

3  A.   Correct.

4  Q.   And beneath that, there's entries -- on page 1, the

5  entries are either lead or copper, correct?

6  A.   Yes.

7  Q.   Okay.  And then the next column over, so second from the

8  right, the title is, what material type was the service line's

9  private portion, correct?

10  A.   Correct.

11  Q.   And beneath that, there's entries saying -- either on page

12  1, galvanized or copper, correct?

13  A.   Correct.

14  Q.   Okay.  And if you look about -- if you -- these appear to

15  be -- there's a bunch listed that are on Delaware Ave. under

16  address of residence, correct?

17  A.   Yes.

18  Q.   And do you see 1809 Delaware Ave. listed about eight or

19  nine down?

20  A.   I do, yes.

21  Q.   And what is the entry under what material type was the

22  service line's public portion next to 1809 Delaware Ave.?

23  A.   It's written as lead.

24  Q.   And what does it say next to -- what material type was the

25  service line's private portion?

1    A.    It's listed as galvanized.

2    Q.    And then what date is listed on that?

3    A.    3.29 of 2017.

4    Q.    I'm going to ask you to -- I'm going to represent to you

5    that this is part of the City of Flint's reporting to

6    plaintiffs in this case about lead service line excavations and

7    replacements.  With that information, would you conclude that

8    the address 1809 Delaware Ave. had service line work conducted

9    at it on March 29th, 2017?

10   A.    Based on the data provided, it looks like there was some

11   work completed on that date, yes.

12   Q.    Okay.  Thank you.

13             MS. TALLMAN:  Nicole --

14             THE COURT:  Ms. Tallman, how much more do you have?

15             MS. TALLMAN:  Just one last -- one last address and a

16   few additional questions, if I may, your Honor.

17             THE COURT:  How many are a few?

18             MS. TALLMAN:  Less than 10.

19             THE COURT:  Well, all right.  We're going to take a

20   recess.

21             MS. TALLMAN:  Okay.

22             THE COURT:  I'll see the people on Franklin Capital

23   back in chambers.  And then, after that, I'll -- I'm going to

24   interrupt this with another proceeding on the record and then

25   we'll finish up.

```
 1              MS. TALLMAN:  Okay.  Thank you, your Honor.

 2              THE COURT:  Recess court, please.

 3              THE CLERK:  All rise.

 4              Court is now in recess.

 5              (Off the record at 11:15 a.m.)

 6              (Back on the record at 12:10 p.m.)

 7              THE CLERK:  All rise.

 8              Court is back in session.

 9              THE COURT:  You may be seated.

10         All right.  Mr. Markstrom, can you come back to the

11   witness stand, please?

12              And, Ms. Tallman, let's finish up this cross.

13              MS. TALLMAN:  Thank you, your Honor.

14              THE COURT:  Mr. Markstrom, do you understand you're

15   still under oath?

16              THE WITNESS:  I do.

17              THE COURT:  All right.

18              MS. TALLMAN:  Nicole, can you please pull up

19   Plaintiff's proposed Exhibit 31 on the screen?

20              Your Honor, I'd like to offer proposed Exhibit --

21   Plaintiff's Exhibit 31 into evidence.  Defense counsel has

22   stipulated to its authenticity and admissibility.

23              THE COURT:  Describe it for the record, please.

24              MS. TALLMAN:  This is a spreadsheet that is part of

25   the City of Flint's status report, dated February 28th, 2018,
```

1  describing all addresses where a service line was excavated or

2  replaced by the City during the reporting period February 2018,

3  including the date of the excavation and/or service line

4  replacement.

5          THE COURT:  Mr. Kuptz, any objection to 31?

6          MR. KUPTZ:  None, Judge.

7          THE COURT:  31 is received.

8          MS. TALLMAN:  Thank you.

9  BY MS. TALLMAN:

10  Q.   Mr. Markstrom, have you seen this document before?

11  A.   No, I have not.

12  Q.   Can you read the title at the top?

13  A.   Sure.  2018.02.28 fast SLR data.

14  Q.   SLR refers to service line replacement, correct?

15  A.   Correct.

16  Q.   And in the column furthest to the left, that title says

17  parcel address, correct?

18  A.   Correct.

19  Q.   And the next column over on the right -- sorry, second

20  from the left says, original public material, correct?

21  A.   Yes.

22  Q.   And beneath that on page 1 of the exhibit, there's some

23  entries saying either lead or copper, correct?

24  A.   Correct.

25  Q.   And two columns over, so this is second from the right,

123

1   the title says, work date performed, correct?

2   A.   Yes.

3   Q.   And beneath that is a series of addresses, correct?

4   A.   Series of dates.

5   Q.   Oh, dates.  Thank you.

6        Yes.  Beneath that is a series of dates, correct?

7   A.   Correct.

8   Q.   And the column furthest to the right says, new underscore

9   portion underscore replaced at the top, correct?

10  A.   Correct.

11  Q.   And beneath that, there's some entries, either both, none

12  or public only or private only on page 1 of the document,

13  correct?

14  A.   Yes.

15  Q.   I'm going to represent to you that this is part of the

16  City of Flint's reporting on service line replacements

17  conducted during February 2018.  ROWE -- does ROWE have this

18  data?

19  A.   I am not sure.

20  Q.   You're not sure.

21       Now, on page -- on page 1 of the document, about two-

22  thirds the way down, do you see an address that says 620

23  Lincoln Ave.?

24  A.   Oh, yes, I do.  Yep.

25  Q.   Okay.  And next -- in the next column over, it says, lead,

1  correct?

2  A.   Correct.

3  Q.   And the date in the row of that address says 4.10.2017,

4  correct?

5  A.   It actually says 4.11.2017.

6  Q.   Thank you.  Excuse me.  Yes.

7       4.11.2017, correct?

8  A.   Correct.

9  Q.   And on the furthest column over, it says both, correct?

10  A.   Correct.

11  Q.   So the address 620 Lincoln Ave. is on this spreadsheet

12  that we're looking at, Plaintiff's Exhibit 31, correct?

13  A.   Yes.

14  Q.   And this is data from the City about lead service line

15  replacements conducted in the past, correct?

16  A.   I would assume so, yes.

17  Q.   Okay.  And do you recall earlier today we looked at

18  defense Exhibits 1-1, 1-2, 1-3 and 4-1, that is the June

19  restoration status reporting.  Do you remember looking at those

20  spreadsheets?

21  A.   I do, yes.

22  Q.   And the address 620 Lincoln Ave. was not on either of

23  those two June spreadsheets, correct?

24  A.   That's correct.

25  Q.   Thank you.  Just a few more questions.

1        You discussed earlier with Mr. Kuptz that you

2   reviewed Mr. Attal's list of roughly 700 addresses, correct?

3   A.    I took a brief look at it, yes.

4   Q.    And you conducted some additional analysis of roughly 10

5   of those, correct?

6   A.    Just to see what was on there, yes.

7   Q.    The other roughly 690, you didn't do any other work other

8   than noting that there was a long list of addresses, correct?

9   A.    That is correct.

10  Q.    So it's possible that some of those addresses have been

11  excavated or replaced, the service lines by the City of Flint,

12  correct?

13  A.    I would say there's -- there's a chance, correct.

14  Q.    You don't know --

15  A.    I don't.

16  Q.    -- whether or not -- you don't know whether or not all of

17  the addresses on Mr. Attal's list have been excavated or

18  replaced, correct?

19  A.    That is correct.

20  Q.    And you don't know whether the City -- you don't know

21  whether the City has reported a restoration status as to those

22  addresses, correct?

23  A.    I do not.

24        MS. TALLMAN:  Nothing further, your Honor.

25        THE COURT:  Thank you.  Would you like some redirect?

1    Q.   And you haven't checked to see if they're owned by the

2    Land Bank?

3    A.   No.

4    Q.   And you haven't checked to see if they're on the City of

5    Flint's demolition list?

6    A.   No.

7              MR. KUPTZ:  Thank you.  That's all I have.

8              THE COURT:  Thank you.

9              Anything else, Ms. Tallman?

10             MS. TALLMAN:  Just a few questions, if I may, your

11   Honor.

12                        RE-CROSS-EXAMINATION

13   BY MS. TALLMAN:

14   Q.   Mr. Markstrom, Mr. Kuptz just asked you about when ROWE

15   began the visual inspections and you talked about beginning

16   those inspections after the snow cover was no longer on the

17   ground; is that correct?

18   A.   That is correct.

19   Q.   At some point since ROWE started those visual inspections,

20   ROWE increased its staffing, it increased the number of crews

21   performing those inspections, correct?

22   A.   That is correct.

23   Q.   And ROWE increased its staffing on or around May 1st,

24   2023; is that correct?

25   A.   Right around that time, correct.

 1          MS. TALLMAN:  Okay.  Nothing further, your Honor.

 2          THE COURT:  Okay.  Mr. Markstrom, you testified in

 3   response to a question about learning that the inspections that

 4   you had been doing did not meet the requirements of a court

 5   order.  Do you remember that testimony?

 6          THE WITNESS:  Yes, I do.

 7          THE COURT:  And you said from that point, you sort of

 8   divided up statistically, I guess, the work that you did

 9   beforehand and then the work that you did afterward, right?

10          THE WITNESS:  Yes.  We -- we started performing

11   visual inspections in the fall of '22 to start looking at

12   restoration, what remaining restoration is available -- or what

13   is required.  Sorry.  That was prior to our knowledge of the

14   formal court order of the seven criteria that had to be taken

15   care of.

16          THE COURT:  Right.  When is it -- can you give me a

17   date as to when you learned about the court order and what you

18   had -- what you were supposed to be doing?

19          THE WITNESS:  I believe we were informed of the

20   potential of it in the fall of '22, winter of '22, but then we

21   -- I do not recall the exact date of when we started performing

22   the seven criteria in the spring of '23.

23          THE COURT:  Okay.  So you were informed about the

24   fact that you needed to do more in the fall of '22, and then

25   you implemented that after the snow cleared in the spring of

1    2023?

2              THE WITNESS:  Correct.

3              THE COURT:  All right.  You also indicated that your

4    restoration began in 2023 as soon as the weather allowed.  Can

5    you put a date on that?

6              THE WITNESS:  I -- I think it was, if I recall

7    correctly, in late April or early May, the contractor was able

8    to start doing actual construction in the field restoration

9    construction.

10             THE COURT:  Are you telling me the snow didn't clear

11   in Flint until late April of 2023?

12             THE WITNESS:  There's a little issue with doing

13   restoration.  It's not only does the snow has to be cleared,

14   the ground has to be unfrozen, or thawed, I should say.  And

15   sometimes when you're doing lawn restoration, you can't put

16   down seed and mulch until the ground -- the ground has warmed

17   up, so that part has a little delay.  Also --

18             THE COURT:  Not just that the frost has to come out,

19   it has to also be receptive to --

20             THE WITNESS:  Correct.  Germination and growth.

21             THE COURT:  -- to landscaping?

22             THE WITNESS:  Yep, yep.

23             And then on the hard surface side, the asphalt and

24   the concrete side, you want to make sure that the ground is

25   still not frozen and that the asphalt plans and the concrete

1   plans are up in production for the year.  And in Michigan, that

2   typically happens sometime in the month of May.

3          THE COURT:  Oh, I see.  Okay.

4          THE WITNESS:  Yeah.

5          THE COURT:  All right.  Anything else then?

6          MS. TALLMAN:  Yes, your Honor.

7          THE COURT:  I'm going to ask Mr. Kuptz first.

8          MR. KUPTZ:  Just one question.

9          THE COURT:  Yeah, right.

10                    REDIRECT EXAMINATION

11  BY MR. KUPTZ:

12  Q.   Mr. Markstrom, I just wanted to clarify from the testimony

13  you just gave in response to the Judge's question that any

14  restoration site visits that were conducted in the fall of 2022

15  that ROWE later determined did not apply all of those visual

16  inspection criteria, were all of those redone?

17  A.   That is my understanding, yes, we went back to all of 'em.

18         MR. KUPTZ:  Thank you.  That's all.

19         THE WITNESS:  All of them.  Sorry.

20         THE COURT:  And when were they redone?

21         THE WITNESS:  During the -- the -- probably, I guess,

22  as it was mentioned earlier, the first dataset, I would think

23  would have been done and we would have completed those in the

24  month of April or May.

25         THE COURT:  All right.  Was there a difference

1  between taking a look at the properties to see what restoration

2  had to be done and actually doing the restoration?

3        THE WITNESS:  The -- the visual inspection that --

4  that ROWE performed just identified what work was required,

5  then the contractor actually had to go out and do the physical

6  work.

7        THE COURT:  Got it.

8        When did you start doing the visual inspections in

9  2023?

10       THE WITNESS:  I believe that was again in April-ish,

11 if I remember correctly, the date.

12       THE COURT:  All right.  You didn't need frost coming

13 out of the ground to do a visual inspection, did you?

14       THE WITNESS:  No, we did not need that.  We needed to

15 have the language for the door hanger approved.  That was part

16 of the visual inspections.  We didn't want to send our crews

17 out once and then have to go back to the same address to hang a

18 door hanger.  So we had a couple things that we were waiting to

19 get completed.  Once all those were agreed upon and we ordered

20 the door hangers and got the printing back, then we started the

21 actual -- the formal visual equal inspections.

22       THE COURT:  Were you tasked with -- with putting the

23 door hangers together?

24       THE WITNESS:  We assisted the City with the -- with

25 the language, putting together a door hanger, and we provided

1   it to the City.

2            THE COURT:  When did you start working on that?

3            THE WITNESS:  I don't recall the exact date.

4            THE COURT:  Can you give me an estimate?

5            THE WITNESS:  February, March-ish, I would think.

6   Somewhere in that range.  Maybe March, April.  Somewhere in

7   that range.

8            THE COURT:  February, March, April?

9            THE WITNESS:  Somewhere in that time range.  I

10  apologize.  I don't know when we started that.

11           THE COURT:  Oh, okay.  So your answer is you don't

12  know?

13           THE WITNESS:  Exactly.

14           THE COURT:  All right.

15           MS. TALLMAN:  Thank you, your Honor.

16                       RE-CROSS-EXAMINATION

17  BY MS. TALLMAN:

18  Q.   Mr. Markstrom, you just explained that you became aware of

19  the possibility of a requirement to do these visual inspections

20  in fall of last year, 2022, correct?

21  A.   Correct.

22  Q.   And you attended some meetings where plaintiff's counsel,

23  including with me, during the fall of 2022, concerning these

24  issues, correct?

25  A.   I believe so, yes.

1    Q.    And during that meeting, plaintiffs proposed specific
2    criteria to govern the City's visual inspections to ensure
3    their accuracy, correct?
4    A.    I believe so, yes.
5    Q.    And those criteria are very similar to the criteria that
6    appear in the court's order or -- is that correct?
7    A.    I believe so.
8              THE COURT:  Are you referring to the February 2023
9    order?
10             MS. TALLMAN:  Yes, the February 2023 order.
11   BY MS. TALLMAN:
12   Q.    And those criteria that were proposed by plaintiffs and
13   ultimately adopted by this court came from the City's own
14   contracts governing restoration work; are you aware of that?
15   A.    That, I'm not a hundred percent sure of, so...
16             MS. TALLMAN:  Nothing further, your Honor.
17             THE COURT:  Do you have any further witnesses?
18             MR. KUPTZ:  No, Judge.
19             THE COURT:  All right.  Thank you, Mr. Markstrom.
20   You may stand down.
21             THE WITNESS:  Thank you.
22             THE COURT:  Any further witnesses?
23             MS. TALLMAN:  No, your Honor.
24             THE COURT:  All right.  How do you want to proceed?
25             MS. TALLMAN:  If the Court will permit oral argument