UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, MELISSA MAYS, AMERICAN
CIVIL LIBERTIES UNION OF MICHIGAN,
and NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

                        Plaintiffs,                        Case Number 16-10277

v.                                                Honorable David M. Lawson

NICK A. KHOURI, FREDERICK HEADEN,
MICHAEL A. TOWNSEND, MICHAEL A.
FINNEY, JOEL FERGUSON, SYLVESTER
JONES, R. STEVEN BRANCH, and
CITY OF FLINT,

                         Defendants.

_____/

**ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR CONTEMPT**

On March 28, 2017, the City of Flint entered into a Settlement Agreement, promising, among other things, to replace the water service lines made of lead that furnished water to residences throughout the City. The Settlement Agreement brought to a conclusion, or so it was thought at the time, a lawsuit that was filed under the Clean Water Act to redress the well-documented and widely publicized contamination of the City's water system when the municipality replaced the Detroit Water and Sewerage Department, which drew its water from Lake Huron, with its own Flint-River-based system as the source of the City's drinking water. The Settlement Agreement established deadlines for various phases of the replacement and restoration operation. Those benchmarks included outreach, reporting, and inspection requirement deadlines intended to ensure that Flint residents were notified of their rights to remediation and to permit the plaintiffs to monitor the City's progress remediating the defective water distribution system.

Those deadlines almost immediately were missed, and the plaintiffs thereafter filed motions and stipulations to modify them.

Now, for the sixth time in six years, the plaintiffs seek to enforce the Settlement Agreement, as modified by the several deadline extensions that the Court has granted following the parties' stipulations. The plaintiffs allege that the City continues to miss deadlines for completing promised replacement work, including by failing (1) to complete by March 1, 2023 outreach to all homes eligible for service line replacement; (2) to determine by May 1, 2023 the addresses where the City still needs to complete restoration work; and (3) to provide accurate and complete monthly restoration reports to the plaintiffs. They ask the Court to impose coercive sanctions by holding the City and its mayor, a non-party, in contempt; ordering the City and its mayor to pay a $500 daily fine to the Court until it complies with the Court's last enforcement order; and amending the Settlement Agreement to permit the plaintiffs to recover attorney's fees and costs for future enforcement efforts.

The Court held a hearing on the motion on June 30, 2023 during which the parties presented evidence. The Court also permitted the parties to file supplemental briefs in August and November 2023. Based on the evidence, it is apparent that the City has failed to abide by the Court's orders in several respects, and that it has no good reason for its failures. The City has demonstrated belated compliance since the hearing, but even now, it has not actually replaced all of the lead service lines, which it originally promised to replace by March 28, 2020. The City is in civil contempt of the Court's order.

## I. Factual Background

At the time of the June 2023 hearing on the present motion, the City of Flint had continued to miss deadlines for completing the water service line replacement work it promised to do when

it entered into a Settlement Agreement on March 28, 2017. The Agreement is extensive, and the parties and the Court repeatedly have modified it in to ensure the City's compliance and protect the health and safety of Flint residents. As modified, the Agreement required that the City "implement a plan to replace *all* lead and galvanized service lines at Flint residences" to reduce lead contamination in the City's tap water. 4th Enforcement Order, ECF No. 228, PageID.11034. It required the City to conduct outreach to residents to seek their consent to excavate their service lines. The outreach was to be made via a mailing and at least two in-person contacts, one of which must occur after 5:00 p.m. or on a weekend, to all homes that had an active water account when or after the parties entered the Agreement. Mar. 2019 Modification Order, ¶¶ 14-15, ECF No. 208, PageID.10354-55; Settlement Agreement, ¶ 11, ECF No. 147-1, PageID.7365-66. The Agreement also mandates that the City address property damage caused by its service line work to residents' sidewalks, curbs, and driveways. The City must repair any damage by filling the excavation trench, removing debris, ensuring uniform plant cover, and repairing any broken asphalt or concrete. 2022 Modification Order, ¶ 2, ECF No. 237, PageID.11071; 5th Enforcement Order, ECF No. 258, PageID.11694-95. Finally, the City must make monthly status reports to the plaintiffs detailing its outreach and restoration efforts, and it must maintain sufficient records to comply with all reporting requirements. 5th Enforcement Order, ECF No. 258 at PageID.11695-96; Mar. 2019 Modification Order, ¶ 6, ECF No. 208, PageID.10348-49.

The City has not fulfilled its obligations under the Agreement as modified. As of the filing date of the plaintiffs' motion, the City had yet to complete outreach, excavations, or restoration; it had made inconsistent reports to the plaintiffs; and it repeatedly had missed deadlines. The City's violations have caused difficulties and, in some cases, hardship to Flint residents, many of whom have waited years for excavations and repairs. *See, e.g.*, Diener decl., ECF No. 260-3,

PageID.11784-85 (attesting that the City did not complete restoration work at declarant's property after replacing the service line in 2019); Hayes decl., ECF No. 260-4, PageID.11787-91 (attesting that the City never replaced declarant's service line after she consented to the replacement in 2020); Perez decl., ECF No. 260-5, PageID.11793-94 (attesting that the City determined that no restoration work was needed at declarant's property, despite the City causing extensive damage to his lawn). Many also still do not have access to safe tap water. Because the City has yet to replace all water service lines, residents still are advised by the Environmental Protection Agency and the state of Michigan not to drink tap water unless a special filter has been installed. May 16, 2023 Scripps Article, ECF No. 260-7, PageID.11850-51.

The Agreement states that its dispute resolution mechanism is the "sole and exclusive mechanism" for resolving disputes and disagreements arising out of the Agreement, and that the Court has jurisdiction to enforce its terms. Settlement Agreement, ¶¶ 125-26, ECF No. 147-1, PageID.7423. It also states that no modification may be made to the Agreement absent a "joint stipulation of all of the Parties and a Court order." *Id.* at ¶ 138, PageID.7426-27. And it caps the plaintiffs' attorney's fees at $895,000, which have been paid, while specifying that the payment "shall fully and finally release, discharge, and satisfy any claim by Plaintiffs to litigation costs (including attorneys' fees and expert costs) incurred in this Case and incurred in enforcing this Agreement through the Termination Date." *Id.* at ¶¶ 123-24, PageID.7422-23. However, the plaintiffs contend that the Agreement's dispute resolution provisions have proved inadequate and its fee provisions are inequitable. The plaintiffs explain, therefore, that they have filed the instant contempt motion in an effort to coerce the City to comply with the Agreement, as well as to amend certain terms of the Agreement to ensure prompt compliance.

A.  Violations of the Court's Order

The plaintiffs have filed five previous motions to enforce the Agreement and to remedy the City's mismanagement of the service line replacement process.  The Court granted the most recent motion to enforce on February 24, 2023 and ordered three remedies that are relevant here.  *First*, the Court ordered the City to create a detailed written Service Line Replacement Plan describing "the steps the City will take to complete the remaining excavation and replacement work (excluding restoration) required by the Agreement as quickly as practicable, and no later than August 1, 2023."  5th Enforcement Order, ECF No. 258, PageID.11689.  The Court directed the City to include a plan for "completing outreach as quickly as practicable and no later than March 1, 2023."  *Id.* at PageID.11690.  *Second*, the Court ordered the City to compile and provide to the plaintiffs an Excel spreadsheet no later than May 1, 2023 (1) listing all previously excavated addresses on the 2022 Replacement Eligible Homes List; and (2) indicating whether the City has contemporaneous documentation that it completed restoration and the date of restoration, or whether it has completed a visual inspection verifying that

> (a) no asphalt, concrete, or other debris remains; (b) the address has a complete, uniform sidewalk with no gaps or holes, and the sidewalk is uniform in both grade and alignment; (c) the address has a complete, uniform driveway with no gaps or holes, and the driveway is uniform in both grade and alignment; (d) the address has a complete, uniform curb, with no gaps or missing pieces, and the curb has a uniform grade and alignment; (e) the lawn is free of holes or trenches and is of a uniform grade, with no visible depressions; (f) any visible topsoil on the greenbelt or lawn is free of debris and the greenbelt or lawn has a consistent and uniform plant cover; and (g) the water shut-off valve is flush with the surface of the lawn and does not pose a tripping hazard.

*Id.* at PageID.11687; Stip. to Modify, ¶ 16.b, ECF No. 256, PageID.11625-27.  The parties agreed that, no later than seven days after submitting this list, the City shall propose a deadline for completing all remaining restoration work required under the Settlement Agreement.  5th Enforcement Order, ECF No. 258, PageID.11687.  *Third*, the Court directed the City to make a

- 5 -

monthly report to the plaintiffs with an Excel spreadsheet listing all of the excavated properties where (1) the City completed and documented restoration, including the dates of restoration; (2) the City has not completed restoration and does not need a visual inspection to confirm restoration status; and (3) the City has no record of restoration. *Id.* at PageID.11695-96. For properties lacking records, the Court ordered the City to indicate in the spreadsheet whether it has confirmed via an in-person visual inspection that restoration was completed, or whether a visual inspection still is needed. *Id.* at PageID.11695-96.

The plaintiffs now contend that the City has violated all three terms of the Court's February 24, 2023 order.

### 1.  Outreach

In the face of the City's noncompliance, the parties repeatedly have agreed to modify the deadline by which the City is required to complete outreach and replace eligible service lines. In April 2022, the City stipulated to complete all remaining excavations by September 30, 2022. Apr. 2022 Modification Order, ¶ 1, ECF No. 237, PageID.11071. The parties agreed at that time that the City had yet to make outreach to 1,369 homes to seek residents' consent to a service line excavation and replacement. Apr. 2022 Stip. to Modify, ECF No. 236, PageID.11060. The homes included those with active water accounts, and more than 700 addresses with inactive accounts that the City agreed were eligible for service line replacement. Sep. 2021 Emails, ECF No. 260-7, PageID.11888; Dec. 2021 Emails, ECF No. 260-7, PageID.11890.

The City did not complete outreach to the 1,369 homes by September 30, 2022. The plaintiffs moved again to enforce the settlement agreement, and the City stipulated in response to a March 1, 2023 deadline for completing any remaining outreach. 5th Enforcement Order, ECF No. 258, PageID.11690. The City also failed to meet that deadline: On April 28, 2023, it sent the plaintiffs a spreadsheet of all work orders "that still needed some sort of outreach," dated April 23,

2023, that included 673 addresses that "were mistakenly excluded because at one point they did not have active water accounts."  Apr. 2023 Emails, ECF No. 260-8, PageID.11979.  The City suggested that it had completed outreach to most of these addresses the previous week by doubling the number of outreach teams, which made 237 first and second attempts and 445 final attempts at outreach.  *Ibid.*  As of May 15, 2023, however, the City had not yet provided a report to the plaintiffs detailing the specific addresses to which it had made such outreach.  May 2023 Emails, ECF No. 260-8, PageID.11952-53.  Moreover, the City allowed that it still was completing outreach to the addresses on its October and December 2022 outreach lists, indicating that it had yet to make weekend visits to 70 of 423 addresses on the October 2022 list and that it still needed to complete outreach to 28 of 104 addresses on the December 2022 list.  Apr. 2023 Emails, ECF No. 260-8, PageID.11979.  The City stated that its outreach to the latter set of addresses had resulted in 47 completed service line replacements and five work declinations.  *Ibid.*

In April, the City also began making weekly reports to the plaintiffs listing the total number of excavations, service line replacements, and consent outreach attempts made, and well as the total number of excavations and replacements scheduled for the next week and the total number of estimated replacements the City could perform based on the number of parts in its materials inventory.  The reports detail the following number of weekly outreach attempts:

| Exhibit | Report Date | Final Consent Attempts | Consents Obtained |
|---------|-------------|------------------------|-------------------|
| 37 | April 12, 2023 | 12 | 3 |
| 38 | April 19, 2023 | 8 | 21 |
| 39 | April 26, 2023 | 445 | 14X (number illegible) |
| 40 | May 3, 2023 | 50 | 10 |
| 43 | May 10, 2023 | 0 | 0 |
| 41 | May 17, 2023 | TK | 20 |
| 42 | May 24, 2023 | N/A | 13 |

*See* Status Reps., ECF No. 260-8, PageID.12020-35.  The City indicated in the May 17, 2023 report that "[c]onsent attempt data is undergoing final quality control checks" and that it

"anticipated that final, updated reporting on consent attempts will be available 05/1[ ]/2023."  May 17, 2023 Status Rep., ECF No. 260-8, PageID.12029 (date illegible).  In the final report, dated May 24, 2023, the City indicated that "[c]onsent attempt work is complete."  May 24, 2023 Status Rep., ECF No. 260-8, PageID.12031.  Although some of the numbers in the emailed status reports are illegible (certain numbers and digits are missing throughout the plaintiffs' exhibits, which came from the City), the plaintiffs represent that the City's spring outreach attempts resulted in more than 200 property owners consenting to service line checks.  Contempt Mot., ECF No. 260, PageID.11744.  However, the City's reports suggest that many of those property owners lacked active water accounts, and that no service line evaluations or replacements could be made at these addresses until the owners established active water accounts.  *See, e.g.*, Apr. 26, 2023 Status Rep., ECF No. 260-8, PageID.12025.

The plaintiffs asked Noah Attal, a data analyst, to complete a statistical analysis of the outreach data the City attached to its weekly reports.  Attal analyzed a spreadsheet dated May 14, 2023 that included outreach attempts through March 20, 2023.  Attal decl., ECF No. 266-1, PageID.12725 n.2.  His analysis shows that, as of May 20, 2023, the City had not completed outreach to 306 addresses on its October 2022 Scope of Work List.  *Id.* at ¶ 13, PageID.12730-31.  Attal compiled a list of these addresses and attached it as an exhibit to his affidavit.  *See* Outreach Work Remaining as of June 2023, ECF No. 266-1, PageID.12740-46.  The list indicates that the City completed some outreach to many of the 306 addresses, but it did not complete its outreach by making the required in-person attempts at the required times or by making the required mailings.  *Ibid.*; *see also* Attal decl., ¶ 13, ECF No. 266-1, PageID.12731 (categorizing remaining outreach).

The plaintiffs blame the City's failure to complete its outreach obligations by the March 1, 2023 deadline in part on the City's mismanagement of its contractors, Lakeshore Global Corporation and ROWE Professional Services. According to the plaintiffs, the City explained that it wrongly instructed its contractors not to complete outreach to homes that did not have active water accounts, despite acknowledging that many of those homes were eligible for service line replacement under the terms of the Agreement. May 2023 Violations Notice, ECF No. 260-7, PageID.11923; Mar. 2022 Emails, ECF No. 260-8, PageID.11975. The City also explained that it did not ensure that its contractors had the technological capacity to record the times that it attempted to make outreach, or to differentiate between consent and scheduling attempts, and that the City therefore lacked complete reports of consent attempts performed during the fall of 2022. Mar. 2023 Emails, ECF No. 260-8, PageID.11975-76; Calero decl., ¶ 3, ECF No. 260-2, PageID.11765.

### 2. Restoration

The City acknowledges that it did not meet the May 1, 2023 deadline for determining the scope of its remaining restoration work. Resp., ECF No. 264, PageID.12071. It blames inclement weather and ground cover in early 2023, which it says precluded it from visually observing lawns, roads, sidewalks, and driveways. *Ibid.* Although the City began conducting visual inspections in the fall of 2022, it acknowledges that none of the inspections it completed prior to March 2023 complied with the visual inspection criteria set out in the parties' January 19, 2023 stipulation and in the Court's February 24, 2023 order. Calero decl., ¶ 6, ECF No. 260-2, PageID.11766; Apr. 2023 Meet and Confer Request, ECF No. 260-8, PageID.11948. The City agreed that it would have to redo at least 2,000 non-compliant visual inspections. Apr. 2023 Meet and Confer Request, ECF No. 260-8, PageID.11948. On May 18, 2023, the City also informed the plaintiffs that it had

decided to complete visual inspections at 11,000 additional addresses for which it had only hard-copy records of possible restoration. Calero decl., ¶ 6, ECF No. 260-2, PageID.11766-67.

The City attached spreadsheets to its April and May weekly status reports listing the homes with complete excavations where "no replacement was needed." *See, e.g.*, May 17, 2023 Status Rep., ECF No. 260-8, PageID.12029. The spreadsheets are not in the record. But plaintiffs' counsel states in a declaration that, based on her analysis of the spreadsheets, the City reported (1) 5,452 addresses where it had completed visual inspections as of May 1, 2023; (2) 21,138 addresses where it had completed or still needed to complete a visual inspection between May 2, 2023 and May 10, 2023; and (3) 26,590 addresses where it had completed or still needed to complete a visual inspection as of May 10, 2023. Calero decl., ¶ 19, ECF No. 260-2, PageID.11773; *see also id.* at ¶¶ 15-18, PageID.11771-73 (describing the spreadsheets and data). The City states in its response brief that, as of June 14, 2023, it has completed 26,520 in-person visual inspections of addresses that did not have a contemporaneous record of restoration, leaving about 500 inspections to complete. Resp., ECF No. 264, PageID.12071. It attached no documentation or affidavits in support of that assertion, but it represented that it would complete all remaining inspections and supply compliant reporting to the plaintiffs by June 26, 2023. *Ibid.*

Noah Attal also analyzed the scope of the City's remaining restoration analysis obligations, using data the City provided to the plaintiffs through June 21, 2023. Attal decl., ¶ 15, ECF No. 266-1, PageID.12731-32. Attal found that the City had completed an excavation or replacement at 704 addresses for which it has not reported any restoration status. *Id.* at ¶ 19, PageID.12734. Attal also compiled an anonymized list of these addresses and attached it as an exhibit to his affidavit. *See* Excavated Addresses Missing from June 2023 Restoration Reporting, ECF No. 266-1, PageID.12748.

Mr. Attal also testified at the evidentiary hearing.  He explained that he is a master's student in public policy and information science at the University of Michigan and worked as a data analyst at the University of Michigan School of Environment and Sustainability and at Safe Water Engineering, a consulting firm based in Detroit.  He stated that he has previous experience analyzing municipal water data in these roles.

Mr. Attal testified that he analyzed whether the June restoration reporting data was comprehensive of all documented service line excavations.  To answer this question, he compiled approximately 40 files containing addresses where the City had conducted an excavation.  He then uploaded this list to ArcGIS, a software program that allowed him to geocode each address and fix data errors, such as duplicate addresses or misspellings.  He used the same process for the City's restoration status data.  Finally, he compared the two lists and concluded that there were 704 addresses where the City had a record of a previous excavation but no record of restoration status.  Thus, the plaintiffs and public were unable to evaluate for those parcels whether restoration was needed.  Mr. Attal admitted that he had not independently determined whether any properties he identified were commercial, vacant, demolished, uninhabitable, or duplexes.

The plaintiffs blame the City's mismanagement of its contractors for its mismanagement of its restoration work.  The City told the plaintiffs that it has no staff working on restoration reporting, but instead relies entirely on its contractor, ROWE, which it hired in April 2022 to oversee service line exploration, replacement, and property restoration.  Calero decl., ¶ 4, ECF No. 260-2, PageID.11765-66; ROWE Contract, ECF No. 260-8, PageID.11957.  However, the City did not inform ROWE of all of its reporting requirements, and ROWE only learned of all of the relevant reporting obligations in March 2023, when the plaintiffs explained to ROWE the

restoration requirements detailed in the Court's February 24, 2023 order.  Mar. 2022 Emails, ECF No. 260-8, PageID.11975; Calero decl., ¶ 4, ECF No. 260-2, PageID.11765-66.

At the hearing, the City presented one witness, Jeff Markstrom, who is the design services manager at ROWE Professional Services Company.  The City contracts with ROWE to oversee service line exploration, replacement, and property restoration.  Mr. Markstrom testified that he oversees ROWE's work and is the liaison between the firm and the City.  He also noted that the City has a contract with the Lakeshore Global Corporation (LGC) to perform service line replacement, restoration, and outreach to residents.  He explained that ROWE staff collaborate with teams in the field to make sure data about each site visit are inputted properly.

Mr. Markstrom testified that restoration status site visits began in the Fall of 2022 and then began again "April-ish," of 2023, at least a month after the March 1, 2023 outreach deadline in the Court's latest order.  Although he was aware of the City's May 1 restoration status deadline, he could not recall when he was informed of it.  He identified two principal justifications for the slow start in the Spring.  First, he explained that city contractors could not be done while winter weather conditions persisted, because snow-covered ground might prevent crews from determining if restoration had been completed.  Second, he testified that ROWE's crews had to wait for the language for the door hanger that was to be used as part of the outreach efforts to be approved.

Mr. Markstrom testified that City officials informed him on May 10 that there were properties his teams had previously visited that needed to be inspected again because the records did not include all the information required by the Court's February 2023 Order.  Initially, these site visits were conducted by two staff members from ROWE, but six to eight two-person teams eventually were participating in the work.  He testified that this staffing increase occurred after

May 1.  Mr. Markstrom estimated that crews could conduct approximately 120 to 140 inspections per day.

Mr. Markstrom also explained that he had reviewed approximately ten of the 704 addresses noted in Mr. Attal's report and identified some with inactive water accounts or that were abandoned homes.  However, he admitted that restoration could be completed at properties with inactive water accounts.

On July 21, 2023, nearly a month after the hearing, the City filed an affidavit from Mr. Markstrom (ECF No. 274-1) stating that he had reviewed the plaintiffs' list of 704 properties and found:

- 102 addresses where visual inspections had already been completed.  Mr. Markstrom noted that addresses in this category were frequently duplexes, had a misspelling, or an improper address type (e.g., DR instead of CT).

- 582 addresses where visual inspections were still required

- 20 addresses that were invalid or were vacant parcels

He stated that the City completed visual inspections of the 582 relevant addresses as of July 7.

### 3.  Reporting

As noted above, the City indicated that it would provide a compliant list of all of the properties where it has completed visual restoration inspections by June 26, 2023.  The spreadsheets the City provided to the plaintiffs apparently did not comply with the Court's February 24, 2023 order.  The City did not provide any spreadsheets to the plaintiffs until May 1, 2023.  Calero decl., ¶ 11, ECF No. 260-2, PageID.11769; Mar. 2022 Emails, ECF No. 260-8, PageID.11975-76.  And the spreadsheets provided thereafter did not comply with the ordered formatting requirements.  According to the plaintiffs, the spreadsheets were missing data for thousands of addresses, did not appear to list any addresses where the City had contemporaneous documentation that restoration is complete, and did not clearly distinguish between addresses

- 13 -

where the City had completed inspections and still needed to complete inspections.  Calero decl., ¶¶ 11-18, ECF No. 260-2, PageID.11769-73; May 2023 Violations Notice, ECF No. 260-7, PageID.11923.  The City does not dispute that allegation.  The plaintiffs also say that the City failed to ensure that ROWE had the technological capability to export restoration data in Excel format until March 2023 and failed to keep ROWE informed of the City's reporting obligations pursuant to the Court's orders.  Mar. 2022 Emails, ECF No. 260-8, PageID.11975; Calero decl., ¶ 4, ECF No. 260-2, PageID.11765-66.  Mr. Markstrom's hearing testimony confirmed that allegation as well.

### B.  Mayor Neely

Flint Mayor Sheldon Neeley is not a party to this lawsuit or to the Settlement Agreement.  The plaintiffs did not name him as a defendant because the City was under the governance of a state emergency manager when they filed their original complaint.  However, the mayor's authority since has been restored, and the mayor once again serves as the "Chief Executive Officer" of the City of Flint.  City Charter, ECF No. 260-7, PageID.11836.  As such, he is responsible for taking "care that the laws shall be enforced," including by making recommendations to the City Council, *ibid.*, reviewing or vetoing every City Council resolution, *id.* at PageID.11834-35, and submitting an annual budget, *id.* at PageID.11837.  He also is responsible for appointing the City Administrator and other executive staff.  *Id.* at PageID.11836.

Mayor Neely also effectively serves as the chief spokesperson for the City of Flint, including for its service line replacement efforts.  He provides updates at public meetings about the status of the City's replacement work and routinely makes comments to the press.  In the fall of 2022, he committed to "continue the work" of pipe replacement "until the work is done," promising that he would "work with anyone who is committed to making that happen" and asking the "remaining homeowners to give our crews the right of entry so we can fix this once and for

- 14 -

all." Nov. 2022 City Press Release, ECF No. 260-7, PageID.11843. He has also admitted that "[d]eadlines were set and deadlines were missed," and taken personal responsibility for that fact. *See* May 2023 Scripps Article, ECF No. 260-7, PageID.11853 ("Some could be attributed to me. . . ."). And he has acknowledged that the City has struggled to pin down what work remains, while nevertheless insisting that the City "will not rush through this process just to say we got it done." *Id.* at PageID.11852.

### C. Proceedings on the Contempt Motion

The plaintiffs notified the City in February, March, April, and May 2023 that it had violated Court's February 24, 2023 enforcement order. *See* Feb. 2023 Violation Notice, ECF No. 260-8, PageID.12016-17; Mar. 2023 Violation Notice, ECF No. 260-7, PageID.11938; Apr. 2023 Meet and Confer Request, ECF No. 260-8, PageID.11946-48; May 2023 Violation Notice, ECF No. 260-7, PageID.11922-23. Counsel met and conferred to discuss the violations on May 12 and 18, 2023, but did not come to an agreement to resolve them. *See* Calero decl., ¶¶ 5-7, ECF No. 260-2, PageID.11766-67. Accordingly, on May 26, 2023, the plaintiffs filed the instant contempt motion. *See* ECF No. 260.

The Court held a hearing on the plaintiffs' motion for contempt on June 30, 2023. At the close of the hearing, the Court ordered both parties to file post-hearing supplemental briefing. On July 27, the Court ordered the plaintiffs to file a reply brief in light of the City's representation that it had complied with its obligations.

On November 1, 2023, the plaintiffs sought leave to submit supplemental evidence. The defendants filed a response in opposition on November 14, 2023. The Court ultimately granted the plaintiffs' request. ECF No. 279.

The documents most recently submitted by the plaintiffs principally concern the City's failure to meet the Court's August 1, 2023 deadline by which it was to complete all service line

excavations and replacements.  *See* ECF No. 258, PageID.11684.  On August 16, 2023, the City notified the plaintiffs of its determination that it had completed all excavations and replacements required by the Settlement Agreement.  ECF No. 277-1, PageID.13096.  However, the plaintiffs responded that the City had failed to provide adequate documentation to support this determination and that the documentation that was provided actually undermined the City's position.  Over the next two months, the parties engaged in detailed correspondence about the scope of the outstanding work and, as of November 1, 2023, it appears that the remaining dispute centers on the status of replacement work at 184 addresses.  ECF No. 277-1, PageID.13085.  Of these, the plaintiffs assert that there are 106 addresses where a resident consented to excavation and there are no records of that work being completed or full scheduling attempts made and 20 addresses where the City's records indicate that a lead or galvanized steel pipe was found but contain no record of replacement.   The remaining 58 are addresses where the City reported an excavation but information on service line composition or replacement status is lacking.  *Id.* at PageID.13103-04.  For its part, the City asserts that the work at the majority of these addresses is complete under the terms of the Settlement Agreement.  However, it appears to concede that scheduling outreach remains to be completed at 60 addresses.  *Id.* at PageID.13085.

## II.  Discussion

### A.  Contempt Finding

The plaintiffs request that the Court impose sanctions to remedy the City's ongoing violations of the Agreement, as modified by the Court's February 24, 2023 enforcement order.  They argue that they have satisfied their burden by demonstrating that the City has failed to comply with clearly ordered outreach, restoration, and reporting requirements.  And they contend that the City cannot show categorically and in detail its inability to comply with the Agreement, because

the City repeatedly took actions at odds with the Agreement, and did so despite the plaintiffs repeatedly informing the City of its outstanding obligations.

The City responds that civil contempt is not warranted because it is not meant to be punitive and should merely coerce future compliance. Such coercion is unnecessary where compliance has been achieved, they insist. First, the defendants contend that there is no remaining dispute that all outreach has been completed to homes on the 2022 Replacement Eligible Homes List as of June 22, 2023. Next, the defendants seek to contextualize the 704 addresses missing restoration reporting, noting that they had completed 26,679 visual inspections as of the date of the hearing. The defendants argue that 582 addresses they concede required inspection represent just over two percent of the total. They maintain that this amount is not indicative of neglect and state that inspections at these addresses are complete as of July 7. Finally, they argue that they have taken all reasonable efforts to comply with the Court's orders. Their argument on this point offers few specifics. Rather, they list the work completed so far and its cost.

One thing is certain: the City did not comply with the latest Court order that detailed the remaining procedures and extended deadlines for compliance. There is another certainty: the "power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." *N.L.R.B. v. Cincinnati Bronze, Inc*., 829 F.2d 585, 590-91 (6th Cir. 1987) (quoting *Gompers v. Buck's Stove & Range Co*., 221 U.S. 418, 450 (1911)); *Shillitani v. United States*, 384 U.S. 364, 370 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."). "Contempt proceedings enforce the message that court orders and judgments are to be complied with in a prompt manner." *Elec. Workers Pension Tr. Fund of Local Union #58, IBEW v. Gary's Elec. Serv. Co*., 340 F.3d 373, 378 (6th Cir. 2003).

"A litigant may be held in contempt if his adversary shows by clear and convincing evidence that he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Cincinnati Bronze*, 829 F.2d at 591 (internal quotation omitted).

"Clear and convincing evidence is a not a light burden and should not be confused with the less stringent, proof by a preponderance of the evidence." *Gary's Electric*, 340 F.3d at 379 (citation omitted). But "[o]nce the movant establishes his prima facie case, the burden shifts to the contemnor who may defend by coming forward with evidence showing that he is presently unable to comply with the court's order." *Ibid.* (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)). "To meet this production burden in this circuit 'a defendant must show categorically and in detail why he or she is unable to comply with the court's order.'" *Ibid.* (quoting *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996)). A "good faith effort" is insufficient. *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir. 1991). Rather, the contemnor must show that it "took all reasonable steps within [its] power to comply." *Ibid.* (quoting *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989)).

Contempt "is . . . reserved for those who 'fully understand[]' the meaning of a court order and yet 'choose[] to ignore its mandate.'" *Gascho v. Glob. Fitness Holdings*, LLC, 875 F.3d 795, 800 (6th Cir. 2017) (quoting *Int'l Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)). As described above, there is ample evidence that the City's conduct fits that reservation. It is undisputed that the City missed the Court-ordered deadlines for completing outreach to service line replacement eligible homes and for assessing the scope of its remaining restoration work. There is clear and convincing evidence that the City violated definite and specific provisions of the Agreement and February 24, 2023 order.

The City effectively suggests that the plaintiffs' motion should be denied as moot because it has completed the ordered outreach and restoration assessments. However, the "mere fact that a party may have taken steps toward achieving compliance is not a defense to a contempt charge." *Sizzler Fam. Steak Houses v. W. Sizzlin Steak House, Inc*., 793 F.2d 1529, 1535 n.5 (11th Cir. 1986).

Despite remaining questions about whether the City has completed all required outreach, *see* ECF No. 277-1, PageID.13085, it now appears that the City has now complied with many of the items raised in the plaintiffs' contempt motion. The City has complied with the Court's orders by completing all required outreach at 313 addresses of concern to the plaintiffs, *see* Stip., ECF No. 269, PageID.12768, and all required visual inspections, *see* Markstrom Decl., ECF No. 274, PageID.13043. Nevertheless, the City may still be found in contempt for its earlier violations. The City is correct that civil contempt is meant to be remedial and not punitive, *see United States v. Work Wear Corp*., 602 F.2d 110, 115 (6th Cir. 1979), but courts regularly find parties in civil contempt, even when they have complied with a court order after the initiation of contempt proceedings. This is possible because there is a distinction between the finding of contempt and the sanctions for the violation, which may be either coercive or compensatory. *See, e.g.*, *Masco Corp. of Indiana v. Delta Imports LLC*, No. 11-14720, 2013 WL 5816525, at *1-2 (E.D. Mich. Oct. 29, 2023) (finding contempt and awarding attorney's fees in enforcing consent judgment even though defendant had purged itself of the contempt); *Benjamin v. Sielaff*, 752 F. Supp 140, 147-48 (S.D.N.Y. 1990) (analyzing contempt and sanctions separately); *Walpole Woodworkers, Inc. v. Atlas Fencing, Inc.*, 218 F. Supp. 2d 247, 254-55 (D. Conn. 2002) (finding defendant in contempt but imposing no sanctions because of compliance). While a coercive remedy may be inappropriate

after compliance has been achieved, a compensatory remedy may be necessary.  *See Masco Corp.*, 2013 WL 5816525, at *2 (awarding compensatory sanctions).

Because the plaintiffs have met their burden of proof, the burden shifts to the City to demonstrate that it is unable to comply with the Court's orders.  *Gary's Electric*, 340 F.3d at 379. The City has not made that showing with regard to its outreach, restoration, or reporting obligations.  It has not even attempted to demonstrate that it "took all reasonable steps within [its] power to comply with" the Court's February 24, 2023 order, *Gary's Electric*, 340 F.3d at 379 (quoting *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989)), let alone that it made any effort to marshal resources, assert authority, or "demand the results needed" to comply, *Glover*, 934 F.2d at 708 (quoting *Aspira of New York, Inc. v. Bd. of Educ. of New York*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976)).  To the contrary, the City acknowledges that it made significant efforts to comply with the order only after the relevant deadlines has passed.  *See* Resp., ECF No. 264, PageID.12070-71; Calero decl., ¶¶ 4-11, ECF No. 260-2, PageID.11765-69; Apr. 2023 Emails, ECF No. 260-8, PageID.11979; May 2023 Emails, ECF No. 260-8, PageID.11952.

The City's two principal justifications for the delay — winter weather and preparations for the doorhanger — are unpersuasive.  First, winter weather cannot explain the City's failure to perform outreach to homes eligible for service line replacement by March 1, 2023.  Although Mr. Markstrom testified about the difficulties conducting compliant visual inspections and restoration work during winter weather, the City provided no evidence that winter weather actually inhibited outreach activities.   And the City conducted at least some outreach in December 2022, suggesting that it was possible to do so in all seasons.  *See* Apr. 2023 Emails, ECF No. 260-8, PageID.11979.

Winter weather may partially explain a delay in conducting site visits.  Certainly, it is challenging to determine whether a property needs restoration if it is covered in snow.  But again,

the City has failed to meet its burden of showing it "took all reasonable steps" to comply. *Gary's Electric*, 340 F.3d at 379. The City provided no evidence about snow cover in Flint during the relevant months. And when site inspections did begin, Mr. Markstrom testified that ROWE did not increase its staffing until May 1, after the Court's deadline. At peak, there were approximately six to eight crews working, who could evaluate 120 to 140 houses a day. Had City officials been ready to proceed at that capacity in early March, the City would have had sufficient time to comply with the Court's May 1 deadline. The City knew how many properties required visual inspections, and it knew how much time it had to complete these inspections, yet it has failed to show why these could not completed by May 1.

Likewise, the delay in approval for doorhanger text does not explain adequately the City's failure to meet its deadlines. The parties agreed to the doorhanger text ahead of schedule. Notice & Stip. ¶¶ 1-4, ECF No. 272, PageID.12910. And doorhangers were not required for the outreach activities. Mr. Markstrom provided no specific explanation about how the doorhanger approval process delayed outreach work. An issue with the printing company might justify a delay, but the City has provided no further evidence and the Court cannot speculate. The defendant must demonstrate "categorically and in detail why he or she is unable to comply with the court's order." *Rolex Watch*, 74 F.3d at 720. This explanation is not sufficiently detailed.

Finally, the City attempts to contextualize its belated compliance, listing its achievements thus far. The City has undoubtedly completed much of what the Settlement Agreement and the Court has required. But that does not excuse its missed deadlines. If the Court's deadlines were unfeasible, the proper path would have been for the City to seek a modification. The City never did that. Instead, deadlines came and went with little note. The defendants did not ultimately complete their required tasks until after the Court's June 2023 hearing. Cases that excuse

noncompliance with court orders on the ground of "substantial compliance" still require the party to have taken "all reasonable steps" to comply. *See, e.g., Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989); *Satyam Computer Servs. Ltd. v. Venture Global Eng'g, LLC*, 323 F. App'x 421, 430 (6th Cir. 2009). "Good faith is not a defense to civil contempt," and "diligence alone does not satisfy" a contemnor's burden of production. *Glover*, 934 F.2d at 708 (quoting *Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 796-97 (1st Cir. 1982)). Here, it is undisputed that the City "repeatedly ignored the court's orders and acted only after contempt proceedings were threatened." *Ibid.* The Sixth Circuit has found that similarly-belated compliance efforts fell "far short of the required diligence" necessary to establish that a party has taken "all reasonable steps to comply" with a court's order. *Ibid.* In *Glover v. Johnson*, the court of appeals cited approvingly a district court's finding of contempt where public officials "allowed deadlines to pass without advance announcements or volunteered explanations, awaiting complaints by the plaintiffs before even treating with the court concerning delinquencies"; bore "with seeming equanimity long periods of nonperformance, inadequate performance, or outright defiance from key constituents"; and "displayed an evident sense of nonurgency bordering on indifference, contrasting vividly with the spurt of activity on the [heels] of plaintiffs' motion for a finding of contempt." *Ibid.* (quoting *Aspira*, 423 F. Supp. at 654). The same findings are evident in the present case, and the City again appears to have made genuine efforts toward compliance only when the plaintiffs spurred it on by filing their sixth motion to enforce the Agreement. *See, e.g., Concerned Pastors for Soc. Action v. Khouri*, 658 F. Supp. 3d 495, 503-04 (E.D. Mich. 2023) (Lawson, J.); 4th Enforcement Order, ECF No. 228, PageID.11030-42.

The City did not take all reasonable steps within its power to comply with the Court's Order. The City has not met its burden of showing an inability to comply with the Court's orders. The City is in contempt of the Court's clear and unambiguous February 24, 2023 order.

### B.  Mayor Neely

The same cannot be said for Mayor Neely. It is true that under "[w]ell settled law," non-party corporate officers may be held in contempt when the corporations they lead fail to comply with federal court orders. *Gascho*, 875 F.3d at 803 (quoting *Gary's Electric*, 340 F.3d at 380). And "because a civil contempt ruling either attempts to coerce compliance or compensate the complainant for losses, it is fully appropriate to impose judicial sanctions on the nonparty corporate officer." *Gary's Electric*, 340 F.3d at 383. Nonetheless, two conditions must be met for a district court to have the authority to hold a non-party officer in contempt. First, the officer must have notice of the Court's order or injunction and its contents. *Gascho*, 875 F.3d at 803 (citing *Gary's Electric*, 340 F.3d at 380). Second, the officer must be "responsible for the corporation's conduct" and have "failed to take appropriate action to ensure performance." *Ibid.* (citing *Gary's Electric*, 340 F.3d at 382); *see also Wilson v. United States*, 221 U.S. 361, 376 (1911) (holding that corporate officers who are "apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty," may be found "no less than the corporation itself . . . guilty of disobedience, and may be punished for contempt.").

As "Chief Executive Officer" of the City of Flint, Mayor Neeley is "subject to the court's order just as the [City] itself was." *Gary's Electric*, 340 F.3d at 382. And the City does not dispute that Mayor Neeley had notice of the Court's February 24, 2023 order and its requirements. However, the plaintiffs have not demonstrated that Mayor Neeley himself failed to take appropriate action to ensure compliance with the extended deadlines. They have not supplied any

- 23 -

evidence that demonstrates that Mayor Neeley himself took any actions that prevented the City from completing its outreach or restoration-assessment obligations, or failed to take any actions within his power to ensure performance.

The parties speculate that Mayor Neeley could have done more to supervise contractors and City staff. But they do not point to anything in the record establishing that Mayor Neeley failed to do either of these things or failed to do them adequately. The plaintiffs' conclusory statements fall far short of the "clear and convincing" evidence required to hold Mayor Neeley in contempt of court. See *Gary's Electric*, 340 F.3d at 382 (applying the clear and convincing evidence standard to a non-party corporate executive); *Consolidation Coal Co. v. Loc. Union No. 1784, United Mine Workers of Am.*, 514 F.2d 763, 766 (6th Cir. 1975) ("[T]he petitioner in a civil contempt proceeding must overcome a heavy burden of proof.").

The plaintiffs have not established a *prima facie* case for holding Mayor Neeley in contempt of court.

## C.  Remedy

In its initial response to the contempt motion, the City contended that sanctions would not be necessary or warranted because it would fully comply with the Court's prior orders by the hearing date on the contempt motion. It didn't. In its July 2023 supplemental filing, the City argued that it has taken all reasonable efforts to comply with the Court's orders. But its argument on this point offers few specifics. Rather, it listed the work completed so far and its cost. The City represented that there were only 19 service line excavations remaining as of July 19 and that it anticipated meeting its August 1 deadline to complete service line replacement. ECF No. 274, PageID.13039. It reasoned that because there would be no future acts left to coerce, the relief the plaintiffs seek is moot.

As noted above the Court has the authority to order sanctions for contempts, even after a party has complied with the Court's order, but the plaintiffs' November 2023 filing indicated that the City still had not complied with all the requirements of the Settlement Agreement. The plaintiffs' sought-after remedies are not moot.

A court may impose coercive or compensatory sanctions as a civil contempt remedy. *Gary's Electric*, 340 F.3d at 379 (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)); *see also Work Wear Corp.*, 602 F.2d at 115 ("Civil contempt is meant to be remedial and to benefit the complainant either by coercing the defendant to comply with the Court's order via a conditional fine or sentence or by compensating the complainant for any injury caused by the defendant's disobedience."). The plaintiffs have asked the Court to impose a $500 fine for each day that the City has failed to comply with the latest order. A contempt fine "is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'" *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994) (quoting *Mine Workers*, 330 U.S. at 303-04). The proposed $500 daily fine is coercive because it is intended to incentivize the City to comply with the order, and it is avoidable by complying with the February 24, 2023 order.

However, considering the City's post-hearing efforts, as belated as they were, a daily fine is no longer appropriate, as the plaintiffs now acknowledge. *See* ECF No. 276, PageID.13049. There also are prudential reasons for declining to impose a daily fine due to the financial condition of the City. "[I]t is necessary in fixing the amount of a coercive fine to consider the defendants' financial resources and consequent burden the fines place on the particular defendants." *United States v. Pro. Air Traffic Controllers Org. (PATCO)*, 525 F. Supp. 820, 822 (E.D. Mich. 1981); *see also Mine Workers*, 330 U.S. at 304 (holding that a "court which has returned a conviction for

contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant").  In light of the City's previous arguments that it lacks sufficient funds to complete the pipeline replacement program, a coercive fine at the present time is not warranted.

The plaintiffs also ask the Court to modify the Settlement Agreement in a way that would allow them to seek attorney's fees if they must seek the Court's assistance in the future to secure compliance.  The plaintiffs acknowledge that they agreed to limit attorney's fees when they entered the Settlement Agreement, which precludes them from seeking fees related to enforcement.  They argue, however, that if they must bring future enforcement actions, the threat of additional attorney fees would deter the City from continuing to violate the Agreement.

The Settlement Agreement required the "State Parties" to pay $895,000 in litigation costs, which included attorneys' fees and expert expenses.  That payment was to "satisfy any claim by Plaintiffs to litigation costs (including attorneys' fees and expert costs) incurred in this Case and incurred in enforcing this Agreement through the Termination Date."  Settlement Agreement, ¶¶ 123-24, ECF No. 147-1, PageID.7422-23.  The "Termination Date" is defined as the later of the date that the Government Parties completed their obligations under the Health Programs section of the Agreement or one year after all the service lines are replaced.  *Id.*, ¶ 2(ee), PageID.7362. The service line replacement deadline under the Agreement was to be January 1, 2020, *id.*, ¶ 20(c), PageID.7370-71.  The City failed to meet that deadline, and it was extended to August 1, 2023, *see* ECF No. 258, PageID.11684.  The City had not met the extended deadline as of November 2023.

Nonetheless, modifying a Settlement Agreement, especially one that has been approved by the Court, is no small task.  The Settlement Agreement entered by the parties in this case operates as a consent decree — that is, a "settlement agreement subject to continued judicial policing." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)).  A consent decree is "a strange hybrid in the law," *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148 (6th Cir. 1992) (quoting *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981)), in that it is "at once 'a voluntary settlement agreement which could be fully effective without judicial intervention' and 'a final judicial order . . . plac[ing] the power and prestige of the court behind the compromise struck by the parties,'" *ibid.* (quoting *Williams*, 720 F.2d at 920).  Consent decrees therefore "may be 'treated as contracts for some purposes but not for others.'"  *Ibid.* (quoting *United States v. ITT Continental Baking*, 420 U.S. 223, 236 n.10 (1975).  It follows that a consent decree also "should be construed to preserve the position for which the parties bargained."  *Vanguards*, 23 F.3d at 1018 (quoting *Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir. 1992)).

A court has the inherent power to enforce "to modify a consent decree if satisfied that the decree 'has been turned through changing circumstances into an instrument of wrong.'"  *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1146 (6th Cir. 1997) (quoting *United States v. Knote*, 29 F.3d 1297, 1302 (8th Cir. 1994)).  This power arises from the "injunctive quality of a consent decree," which "compels the approving court to . . . modify the decree if 'changed circumstances' subvert its intended purpose."  *Vanguards*, 23 F.3d at 1018 (quoting *Williams*, 720 F.2d at 920).  Even though the City's performance of its obligations under the Settlement Agreement has been woefully dilatory, and the delay in replacing the service lines impacts the health and welfare of the community, it cannot be said that the Agreement has been transformed

- 27 -

thereby into "an instrument of wrong," at least not to the extent that would justify a blanket approval for additional attorney's fees for future enforcement efforts.

However, that does not mean that an award of attorney's fees apart from the Agreement is prohibited as a compensatory sanction for the City's contempt.  Although the Court declines to modify the Settlement Agreement to clear the way for future attorney's fee requests, the Court still may fashion some kind of equitable relief for the plaintiffs.  "Where a consent decree is violated, the court should fashion equitable relief that is 'designed to make the party whole for his or her loss.'"  *Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 533 (6th Cir. 2012) (quoting *Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999)).  The cost of bringing the violation of the Court February 24, 2023 order "to the attention of the court is part of the damages suffered by" the plaintiffs and typically would warrant "[a]t a minimum" the recovery of "fees and costs."  *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 959 (9th Cir. 2014).  And it is "well recognized" that "[c]ourts have inherent authority to enforce their judicial orders and decrees in cases of civil contempt by assessing attorneys' fees."  *Liberis v. Craig*, 845 F.2d 326, 1988 WL 37450, at *5 (6th Cir. 1988) (table); *see also Nicole Gas Prod., Ltd.*, 916 F.3d 566, 579 (6th Cir. 2019) (affirming fee award as sanction for contempt finding); *Inst. of Cetacean Rsch.*, 774 F.3d at 958 ("[T]he cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party." (quotation marks omitted)).  Thus, the Court may order "equitable relief that is compensatory in nature" by awarding the plaintiffs attorney's fees now, to compensate the plaintiffs for the cost of bringing the instant action.  *Shy*, 701 F.3d at 533; *see also Inst. of Cetacean Rsch.*, 774 F.3d at 959.  "An award of attorney's fees and expense is among the 'appropriate' equitable remedies for a successful moving party 'in a civil contempt proceeding.'"  *Cernelle v. Graminex, L.L.C.*, 539 F. Supp. 3d 728, 738 (E.D. Mich. 2021), *aff'd,* No. 21-1579,

2022 WL 2759867 (6th Cir. July 14, 2022); *see TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir. 1983) (citing *Chas. Pfizer & Co. v. Davis-Edwards Pharmacal Corp.*, 385 F.2d 533, 538 (2d Cir. 1967)); *see also McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 634 (6th Cir. 2000) ("An award of attorney's fees is appropriate for civil contempt in situations where court orders have been violated.") (citing *Redken Lab., Inc. v. Levin*, 843 F.2d 226 (6th Cir. 1988)).

The plaintiffs have not asked for compensatory attorney's fees in any specific amount. The amount of the award must be "reasonable," generally as measured by the lodestar method. *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 702 (6th Cir. 2016). That method calls for multiplying "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Ibid.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

The Court will permit the plaintiffs to submit their requests for reasonable attorney's fees incurred in seeking the enforcement of the February 24, 2023 order.

### III.  Conclusion

Nearly seven years after entering the Settlement Agreement, it appears that the City still has not completed the service line replacement program. The evidence presented at the hearing demonstrated that the City had outstanding outreach, restoration assessment, and reporting obligations well after the deadlines imposed by the Court's February 24, 2023 Order. The City has not complied with the Court's order, and it has not met its burden of showing an inability to comply.

Accordingly, it is **ORDERED** that the plaintiffs' motion for contempt (ECF No. 260) is **GRANTED IN PART**.

It is further **ORDERED AND ADJUDGED** that the City of Flint is in **CIVIL CONTEMPT** of the Court's February 24, 2023 order.

It is further **ORDERED** that as a remedy for the City's contempt, the plaintiffs may recover their attorney's fees, costs, and expenses (including expert witness expenses) incurred in bringing its motion for contempt and the ensuing proceedings.

It is further **ORDERED** that the plaintiffs may apply for the award of expenses by filing an appropriate motion with proper documentation of fees, costs, and expenses **on or before April 1, 2024**.

It is further **ORDERED** that the motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   March 12, 2024